IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 1:04cr385 |
| ) | |
| ALI AL-TIMIMI ) | |

<u>GOVERNMENT'S RESPONSE TO DISCOVERY MOTION RE: AJMAL KHAN</u>

Defendant Timimi moves for discovery involving Mohammad Ajmal Khan ("Ajmal Khan"). In particular, he seeks evidence to establish that the government failed to produce before his trial in 2005 information in the governments possession that would have enabled him to locate and speak with Ajmal Khan. His motion should be denied, if for no other reason than because he received that very information regarding Ajmal Khan from the government in 2004.

    A.    <u>Timimi Was Provided Discovery About Ajmal Khan's Identity</u>

In essence, Timimi claims that the government did not disclose that the individual known to government witnesses Kwon and Hasan as Abu Khalid was actually identified as Muhammad Ajmal Khan. *See, e.g.,* Defendant Dr. Ali Al-Timimi's Memorandum In Support of Motion to Compel Discovery Related to Abu Khalid ("Defendant's Memorandum") at 11 (the government failed to disclose "the likely identity of Abu Khalid as Muhammad Ajmal Khan"). He cites "the curious failure of the government to actually identify Abu Khalid as a specific, known individual." *Id.* at p. 4. He writes "[d]espite the government's refusal to provide Dr. al-Timimi with any discovery regarding Abu Khalid. . . ." *Id*. at p. 7. To the contrary, the government identified Abu Khalid to Timimi as Ajmal Khan in pre-trial discovery.

First, on or about November 19, 2004, the defense received from the government an FBI Form FD-302 of an interview with Mahmood Hasan, dated June 16, 2004, as documented by a letter from government counsel captioned "Discovery Letter #5."[1]  The first page of that FD-302 states that Hasan was "presented with a photograph of MOHAMMED AJMAL KHAN, DOB: 11/02/1975, POB: Coventry, England."  The FD-302 reports that Hasan knew this person as "Abu Khalid."  Later in that same FD-302, Hasan gave a physical description of Abu Khalid.  Thus, no later than November 2004, the government disclosed to Timimi that it believed the actual name of "Abu Khalid" to be Ajmal Khan, and provided Timimi with Khan's physical description, date of birth, and the city and country of claimed residence.

On or about December 17, 2004 (and as documented by a letter from government counsel captioned "Discovery Letter #7"), Timimi was provided with a statement that Yong Kwon provided to British authorities in March 2004, in connection with the investigation of Ajmal Khan, as well as a statement from the Crown Prosecution Service, dated November 19, 2004, that anything Kwon said "in connection with the prosecution of MOHAMMED AJMAL KHAN (also known as ABU KHALID)" would not be used against him. In his statement, Kwon indicated that he had previously identified a photograph of Abu Khalid; that, in his observation, Abu Khalid was a person of importance within Lashkar-e-Taiba ("LET") who appeared to have traveled a lot for the group in order to act as a recruiter or fundraiser; and that on one occasion,

---

[1] Discovery Letter #5 and the relevant FD-302, Bates ## 3071-3075, are attached as exhibits to this pleading.

2

Kwon asked Chapman to provide him with Abu Khalid's e-mail address of johninformation@yahoo.com.[2]

The discovery provided on or about December 17, 2004, also included the names of Deputy Constable McAulay, who took Kwon's' statement, and Ken MacDonald, QC, who was the Director of Public Prosecutions with the Crown Prosecution Service responsible for the investigation of Ajmal Khan. Thus, in December 2004, Timimi was notified for at least the second time that the individual known to Kwon and Hasan as Abu Khalid was believed by the government actually to be Ajmal Khan. Timimi also was made aware that Ajmal Khan was a high-ranking member of LET whom British authorities were prosecuting.

In light of this information, a failure of recollection is a possible basis for Timimi's baseless claims today. Perhaps the failure of recollection is attributable to the fact that present counsel did not represent Timimi in 2004 when the discovery was provided pre-trial.[3]

B. The Significance of Ajmal Khan to the Prosecution
 of Timimi Was Not His Personal Relationship With Timimi,
 But His Connection To Kwon, Hasan, Chandia, and Masaud Khan

At the same time that Timimi baselessly argues that the government failed to disclose information that would have allowed him to identify Abu Khalid as Ajmal Khan, he also claims that the government tried to link Timimi to Ajmal Khan at trial in order to tar Timimi with

---

[2] Discovery Letter #7 and Kwon Statement, Bates ## 3337-3344, are attached as exhibits to this pleading.

