UNCLASSIFIED, CLEARED FOR PUBLIC RELEASE

Filed with the Classified
Information Security Officer
CISO *[signature]*
Date 8/2/2013

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES | ) | |
| | ) | Case No. cr-04-385 |
| v. | ) | |
| | ) | Hon. Leonie M. Brinkema |
| ALI AL-TIMIMI | ) | |
| | ) | |

## DEFENDANT DR. ALI AL-TIMIMI'S MEMORANDUM
## IN SUPPORT OF MOTION TO COMPEL
## DISCOVERY RELATED TO ABU KHALID

Defendant Dr. Ali al-Timimi respectfully moves this Court, by counsel and pursuant to

Federal Rule of Criminal Procedure 16 and *Brady v. Maryland* and its progeny, to compel the

government to produce previously requested and unlawfully withheld evidence regarding "Abu

Khalid," a.k.a. Muhammad Ajmal Khan.[1][2] The requested evidence, which was publicly

disclosed by the government only a few months after Dr. al-Timimi's 2005 trial before this Court,

and, in all likelihood, was in its possession during Dr. al-Timimi's trial, was clearly material to

the preparation of Dr. al-Timimi's defense. Had the information been disclosed, Dr. al-Timimi

would have been able to refute the government's repeated and damaging insinuation at trial that

Dr. al-Timimi was associated with an attempt by the militant group Lashkar-e-Taiba (LET) to

obtain from the United States technology for unmanned aerial aircraft as well as other materials.

The evidence regarding "Abu Khalid," which was introduced over defense objections, was

---

[1]    In its response to Dr. al-Timimi's recently filed motion to compel discovery , the
government reiterated its  claim that Dr. al-Timimi is not entitled to any further discovery.

[2]    Muhammad Ajmal Khan's name has been spelled several different ways in various court
documents, reports,  and articles. As a result, the spelling of the name also varies here.

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

deemed by the Court to be "critical" to the government's attempts to link Dr. al-Timimi to Lashkar-e-Taiba. *Motions Hr'g Tr.* 16:22-25, 17:1, Apr. 1, 2005.

This motion, like the defense's recently filed motion to compel discovery related to Anwar al-Aulaqi, is based on public information disclosed after Dr. al-Timimi's trial. The newly disclosed evidence suggests a large body of undisclosed material evidence, including evidence derived from government surveillance. This undisclosed evidence raises another area beyond the earlier categories of discovery that the Court previously ordered the government to produce during this remand. Dkt. No. 271. A hearing on this motion and additional motions is currently scheduled for October 4, 2013.[3]

## I.    PROCEDURAL HISTORY

Nearly eight years ago, following his conviction at trial, this Court sentenced Dr. Ali al-Timimi to life in prison. In April 2006, several months after Dr. al-Timimi's sentencing, the Court of Appeals for the Fourth Circuit remanded this case to this Court for additional proceedings after reports surfaced of previously undisclosed surveillance programs covering individuals material to this case. *Exhibit A*. The remand set no period for the Court's review of undisclosed evidence, and included inquiry into (1) whether evidence derived from warrantless surveillance was used against Dr. al-Timimi at trial in violation of the Fourth Amendment; and (2) whether previously undisclosed surveillance contained material evidence that the government had been obligated to produce pursuant to Rule 16 or *Brady v. Maryland* and its progeny. Dkt. No. 183, *CIPA Hr'g Tr.* at 31:9-14, July 21, 2006. Additionally, the remand order did not limit

---

[3]    The defense has attempted to review the entire classified record in the SCIF in order to file classified motions. Unfortunately, despite the assistance of the court security staff, there has been a delay in making these filings available. Lead counsel hopes to have those filings before the Court before the October hearing date, but such filings will depend on when the full record becomes available. The defense is also planning a third unclassified motion on undisclosed surveillance evidence to be filed before the hearing date.

the Court's inherent authority to address any disclosure of prior fraud, false statements, or willful blindness by the government in its dealings with the Court during these proceedings, including the remand period. *Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 585 (7th Cir. 2008) ("No matter who allegedly commits a fraud on the court—a party, an attorney, or a nonparty witness—the court has the inherent power to conduct proceedings to investigate that allegation and, if it is proven, to punish that conduct."); *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993) ("Under [its] inherent power, a court may issue orders, punish for contempt, vacate judgments obtained by fraud, [and] conduct investigations as necessary to exercise the power").

