UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

Filed with Classified
Information Security Officer

CISO _____

Date _____9/10/13_____

|  |  |
|---|---|
| UNITED STATES | ) |
| | ) |
| v. | ) Case No. 04-cr-385 |
| | ) |
| ALI AL-TIMIMI | ) Hon. Leonie M. Brinkema |
| | ) |

### DEFENDANT DR. ALI AL-TIMIMI'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL DISCOVERY OF EVIDENCE GATHERED PURSUANT TO THE PRESIDENTIAL SURVEILLANCE PROGRAM AND "OTHER INTELLIGENCE ACTIVITIES"

Defendant Dr. Ali al-Timimi respectfully moves this Court, pursuant to Federal Rule of Criminal Procedure 16 and *Brady v. Maryland* and its progeny, to compel the government to produce all material evidence captured pursuant to the President's Surveillance Program ("PSP"), a collection of intelligence activities authorized by President George W. Bush in the weeks following the terrorist attacks of September 11, 2001.

In 2006, the Court of Appeals for the Fourth Circuit remanded this case before this Court because of public reports about the Terrorist Surveillance Program ("TSP"), a sweeping surveillance program conducted at the behest of President Bush beginning in 2001. Subsequent to the last hearing in this remand, the Inspectors General of various intelligence agencies published a report (Unclassified Report on the President's Surveillance Program "PSP Report") which revealed not only a broader warrantless surveillance program than previously disclosed to the public, but also one that raised substantial concerns within the Justice Department over its constitutionality as well as violations of federal discovery orders in national security cases. Offices of Inspectors General of DOD, DOJ, CIA, NSA, and Dir. Nat'l Intelligence, Report No.

2009-0013-AS, *Unclassified Report on the President's Surveillance Program* (2009), *available at* www.justice.gov/oig/special/s0907.pdf (Exhibit A).    The Report also refers to "other intelligence activities," that may not have been treated as part of PSP or other previously named programs. *Id.* at 1. These concerns were raised specifically with reference to cases occurring during the period of the al-Timimi investigation and prosecution and, in addition, a 2012 FOIA request by defense counsel indicates that the government may possess PSP-related documents that discuss Dr. al-Timimi.

Given the history of this remand, and in light of the above information, the defense now asks this Court to establish that the government has not limited its searches for undisclosed evidence to any particular agencies or programs, and, in particular that its efforts have included searching all components of the President's Surveillance Program or other similar programs that may have been operative from 2001 to 2004.[1]  Absent such a confirmation by the government, the defense asks for an order compelling the disclosure of previously withheld evidence pursuant to federal rules and prior orders in this case.

## I.    FACTUAL BACKGROUND

In April 2006, several months after Dr. al-Timimi's conviction before this Court on charges that he induced young men to travel abroad to engage in violent "jihad" against the United States, the Court of Appeals for the Fourth Circuit remanded this case to this Court for additional proceedings after reports surfaced of previously undisclosed surveillance programs

---

[1]     This filing, like the rest of Dr. al-Timimi's recently filed motions, is filed through the court security officers. This motion refers only to the public record in this case and prior open court references to the scope of discovery related to previously undisclosed surveillance. Indeed, the PSP has been the subject of published opinions. *See e.g., Al-Haramain Islamic Foundation, Inc. v. Bush*, 633 F. Supp. 2d 949 (N.D. Ca. 2009) (Docket No. C 07-0109 VRW; part of the consolidated cases under *In re NSA Telcoms. Records Litig.*, Docket No 06-1791 VRW). Additionally, as shown in Exhibit A, the PSP has also been the subject of public hearings and reports.

covering individuals material to the case against Dr. al-Timimi. The remand included, among other purposes, inquiry into whether previously undisclosed surveillance contained material evidence that the government had been obligated to produce pursuant to Rule 16 or *Brady v. Maryland* and its progeny. Dkt. No. 183, CIPA Hr'g Tr. at 31:9-14, July 21, 2006. This Court has made clear on several occasions that the scope of the remand is not limited to intercepts by any one agency or under any particular surveillance program, and that the government must produce all undisclosed evidence in its possession to which Dr. al-Timimi is statutorily and constitutionally entitled:

> I'll say it again for the record that the United States government is still one government, and if one branch of the government, especially when they are aware that there's an ongoing civilian criminal prosecution going, and they would be in possession of information that would be relevant to requests for discovery, then the United States government has an absolute obligation to turn that over to the prosecutors and at least bring it to the Court's attention in a CIPA or other type of sealed proceeding so that there can be a judicial evaluation as to whether or not that information must, in fact, be turned over to the defendant.

