UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

Unclassified Information Security Officer
CISO [signature]
Date 9/20/2013

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES ) | |
| ) | Case No. 04-cr-385 |
| v. ) | |
| ) | Hon. Leonie M. Brinkema |
| ALI AL-TIMIMI ) | |

**DEFENDANT DR. ALI AL-TIMIMI'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL DISCOVERY RELATED TO KHWAJA MAHMOOD HASAN**

Defendant Dr. Ali al-Timimi respectfully moves this Court, by counsel and pursuant to Federal Rule of Criminal Procedure 16 and *Brady v. Maryland* and its progeny, to compel the government to produce previously requested and unlawfully withheld evidence related to alleged co-conspirator Khwaja Mahmood Hasan. Telephone communications between Dr. al-Timimi and Hasan have long been a focus of this case and this remand, in large part because of an exculpatory phone call placed by Dr. al-Timimi to Hasan on or about September 19, 2001, in which he left a voicemail discouraging Hasan and alleged co-conspirator Yong Ki Kwon from traveling to Pakistan.

Before his 2005 trial before this Court, Dr. al-Timimi sought from the government phone records related to Mahmood Hasan that would have definitively established that Hasan and Kwon received phone calls from al-Timimi; the government, however, provided Dr. al-Timimi with a temporally incomplete set of records, and insisted that it possessed no phone records for Hasan for the period of September 2001, the month in which many of the events central to the case against Dr. al-Timimi took place, and the time period in which the exculpatory phone call

was placed. In the absence of this critical discovery, Dr. al-Timimi was forced to elicit through witness testimony evidence about the phone call and other related communications.

Hasan's central role in the allegations against Dr. al-Timimi has never been disputed by the government, and this Court during this remand has already ordered the government to search for undisclosed evidence related to Hasan. *Dkt. No. 271*. Since the last hearings in this case, defense counsel has uncovered evidence that shows that the government possessed a far greater body of evidence related to Hasan's phone records than had been represented to Dr. al-Timimi at the time of trial: namely, that the government prior to Dr. al-Timimi's trial had acquired Hasan's phone records through a grand jury subpoena and possibly through a National Security Letter (NSL).[1] Given the central importance of September 2001 in the case against Dr. al-Timimi, it is highly unlikely that the subpoena did not reach relevant phone records during this time period.

Because this evidence has a direct bearing on a communication that Dr. al-Timimi has insisted for nearly a decade would prove his innocence, Dr. al-Timimi now asks the Court to compel the government to produce all undisclosed phone records and intercepted calls of Hasan related to Dr. al-Timimi and the Virginia Jihad investigation.

I.      FACTUAL BACKGROUND

The crux of the government's case against Dr. al-Timimi was that he counseled young men to travel abroad and engage in violent jihad against the United States. From the start of the investigation, Dr. al-Timimi cooperated with the FBI and insisted that he actively discouraged these men to go abroad to engage in violent jihad or military training. *See* Exhibit A (Aug. 21,

---

[1] Current defense counsel has tried unsuccessfully to obtain a complete index of discovery given to Dr. al-Timimi's trial counsel for both classified and unclassified review. Requests were made to both government counsel and the court security officers. This filing is based on a review of the files of former defense counsel and the transcripts in this case.

2003 FBI 302 Interview Report at 5 ("FBI 302"). As a result, the government knew that call records and interceptions would be key to both its case and to the defense at trial.

Hasan featured prominently in the allegations against Dr. al-Timimi, particularly its core allegation that Dr. al-Timimi encouraged Hasan to go to Pakistan to be trained by LET. *See, e.g., Dkt. No. 148, Trial Tr.*, Vol. 1 at 12 (Apr. 4, 2005). Even before the indictment was handed down in the case, the government was aware that Dr. al-Timimi claimed that he called Hasan and Kwon to discourage their trip to Pakistan and contacted others to call the men for the same purpose. *See* FBI 302 at 9. The defense repeatedly asked for these records before trial and after the remand in this case.

