REDACTED / CLEARED FOR PUBLIC RELEASE

Filed with Classified
Information Security Officer

CISO _____

Date ___7/17/2023___

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

## UNDER SEAL

| | |
|---|---|
| **UNITED STATES** ) | |
| ) | **Case No. cr-04-385** |
| **v.** ) | |
| ) | **Hon. Leonie M. Brinkema** |
| **ALI AL-TIMIMI** ) | |

## DEFENDANT DR. ALI AL-TIMIMI'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL DISCOVERY RELATED TO ANWAR AL-AULAQI

Defendant Dr. Ali al-Timimi respectfully moves this Court, by counsel and pursuant to Federal Rule of Criminal Procedure 16 and *Brady v. Maryland* and its progeny, to compel the government to produce previously requested and unlawfully withheld evidence regarding Dr. al-Timimi and Anwar al-Aulaqi.[1] The requested evidence was clearly material to the preparation of Dr. al-Timimi's defense for his 2005 trial before this Court, would have allowed defense counsel to impeach the testimony of at least two key government witnesses, and may contain exculpatory information regarding Dr. al-Timimi's willingness to recruit young men for violent jihad, an alleged willingness that lay at the heart of the government's case. Recent public disclosures regarding this evidence, moreover, raise fundamental questions concerning the government's representations to both the Court and defense counsel during this matter.

---

[1] Defense counsel informed the government about the instant filing to confirm that the government's previous position on this discovery had not changed and to determine the availability of counsel for a future hearing. Government counsel confirmed that he is available August 16th for such a hearing, though the Court may wish to include planned future motions in such a hearing.

REDACTED / CLEARED FOR PUBLIC RELEASE

There are motions related to discovery currently pending in both classified and unclassified dockets in this matter.[2]   This Motion (and planned subsequent motions)[3] supplements these earlier motions and seeks to compel disclosure based on new information obtained since the prior filings.  As of last Wednesday, July 10, lead counsel is now permitted to return to the SCIF for any classified arguments and has arranged for a sealed filing to be given to the court security officer today.[4]

## I.   **INTRODUCTION**

Anwar al-Aulaqi was an American-born Muslim cleric who was killed in a drone strike by order of President Barack Obama in 2011.[5]  Beginning several months prior to his 2005 trial

---

[2]   Since February 2009, this Court has had several motions pending before it, including but not limited to a Motion for Modification of Court's March 14, 2008 Order and a February 2009 Motion to Compel Discovery. (Dkt Nos. 251, 287).   The government has also classified one other pending motion from October 2008, and counsel is still unclear as to whether it can use titles of that or other pending motions in a public filing due to an earlier claim of classification. Dr. al-Timimi, in requesting the below relief, incorporates by reference all of these motions.

[3]   Both classified and unclassified motions to be filed will address additional withheld evidence that has come to light through the efforts of defense counsel, as well as Congress and the media.  The classified motions may be delayed by the need to schedule "SCIF time."

[4]   On Wednesday, July 10, the government informed lead counsel Jonathan Turley that his field investigation and clearance review had been finalized.   As a result, his clearance was reactivated, allowing him to resume filings in the SCIF.  Defense counsel is filing this document under seal due to the references to the Affidavit of Wade Ammerman (which is itself under seal), as well as the enclosure of a document from the National Archives and Records Administration ("NARA"). The NARA document has no classification markings and was given to uncleared defense counsel as an unclassified document. Because, however, the government has previously objected in this matter to a filing quoting a title that appears on the public docket, defense counsel, in an abundance of caution, waited to submit this document under seal. The defense believes that this document and the Ammerman affidavit should be unsealed and placed on the public docket. Defense counsel has also been in consultation with security staff over the last week on how to submit this filing; it was decided that the motion would first be given to court security to allow a review of the NARA document before the motion is placed on the docket as a sealed filing.  Thus, a copy of this filing will be given to the Clerk by security staff once a classification review is completed.

[5]   Michael Martinez, *U.S. Drone Killing Of American al-Awlaki Prompts Legal, Moral Debate*, CNN (Sept. 30, 2011), http://www.cnn.com/2011/09/30/politics/targeting-us-citizens.

before this Court, Dr. al-Timimi has sought from the government material information relating to al-Aulaqi. This information includes, but is not limited to, evidence in the government's possession relating to al-Aulaqi's sudden and unexplained appearance at Dr. al-Timimi's Northern Virginia residence late one night in October 2002, during which Dr. al-Timimi rejected al-Aulaqi's entreaties to help him recruit young men for jihad. Dr. al-Timimi has long believed that this visit could not have happened without the government's knowledge or facilitation, despite the government's assertion at trial that its investigation of him began only in February 2003. These requests for evidence on al-Aulaqi and his dealings with either Dr. al-Timimi or other parties associated with the so-called "Virginia Jihad" conspiracy[6] have been repeatedly rebuffed by the government.

