**U.S. Department of Justice**

*United States Attorney's Office*

*Eastern District of Virginia*

---

*2100 Jamieson Avenue*  *703/299-3721*

*Alexandria, Virginia 22314*  *FAX 703/299-3981*

December 28, 2004

Edward B. MacMahon, Jr.
P.O. Box 903
107 East Washington Street
Middleburg, Virginia 20118

      Re:    <u>U.S. v. Al-Timimi, Crim. No. 1:04cr385; Discovery Letter #8</u>

Dear Ed:

      1. I am ready to provide you cd-roms containing emails and phone calls of other conspirators in this case, which emails and phone calls were captured by FISA. I do not believe that they contain exculpatory evidence in addition to that which you already have obtained (*i.e.*, exhibits introduced in the last trial including self-serving statements by Royer and Hammad). You may find them useful because they may contain previous statements of potential witnesses. They have been declassified. That being said, they *were* captured by FISA, and I am authorized to give them to you only for use in connection with this trial. Accordingly, I will provide them to you if you represent to me that you will not make copies of them (or allow copies of them to be made) except for use in connection with this trial, and that at the end of the trial you will return the original cd-roms and all copies that may have been made from them.

      If you agree with these terms, I can provide to you 11 cd-roms containing materials involving Masaud Khan; four cd-roms containing materials involving Aatique, one cd-rom containing materials involving Chapman, six cd-roms containing materials involving Royer, and 11 cd-roms containing materials involving Hamdi.

      2. You have received the cds with the telephone calls and emails that were captured under the FISA surveillance over Timimi. Of these calls, eight have been declassified. They include four calls to same number about the Space Shuttle article, on 1/31/03 and 2/1/03 (including one call consisting of Timimi reading the article to his listener), one call that was an exhibit at the last trial, with Hammad and Royer calling Timimi; one call that was consensually-monitored, from Kwon to Timimi, for which you already have the transcript in the *Brady* scan materials, and one call with Royer about a press conference.

      3. I am providing you herewith additional documents for your use in the SCIF under the condition that - - absent specific consent in writing from me - -they may not be copied again and

that they may not be taken out of the SCIF except to return them to me. This new material consists of:

| | Dec 8, 2004 | 2 | 03445-03446 |
|---|---|---|---|
| FBI 302, report of interview of Randall Royer | | | |
| FBI 302, report of interview of of Hasan | Dec 2, 2004 | 1 | 03447 |
| FBI 302, report of interview of Kwon | Dec 1, 2004 | 1 | 03448 |
| FBI 302, report of interview of Hasan | Nov 23, 2004 | 1 | 03449 |
| FBI 302, report of interview of Kwon | Nov 19, 2004 | 1 | 03450 |
| FBI 302, report of interview of Hasan | Oct 6, 2004 | 1 | 03451 |
| FBI 302, report of interview of Hasan | Nov 17, 2004 | 1 | 03452 |
| FBI 302, report of interview of Kwon | Nov 16, 2004 | 1 | 03453 |
| FBI 302, report of arrest of Ali Al-Timimi | Sep 24, 2004 | 1 | 03454 |

    4. You previously asked about Timimi's intercepted emails in the case in the Northern District of New York. That wiretap was a Title III wiretap. As a result, much of the take was minimized. I am advised that there were a total of nine emails captured pursuant to a Title III wiretap. Only two messages were not minimized, and I have provided both of them to you with this letter. The other seven were minimized, so they are maintained under seal by the court in New York. No one (other than your client, of course) can say what is on the seven minimized emails (other than that they were not relevant to what the listeners were listening for) and they are not available absent a court order from New York. As you can see, the two that were not minimized seem inconsequential, so it is hard to imagine how little the other seven that did not merit keeping must have had.

