**FRANK R. WOLF**
10TH DISTRICT, VIRGINIA

COMMITTEE ON APPROPRIATIONS

SUBCOMMITTEES:

CHAIRMAN—COMMERCE-JUSTICE-SCIENCE

TRANSPORTATION-HUD

STATE AND FOREIGN OPERATIONS

CO-CHAIR—TOM LANTOS
HUMAN RIGHTS COMMISSION

## Congress of the United States
### House of Representatives

241 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–4610
(202) 225–5136

13873 PARK CENTER ROAD
SUITE 130
HERNDON, VA 20171
(703) 709–5800
(800) 945–9653 (IN STATE)

110 NORTH CAMERON STREET
WINCHESTER, VA 22601
(540) 667–0990
(800) 850–3463 (IN STATE)

wolf.house.gov

August 15, 2012

The Honorable Robert S. Mueller III
Director
Federal Bureau of Investigation
935 Pennsylvania Ave NW
Washington DC 20535

Dear Mr. Mueller:

    I am raising the concerns detailed in this letter because it is the responsibility of the Congress to conduct oversight of the Federal Bureau of Investigation (FBI) and this subcommittee, which I chair, has the direct task of funding the bureau with money provided by the citizens of the United States, including the families and loved ones of those killed at Fort Hood in 2009.

    I was sorry that you were not available to testify before the House Commerce-Justice-Science Appropriations subcommittee on August 1 for the hearing on the Webster Commission report on the FBI's investigation of U.S. Army Maj. Nidal Hasan. As you know, Maj. Hasan has been charged with the murder of 13 individuals following his terrorist attack on Fort Hood in November 2009; his long overdue trial is reportedly scheduled to begin next week. The release of this long-awaited report provided an opportunity for the Congress to learn about the bureau's efforts to improve its counterterrorism operations and investigative practices to prevent future attacks.

    I am concerned that the bureau's witness at this recent hearing, Mr. Mark Giuliano, the executive assistant director for national security, made comments to the committee that I believe were misleading or incorrect with regard to the nature of findings in the Webster Commission report and the FBI's understanding of Anwar Aulaqi at various points over the last decade. I know Mr. Giuliano has had a distinguished career at the FBI and perhaps felt uncomfortable testifying in public.

    I have summarized in detail each comment made by Mr. Giuliano that I believe was potentially misleading, uninformed or incomplete. As part of the record, I am asking you to respond to each of these statements and to provide the committee with the bureau's official position. Specifically, I request your clarification on the following six statements made by Mr. Giuliano during the hearing:

    1.    Statement on the Webster Commission findings on the role of "political correctness" in the FBI's decision not to interview Hasan or his colleagues.

The Honorable Robert S. Mueller III
August 15, 2012
Page 2

2. Statement on Hasan and Aulaqi's relationship.
3. Statement on FBI's perception of full nature of the Aulaqi threat.
4. Statement on Aulaqi's relationship with 9/11 hijackers.
5. Statement on Aulaqi as confidential informant for the FBI.
6. Statement on Aulaqi's 2002 return to the United States.

I also have enclosed a detailed timeline produced by the New York Police Department summarizing what information is publicly known about the FBI's interactions with Aulaqi through 2009. I request that the bureau affirm or correct the record for each of the events on the enclosed timeline to provide the Congress with a detailed understanding of the bureau's interactions and knowledge of Aulaqi's activities.

### 1. Statement on Webster Commission findings on "political correctness."

I asked Mr. Giuliano whether political correctness may have played a role in the decision by the Washington Field Office (WFO) task force agents not to further investigate Hasan after receiving a lead from San Diego Field Office (SD) task force. In response to my question, Mr. Giuliano stated, "the [Webster Commission] report did not find political correctness was in any way, shape, or form responsible for his lack of going forward with the interview [of Hasan or his colleagues]."

Mr. Giuliano's statement was not accurate. The Webster Commission report explicitly notes on pages 81 and 82 that the SD officers were told by WFO officers that "political sensitivities" were a factor in the WFO's decision not to investigate Hasan further. Although the Webster Commission report includes no analysis of these findings, I believe they merit a much more thorough review.

I repeatedly asked Mr. Giuiliano to cite the section of the report that found that there was no political correctness "in any way, shape, or form," but he refused. When I confronted him about misleading the committee, he admitted that I was correct on that point. Later in the hearing reversed again and said that he and I just "disagree" on that point.

Please confirm for the record whether the Webster Commission report conclusively determined, as Mr. Guiliano testified, "the report did not find political correctness was in any way, shape, or form responsible for his lack of going forward with the interview" and provide me with the citation, as I asked him to do during the hearing.

