COMMISSION SENSITIVE

MFR 04019894

# MEMORANDUM FOR THE RECORD

Event: **Duncan Wainwright, Assistant Division Counsel, WFO, FBI**

Type of event: Interview

Date: August 13, 2003

Special Access Issues: None

Prepared by: Peter Rundlet

Team Number: 6

Location: FBI, Washington Field Office

Participants - Non-Commission: Sean O'Neill, Assistant General Counsel

Participants - Commission: Lance Cole and Peter Rundlet

**Background.** Duncan Wainwright graduated from Valparaiso School of Law in 1979. He came to the FBI in 1982 as an Agent, starting in the Chicago Field Office. In 1983, he was sent to the Hickory, North Carolina Resident Agency and in June, 1984 he came to the Washington Field Office (WFO) as a street crime Agent. In 1987, Wainwright went to FBI Headquarters (HQ) as a Supervisor in the Organized Crime Section. From 1991-92 Wainwright had a brief "stint" in the Civil Litigation Unit of the Office of the General Counsel (OGC). In 1992, Wainwright returned to the WFO to be an SSA in charge of a Labor Racketeering squad. In 1994, Wainwright switched to the Healthcare squad. He later became "Inspection Certified" and in 1999, he rotated to the Office of Division Counsel at WFO. There are four counsels in the office at WFO: he is the Assistant Division Counsel (ADC) for Foreign Counterintelligence (FCI) and Counterterrorism (CT); another does FOIA, one does administrative law and civil litigation; and one does criminal advice and training, and this person does most of the "Title III" work.

**Job Description, Pre-9/11.** National security has been the focus of Wainwright's work since 1999. Wainwright had to seek a detail to the National Security Law Unit (NSLU) at HQ for six weeks for "immersion training" to get up to speed. Prior to 9/11, the NSLU had 9 attorneys; now it has 25. The Unit Chief for the NSLU was Mike Woods until about a year ago; Woods had Wainwright sit in on the weekly Unit meetings and he continues to attend those to this day. Prior to 9/11, Wainwright assisted Agents with Foreign Intelligence Surveillance Act (FISA) applications on the National Security Division (NSD) side, as well as compulsory process National Security Letters (NSLs). He frequently provided operational guidance to NSD Agents. Agents on the NSD side were "confused" about dealings with the US Attorneys Office and he acted as a liaison with the Office of Intelligence Policy and Review (OIPR), who he called "the enforcers of the Wall." He also had some odd administrative duties.

**The Wall.** Before the Foreign Intelligence Surveillance Court of Review opinion that tore down the Wall, Wainwright said the Wall was clearly in place, entrenched, and rigorously

COMMISSION SENSITIVE
9/11 Classified Information

COMMISSION SENSITIVE

enforced by OIPR. There is significant discussion of the Wall issue and how the Wall was "killing the FBI" in the Bellows Report, done by Randy Bellows on the Wen Ho Lee case. Wainwright said that he "was surprised to learn of the Wall" since he came from an organized crime background. Wainwright said that there was limited sharing of FISA or non-FISA information between Intelligence investigations and criminal. Wainwright stated that David Cris wrote an internal DOJ monograph on the Wall and provided testimony on the Hill. During this era, Wainwright helped guide compliance and he attempted to make operational progress by using the exceptions.

The Wall had a very significant effect on the FBI's Counterterrorism (CT) and Counterintelligence (CI) activities because they "couldn't deal with the criminal guys." Wainwright mentioned the "primary purpose" test which was built into the FISA. As a precautionary measure, they disallowed CI and CT agents from talking to the criminal agents (they feared that if they talked to the criminal agents, they might be suspected of not having foreign intelligence as the "primary purpose" of the FISA. For every case involving a U.S. person, a Letterhead Memorandum (LHM) was submitted to OIPR. Wainwright believed there were LHMs on non-U.S. persons as well, but that this was less stringent. Prior to the Patriot Act, there was no clear-cut mechanism to share information with the criminal side. Wainwright stressed the irony of this [9/11 Classified Information]
[9/11 Classified Information]

**Attorney General Guidelines.** Wainwright said that there were three applicable AG Guidelines: (1) the July, 1995 AG Guidance (from Reno); (2) the 2000 Deputy AG Guidance, which clarified the earlier AG Guidance; and (3) the early 2001 Guidance, which explained the prior two.

**FISAs prior to 9/11.** Prior to 9/11, the FBI ran lengthy Form 199 intelligence cases, where they tried to keep track of individuals and disrupt them, but generally not criminal prosecutions. Deportation under the Absconder Program was an option, but it was not a strong tool. Prosecution on small matters (*e.g.*, food stamp fraud) was used only very infrequently because of the concern that the FBI could be accused of using a FISA to make a petty crime case.

