REDACTED / CLEARED FOR PUBLIC RELEASE

Filed with Classified
Information Security Officer

CISO _____

Date _____ 9/6/13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

|  |  |
|---|---|
| UNITED STATES | ) |
|  | ) |
| v. | ) |
|  | ) |
| ALI AL-TIMIMI | ) |

**Case No. cr-04-385**

**Hon. Leonie M. Brinkema**

## DEFENDANT DR. ALI AL-TIMIMI'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL DISCOVERY OF UNDISCLOSED MATERIAL INTERCEPT EVIDENCE CAPTURED PURSUANT TO FOREIGN INTELLIGENCE SURVEILLANCE ACT

Defendant Dr. Ali al-Timimi respectfully moves this Court, pursuant to Federal Rule of Criminal Procedure 16 and *Brady v. Maryland* and its progeny, to compel the government to produce previously requested and unlawfully withheld material intercept evidence captured pursuant to the Foreign Intelligence Surveillance Act ("FISA"). 50 U.S.C. 1801 et seq. Since the last hearing in this remand, defense counsel has obtained documents that confirm that the Justice Department's prosecution of the so-called "Virginia Jihad" conspiracy, a conspiracy which Dr. al-Timimi was accused of leading, was based on FISA surveillance that was conducted prior to 2003. This information validates the core concern of the Court of Appeals for the Fourth Circuit when it remanded this case before this Court in 2006, because it contradicts the government's fundamental assertions that (1) its investigation and surveillance of Dr. al-Timimi began only in 2003, (2) it possesses no FISA intercepts material to Dr. al-Timimi's case that pre-date 2003, and, most significantly, (3) that it has provided Dr. al-Timimi with all the discovery to which he is constitutionally and statutorily entitled.

REDACTED / CLEARED FOR PUBLIC RELEASE

Throughout this remand, defense counsel has objected that the government's position with respect to its discovery obligations is fatally flawed and based on a fundamental misreading of Rule 16, as well as the scope of this remand. *See, e.g. Dkt. No. 252.* Since the last hearing in this case, defense counsel has uncovered additional recently declassified and released documents that point to an even broader array of withheld evidence in this case. In a series of recent motions, the defense has laid out this additional evidence, which encompasses virtually every aspect of federal criminal discovery, from exculpatory information, to information rebutting witness testimony, to potential undisclosed witnesses. The government has met these motions with the same extreme position that it has asserted throughout this remand: that it alone determines what is material and what will be disclosed to the defense.

The withholding of pre-2003 material FISA surveillance may have not only denied the defense exculpatory evidence, but also evidence that would have been critical to the defense in the identification and questioning of witnesses. Additionally, this information may have allowed for or supported challenges by the defense to the admission of certain evidence or additional trial testimony.[1]

## I.    PROCEDURAL HISTORY

In April 2006, several months after Dr. al-Timimi's conviction before this Court on charges that he induced young men to travel abroad to engage in violent "jihad" against the United States, the Court of Appeals for the Fourth Circuit remanded this case to this Court for additional proceedings after reports surfaced of previously undisclosed surveillance programs

---

[1]    Such motions to suppress evidence can be made pursuant to 50 U.S.C. 1806(e), which permits a defendant to suppress surveillance evidence "that was not made in conformity with an order of authorization or approval." *Id.* at (e)(2) This provision also expressly allows for post-trial motions when a defendant was "not aware of the grounds of the motion" prior to his trial. *Id.* at 1806(e).

covering individuals material to the case against Dr. al-Timimi. During this remand, the Court has examined the scope of previously withheld surveillance evidence within the context of Rule 16 and *Brady v. Maryland* and its progeny, to determine if a new trial is warranted. *Dkt. No. 183, CIPA Hr'g Tr.* at 31:9-14, July 21, 2006.

The Court has made clear on several occasions that the scope of the remand is not limited to intercepts by any one government agency or under any particular surveillance program, and has insisted that the government produce all undisclosed evidence in its possession to which Dr. al-Timimi is statutorily and constitutionally entitled:

> I'll say it again for the record that the United States government is still one government, and if one branch of the government, especially when they are aware that there's an ongoing civilian criminal prosecution going, and they would be in possession of information that would be relevant to requests for discovery, then the United States government has an absolute obligation to turn that over to the prosecutors and at least bring it to the Court's attention in a CIPA or other type of sealed proceeding so that there can be a judicial evaluation as to whether or not that information must, in fact, be turned over to the defendant.

*Dkt. No. 272, Hr'g Tr.* at 9:18-10:3, Oct. 23, 2008; *see also United States v. Beckford*, 962 F. Supp. 780, 785 (E.D. Va. 1997) (citing *Kyles v. Whitely*, 514 U.S. 419 (1995); *United States v. Agurs*, 427 U.S. 97 (1976)) ("In the discharge of its obligations under *Brady,* the Government must actively search out the requested material in its files and in the files of related agencies reasonably expected to have possession of such information."); *Banks v. United States*, 920 F. Supp. 688, 692 (E.D. Va. 1996) ("The United States Attorney is accountable for the information gathered by the various arms of federal law enforcement in the course of an investigation.").

## II.  GOVERNMENT REPRESENTATIONS TO THIS COURT CONCERNING ITS INTERCEPTION OF DR. AL-TIMIMI'S TELEPHONE AND E-MAIL COMMUNICATIONS

Throughout Dr. al-Timimi's trial and subsequent appellate remand, the government has insisted that its investigation and surveillance of Dr. al-Timimi began only in 2003, and, as a logical consequence, that the government possesses no material FISA intercept evidence that pre-dates that time period. Although the government provided Dr. al-Timimi FISA-related pre-trial discovery involving Dr. al-Timimi and alleged co-conspirators, current defense counsel is aware of no such FISA-related discovery provided to Dr. al-Timimi that pre-dates 2003.[2]

At trial, the government and defense stipulated that the government had intercepted Dr. al-Timimi's communications during most of 2003:

> The United States and the defendant hereby stipulate and agree that the defendant was subject to court-authorized electronic surveillance for a significant portion of 2003. During that same period, several thousand of the defendant's telephone calls were intercepted. In addition, the government obtained an extensive number of defendant's email messages during that same period.

*Stipulation No. 60*, Gov't Ex. 12-60 (Apr. 13, 2005) (Exhibit A).

In addition, FBI Special Agent Wade Ammerman, who helped lead the investigation of Dr. al-Timimi, affirmatively testified before this Court that the investigation of Dr. al-Timimi began only in February of 2003. *Dkt. No. 152, Trial Tr. Vol. 5* at 1337:5-6, Apr. 11, 2005; *see*

---

[2]  Current defense counsel has been unable to obtain a definitive index of all prior evidence revealed to the defense, either in the SCIF or in unclassified form. Requests were previously made to both the prosecution and Court Security staff for such records. Defense counsel has also reached out to prior counsel to confirm that they have no recollection of being provided any FISA material that pre-dated 2003. Prior lead counsel for Dr. al-Timimi's trial team confirmed that he has no recollection of pre-2003 FISA records being shared with the defense.

*also Dkt. No. 220, Hr'g Tr.* 38:9-11, Jan. 16, 2007 (Court stating that "the government insists that there was no material investigation of Timimi until 2003").[3]

In a November 2, 2004 pre-trial discovery letter to the government, Dr. al-Timimi's trial counsel made the following request:

> I understand from conversations with prior counsel that Mr. al-Timimi has been the subject of various FISA warrants for some extended period. I am requesting that the tapes or transcripts of any tapped phone conversations, taps of any sort, and other fruits of any FISA warrants or other non-FISA warrants – e.g. mail covers or pen registers – that relate to Mr. al-Timimi be produced. I understand that this may be a large quantity of information and that there may be classification issues with respect to these items but they are plainly discoverable.

*Discovery Letter #0* at 1, Nov. 2, 2004 (Exhibit B)

The government, in response, indicated that it would provide FISA discovery with respect to Dr. al-Timimi and certain other individuals, but made clear that it was withholding intercepts that appeared to be covered by Rule 16:

> 3. You requested the fruits of "any FISA warrants or other non-FISA warrants…that relate" to your client. Unless these fruits are statements of your client, are exculpatory, or are items we intended to use at trial, I am unaware of any authority for production of such information. We are producing to you the "fruits" that consist of your client's statements. If you notify me of the appropriate authority for the production of other such "fruits," I will promptly revisit this issue.
>
> 4. You requested what I understand to be prior statements and fruits of FISA warrants with respect to any of Al-Timimi's co-conspirators. I expect to have available for you next week cd-roms

---

[3]    Notably, these assertions are contradicted by Paul McNulty, former Deputy Attorney General of the United States and former U.S. Attorney for the Eastern District of Virginia, who in 2003 told the media that the Virginia Jihad investigation "began in 2000, centered in suburban Washington, and then extended into Fredericksburg, Virginia, Philadelphia, Pakistan, India and Afghanistan." Kelli Arena, Kevin Bohn & Terry Frieden, *Feds Charge 11 Men With Conspiracy in Overseas Jihad,* CNN.com, (June 27, 2003, 8:25 PM), http://www.cnn.com/2003/US/06/27/terror.arrests.

> containing all of the phone conversations and e-mails captured
> pursuant to FISA or other authority for Royer, Khan, Hammad,
> Caliph, Hamdi, Chapman, Kwon, Hasan, Surratt, and Aatique.
> Such [sic] of this information that was delivered from FISA likely
> will still be in classified form so that you will have to obtain it
> from [the court security officer]. That being said, I am unaware of
> any authority for production of such other FISA related
> information that is not exculpatory. As noted above, if you notify
> me of the appropriate authority for the production of other such
> "fruits," I will promptly revisit this issue.

*Discovery Letter #3* at 1-2, Nov. 12, 2004 (Exhibit C).

In a December 28, 2004 discovery letter, the government confirmed that it was providing

CD-ROMs "containing emails and phone calls of other conspirators in this case . . . [that] were

captured by FISA." *Discovery Letter #8* at 1, Dec. 28, 2004 (Exhibit D). It also outlined its

intention to provide 33 CDs to defense counsel, which contained "material involving" alleged

co-conspirators Masaud Khan, Muhammed Aatique, Seifullah Chapman, Randall Royer, and

Ibrahim Hamdi. *Id.* The letter also confirms that defense counsel "received the cds with the

telephone calls and emails that were captured under the FISA surveillance over Timimi." *Id.*

The only references to specific FISA intercepts in this letter are to calls made in early 2003. *Id.*

In a January 28, 2005 pre-trial hearing, the government confirmed to this Court that the

defense counsel had been given, although not the entire "universe of tapes on which [Dr.] al-

Timimi's voice has been captured," but at minimum "everything that's relevant or exculpatory or

something that we haven't reviewed enough to know whether it's relevant or exculpatory." *Dkt.*

*No. 145, Hr'g Tr.* 8:11-16, 10:3-14, Jan 28, 2005. The government also indicated that, to the

extent it possessed intercepts between Dr. al-Timimi and one other individual that it deemed

irrelevant or immaterial, it would have no problem with the Court performing an *in camera*

review of such conversations. *Id.* at 10:15-25.

During the same pre-trial hearing, defense counsel objected to the Court that there were obvious temporal gaps in the surveillance that the government had provided:

> [T]he universe of conversations only covers a specific period of time of approximately a year. It is not a universe that encompasses all the conversations from September 11 of 2001 until near the date of this indictment. So in addition to it being a needle in a haystack, there may be other haystacks that we have not been given access to.

*Id.* at 9:14-19. Thus, the government's provision of FISA-related discovery to Dr. al-Timimi was limited in temporal scope and was subject to unilateral materiality determinations that, in light of evidence discussed below, were unlawful.

## III.   EVIDENCE OF PRE-2003 MATERIAL FISA INTERCEPTS

Through a review of documents in the National Archives and Records Administration ("NARA") 9/11 Commission-related files, as well as documents related to the trials of Dr. al-Timimi's alleged co-conspirators, defense counsel has confirmed that the government possesses FISA-derived e-mail intercepts and, in all likelihood, telephone intercepts of Dr. al-Timimi and other alleged co-conspirators that were not disclosed to Dr. al-Timimi prior to his trial.

### A.   9/11 Commission Memoranda for the Record by FBI Personnel

Through its own search of NARA's 9/11 Commission electronic database (*see Dkt. No. 301* at 9-10), as well as supplementary online research, defense counsel has obtained multiple 9/11 Commission "Memoranda for the Record" ("MFRs") in which FBI personnel acknowledge that *pre-2003* FISA surveillance formed the basis of the criminal investigation and eventual prosecution of the so-called Virginia Jihad conspiracy. As Dr. al-Timimi was the alleged "ringleader" and inspiration for the conspiracy, it is implausible that none of these pre-2003 intercepts were material to the preparation of Dr. al-Timimi's defense under Federal Rule of Criminal Procedure 16. *See Dkt. No. 156, Trial Tr. Vol. 9* at 2274:24 - 2275:2 Apr. 18, 2005 (implying to jury that Dr. al-Timimi was "ringleader" of group of local men traveling abroad to

engage in violent jihad). Such FISA surveillance represents core discoverable material, and should have been disclosed to Dr. al-Timimi prior to his trial.

In a 2003 MFR, Duncan Wainwright, Assistant Division Counsel for the FBI Washington Field Office,[4] acknowledged that the "Virginia Jihad" prosecution grew out of the once-forbidden practice of providing FISA-derived intelligence to Federal prosecutors for the purposes of developing criminal cases. *9/11 Commission Memorandum for the Record, Interview of Duncan Wainwright, Ass't Div. Counsel, WFO, FBI* at 4 (Aug. 13, 2003) (Exhibit E). According to Wainwright, this information-sharing began even before a November 18, 2002 opinion by the United States Foreign Intelligence Court of Review, which held for the first time that FISA did not require the government to show the FISA court that its primary purpose in conducting electronic surveillance was *not* criminal prosecution. *Id.* ("Even before the FISA Court of Review opinion, however, the FISC had issued an order approving a request by the Terrorism and Violent Crime Section (now, the Counterterrorism Section) of the Criminal Division to have their attorneys review the FBI's Form 199 (terrorism intelligence case) investigation files for the purpose of identifying any criminal violations that suspected terrorists could be charge [sic] with."); *see generally, In re Sealed Case*, 310 F.3d 717 (FISA Ct. Rev. 2002). Wainwright states that, once "the Wall" between intelligence and criminal cases was formally abolished by the FISA Court of Review, federal prosecutors continued to review FISA surveillance to "identify 'any violations,'" and, significantly, admits that the criminal prosecution of the "Virginia Jihad" case *was one of only a few criminal cases resulting from the sharing of such FISA information*:

---

[4]     Mr. Wainwright has attended hearings during this very remand. *See Dkt. No. 183, Hr'g Tr.* 3:12-14, July 21, 2006.

> When the Wall finally came down after the FISA Court of
> Review's [Nov. 18, 2002] opinion, [Attorney General] Ashcroft
> established a policy to have AUSAs come over and review the
> FBI's 199 files to identify "any violation." *The idea was to use
> every tool available. Wainwright said that not many criminal
> cases came out of this effort, but the Virginia Jihad case did.*

Exhibit E at 4 (emphasis added).

Duncan Wainwright's statements are corroborated by a second declassified 9/11

Commission MFR, which reflects an interview with a Washington Field Office FBI agent whose

name is redacted. *9/11 Commission Memorandum for the Record, Interview of FBI Washington

Field Office Special Agent* (July 31, 2003) (Exhibit F).  The Special Agent also speaks in

extensive detail about the fall of "the Wall" between intelligence and criminal cases, and details

the involvement and supervision by Duncan Wainwright in the process of sharing intelligence

with federal prosecutors. *Id.* at 4, 5.  The unidentified Special Agent specifically states:

> Another important change after 9-11 was that Assistant United
> States Attorneys ("AUSAs") "can now review 'intell' files" for
> potential criminal violations and discuss those files with agents.
> *AUSAs from the Eastern District of Virginia came over to the
> WFO and reviewed "intell" files in late 2002 or early 2003. They
> reviewed "all information in the files," including the FISA
> information "all the way back to pre-PATRIOT Act cases."*

*Id.* at 5 (emphasis added).

Taken together, the two MFRs confirm that the Virginia Jihad prosecution was the direct

consequence of FISA evidence that originated at least as early as 2002, and likely even earlier.

Current counsel can find no such FISA evidence, however, referenced in Dr al-Timimi's

discovery record.  This evidence would obviously have a direct bearing not only on the

allegations against Dr. al-Timimi, but also the trial testimony of some of his alleged co-

conspirators, as well as the trial testimony of government investigators like FBI Special Agent

Ammerman, whose representations to the Court in his affidavit and trial testimony have already

been called into question. *See Dkt. No. 301.* Indeed, these MFRs cast into serious doubt Special

Agent Ammerman's sworn statements in his 2003 affidavit for a search warrant on Dr. al-

Timimi's house, when he informed this Court that he had never heard of Dr. al-Timimi until tips

from confidential informants that, by apparent coincidence, began coming in to the Washington

Field Office only one day after the November 18, 2002 FISA Court of Review Opinion. *See Dkt*

*No. 301* at 14, and Exhibit J to that pleading. Recent public disclosures have confirmed that the

government has in the past created "parallel constructions" in affidavits to hide the fact that

investigations had their origins in warrantless surveillance.[5]

Moreover, the fact that Assistant United States Attorneys from the Eastern District of

Virginia are singled out has having examined pre-2003 FISA intelligence means that Dr. al-

Timimi's prosecutors cannot claim to have been unaware of this information sharing, or the

existence of this pre-2003 FISA surveillance. The defense notes, however, that even a lack of

awareness on the part of "line" prosecutors would not have relieved the government of its

discovery obligations. *Banks*, 920 F. Supp. at 692 ("The United States Attorney is accountable

for the information gathered by the various arms of federal law enforcement in the course of an

investigation.").

---

[5]     In a recent investigative report by Reuters, agents from the DEA's Special Operations
Division, which partners with the FBI and other agencies, admitted that they have engaged in a
procedure called "parallel construction," whereby agents create a false investigative narrative in
affidavits in order to hide from the Court the fact that criminal investigations had their genesis in
NSA intercepts that are not lawfully permitted to be used in criminal investigations. One former
agent said the process "was just like laundering money – you work backwards to make it clean."
A senior DEA official also told Retuters that the practice was "decades old." The report also
cites several current and former prosecutors as opposing the practice, because, in the words of
one prosecutor, "it can lead to all kinds of problems with discovery and candor to the Court."
*See* John Shiffman & Kristina Cooke, *U.S. Directs Agents to Cover Up Program Used to
Investigate Americans*, Reuters.com (Aug. 5, 2013, 3:25 PM) http://www.reuters.com/article/
2013/08/05/us-dea-sod-idUSBRE97409R20130805

**B.     Evidence of Material Pre-2003 FISA Surveillance From NARA 9/11 Commission Records.**

In addition to the MFRs, defense counsel has found other evidence of pre-2003 FISA surveillance of Dr. al-Timimi and his alleged co-conspirators in the NARA 9/11 Commission files. In its recent Memorandum in Support of its Motion to Compel Discovery Related to Anwar al-Aulaqi, defense counsel described the provision by NARA staff of a chart containing basic descriptions of 9/11 Commission-related documents in which Dr. al-Timimi is mentioned. *See Dkt. No. 301* at 9-10. Because the underlying documents remain classified, defense counsel is unable to view them. A reading of the chart alone, however, suggests that there were material investigations, including FISA "intelligence" investigations, prior to 2003 which were not revealed to the defense.[6] In addition, the sheer number of occasions on which Dr. al-Timimi's name appears in pre-November 2002 Washington Field Office documents makes Special Agent Ammerman's sworn statements about the origins of the investigation, and his lack of pre-November 2002 knowledge of Dr. al-Timimi, even more suspect. As illustrative examples, the defense respectfully draws the Court's attention to the following:

- A December 6, 2000 memorandum from the FBI's Detroit Field Office[7] in which Dr. al-Timimi's name is apparently mentioned.
- An August 14, 2001 memorandum from the FBI's Detroit Field Office reflecting a 199 (or terrorism intelligence)[8] case in which Dr. al-Timimi's name is mentioned.[9]

---

[6]     Indeed, the NARA chart shows that Dr. al-Timimi appears to have drawn the interest of non-law enforcement agencies as well. A December 15, 2001 cable by the State Department also apparently references Dr. al-Timimi.

[7]     Defense counsel has confirmed that the abbreviation "DE" in an FBI case file number stands for the Detroit Field Office. *See* FBI Office Abbreviations, *http://negleyvfbi.com/ pdf_files/FBI_Office_Abbreviations.pdf*

[8]     Duncan Wainwright's 9/11 Commission MFR confirms that Class 199 FBI cases were "terrorism *intelligence*" cases and Class 265 cases were "terrorism *criminal*" cases. *See* Exhibit E at 4 (emphasis in original).

[9]     The date for this document does not appear on the chart that is provided to the Court. Defense counsel has confirmed the date, however, by cross-checking the entry against a longer

- A September 12, 2001 FBI Counterterrorism memorandum in which Dr. al-Timimi's name is mentioned.

- A July 2, 2002 memorandum from the FBI's Seattle Field Office, reflecting a 199 terrorism intelligence case, in which Dr. al-Timimi and alleged co-conspirator Seifullah Chapman are apparently mentioned.

- An August 22, 2002 Washington Field Office memorandum reflecting a criminal terrorism case in which Dr. al-Timimi's name is mentioned.

- A September 27, 2002 Washington Field Office memorandum reflecting a criminal terrorism case, in which both Dr. al-Timimi and Anwar al-Aulaqi are mentioned.

- An October 18, 2002 field memorandum from the Washington Field Office in which Dr. al-Timimi and alleged co-conspirator Randall Royer are mentioned.

- An Oct. 23, 2002 Washington Field Office memorandum in which Dr. al-Timimi and Anwar al-Aulaqi are both mentioned.[10]

*See NARA Chart of Documents* (Exhibit G)

### C.    Other Evidence of Pre-2003 FISA Surveillance on Dr. al-Timimi and His Alleged Co-conspirators

In addition to the 9/11 Commission-related documents, Dr. al-Timimi has obtained other publicly available documents indicating that it is highly unlikely that the government possesses no material FISA surveillance information that pre-dates 2003. This includes areas where the defense made substantial and repeated objections during trial. One such example is a critical email used by the prosecution at trial, cited in closing arguments, and ultimately cited by the Court itself.

During Dr. al-Timimi's trial, the government introduced against him Exhibit 4G7 (a copy of which is attached hereto as Exhibit H), a June 19, 2001 e-mail from the mysterious yahoo address "Paint Ballaz pballaz@yahoo.com" that purportedly exhorted several of Dr. al-Timimi's alleged co-conspirators to engage in jihad. *See Dkt. No. 154, Trial Tr. Vol. 7* at 1799:3-25 (Apr.

---

version of the chart that was also provided to defense counsel. Because of its length and the relative difficulty of interpreting it, the longer chart is not being submitted to the Court. Defense counsel, will, however, provide the Court this longer chart if it so requests.

[10]    This document is one of the subjects of Dr. al-Timimi's recently filed Motion to Compel Discovery Related to Anwar al-Aulaqi. *Dkt. No. 300.*

13, 2005); *see also*, Exhibit H. Although the government argued at trial that this e-mail was actually sent by Dr. al-Timimi (*Dkt. No. 156, Trial Tr. Vol. 9* at 2270:9-2272:4 (Apr. 18, 2005)), Dr. al-Timimi vigorously denied this. *Id.* at 2271:16-17. Over later defense objections, the government was allowed to use this email despite the lack of proof as to who sent it. *Id.* at 2271:18-22.

The government never stated that Exhibit 4G7, which pre-dated the period in which the government acknowledged Dr. al-Timimi was under FISA surveillance, was in fact captured through FISA surveillance, and the version of the e-mail that was introduced against him at trial bears none of the traditional markings that it had been captured through FISA. *See* Exhibit H. However, in the 2004 trial of alleged co-conspirator Masaud Khan, when Exhibit 4G7 and other e-mails in the government's "4G" series were introduced by the government, AUSA Kromberg, who was also prosecutor in Khan's case, revealed to this Court that some of the 4G e-mails came to the attention of the government "originally through a FISA," and were only later obtained directly from Yahoo!. *Tr. of Bench Trial, Vol. 1* at 187:19-25, 190:1-8, 192:3-5, *United States v. Masaud Khan, et al.*, E.D. Va. Crim. No. 03-296-A, , (Feb. 9, 2004) (cited excerpts are attached as Exhibit I). None of these documents in the 4G series bore markings that they had been FISA derived. (*See, e.g.*, Government Exhibits 4G4, 4G5 and 4G6 as submitted in the *Khan* proceeding, attached hereto as Exhibit J). Later in that same trial, Special Agent John Wyman, who also testified in Dr. al-Timimi's trial, specifically acknowledged that Exhibit 4G4, a December 2001 e-mail from alleged co-conspirator Randall Royer, was in fact FISA-derived. *Tr. of Bench Trial, Vol. VIII* at 2069:15-19, 2070:4-9, *United States v. Masaud Khan, et al.*, E.D. Va. Crim. No. 03-296-A, (Feb. 19, 2004) (cited excerpts are attached as Exhibit K).

The defense has tried to confirm whether the 4G series, and particularly Exhibit 4G7, was FISA derived. This search recently led to a website run by a Steve Emerson, a controversial expert who has been criticized for extreme positions on national security cases.[11] Emerson's website features versions of Exhibits 4G5 and 4G6, e-mails that are dated April and June 2001 respectively, which feature Dr. al-Timimi's alleged co-conspirators. *See Attachments to Statement of Facts* at PDF p. 24-25 of 61, http://www.investigativeproject.org/documents/ case_docs/1476.pdf (copies of Exhibits 4G5 and 4G6 are attached hereto as Exhibit L). Notably, unlike the versions introduced at Khan's trial, these documents are clearly stamped "FISA-derived." *Id.*

These sources support the view that the entire "4G" series of exhibits was FISA-derived. If Exhibit 4G7 was in fact FISA-derived, and Dr. al-Timimi had known that the government had FISA surveillance from this same period, this information could have been used by the defense to argue in more detail that Dr. al-Timimi was not the source of the critical email. It would have also allowed for a more substantial examination of government witnesses on the point. The use of an exhibit without proof of the sender was already quite controversial at trial; if the government had contemporary emails and surveillance from this source, the information was obviously material and directly related to the challenge made by the defense both at trial and after trial.

## IV.   THE GOVERNMENT WAS REQUIRED TO DISCLOSE FISA EVIDENCE RELATED TO DR. AL-TIMIMI UNDER CONTROLLING LEGAL STANDARDS

Any FISA surveillance on Dr. al-Timimi or on his alleged co-conspirators, in particular surveillance conducted during the period of time covered by Dr. al-Timimi's indictment,

---

[11]   Wesley Yang, *The Terrorist Search Engine,* New York Magazine, (Dec. 5, 2010), available at http://nymag.com/news/features/69920/. Notably, the government's expert in the case against Dr. al-Timimi, Evan Kohlmann, received much of his expertise while working for a think tank founded by Emerson. *Id.*

September 2001 onwards, represents core discoverable material to which Dr. al-Timimi was statutorily and constitutionally entitled under Federal Rule of Criminal Procedure 16 and *Brady v. Maryland* and its progeny.

Under the Fourth Circuit's application of *Brady v. Maryland* and its progeny, Due Process requires that the government disclose "evidence favorable to an accused upon request ... where the evidence is material either to guilt or to punishment*.*" *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010). Of particular importance to this remand, the Supreme Court subsequently extended the *Brady* disclosure rule to material impeachment evidence. *Giglio v. United States,* 405 U.S. 150, 154 (1972); *United States v. Fisher*, 711 F.3d 460, 471 (4th Cir. 2013).

Perhaps even more importantly, the evidence in this motion was requested by Dr. al-Timimi before trial, bringing it squarely within the purview of the much broader discovery provisions of Rule 16(a)(1)(E)(i), which requires the government to make available any requested items that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i); *Caro*, 597 F.3d at 620-21 (agreeing that Rule 16 is "much broader" than *Brady*, and provides the "minimum amount of pretrial discovery granted in criminal cases"). "[E]vidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Caro*, 597 F.3d at 621 (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)).[12] As noted above, "materiality" under Rule 16 is far broader than "materiality" under

---

[12]     This Court has already held that Rule 16 is applicable to discovery requests during this remand:

> [W]ho determines what's relevant?  I mean, again, that's why we
> have an adversary system. . . . The rule requires that the
> appropriate categories of information be turned over to defense

*Brady. Caro,* 597 F.3d at 645 n.15 ("we stress that "materiality" in Rule 16(a)(1)(E)(i) differs from "materiality" under *Brady*). As the defense has repeatedly argued to this Court, the government must first establish what evidence was withheld pre-trial, and must not engage in post-trial rationalizations or the use of hindsight to justify the non-disclosure of material evidence. The evidence must be reviewed under the broad standard for disclosure that existed pre-trial.[13]

As the Court is well aware, the fundamental dispute in this remand has been whether the government is permitted to make unilateral declarations as to the materiality of requested evidence, and whether the government can produce discovery without, at minimum, disclosing the standard of materiality it is applying. In this instance, there can be no serious dispute that surveillance was examined by AUSAs for the explicit purpose of "identifying violations," and which admittedly formed the basis for the prosecution of the conspiracy which a defendant was accused of leading, "would play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *See id; cf. United States v. Spanjol,* 720 F. Supp. 55, 57 (E.D. Pa. 1989)(denying defendants' pre-trial access to FISA evidence only when government attorneys "stated in an affidavit that they have

---

> counsel. Then they'll rummage through it. It may be in their eyes important to some theory of defense that, you know, you might not appreciate, I might not appreciate, but I thought that one of the pretty strong requirements of rule 16 . . .

*Dkt. No. 220, Hr'g Tr.* 43:1-9 (Jan. 16, 2007). Although FISA sets forth its own standards for disclosure separate from Rule 16, it is worth noting again that after 2001 FISA information was for the first time overtly allowed to form the basis of criminal investigations and prosecutions.

[13]    A latter question may arise as to whether "the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *Caro,* 597 F.3d at 621 (quoting *United States v. Ross,* 511 F.2d 757, 763 (5th Cir. 1975)). That appellate standard for a violation of Rule 16 only occurs after the establishment of the body of evidence withheld by the government. *Id.* Moreover, when that secondary question is raised, it is done so through an adversarial process, and not by an opaque determination of the government.

made no direct, indirect or derivative use of any of the surveillance materials at issue in this case," and only after *in camera, ex parte* review).

The government may, of course, claim that prior surveillance at issue in this motion did not mention Dr. al-Timimi or the underlying allegations or conspiracies. The government has itself, however, maintained that the Court should allow an extremely broad interpretation of relevance in this case. This is evident in its use of the "Abu Khalid" evidence that was the subject of one of Dr. al-Timimi's recent motions to compel discovery. (*See* Dkt. No. 305) Indeed, the government has insisted that Dr. Al-Timimi's statements *to anyone at any time* were material when they dealt with 9-11, terrorism, disasters, his views of Islam, or the United States generally. This previously broad view of materiality was expressed in the Government's November 4, 2004 Response to Defendant's Pretrial Motion:

> At the least, Timimi's statement regarding the Space Shuttle is relevant and material to the proof against him because it shows his motive to counsel his followers to aid the Taliban, levy war against the United States. Similarly, it is relevant and material because it further shows that his advice and counseling to Kwon, Hasan, Khan, Royer, and the others was not inadvertent or made by mistake, and it was not misheard by his listeners.

Dkt. No. 16 at 11 n.4.

The first step, however, is for the government to disclose the full range of previously withheld FISA evidence that relates to Dr. al-Timimi or the underlying facts or associations referenced in his indictment and trial, and most certainly any FISA surveillance that was examined by prosecutors to develop the criminal case against Dr. al-Timimi or any other members of the so-called "Virginia Jihad" conspiracy.

## V.   CONCLUSION

Dr. al-Timimi, therefore, asks that the Court compel the government to disclose all FISA surveillance that was used in the investigation of Dr. al-Timimi or his alleged co-conspirators or the so-called Virginia Jihad conspiracy. In light of the prior withholding of such evidence, this production should also include an index of all potentially relevant FISA material, to afford the Court and the parties a complete record of the scope of surveillance evidence in the possession of the government.

Dated: September 6, 2013

Respectfully submitted,
Dr. Ali al-Timimi, by Counsel

_____
Vishant Manu Krishnan (VSB # 82308)

Jonathan Turley (*pro hac vice,* lead counsel)
2000 H St., N.W.
Washington, D.C. 20052
(202) 994-7001 (phone)
(202) 994-9811 (facsimile)

Vishant Manu Krishnan (VSB # 82308)
Bryan Cave LLP
1155 F Street, NW, Suite 700
Washington, D.C. 20004
(202) 508-6000 (phone)
(202) 508-6200 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of September, 2013, the foregoing was given to the court security official in compliance with prior court orders for filing and delivery to both the Court and to opposing counsel.

Vishant Manu Krishnan (VSB # 82308)
*Counsel for Dr. Ali al-Timimi*

Exhibit A

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 1:04cr385 |
| | ) | |
| v. | ) | The Hon. Leonie M. Brinkema |
| | ) | |
| ALI AL-TIMIMI | ) | |

### STIPULATION NO. 60

The United States and the defendant hereby stipulate and agree that the defendant was

subject to court-authorized electronic surveillance for a significant portion of 2003. During that

period, several thousand of the defendant's telephone calls were intercepted. In addition, the

government obtained an extensive number of defendant's email messages during that same

period.

Respectfully submitted,

Paul J. McNulty
United States Attorney

By _____

Gordon D. Kromberg
Assistant United States Attorney

_____
ALI AL-TIMIMI

_____
Edward B. MacMahon, Jr.
Counsel for ALI AL-TIMIMI

GOVERNMENT
EXHIBIT
12-60

April 13, 2005 (7:58pm)

Exhibit B



**EDWARD B. MACMAHON, JR.**
ATTORNEY AT LAW
107 EAST WASHINGTON STREET
P.O. BOX 903
MIDDLEBURG, VIRGINIA 20118

TELEPHONE (540) 687-3902
METRO (703) 589-1124

FACSIMILE (540) 687-6366
E-MAIL ADDRESS: ebmjr@crosslink.net

November 2, 2004

**Via Facsimile (703) 739-9556  and U.S. Mail**
Gordon D. Kromberg, Esquire
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Street
Alexandria, VA 22314

        Re:    **United States v. Al-Timimi, Crim. No. 1:04-385**

Dear Gordon:

        I have today filed a praecipe entering my appearance as counsel in this case.  I look forward to working with you and your office on this case and hope that we can work together efficiently and professionally.  I appreciate that you intend to allow broad access to your files and am happy to schedule a convenient time for a review of same as I understand that there is a tremendous amount of discovery in this case.

        I am writing this letter to request certain items of discovery.  I will try to describe the areas in which I believe discovery is appropriate and will describe  certain items that I need.

        First, pursuant to Brady and its progeny and Rule 16, I would like to review all of the statements of Mr. Al-Timimi that are in the government's possession, custody or control.  I understand from conversations with prior counsel that Mr. Al-Timimi has been the subject of various FISA warrants for some extended period.  I am requesting that the tapes or transcripts of any tapped phone conversations, taps of any sort, and other fruits of any FISA warrants or other non-FISA warrants - e.g. mail covers or pen registers - that relate to Mr. Al-Timimi be produced. I understand that this may be a large quantity of information and that there may be classification issues with respect to these items but they are plainly discoverable.  Of course, I have already received a  clearance in the Moussaoui case, so classification should not be a problem.  In this regard, I am also requesting the same information with respect to any alleged co-conspirators whose statements the government considers to be admissible pursuant to Rule 801 (d)(2)(E).

Case 1:04-cr-00385-LMB Document 339 Filed 09/06/13 Page 24 of 134 PageID# 544

Second, I am requesting any and all affidavits prepared and filed in support of any warrants issued pursuant to FISA or other search warrants that refer or relate to Mr. Al-Timimi. I am especially interested in the identity of the listed "foreign power" identified in any warrants pursuant to 50 U.S.C. § 1801 as that information, in and of itself, may be exculpatory. That information should also show whether the United States has sought or received any information from any foreign governments that would show or tend to show that Mr. Al-Timimi ever recruited any Muslim for armed conflicts anywhere in the world. From a review of the transcript in the prior case, countries that may have information about Mr. Al-Timimi include, but are not limited to, Canada, United Kingdom, Australia, Saudi Arabia, Kuwait, United Arab Emirates, Jordan, Pakistan, Indonesia, Singapore, China, South Korea, Bosnia, Jordan and/or Israel. The F.B.I. and/or the C.I.A. may have files that relate to any investigations of Mr. Al-Timimi with respect to and in coordination with any of these countries. If no such files exist then the United States can say that it has searched for such information and none exists and that there is no information that would show that the government has information that Mr. Al-Timimi has ever recruited any persons for participation in any armed conflict other than as alleged in this Indictment.

I also need any and all information regarding LET and its relationship with either the United States government or the government of Pakistan for the time period at issue in the Indictment. If LET was supported by the government of Pakistan which is an ally of the United States, then that information would be exculpatory.

I also need to review the items seized from his home.

Also, I am requesting certain documents that are referenced in the 911 Commission report. All of these items are discoverable under Brady and its progeny. Specifically, one of the central themes of the statements attributed to several of the convicted co-conspirators was that at the meeting that was held on or about September 15, 2001, "Unindicted Conspirator #1 told KHWAJA MAHMOOD HASAN and the others gathered there that the mullah or emir of Afghanistan had called for Muslims to come to Afghanistan and help fight in their defense." (¶ 6 of Statement of Facts in support of plea of HASAN) The United States has vouched that the evidence at that trial would have proved that such a statement was made beyond a reasonable doubt. This is repeated in several other statements of fact in support of other plea agreements - e.g. Kwon and Aatique - that I have reviewed and forms part of the allegations set forth in paragraphs 1-6 of the Overt Acts in this Indictment. If, as I believe, the Mullah or Emir of Afghanistan never actually issued such a call, then it would undermine the credibility of the government's witnesses who say that Mr. Al-Timimi relayed such a call. To rebut this claim, the defense needs discovery from the government.

In the 911 Commission report - specifically in chapter 10.2 - there are many references to war plans as well as negotiations with representatives of the Taliban regarding the issue of turning Bin Laden and his lieutenants over to the United States in lieu of war. We are therefore requesting all of the documents that are listed as source materials in the footnotes 36 to 54 of the report as well as 79-86. These documents show the actual time-line of the negotiations between the U.S. and the Taliban and must be produced. I have attached a copy of the footnotes to chapter 10 of the 911 Commission report for your convenience.

On a related note, there are, I believe, several high ranking Taliban officials in U.S. custody who can shed light on these issues as well. Two such detainees are apparently in custody in Cuba. One such person is Mulla Abdus Salam Zaeef, the former Taliban Ambassador to Pakistan. Upon information and belief, he is the official that is described in the telephone conversation between Armitage and Mahmoud in footnote 55 to Chapter 10. Also in custody is Mulla Muhammad Fadhil who was the Deputy Defense Minister for the Taliban in the time period in question. If they have been interrogated then the 302s of those interrogations should be produced as Brady. Regardless, we intend to seek subpoenas to have at least the testimony of these two witnesses preserved for trial. That testimony would be helpful to the defense as it would show that there were no calls issued for volunteers to fight for the Taliban in that time period. In fact, the final ultimatum to the Taliban from the United States was not issued until September 20, 2001.

From my experience in the Moussaoui case, I believe that it is likely that the Court would order us to conduct Rule 30 depositions of these witnesses. I am happy to work with you on a schedule for such depositions.

If there are reports regarding the computers seized from Mr. Al-Timimi and what the government has found on those hard drives, they should be produced under Rule 16 (F).

If the government has any expert witnesses that it intends to use at trial then the required information pursuant to Rule 16 (G) should be produced as well.

I look forward to your response.

Best Regards,

Edward B. MacMahon, Jr.

EBM/mlj
Enclosure

Case 1:04-cv-00385-LMB Document 339 Filed 09/06/13 Page 26 of 134 PageID# 546

cers and one of the firefighters in the North Tower, at least some FDNY personnel were unwilling to take the evacuation orders from police that morning.

2. FDNY personnel were concerned about our review of 500 internal FDNY interview transcripts; we conclude that most of these 22 companies, all relaying members of 19 companies, are likely to have known of the evacuation order to evacuate (Engine Companies 1, 4, 7, 9, 15, 16, 21, 24, 33, 39, and 65; Ladder Companies 1, 5, 8, 9, 10, and Rescue 1). We also conclude that at least some members of each of five companies knew to evacuate (Engine to evacuate (Engine Companies 1, 4, 7, 9, 15, 16, 21, 24, 33, 39, and 65; Ladder Companies 1, 5, 8, 9, 10, and ers from Ladder Company 10; the officer of Ladder Company 20; all but the officer of Engine Company 10; at least two firefighters from Squad 18; and at least three firefighters from Engine 6). We do not know whether members of the eight other companies knew to evacuate (Engine Companies 5, 207, and 226; Rescue 2, 3, and 4; Ladder mat 1 and Squad 1) because they all died, and we have come across no on-point eyewitness accounts related to their operation. It is very possible that at least some of these firefighters did hear the evacuation order but never-dicies failed to evacuate in the only 29-minute period between the collapse of the two towers. In addition, it is possible that several of the eight companies for which we have no record of their receiving evacuation instructions were in the South Tower and thus may have died in its earlier collapse.

210. Eric Lipton, "A New Weapon for Firefighters," *New York Times*, May 30, 2004, p. 27.

## 10 Wartime

1. All times are Eastern Daylight Time. Sometime around 10:30, after the decision had already been made not to return to Washington, a reported threat to "Angel," the code word for Air Force One—was widely disseminated in the Presidential Emergency Operations Center (PEOC) and elsewhere. We now know that this report origin-ating that Vice President Cheney informed President Bush in a phone conversation that the morning an anonymous threat had been phoned into the White House that was viewed as credible. At about the same time, news of the threat was conveyed on the air threat conference call.

The Secret Service's Intelligence Division tracked down the origin of this threat and, during the day, deter-mined that it had originated in a misunderstanding by a watch officer in the White House Situation Room. The director of the White House Situation Room that day disputes this account. But the Intelligence Division had the primary job of running down the threat and had found their witnesses on this point to be credible. During the after-noon of September 11 the leadership of the Secret Service was satisfied that the reported threat to "Angel" was unfounded.

At the White House press briefing on September 12, spokesperson Ari Fleischer described the threat to Air Force One a "real and credible." White House transcript, Press Briefing by Ari Fleischer, Sept. 12, 2001 (online at www.whitehouse.gov/news/releases/2001/09/print/20010912-8.html). Fleischer told us he cited the information in good faith. Indeed, Fleischer had conferred with Vice President Cheney and Karen Hughes before the briefing, and they had decided to let people know the threat, as both believing it was true. According to Fleischer, only weeks later did he learn about the dispute on this point. He told us he never found any evi-dence that contradicts his account. Ari Fleischer interview (Apr. 22, 2004); Claude interview (Mar. 10, 2004); Deborah Loewer meeting (Feb. 6, 2004); Ralph Sight interview (July 10, 2004); Andrew Card meeting (Mar. 31, 2004); Edward Marinzel interview (Apr. 21, 2004); Secret Service briefing (Apr. 29, 2004).

2. Edward Marinzel interview (Apr. 21, 2004); USSS memo, interview with Edward Marinzel, Oct. 3, 2001; President Bush and Vice President Cheney meeting (Apr. 29, 2004); Ari Fleischer interview (Apr. 22, 2004); Deb-orah Loewer meeting (Feb. 6, 2004); White House record, PEOC Watch Log, Sept. 11, 2001.

3. Commission review of Air Force One radar data; Edward Marinzel interview (Apr. 21, 2004); USSS memo, interview with Edward Marinzel, Oct. 3, 2001; Deborah Loewer meeting (Feb. 6, 2004).

4. White House record, Situation Room Comm Log, Sept. 11, 2001.

5. White House transcript, Rice interview with Bob Woodward of the *Washington Post*, Oct. 24, 2001, p. 367. In the interview, Rice also said the President characterized the war as "global in nature." Ibid.

6. See White House transcript, Rice interview with Scott Pelley of CBS, Aug. 2, 2002, p. 408; but see Rice's statement to Bob Woodward: "In the first video conference, the assumption that everybody kind of shared was that it was global terrorism. . . . I don't believe anybody said that is likely al Qaeda. I don't think so." White House tran-script, Rice interview with Bob Woodward, Oct. 24, 2001, p. 367.

7. NSC memo, Summary of Conclusions of Deputies Committee Meeting (held by secure teleconference), Sept. 11, 2001.

8. The Secretary's decision was broadcast on the air threat conference call at 10:43. A minute later, Secretary Rumsfeld spoke to the Vice President, and he asked Rumsfeld to run the issue by the President. At 10:45 confer-ees were told to "hold off" on Defcon 3, but a minute later the order was reinstated. Rumsfeld believed the mat-ter was urgent and, having consulted DOD directives, concluded he had the authority to issue the order and would brief the President. Rumsfeld briefed the President on the decision at 11:15. See DOD transcript, Air Threat Con-ference Call, Sept. 11, 2001; Stephen Cambone interviews (July 8, 2004; July 12, 2004); DOD notes, Stephen Cam-bone notes, Sept. 11, 2001.

9. The 9/11 crisis tested the U.S. government's plans and capabilities to ensure the continuity of constitutional government and the continuity of government operations. We did not investigate this topic, except as needed in order to understand the events of that morning. We believe the subject is important and that an appropriate committee of Congress should examine whether the current plans and institutional relationships are robust enough to meet the requirements of a catastrophic terrorist attack.

10. White House transcript, Vice President Cheney's remarks to the Republican Governors Association, Oct. 25, 2001 (online at www.whitehouse.gov/vicepresident/news-speeches/speeches/vp20011025.html). After President Bush spoke to the nation on the evening of September 11, the Vice President also addressed the Nation. Sept. 11, 2001 (online at www.whitehouse.gov/news/releases/2001/09/20010911-16.html).

11. White House transcript, Rice interview with Bob Woodward, Oct. 24, 2001, p. 371.

12. Joshua Bolten interview (Mar. 18, 2004); see also Steven Brill, *After: How America Confronted the September 11* Era (Simon & Schuster, 2003), pp. 50–51.

13. The collapse of the World Trade Center towers on the morning of September 11 created Lower Manhat-tan with a thick layer of dust from the debris and fire. Not only a plume of smoke rose from the site. Between Sep-tember 11 and September 21, 2001, EPA issued five press releases regarding air quality in Lower Manhattan. A release dated September 18 quoted the claim of the assistant secretary, Christine Todd Whitman, that the "air" of New York City "is safe to breathe" and the water "is safe." Many critics have since blamed EPA, and in particular Governor Whitman, for exposing the workers and residents of Lower Manhattan to unsafe levels of various toxic materials. We do not have the expertise to examine the scientific accuracy of the pronouncements in these press releases.

The issue is the subject of pending civil litigation.

We did examine whether the White House improperly influenced the content of the press releases so that they would intentionally mislead the public. The EPA press releases were coordinated with Samuel Thornton, associ-ate director for communications at the White House Council on Environmental Quality. Oral reports, and some air state methods for sampling asbestos in the air, it also noted that more than 25 percent of the bulk dust samples col-lected before September 18 showed the presence of asbestos above the 1 percent standard. The White House Inspec-tor General's office reported on the World Trade Center Collapse: Challenges, Successes, and Areas for Improve-ment," Aug. 21, 2003.

The most controversial press release, on September 18, quoted EPA Administrator Christine Whitman as saying that the air was "safe" to breathe. This statement was issued the day after the financial markets reopened. The EPA Office of Inspector General investigated the issuance of these press releases and con-cluded that the agency did not have enough data about the quality of possible pollutants other than asbestos to make a judgment, lacked public health benchmarks for appropriate levels of asbestos and other pollutants, and had impre-cise methods for sampling asbestos in the air; it also noted that more than 25 percent of the bulk dust samples col-lected before September 18 showed the presence of asbestos above the 1 percent standard. EPA Office of Inspector General, "EPA's Response to the World Trade Center Collapse: Challenges, Successes, and Areas for Improve-ment," Aug. 21, 2003.

The EPA's communications person said she felt extreme pressure from the White House coordinator, and felt that they were no longer her press releases. EPA Inspector General interview of Tina Kreisher, Aug. 28, 2002. The White House coordinator, however, told us that these disputes were solely concerned with process, not the actual sub-stance of the releases. Samuel Thornton interview (Mar. 31, 2004). Former EPA administrator Christine Whit-man agreed with the White House coordinator Christine Whitman interview (June 28, 2004) The documentary evidence supports this claim. Although Whitman told us the process quickly became politicized, we found no evidence of pressure with the White House regarding the specific content of the releases, and no evidence of pressure to say the air was safe in order to permit the markets to reopen. Moreover, the most controversial release that specifically declared the air as safe to breathe was released after the markets had already reopened.

The EPA did not have the detailed benchmarks needed to assess the extraordinary air quality conditions in Lower Manhattan after 9/11. The EPA and the White House therefore improvised and applied standards devel-oped for other circumstances in order to make pronouncements regarding air safety, allowing workers at Ground Zero to cut protective gear and advising the general population that the air was safe. Whether these improvised standards were appropriate is still a subject for medical and scientific debate. See EPA Inspector General report, "EPA's Response to the World Trade Center Collapse," Aug. 21, 2003, pp. 9–19.

14. Brill, *After*, pp. 47–50.

15. We studied this episode and interviewed many of the participants. The NYSE, Amex, and Nasdaq have devel-oped plans for coordination and cooperation in the event of a disaster affecting one or all of them, but these plans do not include other exchanges or international components. The White House effects during the crisis were coor-dinated by the President's Working Group on Financial Markets, a group created in the 1980s.

16. Brill, *After*, pp. 53–56, 89–91. Following interim reports in 1999 and 2000, a congressional commission

chaired by former senators Gary Hart and Warren Rudman, and directed by retired general Charles Boyd, had, in January 2001, recommended the creation of a cabinet department dedicated to "homeland security." In May 2001, President Bush named Vice President Cheney to head a task force on problems of national preparedness. His recently hired coordinator, Admiral Steven Abbot, had started work just before the 9/11 attack.

17. Ashcroft told us that he established a "hold until cleared" policy because of the high rate of flight from deportation proceedings. John Ashcroft testimony, Apr. 13, 2004. For closure of hearings and secrecy of the detainee names, see DOJ email, Chief Immigration Judge Michael Creppy to all immigration judges, "Cases requiring special procedures," Sept. 21, 2001. This policy has been challenged in two U.S. courts of appeals. The Sixth Circuit held that there is a constitutional right of public access to these hearings; the Third Circuit reached the opposite result. The Supreme Court has not yet decided to resolve this "circuit split." See *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002); *North Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198 (3d Cir. 2002), *cert. denied*, 123 S.Ct. 2215 (2003). For the length of the clearance process, see DOJ Inspector General report, "The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks," Apr. 2003, p. 51.

18. DOJ Inspector General report, "The September 11 Detainees," Apr. 2003, pp. 142–150, 195–197.

19. John Ashcroft testimony, Apr. 13, 2004; DOJ record, "Special Interest Cases," Sept. 16, 2003. These numbers do not add up to 768 because we have not included all categories. Some of those remanded to the Marshals Service were held as material witnesses, and individuals were released "on bond" only after they were "cleared" by the FBI of any connection to 9/11. For the response to our questions about the 9/11 detainee program, see DOJ emails, Daniel Levin to the Commission, July 9, 2004; July 13, 2004. There is one exception to the statement in the text that the detainees were lawfully held on immigration charges; one detainee was held for a short time "despite the fact that there was no valid immigration charge." DOJ Inspector General report, "The September 11 Detainees," Apr. 2003, p. 15, n. 22. See also Khaled Medhat Abou El Fadl testimony, Dec. 8, 2003.

20. Intelligence report, interrogation of KSM, May 10, 2003.

21. The complete title of the Act is Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Pub. L. No. 107-56, 115 Stat. 273 (signed into law Oct. 26, 2001).

22. John Ashcroft interview (Dec. 17, 2003).

23. On the early development of the Patriot Act, see, e.g., Brill, *After*, pp. 73–76, 120–125.

24. During the morning of September 11, the FAA suspended all nonemergency air activity in the national airspace. While the national airspace was closed, decisions to allow aircraft to fly were made by the FAA working with the Department of Defense, Department of State, U.S. Secret Service, and the FBI. The Department of Transportation reopened the national airspace to U.S. carriers effective 11:00 A.M. on September 13, 2001, for flights out of or into airports that had implemented the FAA's new security requirements. See FAA response to Commission questions for the record, June 8, 2004.

25. After the airspace reopened, nine chartered flights with 160 people, mostly Saudi nationals, departed from the United States between September 14 and 24. In addition, one Saudi government flight, containing the Saudi deputy defense minister and other members of an official Saudi delegation, departed Newark Airport on September 14. Every airport involved in these Saudi flights was open when the flight departed, and no inappropriate actions were taken to allow those flights to depart. See City of St. Louis Airport Authority, Lambert–St. Louis International Airport response to Commission questions for the record, May 27, 2004; Los Angeles International Airport response to Commission questions for the record, June 2, 2004; Greater Orlando Aviation Authority, Orlando International Airport response to Commission questions for the record, June 8, 2004; Metropolitan Washington Airports Authority, Washington Dulles International Airport response to Commission questions for the record, June 8, 2004; Port Authority of New York and New Jersey, JFK Airport response to Commission questions for the record, June 4, 2004; Massachusetts Port Authority, Logan International Airport, and Hanscom Airfield response to Commission questions for the record, June 17, 2004; Las Vegas–McCarran International Airport response to Commission questions for the record, June 22, 2004; Port Authority of New York and New Jersey, Newark Airport response to supplemental question for the record, July 9, 2004.

Another particular allegation is that a flight carrying Saudi nationals from Tampa, Florida, to Lexington, Kentucky, was allowed to fly while airspace was closed, with special approval by senior U.S. government officials. On September 13, Tampa police brought three young Saudis they were protecting on an off-duty security detail to the airport so they could get on a plane to Lexington. Tampa police arranged for two private investigators to provide security on the flight. They boarded a chartered Learjet. Dan Grossi interview (May 24, 2004); Manuel Perez interview (May 27, 2004); John Solomon interview (June 4, 2004); Michael Fendle interview (June 4, 2004). The plane took off at 4:37 P.M., after national airspace was open, more than five hours after the Tampa airport had reopened, and after other flights had arrived at and departed from that airport. Hillsborough County Aviation Authority, Tampa International Airport response to Commission questions for the record, June 7, 2004. The plane's pilot told us there was "nothing unusual whatsoever" about the flight other than there were few airplanes in the sky. The company's owner and director of operations agreed, saying that "it was just a routine little trip for us" and that he would have

heard if there had been anything unusual about it. The pilot said he followed standard procedures and filed his flight plan with the FAA prior to the flight, adding, "I was never questioned about it." Christopher Steele interview (June 14, 2004); Barry Ellis interview (June 14, 2004). FAA records confirm this account. FAA supplemental response to Commission questions for the record, June 8, 2004. When the plane arrived at Lexington Blue Grass Airport, that airport had also been open for more than five hours. Lexington-Fayette Urban County Airport Board, Blue Grass Airport response to Commission questions for the record, June 8, 2004. The three Saudi nationals debarked from the plane and were met by local police Their private security guards were paid, and the police then escorted the three Saudi passengers to a hotel where they joined relatives already in Lexington. Mark Barnard interview (June 7, 2004). The FBI is alleged to have had no record of the flight and denied that it occurred, hence contributing to the story of a "phantom flight." This is another misunderstanding. The FBI was initially misinformed about how the Saudis got to Lexington by a local police officer in Lexington who did not have firsthand knowledge of the matter. The Bureau subsequently learned about the flight. James M. interview (June 18, 2004).

26. Richard Clarke interview (Jan. 12, 2004).

27. Andrew Card meeting (Mar. 31, 2004); President Bush and Vice President Cheney meeting (Apr. 29, 2004); Condoleezza Rice meeting (Feb. 7, 2004); Prince Bandar interview (May 5, 2004); Richard Clarke interview (Jan. 12, 2004); Richard Clarke testimony, Mar. 24, 2004 ("I would love to be able to tell you who did it, who brought this proposal to me, but I don't know"). Instead, the matter was handled as follows. Within days of September 11, fearing reprisals against Saudi nationals, Rihab Massoud, the deputy chief of mission at the Saudi embassy in Washington, D.C., called Dale Watson, the FBI's assistant director for counterterrorism, and asked for help in getting some of its citizens out of the country. Rihab Massoud interview (May 11, 2004). At about the same time, Michael Rolince, chief of the FBI's international terrorism operations section, also heard from an FBI official in Newark about a proposed flight of Saudis out of the country. Michael Rolince interview (June 9, 2004). We believe this was the Saudi deputy defense minister's flight. Rolince says he told the Newark official that the Saudis should not be allowed to leave without having the names on their passports matched to their faces, and their names run through FBI case records to see whether they had surfaced before. Rolince and Watson briefed Robert Mueller, the director of the FBI, about the issue and how they were handling it. The State Department played a role as well in flights involving government officials or members of the royal family. State coordinated with the FBI and FAA to allow screening by the FBI of flights with Saudi nationals on board. There is no evidence that State tried to limit the screening. DOS record, Log of USA 9-11 Terrorist Attack Task Force, Sept. 13, 2001; Jack S. interview (June 14, 2004). The FBI effectively approved the Saudi flights at the level of a section chief. Having an opportunity to check the Saudis was useful to the FBI. This was because the U.S. government did not, and does not, routinely run checks on foreigners who are *leaving* the United States. This procedure was convenient to the FBI, as the Saudis who wished to leave in this way would gather and present themselves for record checks and interviews, an opportunity that would not be available if they simply left on regularly scheduled commercial flights.

28. These flights were screened by law enforcement officials, primarily the FBI. For example, one flight, the so-called Bin Ladin flight, departed the United States on September 20 with 26 passengers, most of them relatives of Usama Bin Ladin. Screening of this flight was directed by an FBI agent in the Baltimore Field Office who was also a pilot. This agent, coordinating with FBI headquarters, sent an electronic communication to each of the field offices through which the Bin Ladin flight was scheduled to pass, including the proposed flight manifest and directing what screening should occur. He also monitored the flight as it moved around the country—from St. Louis to Los Angeles to Orlando to Washington Dulles, and to Boston Logan—correcting for any changes in itinerary to make sure there was no lapse in FBI screening at these locations. Again, each of the airports through which the Bin Ladin flight passed was open, and no special restrictions were lifted to accommodate its passage. James C. interview (June 3, 2004).

The Bin Ladin flight and other flights we examined were screened in accordance with policies set by FBI headquarters and coordinated through working-level interagency processes. Michael Rolince interview (June 9, 2004). Although most of the passengers were not interviewed, 22 of the 26 people on the Bin Ladin flight were interviewed by the FBI. Many were asked detailed questions. None of the passengers stated that they had any recent contact with Usama Bin Ladin or knew anything about terrorist activity. See, e.g., FBI report of investigation, interview of Mohammed Saleh Bin Laden, Sept. 21, 2001. As Richard Clarke noted, long before 9/11 the FBI was following members of the Bin Ladin family in the United States closely. Richard Clarke testimony, Mar. 24, 2004 Two of the passengers on this flight had been the subjects of preliminary investigations by the FBI, but both their cases had been closed, in 1999 and March 2001, respectively, because the FBI had uncovered no derogatory information on either person linking them to terrorist activity. Their cases remained closed as of 9/11, were not reopened before they departed the country on this flight, and have not been reopened since. FBI electronic communication, Summary of Information Regarding Flights taken by Saudi Citizens Out of the U.S. Shortly After September 11, 2001, Oct. 29, 2003, pp. 9–10.

29. Michael Rolince interview (June 9, 2004). Massoud corroborates this account. He said the FBI required the names and personal information of all departing passengers sponsored for departure by the Saudi Embassy. Rihab Massoud interview (May 11, 2004).

Case 1:04-cr-00385-LMB Document 339 Filed 09/06/13 Page 27 of 134 PageID# 547

30. Jack S. interview (June 14, 2004).

31. The FBI checked a variety of databases for information on the Bin Ladin flight passengers and searched the aircraft. Because it was not clear to us whether the TIPOFF terrorist watchlist was checked by the FBI, the Terrorist Screening Center checked the names of individuals on the flight manifests at our request. There were no matches. At our request, TIPOFF watchlist at our request prior to our hearing in April 2004. There were no matches. At our request, the Terrorist Screening Center in June and July 2004 rechecked the names of individuals based on additional information, on the Terrorist Screening Center in June and July 2004 rechecked the names of individuals believed to be on these six flights, the names of individuals on three more charter flights, and the names of individuals on the flight containing the Saudi Deputy Defense Minister, and the names of Saudi nationals on commercial flights that journalists have alleged are suspect. There were no matches. Tim D. interview (Apr. 12, 2004; June 30, 2004; July 9, 2004); FBI memo, "Terrorist Screening Center response to the 9/11 Commission Task Force to screen the airline passenger lists through the TDSB and TIPOFF databases," Mar. 30, 2004.

32. White House transcript, Vice President Cheney interview with Chadic Gibson of ABC, Sept. 16, 2004.

33. "The only . . . true advice I receive is from our war council." White House transcript, President Bush interview with Bob Woodward and Dan Bale of the Washington Post, Dec. 20, 2001.

34. On Secretary Rumsfeld's remarks, see White House transcript, President Bush interview with Bob Woodward and Dan Bale, Dec. 20, 2001. The President's advisor, Karen Hughes, who was in the interview, lived the points Rumsfeld made at the earlier morning meeting. Ibid.

35. On the President's taking the lead that day see NSC memo, Summary of Conclusions for NSC Meeting Held on September 12, 2001, Dec. 17, 2001. On the paper the President beyond al Qaeda, see NSC memo, Deputies Draft Paper (attached to Agenda for NSC Meeting Scheduled for Sept. 12, 2001) The Summary of Conclusions for the afternoon meeting indicates that the paper was discussed.

On giving priority to preventing terrorism from acquiring weapons of mass destruction, see White House transcript, Hadley interview with Dan Bale and Bob Woodward, July 11, 2002, p. 535.

36. NSC memo, Summary of Conclusions for Principals Committee Meeting Held on September 13, 2001. In addition to the usual members of the Principals meeting, Attorney General John Ashcroft, Secretary of Transportation Mineta and FAA security chief Canavan also attended.

37. DOS cable, State 158711, "Deputy Secretary Armitage's Meeting with General Mahmud: Actions and Support Requested of Pakistan in Fight Against Terrorism," Sept. 14, 2001. On September 14, 2001, the U.S. Embassy in Islamabad sent Musharaf's answer to the State Department by cable.

38. DOS cable, Islamabad 5123, "Musharaf Accepts the Seven Points," Sept. 14, 2001.

39. NSC memo, Summary of Conclusions of NSC Meeting Held on September 14, 2001. According to the Summary of Conclusions, this meeting of the President and his advisers took place in the White House Situation Room on September 14, 2001. According to the Summary of Conclusions, this meeting of the President and his advisers took place in the White House Situation Room on September 14, 2001. Among those specified that it would be conducted via the secure video teleconference system (SVTS). It is still unclear whether the attendees met face-to-face at the White House or held their meeting remotely via SVTS.

40. State Department memo, "Gameplan for Pakistan and Afghanistan," Sept. 14, 2001 (noted by President Bush). The paper was sent to the White House on September 14, 2001. The demand to free all imprisoned foreigners reflected the U.S. government's concern about the welfare of several foreign aid workers in Afghanistan who had been imprisoned by the Taliban in August 2001. Two young American women, Heather Mercer and Dayna Curry of the organization "Shelter Now International," were among those arrested and charged with promoting Christianity. The Taliban and other Islamic figures were arrested and charged with violation of Afghanistan's laws and the region's tenets. Wendy Chamberlin interview (Oct. 28, 2003). Powell stated that the President wanted to get the hostages out but that desire would not constrain American action. White House transcript, President Bush interview with Bob Woodward and Dan Bale, Dec. 20, 2001.

41. State Department memo, "Gameplan for Pakistan and Afghanistan," Sept. 14, 2001.

42. White House transcript, President Bush interview with Bob Woodward and Dan Bale, Dec. 20, 2001.

43. Stephen Hadley meeting (Jan. 31, 2004). Hadley told us that the White House was not satisfied with the Defense Department's plan to use force in Afghanistan after 9/11. Ibid.; see also White House transcript, Rice interview with John King of CNN, Aug. 2, 2002, p. 421.

44. Tommy Franks interview (Apr. 9, 2004).

45. NSC memo, Hadley to recipients, "Discussion Paper for NSC meeting at Camp David on 14 September," Sept. 14, 2001.

46. CIA memo, "Going to War," Sept. 15, 2001.

47. White House transcript, President Bush interview with Bob Woodward and Dan Bale, Dec. 20, 2001.

48. DOD briefing materials, "Evolution of Initial Response Planning (AQ, UBL)," undated (provided to the Commission on Mar. 19, 2004). According to the Deputy National Security Advisor Stephen Hadley, the President responded to Sheehan by saying that in the loose ends of the "gaming option was an interesting idea. He wanted to know what the CIA would do when ground forces were in Afghanistan. White House transcript, Hadley interview with Dan Bale and Bob Woodward, Jan. 11, 2002, p. 545

49. NSC memo, "Conclusions of National Security Council Meeting," Sept. 17, 2001, White House transcript, President Bush interview with Bob Woodward and Dan Bale, Dec. 20, 2001

50. NSC memo, "Conclusions of National Security Council Meeting," Sept. 17, 2001.

51. See NSC memo, Rice to Cheney, Powell, O'Neill, Rumsfeld, Ashcroft, Gonzales, Card, Tenet, and Shelton, Sept. 16, 2001.

52. NSC memo, "Conclusions of National Security Council Meeting," Sept. 17, 2001.

53. NSC memo, Summary of Conclusions of Terrorist Funding Meeting Held on September 18, 2001.

54. DOS briefing materials, "Fact Sheet on Response to Terrorist Attacks in US," Sept. 17, 2001.

55. DOS cable, State 161279, "Deputy Secretary Armitage-Mamoud Phone Call," Sept. 18, 2001.

56. White House transcript, Vice President Cheney interview with Dan Bale and Bob Woodward, Jan. 18, 2002, pp. 6-8.

57. Stephen Hadley meeting (Jan. 31, 2004).

58. See National Security Presidential Directive 9, Oct. 25, 2001.

59. President Bush and Vice President Cheney interview (Apr. 29, 2004). On Iran, see Condoleezza Rice testimony, Apr. 8, 2004.

60. Richard A. Clarke, *Against All Enemies: Inside America's War on Terror* (Free Press, 2004), p. 32. According to Clarke, he responded that "al Qaeda did this: When the President pressed Clarke to check if Saddam was involved and said that he wanted to learn of any shred of evidence, Clarke promised to look at the question again, but added that the NSC and the intelligence community had looked in the past for linkages between al Qaeda and Iraq and never found any real linkage. Ibid., p. 32. Noting the evening of September 12, Clarke had mischaracterized this exchange. On the evening of September 12, the President was at the Pentagon and then went to the White House residence. He dismissed the idea that he had been wandering around looking for something to do. While Clarke said that he did not think that any president would roam around looking for something to do. While Clarke said he had found the President's tone "very intimidating." ("Clarke's Take on Terror," CBSnews.com, Mar. 21, 2004, online at www.cbsnews.com/stories /2004/03/19/60minutes/printable607556.shtml), President Bush doubted that anyone would have found this exchange with the President intimidating. (April 29, 2004) Roger Cressey, Clarke's deputy, recalls this exchange with the President but recalls nothing after 9/11, but did not believe the President was intimidating in manner. Roger Cressey interview (June 23, 2004)

61. President Bush and Vice President Clarke concerning the deeply after 9/11, but did not believe the President was intimidating in manner. Roger Cressey interview (June 23, 2004)

62. NSC memo, Kurtz to Rice, Survey of Intelligence Information on any Iraq Involvement in the September 11 Attacks, Sept. 18, 2001. On *60 Minutes* (CBS, Mar. 21, 2004), Clarke said that the first draft of this memo was returned by the NSC Front Office because it did not find a tie between Iraq and al Qaeda. Rice and Hadley deny that they asked to have the memo redone for this reason.

63. See DOD notes, Victoria Clarke notes, Sept. 11, 2001; DOD notes, Stephen Cambone notes, Sept. 11, 2001. Cambone's notes indicate that this exchange took place at 2:40 p.m. on September 11, 2001. Steven Cambone interview (July 15, 2004).

64. Condoleezza Rice meeting (Feb. 7, 2004). For an account of Rumsfeld's and Wolfowitz's position on Iraq, see Bob Woodward, *Bush at War* (Simon & Schuster, 2002), pp. 83-84. Rice told us that the *Bush at War* account of the Camp David discussions on Iraq accorded with her memory.

65. DOD memo, Office of the Under Secretary of Defense for Policy, "War on Terrorism: Strategic Concept," Sept. 14, 2001.

66. Colin Powell interview (Jan. 21, 2004); Rumsfeld told Dan Bale that he had no recollection of Wolfowitz's remarks at Camp David. DOD transcript, "Secretary Rumsfeld Interview with the Washington Post," Jan. 9, 2002 (online at www.defenselink.mil/transcripts/2002/t02092002_t0109wp.html).

67. Condoleezza Rice meeting (Feb. 7, 2004). For an account of Powell raising concerns that Iraq might negate progress made with the international coalition the administration was putting together for Afghanistan. Taking on Iraq at this time could destroy the international coalition. Ibid.

68. Colin Powell interview (Jan. 21, 2004).

69. White House transcript, President Bush interview with Bob Woodward and Dan Bale, Dec. 20, 2001.

70. Condoleezza Rice meeting (Feb. 7, 2004).

71. NSC memo, "Conclusions of National Security Council Meeting," Sept. 17, 2001.

72. Condoleezza Rice testimony, Apr. 8, 2004; see also Bob Woodward, *Plan of Attack* (Simon & Schuster, 2004), p. 22.

73. DOD memo, Wolfowitz to Rumsfeld, "Preventing More Events," Sept. 17, 2001. We review contacts between Iraq and al Qaeda in chapter 2. We have found no credible evidence to support theories of Iraqi government involvement in the 1993 WTC bombing. Wolfowitz added in his memo that he had attempted in June to get the CIA to explore these theories.

74. DOD memo, Wolfowitz to Rumsfeld, "Were We Asleep?" Sept. 18, 2001.

75. DOD memo, Rumsfeld to Shelton, "Some Thoughts for CINCs as They Prepare Plans," Sept. 19, 2001. In a memo that appears to be Wolfowitz or General Douglas Feith to Rumsfeld, dated September 20, the author expressed disappointment at the limited options immediately available in Afghanistan and the lack of ground opinion. The author suggested instead hitting terrorists outside the Middle East in the initial offensive, perhaps deliberately.

Case 1:04-cv-00385-LMB   Document 339   Filed 09/06/13   Page 28 of 134 PageID# 548

Sept. 20, 2001.

77 Tommy Franks interview (Apr. 9, 2004).

76 Hugh Shelton interview (Feb. 5, 2004).

78 NSC memo, memorandum of conversation from meeting of President Bush with Prime Minister Blair, Sept. 20, 2001.

79 Tommy Franks interview (Apr. 9, 2004).

80 White House transcript, President Bush's Address to a Joint Session of Congress and the American People, Sept. 20, 2001.

81 Ibid. Several NSC officials, including Clarke and Cheney told us that the mention of the Cole in the speech to Congress marked the first public U.S. declaration that al Qaeda had been behind the October 2000 attack. Clarke said he added the language on this point to the speech. Richard Clarke interview (Feb. 3, 2004); Roger Cressey interview (Dec. 15, 2003).

82 White House transcript, President Bush's Address to a Joint Session of Congress and the American People, Sept. 20, 2001. President Bush told the Washington Post that he considered having Powell deliver the ultimatum to the Taliban, but determined it would have more impact coming directly from the president. White House transcript, President Bush interview with Bob Woodward and Dan Balz, Dec. 20, 2001.

83 White House transcript, President Bush's Address to a Joint Session of Congress and the American People, Sept. 20, 2001.

84 Ibid.

85 Tommy Franks interview (Apr. 9, 2004); Vice Chairman of the Joint Chiefs of Staff Richard Myers and Major General Del Dailey, commander of Joint Special Operations Command, also attended the September 21 meeting. The meeting was in direct response to the President's September 17 instruction to Rumsfeld to develop a military campaign plan for Afghanistan. The original "Infinite Justice" name was a continuation of a series of names begun in August 1998 with Operation Infinite Reach, the air strikes against Bin Ladin's facilities in Afghanistan and Sudan after the embassy bombings. The series also included Operation Infinite Resolve, a variety of proposed follow-on strikes on al Qaeda targets in Afghanistan.

86 DOD Special Operations and Central Command briefing (Sept. 15–16, 2003; Apr. 8–9, 2004; Apr. 28, 2004); Tommy Franks interview (Apr. 9, 2004). On details of Atef, see Daniel Benjamin and Steven Simon, The Age of Sacred Terror, p. 349; Henry, "The CIA in Afghanistan, 2001–2002: Studies in Intelligence (Classified version), vol. 47, no. 2 (2003), p. 1.11. See Donald Rumsfeld testimony, Mar. 23, 2004 (nearly two-thirds of the known leaders of al Qaeda had been killed or captured).

## 11 Foresight—and Hindsight

1. Roberta Wohlstetter, Pearl Harbor: Warning and Decision (Stanford Univ. Press, 1962), p. 387.

2. Intelligence Community analytic report, "The Foreign Terrorist Threat in the United States," NIE 95-13, July 1995, pp. v–vi–vii, 10–11, 13, 18.

3. Intelligence Community analytic report, "The Foreign Terrorist Threat in the US Revising Our 1995 Estimate," ICB 97-8, Apr. 1997, p. 1.

4. For Bin Ladin being mentioned in only two other sentences, see ibid.

5. These are drawn from articles in the Los Angeles Times and the Senior Executive Intelligence Brief.

6. John McLaughlin interview (Jan. 21, 2004).

7. Ibid.; Patrick Kennedy interview (Sept. 12, 2003).

8. Tim Weiner, "U.S. Had Plan to Find Proof Bin Laden Directed Attacks," New York Times, Apr. 13, 1999, p. A1.

9. Paul R. Pillar, Terrorism and U.S. Foreign Policy (Brookings Institution Press, 2001), p. 23; see also ibid., pp. 5, 21–22.

10. For a concise statement of the role of the national estimate process, see Task force sponsored by the Council on Foreign Relations, Making Intelligence Smarter: The Future of U.S. Intelligence (Council on Foreign Relations, 1996), pp. 34–35 (additional views of Richard Betts).

11. Walter Laqueur, The New Terrorism: Fanaticism and the Arms of Mass Destruction (Oxford Univ. Press, 1998), p. 215.

12. For the response being routine, see Gordon Prange, At Dawn We Slept: The Untold Story of Pearl Harbor (McGraw-Hill, 1981), pp. 732–733. For a brief summary of these routines and the reasons why the intercepts were not properly deployed, see Graham Allison and Philip Zelikow, Essence of Decision, 2d ed. (Longman, 1999), p. 194, n. 72.

13. PDBs were not routinely briefed to congressional leaders, though this item could have been in some other intelligence briefing. It was not circulated in the NID or SEIB. For the September 1998 report, see Intelligence report, "Terrorism: Possible Attack on a US City," Sept. 8, 1998.

14. For the August report, see Intelligence report, "Terrorism: Alleged Threat by Arab Terrorists to Attack the World Trade Center in New York," Aug. 12, 1998. An FAA civil aviation security official believed the plan was implausible because Libyan planes were required to operate within airspace limitations and did not have the aircraft with the necessary range to make good on the threat. X interview (Dec. 5, 2003). On September 30, 1999, the FAA closed the file on the August report. Transportation Security Intelligence ICF Report 98016-2, source's credibility was deemed suspect. FAA report, Transportation Security, undated; but see FAA/TSA rebuttal to the Joint Inquiry Report, Sept. 18, 2002, staff statement, undated, p. 1 (stating that the FAA did not formally analyze that threat). The Algerian hijackers had placed explosives in key areas of the cabin. However, there was some speculation in the media based on reports from a passenger aboard the plane that the hijackers had discussed turning it into the Eiffel Tower. FAA report, FAA Intelligence Case File 94-305, undated.

15. [see note 14 above]

16. For Clarke's involvement in the 1996 Olympics, see Richard Clarke interview (Dec. 18, 2003). For the 1998 exercise, see Chuck Green interview (Apr. 21, 2004); NSC briefing (July 30, 1998).

17. For the report of the National Transportation Safety Board, see NTSB report, "Aircraft Accident Brief," Mar. 13, 2002 (online at www.ntsb.gov/Publictn/2002/aab0501.htm). For the early 2000 CSG discussion, see NSC note, CSG SVTS agenda, Jan. 31, 2000.

18. Richard Clarke interview (Jan. 12, 2004).

19. FAA memo, Office of Civil Aviation Security Intelligence, "Usama Bin Ladin/World Islamic Front Hijack Warning," MAX 104, Aug. 4, 1999, pp. 5–6.

20. Ibid.

21. As part of his 34-page analysis, the author explained why he thought that a fueled Boeing 747 used as a weapon, "must be considered capable of destroying virtually anything by building-busted anyone in the world." DOJ memo, Robert D to Cathleen C., "Aerial Intercept of an aircraft above Washington or ..."

22. Samuel Brych attempted to commandeer a plane at a Baltimore Washington International Airport with the intention of forcing the pilots to fly into Washington. The man was shot by police and then killed himself on the ground at the airport.

23. For NORAD's hypothesis of aircraft as weapons, see Ralph Eberhardt interview (Mar. 1, 2004). For the 2001 Positive Force 01 exercise, see DOD briefing (Apr. 29, 2004); Tom Cecil and Mark Pongate interview (June 7, 2004).

23. For the Gates report's recommendations, see DCI task force report, "Improving Intelligence Warning," May 29, 1992. For strengthening of the DCI memo, "Warning," July 17, 1992. For the reconstitution of the DCI ... see Charles Allen interview (Jan. 22, 2003). For CTC having responsibility for warning, see Community Counterterrorism Board, Robert Vickers interview (Sept. 17, 2003). For the Board's warnings, see e.g., Community Counterterrorism Board report, "Intelligence Community Terrorist Threat Advisory, Bin Ladin Orchestrating Possible Anti-US Attacks," June 30, 2001.

24. CIA briefing materials, "DCI Update," Aug. 23, 2001.

25. James Pavitt interview (Jan. 24, 2004). For more on this meeting, see Condoleezza Rice meeting (Feb. 7, 2003); George Tenet interview (Jan. 28, 2004).

26. For the briefing to the President and the ... James Pavitt interview (Jan. 8, 2004). The CIA's formal analysis of what would have been removed and compared with the importance of shutting down the ... summary was ... CIA analytic report, "Likely Impact of Taliban Actions Against Al Qaeda" (Feb. 21, 2001 (provided as background for later meeting with Rice on Feb. 23 and Mar. 7, 2001).

27. Richard Clarke testimony, Mar. 24, 2004.

28. Mike interview (Dec. 11, 2003) (reading from CIA email); Mike to Watson interview (Jan. 8, 2004) (providing background for the Cole attack, see White House transcript,

29. For President Bush's statement of al Qaeda's responsibility for the Cole attack, see White House transcript, "Address to a Joint Session of Congress," (online at www.whitehouse.gov/news/releases/2001/09/20010920-8.html).

30. For Pavitt's views, see James Pavitt interview (Jan. 8, 2004).

31. Hugh Shelton interview (Feb. 5, 2004). Zinni was concerned about excessive collateral damage caused by Tomahawk strikes. See Anthony Zinni interview (Jan. 29, 2004).

32. For Shelton's view, see Hugh Shelton interview (Feb. 5, 2004). For Cohen's view, see William Cohen interview (Feb. 5, 2004).

33. Russell Honore interview (Oct. 29, 2003).

34. James Pavitt interview (Jan. 8, 2004).

35. Ibid.

36. Cofer Black interview (Dec. 9, 2003).

37. J.D. interview (Dec. 11, 2003).

38. XX interview (Tenet to Gordon and others, "Usama Bin Ladin," Dec. 4, 1998, p. 2.

39. See, e.g., Joan Dempsey interview (Nov. 12, 2003); Jeff B interview (Dec. 11, 2003); Louis Andre interview

Exhibit C

Case 1:04-cr-00385-LMB  Document 339  Filed 09/06/13  Page 31 of 134 PageID# 551



**U.S. Department of Justice**

*United States Attorney's Office*

*Eastern District of Virginia*

---

2100 Jamieson Avenue                                                703/299-3721

Alexandria, Virginia 22314                                     FAX 703/299-3981

November 12, 2004

Edward B. MacMahon, Jr.
P.O. Box 903
107 East Washington Street
Middleburg, Virginia 20118

      Re:    <u>U.S. v. Al-Timimi, Crim. No. 1:04cr385; Discovery Letter #3</u>

Dear Ed:

    Thank you for your letter of November 2, 2004, regarding discovery issues. I too look forward to working with you and Alan efficiently and professionally.

    With respect to the individual items requested in your letter:

    1. You requested copies of Al-Timimi's statements to the United States: I provided you in connection with Discovery Letter #2 all of the FBI reports of interviews with Al-Timimi. Enclosed for your records is a copy of the proffer letter that we provided him in connection with his last interview with the agents; as I mentioned earlier, he sought such protection only with respect to that last interview about possible proactive cooperation to provide information to prevent terrorist attacks.

    Regarding a related matter, you are welcome to inspect the copies of your client's various lectures and writings that we have. If you are interested in doing so, you can do so by contacting FBI SA John Wyman, at 202.278.4326, or SA Wade Ammerman, at 202.278.4331.

    2. You requested copies of Al-Timimi's statements captured on FISA. FBI SA John Wyman has been in contact with Court Security Officer Christine Gunning to provide these statements to you in classified form on a cd-rom; I expect that they will be available for you as early as Monday, November 15th.

    3. You requested the fruits of "any FISA warrants or other non-FISA warrants - -e.g. mail covers or pen registers - - that relate" to your client. Unless these fruits are statements of your client, are exculpatory, or are items we intend to use at trial, I am unaware of any authority for production of such information. We are producing to you the "fruits" that consist of your client's statements. If you notify me of the appropriate authority for the production of other such "fruits," I will promptly revisit this issue.

Letter to Edward B. MacMahon, Jr.
November 12, 2004
Page 2

4. You requested what I understand to be prior statements and fruits of FISA warrants with respect to any of Al-Timimi's co-conspirators. I expect to have available for you next week cd-roms containing all of the phone conversations and e-mails captured pursuant to FISA or other authority for Royer, Khan, Hammad, Caliph, Hamdi, Chapman, Kwon, Hasan, Surratt, and Aatique. Such of this information that was derived from FISA likely will still be in classified form so that you will have to obtain it from Christine Gunning. That being said, I am unaware of any authority for production of such other FISA related information that is not exculpatory. As noted above, if you notify me of the appropriate authority for the production of other such "fruits," I will promptly revisit this issue.

5. You requested the affidavits prepared and filed in support of the FISA warrants that relate to Timimi. As you likely already know, applications which are submitted to, and orders which are issued by, the FISA Court, may not be disclosed by a federal district court if the Attorney General files an affidavit and claim of privilege, unless "such disclosure is necessary to make an accurate determination of the legality of the surveillance." *See* 50 U.S.C. § 1806(f). Disclosure is, therefore, the "exception" and not the rule. *See United States v. Belfield*, 692 F.2d 141, 149 (D.C. Cir. 1982). Indeed, every federal court that has considered this question has concluded that it is capable of reaching a legal conclusion with respect to the legality of the FISA surveillance at issue without ordering the disclosure of the underlying FISA applications, orders and related materials. *E.g., United States v. Squillacote*, 221 F.3d 542, 553-554 (4th Cir. 2000); *see also United States v. Nicholson*, 955 F.Supp. 588, 592 & n. 11 (E.D. Va. 1997) ("this court knows of no instance in which a court has required an adversary hearing or disclosure in determining the legality of a FISA surveillance") (collecting cases). The situation with the instant case is no different than these other cases. The surveillance at issue in this case was lawfully authorized and lawfully conducted, and no disclosure of the underlying applications and orders will be necessary. We are aware of our discovery obligations and will fully comply with them. For example, as you know, we intend to provide you with access to all of the information that we intend to use during the Government's case-in-chief, as well as to all of the other information to which you are entitled pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and its progeny, and the "*Jencks* Act," 18 U.S.C. 3500. We decline, however, to provide you with copies of the underlying FISA applications and orders.

6. You request information from FBI and/or CIA regarding whether investigations involving foreign governments reflect that Timimi recruited individuals for armed conflict. I am unaware of any authority for producing such information unless it would be exculpatory and in this case, neither the presence or absence of such evidence would be exculpatory. The lack of evidence of his recruiting on other occasions is no more exculpatory to the present indictment than would be the lack of evidence that a defendant indicted for robbing First Union Bank did not also rob First Virginia Bank. That being said, if you tell me that his recruiting of others to fight on other occasions *would* be exculpatory - - and that such evidence is likely to exist - - then I would be willing to so stipulate. Otherwise, such evidence would not be exculpatory and I am unaware of any obligation to search for it for you.

7. You request information regarding the relationship between LET and the governments of the US or Pakistan, on the grounds that if LET was supported by the government of Pakistan which is an ally of the US, then that information would be exculpatory. Absent further explanation from you, we will not be providing such information because on the basis of the information we have now such information is not exculpatory to the indictment of Al-Timimi in any way. Nevertheless, we will

stipulate if you so desire that LET obtained some support from some parts of the government of Pakistan at some times before the United States designated LET as a terrorist organization in December 2001.

8. You request to review the items seized from Timimi's home. As I noted in Discovery Letter #2, all of the items seized from Timimi's home, as well as all of the items seized from the homes of Hamdi, Garbieh, Khan, Hammad, Caliph, Aatique, Surratt, Chapman, and Royer, (and still within our possession) are available for your inspection upon your contacting SA Wyman, 202.278.4326, or SA Ammerman, 202.278.4331.

8. You request the documents backing up the 9/11 Commission report. I am unaware of any authority for production of such information unless it would be exculpatory. That the backup documents encompass the universe of facts within which might exist a factoid you would love to have - - if it existed - - does not entitle you to them.

9. You requested the reports of interview for Mulla Abdus Salam Zaeef and Mullah Muhammad Fadhil, who you indicate may be detained in Guantanamo. The report of interview for Zaeef contains no exculpatory information. I have found no report of interview involving Fadhil.

10. You suggest that we work out a schedule for a deposition of Zaeef and Fadhil. I am unaware of any authority entitling you to take their depositions.

11. You request reports from the computers seized from Timimi. The seized computer was returned to your client. If you still need a copy of what was on that computer, however, we can get you a copy of its mirrored image.

12. You ask for information about expert witnesses. This is to notify you that the United States plans to call to testify David Good and Michael Morrow. Mr. Good is currently Director of the Office of India, Nepal, Sri Lanka, Bhutan, and Maldives Affairs, within the South Asia Bureau of the U.S. Department of State. Mr. Morrow is currently Deputy Director of the Office of Russian Affairs within the Bureau of Europe and Eurasia of the U.S. Department of State. They will testify that the United States was at peace with India and Russia during the period relevant to the Indictment. To the extent that this testimony consists of "expert" testimony, this letter constitutes notice to you that they are expected to be "expert" witnesses.

13. Further, this is to notify you that the United States plans to call Robert Andrews to testify at the trial to describe the course of the war in Afghanistan from September 12, 2001, through approximately November 30, 2001. To the extent that his testimony consists of "expert" testimony, a description of his qualifications is enclosed. I expect him to testify to essentially the following facts:

> Immediately after 9/11, the United States demanded that the Taliban turn over Bin Laden. On September 12, 2001, the Bush administration won NATO support for a possible strike against Usama bin Laden and his supporters in Afghanistan, and was pressuring Pakistan for intelligence and logistical backing. That same day, the Taliban was bracing for an

Case 1:04-cr-00385-LMB  Document 339  Filed 09/06/13  Page 34 of 134 PageID# 554

imminent attack by the United States and sent its top leader Mullah
Mohammad Omar into hiding.

After the Taliban refused those demands, the United States and allied
forces entered Afghanistan and engaged the Taliban in combat to prevent
it from allowing Al-Qaeda to use Afghanistan as a base for terrorist acts
against the United States and around the world. American troops started
the ground war against the Taliban on or about October 20, 2001. On or
about October 21, 2001, American commandos seized an airfield in
southern Afghanistan and then raided a compound of Taliban leader
Mullah Mohammed Omar. On or about November 10, 2001, the Taliban
lost the key city of Mazar-e-Sharif, and the northern provincial capitals of
Shibarghan, Aybak, and Maimana. By November 11, 2001, the Taliban
was being routed through northern Afghanistan. On or about November
13, 2001, the Taliban withdrew from the Afghan capital of Kabul and
Northern Alliance forces allied with the United States took control of the
city. By November 15, Taliban forces had retreated to Kandahar.

4. We expect to call John Miller to authenticate a videotape as a depiction of Usama bin Laden
(the videotape is a depiction of bin Laden making the statement a written version of which was found in
Masoud Khan's residence in May 2003). We are in "possession" of a prior relevant statement of Miller
about how he met Bin Laden in the sense that we downloaded it from the internet. I figure that you can
do the same, at http://www.esquire.com/features/articles/2001/010913_mfe_binladen_1.html.

Naturally, we wouldn't need John Miller to authenticate the videotape if you would agree that the
document found in Khan's house was a translation of bin Laden's speech aired on October 7, 2001, or
that the individual in the tape is, in fact, Bin Laden, or that if Miller were called to testify, he would say
that he met Bin Laden and that the individual in the tape appears to be Bin Laden. I'm sending you by
email the video of the Bin Laden speech when I send you the email of this letter.

14. This letter further is to inform you that we intend to use the services of translators Hany A.
Iskandar, Alex Daghestani, and Zahid Siddiqui as Arabic and Urdu translators in the upcoming trial.
Mr. Iskandar is an Arabic language specialist with the FBI, and was qualified as an expert in translating
from Arabic to English (and vice-versa) during the *U.S. v. Khan* trial. Their summaries of qualifications
are enclosed.

15. This is to notify you that the United States plans to call as an expert witness to testify at trial
Evan F. Kohlmann. Mr. Kohlmann is a Magna Cum Laude graduate of Georgetown University, with a
major in International Politics, a concentration in International Security Studies, and a minor in Islamic
Studies from the Center for Muslim Christian Understanding. He is the author of *The Legacy of the
Arab Afghans: A Case Study*, Georgetown University International Politics Honors Thesis, Spring 2001,
and the book, *Al-Qaida's Jihad in Europe: The Afghan-Bosnian Network*, released by Berg
Publishers/Oxford, United Kingdom, earlier this year. A copy of his resume is enclosed with this letter.

I expect Mr. Kohlmann to testify as an expert on the origins of the Arab-Afghans, Al-Qaida, the Taliban, and Lashkar-e-Taiba. I expect him to testify as an expert regarding the relationship between jihad fighters in Bosnia, Pakistan, and Afghanistan, and the connections between Lashkar-e-Taiba, the Taliban, and Al-Qaida, and the history of Usama bin Laden and Al-Qaeda's war against the United States before 9/11. I expect Mr. Kohlmann to testify that, from about 1995 until late 2001, the Taliban was the political/military entity headquartered in Kandahar, Afghanistan, that exercised de facto control over portions of the territory of Afghanistan until its defeat in late 2001 and early 2002 by a multi-national coalition that included the United States. I expect him to identify a videotape as a depiction of Usama Bin Laden; I expect an Arabic translator to translate the speech of Bin Laden into English, which I expect will match the translation of the speech made in October 2001 and found in the house of Masoud Khan.

Mr. Kohlmann is also an expert in accessing and interpreting information found on the internet. I expect him to testify about the information released on the internet by Lashkar-e-Taiba between 1999 and 2001. I expect him to testify that, by September 13, 2001, it was widely reported that the Bush administration won NATO support for a possible strike against Bin Laden and his supporters in Afghanistan. Finally, I expect him to testify that, that same day, newspapers further reported that the Taliban was bracing for an imminent attack by the United States and sent its top leader Mullah Mohammad Omar into hiding. A synopsis of much of his proposed testimony is enclosed with this letter.

This letter also is to document that I am providing you on email various papers written by Evan Kohlmann, as well as his book. The items included are:

- The cover of Mr. Kohlmann's book, *Al-Qaida's Jihad in Europe: The Afghan-Bosnian Network*;

- Mr. Kohlmann's book, *Al-Qaida's Jihad in Europe: The Afghan-Bosnian Network*;[1]

- *A Web of Terror*, Journal of Counterterrorism, Vol. 6, No. 3, Spring 2000

- *A Bitter Harvest: The Soviet Intervention in Afghanistan and its Effects on Afghan Political Movements*

- *The Ideological Evolution of the Committee for the Defense of Legitimate Rights (CDLR).*

- *An Afghan Ghazi: The Modernization and Reforms of Amir Amanullah Khan*

- *Legal and Investigative Loopholes in Modern Cyberterrorism Cases*

- *400 Years of Colonization: the Ottomans vs. the French in Algeria, 1519-1919*

---

[1] Provided in electronic form by e-mail only.

Letter to Edward B. MacMahon, Jr.
November 12, 2004
Page 6

I suspect that we probably could reach agreement on some or all of the facts underlying the testimony of David Good, Michael Morrow, Robert Andrews, John Miller, Hany Iskandar, Alex Dagestani, Zahid Siddiqui, and Evan Kohlmann, and I welcome your interest in doing so.

In addition to the items listed above that you requested in your letter, this letter is to notify you that we have no reports of physical or mental examination, scientific tests or experiments, that we plan to present in our case, and are aware of none in our possession that are material to your case.

Thank you for your cooperation.

Sincerely,

Paul J. McNulty
United States Attorney

By:

Gordon D. Kromberg
Assistant United States Attorney

Exhibit D



**U.S. Department of Justice**

*United States Attorney's Office*

*Eastern District of Virginia*

2100 Jamieson Avenue          703/299-3721

Alexandria, Virginia 22314          FAX 703/299-3981

December 28, 2004

Edward B. MacMahon, Jr.
P.O. Box 903
107 East Washington Street
Middleburg, Virginia 20118

   Re:  <u>U.S. v. Al-Timimi, Crim. No. 1:04cr385; Discovery Letter #8</u>

Dear Ed:

  1. I am ready to provide you cd-roms containing emails and phone calls of other conspirators in this case, which emails and phone calls were captured by FISA. I do not believe that they contain exculpatory evidence in addition to that which you already have obtained (*i.e.*, exhibits introduced in the last trial including self-serving statements by Royer and Hammad). You may find them useful because they may contain previous statements of potential witnesses. They have been declassified. That being said, they *were* captured by FISA, and I am authorized to give them to you only for use in connection with this trial. Accordingly, I will provide them to you if you represent to me that you will not make copies of them (or allow copies of them to be made) except for use in connection with this trial, and that at the end of the trial you will return the original cd-roms and all copies that may have been made from them.

  If you agree with these terms, I can provide to you 11 cd-roms containing materials involving Masaud Khan; four cd-roms containing materials involving Aatique, one cd-rom containing materials involving Chapman, six cd-roms containing materials involving Royer, and 11 cd-roms containing materials involving Hamdi.

  2. You have received the cds with the telephone calls and emails that were captured under the FISA surveillance over Timimi. Of these calls, eight have been declassified. They include four calls to same number about the Space Shuttle article, on 1/31/03 and 2/1/03 (including one call consisting of Timimi reading the article to his listener), one call that was an exhibit at the last trial, with Hammad and Royer calling Timimi; one call that was consensually-monitored, from Kwon to Timimi, for which you already have the transcript in the *Brady* scan materials, and one call with Royer about a press conference.

  3. I am providing you herewith additional documents for your use in the SCIF under the condition that - - absent specific consent in writing from me - -they may not be copied again and

Case 1:04-cr-00385-LMB Document 339 Filed 09/06/13 Page 39 of 134 PageID# 559

that they may not be taken out of the SCIF except to return them to me. This new material consists of:

| | | | |
|---|---|---|---|
| FBI 302, report of interview of Randall Royer | Dec 8, 2004 | 2 | 03445-03446 |
| FBI 302, report of interview of of Hasan | Dec 2, 2004 | 1 | 03447 |
| FBI 302, report of interview of Kwon | Dec 1, 2004 | 1 | 03448 |
| FBI 302, report of interview of Hasan | Nov 23, 2004 | 1 | 03449 |
| FBI 302, report of interview of Kwon | Nov 19, 2004 | 1 | 03450 |
| FBI 302, report of interview of Hasan | Oct 6, 2004 | 1 | 03451 |
| FBI 302, report of interview of Kwon | Nov 17, 2004 | 1 | 03452 |
| FBI 302, report of interview of Kwon | Nov 16, 2004 | 1 | 03453 |
| FBI 302, report of arrest of Ali Al-Timimi | Sep 24, 2004 | 1 | 03454 |

4. You previously asked about Timimi's intercepted emails in the case in the Northern District of New York. That wiretap was a Title III wiretap. As a result, much of the take was minimized. I am advised that there were a total of nine emails captured pursuant to a Title III wiretap. Only two messages were not minimized, and I have provided both of them to you with this letter. The other seven were minimized, so they are maintained under seal by the court in New York. No one (other than your client, of course) can say what is on the seven minimized emails (other than that they were not relevant to what the listeners were listening for) and they are not available absent a court order from New York. As you can see, the two that were not minimized seem inconsequential, so it is hard to imagine how little the other seven that did not merit keeping must have had.

5. Be aware that what your client said in his interviews with the FBI in 2003 and 2004 will be introduced to show his intent, and an absence of mistake. These statements include the following:

Timimi is familiar with LET and its leader, Hafiz Sayeed. Timimi's religious belief system is similar to that espoused by the organization comprising the LET and the Markaz ad Dawa. Timimi was aware of the LET's annual conference. Timimi was aware that Royer had established the Taiba Bulletin and helped set up the website. Timimi used to visit the LET website regularly and receive the Taiba Bulletin over the internet but removed his name from the mailing list once LET was designated as a terrorist organization. Tapes of his lectures were posted on the LET website. Abu Bara indicated in an e-mail to Timimi that he and Timimi knew each other. Timimi stated that a Muslim can lie when a Muslim is at war.

On 9/11, Timimi spoke at Dar al Arqam about the events of the day, and said that sometimes killing innocents is justified Islamically. There is no question that warfare is part of the Islamic law and religion. One cannot deny that. Islam is not a pacifist religion. War is an

integral part of Islam. There are conditions however, to whether one's participation in jihad is authentic. Jihad is broken down into a communal and a non-communal obligation. A non-communal or individual obligation to participate in jihad can occur when the leader of the Muslims calls you up to fight. When a country is attacked by an outside force, it is also obligatory for Muslims in neighboring countries to assist those in the country being attacked by the oppressor, if those within the country being attacked cannot defend themselves adequately. Attacks carried out with good intentions and with the intended result being of some benefit to muslims or harm to unbelievers should not be considered suicide in Islam.

Rules related to obligatory jihad should not be confused with the rules related to whether participation in a jihad is legitimate or permissible. Whether an individual's participation in a particular jihad is permissible or considered legitimate from a religious perspective is a theoretical question based on a number of different conditions. An individual who died on the battlefield would receive the rewards due to a martyr if the appropriate conditions were met. "Those who die on the battlefield are the best of martyrs". Timimi sent to his brother the article, "An American Born Shaheed, An Example for All of Us."

Many considered Mullah Omar as potentially as the leader of Muslims. Timimi's evaluation of Omar and the Taliban was contained in his paper entitled "Shaikh Ali Timimi on the Taliban and the Statues", by "Shaikh Ali Timimi, 7 March 2001"

In his lecture, "The Role of Muslim Students in North American Universities," Timimi said that if individuals possessed a special skill for jihad like that possessed by an army general, then such individuals would have no choice but to go and fight in jihad to assist muslims fighting disbelievers.

Timimi studied under Hawali in Medina, and considers his views to be in line with Hawali's. Timimi called Hawali shortly after 9/11 for Hawali's take on recent events. Timimi sent the email of 12/13/01, subject, "A call to reflect and repentance." When Timimi mentioned Hawali's declaration in that email, he was adopting Hawali's views as his own.

6. Be aware that what your client has said in public lectures may be introduced to show his intent, and an absence of mistake. These statements include the following:

In "The Principles of Fiqh: The Voluntary Acts of Worship," he said that if the enemy is in front of us, the best act of worship is to fight in jihad. In "Purification of the Soul," he said that it is not enough to want to know what is going on in Chechnya or Kashmir and to read a web site, it is crucial to go forth. Jihad is fighting in the path of Allah. Allah loves those who wage jihad in his path. In "The Luminous Creed," he said that the Muslims should emulate those that fight their enemies, not in a theoretical sense, but in a literal sense. The greatest expression of Islamic belief is jihad. In "A Word of Advice to the Salafis of the UK," Timimi said that there is obviously a jihad going on today. Waging jihad is an unceasing obligatory duty until the Day of Resurrection. In "The Acts of Worship During Shawwal." he said that Allah hates those who have the means to wage jihad, but fail to do so.

In "Signs Before the Day of Judgment," "Faith, Divine Decree, Prophets Companions, Family and Wives), and "A Word of Advice to the Salafis of the UK," Timimi said Muslims are obligated to pledge allegiance to a Muslim ruler, even if that ruler is unjust. They cannot pledge allegiance to any leaders in the US because there are no Muslim leaders. In "Was History Violated When Buddha's Statues Were Annihilated," Timimi said that the only way for Muslims to prevail is through the banner of jihad to be raised and to follow shariah. Appeasement has not worked for 200 years. In "Tawheed and Shirk," Timimi spoke about the final battle where the trees and rocks come alive.

7. Be aware that what your client advised Kwon regarding Kwon's consideration of becoming an American citizen (as described by Kwon in the last trial) may be introduced to show his intent, and an absence of mistake.

8. If I have not mentioned this before, please note that I intend to ask Evan Kohlmann to testify regarding the relationship between Hawali and bin Laden. As you know, bin Laden based his declaration of war against the United States on the grounds that the Saudis incarcerated Hawali at the behest of the Americans.

9. In your letter of December 14th, you requested that I identify *Brady* and *Jencks* materials from the materials provided for your examination in the SCIF as soon as possible. Except as otherwise noted in this series of letters, I am aware of no *Brady* materials. If your motion for a continuance is denied on December 30th, I expect to have the list of *Jencks* materials for you by January 3rd; after that time you can take the listed documents out of the SCIF and let your client read them if you and he so choose. However, all *Jencks* materials (and all copies of such materials) must be returned to me after the trial; if that condition is unacceptable, then we will have to get it resolved by the judge before I can provide you the list of *Jencks* materials.

10. I have asked the agents to identify materials that can be returned to your client. My understanding is that they are doing so.

11. With respect to the issue about Mullah Omar calling for troops, I reiterate my offer to stipulate to the newspaper articles that you submitted to the court in connection with your discovery motion.

12. I do not know what to tell you about your inability to open the DVD with the email files on it. I gave you my copy of the DVD when you said that you couldn't open the original DVD I gave you; I gave you mine after opening it and reading random emails on my office pc. I have more copies of the Terrorism: Review of 1999 cd which you are welcome to if you want (but as I mentioned, its only relevance is that it contains a snippet of Royer asking a question about terrorism).

Discovery Letter #8
December 28, 2004
Page 5

13. You asked about records from Yahoo dealing with Al-Timimi's email traffic, and whether we could segregate out those emails that we believe that Al-Timimi wrote or received himself. On the DVD that I already gave you, you can find his emails from his myself.com account segregated together. Also, by doing a word search for your client's email addresss through your word processing program, you can find the emails from or to him in the accounts of the individuals whose accounts were seized in connection with this case. I understand that this procedure is useless unless you can open the DVD, but as I said, I opened it just fine on my pc.

14. Your inquiry regarding Timimi's Yahoo and Hotmail records is likely moot in light of the provision to you of materials in the SCIF.

15. You asked about our position regarding FISAs containing the voice of your client. Our position is that we will either provide you such recordings as exist, or in limited circumstances, not do so through utilization of CIPA, or, in other limited circumstances, not do so after determining that they are not relevant under Rule 16. The statement of this position also is responsive to your question regarding a recording of Alaqui.

Thank you for your cooperation.

Sincerely,

Paul J. McNulty
United States Attorney

By: _____

Gordon D. Kromberg
Assistant United States Attorney

**From:** "RAD" <rdhafir1@twcny.rr.com>
**To:** "Ali Timimi" <altimimi@myself.com>
**Sent:** Sunday, May 19, 2002 6:36 PM

assalamu alaikum
Did not find you at home.
can you please call me tonight 315-637-3945 or give me a number to call you at.
jazaka Allahu khairan

Rafil

**From:** "RAD" <rdhafir1@twcny.rr.com>
**To:** "Ali Timimi" <altimimi@myself.com>
**Sent:** Saturday, May 11, 2002 4:28 AM
**Subject:** Fw:

I am re-sending this in case you did not receive it the first time. I had no response from you.

Rafil
----- Original Message -----
**From:** RAD
**To:** Ali Timimi
**Sent:** Thursday, May 09, 2002 10:41 PM

assalamu alaikum
I sent an Email to Yusuf Jaafar Idris to see if he can speed up my visa to Jedda, I sent my passport and the documents today for a business visa and should arrive noon Friday insha Allah. He did not respond and I don't know how to get in touch with him.
Do you know someone in the Saudi Embassy to speed it up?

Jazaka Allahu khairan

Rafil

12/21/2004

Case 1:04-cr-00385-LMB  Document 339  Filed 09/06/13  Page 45 of 134 PageID# 565

FD-302 (Rev. 10-6-95)

FEDERAL BUREAU OF INVESTIGATION

Date of transcription  12/09/2004

    RANDALL TODD ROYER, date of birth 03/25/1973, Social Security Number 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 was interviewed at the United States Attorney's Office of the Eastern District of Virginia, located in Alexandria, VA. Also present during the interview was Department of Justice Trial Attorney John Gibbs.

    During this interview, ROYER answered questions from John Gibbs in preparation for ROYER's anticipated testimony at the trial for ALI AL-TIMIMI in the Eastern District of Virginia.

    After being advised as to the identity of the interviewing Agents and the nature of the interview, ROYER provided:

    ROYER saw a national news broadcast on either 09/13 or 09/14/2001. The news cast reported that Mullah Omar, the leader of the Taliban, was not asking for people to come fight in Afghanistan. ROYER thought the telecast was on CNN or perhaps Tom Brokaw, but he could not recall with certainty. ROYER watched the news cast in the conference room at CAIR. ROYER was confident the timing of this broadcast was before the 9/16 dinner meeting with Timimi. ROYER was certain that he saw the story in the CAIR conference room. After the 9/16 meeting ROYER was preparing to leave the US, as a result, he did not spend much time at CAIR after the 9/16 meeting. ROYER noted that if someone had stated at the 9/16 dinner meeting that Mullah Omar was calling for assistance, ROYER would have stood up and pointed out that he had seen the news story in which Mullah Omar was not calling for fighters.

    ROYER recalled that Mullah Omar had still not called for fighters into late October, perhaps early November 2001. ROYER saw a similar news story on the Internet, possibly a BBC piece, that reiterated that Omar did not want fighters. At this time ROYER was in Bosnia and was communicating, via instant messenger, with Abu Baraa at LET. ROYER was attempting to get a visa for Pakistan. Abu Baraa told ROYER that there were people at LET who wanted to go to Afghanistan, but LET would not allow them to go. Some of the Arabs "rebelled" when they were told they could not go to Afghanistan. Abu Baraa added that the Taliban was not allowing anyone to come into Afghanistan. ROYER recalled that this was at a time when the US Forces were "kicking butt." It was only near the

---

Investigation on  12/08/2004  at  Alexandria, VA

File #  315N-WF-226192-___  -___

Date dictated ___

SA James R. Sobchack:jrs
by  SA F. Wade Ammerman

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

03445

Case 1:04-cr-00385-LMB  Document 339  Filed 09/06/13  Page 46 of 134 PageID# 566

315N-WF-226192

Continuation of FD-302 of ___RANDALL TODD ROYER_____ , On _12/08/2004_ , Page __2__

very end, just prior to the collapse of the Taliban, that the
borders were opened up. ROYER recalled that volunteers entered
from places like Waziristan, but many were killed before they could
join the fight, since they had no training, they were easy to kill.

ROYER spoke to Masoud Khan while both were in the
Alexandria lock up. KHAN confirmed that there were some Arabs who
wanted to go to Afghanistan, but were refused.

ROYER was not able to provide information about LET
funding activities, Hawalas, or other individuals who may be
involved with money laundering in the Washington DC Metro area.

O3446

Case 1:04-cr-00385-LMB  Document 339  Filed 09/06/13  Page 47 of 134 PageID# 567

FD-302 (Rev. 10-6-95)

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    12/07/2004

        On 12/02/2004, KHWAJA MAHMOOD HASAN, date of birth
03/24/1976, social security account number 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, was
interviewed at the Alexandria Police Department, Alexandria,
Virginia, by Detective Constable Kenneth Mcaulay and Detective
Constable Martyn Smith, New Scotland Yard (NSY), SO13, Anti-
Terrorist Branch.  Present during the interview of Hasan were
Special Agents John V. Wyman, F. Wade Ammerman, and Christopher
P. Mamula.

        On 12/03/2004, Hasan was again interviewed by Detective
Constable Kenneth Mcaulay at the Alexandria Police Department.
Present during this interview were Special Agents Wyman and
Ammerman.  During this interview, Hasan reviewed a written
statement prepared by NSY Detectives in follow-up to their
interview of Hasan on 12/02/2004.  Hasan reviewed the statement
and before affixing his signature to ~~the last~~ each page.

---

Investigation on    12/03/2004    at  Alexandria, Virginia

File #  315N-WF-226192-302  ·941                    Date dictated    NA

        SA F. Wade Ammerman
by    SA John V. Wyman

O3447

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

Case 1:04-cr-00385-LMB Document 339 Filed 09/06/13 Page 48 of 134 PageID# 560

FD-302 (Rev. 10-6-95)

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    12/07/2004

On 12/01/2004, YONG KI KWON, born on 12/31/1975, was interviewed at the Alexandria Police Department, Alexandria, Virginia, by Detective Dave Field and Detective Ray Thomas, New Scotland Yard (NSY), SO13, Anti-Terrorist Branch. Present ~~during the interview of Kwon were Special Agents John V. Wyman,~~ F. Wade Ammerman, and James R. Sobchack.

On 12/03/2004, Kwon was again interviewed by Detectives Field and Thomas at the Alexandria Police Department. Present during this interview were Special Agents Wyman and Ammerman. During this interview, Kwon reviewed a written statement prepared by NSY Detectives in follow-up to their interview of Kwon on 12/01/2004. Kwon reviewed the statement and made pen and ink changes before affixing his signature to ~~the last~~ page.
                                                          each

---

Investigation on    12/01/2004    at Alexandria, Virginia

File #  315N-WF-226192-302                    Date dictated    NA

        SA F. Wade Ammerman
by      SA John V. Wyman

03448

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Case 1:04-cr-00385-LMB  Document 339  Filed 09/06/13  Page 49 of 134 PageID# 569

FD-302 (Rev. 10-6-95)

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   11/23/2004

     KHWAJA MAHMOOD HASAN, date of birth 03/24/1976, social security account number 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, was interviewed at the Alexandria Police Department, Alexandria, Virginia, by Special Agent John V. Wyman, Special Agent Christopher P. Mamula, and Department of Justice Trial Attorney John Gibbs.

     During the this interview, Hasan answered questions from John Gibbs in preparation for Hasan's anticipated testimony at the trial for ALI AL-TIMIMI in the Eastern District of Virginia.

     During this interview, the following new information was provided by Hasan:

     Hasan clarified for the interviewing agents that at the time of the Kwon dinner meeting, Hasan did not realize the fatwa which Al-Timimi read from was authored by Sheikh UQLA. Hasan later determined that the Uqla fatwa was the one Al-Timimi read from, as a result of interviews with the FBI prior to the previous trial.

     Prior to Hasan's and Kwon's departure for Pakistan, Al-Timimi recommended that Hasan and Kwon keep their distance when traveling through airports, purchase magazines to maintain the appearance of a common traveler, and cry like a baby if confronted by security. Hasan and Kwon used the techniques recommended by Al-Timimi by keeping separate and purchasing magazines. While traveling through Dulles International Airport Hasan was questioned by security. Kwon was not with Hasan at the time. Hasan thinks that officer was trying to determine whether Hasan's name appeared on a list.

---

Investigation on   11/19/2004   at   Alexandria, Virginia

File #   315N-WF-226192-302 - 936      Date dictated   NA

by   SA Christopher P. Mamula
      SA John V. Wyman

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

O3449

Case 1:04-cr-00385-LMB Document 339 Filed 09/06/13 Page 50 of 134 PageID# 570

FD-302 (Rev. 10-6-95)

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    <u>11/23/2004</u>

      On 11/19/2004, at the Alexandria Detention Center, YONG KI KWON, born on 12/31/1975, was presented with a two-page Statement, dated 11/17/2004, prepared by the Australian Federal Police. Following his review, Kwon advised that the information contained in the Statement was correct and thereafter signed the bottom of both pages of the Statement. Kwon's signature was witnessed by Special Agent John V. Wyman. Also present during Kwon's review of the Statement was Assistant United States Attorney Gordon D. Kromberg.

Investigation on   <u>11/19/2004</u>   at   Alexandria, Virginia

File #   <u>315N-WF-226192-302 935</u>      Date dictated   <u>NA</u>

by   <u>SA John V. Wyman</u>

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

O3450

Case 1:04-cr-00385-LMB  Document 339  Filed 09/06/13  Page 51 of 134 PageID# 571

FD-302 (Rev. 10-6-95)

-1-

FEDERAL BUREAU OF INVESTIGATION

Date of transcription    11/23/2004

On 10/06/2004, KHWAJA MAHMOOD HASAN, date of birth
03/24/1976, social security account number 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, was
interviewed at the Cumberland Federal Correctional Institution
(FCI), Cumberland, Maryland, by Special Agent John V. Wyman and
Department of Justice Trial Attorney John Gibbs.

During the initial portion of the interview, Hasan
answered questions from John Gibbs in preparation for Hasan's
anticipated testimony at the trial for ALI AL-TIMIMI in the
Eastern District of Virginia.

Separate from trial-prep questions, Hasan advised that
he has not had any personal experience in sending money to
Pakistan via money transmitters.  Hasan does not know how
Lashkar-e-Taiba (LET) raises funds and does not know where LET
banks.

---

Investigation on    10/06/2004    at  Cumberland, Maryland

File #  315N-WF-226192-302 - 934                    Date dictated    NA

by    SA John V. Wyman

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

03451

Case 1:04-cr-00085-LMB Document 339 Filed 09/06/13 Page 52 of 134 PageID# 572

FD-302 (Rev. 10-6-95)

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription  11/23/2004

     On 11/17/2004, KHWAJA MAHMOOD HASAN, date of birth 03/24/1976, social security account number 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, was interviewed at the Alexandria Police Department, Alexandria, Virginia, by officials from the Australian Government.  The officials from the Australian Government included Barrister Geoffrey Bellew, Public Prosecutor June Philips, and Federal Agent Lam Pakstun.  Also present during the interview were FBI Special Agents John V. Wyman and Christopher P. Mamula.

     At the conclusion of the interview, Hasan was presented with a one-page Statement, dated 11/17/2004, prepared by the Australian Federal Police.  Following his review, Hasan affixed his signature to the bottom of the statement.

Investigation on  11/17/2004  at  Alexandria, Virginia

File #  315N-WF-226192-302        Date dictated  NA

by  SA Christopher P. Mamula
    SA John V. Wyman

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

03452

CD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    11/23/2004

      On 11/16/2004, YONG KI KWON, born on 12/31/1975, was interviewed at the Alexandria Police Department, Alexandria, Virginia, by officials from the Australian Government.  The officials from the Australian Government included Barrister Geoffrey Bellew, Public Prosecutor June Philips, and Federal Agent Lam Pakstun.  Also present during the interview were FBI Special Agents John V. Wyman and F. Wade Ammerman.

Investigation on    11/16/2004    at Alexandria, Virginia

File #    315N-WF-226192-302-972    Date dictated    NA

by    SA F. Wade Ammerman
    SA John V. Wyman

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

03453

FD-302 (Rev. 10-6-95)

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    09/28/2004

        At approximately 9:00 a.m. on 09/24/2004, ALI MEHDI AL-
TIMIMI, white, male, DOB: 12/14/1963, SSAN: 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, FBI
Number 786423JB9, of 4106 Meadow Field Court, Fairfax, Virginia,
was arrested without incident at the FBI, Washington Field
Office, 601 4th Street, Northwest, Washington, D.C.  Al-Timimi
was accompanied by his attorneys James Van and Todd Gallinger.

        The arresting Agents consisted of Special Agent (SA)
John V. Wyman, SA F. Wade Ammerman, and SA Sarah Linden.

        After his arrest processing at WFO, Al-Timimi was
transported by SAs Wyman and Linden to the United States
District Courthouse in Alexandria, Virginia, where he was
remanded to the custody of the United States Marshal Service.

---

Investigation on    09/24/2004    at Washington, D.C.

File #  315N-WF-226192-302 - 915.                              Date dictated    NA

by    SA F. Wade Ammerman
      SA John V. Wyman

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

03454

Exhibit E

MER 04019894

# MEMORANDUM FOR THE RECORD

Event: **Duncan Wainwright, Assistant Division Counsel, WFO, FBI**

Type of event: Interview

Date: August 13, 2003

Special Access Issues: None

Prepared by: Peter Rundlet

Team Number: 6

Location: FBI, Washington Field Office

Participants - Non-Commission: Sean O'Neill, Assistant General Counsel

Participants - Commission: Lance Cole and Peter Rundlet

**Background.** Duncan Wainwright graduated from Valparaiso School of Law in 1979. He came to the FBI in 1982 as an Agent, starting in the Chicago Field Office. In 1983, he was sent to the Hickory, North Carolina Resident Agency and in June, 1984 he came to the Washington Field Office (WFO) as a street crime Agent. In 1987, Wainwright went to FBI Headquarters (HQ) as a Supervisor in the Organized Crime Section. From 1991-92 Wainwright had a brief "stint" in the Civil Litigation Unit of the Office of the General Counsel (OGC). In 1992, Wainwright returned to the WFO to be an SSA in charge of a Labor Racketeering squad. In 1994, Wainwright switched to the Healthcare squad. He later became "Inspection Certified" and in 1999, he rotated to the Office of Division Counsel at WFO. There are four counsels in the office at WFO: he is the Assistant Division Counsel (ADC) for Foreign Counterintelligence (FCI) and Counterterrorism (CT); another does FOIA, one does administrative law and civil litigation; and one does criminal advice and training, and this person does most of the "Title III" work.

**Job Description, Pre-9/11.** National security has been the focus of Wainwright's work since 1999. Wainwright had to seek a detail to the National Security Law Unit (NSLU) at HQ for six weeks for "immersion training" to get up to speed. Prior to 9/11, the NSLU had 9 attorneys; now it has 25. The Unit Chief for the NSLU was Mike Woods until about a year ago; Woods had Wainwright sit in on the weekly Unit meetings and he continues to attend those to this day. Prior to 9/11, Wainwright assisted Agents with Foreign Intelligence Surveillance Act (FISA) applications on the National Security Division (NSD) side, as well as compulsory process National Security Letters (NSLs). He frequently provided operational guidance to NSD Agents. Agents on the NSD side were "confused" about dealings with the US Attorneys Office and he acted as a liaison with the Office of Intelligence Policy and Review (OIPR), who he called "the enforcers of the Wall." He also had some odd administrative duties

**The Wall.** Before the Foreign Intelligence Surveillance Court of Review opinion that tore down the Wall, Wainwright said the Wall was clearly in place, entrenched, and rigorously

enforced by OIPR. There is significant discussion of the Wall issue and how the Wall was "killing the FBI" in the Bellows Report, done by Randy Bellows on the Wen Ho Lee case. Wainwright said that he "was surprised to learn of the Wall" since he came from an organized crime background. Wainwright said that there was limited sharing of FISA or non-FISA information between Intelligence investigations and criminal. Wainwright stated that David Cris wrote an internal DOJ monograph on the Wall and provided testimony on the Hill. During this era, Wainwright helped guide compliance and he attempted to make operational progress by using the exceptions.

The Wall had a very significant effect on the FBI's Counterterrorism (CT) and Counterintelligence (CI) activities because they "couldn't deal with the criminal guys." Wainwright mentioned the "primary purpose" test which was built into the FISA. As a precautionary measure, they disallowed CI and CT agents from talking to the criminal agents (they feared that if they talked to the criminal agents, they might be suspected of not having foreign intelligence as the "primary purpose" of the FISA. For every case involving a U.S. person, a Letterhead Memorandum (LHM) was submitted to OIPR. Wainwright believed there were LHMs on non-U.S. persons as well, but that this was less stringent. Prior to the Patriot Act, there was no clear-cut mechanism to share information with the criminal side. Wainwright stressed the irony of this ⌐9/11 Classified Information⌐         9/11 Classified Information

**Attorney General Guidelines.** Wainwright said that there were three applicable AG Guidelines: (1) the July, 1995 AG Guidance (from Reno); (2) the 2000 Deputy AG Guidance, which clarified the earlier AG Guidance; and (3) the early 2001 Guidance, which explained the prior two.

**FISAs prior to 9/11.** Prior to 9/11, the FBI ran lengthy Form 199 intelligence cases, where they tried to keep track of individuals and disrupt them, but generally not criminal prosecutions. Deportation under the Absconder Program was an option, but it was not a strong tool. Prosecution on small matters (*e.g.*, food stamp fraud) was used only very infrequently because of the concern that the FBI could be accused of using a FISA to make a petty crime case.

Before 9/11, Wainwright said that they would submit "50-page tomes" for affidavits to make clear that no criminal investigations were going on. They would write "even 30 pages" for ⌐9/11 Classified Information⌐ .

**LHMs.** The purpose of the LHM was to identify the nature of your investigation. Wainwright said that "sometimes criminal activity ended up in the LHM, but it was not required until 2002." The LHM was also required to keep HQ and OIPR apprised of all intelligence investigations. Wainwright noted that OIPR has an oversight function for all intelligence cases.

**OIPR/Oversight.** OIPR processes warrants and provides guidance on investigations. Occasionally, Wainwright said, OIPR would advise the FBI to close certain cases. Wainwright said that there was a general perception that the Wall was "crazy," and that it hampered them. They felt like they fought the battle and lost. Agents feared that they would be sanctioned by the Intelligence Oversight Board, which is a Presidential entity that could sanction the agents

personally. "There was a sense that discipline was not meted out fairly between higher-ups and agents."

The Wall was clearly one-way from the intelligence (NSD) side to the criminal side. Going the opposite way, Grand Jury information under Rule 6(e) and Title III was also limited in what they could share, but not nearly as tight a restriction in this direction. Wainwright said that the Wall even affected personal relationships between criminal and intelligence agents.

**FISA Application Process.** Prior to 9/11, agents would first have to draft lengthy LHMs requesting that a FISA be done, and they would include a lot of information. Then, the LHM was sent to a GS-14 counterpart at HQ, who would then have to craft the LHM into an affidavit that showed probable cause – "but it was really a higher standard: beyond certainty." From there, it would go to the NSLU to get edited and blessed. They had to craft it into the proper format before sending it to OIPR. Wainwright said this process took months. OIPR then took time to review the application. Prior to 9/11, they had other priorities. [                    ] But, Wainwright noted, this takes up the AG's time and the Court's time.

9/11 Classified Information

**NSLs.** Before the Patriot Act, National Security Letters were limited to 3 types of entities: (1) phone carriers and Internet Service Providers; (2) financial institutions (those listed in the Right to Privacy Act; specifically, banks and credit unions, not casinos, brokerage houses, pawn shops, etc.); and (3) credit reporting companies (they can get accounts, addresses, and employment, but not balances). Since 9/11 the scope of NSLs has not changed, although the standard has changed. Before 9/11, they had to have specific articulable facts and circumstances that X was engaging in terrorism, for example. The Assistant Director in Charge (ADIC) had to certify them. The WFO did their own, but for the other non-ADIC offices, the requests had to be sent to HQ and "it would take months to get an NSL." Wainwright noted that 18 U.S.C. 2709 has the provisions for NSLs for phones.

The new standard is that the information sought would be relevant to a case pertaining to CFI or CT (a relevance standard). Also, under the new standard, an SAC can certify to this, which makes it a lot easier, process-wise. At present, though, authority for NSLs is still limited to the 3 areas listed. [But note that there is legislation that greatly expands the definition of "financial institution" in the 2004 Intelligence Authorization bill extending the reach to casinos, pawn shops, etc.] Wainwright complained that even under the lower standard there are many things an agent cannot get in an intelligence case that they can easily get in a criminal case under a Grand Jury subpoena.

**Mail and Trash Covers.** Wainwright said that the SAC can request that the Postal Service copy the outside of letters for 30 days, when the request is made for a criminal case. This is run by the Postal Inspectors. On the national security/intelligence side, the FBI makes a

Case 1.04-cr-00385-LMB  Document 339  Filed 09/06/13  Page 59 of 134 PageID# 579

request of the AG to get a 90-day mail cover. The AG, through OIPR, must sign off on the request. An LHM is required to get a mail cover for intelligence purposes. Wainwright said that the SAC can sign off on a request for a trash cover since there is a lower expectation of privacy when it comes to trash.

Wainwright said that there is currently a problem with the Postal Service on mail covers. According to Wainwright, the Postal Service has the authority to turn down requests for mail covers by the AG, and sometimes rejects the request. Wainwright said that this is a recurring problem now. Wainwright said that Jack Livingston, the Unit Chief of the NSLU, is dealing with the Postal Service on this.

**Patriot Act & the "199 Order."** Wainwright said that Mike Woods, who is currently with MZM, a Department of Defense contractor that focuses on terrorism, was the primary FBI person involved with drafting the Patriot Act. Wainwright said that as a practical matter, the Wall did not come down until the FISA Court of Review opinion. The FISA Court of Review (which is the appellate court for FISA issues, and which has only been convened this one time) actually rewrote the AG Guidelines. But this came later. After the Patriot Act, the Foreign Intelligence Surveillance Court (FISC, which is the first-level court for FISA issues) reestablished the Wall to some extent. Thereafter, the FISA Court of Review reversed the decision and took down the Wall. Even before the FISA Court of Review opinion, however, the FISC had issued an order approving a request by the Terrorism and Violent Crime Section (now, the Counterterrorism Section) of the Criminal Division to have their attorneys review the FBI's Form 199 (terrorism intelligence case) investigation files for the purpose of identifying any criminal violations that suspected terrorists could be charge with. This was called the "199 Order." So, the DOJ attorneys reviewed the FBI's 199 files, primarily at HQ, according to Wainwright. When the Wall finally came down after the FISA Court of Review's opinion, Ashcroft established a policy to have AUSAs come over and review the FBI's 199 files to identify "any violation." The idea was to use every tool available. Wainwright said that not many criminal cases came out of this effort, but the Virginia Jihad case did.

**Class 199, 265, & TEI Investigations.** Class 199 cases are terrorism *intelligence* cases, and they are worked under the AG Guidelines for FCI and CT (the "FCI guidelines," which are classified and have been unchanged since Reno). Class 265 cases are terrorism *criminal* cases, and they are worked under the AG Guidelines for General Crimes in Terrorism (these were changed in April or May, 2002). So, Wainwright emphasized, there are two different sets of guidelines that apply to terrorism cases.

Wainwright said that HQ's position was that the FBI can work 199 cases under the Guidelines and if there is a criminal aspect to the case, then the agents can open up a 265 case and work that under the criminal guidelines. Wainwright said that if a 265 case is opened up first, then the rule is that a 199 *must* be opened as a parallel case. Wainwright called this "a paper exercise – since both are discoverable." Wainwright said that some agents were "dual hatting" – the same agents would sometimes have both files.

Wainwright said that the new guidelines in 2002 allowed for Terrorism Enterprise Investigations (TEIs), where previous guidelines referred to Racketeering Enterprise Investigations (REIs). Wainwright noted that the WFO is doing on TEI fo[    ]

COMMISSION SENSITIVE

[REDACTED] in the Washington, DC metropolitan area. He said that they had to get HQ sign-off from the CT Section [of DOJ?]. Wainwright said the TEI was run by the Joint Intelligence Task Force (JITF, the intelligence squad) and that it is not being implemented "all that great." [9/11 Law Enforcement Sensitive] Wainwright noted that Jeff Reinhold of the CT Section and Gordon Crombie (sp?) of the Eastern District of Virginia, are very supportive.

[Note that the distinction between class 199 and class 265 cases is going to go away when the two are merged into class 315 cases.] Wainwright said that post-9/11, there are no walls within the FBI record system and that one agent is working both sides of a case.

**Attorney-Client Communications.** With respect to monitoring privileged conversations between attorneys and their clients, Wainwright said that, under FISA, the rules allow listening to privileged conversations when the subject has not yet been indicted because the monitoring is done for intelligence purposes. He said there may be new implications now that there is no Wall. Wainwright said that, for protection, they work these conversations so that the AUSAs that review the class 199 cases cannot see the take from the conversations. Wainwright said that there is a bright-line rule that requires that only the FISA Court can modify these rules. Once a subject is indicted, then OIPR is required to approve. Wainwright said this was analogous to prison monitoring rules.

**FISA/Title III Standards.** Under the old FISA standard, agents had to show probable cause that the person is an agent of a foreign power and that he will use the specific facility (*e.g.*, telephones). In order to get a search warrant under Title III, the FBI has to show probable cause that the target has committed a crime and that he used the specific facility (*e.g.*, telephone) *in furtherance* of the crime (the so-called "dirty phone").

Wainwright said that the minimization standards under FISA and Title III were different.

9/11 Classified Information

Wainwright emphasized that "now we can get information under FISA and use it in criminal cases, without going to Title III."

**Authority under Different Phases of Investigation (PI v. FFI).** During the phase *prior to* a Preliminary Inquiry (PI), what the FBI can do in the CFI/CT context is very limited. Essentially, an agent can do one record check, Wainwright said. On the criminal side, an agent can do more. Wainwright noted that an agent can use all lawful investigative techniques during a full field investigation (FFI) for a criminal case. As a result, nearly all criminal international

COMMISSION SENSITIVE

terrorism (IT) cases go directly to a FFI, skipping the PI. For non-criminal cases, agents need to have a PI to question a subject. A PI can be opened when there is a "reasonable suspicion" that the person may be involved in IT or clandestine activity. Under a TEI, there is a perpetual FFI that is renewed on an annual basis.

> 9/11 Classified Information

Wainwright said the CIA is "essentially useless to us." He said that the FBI gives the CIA everything they want,

> 9/11 Classified Information

Wainwright said that a threat assessment

> 9/11 Classified Information

was not shared.

> 9/11 Classified Information

"But we give them literally everything."

> 9/11 Classified Information

Wainwright continued: "If we're giving them too much, someone needs to tell us." He said there is no MOU in place for sharing information.

> 9/11 Classified Information

**Looking forward.** Wainwright said that it would be nice to use section 215 of the Patriot Act (regarding library records, etc.) and it will "be nice" to use the roaming wiretaps. He mentioned that they are trying to modify the definition of "financial institution" for the purposed of getting an NSL. He thinks there is a lot of "good stuff" in Patriot Act II. He also said that the FBI would like to get tax information – that they cannot get the information ex parte.

9/11 Classified Information

Exhibit F

MFR04019896

Law Enforcement Sensitive

## MEMORANDUM FOR THE RECORD

Event: [          ] (FBI Washington Field Office Special Agent) Interview

Type of event: Interview

Date: July 31, 2003

Special Access Issues: None

Prepared by: Lance Cole

Team Number: 6

Location: FBI Washington Field Office

Participants - Non-Commission: FBI Assistant General Counsel Robert S. Sinton

Participants - Commission: Lance Cole and John Tamm

**Personal Background:** [          ] joined the FBI on September 3, 1996. She has a B.S. (1993) and an M.S. (1996) in Criminal Justice from the University of Tennessee at Chattanooga. She worked at Blue Cross/Blue Shield in Chattanooga as an internal auditor from 1993 through 1996 while she was earning her Master's degree. She met a retired FBI agent who urged her to apply to the FBI, and she applied as an agent under the "Diversified Program." She went through the interview process, then was hired and assigned to the FBI's Washington Field Office ("WFO") international terrorism squad focusing on radical fundamentalists. Both the assignment to the WFO and to the terrorism squad were "random assignment" and were not [    ] first preferences.

**Pre-9/11 Agent Counterterrorism Training:** When she joined the WFO terrorism squad, [    ] was assigned to an experienced agent on the squad, [          ] (sp?), for training. In addition, to on-the-job training from [          ] signed up for various in-service training sessions. At that time, there was no set curriculum for new agent counterterrorism training. [      ] took the basic counterterrorism in-service course, a one-week course at Quantico. [     ] could not recall exactly when she took that course, but it was within the first two years of her assignment to the WFO. In addition to the basic counterterrorism course, [     ] took a one-week FISA in-service course within her first three years at WFO. She also completed the required orientation

program for new agents, which involved work on other squads, such as bank robbery and white collar crime squads.

**Pre-9/11 FBI Experience:** [ ] stayed in counterterrorism because she liked the work; she did not seek to transfer to another squad. She later took in-service courses on Asset Development and double agents. Both of those were one-week courses offered at Quantico. She also attended a Domestic Terrorism conference in Kansas City, which was helpful because it had guest speakers on topics such as militias. She also has attended a couple of FBI conferences [ ] because she primarily worked on [ ] prior to 9-11. Her [ ] work focused on fundraising and was "totally intelligence gathering" work. [ ] were the major programs on her squad prior to 9-11. Before the 9-11 attacks little work was done by her squad on Usama Bin Laden ("UBL") matters, which was "more of a New York thing" at that time. Her squad had a "control file" on UBL for collection of information, but all UBL information was reported to New York, rather than worked by the WFO. [ ] does not believe that any WFO agents were assigned to UBL matters prior to 9-11.

9/11 Classified Information

2

```
9/11 Classified Information
```

**New JITF Squad** [        ] understands that all the analysts are being assigned to a single squad, and she believes the supervisor who will manage that squad is good, but the office will still be understaffed. Her squad is not getting the support it needs from its analysts. She has complained to her supervisors in the past, but nothing has been done. She thinks too many of the WFO analysts "are not well trained" and many of them do not have college degrees. While she believes that people who do not have a degree can be good analysts, "they should be better" than they are at present. [        ] believes the problem with the analysts is "office wide" and not just with her squad. She thinks the

3

problem may be more severe at the WFO than at other field offices, however. She has spoken with agents from other field offices, and she does not have the sense that they have a similar problem with their analysts.

[          ] also noted that language specialists in the WFO "are being stretched real thin." The WFO language specialists are "assigned out to other field offices or overseas" and therefore may be unavailable to WFO agents. She understands that it is hard to get the language specialist through the hiring process, but more language specialists have been brought into the office since 9-11.

**Post-9/11 FISA Use:** [          ] has used FISA in two cases since 9-11, an Arabic language case and an English language case. The Arabic language case was a UBL matter assigned to her by Headquarters, and people at Headquarters "did it all" in connection with the FISA application. The English language case was related to a parallel intelligence and criminal investigation. [          ] volunteered that "now they want us to have a parallel 'intell' and criminal investigation" whenever possible. Previously the usual investigation was "purely intelligence gathering without intent to prosecute" the case. [          ] added that prior to 9-11 agents working intelligence investigations "weren't allowed to have knowledge of criminal matters because of the wall." Now agents are encouraged to open a full field investigation, but still "keep 'intell' and criminal separate" to avoid using classified information in the criminal case.

[          ] said the squad's legal counsel, Duncan Wainwright (sp?), has encouraged her squad's agents to open a criminal case whenever possible. She recalls that "we had a squad meeting and discussed it," and she liked the idea. Now "pretty much all" of her cases have a parallel criminal charge, usually social security fraud but in one case a material support charge.

When asked about changes after 9-11, [          ] explained that she was on maternity leave during 9-11 and when she came back "everything had changed." The squad was then focusing on UBL and following up on "an unbelievable number of leads." [                              ] and the agents' case loads had increased dramatically. There also was "more urgency in what was being done" in that all allegations, no matter how credible, were investigated.

**Post-9/11 Squad Reorganizations**: The WFO terrorism squads have been reorganized since 9-11, and agents from criminal squads have been reassigned to CT. ▮▮▮▮ believes that the IT-6 and IT-7 squads are mostly comprised of former criminal agents. ▮▮▮▮ works with the JTTF members, particularly the agents from INS and Customs. She primarily uses the JTTF members "as resources and for referrals."

**Post-9/11 Agent Counterterrorism Training**: When asked about policy changes since 9-11, ▮▮▮▮ said that all new CT agents now must complete the basic counterterrorism course, which can now be taken on the Internet. That is the only new training requirement of which ▮▮▮▮ is aware. She does not know what other training new CT agents receive. In ▮▮▮▮ view, the biggest post-9-11 change is "the wall coming down" [between intelligence and criminal matters]. She learned of that change when she returned from maternity leave. All the agents "were a little worried" initially because they were given nothing in writing to confirm that change. They were assured by their legal counsel Duncan Wainwright (sp?) that the wall had come down.

In addition to "the wall coming down," agents now can use NSLs in preliminary investigations where prior to 9-11 they could only be used in full field investigations. The agents were informed of this change by Duncan Wainwright. ▮▮▮▮ has not yet used an NSL in a preliminary investigation because all of her cases are full field investigations.

**Using Criminal Process in Intelligence Cases**: Another important change after 9-11 was that Assistant United States Attorneys ("AUSAs") "can now review 'intell' files" for potential criminal violations and discuss those files with the agents. AUSAs from the Eastern District of Virginia came over to the WFO and reviewed "intell" files in late 2002 or early 2003. They reviewed "all information in the files," including the FISA information "all the way back to pre-PATRIOT Act cases." Duncan Wainwright participated in the review, as did the WFO squad supervisors, who selected the files for the AUSAs to review. The AUSAs are now willing to prosecute things that they previously would have declined. For example, prior to 9-11 ▮▮▮▮ could not get AUSAs to prosecute social security fraud offenses related to her investigations, although she tried, while now they are anxious to do so.

5

Since 9-11 [        ] has opened criminal investigations and used grand jury subpoenas and electronic surveillance "to make criminal cases." She now "has eleven individuals charged who before 9-11 would not have been charged." All of those cases would have been handled as "intell" investigations, with no criminal prosecutions, prior to 9-11.

[        ] is not aware of any changes in the training requirements for experienced CT agents since 9-11. She believes there are now "more training opportunities," such as for training provided by the CIA. She has not participated in those training sessions because "it is hard to get in" and the sessions "fill up fast." She has "requested four, got one" training sessions. She does not know why she did not get into more of the sessions.

**LAW ENFORCEMENT SENSITIVE**

Exhibit G

Case 1:04-cr-00385-LMB   Document 339   Filed 09/06/13   Page 70 of 134 PageID# 590

C0611447

PAGE 71

| File Name | Document No. | Classification | # of Pages | Search Term | Description |
|---|---|---|---|---|---|
| | | | | *Electronic Records for PJ and Manu* | |
| 53845 | MFR04017479 | S | 5 | Dar al-Arkam; Virginia Jihad; Timimi; Paintball; Tamimi | 9/11 Commission interview with FBI special agent. I sent this out for declassification in 2008 and am still waiting for all agencies to respond. |
| 0000F5CE | RDOJ03003548 | S | 35 | Al-Timimi; Timimi; Tamimi | doc. ID: 199N-DE-89187 serial 262 |
| 00062CBF | RDOS04018664 | S | 5 | Tamimi | cable of 12/15/2001 |
| 00035F9A | RFBI03004134 | S | 256 | Al-Timimi; Timimi; BIF; Benevolence International Foundation | Al-Timimi's name in list of telephone contacts by someone else. This is the only mention of him in the document. |
| 00031FAA | RFBI03009401 | S | 28 | Timimi | mention in image 25 only; FBI file# 199M-BA-103070 |
| 00037CD8 | RFBI03009475 | S | 49 | Timimi; Royer | FBI file# is classified; from Washington Field Office; 10/18/2002 |
| 00037D45 00037D90 | RFBI03009477 RFBI03009478 | S S | 74 30 | Dar al-Arkam; Masoud Khan; Yong Ki Kwon; Yong Kwon; Timimi; Royer; Paintball; Tamimi; BIF; Benevolence International Foundation Paintball; Tamimi | 4/21/2003 FBI memo from Baltimore Field Office; FBI case file # is classified; mentioned on one page only 265A-WF-226192, page 4 |
| 0003AFA6 | RFBI03009480 | S | 70 | Tamimi | 12/6/2000, pg. 6, from Detroit Field Office; FBI case file # is classified |
| 0003B0DA | RFBI03009485 | S | 71 | Awlaki; Timimi; Aulaqi | Washington Field Office memo of 10/23/2002; FBI case file # is classified |

| File Name | Document No. | Classification | # of Pages | Search Term | Description |
|---|---|---|---|---|---|
| 0003B151 | RFBI03009487 | S | 59 | Al-Hamdi; Al-Timimi; Timimi; Tamimi; Aulaqi | 1/2/2003 Washington Field Office memo, FBI case file # is classified |
| 0003B18D | RFBI03009488 | S | 60 | Dar al-Arkam; Yong Ki Kwon; Yong Kwon; Timimi; Royer; Chapman; BIF; Beneveolence International Foundation | 3/20/2003 memo and 5/21/2003 Washington Field Office memo, FBI case file # is classified |
| 00037F58 | RFBI03009624 | S | 80 | Awlaki; Dar al-Arqam; Timini; Timimi | page 2 of 2/21/2003 Washington Field Office memo (FBI case file # is classified) |
| 0001C160 | RFBI03010185 | S | 110 | Timimi; Tamimi; BIF; Benevolence International Foundation | 1/3/2001, Chicago Field Office memo (FBI case file # is classified) |
| 00019A0D | RFBI03010195 | S | 37 | Timimi; Chapman | pp 13 and 28 of 7/7/2002 FBI memo 199N-SE-85481 |
| 0003D712 | RFBI03010214 | S | 136 | Al-Hamdi; Timini; Yong Kwon; Timimi; Royer; BIF; Benevolence International Foundation | 5/26/2003 FBI memo |
| 0003CFD4 | RFBI030104478 | S | 36 | Al-Timimi; Al-Timini; Timimi; Aulaqi | pg 6 of 3/20/2003 FBI 302 265C-SU-55418, serial 660 |
| 0001723C | RFBI03010489 | S | 55 | Timimi | 265A-WF-224591, 8/22/2002, pg 7 |
| 000320A8 | RFBI03010650 | S | 43 | Tamimi | pg 4 of FBI memo from Dallas Field Office; FBI case file # is classified |

REDACTED / CLEARED FOR PUBLIC RELEASE

3

| File Name | Document No. | Classification | # of Pages | Search Term | Description |
|-----------|--------------|----------------|------------|-------------|-------------|
| 0004AA7A | RFBI03011843 | S | 18 | Timimi | pg. 18 of 9/12/2001 FBI memo from the Counterterrorism Division; FBI case file # is classified |
| 0003F099 | RFBI03012713 | S | 81 | Al-Timimi; Timimi; BIF | pg 31 of 6/6/2003 FBI memo |
| 0003DBF0 | RFBI03013114 | S | 46 | Al-Timimi; Dar al-Arqam; Virginia Jihad; Timimi; Aulaqi | pg 2 of 9/17/2003 FBI memo from the Washington Field Office; FBI case file # is classified |
| 0003DC1F | RFBI03013115 | S | 55 | Dar al-Arkam; Virginia Jihad; Yong Kwon; Timimi; Royer; Chapman; BIF | Washington Field Office memo of 9/27/2003; case file # 315N-WF-217423 |
| 0003DC80 | RFBI03013117 | S | 59 | Al-Timimi; Timimi; Benevolence International Foundation | pg 36 of 6/6/2003 FBI memo |
| 0005CE8A | RFBI04014773 | S | 57 | Al-Timimi; Timimi | pg 9 of 10/25/1999 FBI memo from Denver Field Office |
| 0005D000 | RFBI04015058 | S | 27 | Al-Hamdi; Al-Timimi; Timimi; Royer; Aulaqi; Benevolence International Foundation | FBI 302 dated 6/23/2003, file # 265C-WF-225105 |
| 0005E58E | RFBI04016742 | S | 24 | Al-Timimi; Timimi; Benevolence International Foundation; BIF | page 4 of list of disruptions to international terrorist operations since 11 September |

REDACTED / CLEARED FOR PUBLIC RELEASE

C0611447

| File Name | Document No. | Classification | # of Pages | Search Term | Description |
|---|---|---|---|---|---|
| 005DB4F | RFBI04016920 | S | 84 | Aatique; Timimi | pg 15 of FBI memo of 9/12/2003 from the Washington Field Office (FBI case file # is classified); pp 15, 17, 18 of 9/14/2003 FBI memo from Washington Field Office (FBI case file # is classified) |
| 0005DBA4 | RFBI04016921 | S | 52 | Al-Timimi; Dar al-Arqam; Timimi; Aulaqi | 7/16/2003 FBI report from Washington Field Office contained on page 9 of 10/31/2003 FBI memo re: case # 315N-WF-221874 |
| 0005DC12 | RFBI04017112 | S | 78 | Al-Timimi; Timimi; Aulaqi | pg 5 of FBI memo of 9/27/2002 from Washington Field Office (case file # 265A-WF-224591) |
| 0001DC64 | RFBI | S | 16 | Tamimi; Aulaqi | FBI case summary memo for case ID: 265A-NY-280350 (PENTTBOM); not your guy |
| 25800 | RFBI03008051 | S | 339 | Tamimi | FBI memo -- not your guy |
| 00036F40 | RFBI03009014 | S | 331 | Tamimi | FBI Legat memo -- not your guy |
| 000392EC | RFBI03009019 | S | 86 | Timimi | FBI memo -- not your guy |
| 000192A7 | RFBI03009758 | S | 133 | Tamimi; BIF; Benevolence International Foundation | FBI memo -- not your guy |

| File Name | Document No. | Classification | # of Pages | Search Term | Description |
|---|---|---|---|---|---|
| 0003CF80 | RFBI03010447 | S | 83 | Tamimi; BIF; Benevolence International Foundation | FBI memo – not your guy |
| 0003EA6C | RFBI03010629 | S | 74 | Tamimi | FBI memo -- not your guy |
| 00025D0A | RFBI03011410 | S | 36 | Tamimi | FBI memo – not your guy |
| 0003ED1F | RFBI03011680 | S | 90 | Tamimi | FBI memo -- not your guy |
| 000419BD | RTR04014136 | S/SCI | 62 | Tamimi | not your guy |
| 42526 | RTR04014192 | TS/SCI | 96 | Tamimi | not your guy |
| 000349BF | | TS | 2 | Tamimi | not your guy |
| 00041AB1 | | TS/SCI | 9 | Tamimi | not your guy |
| 00041E47 | | TS/SCI | 9 | Tamimi | not your guy |
| 0002661B | RFBI03010648 | S | | 28 Al-Hamdi; Al-Timimi | [This is my error: I put the Al-Timimi search term with this document by mistake. The name is not in the document.] |

Exhibit H

467

```
From Paint Ballaz Tue Jun 19 23:03:36 2001
X-RocketMail: 00000021;R---S-----------;0819
X-Apparently-To: seifchapman@yahoo.com via web4404; 19 Jun 2001 23:03:38 -0700
(PDT)
X-Track: 1: 40
Received: from web14802.mail.yahoo.com (216.136.224.218)
  by mta325.mail.yahoo.com with SMTP; 19 Jun 2001 23:03:38 -0700 (PDT)
Message-ID: <20010620060336.43235.qmail@web14802.mail.yahoo.com>
Received: from [63.125.145.107] by web14802.mail.yahoo.com; Tue, 19 Jun 2001
23:03:36 PDT
Date: Tue, 19 Jun 2001 23:03:36 -0700 (PDT)
From: Paint Ballaz <pballaz@yahoo.com>
Subject: Fwd: Fw: document 2
To: AZ <allracesinone@hotmail.com>, Aatique <aatique@yahoo.com>,
  Abdul Majeed <abdxmaj@hotmail.com>, Abdullah <abdallah_9_99@yahoo.com>,
  Abu Hareth <ballpaint@hotmail.com>, Ashraf <ashraf@wam.umd.edu>,
  Fahad <f.r.k@usa.net>, Farhat <farhat@yahoo.com>,
  Hamad <hammad6@hotmail.com>, Husnain <salafy49@hotmail.com>,
  Idris <shai07@hotmail.com>, Isma'il <iroyer@cair-net.org>,
  Khalifa <caliph54@hotmail.com>, Khurum <kshah@gmu.edu>,
  Yong Kwon <r_kwon@hotmail.com>, Madani <person4444@yahoo.com>,
  Mahmood <mahmood76@yahoo.com>, Monthana <almothanna@yahoo.com>,
  Muhammed <abdl_mswr@yahoo.com>, Mustafa <ibnqassim@aol.com>,
  Nabil <nabil74@yahoo.com>, Rasheed <ironknuckle@prodigy.net>,
  Seif <seifchapman@yahoo.com>, Shafiq <asantora@gmu.edu>,
  Shehraze <shehraze@hotmail.com>, Tariq <tarek_hammad@hotmail.com>,
  Waleed <wabdelfattah@hotmail.com>
MIME-Version: 1.0
Content-Type: text/plain; charset=us-ascii
Content-Length: 4128
```

Please let me know if there are any topics you want
answers or proofs forâ€¦

Praying while in a moving car

Praise be to Allaah.

Delaying the prayer past its appointed time is a grave
major sin, as Allaah says (interpretation of the
meaning):
"So woe unto those performers of salaat (prayers)
(hypocrites), who delay their salaat from their stated
fixed times." [al-Maa'oon 107:4-5]

According to a report narrated by Muslim, he said:
"The (whole) earth has been made good for me, a means
of purification and a mosque (or place of prayer); so
wherever a man may be when the time for prayer comes,
let him pray wherever he is." (Saheeh Muslim, no. 521)

As far as praying on board means of transportation is
concerned, then it is possible to pray there so long
as the necessary conditions of prayer are fulfilled,
or else one can wait until one gets out of the
vehicle. If waiting means that the time for the prayer
will pass, then you should pray in the best way that
you can. Let us assume, for example, that you are in a
car or train where there is no place to pray, you
cannot stop and pray at the side of the road, and the
time for that prayer is running out. In such a

GOVERNMENT
EXHIBIT

4G7

situation, the Muslim should pray in the best way that he can, even if he is sitting in his seat and even if he is not facing the qiblah, because Allaah says (interpretation of the meaning): "So keep your duty to Allaah and fear Him as much as you can€|" [al-Taghaabun 64:16], and because the Prophet (peace and blessings of Allaah be upon him) said: "If I have commanded you to do something, do as much of it as you can." (Reported by al-Bukhaari, al-Fath, no. 7288)

An exception to be above is naafil (supererogatory) prayers offered when riding a camel, which is permissible even if one cannot get down or if one is not facing the qiblah. This is known from the report of Ibn 'Umar, who said: "The Prophet (peace and blessings of Allaah be upon him) used to pray when travelling on his camel, no matter which direction it was facing, and he would gesture with his head to indicate the movements of the night prayer, apart from the obligatory prayers, and he would pray witr on his camel too." (Reported by al-Bukhaari, 945)

Ibn 'Umar (may Allaah be pleased with him) said: "The Prophet (peace and blessings of Allaah be upon him) used to pray voluntary (nafl) prayers when riding on his camel, no matter what direction it was facing, when he came from Makkah to Madeenah." Then Ibn 'Umar recited this aayah (interpretation of the meaning): "And to Allaah belong the east and the west, so wherever you turn yourselves or your faces, there is the Face of Allaah (and He is High above, over His Throne)€|" [al-Baqarah 2:115]

Ibn 'Umar said: "It was concerning this that this aayah was revealed." (Reported by al-Tirmidhi, 2883; he said, this is a saheeh hasan hadeeth)

We should not forget to point out here that Muslims living in non-Muslim countries sometimes delay or abandon their prayers for another, completely different, reason, which is that they feel too embarrassed to pray in front of the kuffaar in public or open places, or they are afraid that they will make fun of them and regard them as odd. This is a serious mistake. How can a Muslim feel embarrassed about proclaiming the truth and worshipping openly, hastening to fulfil the command of Allaah at the time when Allaah has said it is to be done? (islam-qa.com)

Seeing a snake or scorpian in front of him while praying

Praise be to Allaah.

He can stop his prayer and kill the snake or scorpion, because the Prophet (peace and blessings of Allaah be upon him) said: "Kill the two black ones during prayer, the snake and the scorpion." (Narrated by the authors of Sunan and classed as saheeh by Ibn Hibbaan). If you can kill it whilst still praying, without moving more than what is regarded as

acceptable, then this is OK and the prayer is still
valid.

And Allaah is the source of strength. May Allaah bless
our Prophet Muhammad and his family and companions,
and grant them peace.

Distance which allows one to shorten prauersd\

The majority of scholars (al-jumhoor) comprising the
Maliki's and the Shafiei's and the Hanbali's have
taken the opinion that the recognized distance for one
who has undertaken its travel in shortening the prayer
is four burud (an antiquated unit of distance), which
is two average day's travel by heavily-loaded camels
(equivalent to 88.7 km in distance). Among what they
have quoted as evidence is what was authentically
(sahih) narrated by Ibn Omar and Ibn Abbas (may Allah
be pleased with them) that they used to shorten the
prayers and break fasting at a distance of four BURUD.
This quoted distance is approximate and not exactly
limited as per the majority of scholars, and thus what
is slightly less is exempted as well.

Some scholars including ibn Qadama and Sheikh ul-Islam
Ibn Taymiyya and his pupil Ibn ul-Qayyim have taken
the opinion that all that is referred to as travel in
practice and in language, and requires preparation of
provisions as well as rest and similar things, falls
under the licenses of shari'a such as the shortening
of the prayer and breaking the fast of Ramadan. Their
pretext and justification is the generalization in the
wording referring to the shortening of the prayer as
it appears in the Qur'an and sunnah, as in the example
of surat al-Nisaa', verses 4:101-102:

And in the following hadith:

Al-Tirmidhi, hadith 2960: Ya'la bin Umayyah said: I
said to 'Umar ibn al-Khattaab "Verily Allaah has said
'â€| if you shorten your prayers, for fear the
unbelievers may attack youâ€|' and now the people feel
secure." 'Umar said, "[Indeed] I wondered the same
thing you are wondering, so I mentioned it to the
Prophet (peace be upon him) and he said '[It is] a
charity that Allaah has bestowed upon you so accept
His charity.' " (Abu 'Isa said this hadith is hasan
sahih.)

Al-Tirmidhi, hadith 453: Umayyah ibn Abdullah ibn
Khaalid ibn Asid said to Ibn 'Umar, "How can you
shorten the prayer when Allaah the Almighty has said,
'there is no blame on you if you shorten your prayers,
for fearâ€|' ," so Ibn 'Umar said, "O son of my
brother, verily the Prophet (peace be upon him) came
to us when we were misguided, so he taught us, and
among what he taught us was that Allaah the Almighty
has ordered us to pray two raka'a during travel."
(Al-Shu'aithiy said that al-Zuhriy used to relate this
hadith via Abdullah ibn Abu Bakr.)

The ayah expresses the permission for shortening the prayer for one who travels without specifically restricting the distance. Thus the Qur'an and sunnah mention "travel" and do not differentiate a particular travel from another, and as such if one travels via air for one hour without any burden or hardship it would be permissible for him or her to shorten the prayer and break the mandatory fast. In fact, this is the most viable opinion, unless for a particularly case there is confusion as to whether it is commonly regarded as travel or not, in which case one falls back to the opinion of the majority of scholars (al-jumhoor) (regarding the minimum required distance).

The Times of Salat

Narrated Abdullah bin Umar (RA): The Prophet (Peace be upon him) said "The time of Zuhr (noon) prayer is when the sun passes the meridian and a man's shadow is of the same length as his height. It lasts until the time of Asr. The time of Asr prayer is as long as the sun has not become yellow (during it's setting). The time of Maghrib prayer is as long as the twilight has not disappeard. The time of Isha is up to midnight. The time of fajr is from the appearance of dawn as long as the sun has not risen. (Muslim)

J-Word

Narrated Uqbah bin Aamir (ra): I heard the Prophet (Peace be Upon Him) recite when he was on the pulpit: "And make ready against them all you can of power, including steeds of war (Planes, Tanks,, etc.)- Surely strength is in shooting, surely strength is in shooting, surely strength is in shooting." (Archery) [Reported Muslim]

Obeying the Ameer

O ye who believe! Obey Allah, and obey the Messenger, and those charged with authority among you. If ye differ in anything among yourselves, refer it to Allah and His Messenger, if ye do believe in Allah and the Last Day: That is best, and most suitable for final determination. 4:59

---

Do You Yahoo!?
Get personalized email addresses from Yahoo! Mail - only $35 a year! http://personal.mail.yahoo.com/

Exhibit I

Case 1:04-cr-00385-LMB  Document 339  Filed 09/06/13  Page 81 of 134 PageID# 601

# COPY

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | . | Criminal No. 03-296-A |
| | . | |
| vs. | . | Alexandria, Virginia |
| | . | February 9, 2004 |
| MASOUD AHMAD KHAN, | . | 9:30 a.m. |
| SEIFULLAH CHAPMAN, | . | |
| HAMMAD ABDUR-RAHEEM, | . | |
| CALIPH BASHA IBN ABDUR-RAHEEM, | . | |
| | . | |
| Defendants. | . | |
| | . | |

. . . . . . . . . . .

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME I

APPEARANCES:

FOR THE GOVERNMENT:        GORDON D. KROMBERG, AUSA
                          DAVID H. LAUFMAN, AUSA
                          United States Attorney's Office
                          2100 Jamieson Avenue
                          Alexandria, VA 22314
                            and
                          JOHN T. GIBBS, ESQ.
                          Counterterrorism Section
                          Criminal Division
                          United States Department of Justice
                          601 D Street, N.W.
                          Washington, D.C. 20004


FOR DEFENDANT KHAN:        BERNARD S. GRIMM, ESQ.
                          JENIFER WICKS, ESQ.
                          Grimm & Wieser
                          307 G Street, N.W.
                          Washington, D.C. 20001

(APPEARANCES CONT'D. ON NEXT PAGE)

(Pages 1 - 310)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

# I N D E X

Opening Statement by Mr. Kromberg:                     Page 8

Opening Statement by Mr. Grimm:                        Page 31

Opening Statement by Mr. Cummings:                     Page 45

Opening Statement by Mr. Amolsch:                      Page 58

Opening Statement by Ms. Kemler:                       Page 67


|                                      | DIRECT | CROSS | REDIRECT | RECROSS |
|--------------------------------------|--------|-------|----------|---------|
| WITNESSES ON BEHALF OF THE GOVERNMENT: |      |       |          |         |
| Bryan Robert Wells                   | 81     | 96    | 105      |         |
|                                      |        | 97    |          |         |
|                                      |        | 99    |          |         |
|                                      |        | 101   |          |         |
| Det. Leland Wiley                    | 110    | 116   |          |         |
| S.A. Philip J. Phillips              | 119    | 128   |          |         |
| S.A. Wade Ammerman                   | 137    | 160   | 181      |         |
|                                      |        | 178   | 185      |         |
|                                      |        | 182   |          |         |
| S.A. Christopher Paul Mamula         | 196    | 207   | 212      |         |
| S.A. John V. Wyman                   | 218    | 235   |          |         |
| Nabil Gharbieh                       | 241    |       |          |         |


## EXHIBITS

|                 | MARKED | RECEIVED |
|-----------------|--------|----------|
| GOVERNMENT'S:   |        |          |
| No. 1D1         |        | 195      |
| 2A1             |        | 140      |
| 2A2             |        | 140      |
| 2A3             |        | 142      |
| 2A4             |        | 144      |

```
 1 │ APPEARANCES:  (Cont'd.)
 2 │ FOR DEFENDANT CHAPMAN:        JOHN K. ZWERLING, ESQ.
   │                              LISA BONDAREFF KEMLER, ESQ.
 3 │                              Zwerling & Kemler, P.C.
   │                              108 North Alfred Street
 4 │                              Alexandria, VA 22314
 5 │
   │ FOR DEFENDANT HAMMAD         WILLIAM B. CUMMINGS, ESQ.
 6 │     ABDUR-RAHEEM:            William B. Cummings, P.C.
   │                              112 South Pitt Street
 7 │                              Alexandria, VA 22314
 8 │
   │ FOR DEFENDANT CALIPH BASHA   CHRISTOPHER AMOLSCH, ESQ.
 9 │     IBN ABDUR-RAHEEM:        Law Office of Christopher Amolsch
   │                              221 South Fayette Street
10 │                              Alexandria, VA 22314
11 │
   │ ALSO PRESENT:                S.A. WADE AMMERMAN
12 │                              S.A. BRIAN BALGAARD
   │                              DANIEL GROOMS, SAUSA
13 │                              SHEILA MYRICK
   │                              BOBBY WILLIAMS
14 │                              S.A. JOHN WYMAN
15 │
   │ OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
16 │                              U.S. District Court, Fifth Floor
   │                              401 Courthouse Square
17 │                              Alexandria, VA 22314
   │                              (703)299-8595
18 │
19 │
20 │
21 │
22 │
23 │
24 │
25 │
```

Case 1:04-cr-00385-LMB  Document 339  Filed 09/06/13  Page 84 of 134 PageID# 604

# COPY

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | . | Criminal No. 03-296-A |
| | . | |
| vs. | . | Alexandria, Virginia |
| | . | February 9, 2004 |
| MASOUD AHMAD KHAN, | . | 9:30 a.m. |
| SEIFULLAH CHAPMAN, | . | |
| HAMMAD ABDUR-RAHEEM, | . | |
| CALIPH BASHA IBN ABDUR-RAHEEM, | . | |
| | . | |
| Defendants. | . | |

. . . . . . . . . . .

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME I

APPEARANCES:

FOR THE GOVERNMENT:         GORDON D. KROMBERG, AUSA
                           DAVID H. LAUFMAN, AUSA
                           United States Attorney's Office
                           2100 Jamieson Avenue
                           Alexandria, VA 22314
                             and
                           JOHN T. GIBBS, ESQ.
                           Counterterrorism Section
                           Criminal Division
                           United States Department of Justice
                           601 D Street, N.W.
                           Washington, D.C. 20004


FOR DEFENDANT KHAN:        BERNARD S. GRIMM, ESQ.
                           JENIFER WICKS, ESQ.
                           Grimm & Wieser
                           307 G Street, N.W.
                           Washington, D.C. 20001

(APPEARANCES CONT'D. ON NEXT PAGE)

(Pages 1 - 310)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

## EXHIBITS (Cont'd.)

GOVERNMENT'S:

| NO. | MARKED | RECEIVED |
|---|---|---|
| 2A5 | | 144 |
| 2A6 | | 114 |
| 2A7 | | 125 |
| 2A8 | | 145 |
| 2A10 | | 154 |
| 2A11 | | 126 |
| 2A12 | | 173 |
| 2A13 | | 127 |
| 2A15 | | 115 |
| 2A16 | | 128 |
| 2A17a | | 146 |
| 2A17b | | 148 |
| 2A18a | | 149 |
| 2A18b | | 150 |
| 2A18c | | 151 |
| 2A19 | | 152 |
| 2B2a | | 230 |
| 3A8 | | 273 |
| 3C3 | | 303 |
| 4A1 | | 301 |
| 4C1 | | 303 |
| 5C6 | | 303 |
| 5C7 | | 201 |
| 6C1 | | 303 |
| 7A1 | | 157 |
| 7A7 through 7A19 | | 227 |
| 7A20 | | 157 |
| 7A21 | | 227 |
| 7A22 | | 227 |
| 7A26 | | 262 |
| 7A32 | | 227 |
| 7A36 | | 227 |
| 7A37 | | 227 |
| 7A38 | | 158 |
| 7A39 | | 159 |
| 7A40 | | 227 |
| 7A42 | | 301 |

4

EXHIBITS (Cont'd.)

|  | MARKED | RECEIVED |
|---|---|---|

GOVERNMENT'S:

| No. 7C1 | | 90 |
|---|---|---|
| 7C2 through 7C5 | | 303 |
| 8-15 | | 273 |
| 8-18 | | 302 |
| 8-28 | | 199 |
| 8-29 | | 199 |
| 8-31 | | 217 |
| 8-46 | | 110 |

1 as I said, if you missed the first round, you've missed it, but

2 in any case, that's the end of the questioning for Agent

3 Ammerman.

4         Thank you.  You may step down.

5         MR. GRIMM:  Your Honor, may I ask one question?

6         THE COURT:  No, no.

7         MR. GRIMM:  Thank you.

8                 (Witness excused.)

9         THE COURT:  All right, call your next witness,

10 Mr. Kromberg.

11         MR. KROMBERG:  Judge, at this point, before -- the next

12 witness is going to be Special Agent Chris Mamula, but before we

13 get to that point, I'd like to move in certain exhibits.

14 Government Exhibit 1D1, 1 David 1, constitutes a certification

15 from the custodian of records of Yahoo! providing that the

16 records provided by Yahoo! are, in fact, authentic copies of

17 business records maintained by Yahoo! in the regular course of

18 their business.

19         Because of that certification of 1D1, I'd like to move

20 in Government Exhibits 1D1 through 9, 1D11 through 54, 4A2, 4A3,

21 4G1, and 4G4 through 4G7.  The reason I say it all at once now,

22 Judge, is because we haven't been able to get a stipulation on

23 this, and if we have to bring somebody from Yahoo! to talk about

24 this if the certification isn't going to be enough, we'd like to

25 know that earlier in the trial rather than later.

1    THE COURT:  All right.  Well, let me ask this:  These

2    documents, Mr. Kromberg, that you've referenced by number, how

3    did you get them?  Are these e-mail messages that were seized

4    from somebody's computer, or did you go to Yahoo! and ask them to

5    do a search?  I'm not sure I understand.

6    MR. KROMBERG:  Your Honor, these are all e-mails and

7    documents we got directly from Yahoo! either from search warrants

8    at Yahoo! or 2703(d) orders at Yahoo!.

9    Now, I think what the confusion is, Mr. Zwerling is

10   saying that they're not business records of Yahoo! in the sense

11   that what Mr. Chapman -- when Mr. Royer sends of a Bin Laden

12   videotape to Mr. Chapman a link, Yahoo! doesn't know that that's

13   really a Bin Laden videotape, but it really is a business record

14   of Yahoo! that it's a message from Royer to Chapman.

15   That's -- they all have -- this is just for

16   authenticity, Judge.  Whether it's relevant or not, it has to be

17   an admission of a defendant, or it has to be a coconspirator

18   statement, but we're mixing apples and oranges by talking about

19   these are not business records of Yahoo!.

20   The fact that the records exist, these messages exist

21   within the records of Yahoo!, it is correct that Yahoo! maintains

22   these documents, these records, and it is a reliable system of

23   finding these records, because Yahoo! has them, and that's all we

24   wanted to show, that these are documents that were within --

25   "documents" is the wrong word -- it's information and messages

Case 1:04-cr-00385-LMB Document 339 Filed 09/06/13 Page 89 of 134 PageID# 609

1  that were maintained by Yahoo!, and Yahoo! has a duty to maintain

2  this stuff accurately, not generate stuff randomly that says

3  Royer is sending Bin Laden videotapes to Chapman.

4       THE COURT:  You have a witness here from Yahoo!?

5       MR. KROMBERG:  No, we have not.  Yahoo! is in

6  California.  We were trying to save -- we thought that the

7  certification saying that these are records that came from Yahoo!

8  records would be sufficient.  We don't have to fly someone from

9  Yahoo! to say exactly that.

10       The person from Yahoo! is not going to say, "I know

11  Seif Chapman from a hole in the wall."  The person from Yahoo! is

12  going to say, "We look in the bowels of our files, and these are

13  things that are in our files."

14       THE COURT:  All right, let me see the certification.

15       MR. KROMBERG:  Judge, it's right behind 1D1.  1D1 is

16  the letter, and right behind the letter is a certification --

17       THE COURT:  This is from Linda Isley, Senior Compliance

18  Paralegal?  Is that what I'm looking at?

19       MR. KROMBERG:  Say again, Judge?

20       THE COURT:  This is dated February 5, 2004?  No, wait a

21  minute.

22       Here it is.  It's the affidavit of Linda Isley,

23  correct?

24       MR. KROMBERG:  Yes, Judge.

25       MR. CUMMINGS:  4A2.

1          THE COURT:  Counsel.

2          MR. CUMMINGS:  I'm sorry.

3          MR. KROMBERG:  Judge, let me correct the record.  When

4    I said these records came from a search of 2703, we also

5    identified them, some of them originally through a FISA, but then

6    when we went to Yahoo! and said can you give us these records,

7    that these are the records of Yahoo!.

8          MR. ZWERLING:  Your Honor, if the Court could look at

9    4A2?

10         THE COURT:  I'm sorry?

11         MR. ZWERLING:  If the Court could look at 4A2?

12         THE COURT:  Wait.

13         MR. ZWERLING:  I'm sorry.

14         THE COURT:  I'm first looking at the Linda Isley

15   affidavit.  I mean, again, this is mixing perhaps apples with

16   oranges.  The only issue right now is whether somebody is needed

17   from Yahoo! to come into court and say, "I pressed the magic

18   buttons on the computer, and this is what spewed out in response

19   to the government's search warrant."  If that's all that is

20   necessary from this witness, her affidavit seems to say that.

21         Now, whether there are problems with just the face of a

22   document such that it shouldn't be entered into evidence is down

23   the road.  This is only whether we need the Yahoo! person here.

24         MR. ZWERLING:  I understand, Your Honor, but I don't

25   know who else would answer a question like at the bottom of 4A2,

Exhibit J

464

```
From Ismail Royer Mon Dec 31 05:53:35 2001
X-RocketMail: 00000021;R---S-----------;0223
X-Apparently-To: seifchapman@yahoo.com via web20609.mail.yahoo.com; 31 Dec
2002 05:56:11 -0800 (PST)
Return-Path: <affairsofmuslims@hotmail.com>
X-Track: 1: 40
Received: from dav46.law15.hotmail.com  (EHLO hotmail.com) (64.4.22.18)
  by mta304.mail.yahoo.com with SMTP; 31 Dec 2002 05:54:32 -0800 (PST)
Received: from mail pickup service by hotmail.com with Microsoft SMTPSVC;
       Mon, 31 Dec 2001 05:54:31 -0800
X-Originating-IP: [195.222.45.243]
From: "Ismail Royer" <affairsofmuslims@hotmail.com>
To: <aljazirah@cybermsa.org>
Subject: Pakistan arrests head of Lashkar-e-Taiba
Date: Mon, 31 Dec 2001 14:53:35 +0100
MIME-Version: 1.0
Content-Type: multipart/alternative;
       boundary="----=_NextPart_000_00DB_01C1920A.EC82AE00"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.00.2615.200
X-MimeOLE: Produced By Microsoft MimeOLE V5.00.2615.200
Message-ID: <DAV46f73aTnQ51xltxi0000a43a@hotmail.com>
X-OriginalArrivalTime: 31 Dec 2001 13:54:31.0829 (UTC)
FILETIME=[AC1D8450:01C19202]
Content-Length: 8738

This is a multi-part message in MIME format.

------=_NextPart_000_00DB_01C1920A.EC82AE00
Content-Type: text/plain;
       charset="iso-8859-2"
Content-Transfer-Encoding: quoted-printable
```

Assalaamu alaikum,

This bastard Musharaff is not only showing his own profound treachery, =
weakness and fear of India and the United States, he is making Pakistan =
itself appear so (just like the Americans mock the Afghans for letting =
them use them--"You can't buy an Afghan, you can only rent him.") Once =
you give up your lunch money to the bully, its open season and your =
dignity is in the toilet. Every single Pakistani and by extension every =
single Muslim should know that removing and replacing this opportunist, =
weakling sellout munafiq is a major first step toward restoring the =
dignity, respect, and strength of the Ummah and Islam.

See also after this article, a statement from Hafiz Saeed  on this, a =
few days old but on topic.

----

Pakistan arrest head of Lashkar-e-Taiba
                =20
        =20
   =20
Pakistan arrested Hafiz Mohammed Saeed, the head of the Lashkar-e-Taiba =
militant organization blamed for carrying out an attack on the Indian =
parliament, a top security official said.

"He has been arrested for making inflammatory speeches to incite people =
to violate law and order," the official, requesting anonymity, told AFP.

GOVERNMENT
EXHIBIT

India has blamed Lashkar and another Pakistan-based militant outfit -- Jaish-e-Mohammad -- of carrying out the December 13 attack on the parliament complex in New Delhi at the behest of Pakistani military intelligence.

Security sources said the arrest was part of the military government's recent crackdown on suspected terrorist elements in the country in line with its wider commitment to fight international terrorism.

"Pakistan continues with its drive to contain terrorists elements within the country as it continues to assist the international coalition against terrorism." another security official said.

Lashkar is one of the most powerful militant groups seeking to expel Indian troops from the northern third of the disputed Himalayan state of Kashmir, which is divided between India and Pakistan.

Analysts believe Saeed's arrest is a significant gesture of Pakistan's desire to defuse the dangerously high levels of brinkmanship between the two nuclear rivals.

Military tensions between the South Asian neighbours have soared since the parliament attack with both sides massing troops along their border and trading tit-for-tat diplomatic sanctions.

Islamabad has denied any role in the attack but has arrested 60 militants from different extremist groups, including the founding head of the Jaish group, Maulana Masood Azhar.

Last Monday Pakistan froze the bank accounts of Lashkar and another militant organization Umma Tameer-e-Nau, which the United States has accused of passing nuclear arms data to suspected international terrorist Osama bin Laden.

India however has dismissed the moves as "cosmetic".

US President George W. Bush on Friday praised Musharraf for the crackdown.

"The president is responding forcefully and actively to bring those who would harm others to justice. The war on terror is not just an American war on terror, it's a civilized government war on terror that we're talking about there," Bush said.

"I'm pleased that President Musharraf is responding to the Indian request to round up those who would do harm to others and incarcerate them, which he did."

However, on Saturday Bush called on Pakistan to do more to "eliminate extremists" implicated in the parliament attack.

Lashkar, headquartered near the eastern city of Lahore, is a militant wing of the Islamic Dawa tul Irshad organisation that conducts relief work and runs schools.

The group has been blamed for other high-profile attacks, including an assault on New Delhi's historic Red Fort in December last year.

-----------

In the name of Allah, the Most Merciful, the Most Gracious.

Lashkar-e-Taiba's Point Of View About Terrorism
 I would like to clarify on a rather sensitive issue concerning =
Lashkar-e-Taiba, one of the organizations of Kashmiri freedom fighters =
battling against Indian occupation forces in the held Kashmir. The aim =
of Lashker-e-Taiba's struggle is that Kashmiri people get the right of =
self-determination like other nations of the world.=20

We are perturbed to learn that some elements in the US government are =
contemplating to declare Lashkar-e-Taiba as a terrorist organization. =
Obviously, misleading information provided by the Indian government has =
influenced those who are supporting this move.=20

We wish to clarify the facts on ground and have the following points to =
make:=20

1.      All operations by Kashmiris under Lashkar-e-Taiba's command =
have been carried out against Indian army with the sole purpose of =
protecting the local population from its repression.=20

 2.      Lashkar-e-Taiba nurses no ill will against Hindus, Sikhs or =
any other community in Indian held Kashmir, and we have never =
purposefully targeted the civilians in Kashmir, whether Hindus, Sikhs or =
other non-Muslims, though accidental civilian casualties during =
encounters with Indian army are a regretful exception.=20

3.      We are certain that you would not find even a single incident =
during our armed struggle, wherein civilians of any community were =
directly targeted.=20

4.      We have never been involved in any incident of hostage-taking, =
hijacking, kidnapping or other such acts. No such gruesome act can be =
imputed to us. We may differ with the US policy and this is our right =
but we do not mean any harm to any US citizen or property. Nor do we =
believe in carrying out attacks on embassies, or issuing threats against =
anybody, not even the Indian citizens.        =20

5.      We entertain no malicious intentions against US, British, or =
even Indian citizens, and, therefore, there is no reason for us to =
resort to any form of violence against them. We believe they are =
entitled to peace and tranquility, and protection from violence like any =
other citizen of the world and there is no question of inflicting any =
harm on civilians of any country. Likewise, we have no direct =
confrontation with any nation, Muslim or non-Muslim. Therefore, there is =
absolutely no possibility of our being involved in any activity that may =
endanger US property or citizens either in US or anywhere else in the =
world.=20

6.      US State Department or any other country cannot find any =
evidence of our involvement in international terrorism.=20

7.      Our activities are focused solely on Kashmir to win freedom for =
Kashmiri people from Indian occupation according to their aspirations. =
We also want to protect them from the brutalities of Indian army.=20

8.      Our focus of activity has been on forceful occupation of =

Kashmir by Indian forces against the popular will of people of there. We =
believe that under international norms and practice, it is our duty to =
provide support to people who are fighting a war of liberation. Even the =
UN General Assembly's Resolution on Prevention of Intervention, allows =
the same. Likewise, past international practice of US in Afghanistan and =
Vietnam supports our view. The only difference is that we are not a =
Government arm but comprise of volunteers who feel strongly about the =
repression of Kashmiri brothers.=20

9.      Further, it must be recalled that Indian-held Kashmir is yet a =
disputed territory as recognized by international community in recent UN =
Security Council Resolution. Our activities therefore, in the said area, =
should not be viewed as intervention in Indian affairs. Our assistance =
is restricted to our Kashmiri brothers in Indian held Kashmir.=20

10.     We demand that not only Pakistan but all Muslim and non-Muslim =
countries that love peace should extend us full support against Indian =
army which is tyrannizing innocent Kashmiris. We have the support of our =
sympathizers and well-wishers all over the world, who share our vision =
of Kashmir's independence. There is must be emphasized that if the =
people of East Timor can be granted freedom in a very short span of time =
then why not Kashmiris? The underlying reason for this anomaly is that =
the people of East Timor were Christians and Kashmiris are Muslims. =20

11.     India violated international border in 1971 and attacked East =
Pakistan. In 1947 it mounted attacks on the states of Junagarh and =
Hyderabad, despite that all these states had announced to join Pakistan =
under the provision in the Partition of India Act. Today all communities =
in India are suffering its aggression. The so-called biggest democracy =
of the world has become hostage to a band of extremist Hindus and this =
lifts the veil from the face of "secular India". Neither the Churches of =
Christians nor the dignity of Muslims are safe in India. Should such a =
country be made a member of Security Council? Such a thing would be =
tantamount to putting the security of entire world in jeopardy.=20

12.     Indian army was directly involved in the killing of Sikhs in Chati =
Singh Pura. Likewise, the massacre of Amarnath Yatris was the handiwork =
of Indian army. If an independent commission is established to look into =
these incidents, the Lashkar-e-Taiba can easily clarify their position =
before the whole world.=20

13.     Lashkar-e-Taiba is not merely a military organization; it is =
engaged in Da'wah and Jihad. Massive attendance at its gatherings, =
congregations and conferences speaks of its popularity.  It is a popular =
movement, which has full support of peace-loving people. Its hospitals =
are rendering exemplary services to people; its schools are eradicating =
ignorance in Pakistan by spreading quality education.=20

Having said all this we would like to ask what is the difference between =
Afghan Jihad and Kashmir Jihad? Why the US supported one Jihad so =
overwhelmingly, and why it is condemning the other Jihad so vehemently? =
Do its standards go easily when it comes to its interests? It =
supported Jihad in Afghanistan because it was against USSR, whereas it =
is condemning Jihad-e-Kashmir because of its ties with India. Then a =
very important question, why the US attacked the innocent people of =
Iraq, why it rained Cruise missiles on Afghanistan and Sudan? Do its =
laws against terrorism not apply to all such acts of aggression? As far =
as we are concerned, we are fighting for our freedom.=20

Prof. Hafiz Muhammad Saeed
    Amir Lashkar-e-Taiba

```
------=_NextPart_000_00DB_01C1920A.EC82AE00
Content-Type: text/html;
       charset="iso-8859-2"
Content-Transfer-Encoding: quoted-printable

<!DOCTYPE HTML PUBLIC "-//W3C//DTD HTML 4.0 Transitional//EN">
<HTML><HEAD>
<META content=3D"text/html; charset=3Diso-8859-2" =
http-equiv=3DContent-Type>
<META content=3D"MSHTML 5.00.2614.3500" name=3DGENERATOR>
<STYLE></STYLE>
</HEAD>
<BODY bgColor=3D#ffffff>
<DIV><FONT face=3DArial size=3D2>Assalaamu alaikum,</FONT></DIV>
<DIV><FONT face=3DArial size=3D2></FONT> </DIV>
<DIV><FONT face=3DArial size=3D2>This bastard Musharaff is not only =
showing his=20
own profound treachery, weakness and fear of India and the United =
States, he is=20
making Pakistan itself appear so (just like the Americans mock the =
Afghans for=20
letting them use them--"You can't buy an Afghan, you can only rent =
him.") Once=20
you give up your lunch money to the bully, its open season and your =
dignity is=20
in the toilet. Every single Pakistani and by extension every single =
Muslim=20
should know that removing and replacing this opportunist, weakling =
sellout=20
munafiq is a major first step toward restoring the dignity, =
respect, and=20
strength of the Ummah and Islam.</FONT></DIV>
<DIV><FONT face=3DArial size=3D2></FONT> </DIV>
<DIV><FONT face=3DArial size=3D2>See also after this article, a =
statement from=20
Hafiz Saeed  on this, a few days old but on =
topic.</FONT></DIV>
<DIV> </DIV>
<DIV><FONT face=3DArial size=3D2>----</FONT></DIV>
<DIV> </DIV>
<DIV><FONT face=3DArial size=3D2>
<H2>Pakistan arrest head of Lashkar-e-Taiba</H2>
<TABLE align=3Dright cellPadding=3D2 width=3D145 valign=3D"top">
  <TBODY>
  <TR>
    <TD>
      <TABLE align=3Dright valign=3D"top">
        <TBODY>
        <TR>
          <TD>
            <TABLE>
              <TBODY>
                <TR>
                  =
<TD></TD></TR></TBODY></TABLE></TD></TR></TBODY></TABLE></TD></TR></TBODY=
></TABLE>
<P>Pakistan arrested Hafiz Mohammed Saeed, the head of the =
```

Lashkar-e-Taiba=20
militant organization blamed for carrying out an attack on the Indian=20
parliament, a top security official said.</P>
<P>"He has been arrested for making inflammatory speeches to incite =
people to=20
violate law and order," the official, requesting anonymity, told =
AFP.</P>
<P>India has blamed Lashkar and another Pakistan-based militant outfit =
--=20
Jaish-e-Mohammad -- of carrying out the December 13 attack on the =
parliament=20
complex in New Delhi at the behest of Pakistani military =
intelligence.</P>
<P>Security sources said the arrest was part of the military =
government's recent=20
crackdown on suspected terrorist elements in the country in line with =
its wider=20
commitment to fight international terrorism.</P>
<P>"Pakistan continues with its drive to contain terrorists elements =
within the=20
country as it continues to assist the international coalition against=20
terrorism." another security official said.</P>
<P>Lashkar is one of the most powerful militant groups seeking to expel =
Indian=20
troops from the northern third of the disputed Himalayan state of =
Kashmir, which=20
is divided between India and Pakistan.</P>
<P>Analysts believe Saeed's arrest is a significant gesture of =
Pakistan's desire=20
to defuse the dangerously high levels of brinkmanship between the two =
nuclear=20
rivals.</P>
<P>Military tensions between the South Asian neighbours have soared =
since the=20
parliament attack with both sides massing troops along their border and =
trading=20
tit-for-tat diplomatic sanctions.</P>
<P>Islamabad has denied any role in the attack but has arrested 60 =
militants=20
from different extremist groups, including the founding head of the =
Jaish group,=20
Maulana Masood Azhar.</P>
<P>Last Monday Pakistan froze the bank accounts of Lashkar and another =
militant=20
organization Umma Tameer-e-Nau, which the United States has accused of =
passing=20
nuclear arms data to suspected international terrorist Osama bin =
Laden.</P>
<P>India however has dismissed the moves as "cosmetic".</P>
<P>US President George W. Bush on Friday praised Musharraf for the=20
crackdown.</P>
<P>"The president is responding forcefully and actively to bring those =
who would=20
harm others to justice. The war on terror is not just an American war on =
terror,=20
it's a civilized government war on terror that we're talking about =
there," Bush=20
said.</P>
<P>"I'm pleased that President Musharraf is responding to the Indian =
request to=20
round up those who would do harm to others and incarcerate them, which =

```
he=20
did."</P>
<P>However, on Saturday Bush called on Pakistan to do more to "eliminate =

extremists" implicated in the parliament attack.</P>
<P>Lashkar, headquartered near the eastern city of Lahore, is a militant =
wing of=20
the Islamic Dawa tul Irshad organisation that conducts relief work and =
runs=20
schools.</P>
<P>The group has been blamed for other high-profile attacks, including =
an=20
assault on New Delhi's historic Red Fort in December last year.</P>
<P> </P>
<P>-----------</P>
<P> </P>
<DIV class=3DSection1>
<P align=3Dcenter class=3DMsoNormal style=3D"TEXT-ALIGN: center"><B=20
style=3D"mso-bidi-font-weight: normal"><SPAN=20
style=3D"FONT-FAMILY: Arial; mso-bidi-font-size: 10.0pt; =
mso-bidi-font-family: 'Times New Roman'; text-shadow: auto">In=20
the name of Allah, the Most Merciful, the Most Gracious</SPAN><SPAN=20
style=3D"FONT-FAMILY: Arial; mso-bidi-font-size: 10.0pt; =
mso-bidi-font-family: 'Times New Roman'">.</SPAN></B></P>
<H4 align=3Dcenter><U><SPAN=20
style=3D"FONT-FAMILY: Arial; mso-bidi-font-size: =
10.0pt">Lashkar-e-Taiba&#8217;s Point=20
Of View About Terrorism</SPAN></U></H4>
<P align=3Dleft class=3DMsoBodyText style=3D"TEXT-ALIGN: left"><FONT =
face=3DArial><B=20
style=3D"mso-bidi-font-weight: normal"><SPAN=20
style=3D"mso-bidi-font-size: 15.0pt"> I would like to clarify on a =
rather=20
sensitive issue concerning Lashkar-e-Taiba, one of the organizations of =
Kashmiri=20
freedom fighters battling against Indian occupation forces in the held =
Kashmir.=20
The aim of Lashker-e-Taiba&#8217;s struggle is that Kashmiri people get =
the right of=20
self-determination like other nations of the world.<?XML:NAMESPACE =
PREFIX =3D O=20
/><O:P> </O:P></SPAN></B></FONT></P>
<P align=3Dleft class=3DMsoNormal style=3D"TEXT-ALIGN: left"><FONT =
face=3DArial><B=20
style=3D"mso-bidi-font-weight: normal"><SPAN =
style=3D"mso-bidi-font-size: 10.0pt">We=20
are perturbed to learn that some elements in the US government are =
contemplating=20
to declare Lashkar-e-Taiba as a terrorist organization. Obviously, =
misleading=20
information provided by the Indian government has influenced those who =
are=20
supporting this move.<O:P> </O:P></SPAN></B></FONT></P>
<P class=3DMsoBodyText2><FONT face=3DArial><B>We wish to clarify the =
facts on ground=20
and have the following points to make:<O:P> </O:P></B></FONT></P>
<P align=3Dleft class=3DMsoNormal=20
style=3D"MARGIN-LEFT: 0.25in; TEXT-ALIGN: left; TEXT-INDENT: -0.25in; =
mso-list: 10 level1 lfo1; tab-stops: list .25in"><SPAN=20
style=3D"mso-bidi-font-size: 10.0pt"><FONT face=3DArial>1.</FONT><SPAN=20
style=3D"FONT-FAMILY: Arial; FONT-STYLE: normal; FONT-VARIANT: normal; =
```

```
FONT-WEIGHT: normal">      =20
</SPAN></SPAN><FONT face=3DArial><SPAN=20
style=3D"FONT-SIZE: 11pt; mso-bidi-font-size: 10.0pt">All operations by =
Kashmiris=20
under Lashkar-e-Taiba&#8217;s command have been carried out against =
Indian army with=20
the sole purpose of protecting the local population from its =
repression.<O:P>=20
</O:P></SPAN></FONT></P>
<P align=3Dleft class=3DMsoNormal style=3D"TEXT-ALIGN: left"><SPAN=20
style=3D"mso-bidi-font-size: 10.0pt"><FONT =
face=3DArial> 2.</FONT><SPAN=20
style=3D"FONT-FAMILY: Arial; FONT-STYLE: normal; FONT-VARIANT: normal; =
FONT-WEIGHT: normal">      =20
</SPAN></SPAN><SPAN style=3D"FONT-SIZE: 11pt; mso-bidi-font-size: =
10.0pt"><FONT=20
face=3DArial><SPAN style=3D"mso-bidi-font-size: 10.0pt">Lashkar-e-Taiba =
nurses no=20
ill will against Hindus, Sikhs or any other community in Indian held =
Kashmir,=20
and we have never purposefully targeted the civilians in Kashmir, =
whether=20
Hindus, Sikhs or other non-Muslims, though accidental civilian =
casualties during=20
encounters with Indian army are a regretful exception.=20
</SPAN></FONT><O:P></O:P></SPAN></P>
<P align=3Dleft class=3DMsoNormal=20
style=3D"MARGIN-LEFT: 0.25in; TEXT-ALIGN: left; TEXT-INDENT: -0.25in; =
mso-list: l0 level1 lfo1; tab-stops: list .25in"><SPAN=20
style=3D"mso-bidi-font-size: 10.0pt"><FONT face=3DArial>3.</FONT><SPAN=20
style=3D"FONT-FAMILY: Arial; FONT-STYLE: normal; FONT-VARIANT: normal; =
FONT-WEIGHT: normal">      =20
</SPAN></SPAN><FONT face=3DArial><SPAN=20
style=3D"FONT-SIZE: 11pt; mso-bidi-font-size: 10.0pt">We are certain =
that you=20
would not find even a single incident during our armed struggle, wherein =

civilians of any community were directly targeted.<O:P> =
</O:P></SPAN></FONT></P>
<P align=3Dleft class=3DMsoNormal=20
style=3D"MARGIN-LEFT: 0.25in; TEXT-ALIGN: left; TEXT-INDENT: -0.25in; =
mso-list: l0 level1 lfo1; tab-stops: list .25in"><SPAN=20
style=3D"mso-bidi-font-size: 10.0pt"><FONT face=3DArial>4.</FONT><SPAN=20
style=3D"FONT-FAMILY: Arial; FONT-STYLE: normal; FONT-VARIANT: normal; =
FONT-WEIGHT: normal">      =20
</SPAN></SPAN><SPAN style=3D"FONT-SIZE: 11pt; mso-bidi-font-size: =
10.0pt"><FONT=20
face=3DArial><SPAN style=3D"mso-bidi-font-size: 10.0pt">We have never =
been involved=20
in any incident of hostage-taking, hijacking, kidnapping or other such =
acts. No=20
such gruesome act can be imputed to us. We may differ with the US policy =
and=20
this is our right but we do not mean any harm to any US citizen or =
property. Nor=20
do we believe in carrying out attacks on embassies, or issuing threats =
against=20
anybody, not even the Indian citizens.<SPAN=20
style=3D"mso-spacerun: yes">     =20
</SPAN></SPAN></FONT><O:P></O:P></SPAN></P>
<P align=3Dleft class=3DMsoNormal=20
```

```
style=3D"MARGIN-LEFT: 0.25in; TEXT-ALIGN: left; TEXT-INDENT: -0.25in; =
mso-list: l0 level1 lfo1; tab-stops: list .25in"><SPAN=20
style=3D"mso-bidi-font-size: 10.0pt"><FONT face=3DArial>5.</FONT><SPAN=20
style=3D"FONT-FAMILY: Arial; FONT-STYLE: normal; FONT-VARIANT: normal; =
FONT-WEIGHT: normal">      =20
</SPAN></SPAN><FONT face=3DArial><SPAN=20
style=3D"FONT-SIZE: 11pt; mso-bidi-font-size: 10.0pt">We entertain no =
malicious=20
intentions against US, British, or even Indian citizens, and, therefore, =
there=20
is no reason for us to resort to any form of violence against them. We =
believe=20
they are entitled to peace and tranquility, and protection from violence =
like=20
any other citizen of the world and there is no question of inflicting =
any harm=20
on civilians of any country. Likewise, we have no direct confrontation =
with any=20
nation, Muslim or non-Muslim. Therefore, there is absolutely no =
possibility of=20
our being involved in any activity that may endanger US property or =
citizens=20
either in US or anywhere else in the world.<O:P> =
</O:P></SPAN></FONT></P>
<P align=3Dleft class=3DMsoNormal=20
style=3D"MARGIN-LEFT: 0.25in; TEXT-ALIGN: left; TEXT-INDENT: -0.25in; =
mso-list: l0 level1 lfo1; tab-stops: list .25in"><SPAN=20
style=3D"mso-bidi-font-size: 10.0pt"><FONT face=3DArial>6.</FONT><SPAN=20
style=3D"FONT-FAMILY: Arial; FONT-STYLE: normal; FONT-VARIANT: normal; =
FONT-WEIGHT: normal">      =20
</SPAN></SPAN><FONT face=3DArial><SPAN=20
style=3D"FONT-SIZE: 11pt; mso-bidi-font-size: 10.0pt">US State =
Department or any=20
other country cannot find any evidence of our involvement in =
international=20
terrorism.<O:P> </O:P></SPAN></FONT></P>
<P align=3Dleft class=3DMsoNormal=20
style=3D"MARGIN-LEFT: 0.25in; TEXT-ALIGN: left; TEXT-INDENT: -0.25in; =
mso-list: l0 level1 lfo1; tab-stops: list .25in"><SPAN=20
style=3D"mso-bidi-font-size: 10.0pt"><FONT face=3DArial>7.</FONT><SPAN=20
style=3D"FONT-FAMILY: Arial; FONT-STYLE: normal; FONT-VARIANT: normal; =
FONT-WEIGHT: normal">      =20
</SPAN></SPAN><SPAN style=3D"FONT-SIZE: 11pt; mso-bidi-font-size: =
10.0pt"><FONT=20
face=3DArial><SPAN style=3D"mso-bidi-font-size: 10.0pt">Our activities =
are focused=20
solely on Kashmir to win freedom for Kashmiri people from Indian =
occupation=20
according to their aspirations. We also want to protect them from the=20
brutalities of Indian army. </SPAN></FONT><O:P></O:P></SPAN></P>
<P align=3Dleft class=3DMsoNormal=20
style=3D"MARGIN-LEFT: 0.25in; TEXT-ALIGN: left; TEXT-INDENT: -0.25in; =
mso-list: l0 level1 lfo1; tab-stops: list .25in"><SPAN=20
style=3D"mso-bidi-font-size: 10.0pt"><FONT face=3DArial>8.</FONT><SPAN=20
style=3D"FONT-FAMILY: Arial; FONT-STYLE: normal; FONT-VARIANT: normal; =
FONT-WEIGHT: normal">      =20
</SPAN></SPAN><FONT face=3DArial><SPAN=20
style=3D"FONT-SIZE: 11pt; mso-bidi-font-size: 10.0pt">Our focus of =
activity has=20
been on forceful occupation of Kashmir by Indian forces against the =
popular will=20
```

Case 1:04-cr-00385-LMB  Document 339  Filed 09/06/13  Page 101 of 134 PageID# 621

of people of there. We believe that under international norms and =
practice, it=20
is our duty to provide support to people who are fighting a war of =
liberation.=20
Even the UN General Assembly&#8217;s Resolution on Prevention of =
Intervention, allows=20
the same. Likewise, past international practice of US in Afghanistan and =
Vietnam=20
supports our view. The only difference is that we are not a Government =
arm but=20
comprise of volunteers who feel strongly about the repression of =
Kashmiri=20
brothers.<O:P> </O:P></SPAN></FONT></P>
<P align=3Dleft class=3DMsoNormal=20
style=3D"MARGIN-LEFT: 0.25in; TEXT-ALIGN: left; TEXT-INDENT: -0.25in; =
mso-list: l0 level1 lfo1; tab-stops: list .25in"><SPAN=20
style=3D"mso-bidi-font-size: 10.0pt"><FONT face=3DArial>9.</FONT><SPAN=20
style=3D"FONT-FAMILY: Arial; FONT-STYLE: normal; FONT-VARIANT: normal; =
FONT-WEIGHT: normal">     =20
</SPAN></SPAN><SPAN style=3D"FONT-SIZE: 11pt; mso-bidi-font-size: =
10.0pt"><FONT=20
face=3DArial><SPAN style=3D"mso-bidi-font-size: 10.0pt">Further, it must =
be recalled=20
that Indian-held Kashmir is yet a disputed territory as recognized by=20
international community in recent UN Security Council Resolution. Our =
activities=20
therefore, in the said area, should not be viewed as intervention in =
Indian=20
affairs. Our assistance is restricted to our Kashmiri brothers in Indian =
held=20
Kashmir. </SPAN></FONT><O:P></O:P></SPAN></P>
<P align=3Dleft class=3DMsoNormal=20
style=3D"MARGIN-LEFT: 0.25in; TEXT-ALIGN: left; TEXT-INDENT: -0.25in; =
mso-list: l0 level1 lfo1; tab-stops: list .25in"><SPAN=20
style=3D"mso-bidi-font-size: 10.0pt"><FONT face=3DArial>10.</FONT><SPAN=20
style=3D"FONT-FAMILY: Arial; FONT-STYLE: normal; FONT-VARIANT: normal; =
FONT-WEIGHT: normal">  =20
</SPAN></SPAN><SPAN style=3D"FONT-SIZE: 11pt; mso-bidi-font-size: =
10.0pt"><FONT=20
face=3DArial><SPAN style=3D"mso-bidi-font-size: 10.0pt">We demand that =
not only=20
Pakistan but all Muslim and non-Muslim countries that love peace should =
extend=20
us full support against Indian army which is tyrannizing innocent =
Kashmiris. We=20
have the support of our sympathizers and well-wishers all over the =
world, who=20
share our vision of Kashmir&#8217;s independence. There is must be =
emphasized that if=20
the people of East Timor can be granted freedom in a very short span of =
time=20
then why not Kashmiris? The underlying reason for this anomaly is that =
the=20
people of East Timor were Christians and Kashmiris are Muslims.<SPAN=20
style=3D"mso-spacerun: yes">  =
</SPAN></SPAN></FONT><O:P></O:P></SPAN></P>
<P align=3Dleft class=3DMsoNormal=20
style=3D"MARGIN-LEFT: 0.25in; TEXT-ALIGN: left; TEXT-INDENT: -0.25in; =
mso-list: l0 level1 lfo1; tab-stops: list .25in"><SPAN=20
style=3D"mso-bidi-font-size: 10.0pt"><FONT face=3DArial>11.</FONT><SPAN=20
style=3D"FONT-FAMILY: Arial; FONT-STYLE: normal; FONT-VARIANT: normal; =

Case 1:04-cr-00385-LMB Document 339 Filed 09/06/13 Page 102 of 134 PageID# 622

```
FONT-WEIGHT: normal">  =20
</SPAN></SPAN><FONT face=3DArial><SPAN=20
style=3D"FONT-SIZE: 11pt; mso-bidi-font-size: 10.0pt">India violated =
international=20
border in 1971 and attacked East Pakistan. In 1947 it mounted attacks on =
the=20
states of Junagarh and Hyderabad, despite that all these states had =
announced to=20
join Pakistan under the provision in the Partition of India Act. Today =
all=20
communities in India are suffering its aggression. The so-called biggest =

democracy of the world has become hostage to a band of extremist Hindus =
and this=20
lifts the veil from the face of &#8220;secular India&#8221;. Neither the =
Churches of=20
Christians nor the dignity of Muslims are safe in India. Should such a =
country=20
be made a member of Security Council? Such a thing would be tantamount =
to=20
putting the security of entire world in jeopardy.<O:P> =
</O:P></SPAN></FONT></P>
<P align=3Dleft class=3DMsoNormal=20
style=3D"MARGIN-LEFT: 0.25in; TEXT-ALIGN: left; TEXT-INDENT: -0.25in; =
mso-list: l0 level1 lfo1; tab-stops: list .25in"><SPAN=20
style=3D"mso-bidi-font-size: 10.0pt"><FONT face=3DArial>12.</FONT><SPAN=20
style=3D"FONT-FAMILY: Arial; FONT-STYLE: normal; FONT-VARIANT: normal; =
FONT-WEIGHT: normal">  =20
</SPAN></SPAN><FONT face=3DArial><SPAN=20
style=3D"FONT-SIZE: 11pt; mso-bidi-font-size: 10.0pt">Indian army was =
directly=20
involved in the killing of Sikhs in Chati Singh Pura. Likewise, the =
massacre of=20
Amarnath Yatris was the handiwork of Indian army. If an independent =
commission=20
is established to look into these incidents, the Lashkar-e-Taiba can =
easily=20
clarify their position before the whole world.<O:P> =
</O:P></SPAN></FONT></P>
<P align=3Dleft class=3DMsoNormal=20
style=3D"MARGIN-LEFT: 0.25in; TEXT-ALIGN: left; TEXT-INDENT: -0.25in; =
mso-list: l0 level1 lfo1; tab-stops: list .25in"><SPAN=20
style=3D"mso-bidi-font-size: 10.0pt"><FONT face=3DArial>13.</FONT><SPAN=20
style=3D"FONT-FAMILY: Arial; FONT-STYLE: normal; FONT-VARIANT: normal; =
FONT-WEIGHT: normal">  =20
</SPAN></SPAN><SPAN style=3D"FONT-SIZE: 11pt; mso-bidi-font-size: =
10.0pt"><FONT=20
face=3DArial><SPAN style=3D"mso-bidi-font-size: 10.0pt">Lashkar-e-Taiba =
is not=20
merely a military organization; it is engaged in Da&#8217;wah and Jihad. =
Massive=20
attendance at its gatherings, congregations and conferences speaks of =
its=20
popularity.<SPAN style=3D"mso-spacerun: yes">  </SPAN>It is a =
popular=20
movement, which has full support of peace-loving people. Its hospitals =
are=20
rendering exemplary services to people; its schools are eradicating =
ignorance in=20
Pakistan by spreading quality education. =
</SPAN></FONT><O:P></O:P></SPAN></P>
```

```
<P class=3DMsoBodyText2><FONT face=3DArial>Having said all this we would =
like to ask=20
what is the difference between Afghan Jihad and Kashmir Jihad? Why the =
US=20
supported one Jihad so overwhelmingly, and why it is condemning the =
other Jihad=20
so vehemently? Do its standards change so easily when it comes to its =
interests?=20
It supported Jihad in Afghanistan because it was against USSR, whereas =
it is=20
condemning Jihad-e-Kashmir because of its ties with India. Then a very =
important=20
question, why the US attacked the innocent people of Iraq, why it rained =
Cruise=20
missiles on Afghanistan and Sudan? Do its laws against terrorism not =
apply to=20
all such acts of aggression? As far as we are concerned, we are fighting =
for our=20
freedom.<O:P> </O:P></FONT></P>
<H3><FONT face=3DArial><SPAN style=3D"mso-bidi-font-size: 10.0pt"><FONT =
size=3D3>Prof.=20
Hafiz Muhammad Saeed<BR></FONT></SPAN><FONT size=3D3>   =20
</FONT><SPAN style=3D"mso-bidi-font-size: 10.0pt"><B><FONT size=3D3>Amir =

Lashkar-e-Taiba</FONT></B></SPAN></FONT></H3></DIV>
<P><SPAN=20
style=3D"FONT-FAMILY: 'Arial'; mso-bidi-font-size: 15.0pt; =
mso-fareast-font-family: 'Times New Roman'; mso-ansi-language: EN-US; =
mso-fareast-language: EN-US; mso-bidi-language: AR-SA"><BR=20
clear=3Dall=20
style=3D"PAGE-BREAK-BEFORE: auto; mso-break-type: =
section-break"></SPAN> </P></FONT></DIV></BODY></HTML>

------=_NextPart_000_00DB_01C1920A.EC82AE00--
```

466

```
From Abu Hamza Tue Jun 26 06:43:52 2001
X-RocketMail: 00000021;R---S-----------;6232
X-Apparently-To: seifchapman@yahoo.com via web4406; 26 Jun 2001 06:46:40 -0700
(PDT)
X-Track: 1: 40
Received: from dav28.law15.hotmail.com  (EHLO hotmail.com) (64.4.22.85)
   by mta542.mail.yahoo.com with SMTP; 26 Jun 2001 06:46:40 -0700 (PDT)
Received: from mail pickup service by hotmail.com with Microsoft SMTPSVC;
        Tue, 26 Jun 2001 06:46:40 -0700
X-Originating-IP: [64.36.82.26]
From: "Abu Hamza" <affairsofmuslims@hotmail.com>
To: "Affairs of Muslims" <abuhamza20@yahoogroups.com>
Cc: <amir@eisa.net.au>, "Saifullah Chapman" <seifchapman@yahoo.com>,     "hammad
abdur-raheem" <hammad6@hotmail.com>,     "saff" <saff@bih.net.ba>
Subject: On-line video of Bin Ladin training camp on Al-Jazeerah
Date: Tue, 26 Jun 2001 09:43:52 -0400
MIME-Version: 1.0
Content-Type: multipart/alternative;      boundary="----
=_NextPart_000_05D7_01C0FE24.825BB5A0"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200
Message-ID: <DAV28IjF9Q0Z3FZLvGV000033a6@hotmail.com>
X-OriginalArrivalTime: 26 Jun 2001 13:46:40.0657 (UTC)
FILETIME=[6D9D6010:01C0FE46]
Content-Length: 520


This is a multi-part message in MIME format.

------=_NextPart_000_05D7_01C0FE24.825BB5A0
Content-Type: text/plain;
        charset="iso-8859-1"
Content-Transfer-Encoding: quoted-printable


Bin Laden Special Training Camps [Video, Arabic]

URL: =
http://www.aljazeera.net/mritems/streams/video/2001/6/20/1_40521_1_12.ASF=


------=_NextPart_000_05D7_01C0FE24.825BB5A0
Content-Type: text/html;
        charset="iso-8859-1"
Content-Transfer-Encoding: quoted-printable

<!DOCTYPE HTML PUBLIC "-//W3C//DTD HTML 4.0 Transitional//EN">
<HTML><HEAD>
<META http-equiv=3DContent-Type content=3D"text/html; =
charset=3Diso-8859-1">
<META content=3D"MSHTML 5.50.4522.1800" name=3DGENERATOR>
<STYLE></STYLE>
</HEAD>
<BODY bgColor=3D#ffffff>
<DIV><FONT face=3DArial size=3D2></FONT> </DIV>
<DIV>Bin Laden Special Training Camps [Video, Arabic]</DIV>
<DIV><BR>URL: <A=20
href=3D"http://www.aljazeera.net/mritems/streams/video/2001/6/20/1_40521_=
1_12.ASF">http://www.aljazeera.net/mritems/streams/video/2001/6/20/1_4052=
1_1_12.ASF</A></DIV></BODY></HTML>
```

GOVERNMENT
EXHIBIT

1?2

------=_NextPart_000_05D7_01C0FE24.825BB5A0--

From affairsofmuslims@hotmail.com Wed Jun 27 16:39:06 2001
X-RocketMail: 00000021;R---S-----------;8493
X-Apparently-To: seifchapman@yahoo.com via web4401; 27 Jun 2001 09:39:06 -0700
(PDT)
Return-Path: <affairsofmuslims@hotmail.com>
X-Track: 1: 40
Received: from dav5.law15.hotmail.com  (EHLO hotmail.com) (64.4.22.109)
   by mta316.mail.yahoo.com with SMTP; 27 Jun 2001 09:39:06 -0700 (PDT)
Received: from mail pickup service by hotmail.com with Microsoft SMTPSVC;
         Wed, 27 Jun 2001 09:39:06 -0700
X-Originating-IP: [64.36.82.26]
From: "Abu Hamza" <affairsofmuslims@hotmail.com>
To: "Affairs of Muslims" <abuhamza20@yahoogroups.com>
Subject: Shaheed Arbi Barayev
Date: Wed, 27 Jun 2001 12:37:07 -0400
MIME-Version: 1.0
Content-Type: multipart/mixed;        boundary="----
=_NextPart_000_0348_01C0FF05.E0ECAB60"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200
Message-ID: <DAV5LI2yL4l4VsA6Xkt00000d6c@hotmail.com>
X-OriginalArrivalTime: 27 Jun 2001 16:39:06.0360 (UTC)
FILETIME=[AE8C1F80:01C0FF27]
Content-Length: 42796

This is a multi-part message in MIME format.

------=_NextPart_000_0348_01C0FF05.E0ECAB60
Content-Type: multipart/alternative;
      boundary="----=_NextPart_001_0349_01C0FF05.E0ECAB60"


------=_NextPart_001_0349_01C0FF05.E0ECAB60
Content-Type: text/plain;
      charset="iso-8859-1"
Content-Transfer-Encoding: quoted-printable



------=_NextPart_001_0349_01C0FF05.E0ECAB60
Content-Type: text/html;
      charset="iso-8859-1"
Content-Transfer-Encoding: quoted-printable

<!DOCTYPE HTML PUBLIC "-//W3C//DTD HTML 4.0 Transitional//EN">
<HTML><HEAD>
<META http-equiv=3DContent-Type content=3D"text/html; =
charset=3Diso-8859-1">
<META content=3D"MSHTML 5.50.4522.1800" name=3DGENERATOR>
<STYLE></STYLE>
</HEAD>
<BODY bgColor=3D#ffffff>
<DIV><FONT face=3DArial size=3D2></FONT> </DIV></BODY></HTML>

------=_NextPart_001_0349_01C0FF05.E0ECAB60--

Case 1:04-cr-00385-LMB  Document 339  Filed 09/06/13  Page 106 of 134 PageID# 626

------=_NextPart_000_0348_01C0FF05.E0ECAB60
Content-Type: image/jpeg;
        name="barayev2.jpg"
Content-Transfer-Encoding: base64
Content-Disposition: attachment;
        filename="barayev2.jpg"


/9j/4AAQSkZJRgABAgEASABIAAD/7RIYUGhvdG9zaG9wIDMuMAA4QklNA+0AAAAAABAASAAAAAEA
AQBIAAAAAQABOEJJTQQNAAAAAAAEAAAAeDhCSU0D8wAAAAAACAAAAAAAAAAOEJJTQQKAAAAAAAB
AAA4QklNJxAAAAAAAAoAAQAAAAAAAAAACOEJJTQP1AAAAAABIAC9mZgABAGxmZgAGAAAAAAABAC9m
ZgABAKGZmgAGAAAAAAABADIAAAABAFoAAAAGAAAAAAAABADUAAAABAC0AAAAGAAAAAAAABOEJJTQP4
AAAAABwAAD//////////////////////////A+gAAAA//////////////////////
/wPoAAAAAP//////////////////////8D6AAAAAD//////////////////////////
A+gAADhCSU0ECAAAAAAAEAAAAAEAAAJAAAAACQAAAAAA4QklNBBQAAAAAAAQAAAABOEJJTQQMAAAA
ABCHAAAAAQAAAHAAAABXAAABUAAAcjAAABBrABgAAf/Y/+AAEEpGSUYAAQIBAEgASAAA/+4ADkFk
b2J1AGSAAAAAf/bAIQADAgICAkIDAkJDBELCgsRFM8DQM8BMDA8VGBMTFRMTGBEMDWAwMDAwMDAwMw
DAwMDAwMDAwMDAwMDAwMDAENCwsNDg0QDg4QFA4ODhQUDA4ODBQRDAwMDAwREQwMDAwMDAwREQwMM
DBEMDAwMDAwMDAwMDAwMDAwM/8AAEQgAVwBwAwEiAAIRAQMRAf/daAQAB//E
AT8AAAEFAQEBAQEBAAAAAAAAAAMAAQIEBQYHCAkKCwEAAQUBAQEBAQEAAAAAAAAAAQACAwQFBgcI
CQoLEAABBAEDAgQCBQcGCAUDDDMBAAIRAwQhEyBFQVFhByJxgTIGFhqRFBJVSsWWIzNHKC0UMH
JZJT8OHxY3M1FqKygyZEk1RkRcKjDYX0lXiZfKzhBmNrKTFDKWRUbVdrJxTCcV8XV9V8MmKmoN
lqa2xtbm9jdHV2d3h5ent8fX5/cRAACAQIEBAMEBgQYBwYYFNQEAAhEDMiEEUQFhcXEiMQSBkF
obFCI8FS0fAzJGLhcoKSQ1MVYM3M08SUGfqKygwcNCLsRJNUoxdkBrVU2d2Ki8r0eW9N1+NG1KSF
tJXE1OT0pbXF1eX1VmZ2hpamtsbW5vY3R1dnd4eXp7fH1+f3O90Qdkw5Jic1AAIT4jf8oEVRG9lt
qeW+m930tylRaHyLbba3E6NMP1iSxw9zv81N/OXBjw4P5DZw4P5ZD9ggj9Jt+kpCvIsMPDXMOdtDjprPuV
Zs6K+3Nrrcw7W1207rGmt3Hth3taoV2FYIcDBU9yb99zn/+QcqdqdmGCHP18AVLO3vO84o0mwl11mSHt5v8aAn79zoJ9MQHT
qeW+m930tylRaHyLbba3E6NMP1iSxw9zv81N/OXBjw4P5DZw4P5ZD9g
Zs6K+3Nrrcw7Wl207rGmt3Hth3taoV2xFYIcXg99zn/+QqdmGCHP18AVLO3vO84o0mwl11mSHt5v8aAn79zoJ9M
uY9gdY4ghsBh3gfTkQxn+chqlk/Lq3Cse552uczcZDfznt/P2KVWZk/pGuaHB3DAZA7t0fCq9RtH
T+n3Zd7RZ6TqwLCSRL3envc5m3G3G3d7/AE1nWZ22RBNx2WT7nAbWw02yxn5v8tERkUEi6da/qVGNu
LmOyLq2gtpYfdqeC9/6Nrz2sdv9liyl31d3loxnMtqdh9FJJ9ozng9j/A2AD1ll0a1047Ht/T5f5i4u1047Hti/TtZ5i04+jiuE1047Ht/
wDSLKqp+1l3oPHqn3PIILHSYJJdy+p/7r6/+213WBiiU0V10tHp1tDGQI9rgGK8kMY13PVjmS16R
0LpnTq/Tx8Wio/vMbueP/Qq39Q2+tuVT69p+t/EXlT9J9sS2F/eszYZ+txg8ddtDjprPuV
g5nRKXAvorDL2+70XmWkDn1Pc73N/qvcvLuvX5H5+sXdOAcIr1A0UkUtd76vpbu5r5t4rg/9pp92g91R
T+n3Zd7RZ6TqwLC/SSRL3evnc5m3G3G3d7/AE1nWZ22RBNx2WT7nAWw02yxn5v8tERkUE...

LiPGO34IxFA2tkdvB//Sp5nUcPpm7Iy7HeqQH14oHve3+RDfY3X+fs/R/wDGrnBZXn5L8q7GY2q5
vquqrrJqZsPps9f0/wBK7d6m+672Pts+gqfUej57Hb6d+YHHc54E2bv5bATZ/bQMLPzKaH4tV7m0
OsLxQZ2+o0H03OZNddj/ANxtn0FHjjGrBvxZJwnCXDONef8AL1Oy/Hf06i9r7GWVO2XUXs1Y9rh7
XMZH0d7vz6/+gqHX8zIbYcGDSyxtdtlQ9rQHNbeytrW/o/R3Weq3Z+j/AJvYrOBcOodNpwXPtZcL
GiydGBn6S15rHu9lP6VZORk2ZfUL7iP5414Y7sPzGf2K/YnAaqkfSKVQIZJ1B7JWs9XHAn3N4J8W
+3/qU7XNLQ5v0CI17EfvJA/THnP3hOWoMLHc7qNNBoOXNjZx2Eg2CdxrD2+5u9v5y7zH+qvQrXGm
/EyOiZjgfRLrPVY7xa0uNlF//CUet665j6tYTbs6zqWZTa7pmKduTbUSAxzw70fVfX+mbTuZ+ksr
/m/8J9Nen9MY2wb6cr7ViEA1F00dxy62v9Hd/It2VqHLI2AGzy8I8JJHXR4jrZzeg47en24baWXa
U59bn2C5o9zv0th9Srn30ub7P+LWLgNa3KGblAtoY7fW/Vjnx9Gur/CObp7vSXrfVulYPVunWYGY
2a7NWuH0q3ifTvrP+kqn/M/Rfzb147k4F/T8u7DyW7b8Z3pvB8voOb/wdjf0laMKquq3KZWDuE1u
Qci80jbXS07G+G4ud/25ZY62613+k/4P00hw0d9o/H3IDSRU/wAbHbR8orRi4b3AdiAPxFw2zbp
xyefAqpl1QQKxpa7aQTEE/D95XBp8e6FkNa/Y13DiAeySjs//9PnM7NoxH1NyX7brG7n+m1zg2f5
ve5o/P8A3Wb0v2njHR91Ti06teWyCPJ5asF2X1voNeQWufoTY+RY2Jhodu+m5v8Awf8A4Imoyrm3
Npx5a97w6tobJNkjZG7dueoDhHRuR5/INDET/wCa6fV7mPbVZQaWfmu9ICXBwez6TP8AgnPZZ++s
RpjOE9zH3hWX13ilxucfdxW40Bbs/Q7fePzNrqvaqlwIuLv3S0z8VNCPDEC7YMs+OZlXDfRK00Fj
6ho/V1c8H/SVu/rtUWhnm8RgmXNENPIP0dp/qouU1wLb2cth33cqrl2MfbLPogAT+KLG3/q/9Y+od
AyTfhu0fHqMJI3bT7fc33MXpf1b+s/Tup0hzGsovcSbagA3WZ/NDWrx9a0NmXYoZk4x902IcRwSP
3gmTheo3ZcWXh9MtY/jHyfbW2tcZ4XLfXzoDs3HZ1bPkA9XD3JIkwHY5Olhd/3Wsd/wBs2/8ABrO6
F9ccq+11T6K7MxwAxy9xbVI+k+7a2xzvT+n6bNqLq63X20H2i11740YNK5nd6np/nW/y/5v/R1K
KyPAjoyyMSKGoL5JaLMe2qm5hY9ha Xsdo4F/ubI/e13KBvrPqQ0bjMuI7SeSt7/GDhHF6xXkNGuU0
2QO7voud+879J6i55gDAGgEk/ve3X+0pomwC15jTaZYBpyfAJwWkOZqwu8IBdr/VrQwHfnkNHgNP
/MkWzpl2TiuzaywVYrwywF2143Bp9Rrf9FXLPU/4xIkDdWpf/9TDyMXoTn20c6ja4gFj7QIIcXtM
7t2/81JZN0J+r3Y/p7QCOvaPaANvuY+t3o6N3+l/OfnrhkIVHHa+fB+jv/zf+c9F1gMHUntY5ry2
usOewNa0uI3uLGs/N92z9/8AfWTeAbngkAOZyex/NVNJWY/KO9IN9d+rqVkuxZcIeGkgO0OkgLLSS
RQeilYr/AKLr2cY/BV0klB10mC5zx6RILYc0dyZja0/vL0fpPVOsZAbU7BNNzY35FzSGBsdqW7bL
7X0/M/RVf6SxeSJKHLv4s+LgocX9j2v15xK2dYpubYbMmykNuZ6kWhzT7LKxtcxtlT2bP5ur/Rr
no5BLh4hwkfMj/ySy0k/HfALW5a4zTq11kOLQ0nsGRB+P0VeEXa3a3pr6zYXYjbjuuI/m9/sLmufHs/
wX0nf6Nc4kia/FbHr5P/2QA4QklNBAYAAAAAAAAAcAAAAAAEBAP/iDFhJQ0NfUFJPRklMRQABAQAA
DEhMaW5vAhAAAG1udHJSR0IgWFlaIAfOAAIACQAGADEAAGFjc3BNU0ZUAAAAAElFQyBzUkdCAAAA
AAAAAAAAAAAAAAD21gABAAAAANmtSFAgIAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAA
AAAAAAAAAAAAAAAAAAEWNwcnQAAAFQAAAAM3desc AAABhAAAAbHd0cHQAAAHwAAAAFGJrcHQAAAHQA
AAIBEAAAAFHJYWVoAAAIAAAAYFHJYWVoAAAIAAAAYFHJYWVo gZdYWVoAAAIAAAAYZ2RYWVoAAAIQA
AAAYYzGQAAAAEhZ1MZWAAANMAAAAAAahZZPZXxAAAAJGblWBkAAADkAAAZKAAAAACeMAAAAHhZWVo
 JHRlУ2gAAQNMAAAAAAhZZXXAXXAXNMAYQAAhwxwEAXNMaDDFTFXQAAJGblWBkAAADkAAAZKAAAAACX
ZWZlcmVuY2UgVmlld2luZyBjb25kaXRpb24gaW4gSUVDNjE5NjYtMi4xAAAAAAAAAAABBWWAAAAXW
zFhZWiAAAAAAAAAAAAAAAAAAAAAWFlaIAAAAAAAG+iAAA49QAAA3WWFlaIAAAAAAAAAYpAAAULQAABb
AAAYl2lhZWiAAAAAAAAAAAAAAAWFlaIAAAAAAAAAAAAYpAAAAAAAA81EAAAULQQAABBkXZXJzAAAA
ABkXZXJzAAAAABkXZXJzAAAAABBkXZXJzAAAAAAAAAAABBkXZXJzAAAAAAAAAAAAAAAAAAACxS
ZWZlcmVuY2UgVUgVmlld2luZyBjb25kaXRpb24gaW4gSUVDNjE5NjYtMi4xAAAAAAAAAAAUmVm
ZXJ1bmNlIFZpZXdpbmcgY29uZGl0aW9uIGluIElFQzYxOTY2LTIuMQAAAAAAAAAAAATAlW
AFAAAABXH+dtZWFzAAAAAAAAAAAAAAAAAAAAAACxXwAAAAJzaWcgAAAAAAENSVCBjdXJ2AAAA
AHIAAAAABBAEBCAENCgwOEBIUFhgaHB4gIiQmKCQsLjAyNDAyNDA4Ojw+QEJERkhKTE5QUlR
AHIAAdw8ORyTQOZLaKbd/wAAAADADFBW8BAVQAUFTBAFSVAKnpxVDAAOD8WEEBAxXAXAY
FAAAABXH+dtWFZWVAABXAXBAVQAUFTBAFSVAKnpxVDAAODdXAYEVAHAXNMaDDhFTFXQAAJGbl
dXJ2AAAAAAAABAAxAGHgAjCAQLAQLAQYACoRAAoRALAQYAC
AHIAdwWBAA1BAgGJoKqCAQLAQLAQYACoRAIQLAQYAiooQLAQ
YwLAoAQQ7BEgEVQRJEBHEEfgSMBJoJoEqEqE0BMQE0WBwThBPAE/gUNRwFKWBVWBQUBxBAYF
tQXFBdUF6QXwBtYHAtAHAAHAWdBwWWBAYF
B6WHvvSFB6IBHghMCGeBWBBPhWBBAQYACoRAIQLAQYAiooQLAQ
5QnXBeJwBlQQCQqAIAQ0YAxXAXAYFAYFAIQLAQYAiooQLAQ
DI4MpwzADNkM8W8ONSNnQ3ADNlA2c24gJDSTUjMlAXAYFAYFAIQLAQYAiooQLAQ
eg+WD7MPzw/eAkQjhBDEGEQGQfhbUER0RJERMRRMPFEW0RjBGcEckR6IBGw4eWbDrY00g7uDWkPJQ9BD14P
jxayFtYW+hcdFOEXZZReRJF64X0hf3GBsYQBhlGIoYrxjVGPoZIBhlFFS8kRm3d3aBBoqSl1Eadxqe
GsUa7BsUGzsbhwlHHDCDhwCCoCVHx7HKHKVXbAXNIbFZd5CBhFYOyOIQBdQAfVAIQLAQYAiooQLAQ

Ph9pH5Qfvx/qIBUgQSBsIJggxCDwIRwhSCF1IaEhziH7IiciVSKCIq8i3SMKIzgjZiOUI8Ij8CQf
JE0kfCSrJNolCSU4JWgllyXHJfcmJyZXJocmtyboJxgnSSd6J6sn3CgNKD8ocSiiKNQpBik4KWsp
nSnQKgIqNSpoKpsqzysCKzYraSudK9EsBSw5LG4soizXLQwtQS12Last4S4WLkwugi63Lu4vJC9a
L5Evxy/+MDUwbDCkMNsxEjFKMYIxujHyMioyYzKbMtQzDTNGM38zuDPxNCs0ZTSeNNg1EzVNNYc1
wjX9Njc2cjauNuk3JDdgN5w31zgUOFA4jDjIOQU5Qjl/Obw5+To2OnQ6sjrvOy07azuqO+g8Jzxl
PKQ84z0iPWE9oT3gPiA+YD6gPuA/IT9hP6I/4kAjQGRApkDnQSlBakGsQe5CMEJyQrVC90M6Q31D
wEQDREdEikTORRJFVUWaRd5GIkZnRqtG8Ec1R3tHwEgFSEtIkUjXSR1JY0mpSfBKN0p9SsRLDEtT
S5pL4kwqTHJMukOCTUpNk03cTiVObk63TwBPSU+TT91QU1BxULtRB1FQUZtR51IxUnxSx1MTU19T
qlP2VEJUj1TbVShVdVXCVg9WXFapVvdXRFeSV+BYL1h9WMtZGl1pWbhaB1pWWqZa9VtFW5Vb5Vw1
XIZc110nXXhdyV4aXmxevV8PX2Ffs2AFYFdgqmD8YU9homH1YklinGLwY0Nj12PrZEBklGTpZT1l
kmXnZj1mkmboZz1nk2fpaD9olmjsaUNpmmnxakhqn2r3a09rp2v/bFdsr20IbWBtuW4SbmtuxG8e
b3hv0XArcIZw4HE6cZVx8HJLcqZzAXNdc7h0FHRwdMx1KHWFdeF2Pnabdvh3VnezeBF4bnjMeSp5
iXnnekZ6pXsEe2N7wnwhfIF84X1BfaF+AX5ifsJ/I3+Bf+WAR4CogQqBa4HNgjCCkoL0g1eDuoQd
hICE44VHhauGDoZyhteHO4efiASIaYjiOTOJmYn+imSKyoswi5aL/IxjjMqNMY2Yjf+OZo7OjzaP
npAGkG6Q1pE/kaiSEZJ6kuOTTZO21CCUipTO1V+VyZY01p+XCpdl1+CYTJi4mSSZkJn8mmia1ZtC
m6+cHJyJnPedZJJ3SnkCerp8dn4uf+qBpoNihR6G20iailqMGo3aj5qRWpMelOKWpphqmi6b9p26n
4KhSqMSpN6mpqhyqj6sCq3Wr6axcrNCtRK24ri2uoa8Wr4uwALB1sOqxYLHWskuywrM4s660JbSc
tRO1irYBtnm28Ldot+C4WbjRuUg5wro7urW7LrunvCG8m70VvY++Cr6Evv+/er/1wHDA7MFnwePC
X8Lbw1jD1MRRxM7FS8XIxkbGw8dBx7/IPci8yTrJuco4yrfLNsu2zDXMtc01zbX0Ns62zzfPuNA5
0LrRPNG+0j/SwdNE08bUSdTL1U7V0dZV1tjXXNfg2GTY6N1s2fHadtr724tDxODyBRdt4c3qLf
Kd+v4DbgveFE4cziU+Lb42Pj6+R5Pz1hOYN5pnH+ep6DLovO1G6dDqW+r163Dr++yG7RHtnO4o
7rTvQO/M8Fjw5fFy8f/yjPMZ86f0NPTC9VD13vZt9vv3ivgZ+Kj5OPnH+1f65/t3/Af8mP0p/br+
S/7c/23////uAA5BZG9iZQBkgAAAAAH/2wCEABALCwsMCxAMDBAXDw8PFxsUEBAUGx8XFxcXFx8R
DAwMDAwMEQwMDAwMDAwMDAwMDAwMDAwMDAwMDAwMDAwMDAwBEQ8PERESFRISFSQODg4MDAwMDAwU
EQwMDAwMEREMDAwMDAwRDAwMDAwMDAwMDAwMDAwMDAwMDAwMDAwMDAwMDP/AABEIAVBwgMBIgAC
EQEDEQH/3QAEAB3/xAE/AAABBQEBAQEBAQAAAAAAAAECAAMEBQYHCAkKC//EAL/qAAEAB/EQEChM
IyYVUVGcKoRYGvIL+Lu4VHQ3F3OpJ5Mdy2RjztKg4xg0ytv1iL9Cjz1Y4LX3JhdMf2Ox8A4/IZNc
8Jb8iF1sQzGkgTYKeGPWGJQhwBbhEVBEd9TpGYl4rNy/bKCMBEFKs0T10+VS/lqDY+Ukl3S0uvUv
Njn0RY/OeAI8IIahX6U7sW/bBAO+0/Pl2RIw21xXuPG5/bK7dQF8iNpEYX23ENNMPLTPiMI7bd5f4q
dx5B8kE2WVjd3I40pUjlgtEuGoJCrWXB44BH7yXiFBc5pqGM4th56ojMl7xujVVnMZOp57Ioe3bA0
I7+aVqpseq8SlwMeHZL1rXs2MBcRrHZBF1rW7YXCCZlbmm/2HhYKWZERRE+aEpKpIbRLR3WcYiAa
mQ3mUxLXSABuGoPdJSxLts8TwHstsc0Etrr/35ENodQBb+bMeKet3pt9QEPEHxSSzc8emN86d
+8qTMobtrTJETCq35DNug4+5CT9hAczQ/wAU1rrR7DJJOiA5s2G2qRW2d45Dh/VUKHB30iYI580zr
C1vt15USUxpvxiN7JDcSBp/1Se+GxBvFoThNTqQmLhpYpw7JJYRJF/uovmisdWUnX3qVWhJMa
8B59rnFglA0nzRpxqc/Ztd+dVoVOlwaN/rkpBp3QT7R27yq9ttFRPqPAHY1GlJMna3He/s1hIPyX
A+t57yiugzestue7FxpLHAhzu5/tTV/pH1UqsqZf1BOaw6ikaFw/es/cZ/1TgCNKlVpQNvQPyW
Ll5LvSw6XW2dw0aD+s76DGrpMH6nZxaH5j2UnT2t08x/Y9i3q2V49XoYtbaKf3WiP7Tvz3dqNWQy
/wBTeXNIjaZA/sp3D/hKMu3pa1X1c6ZUZsrdkOGh3uLWn+wxXmVYtIDa8WpgYIb7ASB/Wd71aaXH
n5JyxrhqE4ADoxGRO5a/2hsfQaPIAKJGJyf0mUs5x77Ddtt4tRXN5sQ+4ikaF0/4g9FX4o34PTLY
3VurPaCQP/IIF3RNDZiWb3CAKxDdI/e/fR3GxgAcPnypV3Bvl81TTGJ6Js93HexplMPFjuCHCE3
Nb3tkad54XR7qr2encwPHmASFUv6RSQ51TjT 7M7/ANlYYcZGx4kQ/ulwm4TTYBNdk8tntopPrIbt
0oVu1oqdscPaNQD/AN+d+chlgkTrKF1ouedYDRmvvZ56KGQ95ynkakkT4xCudWpNd9d4EB3tJ81kZ
V8XGCAZ580oj1FknL0D+83G20DZOvmm9Zo1c4AfwWdTlWuc9gGhEE/EprmQ4tc9u0abQTMIrBs3z
mUAmDPh3KYZ9bi0Na49/DVZrsirGJGMAXcbjrH9VNReWzY4yewHiiq+lupZlW10BfU5odxxJGo/Nc
nHUhGlbu2sghZFmRdbYXuJcB3PCPjWvcdCPgdEFbnR1GZzdwlrwTwCP+krAyKHEjcBHjoVUpD8h8
iAWwA3snya9h2Wsme/kha/h6hviyvSHAhSJB0OrToQsQ1WVkGuyGOOhdxP7rkfE6k71PTt0PHx/q
pLTo6exnj3hJL1GeHaUk7RV+L//QK/1GtLnjcByDogy6xhLhtP5rTzCJstyi4GWf3qBxrGPZuJMa
GOP7ShZwypY6YYJgSZUb/wBHUHuEk8RqUVxdS4GfbrIHKiXOdHgexQS1askvG9zS2NIR2WOncO3C
T2ObpGvMfFNWb6tHMO0941JTcry6g6HSONOyLY+kNc+s+09vNZtthB0ZM9//ACSIKnO0DpI47JEo
pJ6rX0DmmD4KO+pjjucYdyOQhU4jTYXFxAbOniUF+NdXaLGWbmnUjn+yqlt0qaBO4Hw8UOwP2bQ2
JMkoVtxYQ4tLY8VB+VIbL9Hc1JA80wp94dJc4cp4dzHtmFW9YB/i1HHqFpsreHjSG+CSWbi9p0Mj
8VL12PbtIh3ihvNogtEE6EHhQDLHkmAI0QS22RWdDubpJCd1sP1v0QNPFBa2NQZI0cEC+99Wse0x
CNobGQ9xaSAVDGLnMIdo09j4oTMp17hptbxCMWE7dp0HI7IIYWUPc4Pa72AWw+SXpHeWtOnb/wAx
RWsO0n1skrwotfXu2k7T4co2qvtXqNzDsgx+KTrnPdtaC3b9I91M08zA0B81MNG0xGvcpKIWYTYQe
CIClaywe4kNaPHQqBcxlbnud9HwWXbfdkGXAlnAB4hPhHiQXXN9DQNzpPiCsG/rXUVtVgxNnpNMD
cDOisMG0fwQ7qaw02NHu7n/ySlEAP6y0sB1nqDiG2hrB3ezxVbIOX1DJZi483XvPA/6p37rE+w3R

XUJteYYzxcuu6L0ijplAEb8l4Bvt5l3+jb+5TX/6lTqA0AQfFj0T6uYfTGttsjIzoBdYdWMP7tDf
z9n+kWtay6wFoeWk9wk147KbbB8Ell m7RV9MxgQ582uaIDnknX95WmtDIA4SBMJxyhookncpG8cq
Qj4KA0+CmNeyK1XHKYiVIJEapKRurDhH3oDsZvLfaf4q1CYhJNtItfV9IHwJGv8AaRa7QNDwjloO
hQLKD9Jp15KCrtWRjVZDZIEjusfJxbqHFwG+nkOHI/kub+ataqxzTtd961cJBc2Nw+k3sW/vNQMQ
VwJHk851CtuViOrEbhqCfELh8mwsyXgiSNAT4/vL0fLwW2NNtOhM7qx/0nN/8gvPutYX2bMew03f
na8wUwCjRX7x0/RalV/pNIH0ncl02bXFxMkqtGsK5issDwSESi0tdmFuKWgkK3RjNNQniFbbXv5C
jZ6lQLGiW+SZxM4xga0lvs5YJb93aP3UFg900P4LTMLUx6bXVFro3QXNJ00/dQDQzdqJd3HmlxKO
Pb9FPRlVNsZbUwuc7VzQI1/6hGy8r1oFIZqW6GRAUsOnLewhjQGDTgKzbXyFT3TfovodT
q5VTDabK9jnVtIId4FUrKmuzBqWAGNOY/eXSdOroaHekdwnVUrwG9Tus2g1saCRHeEQd1pgJED+s
2vUxfF/0dnZJZP2izxP0tySfw+Kz3I/uv//RsBrzo12086+KGcm9kh8bRqVP1NxAkT2dwhXVOcxz
g4SO3aFCzsDc6xu95012kJY5a+0Cw7mO8kQiRaaD6W0iTxJTw1hgxAnVBKnG4v2hvGg8NFL1HxLn
weANEKy2IDTr4oZvqJ8XDT4FJFpnu09x07nug1mzeSHFze3wRW7LGy72/wBynW2pum6UlIXB4Ouk
90M5AY7aJG36R50Vp1VL3BxJkHTXRDsxmTNRgnkchJX1Q3sZlwDLWcE91GrErPtj2N4J8EQMtY+H
/R58k5srg7gfgNAUFbbqfh4vp7WSXdzOiGymtgG1xBOkIlB3kgN2iCI8ki0McDy4kAAcpJtlbjWu
rcA6HEDaUGkWViHxu7kd1fHvGuhHcqF3ouYJIae7klI30I9zdCfuQzFk0sG4DS00Jq6BW8gWbgY5
80YFlRAAknmdf81JSGymgM3MBa7ulW60P2jWt3JhXLXENBZX7p48lSvzG0Q15AJkxoOUqQe6ckQW
N0HbwQXtO4bYbAkk8Kk/Osc7aywNB7AyYU6hjuE3Pfu8QZR4FW2PVZDveAfBOLOzbA7QQOFWtrxg
IpeXEegIgKuG2AoiIRq280uGO2jsS8y5/IgfylVabGECRHcFGqtsGhn4hTNFGQYtGx3G4aD+01Sw
IiKWksAZCg+We76TTyPJRuwb8Y7qnEsPLeRH8lPW4uGx3PY+Sku9Ut3omC2u+zLiRoKe+0n+dd/3
xbwqcXbg+D2VbDoNNLGNeGtaAAO8/nO/649XmboiQ7y4TVhOtrtDo9/PZw5/tfvIm0hunuI4SaY8
vI8/5yI0wZIPxCSGLN41Rmv8dEgAdZThnz/1/OSQUg11CkNNVVAAjhSaZ5SQyEn+KcJkwI+BRQyPE
poTgymKSlimKcpnf7klNayuXuA8JH/ftqk0HaJ5b38v5SlZILXjtoT5H/wAzUTIdI4KCUFrAwyDH
gua+tnSXZGOOoVNaTUCLoAa7b+a7+WuquZLHfydZ8lTcBtcx4D2WDa5p1lpSI6L4mtXyg1xaAdNV
rsgMEKv1XGGPl2MHDHlsdtCjUasHwUUujLAVKQZnLbV4yPuQXdSB5bPZHGF6pTHEaBs2aeHmhoyE
T6Fg7rPq1Nr9MAtEBw0JCt/Z3vq9StpHs3OcdQFSuwRW2dNeR4BdJiBpwQ2AWbQIQNaUujxfpPNs
zc+RTU4gH8Vaowc663fba0dwIk/+YrSZ0zF5bLXXxXWyjRoJKV+CuHxXxsb0Gcy48ngLJz7Qyy5o
5sdqFIBbBt01XP5b3WXOLvEwlHcImaBprbnpKUBJStZ//9JnscGgN501Klvv2xHs0JPwRXVX7dSI
70KDa11bD7ieCG/+RUFM6/2l3tAd30CM2p1o9Rx8g3zQMUjc4PrEAex3mVZrbtkuJlJXk1hT6txa
AdOT2TPwnMPHtPJVre6PzoFH/wAkolzoG47p7pKRV6k1sjt8U9VL2WQ5oLeZ7qw1p91hO3aJPwTu
c0012hzSyw7WOBBl37qNK0Q2VgTBISpazd7jPgjkOcTuEFvdQYHbdrWyJkFBSSyoPjcNBwFWdXjl
7mtMkchWX3mIcQD5qturNvIDHwFkkpb1GNs9ohJtddlhtMtnjuUV1bA7e1oDz9yC3R5Zw4dklV2TO
cBoPcO/ZV3v9xrdX8D2TbX7y3XcDydBCuMeI2vA00EiUFNd20C0PjXxUa6Q4gOeYHJ4Ktm2NGj29
yhuqY4yDA+5JK1r7aKbbC4uDGkt+AHtXMU2jJte+/wDSepyDquozx+pXEatFTp+5y4Zll9Nwq2kW
EgbFMn2qSA3Y5nZ2WYuOx01M2c+aIAQeEVvT+qVtLnVsJESN0c/Rb9FM3F6i8uilvscWk7xyPzf5
Xv8AYjRUNNKR9iU7HSYlMas4s3nH03QGCDq4ua1v/RQsi52K8V3VbqLYBAd4JfRdpvbbHCcFVq83
HLY9QCex0RG5NciHBze8aoI3/rN2m4ubtdq3g11Rpw225dbpQrdQd5I/dH0mpYrm12753NJ3AcwFf
x/5+2xoG0wGHxn3OTonWv3kHrR0dNjWu+iGjyhGalzToPmq1OupH4q00jsU9YYaXd2g+X/mLk4nh
ug7N7J43dp++5Sa09iR5CAkhTSe4Rmx+aY/FRAIEkpCPD5o1SzPPP4JpgwVHfGgnz8EvVA0c0/cSE
VM9UiJ17qLHAmWvBb2HeVOATpyQ0ihaANZ+KlomKYQmNyOpUuUxSTIqWPmmjjwTnxCYj/AH+aCVnD
8QQqF3tG4j6OsrROqyeo2urYKwJ9QmfqNqRNAlMXkPrDjur14raK7X7jYdXl3u9rnfmM/kMWVjW+
yJ4OnwWj17qDciwYfVbv5ozYTT9d+61YzHGt8Fr8bfRVpqczCXCGQ+twtdrhR3PgYN MZREuaCeT4Lm6L9rg4LX
ryR6BeTAA/FMIpsCVhB1F02FrANggOWhgva2iNCCIhc7k331ziDo/UhFws7JMVBu4njwRpPHHYu5
vLSSDwpC0uCjjUuZUfVdusdqfAD91qmGNbxwgglFdZsaXHsFgXXbXE8ySStDPydzyxvZDy+lXOw6
8uppO0fpWd4/eajHQ/3mOYJBrdzvtDUlCW+CSmprv//TMcix42ESKdpaNw8vgmADwSPaR270T6bQ
Z3SOwUDPTMMAM1HjsnL3tmUJgcXR9HzPipbg4bB9r9KeUlUu6wsIPj2SsucWgBsd2+f5qayONp+kOR
5JiG7mua6Y/12pKpq9QvyK8S1404hvHKcfpKFTWY3RPUxqavXXd/kFp3Fzddnt30Vq9rbKrb mOEbmER
8vasjp2Q++s1Ww5tbSGjtp/JTo7EArS7LH22NY4vguaCZO1hFrvfVMB1o0dyqOFutxWlh/SgkEny
KuMN+jY1d25TTuUha4+tLjInWQp1uqBHs3HSe3zUm41sEuAaG6wVFpaD7fpEcHxKCfBe17g5tgaX
NBgNHH9pTDmHVwh3cqDAQ07z5iBvVqeYfOnHjKSrU51rg6sCWmC091Jwc6trnaQYPgQk26snaGkE
eKle71Ki0CC77k1WydsLPaJPbwQ2ulHEFsk8TwnqYKq2MY8xGiIb8Nxj1G6cHsirTqlOOer+zcjb
AlplcrbiuHUsUSSy8sIeeOWsdt/f9NdV1XJrswbsXHe0vtEbuw/eXP8A7Ly7n12W5YmmPT2gw0A7
vb/bT4aArJ9Kejal1kvLXFmMC+sAwXn/AEf0vf70dtWYypr3Vl0tDiC0BweT7afe78z99Y7sbOFT
rvtvq3WaOrLBAaD7dv7n/CKVOR1Ql jMi6cdoIczbIfP+kTrHdTtV00MY/cTq8Es27Tp+dub9L99c
39Z7qn5FVbWkWQXuLonadram/wDR3rcqyMv0yGvoeS6Wbw5pDP8AR/8Aqi4RZPVui9X6hlHLPouJAa
1jHEQ0fR+n9NDiHdRBT9H6FQekvzMhvrOymO2rv06XtDT+ic3+XVvxmLuzUbJ2oF2Czl.BoCS1u5rf6i
30h/q/TKXBoL7N7h0se9zfb/AJicEO40UQD7WngSSSpG0j2s+ZOn+as6rd098uOqttfBAg+Y80lU
2AHzqdp+UKTWuk+pDp4gnQIQsbGbo0K17DxofGYSQ2GIrwg1TbAGhKB+k5AkcTynbYQNdEkU2gnVc
PE/7VMWDxI/FG0UlOxwggEJADsYI+agHif8AUJbm9xrVSUHsUzuJ8FGZ7pAkfABcfB5C1UuHNc0Ed0/KH
GpA4SJhK1UzTeSH6sHVPvkmErTTM8LB6rbFjnnilkn4+5zlugyAPxXLdUymsx8qx5AB3AA867m+1

NmdB/WXQDwWTY7IyrbuDY4n8U72uYAXa+Ci5rd22qXuPbsrAxLnNLrXAQNGooG5RMsIIV2y97ams
rkz9ILNc5zDHKu0OaQCO/PxTCOrLCXS2DrJHuB+AC1ML7OGNONVbbZ+fpA/zlVdjvIDg06q3iN6i
4trYAG8FziQAmks8Y726DDkOG0sFQPG50uH9liR9empwcQ8mYI0VqnFc0TY4Od4jhVeq3tooc0H3
FpQUd9nCdcDbJEkGfuVzI651XAVU/oamgNIHLj+duWUwyNefFFYxSCIYDkOtH5mUpKcM8Uk5Y//U
lWbB9L6Q5RCfbu0Mz7Uwrg7iRPgp1gz7QJ7+agZ76Imgg6t54Cg2h7HF2uvKnYy1tklpg8HslVdY
6za8adz5IKWOnvjQJMLXAGIBPKPbUeAfZPH/AJkh7Gtn3wG8N5RSjsr12phh7jssDpdD3Z1tDDru
c0GCRz+ct12Qxp2wfTGpMaSsCm70eqWGp5AL5BbpoU6G5Wy6F3MHF2V5NRkXVWT4S0/yVcooe9m9
jvd2b4qr0nKo/aN3rOne0ak6Eq9XbWM2zHqcHNEOaBrAd+b/AJ6EhqT0ZYiJA7sa7HXks13g+4dw
UC0Pa5wePcPkpdQsv6b1GvIqZvZkDa9p0cPouUrXepY59oAd+60ENVTEQBSJr+NyPtpIDiJI4JV
Sw7C0ke0mEVxgc6QIQYwzJrtfLB7m8gcD+ssr6125deJjuqcWNY4iws01I/R71oC4NG5gIPc8IF+
NXlVvqueTXcIJ5g/mub/AFEYmiCiRsU8xR13KYNt36VvnoVcZ9YcaPfU8eYIKx8vFuxLnU2iC0wD
2P8AKaUBTUCxWXqK+qdNtiLCw9w8QtHFswHHc+3d4ARC4ho3OA8SrppJG0EhNkPFfEk3o9nblY5A
FYDm9uxhCbkt3aNa00zMLjfSvZMud5AEqVdNxE7neYkoUO6aJ3D29VtdzYcAYniJ/wA1Sawbh6Vs
eIP/AFK4ScmtxdW9wI7gl5Z19RMkXP011JS4exV9H0IOsGrXGRoRyFnZfTmZNjrbq2OcddAAuVZn
9UI/n3tHghvzupAz67/vSA8VfR6J/RqjqKy3+qmxepCnIPTtvpsoEbjqdxLn+791nuXON6x1Np/p
DvmreCX3XXWuduc4Aknn1O1HVAqRD2NORlRGjpHJ41+j71cqvBO22Nx7tBjVcti5eTTpW6P5J1H+
atvEzmWAOsbsscR4kE/m7f3f3EOLVkOM706w2uHtMk8cJFrT4RwVba1wmAXAiCPH+ypNfY3Td7Rp
BE8fyvpp1sfCna2D7XlkeGqK226I1rx27EKv9o2yXMJgTAgou5jwCNAU1pHcJd4/OaR58hEaZ4P8
FXG4fRcSO/Cfa4nUz96SqbE6cymAEoQdHZSDmnxCSKZ6tPs+7sptsDtDpHI7obS3xTmCdDwkpluI
I8eQfFOdp1nVC9RpBB0jg+abfGvKKqZEmdUwcJgKJcRxrP5FFp100QU2WmGkn4/9+XmvX8452WKa
j7WE7gOAZXo5P6J4n81w08YX8p3m17gIdDnBx78uSPQpGxS11MqAjV3cpWuABn6LRucf+paoi+st
JnUKOU0twdx+nY4OPw/NagloNPq2Q7Tdx8fzeUephrcZ0H4SqrTDgfBSdc9zt0okIBA83epzQylpB
mOyNV10gAu3QQsXGyN3sdxz4JrrKmn2j5dpUfB0ZxlIAekHWatksBd+RZ2blfaQSeTz8FRqu9kgF
wP5URocQCdEhFEslhilkadkYY+Q9gcxpFf7/AP5FWcPDDyLLfodm93f+Yq9Zeylm6whrGjRv/fWt
RM9aHqWCPdxfsvxSVr9r4/8AofzvEcJI3Lsr0d3/1ZF8/BIWvbqIDRqfghAOYC2dw117ogADJJkx
oq7PYSOv3s0M+HxQHF7He8jz8ZUQawQXAzOkTylZX6hJ4j8iSkzb3EwSS0xoiF9bnkfPw1VMAh3h
CdxBmPpd0rVqt1a/08N+waOgHxXPB+LYONsBbYx25rwT7vo/oXNW3mD1MGwj82IJ8Vmv/Y9fT6XB
r3Zz93r7votIP6J1DWf6RifDqqWye/DZZkurqioPrDmjxMfvKGNk06JfVYbG3kBwua0zoTub7v30
smyvIoxnMaWu2au1E/mp8Pp7cnJrrcD6TSDae8fup0imEdQQ6r/rFj9Uy6QafTZXqJ7uVq65ljgW
8/ghfsDEpuN1TiazG0Hsf3U1gax7WkHXwUROtskvkIC5c5wgDUyYHqmAsLRIjxCZriH7fo9jOn+a
rVcRuOsRASYqa+9rWu3M3eQ5SpAeFo7Zn2jVWQKnuMQHJ24jX5e153u5HZJRDUNWLa01Xta5vOlw
mT/WTDpXRHgljDr3Ac6gz/WVt7G11utdthurn00hc+c/L6xe7E6cz06mSX2zBIH8r8xj06IPQ8KD
Q0Ic3q1HTMfMqrwgWkH9M0uLgDO1rWvRmUg6LMz6LsfJcy0Q9hAMGdfpLXxnb62P/eA++E+QqtbV
iNk6MHUT2RasZoYURxB9swPFamJ0p92L6tb2mQYbOpTbZxEW4RxA4xCkzFA0Vm+t9b3BpHqNMFqJ
U9rmy4Qe/wAUlcLUdjADhU8qsNaTwta0iNFj9SuEFoRGpWzHCCXOrbvfC2ekMkWiONv/AH5ZeJW5
5eQCdrZJGsLT6XaKtxMSj4j4iBuTiwY9w6razU8OI57rSvYHNEaz2VD1672c+8KxhXll1gY6RIgR4/
RURbXk6DS6ow0+Uakf2UV11sguh+up0hIQokSPl8FIQWwUgVGIO4ZDLYSWuY6t44PI5+1uRWPrdo
HyBEE6H836LlWIBKTawRqJ1R4itOMdPS36zaWy12nBmTB/0a7ajMtdGoHaT5/wBpUGscIcw7XjUE
aj+0385WBDjLmSe+1xZ/0f0icJLDjbbXVnvHbskXAGAZHY8KrDx9Fuwj87duP/U7FAuub9EgzzIk
cpcSz226ICYvgT+CpnJyh0jYPPM/+QUhmMgeoAIgE8H/AMyR4ggwFZM54gJJ8yk3XlC9akseWu4
kR3H+rE4do18tE61pFMyXA+IRG8sgSZjxR6z8O9YfrPBrf8fdbnr8qgvrc9oOgsB4PdoPDqc+3tN3Y
meJNzvUL95J3/Qc2tjPTXd9evZR0bLfY0kwN9IbdIL/a12791ebu00B55KBSdv7zKoCy0NHBIH/k
lY6oYp1jQEAIOJ/SQBwwT8ypdUdNceJ1N/SCQPSXLThpPCLTjvtIgaFaDcA+m0FsT3TjIBbRc1rT
MASUWuibNloLSeFr42JWHhrW8cuQur1/pmFuh2xPmEzi1pQDCullYgCI5RMV+PbaWvsADTG0g8om
JTY6sPvbAbqB+9/KciNFTWvyLQBW2T4SfzUjX7XxH/NbOX10YdAfyTo1vdxWBdkZGU8vtMN7NHAC
WRe7Jt9V/H5rRwB+61QAk+SdCNeaJSvyX2NSUoCSdotf/9Z0cGu3N41MXtJ5+XmguedwBBl3AGqR
cW2Bv0gI3HuP6yr2zAahkCQ47x8EvXAyWiNIO4HhDe53qe5w2zAPfVS2WMET808goJG+mzKxzX26
e0eHZQFu0LC17tT4IrMd+st0HdM7Fqdq/VzdRH/VJJ6tTPI+zODGmNJPaFjBoeHDbJgwe66KzBbY
x+phwJHbVc7U17Mwbp2Cd5GpA/eUkOqi6PT63ZOFRW1u5wLm+c/SWr07GO01xsEWPOo8AD9FZfRM
iqq92xxNdd8sJ0JadzfctPqPUWUW10g7iZSlvS7H8v8AdbzrC0GdW9x4hVh72b3EQ4nb46Kpj59v
UNzaGQ1n07DwP5P9dXK5K9X59X7htgkTyY/ktTD4q1KxVsdzCG+oJjmBqrWOaC0gzB4PdArDX/SkntGm
qgGmp5e55DZADe7nfutSWfVtGoMDtuneTyqHUOp4+CWh9nq2Ok+m36Q/d3fuqt1XrbsVzqqmtdLS
0vJktd/5Nc5dltuhxHv/ADndynxh32Wy1Xm2eq9fysys44IZSeWjkj91zlQwupZuAScS017vpAAE
H/OQCJlxTMEuHgpKA6aMZJOtpMi+7ItdZe8vscZcT3P7y0+mXB1IYeWGPl+asc6uKPh3ejaD+adC
kRomEqlbq25bza6mpskaBniVf620/NyanfrQqYOfdH/RVFjKnsLjrJ1PktXF6X051QfVkObMHaYk
KMno28UbN2y/ZT8aXi5to1LiNTCPg0YxPrsItjRwPAP9VPT0nprn6ufbyC4uIH+alDxaqen5ORW2
fTMbJTCfFeYgVToW+g5s0raRHgFxHVq2jKeK9GSSJ/61dDmdUDGEA691zF1jrrHOI5P4p2MHdhzS
0rq3O1ONWBn2NHLWsn471DApFlVuvvG3af8AORcZhZ0nIDjAstaD8AN+1SwDWPU2CA4j8An92KO4
tC9+TjncAY7kcLQws71nNDyacHIBWfML2t00J5PKxzn6P1+4V6nsJH/nKFL7MT4Pa15ADGndJ7jnVW
WWNPC4yvqdg0cCI/1/tLSxeq6A7p/KmEMsZAu+XjdoiNcJWF+0gXyCit6jr+RDVfp3d5jpRWu1WR
X1OloG7kchFHWKyCWt0OaE9v5PuRCwusG7tU4aCsV3W2Ax279kzeus4OnaeEfoivF2HMBlV3NbKo

HrAc6A5Wq72Wt3A6Dk8IWqlnywOc07S6GmPMtarIc4bW87ABCp23MbWSNYcCTyNCrrB6hmYbzCdA
70x5OiUaujuNT46o7BoSUMN15MaTA76IlrgyszpAk/8AmKkYXG+tLp6PY2x7mM3B0tE8Fulrm/ue
9cE0NjdOg5PC7Hf6X9SurxGY7ACbiTL27tjQW+m5jX+zfY9q5Tqlbq663WWGy273OnUx+buchf/OX
SFafusenOm+wzyB+VaQ6cMtwNsitpmPFUsDFeLw8asLdfj+a1bV9oxK2ta6Xclp1A/kpkyb03TAa
UUV2DW1jTRDSICnaKhWWvMRwO8rPyepX2Q1oDT4gQVAPJ1cZPieU3hOhJXWNW7hul/pgw50/ch2X
YeVmjD1L63Q1x4cfzmqGHZGQPIFVLX+jmWkUOcd8teBrun6TU6hZ7rCAKp6LLrb6TamjUGPksPqz
jbGNUR6dR94H7y0LepVuxTcA7cGkkER7gP8Aya57Gse68ucfpyXfEoY49T+imZ/5ygwtbBUmNgKy
a2uUdgCm6MdINrvBJWfb4hJJL//Xhsd2MPbweUwrHqG8/wA4RBHaVJ2QGkECT/BSYQ4Ej5nyVZm1
Cn4zHj1I1EETwD/J/eQbw6qvgwdQfOUQOLzAdo37gVaoox8muLgd0EHsEgFX0cezqNtTHmts7ANw
7FT6d9abKS4bGM3t2OeXCdpP8tVusdXx8RlnT8UNuLhtdZ+4Pzm7vz3rExGV+oQWhxnvqpoAgbLZ
G6ey6j1npdmE1zDWL9p3Obue4n/qFymNk+rkEuO6e87efzXfyPrXYjXYLnDaAOD8v5K51wNdntME
O5T0E1VO/blt6Zca2YtFjtDv3F7Sf3lUzbzk3GyAHW+7aOJP5rW/uIVLHZuQN8xtIG395FxsoYz6
S+ttrQ+Cx3cA/R3fmoEdOsUg/ZJ6LBxBi49VFbwS6HWEcbj9LcrG9rTttLWlokOLgBH/AJNZ+cMz
Ptf9gLMZu0WV0AmSCPc2tzlzmYMjHfsv3Ps77iVGIWfmSSQ9vTkUfRY9pnmCCVWzX4ePk7si0Nds
JqZOod/5N64b1iDMuB7EGFM5DnmXuLneLiSf85H2/Fbxps6wuyLHfmlxIHxVMmCpPduJl1QALh8F
IttRM6Kdf0o/dBPzhDlFqH6Ox3gAPvKSEXdTNLw4/sUNW6XBwEn4pFIDo9MJdWX63E8E6aK1VgU2
5IrfZsGhLgVmNLmgQf8AcmrzLBZPgdFGRdtiMwKBe7xcGnGYGsduaOSsLrmZWzJLWnUCNNQqQ6l1
ekWB0aLLJyHve8ve4uJ1BTYw1XSyUNCzvufa4ngdyhMaSZjSfxUNwGhMqT8o7Q1oAA1jvP9ZSgNYy
u3RyZHTWVj895cfMANaquA/a/aVUdfY4Dc4kDQBPRYW2ApV0SJah6Fo9RsxKHZjtlPiu9olWHAEJ
jaABAc5+O08BWOmYLrLS0fEnspPELS6KzVzo7gIE6KERxLZPSi2k2Nggcj/vyyX47yCWyAPyLtwx
rq9pGh5WRmdONJn8x3B5H9VNXEA/1S8s9l4adrio13ZDXbLSSB3Gv/nS3X4JIkCUMdLssJFbC5w1
MDsjazgLRbfUBBkzwA0ko+Oxtv0a4IiJBn+s1aGL0bNJc0P9GILvHhbWJ0/GxmscWh741cdRP9X8
1K08NbuZi9EusAfZ7AeAdJV6np1VOpBc7j3AgD+q1X3P+5CseJkngaIK1aWeW141p7ATrwFaxLBd
XU8H2OaHayCNPo+9ZXW8how3VzBeQD8Pzle6Zf8AaaKbg0BpG0Aaxt9m3/op0N2LLsHUrnnzMD5q
N5a4Bh1BBuHwRGiBJWN1PPNbLGtB3vadroIAEtbu/wCknyNBjgNbP6LjfWPLqNROm9zw1njAWFmh
1hfpJOxlY8vb/wCSRctv2jJDSf0VDdzyNTJP0Uq3tabc54hlXtpafzn x+7/wabEV5qJvybuAwVH9
IYZjtBsPbeR7a/8Arar3WPybC4k7ZkfBB6fUbMVvqEzaTY/zJPtUctjgBHY6NKF6kdUnYGtEDnMF
ggeQUtj7HQ0S53A8VHZ6h00DACSdByrjM7HxQG+oLXDUNY2TP7u5IntuqPcsMfHspyN1g0a0yRqE
Cy4OtL9eSYWoPVtwL8u1vpuAHpNPPLfc5Z9t1d1EWkNsZ9EgauH8pAHqR/USRpoOMvI20+gDq47n
Hy/dVSqzY6e6g9xc4k91KppJkKUCmG24LnFP7jyVBqI5RRCSVoST7kk1P//QG/FcXCxpIjg9vr7Sk
1m2WO4iJ7yph1gkOfIM8cQoljeQT5kf 0x8yaX0m2mw7toBBGk/Rdu/zHIodLKvu3Yd+KSb64jaQT/Kbtaid
dyBlU022V+neyRYCIlp+i7/PVb6uMZZm1NJIPPlpuWhY6jIvy8d7PVuyD6eOONu3/Cb/AMxm9MOk
hX6K/cG/0nnHMBEgbvyoLoPkVZysW7Cvdj3ja9vqZBH7zXILWhzgHu2tP5yfbBiSE91btwg2kOYd
zhO7zH81U01KVo41zMAZLmxVa/a13wVVbnWAKejdNxhy40sP+v8AbQJ1A7pA3PZzxIRKX7XKDdd06
MymdXfd/5JFATvcAQZ1HhxKG60Dz80nt/RnyVaUqXGSZ+Q53lHCGXEqKaUtkE31XLvBMmTpIVKdp
ggqKdJQdrCvBaNVota57ZH9yw81n8B9j61rnNZE/BRSbeKVjVDZvNu0duVv9hPHBHJlZ1Lazusx
4j1XWST3/kLY6W0Ooa74JpOzKBuXRaRwmteBoRPOnKZxAOiJUz853MaJKKLGvpc2GQW9xA5/1KwC
NduhcIMQNP3Vz2Rc7D6rcwaVucHAdtRuWpTkh7QQdEAe6jENrbtkzzH3BMXoZt0058FRyczbuAPu
0j7/AKSVopu23VtaSHREyFQsyt5j5HsqDs4uc40mNCQfghvyG01WudO/wOhiPakhr9TyA9xa88Ek
6x/Z/rLb+q1RHT27tA57nDx2k+3/AKLcdffa7dJBJJJJ7H+Su5+ru4dPoadDt8I/1KWIqg15yu3b
YxzoDAdNTHP8n+0uPzuoW2WXWCo2OpIrqqiILQD9F3766/de1vqM7kbmR2J/Nd+4uB6/kP6+r5+bs+k+h
3u2vDTMkbW7v+7/+i11XQtbA1ZavSLn23zdzAGteBtbM3cbce0/+ZZN3NqGqj+cnlrMMfJVBuJVL
Xbpc4mNJ9yq3Bh9KzcB9MXc1r99jy9wh4r56v3a1MgZ7/cN+f0E1ISHNt0lGGt1nGCwfL +5v9b+s
h9BwxbRbfc57QDtY0GAT+cjWdExJ37nvcddT/wCYptRBN1XEeEd2tecLKYKsNpaCQbLLXBun7rW/
uI1NOJhEussrc7sQQU7um45bLmgMbxJ1/wCiiYfSMR1svqJaOJMhIkVvokb7aqyOpYtuFfU21oLm
naJ1Lh9H2rHff0O0/nHQq/b1dKc22p+IGAOLG2M0cIO31HLPyMztOPPqtf7/AGGgakj95OiANKVI1
qEQUWkkaIRlWaDuYpGJJQnBhJDsftHmg1Nuakqe+xJfT/9F7GNDXQZLNQFFoFjfAjVRAu1EAkRuj
jVEcwtAB7jt4quy8LJjWC1r3PDXfRn4/9+XHZGJUXT15FFzy9wedr/Kd27+uuuDO7dT/FYnXej3vs
dnY5BbsDrmzBBH0nN/sp+M0aP6S0hw!ld9WP6/7K6s+sZr7K3Vtklrlx1H/kUB1z3Bon600P
dSrdbsfskwQSeeVKVr13RsfE9Rr7A64DIh0B/rKt9Zqacbbdii1ek8mQQZIP5u1Vumsy79kGwKRJ
AP8Amq19Yei5ONSLLCBADpLtxE/R/tparnFArfW52S93qlpcwgTL5+jaj5TQ+ysvbHr0iCdNQ36X
/RVCMNr211yXO1De8law+rXUt1ORkWVVM0c31LQTs/d2/mf1EvFDm9L+10W+pSwmyoFw0MARu9ys
1Y992UywEgAAucJ/tNWlT07p7X3UW5e95Eiylr3BoePou2+xV8Pq2F0/JGJa11mODHqEcg+33MTT
4BcNtXTymdO6nifZ8hnpWNHssaNWkfRdu/PZ/IXG5mLbi3uzWOo3sEfvLrMoY3qbB5V5L8NMiP6
qoZ2G3IoI/P5aTrqhB0qQ6vP15D6xt+k3wP/AH0oby0ulvBT21WVO22NqqCexs62l72sHLiAPmtL
rz9+azHZ9MGrZ3C72Gz6z/AKpCqUcvZn2o5P2chl23uOn/B6YS53xKVa+CRSWFbA3+9GCiAiDiO/wDFJSzGuCCFSScC0wVelJ14Q81uWS0W8/BJRakpJkkkS0JJJJJTbwrNkHutkABuui56tx
a8HwWyX78drgdPFMkGfFLQpassMcaipwJ+APj+au16a7bW1gXKxUUxobZI3d//ADL81W6ML+mPTdJH

BBTJM+O9QXsCW8n/AFCpZHWcduQ3EqPqZDz9FvDf5VrvzNiwr+qdTzWDFx2+m5+hfMGP5P7n9dW+
ndEbifpHWg3uB3OBnn6TWuQ6arjuKHF/XT9Xw3PAyazuIA3/APfXKth5TmwD/qVffY+p3Mtj4j91
yA/Bqe4XYxiSNzDxqPpNTVA91XZjo0VVzLbQXEg9weIH9Zv5qvNwdwIcdDyU1tAawVM0HG48AfvJ
ItxXbtzXNOrXaxqDBUM94stAYPY6D8YKNa1mPY4NJLWkwRzJH5v9tZ11z6iSBLtQByQf5P8AaTwL
WTNAr4OPXd1BjC3exjt7wdQ5oPta5u3f+kXf0XMqpDnwwMaA0CAJPtrrb/bcua+quIPTvyclwFlj
gWiBP7y3clzXOx8drdwDw+yeIhzG7v7bt6ka+7qUZgDA1+jwPpBSHfyd35j1y/10wcTFdjZuMzZZ
ll/q1j6Mt2u9RrfzN+5dO5zWY++5wZS1p3vdAAEfy/6q866t1K7qF7HWWeoxh2VCCAGjd+bu/PRQ
OpQh86EQTJA8v5KbQ6DQ90xbIAGhEbT2BTtIfoTteOR4JKTtzLW0ihwGxpkQIP8Aad+cj02+r7RZ
t8ZOqp8jVRjugYg/1U2Ro7VGPSSN5loVq5gqY91R3Og7fN0e1qwK8m1ggE7TyFcszhV0+xzdbBx5
aqMwIIXRPXq4WS99N1jLG/pOHg6wfzmqoeeI8lYfc7IzfVf9Kx0n5q11oVNvaytgaWtAcQIJMfnK
S6IFbrCLs3R5itY2jT5qqrlQhoTlgZkwEENL3SUR57JhDdEEr7G+CSfc3xSSS//SdlhD5bpHKkKy
xznbpcYO3nRU8i661zC32sdyTwFY9WR7yBAEO8VXZQU8n0/Ub9Pdr8FS6re2rpWVWGzY5vPgD+cr
NbmkQPofnHtKm7Hx76bWWDa17SyTxqkDR1QddHzpWcXGuvcGVFo3mJcYAj3bk/UMF+DmPxnHdtPt
cOHD81zVLBeGWsB/fEjyI2qxegKx28R46eWuyXPDRA3Nrc4f2Zbti0M7rHTc6qvHxW3Xvdo/1A2q
sH/q3rHu6rbTUMd+tMkhjjIJHs3Knb1UvG0NaAOIEJLr8W5mYtWPa3Ja9jS6GOYz6I/7+tSqin7G
zIsh+4ho7/2fc72Lm8kl3p2zIfyR3/d3NWhiOG1s9iCJ4/4/6XsTSF0T2DbtybK3Prx3GpjgA8NgTH
9VZWRU51oMSZlnVaeTt9ZpaQQREiCNP6jdiqu9Ntu60hrQOSkF0m1i2hwbU4e7si5d9OO0NscG94
JWLZ1axri3BEToHkSf7LVFvTM7JeX2GJg73nWClVbsZkToG6/P6faCy3a4eMLLvqxnWvNDorABAO
up/Nat/o/wBVsXID7Mu1xDPzGaaR9Jz1gZPosucykQxpIBmZgn3Iggk0gxI1LAQBA4RGhDaT4+aI
CePHt3/kt/t/TRQz4/1/6X/pNSaNx0P9/wDZURxJ18/P84pgYMTt7fL+Sk1MSBoPwUHSWncYEHQa
9v3lKABp/tTO1BGvHwSU5ySciCQeyZJapJJJJSkkkklKWhhZLQwVu4IZ6cEjhAi10ZUbd+zY4Bp+
iVUswrKnzW4t7iJ/6lRxcnezZZ220lb/R8nFrJ+0ND3/m12oA/k/y1GdG7j4ZjZjX/0NzKg94HcgS6D
BB/quRW4PV73B2E0+nw5xMD/AKfvXQmzCLpY3zIiET7UXjbS302AAE8SmWNV6ZeEgVxS/6Dkt6b1x
gabXNe0fuuLiFawrbDaGOEu90q+S0arm1tjdJPUVW4012m0Ha53JQY5Npx2sjus/JudLWzLdRI07
/mqF3UCPaHTMx8vpf1Vj3Z5LyR2JkHy9yIFrDIdfMyALIbwBEHUz+8s2sOy8ptLQZLgIHOpa3co
XWOe8u3aHUSJ1/qrW+rra25fqWN3uERQbrJ/lfnsZ+4pQKYJSM?h7/ScXa2uhrNpcSQDLoEqX1jzD
O2ltGOJyr3ANIPDiNrnNa3/tv/jFa+043SqnX5BBySDspH0mj3f5rX2fnrR6Ebf6fm1dQzLvrBlNIxOl
AuY1x3epe8/qlbf+u+//ALbR8EDuf8Bq/We17L6OmGxz/sdLGXuxJJ33Eere53u972btixR7rQ0fm
jx7n/wA5U7r7L7bcq8k2WuL1VncH8lv8AAUXPW9NysDOrzzWbd/uGoIcJ+kugd6nlluvD3UY
1SMx/qR/moqV6jmc+5o7Jj/6J/kpLTqUpPUun7ymsDNs/I8PSCCXVouCvGc+WOS 5HbaNY+/bO//
1SMx/qR/moqV6jmc+5o7jU/9H6SmIPuaZHiEuGnGw/uTCXVvCCfpCyHg8lt0+8Gj9o3+zdC80d4
Ab4IzwxrJPDpkeX8pAroLZlw2z7GjlV1wPinBisVtIO5Roa+raNS7QAkgflnfykBtL6iTzQ0yfOF
ax2+oAwARqd3aEE11cvL6QcwFtmjgN1VncH81nAUVPW9NydKhVu74D11U0bkh18AUXPW9NysD0rpzWBd/uGoIcJ+kug
rhffqC4atZ/5N658tyci77VkWF9nadf9WqWAIGuy0m/NNKyCm0ER-RRTf7A5qT/58jU+B7aKikggSSSS
QpOmXSfVYYNFVuXextuSXiuljgCG6Bz7drv6yBNC10YmRADziS9FNOBaNjqqqyTyIAKR6Z0ku2Nxa
i8iZLRqP3kz3zB2zZvY1+b/mvAY79rx4SJWkHlzQ+txY9uoj/vy6i36sdIvaSKjS79+snn+p9BYmb0
TJ6dq+bKNYYZMAf8O38xAyRBCS+k 3Zsn4V2Ol6DQ6oQI3ycwcG6Bz7drv9iarXbwloa9InCcE81cy
Qgnif3mt/srTHVSWvJ0g886/m7Wt/kJp8mWzQs8sfSnVWMBbsjJ7HLJ82xayrmrm2E7R2Mx+xrmG+/+wA+
KxnZ5ta5g0EtG466ae5yxH3h+4r4E6N80U9H12ADOf5/yzmsdBPxPH8Ub2p96KmemNPJ/f9zIvzWA+
900oawXOfdVG1chO9tsKxJ3nmvMM7c9qx+gY2DIHOa9tzmsdH/ABY8zKbu*ZJY1/PP0XO3/yF
SYA+x27a0P1wAMiT9FrXfFnLb6zRRjsOZk/o6a2nU6El/1W/nvehI0uhCy52hIduvCodUN1J2BfS5Yr/
J/OR+sXUY9FPQcJ4d1YRnJtafbdkn+dfu/OZR/N1J2BfS5/MrBzn5CbN5+xt6+wb+Tdez9J
f8H+lWUGwNoEDvCURoiZ1KKOiZ1KKO+Fyi36TPb85WWANbEDyHb+yq9fuuc8b/Rb70Q7QV0+yHj
H/ySk7gKLJn/AGyp2RIGmn+vtcklj251T/H7/wDzKJKJH+7T7/opKWcA4QRI+9JkL16NMt/dOv+bu+
il/r4KSSmbSHiR829/CYiFy/r4KSSmbSHiR829/1tYXL1Hmw+/ddOZ9ffSXBHCRQjnfNwbdFXH7T
QQNzpH521c9jO3Or8d2ELT24PolqdJ6hV3uHlg+30zBLXQ5w+i330R80R80Py1Hym2mNVPj4PcY
qA+vuEltIkC535qM7Wnb3Qnupc6TPySUSVn08b948SkjaW1*/jf2WVALjJ6g*P9OOaWXOfEYAL6zMV*
c7HwnFmPwXDQu/e2/usVG3OvyV3OEzskwP/JKrbtmn2fmyGK8RZ7bf+rf2m5yGPGK70N4WHD1D6X/R
gcD/AKpU8faxzzKHl0geRWjSyt+5tmkiGnsD/ACv5KM10eqLp2TS91pyJFjCGk17dZcPotWhK73Vu
fbBcIawCSST7VV6d0fIe591j0OGzwLvp1TDYGW9+qW6pZ/Pz/xi33uG4LjBLcpC535qM7Vm81eer2Hab3zg
QQNzpH521c9jO3Or8d2ELT24PolqdJ6hV3uHlg+30zBLXQ5w+i330R80R80Py1Hym2mNVPj4PcY
/NTR1XSNU6GBZPTMt9joHq1tk8R71n5VnptLtZ2QCP/Nnj+i/mre6Vj/0ZnRMl1p9Gl7i8+vWHWD1D6X/R
XMZQtJ5L6a5ax3Iifpf20Y7ZLoWspNCYDRSA/1/6P8A35OWMmiT/r/WRmDv461DaJBeM/dKKwwY

SSyH3JT4DQdkiNU0/wC1JLGwxYx3Osff+ajEjn/aq94Ppz4EED/vy0x0tHbjjVJS3y+9AsobMtMz
8gjnQ9h5nVRf27/HQJKa11JaJBkd0JXZ9hJ4g/cqSSCui0ZFlDtzD8R2Q2guIDRJOgC6Xo/RcMEH
Ji/IdqGH6DAPpF7f8KhIgDVdjjIm46V+k0qurAuDi8tdx/q5bmD1Gu5rPUMvZ9F410/dctqmjHpZ
6baKwBoRtbH/AFKoZf1cxLybsF32LJ+kIk0uP7tlP5n9ev8A7ZUBo/1W3EkfN6nUx7mvbpqjQ0+3
kOGo5BH8pc/Rfl4DhXm1+m7iQZrd/KqsWtRki1ss1CAPQ/MkxI16Scrq/wBXH2F1/THBlh+1jO0a
7+VQ7/BP/wCD/m1zFj8nHsNOSwscAdzTIIMbG/8AT/8A1A1E6NU0P1cqvU+j43UazXcIsg+ncPpNP5
v9dn8hOEq32Y5Rvrw14B2a9p2mNzgAXAzoR9FM41vG5piCNBqXfS/wCo2puo9Pvwcp+NkAB7BO4A
w4fm2N/roAJaRt1w07A/wCr1KGA2CbT3OdA9NvtcNBpKAA9xif8h8ESrGvvcK2N9x8SG6/S+k93t
VwdPxKS1+Zn11tifSoHr3f1drP0FT/8AjLUkeLHGOPQWuySXHQsqaJcSPot/trQyLHVlt/VGg2gT
i9L7D93I6ht+hSz6fofztv8AwVSq/tOrG06PjfZT3zL3C3JP8qv210Yv/WqvU/4ZUy4klzi5znEl
z3GS4/nO3OS4Qu4tKS35F2Rc6+5+62w+95H91rWt+gxjPoVVoL37WF3gNAnJO4PkJCFd7jXX4mSf
IIrCUuOzawT8yNdT+8iuOiQENn7iP+/NUXmBx92hSSqrUnxlO4ndp/f/ANFKjxMnvB5/6KiT7+Af
vBSV0Zfd+RL4z93/AH5LXz/KE8R/qUkKCeYTc/69k/n2CSV/imLQ4a9vkf8AOTc/D+CcJKU1zgfT
frOrX8f2Xfy1F41UyJEFR5BB+kND/ekoufeHMsIOs8HyTNoe57Gn1/4D95HyWyyfzhx/35PiPDnO
e8gvgNA7x+8itbPoV/uj6MJJ5KSC76P/1eZyurX3Fzanej07kN5/z1T3MJkmXeJ1P+chvxM1txqL
CHc/L97cmfW+o7HiHd0ogDZRBGhu0Wt53N7KG8EJOcRoogxIRQy108wtjpOX0wWMGfudW36TWmC7+
0sZ7SGtJP0hKhxqkkaPYZ31kvvrdh9Prbh4B4YyNzh/wlqza3D84qhVksFMv5EBDtzHPI9MbWjue
Uk23cMmvqFgHDwTHmttrg5rmGDtJAPeP9XLmMbJJy2WPIbGjjwIXQY7wSS13tc1rgeAR+9uTZbL4
HZDZoSPuWba+uu231NAWkNPOpC1njGbJstBA/d1WN1FjX2gVSS9210IgoR3XT2DrZNv2T6qY1DHe
7Ldr47A71X02/u721MXOmwtIjSeY4I/lNWx150ZFOE33MwqmV+06hxDX2+385YjzLkY7X+8xy3r9
1sAVPBkQ4dxz/ab+cmdU5oBMFpiHDXgf9H3OQ6z0nMcHuP6qPW8tMzofzhwf61aKGLB7if18gnJg
qYYAJbxqY+73N/kqDtf4/BJSQ6iRyo9vyDzSrd2PJ38AUpyCCfHxH/fUksXiWuE91CfP91Kgywa/
IKUyPyDt/Wch0GAW8wToP/JJKSkfAT96g6Yk8+Lv/IqZ45j4alQdHhx461JTF/8ANO76c9lUVqx4
FZBkk8Kqkgp8QsbeC/sDt+Me1bWJmh1rXNfteNOeyyem4bs7NqxWnaHn3O8Gj3Pf/mr0HHwOlV1j
GbiU+mBtcXsDnE/vOsd73P8A5fqKPIz4LomtOJFjZvqqF3J7q2y4QTPxVS3oAq1/TbSz/uvaS5h/
4q1/vq/656iq05djbzjXNNd7fpVu5/kub++z+WxRahnoEWP8R2JFw+atIh1eo1HhymD2TIO13qgsZyjts6uTDD
J8w1/f8A03mXAtk008R3Qp8F0+RjY2QIvr1/fZofiqZ6HTM1W14P5vDm/wDk1NHLEjX0tLJyuSOw
4w479WMMzyIRKa6XN9x9x+SVuPfSCCyytzYMjcOyhVSX6nRv5f6qk+rAQRunIozDhy0yByJH7yn13
uc1jhWwAj6QbBJQ7GMawgfSHJ8B+6jvLcjBrYNHNEH4j85BQG7nu3EBxEA8fJbVLt+BQZg7HN/zX
Ob/1CxzW4v8ATGpC1On5VP2CzENPqXjc9r5ja389FI3bGNb6QcDU27exzIcJiR/ON/dexWunY9D6
HZ+Sz+aB2k9w36bmt/f9uxZjMqj3HIfW7Y5gJDu/C1upvFHR6MdurrWtBHBI/nbXbv66bLoP3l0ev
9VwMi05Fj7n6vscXGdHCT9Hcqj9TP+/+0rT/AN0kSez9/QzcquT/v8A+knLCvTzr27jlFeDG8c/
vt5/641Co+nwdO45VpwkT37ubz/ab/kcoI6bSdBqRqW/xrRXNDxub/qVTMsfuHHYhWmkEB401xj3
dj/Js/1JK8GGIdB157+ZUzqqJHI5+PimLfU0+ja03Yj95qq15DtpEHXT/vySmfby7qDJYj26wYMDQa
qRkHXgfcAhD+d4Oo8Y/zkkp9BpwfAan+0oOIaew8J1KxD/cY/wC/0UX6aCB5DU/5yYmvcZf347oa
Jb9M8/NWek4teX1Cmm0xUTL+3tHu2/2kkAWQB10t6Hv0PnNoIO3Vpd2Ers8BMa4/HsUTJ6J0/0xfS
xmDGIEMc0e3+q5v/AKMMX0O2YXX+iSbqDfiHP84z3t/e3s99lF+NurJ9xR8RSsy/QXPVOY+0JPb
XcWvcAXN4dGoH9ZYXTes0ZI9if2mO+kP/Js/lrYxrml2vdWN8Cv0qq/zG0ykCiRtum9q2ZRQNAiF
pU2VMTKhxqFLQorDqu7xQLW94m03Ig/SaiE6JnajhIpD531zA++wZ762tAps/SUB6e0n3N/r1v9iz
wBPYnjkrv+tdKb1DGNegtZ7qXECcO/d/qWLhLa31PdXaNr2Etc0iCCCnxN+bHkjRvpJgG+WnkSnI0
0mfj/wCSS9viPj4qOk8NIPjKcxrXHbVGsugAk/5yNS0Bg0B0GoOKDYJfW0DiXEt1KsN+jJg/Hn/y
aSlnOPfWezh/35CYCbydfbGoMiVNx2zyB48gGKAdz4GpPGhhJTZIO2fDk8/5zUAE7jAnxJaivMAm
eO/BQqwZLoOsxrJSUUkz8u45B/qpcvkgTwJEEqJcDpoT2mQU4/Dx5gpKZgACZ+B85+ipR2j4jj5t
TNJB1GvJB/OH7ybcXaA6a6+Y/NSSvMmPu/uS/wBfmkAP9fFKeySIzKZMnSUgfoD/AK/yVOjVs+Z/
I1DsOpHjz94UqTDPmUkJ4Hgkobwkkm3/16DmgiQquaJ4UasgPO0n03HKHj+y5BdtEbj81Uqujrgg
6g8SMOc3T10HNPPtPimdBUSIKVJ4k4c+PpB7eIdB/wCqSis/ToY6NOP/ACCBOqmHOHdJRIXJYuBY
CH48d/aSFFmD08CGsc2edUT7Q8f3J25J7gI8Uv3pLTjgf0Y/4qJvS+mbi7a+T31BswMTEcLMdz91
ge0tfEQW7muarwyTPAQ8q/1Wsa5o+mACORPtcjGcuIC21LLhgISPDGJjFyOp4N2Lj022bSMhgsYWu
DjtJ+i/b9B38hH611NyHUMBBFdTdCPziPc5r1QyCHNsZ+5q58B9u1OzRoDjBESHajT91ys1df1Whe
/wDWVafb3A8Dq3/OVQ8n/X/NVl+jZgt8xqP7TVVdyUkFeoxYOf1yrvbcfk4aH/N/OVFn0grwggRr
58H+01JQazIzbu5/lDv/AMY381ynQQ+stna8c880H7rmp3ghxIMzy4f9TY1AY707J+/ukpKbHsMP
bxxHb/i3Irg29m5p/SDvxP8AJd+65KXxmka6juP7LvzKKvW51T4tPtGv/fkl1JGv3DafpDseN9BF9Q
P8AONPj48ItjBYNzRts5gfn1Bdvc1x5BEzr/a2pKbII1EDWPDQf5yhY8NYYMEaQ3if6yk0yI57js

```
1ByXy7aDIHhpqkpCPCTOpRsS405DLB8PkfagJ2/SB80lA0Qez6H03Ob9jYWu+iAD8VrY2YXDnn8i81
xOqX4jy1pmqZA8P6q6Tp/XKbANx+f/mP5qgMTHybYnCe27t5fSel32jJFDa72mfUr9u797cxvsei
VYgbEdlWqzq7IDXz4/BX67Nw/ihd7rqI6pmM9vmFNCY5wdqiSD/cnBjK/ITSfBIuLTwmJkTMJIX5
1CXITCTwnASUjeyRC5j609PDmjPqB3NhlwHcfm2OXVkSFVyaGXVPpeJa8Frh5FC6NrtwQXzcnTk/
dKYGTz/0VZ6hh2YOVbjWT7D7T4tP0Xf5irtkn874aKYeDXIINMY3X6a7QII0P+ajF2kT8A41LPda
9wg+486HRGe4jxA+9JCKyQ07QZ1A2mf+ip44isDv4EQgPsbJcQHRoOQVZqcCwHX40/8AJJKWuIiH
fcR/35Ra1oAAAPw0P9lO6d2m4Ad+Qo7t2kh0fmnQ/wBlySmW7z470GoTg/ePDgj95D3HdAJAGonU
T+c1OIIkGG/SB7/1WpXZE7/a06H6J7z4KcgN8Ae3gUMO3HbX9E8PPipNGsk6nk+YSUzB3eQ4Px8U
4iI+9MHA/P8AKEp8P9Skpf4JJgT4QEhzrqkpDZq4gdtT8yh/pgNAY7K5McSq7skh5btJA4J5SQjm
7wSR/XH7qSSvq//Qx6cX1rWVP0a+JJ8FefVht3tL/s5q0g6tI/Ndtco02MGPbVYAy1olp7yPzVk9
WdbkubLvd3HAOij4eLQs3uGOoPCVm9Rxy4tJ26mHDgj97+SrLbGvEscHfDVYNtVlQlwgdj2TUttc
8BhLfNI4h0LJDm5bSjxf8x3++uilvnssu7KyKGAtdMHUu1UW9Ys/OqafMSEz25dPUzjmcV6mUf8A
B/7x1XEHskXN2tAbBHJWf+1mCC+lzR8f+p3MT/tbF/dd+CbwS/dXjPi/fi6IaY1GnioXaMnu0h33
Fqq19UqedrK7Hx2Ak/8ARUrMsuYQ2hxLgQJjw/dSEJAiwqWTHKMqlGXpRZuLTXVbf6gFheR6Z7gn
du/kKoNG6SPxCPn2B7m8+7UmJHH0VXb/AKlv/kVZDmndZ400792n/vqrHn4/JWXCe0+Y0KrO5KSC
xGhV6sy0Hn8CqJVvHd7Ofkf++uSUFWCTPJHJGjv7TfzlXsE+4QfMaf5zfzVcsb0sT5cO/s/vKs5u
6fziOezv8385JRS0WB7Np5CjkVa+0mRw0+H8lyBU4seCrzvezSHd9dNP++uSU1qbT9GYI4B4/wA7
81PkMADbQNpJ18P6zU11Hdkgj808/wBl35yg94XSfw45f5qSvBKx35xHnudx/mqs47nE+Klv8A
aRA1791BJSkkkkkMhGs89kmPfW7cw7T4hRTpKdfB6i7c2TFg+4hdXhdQZawEmHd/FefAlrgWnUcF
auBnuc7aTFnY8AqKcOobOPLfplu97VbPDp+KsNeubweoPaWh0fErWry2vGhTAaZSLb+/cYOg8Up+
aC17SFIOPbhG1lJmFS5P5EIPHfROBROms9kbQAkdEKG100hxgqYbrwhurZ536z9KdI4oy6Gbr6dH
jjcz97d/wf8A57XKOxMiprXvpIYfzgZbH9Zq9NDRMGCCODqCP3VxvU6quk50Tj40vGYWmmlskMBL
tzdv57/W/R1f8EnAkUFsgDqd4vOUmRM8kmHDXn95SvdtaTGo4IMhbjOlU4eJZRkVb8xzZJc6PRJ9
1TWt+g/2N/S+p/xSwcjksgEzB1jgp4IOzEQQAicIo/O89NJn95Fxnfoo5J5GokIVxArjv8ZUqCRX
IkeY1H9pqK1K4xJAHgCDohlwAnkD812h/suTPILtog94iJ/8yQ7HSdusDsfHwSUoPgT46jxn85TZ
LtT2ktHfn8795NXUHCTDj21gIrA5mh2ho8Dqkpnq2gQDqPipS3x57caqEjtJ8gQUgXeDh5kApKSb
hyIPzTF8DX8CFDaTy7yjb/5kna0eR+RCSlw4k6AwfMKRJA8zxJkSokge0D3aQB4fylNo8Sdfgklh
Go3EeMSUzrKx3CjbW676LwI02nmVBuC4/SckjVf7QxJS+wt8Skkr6P8A/9Hn6+qVX+6wxZoCexP7
yhZayx4LQXHsO8rFY/Y6Vdq6i6sbqa/fwXHVAjsuvuU+2VaGBtzrCGnUfH+sqrrG0ta1upCs7t219
LqL6g9rgQI0IP7yoMZLt79PAcoC+oUSBsleLrZa+GN5n1B6fQxt5fbDmtaSAe5/NUZlplMHwARpC
RWE1uu2ZNTm2Da9pG0ngf1kXCfiPY9Mw2vb04H3zxoO/3J0Pzqv5azRYdddSk2Q0/ghwob2Pmf3JZH2Vp
qqd7RZPuez86vd/5BZxySy71GuOhmQfwU81734tDSfa0Ex2k125ypJ4X26Fz2WWB9W4N2jUGQHQ3
d7Xfy1EEm4FauFQqALeAYjVpg/wBpT8jr4A6FFPis7UdneR0P+cq5HuIM/1Ksv0EHy0dx/nKqdHiN
I/19qCCxGoLfuRsZ0CNdfmEJOB86EHuNF0ollmk+fj/aakhtkAjUB0cf+YuQHNjudQ12h/s2Kw2
CD3B+X+c1Cs9o7gHs4S3+y781Jc1Xgh2sz58q1jv02ug+IPh/Jd+cq9rQAOY7dx/Zcnps2+08eB4
SQ2XDafBvIa7UR/Jd+aq+S2C0gE7200/suVwQ5vMeB5CqZDoAYQJ5kSP+ikotdJJJJGkkklKSSS
SU2G1NtZIJniNI1R9F7dZgjUawVLGcBlMfPhHJk6duIbKCW5h5uga5w3eR/61bWLmjaGjT8df6y5
Yuc3UEyO+1Fq6hYvw+47vMaH+01RyheoZ4Za0dn9x9rKTkNcB7te57i4tJAAPPdcnjdWcxsCHA8HutfD6
ky54DtCe0xqo6IZrB2dxsGANO0nTVTUZqY+RkKFHvGn0kd1U6t1jH6alt6T9WnTTnN5bqO6
/uen+49PAtYTTp22U0smx2xx0A5cT/Jr+mo2ZeLUjUssgn6Neod/mu+gsZl/pffk2uiof9qgO090f9
Qxn+jfX+k/X4VTfRR1ITYTYQRS50CLCCwEEuc51D/wBG9G9yp/qpp/AMFsTjGtSeFj4m4/qHrEVOtIJ08S
f/IqLcaplrcmwB17Rta+J2An3bP5f8tSxcajFrFdAIgRucS55R7rrHfm1e88zr5dlH9VXbmdZoc+k
ZNehrIFpPO2fa537+x/85/wa5LqVEWMyAW1lnYCfd+cu7c1tlbgnzDmljiOYcNm5v9hy43obeB3Hv
qJPqY7jpxo0/mt/qe9OqVEWC4dzpdH+4KdZDWRSxyQYP9pqANsivdDdv4ka/1dymYVgTHm7Uzx/W
3KVRAkNAc/xMR/0k1bAdXSPhH/fkdu7g7THaQDp/ZSUtF7jLpH9WCnDD+cS74iU0H94DyLSFLY8c6
d+SB/wBJJSg1o5DT8QQzz1TUD5GFFz2NQrzPg1P8a81KY2v9rvP0Gbf5T/wvduKdrdXXKS3u3KqdHiN
2/v9/wCy1QFc+6wlx7+cFv+aiAN7b+4k8Po8+O03MPQaxaiAJ8n0qGrarA+yyCWAmQPzzz/AKJqrarA5S8
hxT1+nvBeC5ncDQ/5yk2tpnmxnT4JE2opoZ2nI2nZgIulqY7ND0u9nlwRt/wD+uBDSA9vvvbSw8dx
hxT1+nvBeC5ncDQ/5yk2tpnxnT4JE2opoZ2nI2nZgQPo3u8Ul/wLf7l/fewh7cit
xHVVG8mA/Rnn+8uDiR+d4/BC7QVCKENaJMAdO0nN5n6Q71rnvqvbvBgcit/b5sUHVYZZ5/sDS56PQw
CFy8bQRz3UXA54PZ9dwxMP7dyu/JpQ0AzQc12jfuRIVQ8B2728+SOulU1ZtwpttFJ7+dJ/adkDaA8
a6IYa6msO0aQRPh7ne5EHTaBjvvdmVAtANdLZdY8yfPalv5n7/wCkRc3DOFaaL5DGk1jwJBBQ8rDx
KqqraA+yyCWAmQPzz/AKDXJA7KrfT5ULQSOxPnof8AOUzxB48Haj/OTAmdfucP+/Jzp5fiEUMT
7R4A6a6j/O/NVZ+lgiPLbqP7KtEkDcJDfFuo/wAlVLI3yII8Rokor2e4B2k8E8H+01PX7o4JHHZ3
9n9S5272ED3OHY6OHl/4eLC8O5b47rx5p1Cp0Dp9fuo5/1rnnuvObwcOTVbe/u5dn6ak+ETt0s1v1y
B50/78kuzmBwO3v9P0NR/vBt/wDkBjXXBXu1l.sBisnrQpTbHSbJoJN5o6L7p7DuBiGbBdLcFCA5CGB3EB2B
a61Ya6mnsO0aQRPh7ne5EHTaBjvvdmVAtANdLZdY8yfPalv5n7/wCkRc3DOFaaL5DGk1jwJBBQ8rDx
KqqraA+yyCWAmQPzz/AKDXJA7KrfT5ULQSOxPnof8AOUzxB48Haj/OTAmdfucP+/Jzp5fiEUMT
7R4A6a6j/O/NVZ+lgiPLbqP7KtEkDcJDfFuo/wAlVLI3yII8Rokor2e4B2k8E8H+01PX7o4JHHZ3
9n9S5272ED3OHY6OHl/4eLC8O5b47rx5p1Cp0Dp9fuo5/1rnnuvObwcOTVbe/u5dn6ak+ETt0s1v1y
B50/78kuzmBwO3v9P0N/wBt/wDkBjXXBXu1lsBisnrQpTbHSbJoJN5o6L7p7DuBiGbBdLcFCA5CGB3EB2B
```

rjI/FTyLjdc+zjeZjlJtNjwDoB5mFOwHcpWOaIa/0zPbYB/0tqd8sO4VDb4jUf8ARURjAjUa9y1w
P/RcnFb6z7LCI7OBCSmIttcIZx4N/wDIuSFTnkS+fFpJaR/ZcpuNvL6w/wAXN5/6KdttZOcdeCHj
/vySlm0sYddPJ4/781TBcBwY8vcFJrR+Y75TKaKgdSGnvBj/AMwSTShtJ0GvcDQqQDv9hAP/AE1A
20zE7z2gT/1KQdY/Rv6P48x/JaghkYBgQCe+sf2kbGoN+QzHafdYQ2RrE/nbUFsNnbMDkzOqv9BN
LeosvyQTRSC98aGI2t/qe9yEjQK4CyEGd0HJwz6gLbKTOo5CqUUussFbBLj/AKy5dX9orzBcwj9C
8kN7+0/R9y5fKyLsMW4DQBDiDaPpFv5rdyjhIy0O8V84CJ8F9rP9I3+c9Lg/5ySzUlJwhj4vB//T
5/Mx7Giqo+6tjyAWaiD7t27+oquVSK7CyomC0FgIjd+9tXT310MYaq2EgmSQdAf5Kp5OML2Bgivb
DmuGpBURPCaJXcBrxcl+A2zH20glxDX7v+q3KnVjPc9zHNILQZnTWPb/AJ66WpjSTWP0fsILuBMK
NXovY2wjdS47C4DUuB/6SAmtloduFzMHpljnm15bsawkg/mu+ilrmoP2UvsdUz+aslldgbJc4D3V
7vzVunGpdabqva14IgabjHtdt/roFgqYKg7duY+S1k+6PpNa5LiKhpwkepycbpltbPtBaS4SS391
o/fb/LVesZVj3+mAC6BMagg/4P8AcW60W25NgcTjNvYNzHAyGj87+vYrO/HxKtmBVsMEHIujcf5V
dScDuSuEb3/Rah6flPxq39Tt2srbLGuE2OH9X6f/AG4sjqNQruY2AGOG5k8EH6P9padTrsiwuc4v
tbzu7g/u/wAhUOrMFWe+sOIDGM0IkAkeq6v+Tse9OB1pdI/4zVEtGsgfepTHuH3t1H+ambHgI/kn
/vqUE8angRz/AJqcsUR3A47tMH/NVS4gukGflB/tK24CPHy4Kq369zPg4Qfk785JRZV+9vIMcNOh
/s2IL2ljyCII7FEpJjU/AESErmEQ6NOCZkJIT0n2zqPMaj/N+m1Gbp4HtI4/zfzVUxnGdB8YOv8A
m/nK006+fOuhSSGNjeASI5Ad/wB9ch2tOwh24AePuA/tfTarLpLTB+Pf/Oaq2QYrMAa6S06f2mpK
LTSSSSQpJJJJSkkkklKSSSSUpW6XH0hEzrwP+/KorOP9A6cHxgJJDJ5dGu6PgCgnx0nn91FeABoB
4zuMoR85A84I/wA5qSlCPzv+kJtVil/wCbp4iJ4/tNu2e33tP/AH1ymNwMjdI4kBAqDba/71p4
OU4Pbu+BWOHboVrHcCeQPPzCjkF8S9pQ9r6wQ201PZHDAsHAzHNaATI+K18XLDyGnkaQo1zcaAEV
sAaBV32NYC5xDWtBJJ4hUrOt7z9n6a0XXOj9M4fo2j+p9N6PioRJ2bmbmNxhsY31sl4PpUgiePpX
/uUrhPrCMn7aX5T5tLQYEw2fzK/zGM/kLsaWM0XOx9v9xsufrbaeSf5P7rFh/WjED212jgS0m0O87m+
5GEvUGSUBwEdXlGWlrt20OPmJVgZQ/OYW+bSR+Ck2kNHH3tP/VNUxIHED+S6T/muU7W1Yi21/ceW
4AH/ADmqQ04+mPEGf+j9NM51bvpAHtqI/6TU3oAFR3mG1jwIjoh7o7h/mpJ12CD9GCfD6JTA1/zm
qMXjgttHGuh/6Sf1g0neHVniDqEkLfZmHUT8W6/9FIU9wU05Dz56qg/9JTBDtWw4H93lPAOhjyDv/JIK
W/RN8B2GkH/zJSIc6RBa3u7QqTdBGoHJ7hRJnj6Pcg6/5qSubyAIbGmmmmilj5GNjV3NuaSbBABM
SI925v8AO11lj1bS7sOO2qtu10raS90kknThCQsUUxNEEOx9rxG0O9JwEAkNGhlc1kU2XXOtc4e8
ySVfdESAoenU8+9soRiI3S6ZMqtz/Qb/AKQfcUlpfZsH/Ru+9JOvwWcJ/qv/1I2PtIJa6HHSdlQ9
niZMBMI3az5R8VLXcY5u8fkpqvg2GDmAjhRFIazYDDJLojST+cju3T7o4EJt/uSQeGtUQLaqNjnS
4ahwmdfzWojBFYaO+9hDh5B37jdqqq49YjbJ3Rr4Qjr0YajfokqbTZU5ztz3gkud3E7W7nfuqe1
l7/Tsbt2QWP7RHuRrp/QcfzbvyoVnoa87I18Uj4rTdqZVXTYbAN72kbrR+9++7+QuYzLn35+Ve6S
XWO9w1kA7W7m/wBRq7DF9L7Uyz4Hqj+G33bP7S4oRudu54Q6O09lykbxomn1RVaPgZ57FFUn+B0P+cnM
fLzSOnT6OnO1MvU7UQefB2n/AElWu0aRBA7Dkf2Xfmqy5W821dS76Z4qZZSmm5gWgRGg/Ki2MIMDhKn6ARHTv08E1cKRAaaa8qDm
Q5M/f6hjHEP0RPKQUWMhJLVJJFWr/AP/Z

------=_NextPart_000_0348_01C0FF05.E0ECAB60
Content-Type: image/jpeg;
        name="barayev-shahada.jpg"
Content-Transfer-Encoding: base64
Content-Disposition: attachment;
        filename="barayev-shahada.jpg"


/9j/4AAQSkZJRgABAgAAZABkAAD/7AARHHVja3kAAQAEAAAAIwAA/+4ADkFkb2J2J1AGTAAAAAf/b
AIQADAgoKCgsKDgsLDhQNCw0UGBIODIhYGxFrYWGGoUUFxxcFXxcQaGh8gIyAfGikpLS0pKT070zs9
QEBAQEBAQBAQEPPQ0QPEQ8SEBASFA4RDhQQEhQEhQEhcFxcFxcFxcFxcKHKK4mGhoAGhoAhoAHiomKM8y9
Ki8vQj4oJpAQEBAQEBAQEBA/8AAEQgAxADxADASIAAhEBAxEB/EAJ0AAAAEFAQEAAAAAAAAAAAA
AAACAwQFBgEHAQADAQEBAAAAAAAAAAAAAAAAQIDBAUGBwcEBAQFAwEHHBAMAAAAABAgMAEQQh
EjFBBwVRYSIUcZEByFQaBQiMWobBViFMRAAICAQMBAQDBAQDBEAQEIDITES
QQRRYSIycYGCE5FCM/ChUpDjgw8W0IjFf/aAWAQACAQQCEQMAAE8GoNJsl1TGtcaWK+RvSZZh
LjAzW2OfUB9Snk1V+JnsxeMlpYpvTtHFTY0q/wAHtUph25AaoXEvtb9JgXwBMbTWe6woNMBEQbh8T
4Gr7FgmaIiQBFFBuOvYvUjHxMYMWM9q6J6AnU/bGwPhEeEjsM/Wix9WyeTIWbhg1zSrW1Uhlvz
pYFhWiSWxIWvpXAABYYCwrtFMApL2KkHhbUUqEXBFAHnebcsc8qL9I+F6xgoHAgoHiaV2j5EUPqy
znie4A/k/wAtU+/l/1/tKOz09zfU+jpwmGuqRw921P6dMtW393IAEWPkq41tAAtC7U1zgkc4CANhr

NqgFDe50NaIzsSkWN4muL8xeohiV3PAk0/EZAfLlTwxVLb9QD405GlKJnbc/JwUsRuiHnyrS9v7l
FmqLECS19oOtZYegbdRbQaXufhSosiTFmSYKdwPG1qbqrfENUbWio+HmR5cQkQ6/uFSKxaacMs7R
XKKAoOUUUAFFFFABRRRQAUUUUAFFFFAELDwsfHuUhVWb9wW10DOwy4jEyF2JUKDc3HKqqPt/dkif
ozmNDcpGxBYf910a9/iKb9llhZDHjtDLIu0zIRuBA+vW43HhwpwpA0NF6zkcHdenHEYpCiBN251J
Y8ZL6KP7KkYeL3JMvdMZNtlA9QKIAbsBzOnnRAF3RRRSAKKKKACiiigDHd5Qx9wkJ4HWoAZGPAA1
bfkVhmbuRFvlVC7bSbGtEtESycgQg/6hw40pJwSORXjc61XLK3G+vhShuDFlNiedOBJwWy495N4c
WIvoNasFwonUabgR6i1VOJlSr6HN1PgKu8SUbdeBpwOZ3EQY+RguHi9UXMX/AMKuMfKjnF10PMVH
VrcK7dQbjj40rKQmCdRUFc5Y22yG48amqwYXU3BrNpoaYqiuV2kMKKKKACiiigAooooAKKKKAE3t
x4UWFdIvpRQAUUUUAFFFcJ0oA7XCbCuAikyEAX/upoTYb640tqZaT9BTLOz6INfGrVRSUffnDTg8
dNKpHXfcj51oe74TFBIT6hzsaoBdSQCDVaA2MbHB0vTsT62PGlkM3pPCldGF03KbOPEGlIDqOUIN
tKs4MoBRblVVEQQVY3I5U5Yqbr0PCmmhF9FlAjVqfjm3sFBuKzfuHXUcDS0zJl9Snh51UikOkOCA
bmUN8DRg5Kq2zUJ51TQ58s5Cs9gf28SasYDHxteQcFHL41LUqGUmi84i9FR8bJWQBf3DjUisWo0K
O0UUUAFFFFABRRRQAUUUUAcortcNABXaSPSbca7QAUUzkZMOOm+VrA8ANSfhTGP3OOeURiN0Daq7
D0mnDiYAmWrh8LcaVRSAZOMrEk8PClCIAWGgpyinLFBFysYSxlD+lUOV2MsbhSfG1ai1cIuKasEG
Hm7ZJHrtbzvXIoZEazA7TyrYTwgg3F6rpcYg3CirUNCSKOXHVf5E48DTLb7aWNW8+I1j6dDxqvlx
JAbqw2+BpJDITdQ6WA/WkpGC2pJ8QKkCGU8Qop2DEkkYKWJubWWmS0OQiEL6jtPhxNWESzugW2zH
Og2/U1SMPsnTFyNp8W9Rq2gxooR6Br4mpdgSI+FhmGxa+0fSp4/Gp1FFQyztFcov40Adorl/Oi9A
HaK5XaACiigArhF67XKADQVxmCqWPAC5/Su0iZC8UiDiykD9RagCgbKTKyGmc3QGyCk5EshC7Dd
lPpUHQedUcj5OK/t5VZHRjpxv56U5HnNuX1bQOdb6wl0M5ZocTvj6rlJcKbdRf8AKreGeKZA8TB1
PMVloZ45rKdSuoFudSsdukQwJR73L3sAPhUvGntow5RuaMV2q6DucRH8jC3DeCLfKpHv8O27rLb4
1m01uWrJkmioB7x2G38JWufIE/wCFPx5mPKt0e4+X99EPwE71W9xPkbA4YkhBH+FOh1bgQf1o3DmR
86E2hyt5RCaGw8ahT4oUlvHlVyWjPEimzI4nHH9KtWfgTzr4ooujYG9LxQVlW3jVkcaMm3L40R4q
KwI0tTDnT+JExyenccdKcUkgXpDAMlhSk0UDwrNlqOgqiksxHCk7yaIJd0nApnAqP1weNOlb3gBI
SpI4EVdKp6HJ3Oa9ErLYkrMGfbfWpC6VRe7WHIVmva9jV3E6yKGBuDwovWBdp15rV6j167XLU2zk
VG52O3FeodoplZR406GFDTQg5K22YgiiikWcpt5Cq3C3PhTlM5WTFjQtNKbKov8AHyprcTcIZkkQ
ndIFsOZAJHzrOdzy+yl9y4/UlB9RQ7VPxqv7j+QT5UhAtHHrYDw86gY8WRnzCwwqWdjrYaAHnWj4
pS+hha9m4rqT4s7ImlEWFDtLfSFFz8zVrD2HOydcyVo1Gu29yflUiDtq9tjOPiK0mUyjqSkaC/Gx
q0xooYGRHkLz24E8P0rB3dn4G9cKS5WcvwIcf47hIBYMfHcTe9LbsWCNW3BRqbEirY1XSQGXJZZJ
WaI8EHAfGk5RdVOmyRAnx8GEK+NF1Ixfe27UH9a5HlJHGNxKKx9JPOp+T2tGiVYAEZTqTwI53qvz
MbEx7RzzFgeKC1186ul2jLP21M9Vxs620N3THUG0gvxtUeTv8QFxqfjTqfj/AGPJa/uWbT0qrgWp
nN/E8WPa+PI5Q6NflLkCq+75HB/5+WunNsV99jPA0n71LILQjc3kCaVj/AI1ChDPKJB4CrrBwcWBQ
EUC3PnWvLSTnXbZHbjLr5tkDD+4znc4McfieNWaJs5k+ZqTZANDSemGNS7+J1U7VViHyt8Rvq20p
YJbW5AHIc6WIlFQsjJIcxxC45tU6PZGr5YlN7fInLqNaUFAqPjSKVA51IqWoZvjtW9VZahpVflEC
U1OkfaKo+4ZSxyEFgLjW5qsczJy99acfFasj5wS+7x41Hw+9nGmELNeLgPKm8nPjdChIuDNL1Ai9
qCesm7npxrV+a3OTBjyKHDRro+8QEepgKS/c4GvZxWSMi+oRkhTwB5Uw/ulN0IPhSVV4HZeuS1Yl
m1x8iOTVWBFSwxtoawGP3POxn3bDfx5Vf4P5FG4CzaMf0p2UmNFkooc/ElcopEsqxI0jmyrzrnP
TE5E8ePE0rn0qL28awvee7zZsvqG2FfpUGpnfO5tM52n+PgoF/nWcY7tXrRVjU5+5eW6D29TbQL
knTxr0D8e70nbsUO4vkSgF2PEDwrJ/j+EuR3CPqcE9Xyr0Qcqyu23BphrpIzmZKYuO87ftFx5mq/
s+PI7NnTg75dUvyBprOLZnd4cM6xw2d/CrpiqKSdFUfICpnodGyS6GtZsJ6KMba8ieFVzzvFD1T5V
Lkm+1OJ8KkRxvmydeU2x1P8AFH245mpM+JDkRdKQEJxsptRaWVW1a6RvuZDuneu8PItojixAaAnU
686nYXbsrue2XOuioQd3N/KpmV2Dt8dM0l5C1iV3MWAPLjVjjYMJu3xl2dkjAJ87UJ6R5DtbROijW
CO+NjQyCOLEEmI7WCqtuZY07CwVSYoDYHiSo18qGxwy0lzAFLMG4nyrMZndcmWcCxjjT/jjXTTzo
lRsKqbmXsalUjkcuFtJ486jtLECY5SI5R+0niPEVSSd4zIYVZbBRpc8apM7u2TkzdSX6raW0tWlJ
Rnn7etk9UbQdMtow086lrLtAAAI8b15vHnyKwBY6nxNXWF3VlIQjfrxvyrW2p56pfFLNJmZ5RenG
LyPotqYjxWU7na5I4eBpOK6SEyWB8Kl7QoJHEOVSRnkyPIoesCI98ZuDfxqfG+5b1B3IOJ+IqB3X
uvssYiJgZZNF8QPGi65F9s7Utx1aYd87ykJbFhG6W3qa/Cs08jSsWYkseJvUcyu7szMWZuJNdaQj
0jjTqoR28E9WhZ2qbA2PzpJZlPC9cRgNOJ866zOQdqj51UscCfCAEiRNvglSAyst1qE0rDSVLeY1
FLDEj+Nr+NqafiA8WBNr6UllTnw8qbG4cTQX8NaGEJ9D0ueePHjaWU7UUXJrId270+UxAusI+lf8
6gdz79k5rt6isP7U5VWB3c661jVQYZsk6Ifd2l40LAbF2sbcjSkjZbE/LjUiM79gSBtA4iq10R2jR
Fp+KLDLlSDbtMYBQjmb63rYVhu2ZKQ5LqEY6EFfGtdi5LSlkbioFj41jZrkehgT+2iPjYskfdsme
QemRR0zytUvNhknx2ij0lnsLnw508GHPQChXRhdTe1KEay5T8BMUYijWNRoosP0pdJkQsCFYoTzF
MDGmDXMtwPpo5f1pcQ82zuZG8mOyoAT4EX0qNKj+2jjX6OLt4WqxA0tUHuMGQ0D+1+sgqqT/AHUu
GpdLR+MnT3HEVdrsBYWueFYnvGWsmazxN6DwI0pnJmyAx3sQ4PM1XsXJuxJ8blpWniJ3SlLqSp53
cepiV5alDeRr+XKuSSMWtfQcBSVIGrVpCItZgOI2d140LAbF2sbcjSkjZbE/LjUiIM5G8d/
MA0tPyHuTaDcV8BTMePcbmAK1pez43bnhZpYrhRe4p00GSxVmEilXv8AlBiJFY+APjUSfIlnfqOf
Ual96mw3ydmHGY4k434k1AilRiAx0WnXU1+0quRyzWGtt1OINPEjnTgaJyu3gOFdVAp9JBHhVlQc
AHMa10hbeHwpDSqtwTw8bQJ4yL3/AEtRA9BwgEePxplOYzqAVPitSIIJsp9sCljztyq0i7IEF8vJ
jjtxXcL1Sr4sTgoFSdSRuDDkDxroxMpzdY2B8Rf/ACrVxQdmiUFZobjizHWpccuM3piyIyTwsQKf
o2kuuOepgwpBsalIi7b0owHQipEcWgv8qxPLdm2NLIQthXNx0xtAG3qNqBudBSXmjRSQBc0naDb
Fh5MYwZSMx9dK2WBnKqgycxxrAwS2yGYfrWkwJC4CsxVBruPCsnr0O1QtPA1ZzILbt+1Ilz4umdv
GxtWbzMw7QiDao4N42qhl7pkNdS+lyNDyqONjSadTWQ58rRsUyGSS+lzuFv1qK3f08xqWWVJVB+o

oAAB42NZX3sojKqx+INcTKmsLsbVaVkQ7VNK35h3OMANFA3n6hSG/OO4Af8ArQH/AOTVniwk4tam
WIUkA386tR4EtrclZnd8nMYtIqLck+kVFediP76aYilIF71bZDc7Dm+5pwWNtx0NJhTcanpjAsiR
ruZRc86h2gdU2Mx4EsrLsB2nmRVieyzug6S7rDUir3s3bzIqlzccxa1q0WNhw46lUHE3rPm50NWq
pGE7f23PE+zoM48OFc77nTxzphJGcTHiF9h03E8bnnXogRQbgAVSfk8cDYYDxK7sbBiBcfCnOuoK
HolBhUZXNjz50iSNWNr2I8KkGGON/SLf21Jw+1Zea4WOEqhOsjaKBXRMJQY2slMsro0mX6WutS8b
DzMtrQwu54blGnzrVYf472/HQdUGeTnc+m/wqzVocdNiARryRQAP7KTtCMl8ap2b8Cgw/xtyAc
+XYOUS6n9asR2PtEOvtWkPMulv8AGnpu4MoO2yj43qlze8upKxncfGubJna2O/tuwy5NbeleZbKc
PELFMaKF9RLG5FR5+9dvQWSGNrcPTf++s1Lk5UvqkckE8KT6t2oOvA1jbNeYTPRxdh21ffbm/LY
s8nuUU5uMWMeFxUKbKkK2VUS3CwGn603tY6WPlSWAAsVN6Sy21S5OtY+3rWK1Rol/HZ3/eqD5muN
+N5K+qOVWtwuCDWpVbDWu3HCuzn0Pkq9ut2zFT9g7ofpi3g8wdKhS9i7mobdjuFH7tLV6AWUn4Vw
yLS1ZvS1cesnlRRMOYiP1yEasQbD4X41LhyyzBmJJ80VehZOJgZi7ciFJBwuQLi/geNU2V+H4Ti+
HK0DA3s3rFNeYnfk5TRn3kEoKg6Hxqvm7YAN0TXbmpq+f8Y7pHLY7WiGplU8h5VHycnFDGEDftFm
IBB041RSbZnXx5YWtIu0HW/Km9x4VqYJMHPaPBhUzM63N10S3nULuPZYoCemSCDYr4VCt0C2N7rU
pCumnGkte1OSqYzax0poklNBVIjU4Bc60q1K234cafgwMjINkQkczQ2NVfQRCu9wiglzyFbLsfa
DIBJINg5+NMdl/GtpWST/rWxhiWGNY0FgBWdnJpVcV5nIYI4UCRiwFOVGye4YWJb3E6RHwJ1+QqC
35L27qCOLfNfgyKf8aUA56lvWY/Imnys2LGgUuYIuuWHAFvGtDDlLMgcKy34BhY0oqgJYKAW+ogDW
qSJd4Wj1M3gfj0cLLPkMWkGvTH03qzmy44h6/SqjgB/hXc/OSFf4xvb/AEjjTPasaWdzmZClV4Rx
tr+tXzUnJbDlyPfQeeQR4/uJtA3/ABx8CfM1T5fcLDcx15AV3vWWXynUH0roKqJ5P4yx5alyZcrs
3D0Pov8AH/4/Hix1s1Nmp8xWRnO+h0U+FR4omdvQtzTBaNNIGsQDyq1xwYgdilnFtBWbnqze2R2m
qSpRfvFx9vsQZdAeVShiwI1uPxpcKPmuFkb26rwLak1YfYQTuXJOvKwtQqWtqkYXzY8elm6vyRCE
cAFtoJpDYmPIfp41Pl77PBt0IlPhwNQ5IpYz/JGyW52NJluug6ZKW1rcuJe5LqsIu3Itwpj3k+71
G5PMDhUdfrseJp0cK9ZYqo+Ny971tpPH4EhclxxN6cEyt5VBaVl/qIFI9zFe27Xwp8Kmde6yLd8k
Wtxa4robzqBHkWHkeFONKTwbaOdQ6HRTuqPVEzqEU1NgYeWG3xgMwILgAMQaaEyAXLD9afjkuLg1
LrGx04u5l67FVhdsbtGVK0cG/FlGki6sv6Vmu/8Acp2O6ExgpBAF2kcfOvQElvoaqu99qh7ml49s
c41D241mlrqdtMidfTqYmSHrrutYmo5wTcX8eVXrdm7hgKeqnUQa7k1t+lQpJ4wdx0t4VLlFpVtq
LxsCFbEi/kavcGCNBcjTyrMSd3kTSBN58SNKexu5d3yv44YmdvFVsKXDIy1fFTVtGyye64fbscys
C2npReJNZzK/Je5dwYw4p9uraBI9Xt5t/1TmN2LLyGEvcpWI/wDxBufnyq8xu34eHHvSNYY11L/u
+daVxQvUcmTvKNxiXK3iUeF+O5OQwlzXIv4m7H4k1fYeHg4t1x0DOOLaE3+NPpKzfQu2K1wTxahE
iR72221sBrVadOhE3trZj6uuuliOPjoiA3WH5SZYDel6v3NYhGKw8dbNeUF2U9Vzy4VHycm
OO4DDfwtVu2EGHEiocvZYpCS7tY8tK3+5Vrc+bt2WdPWunxM7k5sga9wSOR1qOmR3DIcrjxtL4EV
P99aqLsuDGblN1v9Wo+VNHNMWgdUVSCVCqLAmwFvOp5LpqbY+1e1tCiCd7jAeTGksNb2vb5VIg7k
5XaSDbiGGtW/3wfvuSaGWMsSm/gxgHmSyZKydTBVJEJKFSbvYcbi3D/AHUK/ije/YKJo9QX
uL2BCobaeGn60fccgggKNx+elQVkOOrSzgS1SVCRBzYjje4GgB4irP3kBWOOnADOWEewnTcfNqua
9NSaYHVepIY+55qKb/2rS40/5K+mULp5VWz5ckzEsyW2GTqLvto3SDC7Qu76vCoUhzYi8b7JGVpBa
7adPaDt8iWtS9DcNGta5KapfIuM78iyzE4x1R5eC3XhfxrKSR9zmlLyRqGY3YiwWrQgpHKzGJBEz
pcsfWyeoqt+YvSNjvlnEaRI2WMySMywsjsN21tvO3PhV1WLbct3y/wAMEaGNotZdsh/07dP7Ksou
9ZsahIVijT/SEtUIQztjw5D7CZ2VIohcMdzFVOugBteuTwZRkfHgMUkiKrNtbmz9LZx+q9YxzxRD
xZLv1LQnP+T50AH/ABM/CwXnTEn5J3aRlaTpsbjZFt0ueF6hvgZMMck520E6u5iTc9hTYcfUTYU
jLw8yFJHkjFo4w5c7tpvtG1SP3Atwpf9T8J0jHirVbF5P3rvMboj TYwFpDK4hc9Poi7em4LcbXGl
Ik7v3qNcgtk4iwxHaJWiK7n6fV2WLXWw0rPd2jzMOZRkZHVkkiuWDNfpNyqDu/1eFKhwu4S5CYZz
Ck2YnXnjbcQse26vJwBuPCs/tpKfTr5FqvkWr53fYcaJieGWbIMY9uIW3gyrvWxJCsQvECux9w7p
i5rtJlwxiDGGTvOOzehjbaVDaNVdPjdzy5Mv Kl2ggp7azhGUPsVo1F+mP/HyAvTC9q7j1d0Zs7rLm
wGSeR9y7Yo2A2vf6hfhU1w425br+Bt926XHlo+hdT94/JrQ5by4u6YQrDH0jduu1hoW5cacy08fk
0eW2JDNizFI0kB60wEu/TVPU/jqKo4u1dwlSbI90On jl1jmLvtBxVujpbjbgoqF2xcvuWY8mRkzB
ChHlaPWRjvCx7b6CzG9+VXXBSLW9LVd9COVtp22NRJ3X8qnCxq+LPG0zwvaL6ERghlsWvtvVRPl9
wjwWz5JsdTc9KHZYyKHMe5bt5Xt4U9mYTYuUkUGdlr26JJsiXHLDqgRNY1TbXqNrqKiYeJj53asi
VVm9vG5GJgPk7RdE6krglPUedtKSx43xbquMroXTPkx+yzrJyHu2YcH3s0kX2cuWV8mRkc+hP0kB
QAanTJ373/sxJD0ArOcsJZdqAF7rcm634VS/j0BzJZsWaZ17fEhyJohIllLKQFJdtBUybHzcnInz
sTukjLjiX2MkhbfJHGB1LMoCqNba8a0v2+JZLKKVXnWV5FPu8zWuRuS47b19/If2L4cix5Ix+uIi
wIOrTbt3Bb2pWR+RflCYDZrT4xiM7Y8QWE3Z1fYD9X0mxqgTD7hjvVj/AHIwdBOvnBQ+2HcVYXt9
bE24Uk9s7r7EZfuilGjSWGM3u15dsYAPO53Ulgxpe7H/ACsydrTLcst099y77hQK+VPju8srR9NY
/V6ALkknzqk/qHuI4dP/AOlL7z2zuGHDHNnZXXaSaRUjJJa4sXkN/wDUaqX9HtMGP75ScVtr0E728
T36kNe9FFeFUjJsMScDeqOofobTfre1svU3/TxGz6taKK0WxyW935vkMP916r9fqcDv8Ar3bf99tb
X8as5Pt3Fupv6Xo+r6b+f0iipZvi3/N9Qy/27pnf1+tr1Prl6lv3aW8At+FR5ft3/3SW/X2CNvq97
/O9FFXxjM46e7f7foRx9t3n/2fc2/kvu6tr7c7qRH7X3A3svd/UbbLbGd24bvr/3CaKKF4GrS/VIjz/b
LTdfr7eqfc2/4+pf1button/hSJPtfWHW931dnq47ulb9318aKKpftBXX+t8zsv2vwbfe+306F7+J

2903PwpyT+mOsep7/wBzuTfa+7qX9G637r0UVNvmd2P2/wC41L/Stj1fuNtrXvf6d/q4/wC/j513
N+0/v+59WyW6nC1/4/L6v+tFFL+Yt+1mf7h7LcOr7nftOzr+G71Wv51Owul1Mfb9x6/QPR22v0f3
bd37aKKeT2195eH5bfmGpPtvRm6X3Dp/ydbha9xu3387U5263vR9x+5e42HpdG1+l+np20UVNNn7
jTLsv0/p3JZ/pf23p+7e1tL9P0cf5vLjxqP2z+k/ex/avunvv/H0bbrc78rfHSiitaey3v8A9PmY
nU/p77qdn3n7tc34dbzvu5W/Snz9o9rkW+8+x3v7q2y2/wD8m793/daiih9Pd0BFO39M9Kf7d9w9
ttHu77duy/p3eV6E9j9ufZ7/AO2bz1Nt+nu040UVpk6/qdNzpxfp/wBH69yUOl1xf7r7jo6W2X6F
v3buXx1qPP7W0VvuPT2xdPftts3fw7eX18KKK1brf6iMm79n0jOZ9vuv3L399z26m2++/wDJ+t6S
n9G/v9/fnbZRRo4/wBNfqf2tjB79D//2Q==

------=_NextPart_000_0348_01C0FF05.E0ECAB60--

465

```
From Abu Hamza Thu Apr 19 12:12:06 2001
X-RocketMail: 00000021;R---S-----------;0851
X-Apparently-To: seifchapman@yahoo.com via web4401
Return-Path: <affairsofmuslims@hotmail.com>
X-Track: 1: 40
Received: from dav33.law15.hotmail.com  (EHLO hotmail.com) (64.4.22.90)
  by mta229.mail.yahoo.com with SMTP; 19 Apr 2001 12:14:04 -0700 (PDT)
Received: from mail pickup service by hotmail.com with Microsoft SMTPSVC;
      Thu, 19 Apr 2001 12:14:04 -0700
X-Originating-IP: [64.36.82.26]
From: "Abu Hamza" <affairsofmuslims@hotmail.com>
To: "Affairs of Muslims" <abuhamza20@yahoogroups.com>
Subject: CHECHNYA: Very nice videos
Date: Thu, 19 Apr 2001 15:12:06 -0400
MIME-Version: 1.0
Content-Type: multipart/alternative;      boundary="----
=_NextPart_000_0688_01C0C8E3.18AA01A0"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4133.2400
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4133.2400
Message-ID: <DAV33kLQ8aZRhQdOgl40000017e@hotmail.com>
X-OriginalArrivalTime: 19 Apr 2001 19:14:04.0371 (UTC)
FILETIME=[E6174230:01C0C904]
Content-Length: 846

This is a multi-part message in MIME format.

------=_NextPart_000_0688_01C0C8E3.18AA01A0
Content-Type: text/plain;
      charset="iso-8859-1"
Content-Transfer-Encoding: quoted-printable

http://www.kavkaz.org/english/media/video.htm

------=_NextPart_000_0688_01C0C8E3.18AA01A0
Content-Type: text/html;
      charset="iso-8859-1"
Content-Transfer-Encoding: quoted-printable

<!DOCTYPE HTML PUBLIC "-//W3C//DTD HTML 4.0 Transitional//EN">
<HTML><HEAD>
<META http-equiv=3DContent-Type content=3D"text/html; =
charset=3Diso-8859-1">
<META content=3D"MSHTML 5.50.4134.600" name=3DGENERATOR>
<STYLE></STYLE>
</HEAD>
<BODY bgColor=3D#ffffff>
<DIV><FONT face=3DArial size=3D2><A=20
href=3D"http://www.kavkaz.org/english/media/video.htm">http://www.kavkaz.=
org/english/media/video.htm</A></FONT></DIV></BODY></HTML>

------=_NextPart_000_0688_01C0C8E3.18AA01A0--

From nabil@gharbieh.com Tue Apr 24 11:57:37 2001
X-RocketMail: 00000021;R---S-----------;1346
X-Apparently-To: seifchapman@yahoo.com via web4404
Return-Path: <nabil@gharbieh.com>
X-Track: -10
Received: from smtp-hub.mrf.mail.rcn.net (207.172.4.107)
  by mta456.mail.yahoo.com with SMTP; 24 Apr 2001 11:59:13 -0700 (PDT)
```

GOVERNMENT EXHIBIT

```
Received: from smtp02.mrf.mail.rcn.net ([207.172.4.61])
        by smtp-hub.mrf.mail.rcn.net with esmtp (Exim 3.16 #5)
        id 14s81k-0001Fz-00; Tue, 24 Apr 2001 14:59:08 -0400
Received: from 207-172-52-75.s75.tnt1.brd.va.dialup.rcn.com ([207.172.52.75]
helo=b6p9i7)
        by smtp02.mrf.mail.rcn.net with smtp (Exim 3.16 #5)
        id 14s81j-0006T2-00 ; Tue, 24 Apr 2001 14:59:07 -0400
Message-ID: <006201c0ccf0$704596c0$4b34accf@b6p9i7>
From: <nabil@gharbieh.com>
To: "hammad abdur-raheem" <hammad6@hotmail.com>,
        "Abdullah Zakaria" <allracesinone@hotmail.com>,
        "AbuAsiyah" <abuasiyah@erols.com>,
        "Allen Shafiq" <asantora@gmu.edu>,
        "Br. Ashraf" <mujahid10@hotmail.com>,
        "Br. Farhat" <farhat@yahoo.com>,
        "Br. Khalif" <caliph54@hotmail.com>,
        "Haroon Zakaria" <hzikria@aol.com>,
        "Haroun Mateen" <harunmateen1@yahoo.com>,
        <hshakur@hotmail.com>,
        "Husanain Awan" <husanain@paintballers.intranets.com>,
        "Ibrahim Y" <yemen77@hotmail.com>,
        "Idris Suratt" <shai07@hotmail.com>,
        "Nader" <nkalifa@yahoo.com>,
        "Omar M" <omarmadani@yahoo.com>,
        "Omer S" <oyem@hotmail.com>,
        "Saifullah Chapman" <seifchapman@yahoo.com>,
        "Yung Kwon" <r_kwon@hotmail.com>
Subject: USS LIBERTY
Date: Tue, 24 Apr 2001 14:57:37 -0400
MIME-Version: 1.0
Content-Type: multipart/alternative;
        boundary="----=_NextPart_000_005F_01C0CCCE.E6F1A7E0"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.00.2615.200
X-MimeOLE: Produced By Microsoft MimeOLE V5.00.2615.200
Content-Length: 818

This is a multi-part message in MIME format.

------=_NextPart_000_005F_01C0CCCE.E6F1A7E0
Content-Type: text/plain;
        charset="iso-8859-1"
Content-Transfer-Encoding: quoted-printable

http://www.halcyon.com/jim/ussliberty/

------=_NextPart_000_005F_01C0CCCE.E6F1A7E0
Content-Type: text/html;
        charset="iso-8859-1"
Content-Transfer-Encoding: quoted-printable

<!DOCTYPE HTML PUBLIC "-//W3C//DTD HTML 4.0 Transitional//EN">
<HTML><HEAD>
<META content=3D"text/html; charset=3Diso-8859-1" =
http-equiv=3DContent-Type>
<META content=3D"MSHTML 5.00.2614.3500" name=3DGENERATOR>
<STYLE></STYLE>
</HEAD>
<BODY bgColor=3D#ffffff>
<DIV><FONT face=3DArial><A=20
```

href=3D"http://www.halcyon.com/jim/ussliberty/">http://www.halcyon.com/ji=
m/ussliberty/</A></FONT></DIV></BODY></HTML>

------=_NextPart_000_005F_01C0CCCE.E6F1A7E0--

Exhibit K

# COPY

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | . | Criminal No. 03-296-A |
| | . | |
| vs. | . | Alexandria, Virginia |
| | . | February 19, 2004 |
| MASOUD AHMAD KHAN, | . | 10:00 a.m. |
| SEIFULLAH CHAPMAN, | . | |
| HAMMAD ABDUR-RAHEEM, | . | |
| CALIPH BASHA IBN ABDUR-RAHEEM, | . | |
| | . | |
| Defendants. | . | |
| | . | |

. . . . . . . . . .

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME VIII

APPEARANCES:

FOR THE GOVERNMENT:       GORDON D. KROMBERG, AUSA
                          DAVID H. LAUFMAN, AUSA
                          United States Attorney's Office
                          2100 Jamieson Avenue
                          Alexandria, VA 22314
                            and
                          JOHN T. GIBBS, ESQ.
                          Counterterrorism Section
                          Criminal Division
                          United States Department of Justice
                          601 D Street, N.W.
                          Washington, D.C. 20004


FOR DEFENDANT KHAN:       BERNARD S. GRIMM, ESQ.
                          JENIFER WICKS, ESQ.
                          Grimm & Wieser
                          307 G Street, N.W.
                          Washington, D.C. 20001

(APPEARANCES CONT'D. ON NEXT PAGE)

(Pages 1793 - 2087)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1   APPEARANCES:  (Cont'd.)

 2   FOR DEFENDANT CHAPMAN:        JOHN K. ZWERLING, ESQ.
                                  LISA BONDAREFF KEMLER, ESQ.
 3                                Zwerling & Kemler, P.C.
                                  108 North Alfred Street
 4                                Alexandria, VA 22314

 5
     FOR DEFENDANT HAMMAD         WILLIAM B. CUMMINGS, ESQ.
 6      ABDUR-RAHEEM:             William B. Cummings, P.C.
                                  112 South Pitt Street
 7                                Alexandria, VA 22314

 8
     FOR DEFENDANT CALIPH BASHA   CHRISTOPHER AMOLSCH, ESQ.
 9      IBN ABDUR-RAHEEM:         Law Office of Christopher Amolsch
                                  221 South Fayette Street
10                                Alexandria, VA 22314

11
     ALSO PRESENT:               S.A. WADE AMMERMAN
12                               S.A. BRIAN BALGAARD
                                 DANIEL GROOMS, SAUSA
13                               SHEILA MYRICK
                                 BOBBY WILLIAMS
14                               S.A. JOHN WYMAN

15
     OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
16                                U.S. District Court, Fifth Floor
                                  401 Courthouse Square
17                                Alexandria, VA 22314
                                  (703)299-8595
18

19

20

21

22

23

24

25
```

Case 1:04-cr-00385-LMB Document 339 Filed 09/06/13 Page 125 of 134 PageID# 645

I N D E X

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **WITNESSES ON BEHALF OF THE GOVERNMENT:** | | | | |
| Yong Ki Kwon (Resumed) | | 1798 1808 | 1810 | 1832 1836 1840 |
| Hany Iskandar | 1845 | 1864 1866 | | |
| S.A. John Wyman (Recalled) | 1877 | 2015 2021 2038 2059 2075 | 2079 | 2084 |

EXHIBITS

| | STRICKEN | RECEIVED |
|---|---|---|
| **GOVERNMENT'S:** | | |
| No. 3C4 | | 1868 |
| 3C4a | | 1868 |
| 3C4b | | 1868 |
| 4A6a | | 1863 |
| 4A6b | | 1863 |
| 4C5 | | 1868 |
| 4C7 | | 1869 |
| 5A1 | | 2013 |
| 5A2 | | 2012 |
| 5A7 | 1892 | |
| 5C1 | | 2013 |
| 5C2 | | 1869 |
| 5C3 | | 1869 |
| 5C4 | | 1869 |
| 5C5 | | 1869 |
| 5C10a | | 1870 |
| 5C10b | | 1870 |
| 5C11 | | 1870 |
| 5C12 | | 1869 |

1   EXHIBITS  (Cont'd.)

2                                                    RECEIVED

3   GOVERNMENT'S:

4   No.  5F3                                         2012
         6A2                                         2012
5        6C2                                         1869
         7A1                                         1862
6        7A1a                                        1862

7        7A15                                        1863
         7A20                                        1862
8        7A20a                                       1862
         7A38                                        1863
9        7A38a                                       1863

10       7A39                                        1863
         7A39a                                       1863
11       7H13                                        1867
         7H19a                                       1922
12       8-19                                        1868

13       8-22                                        1868
         8-23                                        1869
14       8-27                                        1869
         8-30                                        1870

15

16

17

18

19

20

21

22

23

24

25

1   Q.   Okay.  And the other one that was later sold to Nabil was

2   really the testimony, was it not, that it was sold to Nader,

3   "Nader"?

4   A.   No.  I think I actually have -- I think 6A2 --

5   Q.   That's the receipt.

6   A.   -- is the receipt for the --

7   Q.   I'm sorry, wasn't the testimony of Mr. Nabil that about six

8   months prior to the creation of that bill of sale, Seif Chapman

9   had given the gun to his cousin at his request?

10   A.   I don't remember exactly what he said about that.

11   Q.   All right.

12          THE COURT:  We'll get back to it.  Go ahead.

13          MR. ZWERLING:  Thank you, Your Honor.

14   Q.   Page 13, December 18, 2000, the weapon that was sold to

15   Mr. Al-Hamdi in December of 2000, do you recall Mr. Al-Hamdi

16   saying that he bought it to go hunting?

17   A.   In his testimony?

18   Q.   Yes.  Also in his debriefs, if I'm not mistaken.

19   A.   I mean, I don't remember his testimony whether he said go

20   hunting or not, but he certainly has said at times that was one

21   of the reasons that he wanted to buy it -- was the reason he

22   wanted to buy it.

23   Q.   Was to go hunting?

24   A.   Right.

25   Q.   Okay.  And if you would look at page 14, March 5, is that

1   the first time anybody -- you have any record that anybody's

2   buying paintball equipment or, I guess, paintballs, Pev's

3   paintballs, the first time they bought paintballs in 2001, the

4   beginning of their paintball season?

5   A.   Again, all we have in here are Kwon's and Hamdi's.  They

6   were the main purchasers of paintball equipment.

7   Q.   All right.

8   A.   I know there were some by other, other people.  I think

9   that's the first one in this time line, but I just want to point

10  out that it is limited to the two major purchasers.

11  Q.   Well, as to what is in evidence in this case, this is the

12  only evidence --

13  A.   Okay.

14  Q.   This is the earliest evidence of paintballs being bought in

15  2001, correct?

16  A.   Right.

17  Q.   And then six days later, March 11, is when they were playing

18  paintball and on the way back, there was a car accident, correct?

19  A.   Correct.

20  Q.   Now, you have in here that -- I'm not going to argue about

21  your use of the word "conspirators," but I would point out to the

22  Court we're not conceding it by not objecting to it.  That's for

23  the Court to determine.

24       But you used "practiced military tactics using

25  paintball equipment."  They told you they played paintball on

1  that day, didn't they?  Isn't that how they worded it?

2  A.  No.  I've been told, I've been told a variety of things

3  about what they were doing at paintball, but the specific

4  language that went into this bullet was, I guess was taken as a,

5  as an act out of the -- the language itself was taken as an act

6  out of the indictment as far as a time line, and so I was trying

7  to tie it to the evidence.

8  Q.  But really as far as being a summary, the summary is that

9  this is when they went there and they played paintball?

10  A.  Correct.

11  Q.  All right.

12        THE COURT:  I've changed it for my own edification, all

13  right?

14        MR. ZWERLING:  Thank you, Your Honor.  I appreciate it.

15  Q.  And you're aware that Nabil and Hamdi both testified after

16  the accident, that was the last time Mr. Chapman played

17  paintball?

18  A.  I don't know that that's the case.

19  Q.  You weren't here for their testimony?

20  A.  I've been here, but I don't remember whether they said that

21  was the last time or not.

22  Q.  If they had -- the next thing I want to point to is April

23  15, where it says that Chapman played paintball with Mr. Wells

24  and others.  You are aware that Mr. Wells was never asked to

25  physically identify who it was he thought was Seif Chapman in the

1    courtroom?

2    A.    Whether he identified Seif Chapman or not?

3    Q.    As this person.

4    A.    Or whether he just said it?  I don't remember him

5    identifying him.

6    Q.    All right.

7    A.    I don't remember whether that happened.

8    Q.    All right.  And, and you say you don't recall Nabil's

9    testimony and Al-Hamdi's testimony about the accident being the

10   last time Seif Chapman played?

11   A.    I remember them discussing the accident.  I don't remember

12   the specific point about whether Seif was there afterwards.

13   Q.    Okay.  Page 20, December 31, what do you mean by "recorded

14   conversation"?

15   A.    That is -- it's language we use to -- that was obtained off

16   of a FISA that's now declassified, as opposed to a search

17   warrant.  So it was a recorded -- it's a recorded conversation

18   between them, as opposed to a search on an e-mail.  So it's a

19   recorded conversation.

20   Q.    The e-mail was recorded?

21   A.    Correct.

22   Q.    Okay.  It was not voice mail?

23              MR. KROMBERG:  And if I could make a suggestion?

24              THE COURT:  Yes.

25              MR. KROMBERG:  That we just cross out "recorded

1  conversation"?

2          MR. ZWERLING:  Sure.  I just was a little confused.

3  Thank you.

4  Q.   And it was from Royer, sent to affairsofmuslims@hotmail, and

5  then sent on to other people, including Seif Chapman, correct?

6  A.   I believe the way it -- maybe I can look at the exhibit, but

7  I think the way, I think the way it worked was -- well, maybe we

8  could look -- if I can look at the exhibit?

9  Q.   All right.  4G4.

10         THE COURT:  All right.

11 BY MR. ZWERLING:

12 Q.   Do you see where it says "Apparently-To"?

13 A.   Right.  It appears that Royer sent this to the Al-Jazeera

14 mailing list, and Chapman is part of that mailing list, and

15 that's why he got it.

16 Q.   And that's what I was asking.

17 A.   Right.

18 Q.   Thank you.

19         March 7, just a little down -- March 27, '02, this is

20 the only time I noticed you using a qualifier, and in the

21 summary, I'm wondering whether it's appropriate to

22 use "individual using the name Pal Singh."  Every place else you

23 say Pal Singh did this, Pal Singh did that, or So-and-so

24 did this.

25 A.   I didn't want to keep saying "individual using the name" on

Exhibit L


SECRET - NOFORN - ORCON - X1
FISA Derived

X-Apparently-To: seifchapman@yahoo.com via web4401
Return-Path: <affairsofmuslims@hotmail.com>
X-Track: 1: 40
Received: from dav33.law15.hotmail.com  (EHLO hotmail.com) (64.4.22.90) by
mta229.mail.yahoo.com with SMTP; 19 Apr 2001 12:14:04 -0700 (PDT)
Received: from mail pickup service by hotmail.com with Microsoft SMTPSVC; Thu, 19 Apr
2001 12:14:04 -0700
X-Originating-IP: [64.36.82.26]
From: "Abu Hamza" <affairsofmuslims@hotmail.com>
To: "Affairs of Muslims" <abuhamza20@yahoogroups.com>
Subject: CHECHNYA: Very nice videos
Date: Thu, 19 Apr 2001 15:12:06 -0400
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4133.2400
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4133.2400
Message-ID: <DAV33kLQ8aZRhQdOgl40000017e@hotmail.com>
X-OriginalArrivalTime: 19 Apr 2001 19:14:04.0371 (UTC) FILETIME=[E6174230:01C0C904]

DECLASSIFIED BY 60267NLS/BAW
ON 1 13 04

STAU Comment: Plain Text version
http://www.kavkaz.org/english/media/video.htm

STAU Comment: HTML version
http://www.kavkaz.org/english/media/video.htm

1 13 04
CLASSIFIED BY: 60267NLS(LV)/BAW
REASON: 1 5 (1)
DECLASSIFY ON: X 1-13-2029

STAU Comment: MIME Postfix

From nabil@gharbieh.com Tue Apr 24 11:57:37 2001

STAU Comment: End Postfix

SECRET - NOFORN - ORCON - X1
FISA Derived

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE



GOVERNMENT
EXHIBIT
4G5
03-296-A



Case 1:04-cr-00385-LMB Document 339 Filed 09/06/13 Page 134 of 134 PageID# 654

SECRET - NOFORN - ORCON - X1
FISA Derived

X-Apparently-To: seifchapman@yahoo.com via web4406; 26 Jun 2001 06:46:40 -0700 (PDT)
X-Track: 1: 40
Received: from dav28.law15.hotmail.com (EHLO hotmail.com) (64.4.22.85) by
mta542.mail.yahoo.com with SMTP; 26 Jun 2001 06:46:40 -0700 (PDT)
Received: from mail pickup service by hotmail.com with Microsoft SMTPSVC; Tue, 26 Jun
2001 06:46:40 -0700
X-Originating-IP: [64.36.82.26]
From: "Abu Hamza" <affairsofmuslims@hotmail.com>
To: "Affairs of Muslims" <abuhamza20@yahoogroups.com>
Cc: <amir@eisa.net.au>, "Saifullah Chapman" <seifchapman@yahoo.com>, "hammad abdur-
raheem" <hammad6@hotmail.com>, "saff" <saff@bih.net.ba>
Subject: On-line video of Bin Ladin training camp on Al-Jazeerah
Date: Tue, 26 Jun 2001 09:43:52 -0400
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200
Message-ID: <DAV28ljF9Q0Z3FZLvGV000033a6@hotmail.com>
X-OriginalArrivalTime: 26 Jun 2001 13:46:40.0657 (UTC) FILETIME=[6D9D6010:01C0FE46]

DECLASSIFIED BY 60267NLS/BAW
ON 1/13/04

STAU Comment: Plain Text version

Bin Laden Special Training Camps [Video, Arabic]

URL: http://www.aljazeera.net/mritems/streams/video/2001/6/20/1_40521_1_12.ASF

STAU Comment: HTML version

Bin Laden Special Training Camps [Video, Arabic]

URL: http://www.aljazeera.net/mritems/streams/video/2001/6/20/1_40521_1_12.ASF

STAU Comment: MIME Postfix

From affairsofmuslims@hotmail.com Wed Jun 27 16:39:06 2001

1/13/04
CLASSIFIED BY: 60266NLS(vc)Ban
REASON: 1.5 (1)(X)
DECLASSIFY ON: X1/13/2029

STAU Comment: End Postfix

SECRET - NOFORN - ORCON - X1
FISA Derived

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE

(153)

GOVERNMENT
EXHIBIT

4G6
03-296-A