REDACTED / CLEARED FOR PUBLIC RELEASE

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

Filed with Classified
Information Security Officer

CISO _____

Date ___ 4 | 28 | 2014

UNITED STATES OF AMERICA,       )
                                   )
                                   )
    v.                      )
                                   )    1:04cr385 (LMB)
                                   )
ALI AL-TIMIMI,               )
                                   )
         Defendant.      )

## MEMORANDUM OPINION

Before the Court are several post-conviction motions by defendant to compel discovery. For the reasons stated in open court and in this Memorandum Opinion, each such motion will be denied.

### I.   BACKGROUND

This is a complex criminal case, the history of which now spans more than a decade. In the interest of brevity, only the essential events are recounted here. By 2000, defendant Ali al-Timimi was a principal lecturer at the Dar al-Arqam Islamic Center, a mosque located in Falls Church, Virginia. Among the worshippers there was a group of devout young men who were ultimately convicted of various crimes relating to their preparations for violent jihad, the so-called Virginia Jihad Network. See generally United States v. Khan, 309 F. Supp. 2d 789 (E.D. Va. 2004). On September 16, 2001, five days after terrorists attacked the Pentagon and World Trade Center,

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

defendant attended a group dinner meeting with several of these men to speak about the events.  Upon arriving, defendant first instructed those present to disconnect the phones and draw the blinds.  He then proceeded to advise the men that it would become necessary to defend Islam by engaging in violent jihad against enemies of their faith, including the United States military in Afghanistan.  Some of the men present heeded defendant's words and shortly thereafter flew to Pakistan to obtain military training at a camp run by Lashkar-e-Taiba ("LET"), a group which landed on the State Department's Foreign Terrorist Organization list in December 2001.

A criminal investigation of defendant began in early 2003 after the Federal Bureau of Investigation ("FBI") received an anonymous tip from someone associated with Dar al-Arqam.  This was not the first time defendant had come to the attention of federal authorities.  His name appears in internal FBI memoranda as far back as 2000.  The FBI had also contacted him directly in 2001 to arrange multiple interviews a week after the September 11 attacks.  Defendant even complained a month later that the FBI had started harassing his brother because of their relationship.  Once the criminal investigation launched, defendant's phone was routinely tapped, his home was searched, and he was eventually brought in for an interview with the FBI.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

On September 23, 2004, a grand jury returned an indictment charging defendant with six terrorism-related counts, including conspiring to levy war against the United States, in violation of 18 U.S.C. §§ 371 and 2384; attempting to contribute services to the Taliban, in violation of 50 U.S.C. § 1705; aiding and abetting the use of firearms in connection with a crime of violence, in violation of 18 U.S.C. § 924(c); and aiding and abetting the carrying of explosives during the commission of a felony, in violation of 18 U.S.C. § 844(h).  Dkt. No. 1.  On February 3, 2005, a ten-count superseding indictment was returned, charging defendant with additional counts for soliciting others to levy war against the United States, in violation of 18 U.S.C. § 373; inducing others to conspire to violate the Neutrality Act, in violation of 18 U.S.C. §§ 371 and 960; and inducing others to conspire to use firearms, in violation of 18 U.S.C. § 924(n).  Dkt. No. 47.  After a jury trial in which several of the previously convicted young men testified, defendant was convicted on all counts.  Dkt. No. 107. As a result, on July 13, 2005, the Court sentenced him to life imprisonment.  Dkt. No. 132.

Defendant filed a notice of appeal.  Dkt. No. 133.  On April 25, 2006, while his appeal was pending, the Fourth Circuit remanded the case for additional proceedings after defendant raised concerns stemming from public reports of previously

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

undisclosed government surveillance programs, arguing that withheld evidence derived from such programs might constitute Brady material.  The Fourth Circuit directed the Court to address defendant's concerns "and order whatever relief or changes in the case, if any, that it considers appropriate." Dkt. No. 164.