[3] Timimi also asserts that, with more information, he might have been able to interview Ajmal Khan to shed light on his alleged connection to Timimi. Defendant's Memorandum at p. 10. This seems unlikely given that - - as disclosed to Timimi - - Ajmal Khan was a high-ranking LET official who was the subject of a criminal investigation in England. Nonetheless, Timimi was provided in discovery with sufficient information to attempt to contact Ajmal Khan.

3

Masaud Khan's procurement of parts for an unmanned aerial vehicle ("UAV") at Ajmal Khan's behest. Notwithstanding the fact that these arguments are contradictory, this claim, too, is baseless.

Timimi claims that had evidence about Ajmal Khan been provided in discovery, Timimi "would have been able to refute the government's repeated and damaging insinuation at trial that Dr. al-Timimi was associated with an attempt by the militant group Lashkar-e-Taiba (LET) to obtain from the United States technology for unmanned aerial aircraft as well as other materials." Defendant's Memorandum at p. 1. Notwithstanding his inflammatory general allegation, he fails to specify any of these damaging insinuations that he asserts were repeatedly made related to this issue. His failure to do so is likely attributable to the fact that none exist.

Ajmal Khan was never a significant part of the case against Timimi. Nevertheless, it would have made no sense for the government to withhold information that demonstrated that Ajmal Khan was an LET operative; that he had connections to people whom Timimi solicited to commit crimes; that one of those people brought Ajmal Khan to meet Timimi; and that Ajmal Khan traveled to the United States on two occasions to procure material intended to make LET a more lethal terrorist organization. After all, if the government could have tarred Timimi with Masaud Khan's procurement of parts for a UAV at Ajmal Khan's behest, it would have sought to introduce *more* information about Ajmal Khan rather than withhold it from discovery, on the grounds that such information would only be inculpatory anyway.

In fact, the government lacked significant evidence about Ajmal Khan, and about links between Ajmal Khan and Timimi. The significance of Ajmal Khan to the Timimi trial was that

Kwon, Hasan, Masaud Khan, and Chandia all knew Abu Khalid - - and that their knowing Abu Khalid made it more likely that they had, in fact, attended LET camps at Timimi's urging.

In his memorandum, Timimi repeatedly referenced statements made during the pre-trial motions hearing that occurred on April 1, 2005. At that hearing, the Court ruled on Timimi's pre-trial motion to keep out of evidence documents related to Masaud Khan's purchase of a GPS module for an unmanned aerial vehicle. The most important point to consider about the statements at that hearing by the parties and by the Court is that they were made *before* the trial, before any evidence was actually introduced at trial. In fact, the evidence that was discussed at the pre-trial hearing was different from the evidence that was actually introduced at trial. Before the trial, the government projected that it would be able to show that Timimi probably met Abu Khalid; at the trial however, any inference that he did so was only tenuous.

In any event, in arguing why the documents were relevant pre-trial, the government never claimed that Timimi was involved in the purchase of the GPS module for the UAV. In fact, as the defense points out, the government freely acknowledged that the "information linking Mr. Timimi to Abu Khalid is not strong evidence." April 1, 2005 Motions Hearing at p. 18. Yet, the linkage that was of significance to the government was not the one between Timimi and the purchase of the UAV, but the one between Timimi's followers and Abu Khalid - - because the connections between Abu Khalid on the one hand, and Kwon, Hasan, Masaud Khan, and Chandia on the other, tended to prove that Timimi's followers had, in fact, followed his counsel to train with and support LET.

At the motions hearing before trial, we candidly acknowledged that the facts relating to Ajmal Khan's meeting with Timimi were not compelling. April 1, 2005 Motions Hearing at p.

18-19. Thus, it is not surprising that, at trial, the government ultimately presented very little evidence about Ajmal Khan's meeting with Timimi. Similarly, it is not surprising that such a meeting was not even mentioned in our closing arguments.