## II.   EVIDENCE RELATED TO "ABU KHALID" WAS IMPROPERLY WITHHELD FROM THE COURT AND THE DEFENSE

Before Dr. al-Timimi's trial, the government improperly withheld requested evidence relating to the identity of a shadowy terrorist figure named "Abu Khalid," an alleged agent for LET. The failure of the government to turn over this information allowed the jury to infer a damaging and non-existent connection between Dr. al-Timimi and an attempt by LET to obtain technology for unmanned aerial aircraft from the United States.

### A.   Pre-trial Discovery Related to "Abu Khalid"

Before trial, the government stated an intention to link Dr. al-Timimi, as the purported leader of the "Virginia Jihad" conspiracy, to a mysterious Lashkar-e-Taiba operative nicknamed Abu Khalid. The government did this in spite of its own admission that its evidence was weak and required "inferences" to be drawn by the jury. *Motions Hr'g Tr.* 18:9-25, 19:1-3, Apr. 1, 2005 ("I say to the Court now that the information linking Mr. Timimi to Abu Khalid is not strong evidence. It is that you have to draw inferences from it.") The government's admitted

weak foundation for the use of Abu Khalid and his conspiracy included the curious failure of the government to actually identify Abu Khalid as a specific, known individual.

In a June 24, 2004 interview by FBI Agents John Wyman and Wade Ammerman,[4] about which Special Agent Wyman testified at trial, the government pressed Dr. al-Timimi about a meeting that took place "sometime between February 2002 and June 2002." In this earlier meeting, Ali Asad Chandia, another alleged member of the so-called "Virginia Jihad" conspiracy, came to Dr. al-Timimi's house with an individual of Pakistani descent who spoke with a British accent. *Trial Tr. Vol. 6* at 1650, Apr. 12, 2005; *see also* June 24, 2004 FBI 302 Interview Report (further identified as File No. 315N-WF-226192-302) at 10, ("FBI 302" or "Exhibit B").

During the same June 2004 interview, Dr. Al-Timimi was presented with a series of ten photographs, and was asked by FBI agents whether he could identify any of the men pictured. FBI 302 at 10. One of those men, in "Picture #6" was Muhammad Ajmal Khan.[5] *Id.* According to the FBI's field report, Dr. al-Timimi could not identify the man from Picture #6. Later in the interview, the agents again turned Dr. al-Timimi's attention to the same picture:

> [Dr. al-]Timimi was [then] asked to refer back to Picture #6 and compare the picture to his recollection of the British Pakistani whom he had just described. Timimi advised that he [sic] person Chandia brought to his house did not have a beard, like the person in Picture #6. [Dr. al-]Timimi said that he was unable to determine whether the person pictured was the same as the individual he met because the person in the photo had a beard.

*Id.* at 11.

Three days before trial, defense counsel objected that it still had virtually no information about the identity of Abu Khalid, much less any basic information about him, such as travel

---

[4]     Also present at this meeting were several government attorneys, including trial prosecutors Robert Gibbs and Gordon Kromberg.

[5]     In the FBI report, the name is spelled "Mohammed Ajmal Khan," but in the context of the narrative clearly appears to be the same person.

documents. *See Motions Hr'g Tr.* 17:11-14, Apr. 1, 2005 ("I should have some [discovery] – Is there Brady?  Is there something on who Abu Khalid is?  Do I have his passport?  Do I have his visa?  Do I have anything?").  In the end, the government never turned over any discovery on the likely or known identity of this individual.

### B.      The Trial Evidence and Testimony Related to "Abu Khalid"

During Dr. al-Timimi's 2005 trial before this Court, government witnesses and prosecutors repeatedly referenced "Abu Khalid," a man whom the government alleged was attempting to obtain technology for LET with the assistance of other members of the alleged "Virginia Jihad" conspiracy.  As the alleged "ringleader" of the conspiracy, Dr. al-Timimi was associated with this evidence, including highly prejudicial evidence on alleged efforts to secure technology associated with remote controlled aircraft.  *See Trial Tr. Vol. 9* at 2274:24 - 2275:2 Apr. 18, 2005. ("You have all these guys from Dar al-Arqam who have been involved in going to overseas terrorist camps.  If it turns out that the most frequent lecturer at Dar al-Arqam is the ring leader, what does that say for Dar al-Arqam?").