*Dkt. No. 272, Hr'g Tr.* at 9:18-10:3, Oct. 23, 2008.

While motions have been pending on both classified and unclassified dockets in the case, the defense has continued to pursue publicly available information on the scope of prior undisclosed surveillance by the government. This included efforts by defense counsel, following the release of the unclassified PSP Report, to obtain documents under the PSP that are related to Dr. al-Timimi.

One such Freedom of Information Act (FOIA) request was answered in 2012. In its FOIA letter, the defense noted the public acknowledgement of the PSP program and asked for summaries and documents that "reference, discuss, mention, or list the name of Dr. Ali Al-Timimi." Letter from P.J. Meitl to DOJ Office of Inspector General at 2 (May 29, 2012)

(Exhibit B). Defense counsel also cooperated with an investigation of the Inspector General's office into undisclosed surveillance programs and alleged false statements in the al-Timimi case.[2]

On June 5, 2012, the Office of the Inspector General wrote to the defense confirming that there were documents responsive to its request, and that those documents had been reviewed. Letter from DOJ Office of Inspector General to P.J. Meitl (June 5, 2012) (Exhibit C).[3] The Inspector General, however, had determined that these documents must remain entirely classified. Thus, while the inquiry under the PSP confirmed relevant documents exist, those documents remain undisclosed to this day.

In a series of motions in the last few weeks, the defense has detailed a wide variety of evidence believed to have been withheld by the government in this case, despite the remand to look into such withheld surveillance evidence. While the defense has been clear that past discovery demands are not limited by agency or program, recent disclosures indicate that the government has distinguished between surveillance under the PSP and other programs disclosed after the al-Timimi trial, and the public acknowledgement of the PSP program came after the last hearing in this case. Once again, such a distinction to limit efforts of discovery in this case would directly contradict representations made to the Court and counsel by the government and ignore express language in discovery demands that refer to the government as a whole and not any insular part of the government. Moreover, the PSP Report indicates that the existence of this broader program was concealed by the Justice Department even after the disclosure of the

___

[2]    The results of this IG investigation were not made publicly available and it is not clear if the al-Timimi case was referenced or given due consideration in the classified review regarding potential discovery violations.

[3]    Mr. Meitl was former local counsel in this case who is now a federal prosecutor with the United States Department of Justice.

4

warrantless surveillance programs that led to the remand in this case. Thus, as the parties

prepare for the October hearing, the defense believes that it is important for the Court to issue an

order on this foundational issue to guarantee that the government is not artificially limiting its

discovery efforts.

## II.   RECENT DISCLOSURES ESTABLISH THAT THE PSP IS BROADER THAN PREVIOUSLY ACKNOWLEDGED AND THAT THE JUSTICE DEPARTMENT FOUND THE PROGRAM RAISED SERIOUS PROBLEMS UNDER FEDERAL DISCOVERY RULES

In the July 2009 PSP Report, the government disclosed the existence of a program that

was far broader than just the Terrorist Surveillance Program, the program that was the subject of

widespread media reports in 2005 which preceded the remand in this case.

The PSP Report states that "the PSP expanded NSA's authority by allowing it to conduct

electronic surveillance within the United States without an order from the [Foreign Intelligence

Surveillance Court] when certain factual and legal standards were met," and explicitly states that

the PSP was broader than the previously disclosed TSP program. Exhibit A at 5. It further notes

that there exist other previously undisclosed intelligence programs that go beyond the disclosed

PSP programs and are referred to in the PSP Report as "other intelligence activities." *Id.* at 6.

According to the PSP Report, the legal basis for the program came in significant part from legal

memoranda by John Yoo, then Deputy Assistant Attorney General at the Justice Department's

Office of Legal Counsel. *Id.* at 10. In his memoranda, Yoo found that the government had

sweeping authority to intercept the communications of U.S. citizens without a warrant under

what he claimed to be a "border crossing" exception. *Id.* at 12. The Yoo analysis apparently

raised "serious concerns" among other Justice Department attorneys for its legal "deficiencies,"

its unsupported conclusions, and sweeping interpretation of surveillance powers. *Id.* at 12, 30.