## II. PRE-TRIAL REQUESTS FOR DISCOVERY RELATED TO KHWAJA MAHMOOD HASAN

Before trial, the defense repeatedly asked the government for telephone records for Hasan, in order to confirm the fact that Dr. al-Timimi had called Hasan and Kwon shortly before their departure for Pakistan and discouraged them from travelling. Furthermore, Dr. al-Timimi maintained that he had received calls from other individuals, who had themselves been in contact with Kwon and Hasan. *See, e.g., Dkt. No. 154, Trial Tr.*, Vol. 7 at 1857-1858 (Apr. 13, 2005). These calls offered the most direct refutation of the government's claim that Dr. al-Timimi encouraged these men to go to the Lashkar-e-Taiba ("LET") camp for training.

Throughout these pre-trial demands, the government insisted that it did not have a complete record of calls for Hasan, and provided to the defense only a partial disclosure that notably did not include the critical week during which the call from Dr. al-Timimi to Hasan was placed as well as other key calls. For example, in a March 25, 2004 e-mail to the government, defense counsel asked for relevant phone records from September 11-20, 2001, including requests linked to the completion of trial exhibits for the jury. *See* Exhibit B (E-mail from Ed

3

MacMahon, trial counsel for Dr. al-Timimi, to Gordon Kromberg, Ass't United States Attorney, Mar. 25, 2004 09:47 a.m. EST, noting "I need Hasan's phone records so I can fill in all the blanks for the summary exhibit i [sic] am preparing"). This position was maintained during and after the trial. For example, in a July 11, 2005 email, Mr. Kromberg again stated that no such records existed. *See* Exhibit C (E-mail from Gordon Kromberg, Ass't United States Attorney, to Alan Yamamoto, assistant trial counsel for Dr. al-Timimi) ("We do not have any of Hasan's phone records for September 2001.").

In the absence of the critical phone records, the defense continued to pursue the missing telephone records in the questioning of witnesses at trial. Notably, Hasan himself testified at trial that he recalled the government showing him his telephone records during the investigation. *Dkt. No. 155, Trial Tr.*, Vol. 8 at 2125:20-21 (Apr. 14, 2005) ("I just remember showing them – they [sic] showing them one time. I don't know which records exactly."). This contradicted the testimony of FBI Special Agent Ammerman, who could recall specifically looking for such calls only in the two to three weeks before the trial. *Dkt. No. 153, Trial Tr.*, Vol. 6 at 1435:16-19 (Apr. 12, 2005) ("We intermittently looked at telephone records throughout the course of the case. The specific issue of telephone calls between Mr. Kwon and Mr. Timimi became an issue probably about two, maybe three weeks ago in terms of preparing a chart of this nature.").

While the defense sought to show that these calls were made through the examination of witnesses, it could not show the complete telephone records of calls – let alone the content of those calls, as part of the trial. Such records would have been used to corroborate Dr. al-Timimi's claim that Hasan had telephoned witness Yousuf Idris, and his father Jafar Idris, to set up a meeting at Borders Bookstore, where the elder Idris attempted to discourage Hasan and Kwon from departing for Pakistan. The records would also have supported Dr. al-Timimi's

claim at trial that and that Yousuf Idris and Mohammad al-Qahtani also separately telephoned Hasan to dissuade him from traveling. *See, e.g., Dkt. No. 154, Trial Tr.*, Vol. 7 at 1868:23-1869:21; 1870:21-1871:5 (Apr. 13, 2005).

In the absence of the phone records, the defense was also stymied in its effort to impeach Hasan and Kwon about receiving calls from al-Timimi and others, as well as testimony of Special Agents Wyman and Ammerman with respect to their handling of the phone records. While the jury was told that a call was made, the defense was left without direct evidence to show the jury that day and time of that call as well as direct evidence of these other calls.

### III. POST-TRIAL EVIDENCE SUGGESTS THAT THE GOVERNMENT WITHHELD KEY EVIDENCE RELATED TO KHWAJA HASAN

As outlined in its recently filed motion to compel discovery (*Dkt No. 319*) the defense has previously sought undisclosed FISA and other evidence that would likely cover relevant communications by or with Hasan. The defense also wishes to present the Court with additional evidence that suggests that the government may have a far greater body of evidence related to Hasan than it has previously represented.