Since the last hearing in this remand, defense counsel has pursued a variety of different means to establish the scope of withheld evidence in this case, including surveillance evidence and related field reports concerning al-Aulaqi. This evidence—which includes heavily redacted material disclosed in just the last two weeks as well as evidence uncovered by defense counsel at NARA—demonstrates the intense interest and direct involvement in al-Aulaqi's movements in October 2002 by FBI Special Agent Wade Ammerman, who helped lead the investigation of Dr. al-Timimi and testified against him at trial. The documents also show that the FBI's October 2002 communications about al-Aulaqi include "asset reporting," and that, at least in the early part of 2002, Anwar al-Aulaqi was under close government surveillance. Indeed, Agent

---

[6]     The alleged conspiracy, which Dr. al-Timimi was accused of inspiring with his words, has also been referred to as the "Virginia Paintball" case. Although the government has long claimed the prosecutions to be a significant victory against terrorism, recently uncovered documents show that, even during the height of the investigation, there existed highly dismissive attitudes within the FBI toward the need for criminal prosecutions in the case. *See* Memorandum for the Record, Interview of FBI Special Agent Tim Ervin by "9/11 Commission," at 3 (October 17, 2003) (Exhibit A)("[t]he Lackawanna 6 was a good case. The other prosecutions for terrorism are B.S.[.]  They would never have investigated the Virginia jihad group before 9/11.").

Ammerman is quoted in an interview with a Fox News reporter as stating, "I don't think anyone wants me talking 'bout what I was involved in" vis-à-vis al-Aulaqi. Catherine Herridge, The Next Wave: On the Hunt for Al Qaeda's American Recruits 217 (Crown Publishing Grp. 2011).[7]

This information raises highly troubling questions over past representations made to the Court and defense counsel by the government—misrepresentations which both directly relate to the issues in this remand and which the Court possesses inherent authority to investigate. *Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 585 (7th Cir. 2008) ("No matter who allegedly commits a fraud on the court—a party, an attorney, or a nonparty witness—the court has the inherent power to conduct proceedings to investigate that allegation and, if it is proven, to punish that conduct."); *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993) ("Under [its] inherent power, a court may issue orders, punish for contempt, vacate judgments obtained by fraud, [and] conduct investigations as necessary to exercise the power").

## II.   PROCEDURAL HISTORY

### A.   *United States v. al-Timimi* and the Fourth Circuit Remand

Nearly eight years ago, following his conviction at trial, this Court sentenced Dr. Ali al-Timimi to life in prison.[8] In April 2006, several months after Dr. al-Timimi's sentencing, the Court of Appeals for the Fourth Circuit remanded this case to this Court for additional proceedings after reports surfaced of previously undisclosed surveillance programs covering

---

[7]     According to the author of this source, this statement is not a verbatim quote, but captures the essence of Agent Ammerman's comment. *Id.*

[8]     Dr. al-Timimi had been indicted for counseling and inducing others to conspire to levy war against the United States, aid the Taliban, aid Lashkar-e-Taiba, violate the Neutrality Act, and to use firearms and explosives in furtherance of those underlying crimes of violence. At the time of sentencing, this Court acknowledged that the statutorily mandated sentence was "very draconian." Sentencing Hr'g Tr. 20:23-24, July 13, 2005. On other occasions, this Court has expressed concern that the case against Dr. al-Timimi was "permeated with First Amendment issues." (Dkt. No. 146, Hr'g Tr. 34:24-25, 35:1-3, Mar. 18, 2005).

individuals material to this case. (Exhibit B). The remand set no period for the Court's review of undisclosed evidence, and included inquiry into (1) whether evidence derived from warrantless surveillance was used against Dr. al-Timimi at trial in violation of the Fourth Amendment; and (2) whether previously undisclosed surveillance contained material evidence that the government had been obligated to produce pursuant to Rule 16 or *Brady v. Maryland* and its progeny.[9] (Dkt. No. 183, Hr'g Tr. 31:9-14, July 21, 2006). The adequate resolution of both of these issues was critically dependent on one thing: the production by the government of all undisclosed evidence in its possession that was material to Dr. al-Timimi's case.[10]

This remand has been unique in its focus and its procedural posture. The inequity faced by Dr. al-Timimi, however, remains simple and, in light of newly discovered information, increasingly untenable. Despite submitting, in compliance with an order from this Court, a set of narrowly tailored discovery requests for evidence, defense counsel has received from the government only unsupported legal objections about the materiality and discoverability of the evidence. To the extent the government has disclosed anything, it has done so in a series of *ex parte* filings, or else has provided very limited classified information to cleared defense counsel.

---

[9]     As discussed below, defense counsel has recently uncovered declassified documents which show that the government, contrary to assertions it has made in the past, shared FISA information with criminal investigators in order to develop cases against individuals associated with the "Virginia Jihad." Given this admitted "cross-pollination" between intelligence and criminal investigations in this matter, discovery in this remand must necessarily cover both intelligence and investigatory agencies.