    5. Be aware that what your client said in his interviews with the FBI in 2003 and 2004 will be introduced to show his intent, and an absence of mistake. These statements include the following:

    Timimi is familiar with LET and its leader, Hafiz Sayeed. Timimi's religious belief system is similar to that espoused by the organization comprising the LET and the Markaz ad Dawa. Timimi was aware of the LET's annual conference. Timimi was aware that Royer had established the Taiba Bulletin and helped set up the website. Timimi used to visit the LET website regularly and receive the Taiba Bulletin over the internet but removed his name from the mailing list once LET was designated as a terrorist organization. Tapes of his lectures were posted on the LET website. Abu Bara indicated in an e-mail to Timimi that he and Timimi knew each other. Timimi stated that a Muslim can lie when a Muslim is at war.

    On 9/11, Timimi spoke at Dar al Arqam about the events of the day, and said that sometimes killing innocents is justified Islamically. There is no question that warfare is part of the Islamic law and religion. One cannot deny that. Islam is not a pacifist religion. War is an

integral part of Islam. There are conditions however, to whether one's participation in jihad is authentic. Jihad is broken down into a communal and a non-communal obligation. A non-communal or individual obligation to participate in jihad can occur when the leader of the Muslims calls you up to fight. When a country is attacked by an outside force, it is also obligatory for Muslims in neighboring countries to assist those in the country being attacked by the oppressor, if those within the country being attacked cannot defend themselves adequately. Attacks carried out with good intentions and with the intended result being of some benefit to muslims or harm to unbelievers should not be considered suicide in Islam.

Rules related to obligatory jihad should not be confused with the rules related to whether participation in a jihad is legitimate or permissible. Whether an individual's participation in a particular jihad is permissible or considered legitimate from a religious perspective is a theoretical question based on a number of different conditions. An individual who died on the battlefield would receive the rewards due to a martyr if the appropriate conditions were met. "Those who die on the battlefield are the best of martyrs". Timimi sent to his brother the article, "An American Born Shaheed, An Example for All of Us."

Many considered Mullah Omar as potentially as the leader of Muslims. Timimi's evaluation of Omar and the Taliban was contained in his paper entitled "Shaikh Ali Timimi on the Taliban and the Statues", by "Shaikh Ali Timimi, 7 March 2001"

In his lecture, "The Role of Muslim Students in North American Universities," Timimi said that if individuals possessed a special skill for jihad like that possessed by an army general, then such individuals would have no choice but to go and fight in jihad to assist muslims fighting disbelievers.

Timimi studied under Hawali in Medina, and considers his views to be in line with Hawali's. Timimi called Hawali shortly after 9/11 for Hawali's take on recent events. Timimi sent the email of 12/13/01, subject, "A call to reflect and repentance." When Timimi mentioned Hawali's declaration in that email, he was adopting Hawali's views as his own.

6. Be aware that what your client has said in public lectures may be introduced to show his intent, and an absence of mistake. These statements include the following:

In "The Principles of Fiqh: The Voluntary Acts of Worship," he said that if the enemy is in front of us, the best act of worship is to fight in jihad. In "Purification of the Soul," he said that it is not enough to want to know what is going on in Chechnya or Kashmir and to read a web site, it is crucial to go forth. Jihad is fighting in the path of Allah. Allah loves those who wage jihad in his path. In "The Luminous Creed," he said that the Muslims should emulate those that fight their enemies, not in a theoretical sense, but in a literal sense. The greatest expression of Islamic belief is jihad. In "A Word of Advice to the Salafis of the UK," Timimi said that there is obviously a jihad going on today. Waging jihad is an unceasing obligatory duty until the Day of Resurrection. In "The Acts of Worship During Shawwal." he said that Allah hates those who have the means to wage jihad, but fail to do so.