### 2. Statement on Hasan and Aulaqi's relationship.

I asked, "Did Aulaqi ever meet with Major Hasan in Virginia?" and Mr. Giuliano definitively responded "No, not that we know."

This statement is contrary to a number of published reports, including a February 1, 2010, piece in *The Weekly Standard* that reported, "[Aulaqi] met Hasan when Hasan's mother died in early 2001, and [Aulaqi] presided over her funeral."

The Honorable Robert S. Mueller III
August 15, 2012
Page 3

Please confirm for the record whether or not Maj. Hasan and Aulaqi met while he served as imam for the Dar al Hijrah mosque in Falls Church, Virginia. If so, please provide a summary of the FBI's full understanding of their encounters, including the funeral.

### 3. Statement on FBI's perception of full nature of the Aulaqi threat.

I asked Mr. Giuliano if he agreed that violent Islamist extremism was *a* cause of the Fort Hood terrorist attack. He refused to comment, but said "Clearly, Anwar Aulaqi was an individual who was well known in the community, he was a – a propagandist at that point back in that time."

In a later response to a question from the subcommittee's ranking member, Mr. Fattah, Mr. Giulaino stated, "So [Aulaqi] changed and he changed a lot over the years. When he went to prison in Yemen in, you know, '06, '07 and as he came out and came back up online in early '08, [Aulaqi] still had somewhat of a moderate tone but – but began to be more of a propagandist, began to show more radical tendencies, but we could not and the [Intelligence Committee] did not see him as operational or in an operational role at that time."

Aside from Mr. Giuliano's troubling failure to acknowledge the obvious about Maj. Hasan's violent Islamist extremist motivation for the attack, I was troubled by his characterization of the Aulaqi threat in 2009 – including his assessment that Aulaqi "still had somewhat of a moderate tone" as late as 2008. This statement, quite simply, is fundamentally false.

According to a February 27, 2008 *Washington Post* article by Susan Schmidt titled "Imam from Va. Mosque Now Thought to Have Aided Al-Qaeda," a U.S. counterterrorism official speaking on the condition of anonymity said, "There is good reason to believe Anwar Aulaqi has been involved in very serious terrorist activities since leaving the United States, including plotting attacks against America and our allies." Again, this article was published in early 2008, the same period of time that Mr. Giuliano asserted that Aulaqi "still had somewhat of a moderate tone" and alleged that the U.S. Intelligence Community "did not see [Aulaqi] as operational or in an operational role at that time."

Additionally, according to the article, Aulaqi had a very long record of radical rhetoric -- not the "moderate tone" as Mr. Giuliano alleged. Schmidt noted that just six days after 9/11, Aulaqi wrote on the "IslamOnline" Web site that the FBI "went into the roster of the [hijacked] airplanes and whoever has a Muslim or Arab name became the hijacker by default," and months later Aulaqi "posted an essay in Arabic titled 'Why Muslims Love Death' on the Islam Today Web site, lauding the fervor of Palestinian suicide bombers."

Schmidt also reported that "In one speech apparently made in 2006, [Aulaqi] predicted an epic global clash between Muslims and 'kfur,' or nonbelievers. 'America is in a state of war with Allah,' he said, referring to the fighting in Afghanistan and Iraq. He praised the insurgency

The Honorable Robert S. Mueller III
August 15, 2012
Page 4

in Iraq and 'martyrdom operations' in the Palestinian territories. Muslims must choose sides between President Bush and the 'mujaheddin,' he said. The solution for the Muslim world, he said, 'is jihad.'"

If these comments were all made prior to 2008, how can Mr. Giuiliano honestly state that Aulaqi still had a "moderate tone" and was not operational as late as 2008?

Even within the FBI, many believed Aulaqi was a far more serious threat around 2009 than Mr. Guiliano indicated. The Webster Commission report specifically noted that at least certain sections of the bureau perceived the threat posed by Aulaqi around 2009 as more substantial than a "propagandist" or radicalizer. Specifically, the unclassified version of the Webster Commission report notes "SD-Agent and SD-Analyst believed Aulaqi had [ambitions beyond radicalization]," which conflicts with Mr. Giuliano's description of Aulaqi as merely a "propagandist at that point back in time."