Before 9/11, Wainwright said that they would submit "50-page tomes" for affidavits to make clear that no criminal investigations were going on. They would write "even 30 pages" for [9/11 Classified Information]

**LHMs.** The purpose of the LHM was to identify the nature of your investigation. Wainwright said that "sometimes criminal activity ended up in the LHM, but it was not required until 2002." The LHM was also required to keep HQ and OIPR apprised of all intelligence investigations. Wainwright noted that OIPR has an oversight function for all intelligence cases.

**OIPR/Oversight.** OIPR processes warrants and provides guidance on investigations. Occasionally, Wainwright said, OIPR would advise the FBI to close certain cases. Wainwright said that there was a general perception that the Wall was "crazy," and that it hampered them. They felt like they fought the battle and lost. Agents feared that they would be sanctioned by the Intelligence Oversight Board, which is a Presidential entity that could sanction the agents

COMMISSION SENSITIVE

9/11 Classified Information

personally. "There was a sense that discipline was not meted out fairly between higher-ups and agents."

The Wall was clearly one-way from the intelligence (NSD) side to the criminal side. Going the opposite way, Grand Jury information under Rule 6(e) and Title III was also limited in what they could share, but not nearly as tight a restriction in this direction. Wainwright said that the Wall even affected personal relationships between criminal and intelligence agents.

**FISA Application Process.** Prior to 9/11, agents would first have to draft lengthy LHMs requesting that a FISA be done, and they would include a lot of information. Then, the LHM was sent to a GS-14 counterpart at HQ, who would then have to craft the LHM into an affidavit that showed probable cause – "but it was really a higher standard: beyond certainty." From there, it would go to the NSLU to get edited and blessed. They had to craft it into the proper format before sending it to OIPR. Wainwright said this process took months. OIPR then took time to review the application. Prior to 9/11, they had other priorities. [redacted] But, Wainwright noted, this takes up the AG's time and the Court's time [redacted]

9/11 Classified Information

**NSLs.** Before the Patriot Act, National Security Letters were limited to 3 types of entities: (1) phone carriers and Internet Service Providers; (2) financial institutions (those listed in the Right to Privacy Act; specifically, banks and credit unions, not casinos, brokerage houses, pawn shops, etc.); and (3) credit reporting companies (they can get accounts, addresses, and employment, but not balances). Since 9/11 the scope of NSLs has not changed, although the standard has changed. Before 9/11, they had to have specific articulable facts and circumstances that X was engaging in terrorism, for example. The Assistant Director in Charge (ADIC) had to certify them. The WFO did their own, but for the other non-ADIC offices, the requests had to be sent to HQ and "it would take months to get an NSL." Wainwright noted that 18 U.S.C. 2709 has the provisions for NSLs for phones.

The new standard is that the information sought would be relevant to a case pertaining to CFI or CT (a relevance standard). Also, under the new standard, an SAC can certify to this, which makes it a lot easier, process-wise. At present, though, authority for NSLs is still limited to the 3 areas listed. [But note that there is legislation that greatly expands the definition of "financial institution" in the 2004 Intelligence Authorization bill extending the reach to casinos, pawn shops, etc.] Wainwright complained that even under the lower standard there are many things an agent cannot get in an intelligence case that they can easily get in a criminal case under a Grand Jury subpoena.

**Mail and Trash Covers.** Wainwright said that the SAC can request that the Postal Service copy the outside of letters for 30 days, when the request is made for a criminal case. This is run by the Postal Inspectors. On the national security/intelligence side, the FBI makes a

COMMISSION SENSITIVE

request of the AG to get a 90-day mail cover. The AG, through OIPR, must sign off on the request. An LHM is required to get a mail cover for intelligence purposes. Wainwright said that the SAC can sign off on a request for a trash cover since there is a lower expectation of privacy when it comes to trash.

Wainwright said that there is currently a problem with the Postal Service on mail covers. According to Wainwright, the Postal Service has the authority to turn down requests for mail covers by the AG, and sometimes rejects the request. Wainwright said that this is a recurring problem now. Wainwright said that Jack Livingston, the Unit Chief of the NSLU, is dealing with the Postal Service on this.

**Patriot Act & the "199 Order."** Wainwright said that Mike Woods, who is currently with MZM, a Department of Defense contractor that focuses on terrorism, was the primary FBI person involved with drafting the Patriot Act. Wainwright said that as a practical matter, the Wall did not come down until the FISA Court of Review opinion. The FISA Court of Review (which is the appellate court for FISA issues, and which has only been convened this one time) actually rewrote the AG Guidelines. But this came later. After the Patriot Act, the Foreign Intelligence Surveillance Court (FISC, which is the first-level court for FISA issues) reestablished the Wall to some extent. Thereafter, the FISA Court of Review reversed the decision and took down the Wall. Even before the FISA Court of Review opinion, however, the FISC had issued an order approving a request by the Terrorism and Violent Crime Section (now, the Counterterrorism Section) of the Criminal Division to have their attorneys review the FBI's Form 199 (terrorism intelligence case) investigation files for the purpose of identifying any criminal violations that suspected terrorists could be charge with. This was called the "199 Order." So, the DOJ attorneys reviewed the FBI's 199 files, primarily at HQ, according to Wainwright. When the Wall finally came down after the FISA Court of Review's opinion, Ashcroft established a policy to have AUSAs come over and review the FBI's 199 files to identify "any violation." The idea was to use every tool available. Wainwright said that not many criminal cases came out of this effort, but the Virginia Jihad case did.