Defendant thereafter filed a series of motions requesting disclosure of intercepted communications and other documents by the government.  Among a bevy of actions, the Court ordered the government to bring forth for inspection all documents used to support a relevant Foreign Intelligence Surveillance Act ("FISA") warrant, Dkt. No. 182; denied defendant's request for access to classified portions of the National Archives, Dkt. No. 231; and ordered the government to search the records of the Central Intelligence Agency ("CIA"), Department of Defense ("DoD"), National Security Agency ("NSA"), and FBI to provide a response to five specific inquiries made by defendant, Dkt. No. 271.  Since 2006, defendant has on several occasions sought to compel the government to make available allegedly undisclosed surveillance evidence within its possession.[1]

---

[1] The delay in resolving some of these motions has been due to the government's refusal to clear any of this Court's term judicial clerks for access to certain classified materials.

REDACTED / CLEARED FOR PUBLIC RELEASE

In the immediate aftermath of Edward Snowden's revelatory leaks about NSA surveillance activities, defendant filed seven new motions seeking to compel discovery of evidence relating to various individuals and surveillance programs.  These motions are currently before the Court:  Motion to Compel Discovery Related to Anwar al-Aulaqi, Dkt. No. 300; Motion to Compel Discovery Related to Abu Khalid, Dkt. No. 306; Motion to Compel Discovery of Undisclosed Material Intercept Evidence Captured Pursuant to Foreign Intelligence Surveillance Act, Dkt. No. 312; Motion to Compel Discovery of Evidence Gathered Pursuant to the Presidential Surveillance Program and "Other Intelligence Activities," Dkt. No. 319; Motion to Compel Discovery of Any Classified Evidence Gathered Pursuant to the Presidential Surveillance Program and "Other Intelligence Activities," Dkt. No. 320; Motion to Compel Classified Discovery Related to Khwaja Mahmood Hasan, Dkt. No. 323; Motion to Compel Discovery Related to Khwaja Mahmood Hasan, Dkt. No. 325.

## II.    LEGAL STANDARD

Each of defendant's motions invokes Brady v. Maryland, 373 U.S. 83 (1963), which introduced a now-familiar standard: "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Id. at 87.  A

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Brady violation therefore has three components: (1) the evidence
must be favorable to the defendant; (2) the evidence must have
been suppressed by the government; and (3) the evidence must be
material to the guilt or innocence of the defendant.  See id.;
see also United States v. McLean, 715 F.3d 129, 142 (4th Cir.
2013) (enumerating the requirements of a Brady claim).  Evidence
is considered "favorable" if it is exculpatory, Brady, 373 U.S.
at 87, or if it is impeaching, Giglio v. United States, 405 U.S.
150, 154-55 (1972).  Evidence is considered "material" if there
is "a reasonable probability that [its] disclosure . . . would
have produced a different outcome" at trial.  McLean, 715 F.3d
at 142 (citing Kyles v. Whitley, 514 U.S. 419, 434 (1995)).  In
other words, the materiality determination turns on whether
nondisclosure deprived the defendant of "a fair trial" and a
resulting "verdict worthy of confidence."  Kyles, 514 U.S. at
434.  That means the suppression of evidence merely marginal or
cumulative of the evidence introduced at trial is not sufficient
to establish a Brady violation.  Nor does it suffice to show
"the mere possibility that an item of undisclosed information
might have helped the defense."  See United States v. Agurs, 427
U.S. 97, 110 (1976).

Defendant's motions also invoke Fed. R. Crim. P. 16, which
is similar in principle to Brady, if slightly broader in scope.
Specifically, Rule 16 requires the government to make available

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

for inspection "item[s] . . . material to preparing the defense"
if such items are "within the government's possession, custody,
or control."  Fed. R. Crim. P. 16(a)(1)(E)(i).  This language
would seem to cast a somewhat wider net than the Brady doctrine.
See United States v. Caro, 597 F.3d 608, 620 (4th Cir. 2010);
accord United States v. Baker, 453 F.3d 419, 424 (7th Cir. 2006)
("Rule 16 . . . is broader than Brady.").  Even so, the items
sought by the defendant must still be "material" — that is, in
this context, the defendant must establish "a strong indication"
that the evidence would have "play[ed] an important role in
uncovering admissible evidence, . . . corroborating testimony,
or assisting impeachment or rebuttal."  Caro, 597 F.3d at 621
(internal quotation marks and citation omitted).