The only evidence even suggesting a direct link between Timimi and Ajmal Khan was through the testimony of FBI Special Agent Wyman. In pertinent part, SA Wyman testified that Timimi told him that Chandia brought to Timimi's house between February and June 2002 an individual of Pakistani descent who spoke with a British accent. SA Wyman testified that Timimi told him that the purpose of the meeting was to discuss research on which he and Chandia were working. Trial Transcript Vol. 6 at 1650-1651, Apr. 12, 2005. The government had hoped that the jurors would be led to infer that Abu Khalid was the individual that Chandia brought to Timimi's house, but the proof did not come in as expected and, as a result, the inference was not an obvious one to draw. In any event, the significance of that inference was not that Timimi was involved with the purchase of an unmanned aerial vehicle. Instead, the significance of that inference was that Chandia must have met Abu Khalid in Pakistan in the course of Timimi's advice to train with LET.

The defense did not probe this event on cross-examination and the government did not re-visit it on re-direct. Even if the jury was able to conclude that the Pakistani with the British accent was Ajmal Khan, Special Agent Wyman testified that Timimi said the meeting occurred between February and June 2002. The government never sought to dispute that date, so this event could not have been used to tie Timimi to the purchase of the UAV by Masaud Khan in late 2002.

The lack of focus on Ajmal Khan in the government's case was mirrored by the lack of focus on him during the closing arguments. The only reference to him was to link him to Kwon and *Masaud* Khan - - again, to suggest that Kwon and Masaud Khan knew him through their training with LET in Pakistan upon Timimi's inducement:

> Also in late 2002 and early into 2003, Masaud Khan is corresponding with Abu Khalid, johninformation, the individual from LET that he was assisting to purchase an unmanned aerial vehicle at a time when LET was designated as a foreign terrorist organization. Unlike Kwon, Khan was continuing to assist the terrorist organization that Timimi had sent him to.

Trial Transcript Vol. 9 at 2221, Apr. 18, 2005. This reference relates to the e-mail correspondence between Ajmal Khan and Masaud Khan about the purchase of the UAV, and was intended to show that *Masaud Khan* interacted with Ajmal Khan. It simply does not constitute an attempt to argue that there was a relationship between Timimi and Ajmal Khan that somehow related to the purchase of the UAV.

Despite Timimi's repeated claims that the government attempted to draw a connection between him and the UAV purchase, the record reflects that no such attempt was made.[4] The government did not present any evidence to show that such a connection existed, and, in closing, did not argue that such a connection existed, either. To the extent that the evidence related to

---

[4] As an example, Timimi pointed to the government's rebuttal closing argument where it said, "You have all these guys from Dar-al-Arqam who have been involved in going to overseas terrorist camps. If it turns out that the most frequent lecture at Dar-al-Arqam is the ring leader, what does that say for Dar-al-Arqam." According to Timimi, "[a]s the alleged 'ringleader' of the conspiracy, Dr. al-Timimi was associated with this evidence, including highly prejudicial evidence on alleged efforts to secure technology associated with remote controlled aircraft." Defendant's Memorandum at p. 5. Yet the referenced portion of the government's rebuttal argument had nothing to do with Ajmal Khan or any effort to obtain remote controlled aircraft. Instead, it focused on why jury should not believe a defense witness, Yousuf Idris. Trial Transcript Vol. 9 at 2274-2275, Apr. 18, 2005.

Ajmal Khan was significant, it was significant not as a way of linking Timimi to the purchase of the GPS module or the remote controlled airplane, but instead to prove that at least one person that Timimi solicited to go train with LeT, Masaud Khan, had actually done so.

Timimi argues that the "prejudicial impact" of the link to the UAV "was obvious, particularly to a jury sitting just a few miles from the site of the Pentagon attack by commandeered aircraft on September 11, 2001." Defendant's Memorandum at p. 7. Once again, however, that is not what the evidence showed. In fact, the evidence established that Masaud Khan purchased a module that enabled remote control of "an airplane with a 10-12 foot wingspan using Global Positioning ("GPS") coordinates." *Khan*, 309 F.Supp.2d 789, 813. In the Timimi trial, the government never sought to portray the UAV as anything more than what it was – a way of flying an aircraft remotely. Timimi fails to point to any evidence showing that the government attempted to argue that the UAV was meant to crash planes into buildings, because such evidence does not exist.

    C.    There is No Dispute that Ajmal Khan's Visit to Timimi's
           House Pre-Dated Masaud Khan's Purchase of UAV Parts by Months

Timimi also claims that, if the defense had been provided with information documenting when Ajmal Khan traveled to the United States in 2002 and 2003, "[t]hese dates would have established that, if it was Khan that was brought to the al-Timimi home, this sole contact would have occurred long before Masaud Khan's purchase of a GPS control module, which by the government's own admission, took place several months later." Defendant's Memorandum at p. 10. This argument is baseless, because there was no dispute at trial that Ajmal Khan's visit to Timimi's house pre-dated Masaud Khan's purchase of the GPS control module by many

months.[5]  As a result, the provision to Timimi of the dates of Ajmal Khan's travel to the United States in 2002 and 2003 (assuming that the government had that information in the first place) would simply have confirmed what the government's proof established anyway.