At trial, defense counsel objected to the assertion by Special Agent Wade Ammerman that Masoud Khan[6] had been corresponding with Abu Khalid about unmanned aerial surveillance technology via the latter's e-mail account, johninformation@yahoo.uk.co. *See Trial Tr. Vol. 6* at 1442:23-25, 1443:1, Apr. 12, 2005. ("John information isn't here to testify, Your Honor.  We've asked for information from the government on who they think this person is and have received absolutely nothing.").[7]  Indeed, Special Agent Ammerman testified extensively about these e-

---

[6]      Masoud Khan's name has also been spelled "Masaud Khan."

[7]      The government, pre-trial, had fought to keep Abu Khalid as part of the case against Dr. al-Timimi stressing to the court that "[w]e have a witness saying that Mr. Timimi said that Chandia brought by a person matching the description generally of Abu Khalid to visit Timimi." *Motions Hr'g Tr.* at 18:23 – 19:1, Apr. 1, 2005 .

mails, which showed Abu Khalid's alleged intent to acquire a GPS module for remote operated airplanes, as well as paintball equipment. *See Trial Tr. Vol. 5* at : 1378, 1379, 1380, 1382, 1396, and 1397, Apr. 11, 2005.

The government's evidence also included how, in May and June 2002, witness Yong Ki Kwon e-mailed alleged co-conspirators Masoud Khan and Seifullah Chapman to ask for Abu Khalid's email address. *See Trial Tr. Vol. 4* at 1061-1066.

During the trial, lead prosecutor Kromberg explained to the Court how Abu Khalid and others were critical parts of a broader conspiracy that it wanted to associate with Dr. al-Timimi:

> Ali Timimi induced, counseled, and otherwise procured the offense of the conspiracy between Kwon, Hasan, Royer, Aatique, and Khan and, for that matter, Abu Khalid and other folks at Lashkar. There was a conspiracy.  A lot of guys got convicted of a conspiracy.  He induced them to engage in that conspiracy, he counseled them to do it, and he procured them to do it.[8]

*Trial Tr. Vol. 7* at 1814, , Apr. 13, 2005.  Finally, Kromberg told the jury during closing arguments:

> Also in late 2002 and early into 2003, Masaud Khan is corresponding with Abu Khalid, johninformation, the individual from LET that he was assisting to purchase an unmanned aerial vehicle at a time when LET was designated as a foreign terrorist organization.  Unlike Kwon, Khan was continuing to assist the terrorist organization that Timimi had sent him to.

*Trial Tr. Vol. 9* at 2221, Apr. 18, 2005.  Thus, through these statements and testimony of the witnesses, the government painted Dr. al-Timimi with the actions of this unknown individual, even though it could not demonstrate any direct connection between Dr. al-Timimi and Abu Khalid.  During his cross examination of Special Agent Ammerman, Dr. al-Timimi's trial counsel asked:

---

[8]   This statement was made outside of the presence of the Jury.

> Q. Okay. Did you ever find any e-mails from -- you searched all
>    of Ali Timimi's computers, didn't you?
> A. Yes.
> Q. All right. You searched every inch of space you could on every
>    one of his computers, didn't you?
> A. That was conducted by a series of computer reviews, yes.
> Q. Okay. And you never found any e-mails to anyone named
>    johninformation@yahoo.co.uk, right?
> A. E-mails? No, I don't believe so.

*Trial Tr. Vol. 5* at 1396:19-1397:2, Apr. 11, 2005.[9]   The prejudicial impact was obvious,

particularly to a jury sitting just a few miles from the site of the Pentagon attack by

commandeered aircraft on September 11, 2001.[10]

### C.   The Government Later Disclosed the True Identity of "Abu Khalid" as Well as a Host of Potentially Exculpatory Evidence

Despite the government's refusal to provide Dr. al-Timimi with any discovery regarding

Abu Khalid, it is clear that the government, at minimum, strongly suspected that Abu Khalid was

in fact Muhammad Ajmal Khan, the man featured in "Picture #6" during Dr. al-Timimi's June

2004 interview with the FBI, or, alternatively, thought Abu Khalid was a man named Pal Singh.