Indeed, Yoo found that national security simply trumped all individual privacy interests and that

Congress could not limit the authority for such sweeping warrantless surveillance. *Id.* The government acknowledged that the "PSP activities were more aggressive than those available traditionally under FISA." *Id.* at 16. Eventually, high-ranking officials at the Justice Department threatened to resign over the unlawful scope and basis for the program as well as the "over-secrecy" of the PSP. *Id.* at 27.

Significantly, the report details how this potentially unlawfully gathered material was distributed to FBI and U.S. Attorney's offices. *Id.* at 17-19. These concerns extend to the operations described as falling not under the PSP authorization but rather "other intelligence activities," which in 2004 were found to have been approved by the U.S. Attorney General based on false assumptions. *Id.* at 26 n.17.

In mid 2004, critical changes were made to the PSP program to address the unlawful basis for the surveillance. *Id.* at 29. The PSP Report confirms that officials saw the obvious danger of violating federal discovery rules with the collection and sharing of such surveillance material. Specifically, officials admitted that they foresaw that "such information might impact the [FISA] process." *See id.* at 18-19 (also acknowledging that the "DOJ was aware as early as 2002 that information collected under the PSP could have implications for DOJ's litigation responsibilities under Federal Rule of Criminal Procedure Rule 16 and *Brady v. Maryland*, 373 U.S. 83 (1963).").[4] The PSP Report expressly stated the need to "re-examine past cases to see whether potentially discoverable but undisclosed Rule 16 or *Brady* material was collected under the PSP, and take appropriate steps to ensure that it has complied with its discovery obligations in such cases." *Id.* at 19.

---

[4]    Former United States Attorney for the Eastern District of Virginia Chuck Rosenberg is expressly referenced in the PSP Report as part of the internal debate over the illegality of the PSP program. *Id.* at 27 n.18.

Such admissions raise the question of whether unlawfully gathered material was used to target individuals like Dr. al-Timimi – information that would have been the subject of suppression motions. The most immediate question, however, remains the scope of such surveillance related to Dr. al-Timimi.

Recently, the Washington Post and other news sites also published a draft report from the NSA's Office of Inspector General stating that the PSP collected a comprehensive range of communications including telephony content, Internet content, telephony metadata, and Internet metadata.[5] This report describes the treatment of discovery issues in criminal cases and the NSA's coordination with the Justice Department in these matters, and that states that, when there appear to be discovery obligations, "[a]ll responsive reports, to the extent any exist, are made available for review by DoJ." *Id.* at 20. The report further states that, in 2004, an internal review found aspects of the PSP to be unlawful and that presidential authorization was rescinded (as to bulk internet metadata). Once again, any interceptions or surveillance on Dr. al-Timimi would have likely fallen under the original version of the PSP.

The concern that the PSP information had not been shared or violated federal discovery rules was known to various Justice Department officials. This concern was particularly acute with the original version of the PSP (the version that would have applied to any al-Timimi surveillance or intercepts). Thus, in his 2008 confirmation hearing for the position of Assistant Attorney General, J. Patrick Rowan testified that he was read into the TSP while in the DOJ Criminal Division shortly before the program became public in December 2005. He told the

---

[5]    *See* National Security Agency Inspector General Draft Report (June 27, 2013), http://apps.washingtonpost.com/g/page/world/national-security-agency-inspector-general-draft-report/277/; *see also,* NSA Inspector General Report on Email and Internet Data Collection Under Stellar Wind – Full Document (June 27, 2013), http://www.theguardian.com/world/interactive/2013/jun/27/nsa-inspector-general-report-document-data-collection.

Senate that he was focused on "trying to determine how to deal with the issue of our criminal discovery obligations in connection with prosecutions and the potential that there may be intelligence information out there . . . we were trying to determine, how can we ensure that we are maintaining – that we're meeting any obligations we might have." *Exec. Nominations: J. Patrick Rowan of MD, to be an Ass't Atty Gen., Nat'l Sec. Div.; Jeffrey Leigh Sedgwick, Nominee to be Ass't Atty Gen., Office of Justice Program, & William B. Carr, Jr., Nominee to be Member of U.S. Sentencing Comm., S. Comm. on the Judiciary,* 110th Cong. 109-110 (2008) (statement of J. Patrick Rowan) *available at* http://www.gpo.gov/fdsys/pkg/CHRG-110shrg45140/pdf/CHRG-110shrg45140.pdf.