#### A. Government Exhibit 9D8 from United States v. Benkahla

In the related trial of Sabri Benkahla[2], which took place after the trial of Dr. al-Timimi, the government introduced Government Exhibit 9D8, which specifically references a grand jury subpoena for the Hasan telephone records. This document includes the following references:

Summary of Relevant Grand Jury Subpoenas Issued By Grand Juries 04-1 and 04-2

| 234 | 19 Apr 04 | Telephone Company | Telephone records relating to individuals in contact with Hasan | 04-1 |

---

[2] *United States v. Sabri Benkahla*, E.D. Va. Case No. 1:06-cr-00009 (appeal to 4th Cir. dismissed), hereinafter referenced generally as the "Benkahla Trial" or "Benkahla Docket."

| 575 | 23 Sep 04 | Telephone Company | Telephone records relating to individuals in contact with Timimi, Kwon, & Hasan | 04-1 |

*Unpublished Summary of Relevant Grand Jury Subpoenas Issued By Grand Juries 04-1 and 04-2*, on file with Benkahla Trial parties ("Benkahla Ex. 9D8").

The subpoenas show an active and early effort by Special Agents to review such records, and, notably, they are dated months before Mr. Kromberg, who was also lead counsel in the Benkahla trial, denied that any September 2001 records existed for Hasan. Since September 2001 was the critical period for the alleged conspiracy, it is implausible that the subpoenas did not include records for the month of September 2001.

The existence of the subpoenas also appears to contradict the testimony of government witnesses like Special Agent Wyman who was asked at Dr. al-Timimi's trial whether there was an effort to review the records of people who spoke with Hasan and Kwon. Special Agent Wyman answered that question in the negative. *See* Dkt. No. 154, Trial Tr., Vol. 7 at 1730 (Apr. 13, 2005).

The same government document, however, lists the following subpoena:

Summary of Relevant Grand Jury Subpoenas Issued By Grand Juries 04-1 and 04-2

| 575 | 23 Sep 04 | Telephone Company | Telephone records relating to individuals in contact with Timimi, Kwon, & Hasan | 04-1 |

Benkahla Ex. 9D8.

The date of that request is notable since it is the day before al-Timimi's indictment. While the defense has not reviewed these records, it is reasonable to believe the subpoena would have included the call record sought by the defense before trial.

The Government's Benkahla Exhibit 9D8 also raises questions about the testimony of Special Agent Ammerman at Dr. al-Timimi's trial:

> Q. When was the first time someone asked you to take Ali Al-Timimi's phone records and look for telephone calls to Yong Kwon?
>
> A. We intermittently looked at telephone records throughout the course of the case. The specific issue of telephone calls between Mr. Kwon and Mr. Timimi became an issue probably about two, maybe three weeks ago in terms of preparing a chart of this nature.
>
> Q. Were you able to determine who Al-Timimi had called on his cell phone records or attempted to call before the 10:35 p.m. call that's listed on this exhibit?
>
> A. Well, I'm speaking strictly from memory at this point, but I believe somewhere around this time frame, there was a call to Masaud -- Mahmood Hasan.

*Dkt. No. 153, Trial Tr.*, Vol. 6 at 1435:13-25 (Apr. 12, 2005).

The testimony of Special Agent Sarah Linden, who testified at the Benkahla trial, further contradicts Special Agent Ammerman's testimony. Special Agent Linden worked in the same office with Special Agent Ammerman. When asked about her "squad" investigating these allegations, Linden testified that "[t]hroughout 2004 we were requesting that the grand jury issue subpoenas for documentary evidence and for witnesses to testify before them." *Benkahla Dkt. No. 125, Trial Tr.*, Vol. 2 at 410-11 (Jan. 30, 2007). As the defense has shown in other motions filed recently,[3] evidence not disclosed in the al-Timimi trial appears to have been freely referenced in other trials.[4]

---

[3] Not including the prior pending motions after the remand on the classified and unclassified dockets, the defense recently filed the following unclassified motions at Dkt. Nos. 315-318. Additional motions have been filed in the SCIF due to the classification of information by the government.