[10]     Additionally, the remand order did not limit the Court's inherent authority to address any disclosure of prior fraud, false statements, or willful blindness by the government in its dealings with the Court during these proceedings, including the remand period. *See Shaffer Equip. Co.*, 11 F.3d at 462.

**B.      Pre-trial Discovery Related to Anwar al-Aulaqi**

For the last nine years, defense counsel has sought from the government evidence related to Anwar al-Aulaqi's dealings with Dr. al-Timimi or others in the so-called "Virginia Jihad" or "Virginia Paintball" conspiracy. These efforts began in November 2004, from the start of pre-trial discovery in this case, and have continued to this day.[11]

On November 19, 2004, Dr. al-Timimi filed a Motion for Discovery and *Brady* Material (Dkt. No. 18). In this motion, Dr. al-Timimi sought evidence, including tapes or debriefing notes, regarding "Mr. Al-Timimi's Meeting with Anwar Nasser Aulaqi." (*Id.* ¶ 26).[12] In its subsequent Response to Defendant's Supplemental Pre-Trial Motions, the government stated only, "Al-Timimi seeks the Court to order the government to produce tapes he suggests Aulaqi made while visiting Al-Timimi. We are aware of no authority for this request." (Dkt. No. 23 ¶ 23).

In pre-trial Discovery Letter #8, dated December 28, 2004, the government again made only a passing reference to Dr. al-Timimi's requests concerning al-Aulaqi, and noted that it would decide what had to be turned over to the defense:

> You asked about our position regarding FISAs containing the voice of your client. Our position is that we will either provide you such recordings as exist, or in limited circumstances, not do so through utilization of CIPA, or, in other limited circumstances, not do so after determining that they are not relevant under Rule 16. The statement of this position also is responsive to your question regarding a recording of Alaqui [sic].

(Discovery Letter #8 at 5, Dec. 28, 2004) (Exhibit C).

---

[11]      These efforts have been delayed by the over-classification of material by the government in this case. As a result, defense counsel have been forced to rely on information trickling out of Congress and the media as well as its own efforts through the Freedom of Information Act and long-delayed efforts to gain access to information in the National Archives and Records Administration 9/11 Commission-related records.

[12]      This request, which was made as part of a broader discovery motion, was denied. (Dkt. No. 25).

On January 12, 2005, trial counsel for Dr. al-Timimi sent the government an e-mail reminding them of their non-response to requests regarding al-Aulaqi. (Exhibit D).

Notwithstanding its refusal of Dr. al-Timimi's discovery requests regarding al-Aulaqi, the government, in a February 16, 2005 letter, notified defense counsel that among items seized from Dr. al-Timimi's house was a "Piece of paper containing Arabic and English writing with contact information for Anwar Awlaki.[13]" (Discovery Letter #11 at 2, Feb. 16, 2005) (Exhibit E). The government further informed defense counsel that some of these materials might be used as exhibits at trial. (*Id.* at 4.)

### C.   Post-Remand Efforts Related to Anwar al-Aulaqi.

Dr. al-Timimi's efforts to obtain information related to Anwar al-Aulaqi have continued throughout this remand, and have been met with virtually identical non-responses from the government.  Dr. al-Timimi has sought information not only about the October 2002 visit, but also al-Aulaqi's relationship with other witnesses and parties involved in the investigation of the "Virginia Jihad" and activities surrounding Dr. al-Timimi.

In a September 14, 2007, letter to the government, drafted pursuant to an August 24, 2007, order of this Court, Dr. al-Timimi requested the following with respect to Anwar al-Aulaqi:

> Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators. AuLaqi met with Dr. Al-Timimi at his house in October 2002 to discuss his reaction to 9-11, the congressional letter, and other individuals later associated with his trial. Telephone calls were made to Dar Al-Arqam and to Dr. al-Timimi's home. We also ask for any reports or notes generated in connection with AuLaqi's visit to Dr.

---

[13]      "Awlaki" is a common alternate spelling for "Aulaqi."

Al-Timimi's home in October 2002 when he was accompanied by Nabil Gharbieh[14] and Rubeel Iqbal.

Letter from Jonathan Turley to Gordon D. Kromberg, at 5 (Sept. 14, 2007) (Exhibit F). In its response, the government again mischaracterized both the scope of the request and its discovery responsibilities, and stated:

> We agree that any previously undisclosed communications to which Al-Timimi was a party that were obtained from a government surveillance program and covered by Fed.R.Crim.P 16 should be disclosed or otherwise brought to the attention of the Court. This naturally, includes communications between Al-Timimi and Al-Aulaqi...[H]owever, there is no requirement that the government disclose intercepts that merely reference Al-Timimi unless they constitute *Jencks* or are exculpatory ... Al-Aulaqi [was not a] government witness[ ], so *Jencks* does not apply.

(Dkt No. 237 at 9).