In "Signs Before the Day of Judgment," "Faith, Divine Decree, Prophets Companions, Family and Wives), and "A Word of Advice to the Salafis of the UK," Timimi said Muslims are obligated to pledge allegiance to a Muslim ruler, even if that ruler is unjust. They cannot pledge allegiance to any leaders in the US because there are no Muslim leaders. In "Was History Violated When Buddha's Statues Were Annihilated," Timimi said that the only way for Muslims to prevail is through the banner of jihad to be raised and to follow shariah. Appeasement has not worked for 200 years. In "Tawheed and Shirk," Timimi spoke about the final battle where the trees and rocks come alive.

7. Be aware that what your client advised Kwon regarding Kwon's consideration of becoming an American citizen (as described by Kwon in the last trial) may be introduced to show his intent, and an absence of mistake.

8. If I have not mentioned this before, please note that I intend to ask Evan Kohlmann to testify regarding the relationship between Hawali and bin Laden. As you know, bin Laden based his declaration of war against the United States on the grounds that the Saudis incarcerated Hawali at the behest of the Americans.

9. In your letter of December 14th, you requested that I identify *Brady* and *Jencks* materials from the materials provided for your examination in the SCIF as soon as possible. Except as otherwise noted in this series of letters, I am aware of no *Brady* materials. If your motion for a continuance is denied on December 30th, I expect to have the list of *Jencks* materials for you by January 3rd; after that time you can take the listed documents out of the SCIF and let your client read them if you and he so choose. However, all *Jencks* materials (and all copies of such materials) must be returned to me after the trial; if that condition is unacceptable, then we will have to get it resolved by the judge before I can provide you the list of *Jencks* materials.

10. I have asked the agents to identify materials that can be returned to your client. My understanding is that they are doing so.

11. With respect to the issue about Mullah Omar calling for troops, I reiterate my offer to stipulate to the newspaper articles that you submitted to the court in connection with your discovery motion.

12. I do not know what to tell you about your inability to open the DVD with the email files on it. I gave you my copy of the DVD when you said that you couldn't open the original DVD I gave you; I gave you mine after opening it and reading random emails on my office pc. I have more copies of the Terrorism: Review of 1999 cd which you are welcome to if you want (but as I mentioned, its only relevance is that it contains a snippet of Royer asking a question about terrorism).

Discovery Letter #8
December 28, 2004
Page 5

     13. You asked about records from Yahoo dealing with Al-Timimi's email traffic, and whether we could segregate out those emails that we believe that Al-Timimi wrote or received himself. On the DVD that I already gave you, you can find his emails from his myself.com account segregated together. Also, by doing a word search for your client's email addresss through your word processing program, you can find the emails from or to him in the accounts of the individuals whose accounts were seized in connection with this case. I understand that this procedure is useless unless you can open the DVD, but as I said, I opened it just fine on my pc.

     14. Your inquiry regarding Timimi's Yahoo and Hotmail records is likely moot in light of the provision to you of materials in the SCIF.

     15. You asked about our position regarding FISAs containing the voice of your client. Our position is that we will either provide you such recordings as exist, or in limited circumstances, not do so through utilization of CIPA, or, in other limited circumstances, not do so after determining that they are not relevant under Rule 16. The statement of this position also is responsive to your question regarding a recording of Alaqui.

     Thank you for your cooperation.

                                                        Sincerely,

                                                         Paul J. McNulty
                                                         United States Attorney

                                    By: _____

                                                         Gordon D. Kromberg
                                                        Assistant United States Attorney

**From:** "RAD" <rdhafir1@twcny.rr.com>
**To:** "Ali Timimi" <altimimi@myself.com>
**Sent:** Sunday, May 19, 2002 6:36 PM

assalamu alaikum
Did not find you at home.
can you please call me tonight 315-637-3945 or give me a number to call you at.
jazaka Allahu khairan

Rafil

12/21/2004

**From:** "RAD" <rdhafir1@twcny.rr.com>
**To:** "Ali Timimi" <altimimi@myself.com>
**Sent:** Saturday, May 11, 2002 4:28 AM
**Subject:** Fw:

I am re-sending this in case you did not receive it the first time. I had no response from you.