There is ample evidence that Aulaqi had demonstrated operational roles in terrorism activities far earlier than 2009, despite Mr. Giuliano's assessment. A detailed examination of Aulaqi's record -- based on publicly available reports -- clearly demonstrates Aulaqi's history of operational actions and associations with al-Qaeda affiliated groups and individuals.
When the Treasury Department "designated" Aulaqi under Executive Order 13224 in July 2010, its press release included a quote from Stuart Levey, the under secretary for terrorism and financial intelligence, stating, "[Aulaqi] has involved himself in every aspect of the supply chain of terrorism -- fundraising for terrorist groups, recruiting and training operatives, and planning and ordering attacks on innocents." The release indicates Aulaqi's operational role starting as early as January 2009 -- the exact same timeframe I asked Mr. Giuliano about during the hearing. How did Treasury come to a different understanding of Aulaqi's role in early 2009 than the bureau?

Additionally, the Treasury Department's release specifically notes that Aulaqi was "imprisoned in Yemen in 2006 on charges of kidnapping for ransom and being involved in an al-Qaeda plot to kidnap a U.S. official." This plot and his subsequent arrest certainly indicate that Aulaqi was far more operational prior to 2009 than Mr. Giuliano indicated.

Aulaqi, himself, wrote of his radicalization in the early 1990s. In his final column for al Qaeda's *Inspire* publication, before his death last year, Aulaqi wrote about his radicalization and his early affiliation with al Qaeda-affiliated groups, which was not referenced in the Webster Commission analysis of Aulaqi's record. Aulaqi wrote that following the Gulf War, "That is when I started taking my religion more seriously and I took the step of traveling to Afghanistan to fight," in 1993. "I spent a winter there and returned with the intention of finishing up in the U.S. and leaving Afghanistan for good. My plan was to travel back in summer. However, Kabul was opened by the mujahideen and I saw that the war was over and ended up staying in the U.S."

The federal government's own records show that Aulaqi was far more closely affiliated with al-Qaeda than the bureau has indicated. A 2009 New York Police Department (NYPD) special analysis report on Aulaqi reported that from 1998 to 1999, Aulaqi served as the vice

The Honorable Robert S. Mueller III
August 15, 2012
Page 5

president for the Charitable Society for Social Welfare, which federal prosecutors have described as "a front organization... used to support al-Qaeda..."

The NYPD report also notes that from 1999 to 2000, the FBI investigated Aulaqi for "fundraising links to Hamas and al-Qaeda" and found that Aulaqi met with "an associate of Omar Abdel Rahman," the "blind sheik," who is currently serving a life sentence for terrorist activities associated with the 1993 World Trade Center attack that killed six people. According to Schmidt's February 2008 article, "Law enforcement sources now say that agent was Ziyad Khaleel, who the government has previously said purchased a satellite phone and batteries for bin Laden in the 1990s. Khaleel was the U.S. fundraiser for Islamic American Relief Agency, a charity the U.S. Treasury has designated a financier of bin Laden and which listed Aulaqi's charity as its Yemeni partner."

The Webster Commission report also explicitly notes that Aulaqi was twice under investigation by the FBI prior to his reemergence in Yemen: once by SDFO in the late 1990s and again – under full investigation by WFO – from 2001 to 2003. These two investigations demonstrate that, as early as 14 years ago, the FBI considered Aulaqi to be a significant concern.

The NYPD report also indicates that in 2002 the federal government added Aulaqi to the Terror Watchlist, which coincidentally is managed by the FBI. Again, this designation should certainly demonstrate that the both bureau and the entire Intelligence Community, in fact, considered Aulaqi to be of serious concern as early as 2002.

It is also worth noting that around 2006, prior to his arrest in Yemen, Aulaqi was invited to give lectures at the Yemini university run by Abdul al-Zindani, "designated" a terrorist in 2004 by the U.S.

This record indicates that Aulaqi has long been viewed by both the FBI and the Intelligence Community as a more significant threat than the mere "propagandist" than Mr. Giuliano stated. Given this public information demonstrating Aulaqi's long history with al-Qaeda-affiliated groups and multiple bureau investigations, please confirm for the record whether the bureau viewed Aulaqi only as "propagandist" with a "moderate tone" as late as 2008, or in fact regarded him as a more complex and substantial threat than Mr. Giuliano described?

### 4. Statement on Aulaqi as confidential informant for the FBI:

I asked Mr. Giuliano whether Aulaqi or Hasan had ever served as a confidential informant for the FBI, given that the Webster Commission report noted that the SD officers suspected this based on WFO's failure to further investigate Hasan. Mr. Giuliano definitively responded, "No, sir."

However, Aulaqi's own words could potentially indicate otherwise. In his final column for *Inspire,* Aulaqi wrote: "I was visited by two men who introduced themselves as officials with

The Honorable Robert S. Mueller III
August 15, 2012
Page 6

the US government (they did not specify which government organization they belonged to) and that they are interested in my cooperation with them. When I asked what cooperation did they expect, they responded by saying that they are interested in having me liaise with them concerning the Muslim community in San Diego."