**Class 199, 265, & TEI Investigations.** Class 199 cases are terrorism *intelligence* cases, and they are worked under the AG Guidelines for FCI and CT (the "FCI guidelines," which are classified and have been unchanged since Reno). Class 265 cases are terrorism *criminal* cases, and they are worked under the AG Guidelines for General Crimes in Terrorism (these were changed in April or May, 2002). So, Wainwright emphasized, there are two different sets of guidelines that apply to terrorism cases.

Wainwright said that HQ's position was that the FBI can work 199 cases under the Guidelines and if there is a criminal aspect to the case, then the agents can open up a 265 case and work that under the criminal guidelines. Wainwright said that if a 265 case is opened up first, then the rule is that a 199 *must* be opened as a parallel case. Wainwright called this "a paper exercise – since both are discoverable." Wainwright said that some agents were "dual hatting" – the same agents would sometimes have both files.

Wainwright said that the new guidelines in 2002 allowed for Terrorism Enterprise Investigations (TEIs), where previous guidelines referred to Racketeering Enterprise Investigations (REIs). Wainwright noted that the WFO is doing on TEI for ▓▓▓▓▓

COMMISSION SENSITIVE
9/11 Classified Information

COMMISSION SENSITIVE

● [redacted] in the Washington, DC metropolitan area. He said that they had to get HQ sign-off from the CT Section [of DOJ?]. Wainwright said the TEI was run by the Joint Intelligence Task Force (JITF, the intelligence squad) and that it is not being implemented "all that great." [9/11 Law Enforcement Sensitive] Wainwright noted that Jeff Reinhold of the CT Section and Gordon Crombie (sp?) of the Eastern District of Virginia, are very supportive.

[Note that the distinction between class 199 and class 265 cases is going to go away when the two are merged into class 315 cases.] Wainwright said that post-9/11, there are no walls within the FBI record system and that one agent is working both sides of a case.

**Attorney-Client Communications.** With respect to monitoring privileged conversations between attorneys and their clients, Wainwright said that, under FISA, the rules allow listening to privileged conversations when the subject has not yet been indicted because the monitoring is done for intelligence purposes. He said there may be new implications now that there is no Wall. Wainwright said that, for protection, they work these conversations so that the AUSAs that review the class 199 cases cannot see the take from the conversations. Wainwright said that there is a bright-line rule that requires that only the FISA Court can modify these rules. Once a subject is indicted, then OIPR is required to approve. Wainwright said this was analogous to prison monitoring rules.

● **FISA/Title III Standards.** Under the old FISA standard, agents had to show probable cause that the person is an agent of a foreign power and that he will use the specific facility (*e.g.*, telephones). In order to get a search warrant under Title III, the FBI has to show probable cause that the target has committed a crime and that he used the specific facility (*e.g.*, telephone) *in furtherance* of the crime (the so-called "dirty phone").

Wainwright said that the minimization standards under FISA and Title III were different

9/11 Classified Information

Wainwright emphasized that "now we can get information under FISA and use it in criminal cases, without going to Title III."

● **Authority under Different Phases of Investigation (PI v. FFI).** During the phase *prior to* a Preliminary Inquiry (PI), what the FBI can do in the CFI/CT context is very limited. Essentially, an agent can do one record check, Wainwright said. On the criminal side, an agent can do more. Wainwright noted that an agent can use all lawful investigative techniques during a full field investigation (FFI) for a criminal case. As a result, nearly all criminal international

COMMISSION SENSITIVE

COMMISSION SENSITIVE

terrorism (IT) cases go directly to a FFI, skipping the PI. For non-criminal cases, agents need to have a PI to question a subject. A PI can be opened when there is a "reasonable suspicion" that the person may be involved in IT or clandestine activity. Under a TEI, there is a perpetual FFI that is renewed on an annual basis.

[9/11 Classified Information] Wainwright said the CIA is "essentially useless to us." He said that the FBI gives the CIA everything they want, [9/11 Classified Information]

Wainwright said that a threat assessment was not shared. [9/11 Classified Information] "But we give them literally everything." [9/11 Classified Information] Wainwright continued: "If we're giving them too much, someone needs to tell us." He said there is no MOU in place for sharing information.

[9/11 Classified Information]

**Looking forward.** Wainwright said that it would be nice to use section 215 of the Patriot Act (regarding library records, etc.) and it will "be nice" to use the roaming wiretaps. He mentioned that they are trying to modify the definition of "financial institution" for the purposed of getting an NSL. He thinks there is a lot of "good stuff" in Patriot Act II. He also said that the FBI would like to get tax information – that they cannot get the information ex parte.

9/11 Classified Information

COMMISSION SENSITIVE