Beyond Brady and Rule 16, there is an additional wrinkle
where, as here, the government information in question is
classified or unclassified but especially important to national
security interests.  In Roviaro v. United States, 353 U.S. 53
(1957), the Supreme Court recognized a general governmental
privilege to withhold law enforcement methods and sources —
e.g., surveillance techniques — if disclosure would endanger the
secrecy of that information.  Id. at 59-60; accord United States
v. Moussaoui, 382 F.3d 453, 471-72 (4th Cir. 2004) (applying
Roviaro in the context of classified information).  Such
privilege "give[s] way," however, where disclosure would be

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

"relevant and helpful to the defense of an accused" or would be "essential to a fair determination of a cause."   Rovario, 353 U.S. at 60-61.  Courts consider a number of factors in applying the Rovario balancing test.  One factor is whether the defendant can make more than "a mere showing of theoretical relevance." United States v. Yunis, 867 F.2d 617, 623 (D.C. Cir. 1989).  In other words, courts consider whether the privileged information sought would be "useful to counter the government's case or to bolster a defense."  United States v. Aref, 533 F.3d 72, 80 (2d Cir. 2008) (internal quotation marks and citation omitted). Another factor is whether "the assertion of privilege by the government is at least a colorable one."  Yunis, 867 F.2d at 623.  But there is no "fixed rule" regarding disclosure.  See Rovario, 353 U.S. at 628-29.  Ultimately, courts must make a pragmatic determination after engaging in the fact-intensive task of balancing a defendant's right to discovery against the government's legitimate assertion of privilege.  Id. at 629.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

### III.    DISCUSSION

Defendant generally argues that the government flouted its obligations under <u>Brady</u> and Rule 16 by failing to disclose that certain evidence introduced against him at trial was derived from then-unknown electronic surveillance programs.  The Court will consider each of defendant's motions to compel in turn.

### A.  Motion to Compel Discovery Related to Anwar al-Aulaqi

Defendant seeks "surveillance evidence, field reports, and recordings" of a brief meeting in October 2002 between himself and Anwar al-Aulaqi,[2] an American-born cleric killed by a drone strike in Yemen more than two years ago.[3]  Dkt. No. 301, at 3. Defendant contends that the meeting "could not have happened without the government's knowledge or facilitation" because al-Aulaqi was the subject of intense FBI scrutiny at the time.  In support, defendant cites a number of public sources to the same effect, including a book by national security journalist Catherine Herridge and a list of search results of classified documents provided by the National Archives.  Defendant goes so far as to suggest that at the time of their meeting al-Aulaqi

---

[2] Although his last name is also spelled "al-Awlaki" at various points in the record, the Court will defer to defendant's preferred spelling for the sake of clarity.

[3] Defendant requested substantially similar discovery from the government in a letter dated September 14, 2007, pursuant to an Order of the Court, Dkt. No. 231, but was rebuffed.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

may have been a government "asset" or, at the very least, was accompanied to defendant's residence by someone who was an asset.

Defendant argues that any information regarding what was said that night, if it exists, must be disclosed under Brady or Rule 16 for two reasons. First, it would impeach the testimony of FBI Special Agent Wade Ammerman, who led the criminal investigation and testified at trial that the investigation only began after receipt of an anonymous tip in November 2002, one month after the meeting with al-Aulaqi took place, implying that Ammerman lied to obscure the existence of illegal surveillance. Second, the evidence sought would be exculpatory to the extent it shows that defendant turned down al-Aulaqi's entreaty to recruit young men at Dar al-Arqam for violent jihad against the United States. Id. at 18. The government curtly responds that defendant "has been provided with all information to which he is entitled by law." Dkt. No. 304, at 2. In its public position, the government neither concedes nor denies that such evidence exists.