The government never sought to tie Ajmal Khan's brief visit with Timimi to the date of the UAV purchase.  The only evidence introduced at trial about the date of Ajmal Khan's visit was Timimi's admission to Special Agent Wyman that the visit occurred between February and June 2002.  Yet, it was obvious from the e-mails in Government Exhibit 2A20a that Masaud Khan's purchase of the GPS module occurred in late 2002.  In short, the record reflects the existence of the very facts that Timimi claims that he needed in 2005 to make the argument that he now claims that he was prevented from making.

      D.      There is No Basis for Timimi to Access Additional Records
              In the Government's Custody Regarding Ajmal Khan

In Timimi's Motion to Compel, at page 1, he seeks an order for disclosure of all surveillance reports, field reports, and recordings relating to Ajmal Khan's relationship with Timimi, Chapman, Pal Singh, Chandia, and information regarding visits to the United States by Ajmal Khan or Pal Singh from 2001 through 2003.  Further, he seeks FISA evidence on Muhammad Ajmal Khan as well as FISA evidence on Masaud Khan in the year 2002.  Defendant's Memorandum at p. 12.  Aside from being utterly speculative, Timimi has offered no authority for such a broad demand for discovery.

---

[5] After all, Timimi himself argues that the government admitted that Masaud Khan's purchase of the GPS control module "took place months later - - "Masaud Khan's purchase of a GPS control module, *which by the government's own admission*, took place several months later." Defendant's Memorandum at p. 10 (emphasis added).

9

As noted above, Timimi was provided with the appropriate discovery about Ajmal Khan. The law properly requires the disclosure of certain information in pre-trial discovery, but it does not entitle any defendant to the disclosure of the extent and nature of the government's investigative tools or tactics simply because he suspects that materials are in the government's possession that might prove interesting to him.

Timimi also argues "new evidence" obtained by the defense shows that the government had relevant surveillance during the critical periods raised at trial. According to Timimi, the new evidence consists of a memorandum from a Seattle FBI office, dated July 7, 2002, that references Timimi and Chapman. Defendant's Memorandum at p. 13. Simply as a matter of logic and common sense, the existence of a memorandum mentioning Timimi and Chapman from an FBI office in Seattle in July 2002 does not establish that (1) the FBI's awareness of Timimi and Chapman was based on some sort of surveillance; (2) there was discoverable evidence about Ajmal Khan from this time particular time frame that was not disclosed; or (3) there was anything discoverable about Timimi or Chapman from that time frame that was not disclosed.

The government provided Timimi with discovery related to Ajmal Khan. This included his full name, his alias of "Abu Khalid," his date of birth, his physical description, his hometown, and the fact that he was the subject of a criminal investigation in England. The government was aware of its discovery obligations at the time of trial, and complied with them. There is no basis

to order the government to provide material beyond that which was turned over to the defense in this case long ago.

        Respectfully submitted,

        Neil H. MacBride
        United States Attorney

        John Gibbs
        Trial Attorney
        Counterterrorism Section
        United States Department of Justice

  By:     /s/
        Gordon D. Kromberg
        Assistant United States Attorney
        Virginia Bar No. 33676
        Assistant United States Attorney
        Attorney for the United States
        2100 Jamieson Avenue
        Alexandria, VA  22314
        (703) 299-3700
        (703) 837.8242 (fax)
        gordon.kromberg@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2013, I electronically filed the foregoing GOVERNMENT'S RESPONSE TO DISCOVERY MOTION RE: AJMAL KHAN with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

>Manu Krishnan
>Bryan Cave LLP
>1155 F Street, N.W., Suite 700
>Washington, D.C. 20004
>manu.krishnan@bryancave.com

>            /s/
>Gordon D. Kromberg
>Assistant United States Attorney
>Virginia Bar No. 33676
>Assistant United States Attorney
>Attorney for the United States
>2100 Jamieson Avenue
>Alexandria, VA  22314
>(703) 299-3700
>(703) 837.8242 (fax)
>gordon.kromberg@usdoj.gov