Just one month before the trial of Dr. al-Timimi, Pal Singh stood trial in the United

Kingdom for his alleged connections to LET.   More importantly, he was charged along with a

second man: Mohammed Ajmal Khan.   Singh was eventually cleared of all charges in allegedly

supplying material and assistance to LET.   Conversely, Khan confessed in the same prosecution

of his connections to LET.   *See Terror Supplier Gets Nine Years,* BBC News, Mar. 17, 2006,

---

[9]    The government also told the Court in a pre-trial hearing that "[T]he defendant met with Abu Khalid when Abu Khalid came to the United States on his mission … in – December 2002, Judge. *Motions Hr'g Tr.* at 13, Mar. 18, 2005.

[10]    Indeed, this association with such aircraft technology and 9-11 was further magnified by the fact that the critical dinner at the heart of the case occurred just days after the attacks and that the attacks were a critical subject of that dinner.   The government clearly knew that the combination of that dinner and the conspiracy to acquire unmanned aircraft technology would have a prejudicial association for jurors.

http://news.bbc.co.uk/2/hi/uk_news/england/coventry_warwickshire/4817432.stm; *Terror Charge Man Cleared,* Birmingham News (UK), Mar. 9, 2006, http://www.birminghampost.co.uk/news/local-news/terror-charge-man-cleared-3985446.  Not only were both men tried in that case, but the government's expert at the al-Timimi trial, Evan Kohlmann, apparently testified at that trial just one month before testifying at Dr. al-Timimi's trial.  *See About Evan Kohlmann - Court Testimonies,* https://flashpoint-intel.com/about_evan_kohlmann1.php (last visited Aug. 2, 2013) ("listing service as expert testimony in Regina v. Mohammed Ajmal Khan and Palvinder Singh (Snaresbrook Crown Court, UK, 2006)")

The information revealed in the trial of Masoud Khan (just eight months before the al-Timimi trial) in Northern Virginia also references evidence on the identity of Abu Khalid.  On February 9, 2004, the government laid out its case in *United States* v. *Masoud Khan, et al.*  In a published opinion, the Court noted that Abu Khalid was the same person as one "Pal Singh," who used the same e-mail account that was referenced during Dr. al-Timimi's trial:

> Chapman [also] testified that Abu Khalid, who used the johninformation e-mail account, is the same person as Pal Singh, who uses the e-mail address of psingh@hotmail.com.  Chapman's testimony that Abu Khalid and Pal Singh are the same person [was] buttressed by technical evidence that the government introduced through Evan Kohlmann ... The johninformation @yahoo.co.uk account was created in the summer of 2001 from an Internet connection at Coventry University in England, by someone using the alias "John Smith" ... Chapman shipped video equipment for a model airplane to Pal Singh in Coventry, England. ... Based on this evidence, and because Kwon encountered [Abu] Khalid in Pakistan and Chapman encountered Singh in the United States, [the Court] dr[e]w the inference that Singh routinely travels between Pakistan, the United Kingdom, and the United States.

*United States v. Masoud Khan, et al.*, 309 F. Supp. 2d 789, 812 (E.D. Va. 2004).  Notably, the identity of Abu Khalid as Pal Singh was also based in significant part on the testimony of Evan Kohlmann.  *See id.*  Thus, before the trial of Dr. al-Timimi, the government had information

linking two individuals to the identified email account, and further argued that it knew the identity of Abu Khalid. However, when pressed by defense counsel before trial, none of this information was shared with the defense.

The true identity of Abu Khalid, "Mohammed Ajmal Khan," was revealed by the government during the indictments of Ali Asad Chandia and Abu Khalid himself, just a few months after the sentencing of Dr. al-Timimi. *See Indictment* at 1, *United States v. Chandia, et. al.*, (No. 1:05-cr-401) ECF No. 1. The government clearly stated in that indictment that Abu Khalid is in fact no one other than Mohammed Ajmal Khan.