While it is not clear that the aforementioned review included a review of the evidence used in the al-Timimi investigation, it is clear, as detailed in Dr. al-Timimi's recently filed motion to compel discovery of undisclosed FISA surveillance, that intelligence was made available to investigators and prosecutors at the Eastern District of Virginia, who were particularly eager to review intelligence files that became available at 9-11:

> Another important change after 9-11 was that Assistant United States Attorneys ("AUSAs") "can now review 'intell' files" for potential criminal violations and discuss those files with agents. *AUSAs from the Eastern District of Virginia came over to the WFO and reviewed "intell" files in late 2002 or early 2003. They reviewed all information in the files, including the FISA information "all the way back to pre-PATRIOT Act cases."*

*See* Dkt. No. 312 at 9 (emphasis added).

Whether information from the PSP (or "other intelligence activities") information was shared at that time, it is likely that the investigators and prosecutors were given access to PSP-derived material in this case. Given the public acknowledgment of the flawed legal analysis for the PSP program, as well as the concerns for discovery rules, the relevance to this remand is

8

obvious. This concern is magnified by the response of the Office of Inspector General to defense counsel, acknowledging that there exist documents that were responsive to the inquiry regarding Dr. al-Timimi, but declaring such documents to be classified. *See* Exhibit C.

## III.   THE GOVERNMENT SHOULD PRODUCE ALL RELEVANT SURVEILLANCE UNDER THE PSP AND "OTHER INTELLIGENCE ACTIVITIES" IN ACCORDANCE WITH CONTROLLING DISCOVERY STANDARDS.

Under the Fourth Circuit's application of *Brady v. Maryland* and its progeny, Due Process requires that the government disclose "evidence favorable to an accused upon request ... where the evidence is material either to guilt or to punishment." *United States v. Caro*, 597 F.3d. 608, 619 (4th Cir. 2010). The Supreme Court subsequently extended the *Brady* disclosure rule to material impeachment evidence. *Giglio v. United States,* 405 U.S. 150, 154 (1972); *United States v. Fisher*, 711 F.3d. 460, 471 (4th Cir. Apr. 1, 2013). Likewise, Dr. al-Timimi is clearly entitled to the requested evidence under the much more permissive standard of Rule 16(a)(1)(E)(i), which requires the government to make available any requested items that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i); *Caro*, 597 F.3d. at 620-21 (agreeing that Rule 16 is "much broader" than *Brady*, and provides the "minimum amount of pretrial discovery granted in criminal cases"). "[E]vidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Caro*, 597 F.3d. at 621 (quoting *United States v. Lloyd*, 992 F.2d. 348, 351 (D.C. Cir. 1993)).

The defense has consistently stated that it was seeking discovery from the United States government, and has not confined those demands to a particular agency or surveillance program. Federal courts have consistently stated that artificial limits on discovery searches by prosecutors would not be tolerated. *See United States v. Safavian*, 233 F.R.D. 12 (D.D.C. 2005) (determining that under *Brady*, prosecutors have an affirmative duty to cause files to be searched

that are not only maintained by the prosecutor's or investigative agency's office, but also by other branches of government closely aligned with the prosecution); *United States v. Beckford*, 962 F. Supp. 780, 785 (E.D. Va. 1997) ("In the discharge of its obligations under *Brady*, the Government must actively search out the requested material in its files and in the files of related agencies reasonably expected to have possession of such information."); *Banks v. United States*, 920 F. Supp. 688, 692 (E.D. Va. 1996) (stating, in the context of *Brady*, that "[t]he United States Attorney is accountable for the information gathered by the various arms of federal law enforcement in the course of an investigation."); *United States v. Beers*, 189 F.3d. 1297, 1304 (10th Cir. 1999) ("Information possessed by other branches of the federal government, including investigating officers, is typically imputed to the prosecutors of the case."). To the extent that material surveillance information was generated related to Dr. al-Timimi, it should have been turned over regardless of whether it was part of the TSP, PSP, or "other intelligence activities."