[4] The lead prosecutor is in a unique position to confirm whether evidence withheld in the al-Timimi trial was disclosed or discussed in the Benkahla trial. Not only was Mr. Kromberg lead prosecutor the same in both the al-Timimi and Benkahla trials, but Mr. Kromberg handled the grand jury investigation in 2004.

B. **National Security Letters**

In addition to the documents from *United States v. Benkahla*, public disclosures concerning the use of National Security Letters in the so-called "Virginia Jihad" prosecution make it highly unlikely the government does not possess relevant phone records related to Hasan.

After the remand of this case, Congressional hearings were held on the use of National Security Letters (NSLs) in prior terrorism investigations.[5] The unclassified testimony in these hearings makes repeated references to the Virginia Jihad investigations. In the 2008 hearings, officials testified about the use of both NSLs and "link analysis" relating to the telephone calls of suspects:

> National security letters generally permit us to obtain the same sort of documents from third party businesses that prosecutors and agents obtain in a criminal investigation with grand jury subpoenas. National security letters have been instrumental in breaking up cells like the Lackawanna Six and the Northern Virginia Jihad, through the use of NSLs, the FBI has traced sources of terrorist funding, established telephone linkages that resulted in further investigations and arrests, and arrests of suspicious associates with deadly weapons and explosives. NSLs also allow the FBI to link terrorists together financially and pinpoint cells and operatives by following the money.[6]

The defense has searched the available records and can find no evidence of NSLs revealed to trial counsel. Indeed, the prior transcript references indicate that no such NSLs were revealed to the defense by government agents who presumably knew of their existence.

Further confirmation of the undisclosed NSLs can be found in April 2011 testimony on

---

[5] Hearing on: The Inspector General's Independent Report on the FBI's Use of National Security Letters: Hearing Before H. Comm. on the Judiciary, 110th Cong. (Mar. 20, 2007) (statement of FBI General Counsel Valerie E. Caproni); Hearing on: H.R. 3189, the "National Security Letters Reform Act of 2007" before the Subcomm. on the Constitution, Civil Rights, and Civil Liberties (Apr. 15, 2008).

[6] Tr. of Hearing on H.R. 3189, the "National Security Letters Reform Act of 2007," Serial No. 110-96 at (Apr. 15, 2008), available at http://judiciary.house.gov/hearings/printers/110th/41795.PDF.

the PATRIOT Act Sunset extension.[7] Referencing earlier testimony by Valerie Caproni, General Counsel of the FBI, in 2007, the government again confirmed that NSLs were critical in the investigation of the "Virginia Jihad."

Once again, not only does this information not appear to have been revealed to trial counsel, but the government never moved to amend disclosure in the post-remand proceedings while it was confirming this information in other forums. In conjunction with the earlier motion seeking undisclosed FISA information (which would include Hasan evidence), this undisclosed evidence is obviously material and, if withheld, would constitute a serious breach of both federal law and prior court orders.

IV. **THE GOVERNMENT SHOULD DISCLOSE ALL PREVIOUSLY WITHHELD EVIDENCE RELATED TO HASAN IN CONJUNCTION WITH THE INVESTIGATION OF DR. AL-TIMIMI AND THE VIRGINIA JIHAD.**

The evidence described above fits well within the scope of pre-trial discovery under *Brady* and other controlling standards in criminal cases. Under the Fourth Circuit's application of *Brady v. Maryland* and its progeny, Due Process requires that the government disclose "evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment." *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010). Of particular importance to this remand, the Supreme Court subsequently extended the *Brady* disclosure rule to material impeachment evidence. *Giglio v. United States*, 405 U.S. 150, 154 (1972); *United States v. Fisher*, 711 F.3d 460, 471 (4th Cir. 2013).