In his Opposition to the Government's Motion to Quash his discovery requests, Dr. al-Timimi noted to the Court that the government had reserved the right to decide whether communications were exculpatory without explaining its understanding of why Dr. al-Timimi sought the material, or explaining its own view on the "proper" use of such evidence. (Dkt No. 244 at 14). Dr. al-Timimi also reminded the Court that:

> Anwar al-Aulaqi goes directly to Dr. Al-Timimi's state of mind and his role in the alleged conspiracy. The 9-11 report indicates that Special Agent Ammerman interviewed al-Aulaqi just before or shortly after his October 2002 visit to Dr. al-Timimi's home to discuss the attacks and his efforts to reach out to the U.S. government.

(*Id.* at 15).

Subsequent to these filings, al-Aulaqi became more prominent in news stories, after a connection was alleged between him and Nidal Malik Hasan, an Army psychiatrist accused in the 2009 Fort Hood shootings, and Umar Farouk AbdulMutallab, who in 2009 attempted to blow

---

[14] As discussed in further detail below, Nabil Gharbieh was the government's first witness at trial.

up Northwest Airlines Flight 253.[15] Ultimately, President Obama ordered al-Aulaqi killed in a drone attack in Yemen on September 30, 2011. Two weeks later, his 16-year-old son was also killed in a targeted drone attack by the CIA.[16] The killings led to additional information being made public about the ties between the United States government and al-Aulaqi.

Given the pending motions and the refusal of the government to disclose the full extent of its evidence related to al-Aulaqi, the defense proceeded during the remand to seek alternative sources for information. This included the NARA 9/11 Commission-related records, to which defense counsel had already unsuccessfully sought access during this remand.[17]

In September 2012, after negotiating issues of scope and search terms, defense counsel received permission from NARA authorities to search its electronic database of 9/11 Commission-related documents for material relevant to this remand. Dr. al-Timimi provided NARA with more than thirty search terms, including several variations of "Aulaqi." In December 2012, defense counsel received a chart of results from this search, which included 99 "hits" on the variations of "Aulaqi." For classification reasons, this chart included, for each

---

[15]     Brian Ross and Lee Ferran, *How Anwar al-Awlaki Inspired Terror From Across the Globe*, ABC News (Sept. 30, 2011), http://abcnews.go.com/Blotter/anwar-al-awlaki-inspired-terror/story?id=14643383#.UeSXyNKsjTo.

[16]     Associated Press, *Al-Awlaki's Son Among Al Qaeda Militants Killed in Yemen Air Strike*, Fox News (Oct. 15, 2011), http://www.foxnews.com/world/2011/10/15/yemen-says-local-al-qaeda-media-chief-six-others-killed/#ixzz2ZAJbq7Ql.

[17]     In 2006, Dr. al-Timimi's trial counsel wrote a letter to the Court stating that, during the course of representing another client, he had come across 9/11 Commision documents in the SCIF indicating that Dr. al-Timimi had been the subject of a government investigation long before the period of time in which the government had represented to the Court that the investigation of al-Timimi started. After hearings during this remand in which FBI Agents Christopher Mamula and Sarah Linden testified and were cross examined about their limited efforts to find the information using paper finding aids (Dkt. No. 220, Hr'g Tr. 13:25-42:7, Jan. 16, 2007), a limited number of documents from the 9/11 Commission records, allegedly containing Dr. al-Timimi's name, were turned over to the Court *ex parte*; Dr. al-Timimi, however, was denied an order to be allowed to review this material through cleared counsel and to conduct his own search. (Dkt. 231).

document, only the file and document number, the classification level, the date and number of pages, and the search term or terms found within it. Also in December 2012, NARA provided to defense counsel a slightly more detailed chart containing very basic descriptions of those responsive documents that contained Dr. al-Timimi's name. This second chart is being provided to the Court under seal. (Exhibit L). While the defense will not quote from this chart until it is unsealed, the chart calls into question the government's repeated assertions that it has provided Dr. al-Timimi all the discovery to which he is entitled. (*See, e.g.*, Dkt. No. 183, Hr'g Tr. 16:11-12, July 21, 2006). Defense counsel was not permitted to view any of the 9/11 Commission documents containing Dr. al-Timimi's name, and was able to view only a declassified subset of those documents containing al-Aulaqi's name.

On October 11, 2012, Dr. al-Timimi submitted a request pursuant to the Freedom of Information Act asking for disclosure of "any records that were prepared, received, transmitted, collected and/or maintained by the FBI, concerning Anwar al-Aulaqi between January 1, 2001 and March 2003." Letter from Jonathan Turley to FBI, at 1 (Oct. 11, 2012) (Exhibit G). To the best of current defense counsel's knowledge, there has been no response.