Rafil

----- Original Message -----
**From:** RAD
**To:** Ali Timimi
**Sent:** Thursday, May 09, 2002 10:41 PM

assalamu alaikum
I sent an Email to Yusuf Jaafar Idris to see if he can speed up my visa to Jedda, I sent my passport and the documents today for a business visa and should arrive noon Friday insha Allah. He did not respond and I don't know how to get in touch with him.
Do you know someone in the Saudi Embassy to speed it up?

Jazaka Allahu khairan

Rafil

12/21/2004

FD-302 (Rev. 10-6-95)

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription  12/09/2004

RANDALL TODD ROYER, date of birth 03/25/1973, Social Security Number 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 was interviewed at the United States Attorney's Office of the Eastern District of Virginia, located in Alexandria, VA. Also present during the interview was Department of Justice Trial Attorney John Gibbs.

During this interview, ROYER answered questions from John Gibbs in preparation for ROYER's anticipated testimony at the trial for ALI AL-TIMIMI in the Eastern District of Virginia.

After being advised as to the identity of the interviewing Agents and the nature of the interview, ROYER provided:

ROYER saw a national news broadcast on either 09/13 or 09/14/2001. The news cast reported that Mullah Omar, the leader of the Taliban, was not asking for people to come fight in Afghanistan. ROYER thought the telecast was on CNN or perhaps Tom Brokaw, but he could not recall with certainty. ROYER watched the news cast in the conference room at CAIR. ROYER was confident the timing of this broadcast was before the 9/16 dinner meeting with Timimi. ROYER was certain that he saw the story in the CAIR conference room. After the 9/16 meeting ROYER was preparing to leave the US, as a result, he did not spend much time at CAIR after the 9/16 meeting. ROYER noted that if someone had stated at the 9/16 dinner meeting that Mullah Omar was calling for assistance, ROYER would have stood up and pointed out that he had seen the news story in which Mullah Omar was not calling for fighters.

ROYER recalled that Mullah Omar had still not called for fighters into late October, perhaps early November 2001. ROYER saw a similar news story on the Internet, possibly a BBC piece, that reiterated that Omar did not want fighters. At this time ROYER was in Bosnia and was communicating, via instant messenger, with Abu Baraa at LET. ROYER was attempting to get a visa for Pakistan. Abu Baraa told ROYER that there were people at LET who wanted to go to Afghanistan, but LET would not allow them to go. Some of the Arabs "rebelled" when they were told they could not go to Afghanistan. Abu Baraa added that the Taliban was not allowing anyone to come into Afghanistan. ROYER recalled that this was at a time when the US Forces were "kicking butt." It was only near the

---

Investigation on  12/08/2004  at  Alexandria, VA

File #  315N-WF-226192-

by  SA James R. Sobchack:jrs
    SA F. Wade Ammerman

Date dictated  

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

03445

FD-302a (Rev. 10-6-95)

315N-WF-226192

Continuation of FD-302 of  RANDALL TODD ROYER , On 12/08/2004 , Page 2

very end, just prior to the collapse of the Taliban, that the borders were opened up. ROYER recalled that volunteers entered from places like Waziristan, but many were killed before they could join the fight, since they had no training, they were easy to kill.

ROYER spoke to Masoud Khan while both were in the Alexandria lock up. KHAN confirmed that there were some Arabs who wanted to go to Afghanistan, but were refused.

ROYER was not able to provide information about LET funding activities, Hawalas, or other individuals who may be involved with money laundering in the Washington DC Metro area.

03446

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription  12/07/2004

    On 12/02/2004, KHWAJA MAHMOOD HASAN, date of birth 03/24/1976, social security account number 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, was interviewed at the Alexandria Police Department, Alexandria, Virginia, by Detective Constable Kenneth Mcaulay and Detective Constable Martyn Smith, New Scotland Yard (NSY), SO13, Anti-Terrorist Branch. Present during the interview of Hasan were Special Agents John V. Wyman, F. Wade Ammerman, and Christopher P. Mamula.