Although Mr. Giuliano testified that neither Aulaqi nor Hasan ever <u>served</u> as a confidential informant for the FBI, in light of Aulaqi's own comments, I would like you to provide for the record whether the FBI or other federal agencies ever approached, cultivated or targeted Aulaqi or Hasan to be potential confidential informants. I believe this additional information would help reconcile Aulaqi's comments with the bureau's actions – and perhaps clarify why the FBI was reluctant to take more aggressive investigative actions with regard to Aulaqi.

### 5. Statement on Aulaqi's relationship with 9/11 hijackers:

I asked Mr. Giuliano about the FBI's understanding of Aulaqi's relationship with the 9/11 hijackers. I wanted to know whether the bureau's view on Aulaqi's connection to the 9/11 plot might have influenced its actions in 2009.

In response to my question, Mr. Giuliano stated, "We were never able to obtain <u>a stitch of evidence</u> that shows Aulaqi knew beforehand about 9/11 or supported the 9/11 hijackers." However, the public record shows that there were certainly a number of signs that show Aulaqi may have been closer to the 9/11 plot than originally believed. Consider the following:

- The 9/11 Commission report noted that, "Some [FBI] agents suspect that [Aulaqi] may have tasked Rababah to help [9/11 hijackers] Hamzi and Hanjour. We share that suspicion, given the remarkable coincidence of [Aulaqi]'s prior relationship with Hamzi."

- Last year House Homeland Security Committee Chairman Peter King sent you and Secretary Napolitano the enclosed letter detailing other known links between Aulaqi and the 9/11 plot. This information certainly adds to the 9/11 Commission's suspicions about Aulaqi's role in a possible domestic support network for the hijackers.

- Former Senator Bob Graham, a past chairman of the Senate intelligence committee, wrote in his 2004 book that, "Some believe that Aulaqi was the first person since the [al Qaeda] summit meeting in Malaysia with whom al-Mihdhar and al-Hazmi shared their terrorist intentions and plans."

- The 2009 NYPD report on Aulaqi also noted that, "Witnesses claim closed door meetings between [Aulaqi and Hamzi and Mihdhar] were common." It also reports that following 9/11, "German police found a phone number for the Dar al-Hijrah mosque [where Aulaqi served as imam at the time] in the apartment of Ramzi Binalshibh, a 9/11 co-conspirator."

The Honorable Robert S. Mueller III
August 15, 2012
Page 7

- In 2010 the *New York Times* reported, "One day in August 2001, Mr. [Aulaqi] knocked at the door of Mr. Higgie, his neighbor, to say goodbye. He had moved the previous year to Virginia, becoming imam at the far bigger Dar al-Hijrah mosque, and he had returned to pick up a few things he had left behind. As Mr. Higgie tells it, he told the imam to stop by if he was ever in the area — and got a strange response. 'He said, 'I don't think you'll be seeing me. I won't be coming back to San Diego again. Later on you'll find out why,'' Mr. Higgie said. The next month, when Al Qaeda attacked New York and Washington, Mr. Higgie remembered the exchange and was shaken, convinced that his friendly neighbor had some advance warning of the Sept. 11 attacks."

Despite these very serious connections to the 9/11 hijackers and suspicious comments, Mr. Giuliano testified, "We were never able to obtain a stitch of evidence that shows Aulaqi knew before hand about 9/11 or supported the 9/11 hijackers."

Please confirm for the record that Mr. Giuoliano's statement that the FBI was "never able to obtain a stitch of evidence that shows Aulaqi knew beforehand about 9/11 or supported the 9/11 hijackers" accurately reflects the FBI's position?

Also, please confirm for the record whether Mr. Guiliano's characterization correctly represents the FBI's understanding of Aulaqi's connection to the 9/11 plot today, especially in light of any information that may have been learned from documents seized during the raid on Osama bin Laden's compound in May 2011?

### 6. Statement on Aulaqi's 2002 return to the United States:

As you know, for several years I have been pressing the FBI for a full accounting of why Aulaqi was abruptly released from custody upon his return to the U.S. in October 2002. I have not yet received an unclassified explanation.

Following Aulaqi's abrupt departure from the U.S. in early 2002, the State Department became aware of Aulaqi's fraudulent Social Security and passport statements, and the warrant for his arrest was approved. However, Fox News and others have reported that on October 9, 2002, the U.S. Attorney's office in Colorado abruptly and uncharacteristically submitted a motion to dismiss its complaint and vacate the outstanding arrest warrant against Aulaqi.