In a highly classified document to which only the Court, and none of the Court's cleared staff, has been allowed access, the government has provided sufficient information to satisfy the Court that the government has not violated its obligations under either Brady or Rule 16. See Dkt. Nos. 185, 331

REDACTED / CLEARED FOR PUBLIC RELEASE

(classified). Moreover, the government's position — that defendant cannot compel disclosure "of the extent and nature of the government's investigative tools or tactics" in this instance — has merit. Dkt. No. 304, at 1. Under Rovario, it appears to the Court that disclosing whether or not agents were listening in on the meeting or had an asset listening in for them "would endanger the secrecy of that information." 353 U.S. at 59-60. This concern is only heightened by the government's legitimate interest in preserving the integrity of ongoing counterterrorism operations. Defendant cannot make a correspondingly weighty showing — in this context, that a record likely exists of defendant making an explicitly exculpatory statement to al-Aulaqi. Short of that, the balance between defendant's need for any information relating to al-Aulaqi and the government's interest in nondisclosure favors the latter. See id. at 60-61.

B. Motion to Compel Discovery Related to Abu Khalid

Defendant seeks evidence relating to "Abu Khalid," a shadowy terrorist figure now known to be Muhammad Ajmal Khan.[4] According to defendant, Khan was the LET operative responsible for orchestrating a plot to obtain technology for unmanned

---

[4] Like al-Aulaqi, Khan's name is subject to various spellings throughout the record. The Court will again defer to defendant's preferred spelling.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

aerial vehicles ("UAVs") in the period following September 11, 2001. Dkt. No. 306, at 1. Khan is also associated with an email account that played a pivotal role in the separate prosecution of the Virginia Jihad Network members.[5]  At defendant's trial, the government introduced evidence regarding "Abu Khalid" for the purpose of establishing that some of defendant's co-conspirators maintained an active relationship with LET after defendant encouraged them to train with LET. Yet, some degree of confusion existed then as to Khalid's true identity. Defendant now contends that the government knew Khalid's true identity was Khan all along and withheld that information. Defendant requests such evidence on the theory that locating and speaking with Khan before trial would have allowed defendant "to refute the government's repeated and damaging insinuation" that defendant was associated with LET. Id.

The government makes two points in response. First, it claims Abu Khalid was in fact identified to defendant as Khan twice in pre-trial discovery: in an FBI interview report in which Mahmood Hasan positively identified a photo of Khan as "Abu Khalid" and gave a physical description of him, Dkt. No.

---

[5] Some of defendant's co-conspirators allegedly corresponded with Khan at johninformation@yahoo.uk.co regarding the purchase of technology for a remote-controlled aircraft.  Khan, 309 F. Supp. 2d at 812.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

308-2; and again in a statement made to British authorities by Yong Kwon in which Kwon identified Khan as Khalid and described the latter's association with LET, Dkt. No. 308, at 1.  Second, the government claims that any undisclosed evidence relating to Khan is outside the scope of Brady and Rule 16 because "Khan was never a significant part of the case" against defendant.  Id. at 4.  More specifically, the government claims that whether Khan did or did not know defendant was irrelevant because "the linkage that was of significance to the government was not the one between [defendant] and [the plot to] purchase the UAV, but the one between [defendant's] followers and Abu Khalid because [those connections] tended to prove that [defendant's] followers had, in fact, followed his counsel to train with and support LET."  Id. at 5.