In addition to Abu Khalid's true identity, a review of the *Chandia* trial shows a great deal of evidence that had been unsuccessfully sought by Dr. al-Timimi during pre-trial discovery. This evidence includes:

a.   Copy of Mohammad Ajmal Khan's Pakistani passport issued on March 7, 2002 (Government Exhibit No. 104)

b.   Copy of Mohammad Ajmal Khan's U.K. passport issued on November 8, 2002 (Government Exhibit No. 103)

c.   Mohammad Ajmal Khan's I-94 U.S. entry form completed in February 2002 (Government Exhibit No. 37)

d.   Mohammad Ajmal Khan's I-94 U.S. entry form completed in March 2003 (Government Exhibit No. 38)

e.   Mohammad Ajmal Khan's Continental Airline records showing his arrival at Washington Dulles International Airport on February 11, 2002 (Government Exhibit No. 71)

f.   Mohammad Ajmal Khan's Continental Airline records showing his travel from Washington, D.C. to Denver, Colorado on February 21, 2002 (Government Exhibit No. 72)

g.   Mohammad Ajmal Khan's address book found at 11 Ransom Road, Coventry, U.K. (Government Exhibit No. 106A)

*See* Final Admitted Exhibit List, USA v. Chandia et al, No. 1:05-cr-00401-CMH (E.D.Va. 2006), ECF No. 201.

The importance of this evidence is obvious.  This evidence would have shown that Mohammad Ajmal Khan came to the United States on two occasions, February 2002 and March 2003.  *Id.*  During Mohammad Ajmal Khan's February 2002 U.S. visit, he was apparently in the Washington, D.C. area between February 11 – 21, 2002.  These dates would have established that, if it was Khan that was brought to the al-Timimi home, this sole contact would have occurred long before Masaud Khan's purchase of a GPS control module, which by the government's own admission took place several months later.  *See Trial Transcript, Vol. 1* at 20:11-12, *United States v. Khan, et. al.*, No. 03-cr-296, 309 F. Supp. 2d 789 (E.D. Va. 2004) ("*Khan, et. al.*"), ECF No. 485 Instead, the government was allowed to repeatedly reference Abu Khalid as a virtual abstraction without fear of contradiction with evidence related to either Singh or Khan.  *See Motions Hr'g Tr.* at 13-14, Mar. 18, 2005 ("I mean, the question is if somebody's charged with aiding and abetting a crime, whether they have to know about it.  What is the limit of what is relevant in terms of the aiding and abetting ...  [T]here's got to be some logical limit to what the government can do in terms of putting on evidence of things that were done totally unrelated.").

Thus, there was no need for the jury to draw "inferences" about Dr. al-Timimi's association with Abu Khalid, as AUSA Kromberg suggested they had to do.  Rather, there were travel documents, likely surveillance, and other evidence that would have established the foundation for any alleged connection.  The same type of information, in addition to surveillance and other evidence, could have been sought for Pal Singh – the man the government had previously identified as Abu Khalid.  Indeed, Pal Singh was later acquitted of alleged associations with LET.  Both men could have been interviewed by the defense and both men had known associates who could have helped shed light on the alleged connection to Dr. al-Timimi.

By not disclosing the likely identity of Abu Khalid as Muhammad Ajmal Khan and providing crucial discovery regarding his travel documents, the government effectively barred the introduction of evidence on the movements of Khan during this period.

The knowledge of Abu Khalid's true identity would have reinforced the defense counsel's motion to exclude the evidence before trial and, even if the evidence had still been allowed in, would have allowed for rigorous examination of witnesses at trial. In short, it would have reinforced what Dr. al-Timimi told the FBI, that "[n]either Chandia nor the Pakistani made any mention of any connections between this person and LET. This person did not indicate the purpose of his trip to the United States nor did he mention where he was going or with whom he was meeting. ... Following this encounter, al-Timimi never saw the person again and never discussed the man or his activities further with Chandia." FBI 302 at 11. Combined with the government's acknowledgement that there was no evidence of any e-mail contact between Abu Khalid, via the e-mail account johninformation@yahoo.co.uk, and Dr. Al-Timimi (*See Trial Tr. Vol. 5* at 1396:19-1397:2, Apr. 11, 2005), the basis for introducing the Abu Khalid conspiracy would have gone from "not strong" to nonexistent.

Indeed, al-Timimi's account of the meeting is consistent with the testimony from the *Chandia* trial:

> The [*Chandia* trial] transcript ... reveals that Hasan testified as follows: he knew [Mohammed Ajmal] Khan was associated with LET, and he assumed Khan was in the United States on LET business. Hasan did not testify that Khan said in Chandia's presence that Khan was in the United States on LET business Hasan conceded that Khan did not indicate to Hasan his purpose for being in the United States, nor did Hasan speculate on Khan's purpose in Chandia's presence.