This information would potentially touch upon every aspect of the al-Timimi trial. First and foremost, unlawful surveillance used to target Dr. al-Timimi or his alleged associates would have been the basis for a motion to suppress such evidence. While there is evidence of disclosure of PSP evidence to both the FBI and Justice Department personnel in the precise time period in which the "Virginia Jihad" conspiracy was being investigated, there was no acknowledgment of such PSP-generated evidence in the record. Thus, defense counsel was not informed of the possible illegal gathering of such evidence to allow for a proper challenge to be made as to either this evidence or its "fruits" in the al-Timimi investigation.[6] Second, the

---

[6]    The PSP program has been widely criticized as overtly unconstitutional. *See, e.g.,* Tracey Maclin, *The Bush Admin's Terrorist Surveillance Program and the Fourth Amendment's Warrant Requirement: Lessons from Justice Powell and the Keith Case*, 41 U.C. Davis L. Rev. 1259 (2007-2008); Jack Balkin, *The Constitution in the Nat'l Surveillance State*, 93 Minn. L. Rev. 1 (2008); Robert Bloom & William Dunn, *The Constitutional Infirmity of Warrantless NSA*

evidence could have further challenged testimony of key witnesses like Special Agent
Ammerman, who insisted that the investigation of Dr. al-Timimi began in 2003. *See, e.g., Dkt.
No. 152, Trial Tr.* 1337:5-6 (Apr. 11, 2005) (Ammerman affirmatively testifying before this
Court that the investigation of Dr. al-Timimi began in February 2003); *see also* Dkt. No. 220,
Hr'g Tr. 38:9-11 (Jan. 16, 2007) (Court stating that the government "insists that there was no
material investigation of Timimi until 2003").

Third, such evidence would have included intercepted messages that could have shown
the tenor and content of Dr. al-Timimi's associations, including likely conversations with alleged
co-conspirators or figures referenced at trial. Finally, the surveillance evidence is core discovery
under federal rules and clearly at issue in the remand of the Fourth Circuit. There should be no
uncertainty as to the scope of the government review of potential evidence as well as the scope
of surveillance related to Dr. al-Timimi before any final ruling of this Court on the question of a
new trial.

## IV.   CONCLUSION

In light of the foregoing, Defendant Dr. al-Timimi respectfully requests that this Court
order the disclosure of all surveillance or interceptions of Dr. al-Timimi or his alleged co-
conspirators or associates under any government surveillance program, including but not limited
to the President's Surveillance Program or "other intelligence activities." Additionally, given the
government's acknowledgement of concerns over the legality of surveillance during the period
of the al-Timimi investigation, Dr. al-Timimi asks the Court to order the government to confirm

---

*Surveillance: The Abuse of Presidential Power and the Injury to the Fourth Amendment*, 15 Wm.
& Mary Bill Rts. J. 147 (2006-2007); *see also* http://balkin.blogspot.com/FISA.AUMF.Replyto
DOJ.pdf (citing the view of numerous constitutional experts). Courts have denied standing to
many who have sought to challenge it, but standing would not be an issue in this criminal case.
Thus, it was particularly useful for the government to conceal any use of PSP in criminal cases
where it could have a harder time preventing judicial review of the basis for such warrantless
surveillance of U.S. citizens.

any review or use (and the specific source(s) or program(s)) of material from warrantless surveillance programs as part of his investigation or prosecution.

Dated: September 10, 2013

Respectfully submitted,
Dr. Ali al-Timimi, by Counsel:

Vishant Manu Krishnan (VSB # 82308)

/jaj
with
permission

Jonathan Turley (*pro hac vice,* lead counsel)
2000 H St., N.W.
Washington, D.C. 20052
(202) 994-7001 (phone)
(202) 994-9811 (facsimile)

Vishant Manu Krishnan (VSB # 82308)
Bryan Cave LLP
1155 F Street, NW, Suite 700
Washington, D.C. 20004
(202) 508-6000 (phone)
(202) 508-6200 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of September, 2013, the foregoing was given to the court security official in compliance with prior court orders for filing and delivery to both the Court and to opposing counsel.

Vishant Manu Krishnan (VSB # 82308) *jaj with permission*
*Counsel for Dr. Ali al-Timimi*

13