In this case, the September 2001 phone call between Dr. al-Timimi and Hasan has long been represented by the defense to the Court and to the government as exculpatory, and there is

---

[7] See Sen. Rep. No. 112-13 (Apr. 5, 2011), available at http://www.gpo.gov/fdsys/pkg/CRPT-112srpt13/pdf/CRPT-112srpt13.pdf.

no question that any information about the call in the government's possession would fall squarely within the purview of federal discovery.

Dr. al-Timimi is clearly entitled to the requested evidence under the much more permissive standard of Rule 16(a)(1)(E)(i), which requires the government to make available any requested items that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i); *Caro*, 597 F.3d at 620-21 (agreeing that Rule 16 is "much broader" than *Brady*, and provides the "minimum amount of pretrial discovery granted in criminal cases"). "[E]vidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Caro*, 597 F.3d at 621 (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)).

This information was critical in not only allowing a review of the full record by the defense in preparing for trial, but also to completing trial exhibits and examining key witnesses. It was also evidence that was directly covered not only by pre-trial orders but post-remand orders in this case. In a January 16, 2007 hearing, the Court stressed that full disclosure was necessary under Rule 16:

> [W]ho determines what's relevant? I mean, again, that's why we have an adversary system . . . The rule requires that the appropriate categories of information be turned over to defense counsel. Then they'll rummage through it. It may be in their eyes important to some theory of defense that, you know, you might not appreciate, I might not appreciate, but I thought that one of the pretty strong requirements of rule 16 . . .

Dkt. No. 220, Hr'g Tr. 43:1-9 (Jan. 16, 2007).

As discussed above, "materiality" under Rule 16 is far broader than "materiality" under *Brady*. *Caro*, 597 F.3d at 621 n.15 ("we stress that 'materiality' in Rule 16(a)(1)(E)(i) differs from 'materiality' under *Brady*"). As with the disclosure of exculpatory material, the

government must first establish what evidence was withheld pre-trial, and cannot engage in post-trial rationalizations or use of hindsight to excuse violations of Rule 16. The evidence must be reviewed under the standard for disclosure that existed pre-trial. In this case, there is no question that this evidence, when requested pre-trial, would have "play[ed] an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Caro*, 597 F.3d at 621 (citation and internal quotation omitted).[8]

## V. CONCLUSION

In light of the foregoing, the Defendant respectfully requests an order to compel the government to produce all undisclosed phone records and intercepted calls of Khwaja Mahmood Hasan related to Dr. al-Timimi and the Virginia Jihad investigation.

Dated: September 20, 2013

Respectfully submitted,
Dr. Ali al-Timimi, by Counsel:

_____
Vishant Manu Krishnan (VSB # 82308)

Jonathan Turley (*pro hac vice*, lead counsel)
2000 H St., N.W.
Washington, D.C. 20052
(202) 994-7001 (phone)
(202) 994-9811 (facsimile)

Vishant Manu Krishnan (VSB # 82308)
Bryan Cave LLP
1155 F Street, NW, Suite 700

---

[8] A latter question may arise as to whether "the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *Caro*, 597 F.3d at 621 (quoting *United States v. Ross*, 511 F.2d 757, 763 (5th Cir. 1975). That appellate standard for a violation of Rule 16 only occurs after the establishment of the body of evidence withheld by the government. *Id.* Moreover, when that secondary question is raised, it is done so through an adversarial process, and not by an opaque determination of the government.

Washington, D.C. 20004
(202) 508-6000 (phone)
(202) 508-6200 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of September, 2013, the foregoing was given to the court security official in compliance with prior court orders for filing and delivery to both the Court and to the below opposing counsel:

Mr. Gordon Kromberg, Esq.
Assistant United States Attorney
2100 Jamieson Ave.
Alexandria, Virginia 22314-5794
(703) 299-3800 phone
gordon.kromberg@usdoj.gov

_____
Vishant Manu Krishnan (VSB # 82308)
*Counsel for Dr. Ali al-Timimi*

13