## III.   SUMMARY OF EVIDENCE REGARDING ANWAR AL-AULAQI

### A.   Summary of Publicly Available Evidence Regarding Anwar al-Aulaqi

Publicly available documents, including some obtained this month by defense counsel, show not only that the Department of Justice possesses considerable undisclosed material information on al-Aulaqi, but that a key government witness and a leader of the investigation against Dr. al-Timimi, FBI Special Agent Wade Ammerman, was personally involved in Anwar al-Aulaqi's movements during the critical period of time covered by Dr. al-Timimi's discovery efforts. Indeed, it now appears Special Agent Ammerman played a key role in facilitating al-

Aulaqi's October 2002 re-entry into the United States, and, by extension, his visit to Dr. al-Timimi. New documents also cast doubt on Special Agent Ammerman's assertions, made both in his 2003 Affidavit for a search warrant on Dr. al-Timimi's residence and at trial, about the origins and temporal scope of the investigation against Dr. al-Timimi. Had this information been disclosed to defense counsel prior to trial, counsel would have been able to impeach Special Agent Ammerman's witness testimony on these points.

On October 10, 2002, Anwar al-Aulaqi returned to John F. Kennedy International Airport in New York on a flight from Yemen via Saudi Arabia, despite a warrant for his arrest in Colorado, and his prior identification as a possible terrorist leader. Herridge, *supra*, at 75-82. That warrant, which had been secured by the FBI Joint Terrorism Task Force in San Diego, was a "holding charge" to allow for al-Aulaqi's arrest to permit the Task Force to question al-Aulaqi on his ties to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar. Herridge, *supra*, at 75-77. Accordingly, upon his arrival, al-Aulaqi was promptly held at the airport and put into custody by American officials. *Id.* at 82.

New reporting shows that, on the same night, Special Agent Ammerman took extraordinary steps to arrange for al-Aulaqi to be released from holding by American customs officials, despite the outstanding warrant for his arrest. *Id.* at 82-84, 93-96, 216-17. Not only did Special Agent Ammerman order his release, but he did so based on representations to Customs agents that have been thrown in question.[18] Congress has demanded answers on how the arrest

---

[18]     As noted in recent coverage of this new material, '[t]he Justice Department, in explaining why it had the warrant pulled, claimed Awlaki had corrected lies about his place of birth on his Social Security card application, in turn making a passport fraud case against him weak. However, Fox News obtained, through FOIA, Awlaki's Social Security records showing there was no correction – Awlaki only applied for a replacement card using his true place of birth, New Mexico." Catherine Herridge, *Exclusive Documents: Was Anwar al-Awlaki a Government Asset?*

warrant in Colorado could have been rescinded, as Special Agent Ammerman apparently claimed to Customs officials that day, since no one would presumably have been at the local U.S. Attorney's office in Colorado at the time of al-Aulaqi's arrest at the airport. *See* Letter from Congressman Frank R. Wolf to FBI Director Robert Mueller, at 8 (Aug. 15, 2012) (Exhibit H) (noting that the questionable timeline of events surrounding al-Aulaqi's release from detention on October 10, 2002 has "never been adequately explained," and asking if the Washington Field Office of the FBI (the "WFO") and Agent Ammerman "want[ed] Aulaqi released to assist in [the] investigation of Timimi").

Moreover, documents obtained this month by a public interest organization show a high degree of interest in al-Aulaqi, including at the highest levels of the FBI, before and after his entrance into the United States. On October 1, 2002, the WFO transmitted a memorandum marked "secret" and "priority" to FBI headquarters; the unredacted portion of the subject line of this memo reads, "Aulaqi." (Exhibit I at 1-4, also marked as AWLAKI-895-898). Then, on October 3, 2002, the Director of the FBI authored a Secret Memo, referencing a National Security investigation by the Washington Field Office ("199N-WF-222852"). (*Id.* at 5-6, AWLAKI-899-900). The subject of this fully redacted memorandum is "Anwar Aulaqi; IT-UBL/Al-Qaeda." (*Id.*) Seven days later, al-Aulaqi entered the United States with Special Agent Ammerman's apparent assistance; that same day, a fax was sent from the FBI at JFK airport that included Aulaqi's plane ticket, customs form, passport and Social Security card. (*Id.* at 7-13, AWLAKI-901-907).

The FBI's document trail on Anwar al-Aulaqi in October 2002 does not stop with his re-entry into the United States; it continues well into the period where al-Aulaqi visited Dr. al-

---

Fox News (July 2, 2013), http://www.foxnews.com/politics/2013/07/02/why-did-fbi-allow-awlaki-to-roam-in-us/.

Timimi's house, and clearly involves the Washington Field Office. On October 22, 2002, the WFO sent a memorandum to the Counterterrorism Unit titled "Anwar Nasser Aulaqi, IT-UBL/AlQaeda, OO:WFO," whose synopsis contains the term "asset reporting." (Exhibit I at 14, AWLAKI-908). For other relevant documents relating to this specific issue, Dr. al-Timimi respectfully refers the Court to its sealed exhibit accompanying this pleading. (Exhibit L).