    On 12/03/2004, Hasan was again interviewed by Detective Constable Kenneth Mcaulay at the Alexandria Police Department. Present during this interview were Special Agents Wyman and Ammerman. During this interview, Hasan reviewed a written statement prepared by NSY Detectives in follow-up to their interview of Hasan on 12/02/2004. Hasan reviewed the statement and before affixing his signature to ~~the last~~ each page.

Investigation on  12/03/2004  at  Alexandria, Virginia

File #  315N-WF-226192-302 -941      Date dictated  NA

by  SA F. Wade Ammerman
    SA John V. Wyman

03447

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 10-6-95)

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription  12/07/2004

On 12/01/2004, YONG KI KWON, born on 12/31/1975, was interviewed at the Alexandria Police Department, Alexandria, Virginia, by Detective Dave Field and Detective Ray Thomas, New Scotland Yard (NSY), SO13, Anti-Terrorist Branch. Present during the interview of Kwon were Special Agents John V. Wyman, F. Wade Ammerman, and James R. Sobchack.

On 12/03/2004, Kwon was again interviewed by Detectives Field and Thomas at the Alexandria Police Department. Present during this interview were Special Agents Wyman and Ammerman. During this interview, Kwon reviewed a written statement prepared by NSY Detectives in follow-up to their interview of Kwon on 12/01/2004. Kwon reviewed the statement and made pen and ink changes before affixing his signature to ~~the last~~ each page.

---

Investigation on  12/01/2004  at  Alexandria, Virginia

File #  315N-WF-226192-302 -340   Date dictated  NA

SA F. Wade Ammerman
by  SA John V. Wyman

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

03448

-1-

FEDERAL BUREAU OF INVESTIGATION

Date of transcription  11/23/2004

KHWAJA MAHMOOD HASAN, date of birth 03/24/1976, social security account number 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, was interviewed at the Alexandria Police Department, Alexandria, Virginia, by Special Agent John V. Wyman, Special Agent Christopher P. Mamula, and Department of Justice Trial Attorney John Gibbs.

During the this interview, Hasan answered questions from John Gibbs in preparation for Hasan's anticipated testimony at the trial for ALI AL-TIMIMI in the Eastern District of Virginia.

During this interview, the following new information was provided by Hasan:

Hasan clarified for the interviewing agents that at the time of the Kwon dinner meeting, Hasan did not realize the fatwa which Al-Timimi read from was authored by Sheikh UQLA. Hasan later determined that the Uqla fatwa was the one Al-Timimi read from, as a result of interviews with the FBI prior to the previous trial.

Prior to Hasan's and Kwon's departure for Pakistan, Al-Timimi recommended that Hasan and Kwon keep their distance when traveling through airports, purchase magazines to maintain the appearance of a common traveler, and cry like a baby if confronted by security. Hasan and Kwon used the techniques recommended by Al-Timimi by keeping separate and purchasing magazines. While traveling through Dulles International Airport Hasan was questioned by security. Kwon was not with Hasan at the time. Hasan thinks that officer was trying to determine whether Hasan's name appeared on a list.

| | | |
|---|---|---|
| Investigation on | 11/19/2004 at Alexandria, Virginia | |
| File # 315N-WF-226192-302 - 936 | | Date dictated  NA |
| by | SA Christopher P. Mamula<br>SA John V. Wyman | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

03449

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription  11/23/2004

On 11/19/2004, at the Alexandria Detention Center, YONG KI KWON, born on 12/31/1975, was presented with a two-page Statement, dated 11/17/2004, prepared by the Australian Federal Police. Following his review, Kwon advised that the information contained in the Statement was correct and thereafter signed the bottom of both pages of the Statement. Kwon's signature was witnessed by Special Agent John V. Wyman. Also present during Kwon's review of the Statement was Assistant United States Attorney Gordon D. Kromberg.