On the same day, Aulaqi was reportedly the subject of a classified FBI Electronic Communication (EC) memo. At that same time, Aulaqi was en route back to the U.S. after months living abroad but was detained by U.S. customs agents upon his arrival at Kennedy Airport in New York City.

However, following his detention at Kennedy early on the morning of October 10, 2002, Aulaqi was reportedly ordered to be released by U.S. customs agents after having been detained on an outstanding warrant, according to the Fox News report. This is particularly questionable given the time of these events. The Colorado U.S. Attorney's motion to dismiss the warrant was not approved until October 11, 2002 -- the day after Aulaqi was inexplicably released into the U.S. To date, this action and the timeline of these events have never been adequately explained.

The Honorable Robert S. Mueller III
August 15, 2012
Page 8

Had Aulaqi been arrested and tried in 2002, there is a chance that his rise as a radicalizer and terrorist operative over the last decade might have been prevented. While there may have been a reasonable argument for allowing him into the U.S. at the time the decision was made in October 2002, the FBI has, thus far, failed to publicly explain its rationale and its role. More troubling, the documents surrounding the release of Aulaqi do not match the bureau's public statements on this incident.

Given the key role that Aulaqi played in the radicalization of Maj. Hasan, and 13 innocent individuals who died at Ft. Hood as a result of his radicalization, I asked Mr. Giuliano to provide some explanation for this landmark October 2002 incident. While the full summary of our dialogue may be found in the committee record, I want to note several noteworthy comments made by Mr. Giuliano on this topic during the hearing that may or may not contradict the FBI's official position on this incident.

Mr. Giuliano testified, "I assure you, the bureau, if anything at that point [in October 2002], would have, if we could have incarcerated [Aulaqi], we would have." He also told the committee, "We knew [Aulaqi] was coming in before [his flight arrived]...

The unclassified version of the Webster Commission report confirmed that around 2001, "WFO opened a full investigation" on Aulaqi, and it remained open until May 2003, after Aulaqi again fled the U.S. for the U.K. and, later, Yemen.

As noted above, NYPD reported that Aulaqi was placed on the federal government's Terror Watchlist in Summer 2002. Please explain why and how Aulaqi was permitted to board a flight to the U.S. in October 2002 if he was already included on the watchlist?

Additionally, if, as Mr. Giuliano testified, the FBI "knew [Aulaqi] was coming in" before he landed at JFK, what information was communicated to the U.S. attorney's office that would set off this strange series of events early in the morning of October 10? Please provide for the record the full series of communications between the FBI and the U.S. attorney's office and the customs office?

During the hearing, I raised the question of whether the FBI requested that Aulaqi be allowed into the country, without detention for the outstanding warrant, due to a parallel investigation regarding Aulaqi's former colleague al Timimi, a radical imam who was recruiting American Muslims to terrorism. Notably, the Timimi case was being led by the same WFO agent who called the U.S. attorney's office and customs on the morning of October 10. Did WFO want Aulaqi released to assist in its investigation of Timimi?

Public records demonstrate a nexus between these cases. According to Schmidt's article, after flying to Washington on October 10, Aulaqi visited Timimi. Timimi's own attorney in a court filing wrote, "Aulaqi attempted to get al Timimi to discuss issues related to the recruitment of young Muslims," for jihad. "Timimi was sentenced in 2005 to life in prison for inciting young Muslims to go to Afghanistan after 9/11 and to wage war against the United States.

The Honorable Robert S. Mueller III
August 15, 2012
Page 9

Eleven of his followers were convicted of charges including weapons violations and aiding a terrorist organization."

According to a November 30, 2009 ABC News article titled "How Anwar [Aulaqi] Got Away:" "The decision to cancel [Aulaqi]'s arrest warrant outraged members of a Joint Terrorism Task Force in San Diego, which had been monitoring the imam. 'This was a missed opportunity to get this guy under wraps so we could look at him under a microscope,' said a former agent with the Joint Terrorism Task Force (JTTF), who asked not to be named. 'He couldn't cause any harm from a prison cell.'"

The timing and rationale for these decisions simply don't add up. Andrew McCarthy, the former assistant U.S. attorney who prosecuted the blind sheik, recently wrote, "To begin with, the warrant had not been 'pulled back' at the time of [Aulaqi]'s detention at JFK. The prosecutor and the FBI may have made an application for dismissal from the court, but not such application had been granted. The warrant was still in effect. It was not dismissed by a judge until later that day, at the earliest. Of course, had the warrant actually been vacated at the time of [Aulaqi]'s arrival, as the government has been claiming, it would almost certainly have been withdrawn from the Customs database. And if, as the government claims, the FBI told Customs the warrant had been 'pulled,' the protocol would have been for Customs to ask for, and the FBI to supply, easily accessible paperwork showing dismissal of the warrant by the court. There was no such paperwork because the warrant had not been dismissed. Customs appears to have released [Aulaqi] based not on a court dismissal but on the FBI's say-so."