The government's argument is well-taken.  The evidence supports its position that information linking the two names had, in fact, been turned over to defendant.  Moreover, under Brady, it is difficult to imagine how evidence relating to Khan is either "favorable" to defendant's cause or "material" to his guilt or innocence.  See 373 U.S. at 87.  The ability to show that defendant had no contact with or awareness of Khan does not exculpate him of taking steps to incite his followers to engage in violent jihad, including taking up arms against the United States military in Afghanistan.  Nor does it refute the core

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

evidence introduced at trial of defendant's statements at a
dinner meeting with his co-conspirators on September 16, 2001 —
not to mention other inflammatory statements made at other
points in time.  Accordingly, disclosure almost certainly would
not have produced a different outcome at trial.  See McLean, 715
F.3d at 142; see also Kyles, 514 U.S. at 434.  Khan existed on
the periphery of the series of events leading to defendant's
conviction.  Indeed, the plot to obtain a UAV took root well
after defendant's followers heeded his advice at the dinner
meeting and departed for the LET training camp in Pakistan.
That some of his followers were at some later point involved in
both conspiracies is unlikely to have absolved defendant in the
eyes of the jury.  Evidence of Khan's identity is therefore too
marginal to trigger the government's obligations under Brady.
See Agurs, 427 U.S. at 110.  Nor does information about Khan's
identity come within the scope of Rule 16, which also has a
materiality requirement.  See Caro, 597 F.3d at 621.  Finally,
the implication that Khan would have communicated with
defendant's counsel is pure conjecture.

Absent a basic articulation of how additional discovery
regarding Khan could have changed the calculus at trial,
disclosure by the government is not required here under either
Brady or Rule 16.  See Agurs 427 U.S. at 110 (noting that "the

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

mere possibility that an item of undisclosed information might have helped the defense" is insufficient).

### C. Motion to Compel Discovery of Undisclosed Material Intercept Evidence Captured Pursuant to Foreign Intelligence Surveillance Act

Defendant seeks production of all FISA surveillance evidence relating to his communications — specifically, email and telephone intercepts from surveillance conducted before the criminal investigation began in 2003. Dkt. No. 312, at 1. Defendant's request cites recently obtained documents, many from the National Archives, showing that the government may have been monitoring his activities going back several years. Id. at 7. Defendant suggests his criminal investigation grew out of the then-forbidden practice of sharing FISA-derived intelligence with prosecutors, contradicting testimony to the contrary from Ammerman. Id. at 1. The government, for its part, readily admits that defendant was the subject of an intelligence investigation predating the criminal investigation. Dkt. No. 322, at 1. It also insists that all relevant FISA intercepts were disclosed to defendant before trial.[6] The government explicitly rejects defendant's assertion that the existence of

---

[6] The government references a letter, sent to defendant on December 28, 2004, in which the government confirmed that he "received all [CDs] with the telephone calls and emails that were captured under the FISA surveillance over [defendant]." Dkt. No. 312, Ex. D.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

an intelligence investigation necessarily implies the existence of additional discoverable electronic surveillance. Id. at 4.

Defendant's motion is simply too vague to grant. The Court cannot evaluate it under the rubrics provided by Brady and Rule 16 because defendant does not describe the evidence sought with any particularity. Indeed, he merely seeks all "withheld material intercept evidence captured pursuant to" FISA. Dkt. No. 312, at 1, 18. Even acknowledging that defendant faces the difficult prospect of specifying the nature of the material to which he does not have access, the Court cannot issue an order granting him "unsupervised authority to search through" the government's files — that plainly is not a facet of the right to discover exculpatory evidence. See Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987). Moreover, defendant's motion is poorly calibrated to uncover evidence that might establish that he never possessed the requisite intent to commit the crimes for which he was convicted. Defendant's motion thus amounts to little more than a fishing expedition in the end. Perhaps emboldened by recent leaks detailing the extent of previously unknown government surveillance programs, defendant's request rests heavily on plausible-sounding speculation. But that is not enough to state a viable Brady claim. See Caro, 597 F.3d 608 ("Because Caro can only speculate as to what the requested information might reveal, he cannot satisfy Brady's requirement

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

of showing that the request evidence would be favorable to the accused." (internal quotation marks and citation omitted)).