(*United States v. Chandia*, No. 08-4529, 2010 WL 3556255, at *15 (4th Cir. Sept. 14, 2010) (emphasis in original) (internal citations omitted).

The defense has clearly not been shown what the government has in relation to Abu Khalid's e-mail address and, more importantly, when that information was acquired. Given the recent disclosures of the extensive warrantless surveillance programs during the time period in question, and the prior interest in both Khan and LET, there is ample reason to demand disclosure of this information.

This includes material FISA evidence on Muhammad Ajmal Khan, Chandia, and Masaud Khan. The connection between Muhammad Ajmal Khan and Chandia offered an opportunity to show a further predisposition of Chandia to go to Pakistan, and possible surveillance evidence showing an absence of discussion or direction involving Dr. al-Timimi, the alleged "ringleader" of the so-called Virginia Jihad group. The Khan disclosure shows an overlap with periods of known surveillance. In *Chandia*, the government revealed that in March 2003, Mohammad Ajmal Khan entered the U.S. (*See* Final Admitted Exhibit List, USA v. Chandia et al, No. 1:05-cr-00401-CMH (E.D.Va. 2006), ECF No. 201, at Exhibit No. 38) and Chandia assisted Mohammad Ajmal Khan in "shipping paintballs to Pakistan for LET use in military training operations" *United States v. Chandia,* 514 F.3d 365, 371 (4th Cir. 2008). This would have put these events after the search of Dr. al-Timimi's house on February 25, 2003 when he was under FISA surveillance and presumably while other targets like Khan or Chandia were under surveillance. For example, the government's disclosures in other cases indicate that Abu Khalid was in contact with Masaud Khan in 2002 – something that was not revealed to the defense. This evidence suggests that Masaud Khan's communications were monitored in 2002, a prospect that not only raises undisclosed evidence but evidence that contradicts Ammerman's testimony implying he discovered the relationship between Abu Khalid and Masaud Khan only after raiding Masaud Khan's house in May 2003. *See Trial Tr. Vol. 6* at 1415:9-12  These are

precisely the types of linkages that the government sought to infer with the Abu Khalid evidence, but with his identification such links could have shown years of surveillance with no reference or association with Dr. al-Timimi.

New evidence obtained by the defense shows that government indeed had relevant surveillance during the critical periods raised at trial. Within the 9/11 Commission records at the National Archives and Records Administration, there is a 37-page Seattle Field Office foreign counterintelligence-terrorism memorandum related to FBI case number 199N-SE-85481.[11]  In the portion of the memorandum dealing with July 7, 2002, Dr. al-Timimi is referenced on pages 13 and 28.  Seifullah Chapman is also apparently referenced.  This date is central to the requested discovery in the case because it was during roughly the same period that Seifullah Chapman said he hosted Pal Singh. *See Memorandum Opinion* at 40, *Khan, et. al.*, ECF No. 472.

That information alone, and likely surveillance and other evidence that could have been acquired from it, was material to the alleged communications with Dr. al-Timimi to help acquire radio controlled airplane components for LET.  At a minimum, the withheld evidence would have allowed Dr. al-Timimi to deal concretely with two individuals – Pal Singh and Ajmal Khan – including seeking information from those individuals and reviewing their roles in the conspiracy that was ultimately associated with Dr. al-Timimi.

## III. FULL DISCLOSURE OF EVIDENCE RELATED TO THE SURVEILLANCE AND ASSOCIATIONS OF ABU KHALID SHOULD BE COMPELLED FROM THE GOVERNMENT

The evidence described above fits well within the scope of pre-trial discovery under *Brady* and other controlling standards in criminal cases.  Under the Fourth Circuit's application of *Brady v. Maryland* and its progeny, Due Process requires that the government disclose

---

[11]    As the chart with this information is currently undergoing review by the Court security officer, the defense respectfully refers the Court to Exhibit "L" in its previous motion to compel.