In addition to the October 2002 FBI documents, other newly released documents highlight the startling efforts expended by the Department of Justice in allowing al-Aulaqi to remain free in the United States in 2001 and early 2002.[19] In 2001 and early 2002, the new documents show, al-Aulaqi was under surveillance by the FBI. *Id.* During this surveillance, the FBI observed al-Aulaqi engage prostitutes at local hotels, and indeed interviewed the prostitutes. *Id.* Despite witnessing the commission of these crimes, the FBI did not arrest him or even detain him. *Id.* This accommodation of al-Aulaqi continued despite the fact that, according to another document obtained this month, a "computer database record" in February 2002 listed al-Aulaqi's name with the warning to "approach with caution" under the heading of "terrorist organization member." *Id.*

**B.      The Relation of the al-Aulaqi Evidence to Special Agent Ammerman**

The new evidence about FBI surveillance on Anwar al-Aulaqi, coupled with the intense interest and intervention in his October 2002 movements by both Special Agent Ammerman and the FBI Director's office, makes it highly unlikely that the government possesses no evidence about al-Aulaqi's visit to Dr. al-Timimi's house and other contacts with parties associated with

---

[19]      FoxNews.com (July 2, 2013) *Terror leader Awlaki paid thousands for prostitutes in DC area, documents show*, http://www.foxnews.com/politics/2013/07/02/terror-leader-awlaki-paid-thousands-for-prostitutes-in-dc-area-documents-show/#ixzz2ZEUUxkCK

his case.  This evidence also conflicts with prior representations to the Court, and calls into

questions the government's arguments about the materiality and discoverability of this evidence.

For example, Special Agent Ammerman affirmatively testified before this Court that the

investigation of Dr. al-Timimi began in February 2003. (Trial Tr. 1337:6 (Apr. 11, 2005); *see*

*also* Dkt. No. 220, Hr'g Tr. 38:9-11, (Jan. 16, 2007)) (Court stating that the government "insists

that there was no material investigation of Timimi until 2003").  In his Affidavit in Support of

Application for Search and Seizure Warrants on Dr. al-Timimi's house (Exhibit J),[20] he states

that he was made aware of Dr. al-Timimi's activities at the Dar al-Arqam mosque on November

19, 2002, following a tip from a confidential informant. (Exhibit J at ¶ 17). Later in the affidavit,

Special Agent Ammerman strongly implies that he had never heard of Dr. al-Timimi before that

same tip. ("Upon learning of Timimi from CI-1 and CI-2...I researched Timimi on the internet.")

*Id.* at ¶ 21.

Special Agent Ammerman's alleged tip came just one day after the United States Foreign

Intelligence Court of Review ruled that the Foreign Intelligence Surveillance Act did not require

the government to show the FISA court that its primary purpose in conducting electronic

surveillance was not criminal prosecution. *See generally In re Sealed Case*, 310 F.3d 717, 746

(FISA Ct. Rev. 2002). In an August 13, 2003, 9/11 Commission Memorandum for the Record,

obtained by defense counsel, Duncan Wainwright, Assistant Division Counsel for the FBI WFO,

stated that this decision led to a great deal of previously forbidden information sharing between

intelligence and criminal investigators. *See* Memorandum for the Record, Interview of Duncan

Wainwright, Assistant Division Counsel, WFO, FBI by 9/11 Commission, at 4 (Aug. 13, 2003)

---

[20]    The Affidavit also states that "on several occasions and as recently as January 10, 2003,
FBI physical surveillance has observed Ali al-Timimi entering and exiting his residence located
at 4106 Meadowfield Court, Fairfax, Virginia, 22033." (Exhibit J at ¶ 72).

(Exhibit K). Moreover, he explicitly admits that the criminal prosecution of the "Virginia Jihad" case was one of only a few criminal cases resulting from the sharing of such FISA information. *Id.*[21] Thus, not only does this document call into question Special Agent Ammerman's assertion that the investigation of Dr. al-Timimi began with a confidential tip only one day after this decision, but it casts into even deeper doubt the government's bedrock contention during this remand, that there are no intercepts material to Dr. al-Timimi's defense that have not already been disclosed.

It now appears likely that Special Agent Ammerman must have known about Dr. al-Timimi before that "tip," given his undisputed involvement in the al-Aulaqi matter. Had this evidence been disclosed to the defense before trial, Special Agent Ammerman would have been examined on the stand as to his claimed lack of knowledge regarding Dr. al-Timimi before the "tip." The defense could also have explored Special Agent Ammerman's role in facilitating, directly or indirectly, an effort by al-Aulaqi to use Dr. al-Timimi for possible terrorist activities. If Special Agent Ammerman or the government wanted al-Aulaqi to be able to conduct such meetings in the United States, it bears directly on his relationship with the government and the purpose of such meetings. Finally, the information would have also allowed the defense to pursue potential exculpatory evidence from the exchange between al-Aulaqi and Dr. al-Timimi.[22]

## C.    The Relation of the al-Aulaqi evidence to Nabil Gharbieh

The al-Aulaqi evidence is also relevant to the testimony of Nabil Gharbieh, who drove al-Aulaqi to Dr. al-Timimi's residence that night in October 2002, and who was the government's

---

[21]    This same memorandum appears to reference AUSA Kromberg as being "very supportive" of a related effort. (Exhibit K at 5.)