---

Investigation on  11/19/2004  at  Alexandria, Virginia

File #  315N-WF-226192-302 935                                Date dictated  NA

by  SA John V. Wyman

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

03450

FD-302 (Rev. 10-6-95)

-1-

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription  11/23/2004

On 10/06/2004, KHWAJA MAHMOOD HASAN, date of birth 03/24/1976, social security account number 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, was interviewed at the Cumberland Federal Correctional Institution (FCI), Cumberland, Maryland, by Special Agent John V. Wyman and Department of Justice Trial Attorney John Gibbs.

During the initial portion of the interview, Hasan answered questions from John Gibbs in preparation for Hasan's anticipated testimony at the trial for ALI AL-TIMIMI in the Eastern District of Virginia.

Separate from trial-prep questions, Hasan advised that he has not had any personal experience in sending money to Pakistan via money transmitters. Hasan does not know how Lashkar-e-Taiba (LET) raises funds and does not know where LET banks.

Investigation on  10/06/2004  at  Cumberland, Maryland

File #  315N-WF-226192-302 -934   Date dictated  NA

by  SA John V. Wyman

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

03451

FD-302 (Rev. 10-6-95)

-1-

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription  11/23/2004

On 11/17/2004, KHWAJA MAHMOOD HASAN, date of birth 03/24/1976, social security account number 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, was interviewed at the Alexandria Police Department, Alexandria, Virginia, by officials from the Australian Government. The officials from the Australian Government included Barrister Geoffrey Bellew, Public Prosecutor June Philips, and Federal Agent Lam Pakstun. Also present during the interview were FBI Special Agents John V. Wyman and Christopher P. Mamula.

At the conclusion of the interview, Hasan was presented with a one-page Statement, dated 11/17/2004, prepared by the Australian Federal Police. Following his review, Hasan affixed his signature to the bottom of the statement.

Investigation on  11/17/2004  at  Alexandria, Virginia

File #  315N-WF-226192-302 -953  Date dictated  NA

by  SA Christopher P. Mamula
    SA John V. Wyman

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

03452

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription  11/23/2004

On 11/16/2004, YONG KI KWON, born on 12/31/1975, was interviewed at the Alexandria Police Department, Alexandria, Virginia, by officials from the Australian Government. The officials from the Australian Government included Barrister Geoffrey Bellew, Public Prosecutor June Philips, and Federal Agent Lam Pakstun. Also present during the interview were FBI Special Agents John V. Wyman and F. Wade Ammerman.

Investigation on  11/16/2004  at  Alexandria, Virginia

File #  315N-WF-226192-302-932  Date dictated  NA

by  SA F. Wade Ammerman
    SA John V. Wyman

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

03453

FD-302 (Rev. 10-6-95)

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription  09/28/2004

    At approximately 9:00 a.m. on 09/24/2004, ALI MEHDI AL-TIMIMI, white, male, DOB: 12/14/1963, SSAN: 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, FBI Number 786423JB9, of 4106 Meadow Field Court, Fairfax, Virginia, was arrested without incident at the FBI, Washington Field Office, 601 4th Street, Northwest, Washington, D.C.  Al-Timimi was accompanied by his attorneys James Van and Todd Gallinger.

    The arresting Agents consisted of Special Agent (SA) John V. Wyman, SA F. Wade Ammerman, and SA Sarah Linden.

    After his arrest processing at WFO, Al-Timimi was transported by SAs Wyman and Linden to the United States District Courthouse in Alexandria, Virginia, where he was remanded to the custody of the United States Marshal Service.

| | | | |
|---|---|---|---|
| Investigation on | 09/24/2004 | at | Washington, D.C. |
| File # | 315N-WF-226192-302 -915 | Date dictated | NA |
| by | SA F. Wade Ammerman / SA John V. Wyman | | |

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

03454