McCarthy continued: "When [Aulaqi] was detained at JFK airport on October 10, 2002, there was a live warrant for his arrest and every valid reason to press ahead with the case against him. If, down the road, a defense lawyer thought he could make the 'correct the record' gambit fly, the prosecutor could have opposed that in court – that's what prosecutors do. There was no reason to dismiss the case at that point."

To that point, Mr. Giuliano testified to the committee that the FBI knew Aulaqi would be arriving in the U.S. – and more importantly – told me, "I assure you, the bureau, if anything at that point, would have, if we could have incarcerated Aulaqi, we would have."

Please confirm for the record whether the FBI did everything in its power to incarcerate Aulaqi on October 10, 2002? Specifically, did the WFO agent or others ask the customs office and/or the U.S. attorney's office to use the outstanding warrant to detain Aulaqi further, as Mr. Giuliano asserted that the FBI would have wanted? Or did the FBI ask the other agencies involved to stand down and withdraw the warrant to allow Aulaqi in the country for the purpose of further investigation regarding Timimi or other suspects?

I am asking you to provide the committee with a detailed unclassified accounting of the FBI's actions in October 2002 with regard to Aulaqi. Given that I have been asking for this information since 2010, I believe it is long overdue. I also request that this information be provided to my colleague, Rep. Fattah, as well as House Homeland Security chairman Rep. Peter King, House Intelligence Committee chairman Rep. Mike Rogers and ranking member, Dutch

The Honorable Robert S. Mueller III
August 15, 2012
Page 10

Ruppersberger, Senate Commerce-Justice Science Appropriations subcommittee chairman Sen. Barbara Mikulski and ranking member Sen. Kat Bailey Hutchison, Senate Homeland Security chairman Sen. Joe Lieberman and ranking member Sen. Susan Collins, and Senate Intelligence chairman Sen. Diane Feinstein and ranking member Saxby Chambliss.

    Finally, I remain concerned that the Justice Department has never fully explained why it failed to use its authorities under the Patriot Act and other anti-terror statutes to investigate and prosecute Hasan, especially given his communications with Aulaqi, who is the ultimate terrorist given his connections to the Christmas Day attempted bombing and other plots. This connection is noteworthy because the president authorized the drone strike that targeted and killed Aulaqi last year. Yet, these important anti-terror investigative tools were provided to the FBI and Justice Department for cases exactly like the Fort Hood attack, but a decision was made in the department not to exercise these authorities. Can you please explain to the committee why this decision was made, and whether the department sacrificed any opportunities to gather additional evidence in choosing not to use these tools?

    I hope you can understand why I was disappointed in a number of the statements made to the subcommittee during this hearing. That is why I wanted to give you the opportunity to correct the record. I expect that you will provide the committee, by September 15, with the necessary information to clarify some of these misleading, inaccurate or incomplete statements. I look forward to your response.

    I sincerely appreciate your efforts – and those of the hard-working agents, analysts and staff members of the FBI – to keep the country safe.

Best wishes.

Sincerely,

Frank R. Wolf
Member of Congress

PETER T. KING, NEW YORK
CHAIRMAN

BENNIE G. THOMPSON, MISSISSIPPI
RANKING MEMBER



One Hundred Twelfth Congress
U.S. House of Representatives
Committee on Homeland Security
Washington, DC 20515

October 25, 2011

The Honorable Janet Napolitano
Secretary
Department of Homeland Security
Washington, D.C. 20528

The Honorable Eric H. Holder, Jr.
Attorney General
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Dear Secretary Napolitano and Attorney General Holder:

The Committee on Homeland Security is investigating the role of the late Anwar al-Awlaki and his associates in the September 11, 2001 attacks. In furtherance of that investigation, I write to request that the Departments of Homeland Security and Justice not seek to deport Daoud Chehazeh, an associate of Awlaki and two of the 9/11 hijackers, without first questioning Chehazeh -- under oath -- about what role he, Awlaki and their associate Eyad al-Rababah played in the 9/11 attacks.

It is well-known that Awlaki met 9/11 hijackers Khalid al-Mihdhar, Hani Hanjour and Nawaf al-Hazmi in California and Virginia in 2000 and 2001, and with Hazmi in both locations. Awlaki fled the US in 2002.