In addition, defendant's claim that any evidence at all of pre-2003 surveillance would impeach Ammerman's testimony is dubious.  Ammerman testified that the government received an anonymous tip about defendant from someone at Dar al-Arqam in November 2002 and, as a result, launched a criminal investigation in February 2003.  Defendant takes this as an affirmative statement that no investigation was undertaken before then.  Dkt. No. 312, at 4.  But such a literal interpretation of Ammerman's statement is unjustified for a number of reasons.  As the government correctly observes, defendant and his counsel were well aware of FBI interviews of defendant in 2001 immediately following the September 11 attacks.  Dkt. No. 322, at 3.  Defendant's counsel was also aware that defendant complained that his brother was harassed by the FBI because of their relationship as far back as October 2001.  In other words, there was a mutual understanding before trial that defendant had been on the government's radar for several years before the criminal investigation started in 2003. Interpreting Ammerman's testimony to deny this obvious fact is

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

uncharitable at best,[7] and it provides no basis for the Court to grant defendant's motion.

On another level, the bulk of defendant's arguments are not a particularly good fit for this type of procedural vehicle. Rule 16 does not by its terms apply to information that could only yield grounds for a motion to suppress — e.g., evidence of illegal warrantless electronic surveillance — because such information is not, generally speaking, material to the fundamental question of guilt or innocence. Fed. R. Crim. P. 16(a)(1)(E)(i); see Caro, 597 F.3d at 621. The same thing can be said of the Brady doctrine — discoverable evidence does not necessarily include the fact of illegal surveillance, as long as any exculpatory fruits of that surveillance were disclosed. See 373 U.S. at 87. And even if such fruits existed and were used against him at trial, defendant in this instance has not demonstrated that they ought to be suppressed in light of the government's extensive use of lawful means of investigation. Cf. United States v. Smith, 155 F.3d 1051, 1059-61 (9th Cir. 1998) (declining to suppress evidence allegedly derived from an

---

[7] The government explains that Ammerman's testimony "refer[ed] to the criminal investigation rather than an intelligence investigation," Dkt. No. 322, at 3, which is a much more plausible interpretation given how those distinct types of investigations were conducted before September 11, 2001.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

illegally intercepted voicemail message because the causal chain
was sufficiently weak to dissipate any taint).

### D. Motions to Compel Discovery of Evidence Gathered Pursuant to the Presidential Surveillance Program and "Other Intelligence Activities"

Defendant has filed two motions seeking production of
surveillance evidence derived from the President's Surveillance
Program ("PSP"). Because these motions are coterminous,[8] they
will be discussed together. Both request "all material evidence
captured pursuant to the President's Surveillance Program, a
collection of intelligence activities authorized by President
George W. Bush in the weeks following the terrorist attacks of
September 11, 2001." Dkt. No. 319, at 1. Defendant suspects
undisclosed evidence of this nature exists in part because of a
report published by the Inspectors General of several
intelligence agencies revealing the vast extent of warrantless
surveillance activities and in part because of the results of a
2012 Freedom of Information Act ("FOIA") request. Id. at 2; see
Dkt. No. 319-A. Accordingly, defendant seeks an order directing
the government to confirm that its prior searches encompassed
all surveillance programs and to submit a report on what
information investigators reviewed from the PSP and related

---

[8] The second motion appears to be entirely duplicative of the
first motion save for a few references to classified exhibits.
Dkt. Nos. 319, 320. Defendant claims to have filed it in
classified form only out of an abundance of caution.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

programs.  Defendant does not specify in any meaningful way what such information might look like or how it might help his cause.

The government responds that "[t]here is no need for the requested orders because the scope of the prior search encompassed the PSP, and the Court already has detailed reports on what information was reviewed by investigators. . . . No new report is necessary or appropriate . . . because detailed reports providing that information were submitted to this Court" on three separate occasions.[9]  Dkt. No. 330.  The government also filed an ex parte declaration of an NSA officer.  Dkt. No. 331.  This highly classified declaration satisfies the Court that the government has fulfilled its obligations under Brady and Rule 16.