"evidence favorable to an accused upon request ... where the evidence is material either to guilt or to punishment." *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010). Of particular importance to this remand, the Supreme Court subsequently extended the *Brady* disclosure rule to material impeachment evidence. *Giglio v. United States,* 405 U.S. 150, 154 (1972); *United States v. Fisher*, 711 F.3d 460, 471 (4th Cir. 2013). In this case, Dr. al-Timimi seeks information that would have undercut a prejudicial association that the Court deemed "critical" to the government's case, and thus falls squarely within the scope of *Brady*.

Dr. al-Timimi is clearly entitled to the requested evidence under the much more permissive standard of Rule 16(a)(1)(E)(i), which requires the government to make available any requested items that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i); *Caro*, 597 F.3d at 620-21 (agreeing that Rule 16 is "much broader" than *Brady*, and provides the "minimum amount of pretrial discovery granted in criminal cases"). "[E]vidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Caro*, 597 F.3d at 621 (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)).

Throughout this remand, defense counsel has expressed alarm to this Court that the government's position with respect to its discovery obligations is fatally flawed and based on a fundamental misreading of Rule 16 as well as the scope of this remand. (*See, e.g.* Dkt. 252). Defense counsel has also objected to the fact that any disclosures that have been made have occurred in the absence of a formal order from this Court clearly establishing the materiality standards to be applied. (*Id.*)

In a January 16, 2007 hearing, the Court stressed that full disclosure was necessary under Rule 16:

> [W]ho determines what's relevant?  I mean, again, that's why we have an adversary system. . . .  The rule requires that the appropriate categories of information be turned over to defense counsel.  Then they'll rummage through it.  It may be in their eyes important to some theory of defense that, you know, you might not appreciate, I might not appreciate, but I thought that one of the pretty strong requirements of rule 16 . . .

(Dkt. No. 220, Hr'g Tr. 43:1-9 Jan. 16, 2007).

As discussed above, "materiality" under Rule 16 is far broader than "materiality" under *Brady*.  *Caro,* 597 F.3d at 645 n.15  ("we stress that "materiality" in Rule 16(a)(1)(E)(i) differs from "materiality" under *Brady*).  As with the disclosure of exculpatory material, the government must first establish what evidence was withheld pre-trial, and cannot engage in post-trial rationalizations or use of hindsight to excuse violations of Rule 16.  The evidence must be reviewed under the standard for disclosure that existed pre-trial.  In this case, there is no question that this evidence, if requested pre-trial, would "play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Caro,* 597 F.3d at 621 (quotation omitted).[12]

## IV.   CONCLUSION

In light of the foregoing, the Defendant respectfully requests an order compelling the disclosure of all evidence, including, but not limited to, any surveillance records, field reports, and recordings, relating to Muhammad Ajmal Khan's relationship with Dr. al-Timimi, Seifullah

---

[12]     A latter question may arise as to whether "the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *Caro,* 597 F.3d at 621 (quoting *United States v. Ross*, 511 F.2d 757, 763 (5th Cir. 1975). That appellate standard for a violation of Rule 16 only occurs after the establishment of the body of evidence withheld by the government. *Id.*  Moreover, when that secondary question is raised, it is done so through an adversarial process, and not by an opaque determination of the government.

Chapman, Pal Singh (or Palvinder Singh), and Ali Asad Chandia; and information regarding visits to the United States by Muhammad Ajmal Khan or Pal Singh from 2001-2003.   The Defendant also requests discovery on the use by Muhammad Ajmal Khan of the email address johninformation@yahoo.co.uk in relation to individuals associated with the Virginia Jihad investigation or Dr. al-Timimi.

Dated: August 2, 2013

Respectfully submitted,
Dr. Ali al-Timimi, by Counsel:

_____
Vishant Manu Krishnan (VSB # 82308)

Jonathan Turley (*pro hac vice,* lead counsel)
2000 H St., N.W.
Washington, D.C. 20052
(202) 994-7001 (phone)
(202) 994-9811 (facsimile)

Vishant Manu Krishnan (VSB # 82308)
Bryan Cave LLP
1155 F Street, NW, Suite 700
Washington, D.C. 20004
(202) 508-6000 (phone)
(202) 508-6200 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of August, 2013, the foregoing was given to the court security official in compliance with prior court orders for filing and delivery to both the Court and to opposing counsel.

Vishant Manu Krishnan (VSB # 82308)
*Counsel for Dr. Ali al-Timimi*