[22]    This information also has bearing on any prior undisclosed surveillance related to al-Aulaqi and al-Timimi. The high degree of surveillance reflected in these new sources strongly suggest electronic and physical surveillance that remains undisclosed in the case.

first witness at Dr. al-Timimi's trial. At trial, Gharbieh was specifically asked about the scope and character of his contacts with Dr. al-Timimi, including any discussion of violent or disloyal acts. Trial Tr. 28:15-139:22 (April 4, 2005). If there are records on the visit to Dr. al-Timimi's house or the relationship of Gharbieh to a known terrorist, they should have been revealed to the defense.  Gharbieh was a government witness and his association and interaction with al-Aulaqi directly bears on this credibility and knowledge.

Notably, one of the documents revealed this month includes the report from October 22, 2002 with the subject line "Anwar Nasser Aulaqi" and "Synopsis: Asset reporting." (Exhibit I at 14, AWLAKI-908).  The identity of the "asset" is not clear.  However, what is clear is that the FBI may have had an asset, as well as surveillance, on al-Aulaqi on the night of the visit that was not revealed to defense counsel.  If al-Aulaqi was the "asset," this fact should have been disclosed when the defense requested it pre-trial, along with any field reports and other records. If a witness like Nabil Gharbieh was an asset, that too should have been revealed pre-trial. Likewise, if the government sent someone like Rubeel Iqbal (an acquaintance of Dr. Ali al-Timimi who accompanied al-Aulaqi that night) as an "asset," the defense should have been informed that an asset or agent had facilitated a meeting with and an attempt to recruit the Defendant by al-Aulaqi.

Whether it is evidence that would have been used to cross-examine Special Agent Ammerman, Nabil Gharbieh, or evidence that would have directly exculpated Dr. al-Timimi, it is clearly evidence that should have been disclosed to the defense before trial.

## IV.     EVIDENCE RELATED TO AL-AULAQI SHOULD BE ORDERED PRODUCED FOR REVIEW BY THE COURT AND THE DEFENSE.

Dr. al-Timimi has a constitutional right to the requested evidence under *Brady v. Maryland* and its progeny, as well as the broad statutory guarantee to such evidence under

Federal Rule of Criminal Procedure 16(a) (1) (e). It is critical, however, that in applying these standards, the Court recognize the unique procedural posture of this remand and treat Dr. al-Timimi's requests *as if they were being made pre-trial*.

### A.    *Brady v. Maryland*

Under the Fourth Circuit's application of *Brady v. Maryland* and its progeny, Due Process requires that the government disclose "evidence favorable to an accused upon request ... where the evidence is material either to guilt or to punishment*." United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010). Of particular importance to this matter and this remand, the Supreme Court subsequently extended the *Brady* disclosure rule to material impeachment evidence. *Giglio v. United States* (1972); *United States v. Fisher*, 711 F.3d 460, 471 (4th Cir. 2013).

In the typical post-conviction context in which *Brady* issues surface, an appellate court will apply hindsight and find favorable evidence material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

As the Court is aware, this is far from the typical post-conviction context in which the Court considers previously undisclosed evidence and the parties argue, with the benefit of hindsight, whether the evidence would have affected the outcome of the trial. *See, e.g., Caro*, 597 F.3d at 619. Rather, the Fourth Circuit remanded this case before this Court to determine *whether or not undisclosed exculpatory evidence existed* to begin with. This remand is, therefore, procedurally analogous to pre-trial discovery and requests for *Brady* material, where courts have prohibited prosecutors from making any unilateral materiality determinations before producing exculpatory evidence. Indeed, the Eastern District of Virginia recently stated that the normal definition of "materiality" under *Brady* is best suited for typical post-conviction appellate review,

and that, in a pre-trial setting, circumstances necessitate a "somewhat different inquiry." The Court stated:

> The prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial. Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed—with the benefit of hindsight—as affecting the outcome of the trial.

*United States v. Danielczyk*, 2013 WL 142460, at *2 (E.D. Va. Jan. 10, 2013) (quoting *United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C.2005).

This admonition to prosecutors is particularly relevant to this case, where the government has on many occasions reserved its right to determine what is "material." (*See* Dkt No. 237 at 9; Exhibit C at 4).

As Dr. al-Timimi has demonstrated, the desired evidence would have served to impeach two witnesses in his case. Moreover, the evidence could undercut the government's fundamental narrative that Dr. al-Timimi hated the United States and wished to send young men abroad to wage war against it; the October 2002 meeting between Dr. al-Timimi and al-Aulaqi featured the explicit rejection by Dr. al-Timimi, during the same period of time covered by the indictment, of a solicitation to recruit followers for overseas jihad. In light of the wide latitude given to the government in introducing Dr. al-Timimi's own statements against him at trial, there is no question about the exculpatory and material nature of this exchange.[23]

---

[23] Indeed, the government at trial adopted the broadest possible interpretation of relevance in the introduction of "state of mind" evidence. This standard was often used to justify the introduction of evidence such as the statements on the Space Shuttle disaster (made almost seventeen months after the September 16, 2001 dinner that was the focus of the government's case) over constitutional and evidentiary objections. In a December 3, 2004 hearing, the Court made clear that "the intent of the defendant is going to be a critical factor in this case, and obviously, statements that a defendant makes are a very significant piece of evidence to one's intent." (Dkt. No. 144 at 34:13-16); (*see also id.* at 35:1-3 ) ("In other words, I think the probative value is so critical because the statements of a defendant are important windows into that person's intent.").