Awlaki was later implicated in several attempted terror attacks on the Homeland, and connected to fatal attacks in Little Rock, Arkansas and Fort Hood, Texas in 2009. At the time of his death, Awlaki served as al-Qaeda in the Arabian Peninsula's external operations coordinator, and was described by senior Government officials as a terrorist at least as dangerous as Usama bin Laden. It is not yet known if Awlaki was an al-Qaeda member in 2000-01, or if he was radicalized to terrorism sometime between then, and his public emergence as an al-Qaeda leader in 2009.

It is also known that hijackers Hanjour and Hazmi met in 2001 with a contact of Awlaki's, Palestinian identity documents procurer Eyad al-Rababah. As discussed by the Report of the National Commission on Terrorist Attacks upon the United States, Rababah helped Hanjour and Hazmi find apartments in New Jersey and Virginia, and accompanied hijackers Hanjour, Hazmi, Ahmed al-Ghamdi and Majed Moqed on a trip to Connecticut. Rababah knew the hijackers were undertaking flight training. Rababah was deported to Jordan in 2002.

According to the 9/11 Commission, "Some FBI investigators doubt Rababah's story. Some agents suspect that Awlaki may have tasked Rababah to help Hazmi and Hanjour. We share that suspicion, given the remarkable coincidence of Awlaki's prior relationship with Hazmi."

What is not as well known, and may not have been shared with either the Joint Inquiry into the Terrorist Attacks of September 11, 2001 by the House and Senate Intelligence Committees, or the 9/11 Commission, is the following. I am reliably informed that:

- In March 2001, Rababah met a Syrian procurer of Saudi visas, Daoud Chehazeh.

- Chehazeh informed Rababah that they must move to the Boston or Washington areas (the points of origin for three of the hijacked flights).

- In April 2001, Chehazeh and Rababah moved to Virginia together, with Rababah paying the rent for both men.

- Chehazeh directed Rababah to Anwar al-Awlaki at the Dar al-Hijrah mosque in Virginia to find "work."

- Awlaki then directed hijackers Hanjour and Hazmi to Rababah.

- Chehazeh described the hijackers to Rababah as "special police" and "important" men.

- A reliable eyewitness states that Rababah frequently visited the same New Jersey library computer facility with Hanjour and Hazmi where Hanjour bought his tickets for 9/11.

- Documentary evidence suggests that Chehazeh was likely aware of Hanjour's flight training past the World Trade Center.

- Chehazeh lives in New Jersey, is the subject of an asylum proceeding currently under appellate review (*Daoud Chehazeh v. Attorney General of the United States, et al.*, Case No. 10-2995), and has never been questioned under oath about his role in the attacks.

In addition to the facts already provided to the Joint Inquiry and the 9/11 Commission, this additional evidence suggests that Awlaki, Chehazeh and Rababah may have facilitated the 9/11 attacks, and perhaps even wittingly facilitated these attacks.

The Committee on Homeland Security is committed to determining what role these men, and any other at-large Awlaki associates, may have played in the worst mass murder in US history. I request that the Departments of Homeland Security and Justice not seek to deport Chehazeh without first questioning Chehazeh, under oath, about what role he, Awlaki and their associate Eyad al-Rababah may have played in the 9/11 attacks.

If you have any questions regarding this letter, please contact Kevin Carroll or Joseph Herbert on my staff at 202-226-8417.