Defendant's motion seeking PSP evidence also fails for the same reasons as his motion seeking FISA evidence — that is, defendant falls short of meeting the basic requirements of a Brady claim.  Defendant cannot show that the evidence sought is "favorable" or "material" because he does not offer the slightest hint as to what particular exculpatory evidence he seeks.  See Brady, 373 U.S. at 87.  To his credit, defendant does note that the DOJ Inspector General confirmed the existence

---

[9] The reports were filed with the Court on March 6, 2008 (Dkt No. 249); on May 14, 2008 (Dkt. No. 258); and on May 27, 2008 (Dkt. No. 259).

REDACTED / CLEARED FOR PUBLIC RELEASE

of PSP materials ▮▮▮▮▮▮ though such materials remain classified. Dkt. No. 319, at 4. But that limited admission is not sufficient on its own to trigger the government's obligations under Brady or Rule 16. Even more than the preceding motions, defendant makes a request here which the Court has no power to approve. Ritchie, 480 U.S. at 59 (holding that defendants do not have a right to rummage through the government's files).

Further, defendant does not explain why the mere fact of surveillance conducted pursuant to the PSP is discoverable evidence in this context. Nor does he address inevitable questions regarding attenuation and independent sources that would work against suppression of any PSP-derived evidence used against him at trial (assuming, of course, the existence of such evidence).

E. Motions to Compel Discovery Related to Khwaja Mahmood Hasan

Defendant has filed two motions seeking production of the phone records of co-conspirator Khwaja Mahmood Hasan[10] — specifically, to prove the existence of a voice message left for Hasan in which defendant allegedly discouraged him (and Kwon)

---

[10] As with the PSP motions, defendant filed two essentially identical motions — one for unclassified evidence and another for classified evidence of the same nature. These motions will be discussed together.

REDACTED / CLEARED FOR PUBLIC RELEASE

from going to Pakistan to train with LET.  Dkt. No. 323, at 2.
Defendant asserts that he left this message sometime around
September 19, 2001.  He also asserts that the government has
been withholding records of calls made to and from Hasan's phone
in its possession, citing public sources that indicate the
government obtained such records from telecommunications
companies and conducted its own surveillance activities at the
time.  Id. at 4.  Defendant suggests that such evidence proving
he made a call to Hasan on the date in question would be
exculpatory to the extent it corroborates his account of the
voice message allegedly discouraging his followers from
traveling abroad for purposes of levying war against the United
States.

The government counters that it "has no records of the
calls involving Hasan in [the] key period, other than those that
were obtained from the [phone records] of [defendant] and Kwon,"
both of which were introduced at trial.  Dkt. No. 329, at 1.
The government similarly disclaims any attempt to obtain Hasan's
phone records by subpoena or National Security Letter.  Id. at
3.  The Court has no good reason to doubt the government's
representations, nor has defendant provided one.  Mere
insinuation and speculation are not sufficient to demonstrate
that the government actually suppressed discoverable material.
See Brady, 373 U.S. at 87.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

More importantly, the evidence sought is not discoverable in any event. Defendant seeks mere confirmation that a call was made to Hasan's phone from his own, rather than evidence detailing the contents of the call or alleged voice message, which would not appear in the transactional records provided by a telecommunications company. Only the latter could be properly considered exculpatory. At best, the evidence sought is cumulative of defendant's testimony that he indeed made a call to Hasan on the night of September 19, 2001, a fact that was already corroborated through his own phone records, which were introduced at trial. Dkt. No. 329, at 4. Accordingly, defendant cannot satisfy the requirements of Brady or Rule 16.

## IV.     CONCLUSION

For all these reasons, each of defendant's motions to compel will be denied by an Order to be issued with this Memorandum Opinion.

Entered this _28_ day of April, 2014.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

REDACTED / CLEARED FOR PUBLIC RELEASE