In a November 20, 2007 hearing on the government's Motion to Quash, the Court recognized that Dr. Al-Timimi's counsel's right to participate in the discovery process to confirm whether all exculpatory evidence has been produced. Specifically, the Court noted that:

> I think you make a good argument that defense counsel have a right under our legal system to be involved to a reasonable degree in making judgment calls as to whether material is, in fact, exculpatory or not exculpatory.

(Dkt. No. 245, at 4:12-19).

### B.     Federal Rule of Criminal Procedure 16

Dr. al-Timimi is clearly entitled to the requested evidence under the much more permissive standard of Rule 16(a) (1) (E) (i), which requires the government to make available any requested items that are "material to preparing the defense." Fed.R.Crim.P. 16(a) (1) (E) (i); *United States v. Caro*, 597 F.3d 608, 620-21 (4th Cir. 2010) (agreeing that Rule 16 is "much broader" than *Brady*, and provides the "minimum amount of pretrial discovery granted in criminal cases"). "[E]vidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Caro*, 597 F.3d at 621 (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)).

Throughout this remand, defense counsel has expressed alarm to this Court that the government's position with respect to its discovery obligations is fatally flawed and based on a fundamental misreading of Rule 16 as well as the scope of this remand. (*See, e.g.* Dkt. 252). Defense counsel has also objected to the fact that any disclosures that have been made have occurred in the absence of a formal order from this Court clearly establishing the materiality standards to be applied. (*Id.*)

In a January 16, 2007 hearing, the Court stressed that full disclosure was necessary under Rule 16:

> [W]ho determines what's relevant?  I mean, again, that's why we have an adversary system. . . .  The rule requires that the appropriate categories of information be turned over to defense counsel.  Then they'll rummage through it.  It may be in their eyes important to some theory of defense that, you know, you might not appreciate, I might not appreciate, but I thought that one of the pretty strong requirements of rule 16 . . .

(Dkt. No. 220, Hr'g Tr.  43:1-9 Jan. 16, 2007).

As discussed above, "materiality" under Rule 16 is far broader than "materiality" under *Brady*. *United States v. Caro*, 597 F.3d at 621 (4th Cir. 2010) ("we stress that "materiality" in Rule 16(a) (1) (E) (i) differs from "materiality" under *Brady*). As with the disclosure of exculpatory material, the government must first establish what evidence was withheld pre-trial, and cannot engage in post-trial rationalizations or use of hindsight to excuse violations of Rule 16.  The evidence must be reviewed under the standard for disclosure that existed pre-trial. In this case, there is no question that this evidence, if requested pre-trial, would "play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Caro*, 597 F.3d at 621 (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)).[24]

In light of the foregoing, the Defendant respectfully requests an order compelling the disclosure of all evidence, including, but not limited to, any surveillance records, field reports, and recordings, related to visits by Anwar al-Aulaqi to the United States from 2001 to 2003 and that reference Dr. al-Timimi, any of the trial witnesses in this case, other alleged members of the "Virginia Jihad" conspiracy, or the Dar-al-Arqam mosque.

---

[24]     A latter question may arise as to whether "the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *Caro*, 597 F.3d at 621. That appellate standard for a violation of Rule 16 only occurs after the establishment of the body of evidence withheld by the government. *Id.*  Moreover, when that secondary question is raised, it is done so through an adversarial process, and not by an opaque determination of the government.

Dated: July 17, 2013

Respectfully submitted,

Dr. Ali al-Timimi, by Counsel:

_____
Vishant Manu Krishnan (VSB # 82308)

Jonathan Turley (*pro hac vice,* lead counsel)
2000 H St., N.W.
Washington, D.C. 20052
(202) 994-7001 (phone)
(202) 994-9811 (facsimile)

Vishant Manu Krishnan (VSB # 82308)
Bryan Cave LLP
1155 F Street, NW, Suite 700
Washington, D.C. 20004
(202) 508-6000 (phone)
(202) 508-6200 (facsimile)

**CERTIFICATE OF SERVICE**

I hereby certify that on the ⏸ th day of July, 2013, I served the foregoing via courier

upon:


Mr. Gordon Kromberg, Esq.
Assistant United States Attorney
2100 Jamieson Ave.
Alexandria, Virginia 22314-5794
(703) 299-3800 phone
gordon.kromberg@usdoj.gov


_____
Vishant Manu Krishnan (VSB # 82308)
*Counsel for Dr. Ali al-Timimi*