Sincerely,

PETER T. KING
Chairman

## CHRONOLOGY

| | |
|---|---|
| 1971 | **Born in New Mexico to Yemeni parents. He holds U.S. and Yemeni citizenship.** |
| 1975-1977 | Awlaki's father, Nasser al-Awlaki, works at the University of Minnesota |
| 1978 | Family moves back to Yemen |
| | Nasser al-Awlaki becomes Agriculture Minister and a university president |
| 1991 | Begins attending Colorado State University on a F-1 student visa |
| 1995 (est.) | Obtains a B.S. in Civil Engineering from Colorado State University |
| | Becomes imam in Fort Collins, Colorado |
| 1995-1996 (est.) | Moves to San Diego to obtain M.A. in Education Leadership from San Diego State University |
| | **Becomes imam at Masjid Ar-Ribat al-Islami mosque in San Diego.** |
| 1996-1997 | Arrested twice in San Diego for soliciting prostitutes |
| 1998-1999 | **Serves as Vice President for Charitable Society for Social Welfare (CSSW),** founded by Abdul Majeed al-Zindani. Federal prosecutors have referred to CSSW as "a front organization…used to support al-Qaeda…." |
| | **FBI investigates Awlaki for fundraising links to HAMAS and Al-Qaeda.** |
| Jun. 1999–2000 | Awlaki is connected to Ziyad Khaleel, a fundraiser for the Islamic American Relief Agency, a charity designated as a terrorism-financier and a partner-charity with CSSW. |
| | **Awlaki reportedly meets with an associate of Omar Abdel Rahman** |
| | FBI lacks evidence to arrest; case closed. |
| Early 2000 | **Khalid al-Mihdhar and Nawaf al-Hazmi, two 9/11 hijackers, visit the Awlaki's San Diego mosque.** Witnesses claim closed door meetings between them were common. |
| Feb. 4, 2000 | Phone calls are made from Awlaki's phone to Omar Bayoumi's phone (Bayoumi assisted Al-Mihdar and al-Hazmi in finding a San Diego apartment) |
| | Begins Ph.D. at George Washington Univ. for Human Resource Development |
| Jan. 2001 | **Becomes imam at Dar al-Hijrah Mosque in Falls Church, Virginia. Ft Hood shooter, Nidal Malik Hasan attends the sermons.** |
| April 4, 2001 | Al-Hanjour and Hazmi move to Falls Church. **Three 9/11 hijackers – al-Mihdar, al-Hazmi, and al-Hanjour –attend Awlaki's sermons.** |
| Sept. 11, 2001 | 9/11 Attacks |
| Sept. 17, 2001 | Awlaki at first condemns the 9/11 attacks, then suggests Israeli culpability |
| Post 9/11 | **German police find phone number for the Dar al-Hijrah mosque in the apartment of Ramzi Binalshibh, a 9/11 co-conspirator** |

2

| | |
|---|---|
| *2001-2002 (est.)* | FBI observes Awlaki taking prostitutes from DC to Virginia; contemplates use of Mann Act, a federal law prohibiting transporting prostitutes across state lines |
| March 2002 | Awlaki leaves United States for Yemen |
| Summer 2002 | **Awlaki becomes target of JTTF investigation** after the subject of an investigation sends him money; **Awlaki's name placed on terror watch list** |
| Early Oct. 2002 | **Federal judge issues arrest warrant for Awlaki** for passport fraud and making a false statement. [Awlaki had attended college on a foreign-student visa falsely claiming he was born in Yemen, not the U.S.] |
| Oct. 9, 2002 | **Colorado U.S. Attorney's Office in Denver withdraws the arrest warrant** |
| Oct. 10, 2002 | **Awlaki arrives at JFK airport** from Riyadh (potential connection from Yemen). **He is briefly detained, then released** due to withdrawn warrant |
| Oct. 2002 | **Federal court papers assert that Awlaki visited Ali al-Timimi**, who is now serving a life sentence for inciting followers to fight on behalf of the Taliban, to ask how to recruit members for "violent jihad." |
| Fall 2002 | Awlaki moves to Britain; develops lectures and audiotapes for the internet |
| 2004 | Moves to Yemen permanently |
| *2006 (est.)* | Gives a few lectures at al-Iman University, run by al-Zindani, who was designated foreign terrorist by the U.S. government in 2004. |
| Aug. 31, 2006 | **Awlaki arrested in Yemen**; claims he was questioned by FBI agents |
| Dec.12, 2007 | **Awlaki released from prison.** |
| Dec. 17, 2008 | **Awlaki: Received the first email from Ft Hood shooting, Nidal Hasan** |
| Late Dec.2008 | East London Mosque controversially hosts an Awlaki lecture via videolink |
| March 2009 | **Awlaki's parents say he has been missing since March 2009.** Suspected of hiding in Mareb or Shabwah governorates. [Family originally from Shabwah]. |
| Aug. 2009 | Awlaki banned by London authorities from speaking via videolink to a fundraiser event for Guantanamo detainees |
| Nov. 5, 2009 | Ft. Hood Shooting |
| Nov. 2009 | **Awlaki's website removed from WordPress** |

*Note: al-Awlaki has a wife and five children (three boys and two girls). They are currently residing with his father, Nasser.*

## AL-AWLAKI'S INFLUENCE ON TERRORIST ACTORS

Awlaki's lectures are strongly pro-jihad and supportive of al-Qaeda and its affiliates. In January of this year, he released an article entitled, "44 Ways to Support Jihad;" in July, he praised the efforts of al-Qaeda after militants in Yemen clashed with the government; and, on his blog, he has praised al-Shabaab, who has pledged allegiance to the al-Qaeda cause. In the following case studies, Awlaki is suspected of being a spiritual advisor to operatives, recruiters, and homegrown terrorists.

3