1

```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
                     Alexandria Division




-----------------------------:
                             :
UNITED STATES OF AMERICA      :
                             :
                             :
    -vs-                      :   Case No. 1:04-cr-385
                             :
                             :
ALI AL-TIMIMI,                :
              Defendant.      :
                             :
-----------------------------:




                    JURY SELECTION HEARING
                        (Day 1 of 2)

                       March 31, 2005


           Before:   Leonie M. Brinkema, USDC Judge
```

APPEARANCES:

Gordon D. Kromberg and John T. Gibbs,
Counsel for the United States

Edward B. MacMahon and Alan H. Yamamoto,
Counsel for the Defendant

The Defendant, Ali Al-Timimi, in person

2

1              NOTE:  The hearing begins in the presence of a group

2    of potential jurors as follows:

3    JURY PANEL IN

4              THE CLERK:  Criminal case 2004-385, United States of

5    America versus Ali Al-Timimi.  Will counsel please note your

6    appearances for the record.

7              MR. KROMBERG:  Good morning, Your Honor.  Gordon

8    Kromberg and John Gibbs for the United States.  With us at

9    counsel table is Special Agent John Whyatt.  And behind us is

10   Special Agent Ammerman.  And paralegal Sheila Myrick from our

11   office.

12             THE COURT:  Good morning.

13             MR. MacMAHON:  Good morning, Your Honor.  Edward

14   MacMahon and Alan Yamamoto for Dr. Al-Timimi.  With us is

15   Margie Fargo, I am sure the Court knows, sitting here helping

16   us, with her assistant Stephanie.

17             Thank you.

18             THE COURT:  All right.  Good morning.

19             Ladies and gentlemen, I want to thank you for your

20   attendance this morning.  We are going to begin by calling

21   roll, just calling by number.  If you will just stand and say

22   "here" or "present," that would be fine.

23             THE CLERK:  Juror number 3.

24             JUROR NO. 3:  Here.

25             THE CLERK:  Juror number 31.

3

1          JUROR NO. 31:  Here.

2          THE CLERK:  Juror number 34.

3          JUROR NO. 34:  Here.

4          THE CLERK:  Juror number 39.

5          JUROR NO. 39:  Here.

6          THE CLERK:  Juror number 43.

7          JUROR NO. 43:  Here.

8          THE CLERK:  Juror number 47.

9          JUROR NO. 47:  Here.

10          THE CLERK:  Juror number 57.

11          JUROR NO. 57:  Here.

12          THE CLERK:  Juror number 62.

13          JUROR NO. 62:  Here.

14          THE CLERK:  Juror number 67.

15          JUROR NO. 67:  Here.

16          THE CLERK:  Juror number 74.

17          JUROR NO. 74:  Present.

18          THE CLERK:  Juror number 76.

19          JUROR NO. 76:  Here.

20          THE CLERK:  Juror number 79.

21          JUROR NO. 79:  Here.

22          THE COURT:  Excellent.  All right, ladies and

23  gentlemen, let me tell you how we're going to proceed this

24  morning.  You've been brought back to court because we want to

25  ask you some follow-up questions based on the answers you

4

1    provided in the questionnaire.

2          And I want to remind you as we go through this this

3    morning that you're still under the original affirmation that

4    you took on Monday to answer truthfully as best you possibly

5    can any and all of the Court's questions.

6          I am going to give you an opportunity this morning

7    while you're here to expand upon any answer that you provided

8    to the Court in the questionnaire.  And I'm also going to be

9    asking you whether anything has come to your mind since Monday

10   that you want to bring to our attention that you think might be

11   relevant to our considering you for jury service in this case.

12         And the last thing I just want to make sure you have

13   in mind as we talk to you individually this morning is, again,

14   the time commitment.  We, frankly, from the original pool had

15   quite a few jurors who we needed to excuse because they had

16   significant conflicts that they couldn't get around.  And we

17   want to make sure that those I shall use are addressed now

18   rather than have the trial start and then have a problem

19   because we are losing jurors.

20         We are going to move as quickly as we can because I

21   know your time is very valuable, but I want to assure you that

22   you will be finished this morning.  And so, you'll be able to

23   get on with your normal lives tomorrow.

24         And we will before you leave the courthouse, you will

25   each individually have a good sense of what further commitment,

5

1    if any, you will have as to this case.

2              At this point I am going to ask if you would go into

3    the jury room.  Mr. Wood will show you where that is.  We are

4    going to call you in here individually.  When you are called, I

5    am going to ask that you go over here and sit in the witness

6    box.

7              It is kind of an interesting perspective for jurors

8    anyway to have sat in that box because those of you who wind up

9    trying this case will have an understanding of what it's like

10   to be a witness.  But hopefully we will not take any of your

11   time too long.  We will move as quickly as we can.  But if you

12   will go with Mr. Wood.

13             Juror number 3 will be the first juror we call in, so

14   she may want to not settle down because we will have you in

15   here in a second.

16             NOTE:  The potential jurors leave the courtroom.

17             THE COURT:  Counsel, I want you to all understand, I

18   have had a chance to look at the proposed follow-up voir dire

19   that both sides have submitted.  It's not my intention to go

20   into the level of detail that the defense has requested.

21             I have looked at each individual questionnaire for

22   the 19 jurors we're going to see this morning -- and I should

23   tell you, juror number 83 came in this morning at 10 o'clock,

24   and then indicated that that juror had a medical appointment

25   this morning, asked if the juror could come back at 2.

1          So, 83 will not be in the morning questioning.  I

2     wanted you to know that, but that juror will be available in

3     the afternoon.

4          Anyway, I propose to go ahead and ask the questions

5     of the jurors.  And then if there are specific relevant

6     questions that you feel have not adequately been answered, what

7     we'll do is have -- I don't want the juror to have to be

8     sitting here too long for bench conferences.  We'll see whether

9     we need to have a bench conference or excuse the juror and then

10    just discuss what further follow-up has to be done.

11         But remember, I'm going to require that you decide --

12    any arguments as to any further for-cause basis to strike a

13    juror will be addressed right then and there.  Not in the

14    presence of the juror.  If a juror is not excused, then he or

15    she goes into the final pool, which hopefully will come back on

16    Monday so we can start the trial on Monday.  We may wind up

17    having a little slippage, we'll have to see how we do today.

18         All right.  Is there anything before we call in juror

19    number 3?

20         MR. MacMAHON:  If I could, Your Honor, just very

21    briefly.

22         The defense is concerned about the size of the pool

23    that we've got left given the amount that we're going to have.

24    And also objects to the composition of the jury in the sense

25    that there was I think one Muslim juror that was called for

7

1    service.  And given the answers that we've received, the

2    overwhelming attitudes of all these jurors in terms of

3    predisposition and religious I shall use, we just object to the

4    entire panel that was brought in and don't believe that under

5    those circumstances -- we should get a larger pool, and maybe

6    we can get a better sampling of the community than we have.

7         THE COURT:  I find that an unacceptable argument.

8    That is just a broad brush argument.  Frankly, I had just the

9    opposite reaction.  I was impressed with many of the answers.

10   Most of these jurors in my view expressed thoughtful

11   consideration of the I shall use, such as the role of religion

12   in American society.  Several of them indicated that they had

13   friends or acquaintances who were Muslim.  One person whom

14   we'll be talking to I think this morning had a coworker whose

15   child died of leukemia, the man was Muslim.  And I would be

16   interested in probing that a little bit more with that

17   particular juror.

18        But this was a random selection of jurors out of the

19   general jury wheel of the court.  There is nothing that I'm

20   aware of that was done any differently other than the number.

21   You got more than twice, almost three times the number of

22   jurors normally called for a criminal case.  This is not a

23   capital case.  And frankly, there was no requirement that the

24   Court even go to this extent.

25        But I think you've had more than enough access to

8

1    background information.  And we'll see whether or not we get

2    enough jurors.  I agree, we've excused a fair number.  But I am

3    not worrying about that issue until we see what's left after

4    today and tomorrow.

5         MR. MacMAHON:  Thank you, Your Honor.  I am concerned

6    about the terrorism, all the confusion about the I shall use in

7    the case, and perhaps the Court can do that, clear that up

8    under voir dire, but almost half of the jurors it seems thinks

9    the Taliban was responsible for 9/11.  And since that's all

10   that is going to come into this case, I just think -- I have

11   made my objection, Your Honor.

12        THE COURT:  All right.  You've made the objection,

13   but I don't think there is any basis to grant it.  So it is

14   denied.

15        Mr. Kromberg.

16        MR. KROMBERG:  Your Honor, I think I can speak for

17   Mr. MacMahon and myself, knowing how hard that we were working,

18   and we can tell that you and your staff spent an enormous

19   amount of time looking at these questionnaires, and my eyes

20   glaze over after a certain amount of time, so on behalf of Mr.

21   MacMahon and myself, and Mr. Gibbs, obviously, and Mr.

22   Yamamoto, I think we all want to thank the Court for the amount

23   of time and effort that the Court put into doing this.  This

24   was not an easy task.

25        THE COURT:  Well, it's an interesting process.  As I

9

1  said, it always reinforces my impression that the jurors in

2  Northern Virginia are a phenomenal pool, and I think we'll see

3  that as we go through the individual questioning this morning.

4          All right, let's bring in juror number 3, about whom

5  I think there are almost no I shall use.  Neither of you had

6  anything with 3.

7          NOTE:  Juror number 3 enters the courtroom.

8          THE COURT:  All right, ma'am, if you would have a

9  seat over here in the witness box.

10         I would just like to ask you, first of all, since you

11  filled out the questionnaire on Monday, has anything else come

12  to your mind that you think you might want to share with us

13  concerning your qualifications?

14         JUROR NO. 3:  Can't think of anything.

15         THE COURT:  All right, very good.  To your knowledge,

16  has anyone spoken to you or asked you any questions about your

17  possibly being a juror in this case?

18         JUROR NO. 3:  No.

19         THE COURT:  All right.  And have you read any media

20  articles -- have you read or heard any media coverage about

21  this case?

22         JUROR NO. 3:  No.

23         THE COURT:  All right.  And you've not conducted any

24  investigation on the Internet?

25         JUROR NO. 3:  No.

1          THE COURT:  All right, very good.  Again, I just want

2   to repeat, the time commitment is not going to be a problem for

3   you if you --

4          JUROR NO. 3:  As long as we're done by the time my

5   daughter gets married May 7.

6          THE COURT:  I guarantee you we will be done by then.

7          All right.  I did have one practical concern.  I know

8   from where you live, you've got a pretty good commute.

9          JUROR NO. 3:  It's horrid.

10         THE COURT:  And I want to try to start this trial at

11  9:30.  And we can't start unless we have all the jurors here.

12         Do you feel that the distance is going to be a

13  problem for you?

14         JUROR NO. 3:  Possibly.  I mean, I'm not -- I made it

15  this morning by 8:15.  It's a long drive.  It is 117 miles

16  round trip.

17         THE COURT:  I know it is a long drive.  Where do you

18  work?

19         JUROR No. 3:  I work in Manassas.

20         THE COURT:  So your normal commute is not quite that

21  long?

22         JUROR NO. 3:  No.

23         THE COURT:  And then going home at night, it is going

24  to be a long commute for you as well?

25         JUROR NO. 3:  Yes.

11

1          THE COURT:  Now, we're going to try to keep this

2    trial, if we can, to four days a week, Monday through Thursday.

3    Obviously none of us control the roads in Northern Virginia.

4    But barring some sort of problematic traffic issue, do you

5    think that you will have any problems --

6          JUROR NO. 3:  No, I am a morning person, I usually am

7    at work by 6:30.

8          THE COURT:  All right, very good.  All right, ma'am,

9    if you will just step out for one second.  I will see if we

10   have any further questions for you.

11         NOTE:  Juror number 3 leaves the courtroom.

12         THE COURT:  All right.  Any specific follow-up

13   questions for number 3?

14         MR. KROMBERG:  No, Your Honor.

15         THE COURT:  All right.  Mr. MacMahon?

16         MR. MacMAHON:  The Court has indicated that you're

17   not going to ask the questions on ours, so we --

18         THE COURT:  They are so general -- I mean, you

19   already have far more detailed information.  Where there are

20   problematic questions on the questionnaire, I myself am

21   following through.  And I think it's pretty consistent, not the

22   exact wording you've got -- but, I mean, this juror number 3,

23   there was nothing that came out on the questionnaire.

24         MR. MacMAHON:  We have no follow-up or objection to

25   this juror, Your Honor.

1          THE COURT:  All right.  Is there any argument that
2    number 3 should be excused for cause?
3          MR. KROMBERG:  No, Your Honor.
4          MR. MacMAHON:  No, Your Honor.
5          THE COURT:  All right.  Then number 3 will be our
6    first juror in the pool.  Let's just bring her back in.
7          She can stay in the corner there, Mr. Wood.
8          NOTE:  Juror number 3 returns to the courtroom.
9          THE COURT:  All right, ma'am, I am not going to make
10   you walk back across the courtroom.  We are going to consider
11   you for the final jury pool.  All right.  So there is a high
12   likelihood that you may wind up being one of the jurors who
13   actually hears this case.
14         You are going to be done with us for today, and you
15   don't need to come back here tomorrow.  I cannot yet tell you
16   exactly when we are going to start on Monday, or it might not
17   be until Tuesday.  It will not be any later than Tuesday.
18         So I don't know how that leaves it with your
19   employer.  You can certainly go to work today and you can work
20   tomorrow.
21         We will try to have an announcement on the call-in
22   system the way you got notification about today as quickly as
23   we can.  So I recommend you check first of all tonight after 6
24   o'clock.  And if there is no message, then check again
25   tomorrow, which is Friday, after 6 o'clock, and by then we will

13

1    know for certain what time.  All right?

2              JUROR NO. 3:  Okay.

3              THE COURT:  Now, I just want to remind you, it is

4    even more important now than before that you avoid any media

5    coverage about this case.  That you not conduct any

6    investigation about any of the issues in this case, such as the

7    Taliban, or paintball, or any of the things we talked about

8    briefly in the questionnaire or that we talked about in court.

9              And obviously if anyone from the media or anybody

10   tries to contact you, and it is almost impossible since nobody

11   knows your name, but we would need to know about that.  All

12   right?

13             JUROR NO. 3:  Okay.

14             THE COURT:  Very good.  Thank you for your attendance

15   this morning, and you are free to go.

16             NOTE:  Juror number 3 leaves the courtroom.

17             THE COURT:  All right.  We will call in number 31

18   next.

19             NOTE:  Juror number 31 enters the courtroom.

20             THE COURT:  Good morning, sir.

21             JUROR NO. 31:  Good morning, ma'am.

22             THE COURT:  Thank you for your attendance this

23   morning.

24             I wanted to start by just asking you whether you had

25   any, since Monday, which is when you filled out the

14

1  questionnaire, whether you wanted to change any of your answers

2  or expand upon any of the answers that you provided in the

3  questionnaire?

4          JUROR NO. 31:  No, ma'am.

5          THE COURT:  All right.  Is there anything else that

6  perhaps was not included in the questionnaire, but any

7  information you think we might want to know about that could

8  affect your service as a juror in this case?

9          JUROR NO. 31:  No, ma'am.

10          THE COURT:  All right.  Have you since Monday

11  overheard any media coverage of this case or in any respect

12  conducted any investigation on the Internet or elsewhere about

13  the issues in this case?

14          JUROR NO. 31:  No, ma'am.

15          THE COURT:  And again, the time commitment that we

16  explained in court Monday, are there any issues concerning that

17  that you want to bring to our attention?

18          JUROR NO. 31:  No, ma'am.

19          THE COURT:  All right.  Now, I had a couple of

20  specific questions for you.  From where you live, which is a

21  bit of a distance from Alexandria, do you expect to have any

22  problems getting here?

23          JUROR NO. 31:  No, ma'am.  I work next door at the

24  Hoffman buildings.

25          THE COURT:  Oh, you do?  All right.  Then you are

15

1   used to the commute?

2           JUROR NO. 31:  Yes, ma'am.

3           THE COURT:  All right.  And as you know, we will be

4   starting here about 9:30 and then ending around 6.  So it is

5   probably different hours than what you've been working next

6   door.

7           JUROR NO. 31:  Yes, ma'am.

8           THE COURT:  All right.  In question number 30, and I

9   am just going to address a few follow-up questions to matters

10  that you raised in your answers, you indicated to that

11  question, which was whether you or family members knew anyone

12  who was a victim of the attacks on September 11, and you

13  indicated some personnel from your office were at the Pentagon.

14          Were these individuals whom you personally knew, or

15  just generally from your office?

16          JUROR NO. 31:  One of the people I personally knew,

17  ma'am.

18          THE COURT:  All right.  Are these people who were

19  either killed or injured?

20          JUROR NO. 31:  Killed.

21          THE COURT:  Killed.  Now, I'm sure that must have had

22  some effect on you?

23          JUROR NO. 31:  I worked with them about 20 years ago,

24  ma'am, when he was a lieutenant.  When he was at the Pentagon,

25  he was a Lt. Colonel.  So contact with him hadn't been for -- I

16

1    hadn't seen him or talked to him for about ten years.

2          THE COURT:  All right.  Nevertheless though, I mean,

3    the Pentagon obviously affected everybody in this area, the

4    attack there.

5          Do you feel in any respect because you even knew

6    somebody who died there, that that might color your ability to

7    objectively approach this case?

8          JUROR NO. 31:  No, ma'am.  None at all.

9          THE COURT:  All right.  You indicated in your answer

10   to question number 44 that you had heard something about this

11   case, you indicated:  News channel arrest and parents appeared

12   at news conference.

13         JUROR NO. 31:  Yes, ma'am, I believe, I think it was

14   his father had a news conference on TV.

15         THE COURT:  All right.  Do you remember any details

16   about that?

17         JUROR NO. 31:  No, ma'am.

18         THE COURT:  Is that the only piece of news coverage

19   you can recall about this case?

20         JUROR NO. 31:  Yes, ma'am.  The only thing I remember

21   is something about a school teacher or something like that, and

22   his father was standing there with a bunch of reporters and

23   they had come out from some kind of hearing.

24         THE COURT:  Do you remember about how recently you

25   may have seen that?

17

1          JUROR NO. 31:  I thought it was like in November or

2  December, if I'm not mistaken.

3          THE COURT:  Just a few months ago?

4          JUROR NO. 31:  Yes, ma'am.

5          THE COURT:  All right.  Is there anything about that

6  news coverage that you feel might have affected your ability to

7  judge this case impartially?

8          JUROR NO. 31:  No, ma'am.  I really didn't -- I

9  really didn't pay too much to the article.  I mean, I kind of

10  saw something, the name recognition, and that was about it.

11          THE COURT:  All right.  In paragraph 54 you indicated

12  that your son had been charged with a crime or the subject of a

13  criminal investigation?

14          JUROR NO. 31:  Yes, ma'am.

15          THE COURT:  Can you expand upon that a little bit.

16          JUROR NO. 31:  DWI.  That was like his second time.

17  So rather than pay the court costs and stuff like that, he went

18  to jail.  He is in Winchester right now.

19          THE COURT:  So he had a trial, or did he plead

20  guilty?

21          JUROR NO. 31:  He came in and pleaded guilty.

22          THE COURT:  All right.  Did you go to the proceedings

23  with him?

24          JUROR NO. 31:  No, ma'am.

25          THE COURT:  Is there anything about your family

18

1    having had that incident that you think might affect your

2    attitude towards the criminal justice system?

3            JUROR NO. 31:  No, ma'am.  He was guilty.

4            THE COURT:  All right.  All right, sir.  If you would

5    step outside for a second, we'll see if there are any follow-up

6    questions.

7            NOTE:  Juror number 31 leaves the courtroom.

8            THE COURT:  All right.  Mr. Kromberg?

9            MR. KROMBERG:  Nothing, Your Honor.

10           THE COURT:  All right.  Mr. Yamamoto?

11           MR. YAMAMOTO:  Your Honor, we would like the Court to

12    explore a little bit more what his job duties are at the

13    Department of the Army at the Pentagon.  Whether or not he is

14    involved in any way with national security, or involved in

15    terrorism and getting information, security briefings about

16    terrorism.

17           THE COURT:  He is a systems analyst.

18           MR. YAMAMOTO:  Right.

19           THE COURT:  I will ask him that.  But I should tell

20    you, by the way, for the record, nobody -- remember how I asked

21    the panel if anyone had a clearance that they couldn't -- if

22    anybody was employed in an intelligence role, that they have

23    restrictions as to how they can divulge it, that they were to

24    advise us.  Nobody did so advise us.  So we should not have

25    anybody in the pool that is working in any kind of clandestine

1    or problematic --

2           MR. YAMAMOTO:  Correct, Your Honor, he may not be

3    working in a clandestine capacity, but he may be involved in

4    collating information.

5           THE COURT:  All right.  I will ask that follow-up

6    question.  He can stay right were you are, Mr. Wood.

7           NOTE:  Juror number 31 returns to the courtroom.

8           THE COURT:  Sir, you indicated that your position is

9    a systems analyst?

10          JUROR NO. 31:  Yes, ma'am.

11          THE COURT:  Does that -- what kind of general work do

12   you do?

13          JUROR NO. 31:  Computers, ma'am, work on people's PCs

14   and run around and fix things.

15          THE COURT:  All right.  Do you do anything with

16   gathering any data concerning terrorism or international --

17          JUROR NO. 31:  No, ma'am.  I work with the broken

18   computers, not with the data.

19          THE COURT:  That's all you do?

20          JUROR NO. 31:  Yes, ma'am.

21          THE COURT:  All right.  Thank you, sir.  If you would

22   step back inside for just one more second.

23          NOTE:  Juror number 31 leaves the courtroom.

24          THE COURT:  All right.  I don't believe there is any

25   necessity for follow-up to that.  Does either side have any

1   claim that this juror should be excused for cause?

2         MR. KROMBERG:  No, Your Honor.

3         THE COURT:  Let me hear from the defense.

4         MR. YAMAMOTO:  No, Your Honor.

5         THE COURT:  So 31 will come in, and we will bring him

6   back.

7         NOTE:  Juror number 31 returns to the courtroom.

8         THE COURT:  All right, sir, we're moving very quickly

9   at this point.  I want to thank you for your attendance.  You

10  have made the second cut, and that means you are seriously

11  being considered now for the final consideration.

12        The rest of today you can go back to work if you

13  would like, and tomorrow you're clear.  I am not yet sure about

14  what commitments will be necessary for next week.  I am hoping

15  to actually start the trial on Monday if I have enough jurors

16  in that final pool.

17        So what I am going to ask you to do is to check in

18  tonight, the same phone number that you had.  We may know for

19  certain today.  If not, certainly by 6 o'clock Friday we'll

20  know for certain; that is, we can tell you exactly when you

21  need to appear back at court.

22        If you are selected, obviously, for the final jury,

23  then you will, you know, be committed to the trial for the time

24  we had spoken about.

25        I want to remind you now more than ever that it's

21

1  extremely important that you not conduct any investigation

2  whatsoever about this case.  I am not barring any juror from

3  using the Internet, but you can't use it to research any of the

4  issues that we might be covering.  And those were the ones

5  discussed in the questionnaire that I explained at the

6  beginning of the trial.

7        Obviously, you are not to discuss the questionnaire,

8  as we said earlier, or anything about this case with anyone.

9        And if for some reason, although it is highly

10 unlikely since your name is not in any kind of public record,

11 you shouldn't be receiving any phone calls from the media or

12 anybody about this case.  But if you were to, obviously, we

13 need to know about that right away.  All right, sir?

14        JUROR NO. 31:  Yes, ma'am.

15        THE COURT:  All right.  So with that understanding,

16 that you might be back here as early as 10 o'clock Monday

17 morning, but I can't guarantee that, so you just need to be

18 checking in with that phone number.  That will give you the

19 next report date.

20        JUROR NO. 31:  Yes, ma'am.

21        THE COURT:  Anything further I need to tell this

22 person?  We are all set?  All right.

23        Thank you, sir, for your attendance.

24        NOTE:  Juror number 31 leaves the courtroom.

25        THE COURT:  Juror number 34.

22

1              NOTE:  Juror number 34 enters the courtroom.

2              THE COURT:  Good morning, ma'am.  If you would come

3      over here.  Just be careful walking across the well of the

4      court, we have some bumps there.

5              All right.  Just a few follow-up questions.  First of

6      all, I want to ask you whether since you filled out the

7      questionnaire on Monday you wanted to add anything to any of

8      your answers or expand upon anything that you may have written

9      in the questionnaire?  Is there anything?

10             JUROR NO. 34:  Nothing comes to mind.

11             THE COURT:  All right.  And has anything else come to

12     mind, anything that wasn't in any of your answers, any

13     additional information that you think might be relevant to our

14     consideration of you for possible service on this jury?

15             JUROR NO. 34:  Not that I have thought of.

16             THE COURT:  All right.  Since Monday have you

17     experienced any media coverage of this case or conducted any

18     investigation into any of the issues involved in this case?

19             JUROR NO. 34:  No.

20             THE COURT:  All right.  And again, the time

21     commitment, which was a problem for many people, did not appear

22     to be a problem for you.  Is that still the case?

23             JUROR NO. 34:  I can handle it, yes.

24             THE COURT:  All right.  Now, I noticed just a tiny

25     bit of hesitation.  Do you want to explain why.

23

1           JUROR NO. 34:  Well, the impact of that much time is

2  obviously an impact, but I can work around anything that comes

3  up.

4           THE COURT:  All right.  Now, I noticed in your answer

5  to question number 30, you indicate that you work at the

6  Pentagon, and you knew five of the people who were killed on

7  the plane crash.

8           JUROR NO. 34:  Yes, ma'am.

9           THE COURT:  How well did you know those people?

10          JUROR NO. 34:  The majority of the people that I knew

11  I worked with for several months prior to the crash.  They were

12  Navy personnel who were moving into a facility.  My job at the

13  time was a liaison person with part of the renovation project.

14  And so, I worked daily with some of those people for several

15  months beforehand.

16          The fifth person was an Army employee who I have

17  known for ten years, off and on worked with, but not closely.

18          THE COURT:  All right.  But obviously that must have

19  had an impact upon you.

20          JUROR NO. 34:  Yes, ma'am.

21          THE COURT:  Now, were you at the Pentagon on the day

22  of the plane crash?

23          JUROR NO. 34:  No.  I was actually at a conference in

24  Florida.

25          THE COURT:  All right.  But you are involved right

24

1   now especially, but I guess even before then, with the

2   maintenance and security of the building, is that correct?

3          JUROR NO. 34:  At the time of the crash I worked for

4   the Army agency that interfaced with the renovation over

5   information structures.  Right now I work at an agency that is

6   charged with the mission of the physical security of the

7   building.

8          THE COURT:  Were you actually involved in the

9   rebuilding of the building after it was attacked?

10          JUROR NO. 34:  Yes, ma'am.

11          THE COURT:  All right.

12          JUROR NO. 34:  I was part of the infrastructure.

13          THE COURT:  Now, do you feel because of your very

14   personal involvement in the building itself, and obviously you

15   smelled the aftermath, you saw the aftermath, and you worked

16   with people who were affected by it, and as you know from our

17   brief summary of some of the issues in this case, there is some

18   connection between those activities and this case.

19          Do you feel in any respect you would have problems in

20   being completely impartial in judging the issues in this case?

21          JUROR NO. 34:  I don't know enough to know how well

22   connected they are.  So I believe, yes, ma'am, that I could.

23          THE COURT:  Well, for example, if there were evidence

24   in this trial either in writing or verbally of people praising

25   what happened at the Pentagon, would that affect you in such a

25

1  way that you couldn't step back and impartially sort out the

2  facts for yourself?

3          JUROR NO. 34:  I think I could sort it out.  I have

4  read that before.  It's nothing new.  Part of the things that I

5  put in that questionnaire indicate I am privy to daily

6  intelligence on threats.  And so, I see that sort of thing all

7  the time.

8          THE COURT:  All right.  Now, you have served -- when

9  you say you are privy to information about threats, this is

10 threats specifically to the Pentagon?

11         JUROR NO. 34:  Overall terrorist threats.  I work now

12 with a federal law enforcement agency, the Pentagon Police

13 Department, we have daily briefings on what the situation is as

14 far as threat intelligence.

15         So two or three times a week I have to attend those

16 daily briefings.

17         THE COURT:  All right.  You indicated in question

18 number 58 that you have served previously as a juror.

19         JUROR NO. 34:  Yes, ma'am.

20         THE COURT:  Back in 1992.  And that was an assault

21 case, and you found the defendant guilty in that case?

22         JUROR NO. 34:  Yes, ma'am.  That was in Fairfax

23 County.

24         THE COURT:  All right.  Was there anything about your

25 experience as a juror either with the way the judge conducted

1    the trial, or the way the other jurors acted, or the way the

2    lawyers acted, that you feel left a particularly negative or

3    positive feeling?

4         JUROR NO. 34:  It was an interesting and educational

5    experience.  But no, ma'am, it was -- I think it was just part

6    of life.  Some things were good, some things were bad.

7         THE COURT:  Can you just for a second tell us what

8    was good, what was bad.

9         JUROR NO. 34:  It was interesting to see how the

10   system worked.  I had never been exposed to it before.  It was

11   interesting to see how different the viewpoints were expressed

12   in the jury room.  I was surprised at the variety of the take

13   on the case.

14        There was a little bit of persuading and compromise

15   that had to take place in the jury room.

16        So it was interesting.

17        THE COURT:  What, if any, overall impression did you

18   have after that was over as to how the criminal justice system

19   works in this country?

20        JUROR NO. 34:  The system I think works pretty well.

21   It may have some warts, but it works pretty well.

22        THE COURT:  Can you just give us an example of the

23   warts you think there might be?

24        JUROR NO. 34:  Well, I was disappointed that there

25   wasn't more detail on some -- this was a simple assault case,

27

1    and it was handled -- I won't say superficially, but there

2    wasn't a lot of detail on the exact nature of the injuries.

3    The defendant never spoke.  There were a lot of questions in

4    our minds in the jury room as to the extent and the seriousness

5    of the injuries, but we were able to get past it and find a

6    verdict.

7             THE COURT:  Now, you understand that it is a

8    fundamental principle of our legal system that a defendant has

9    a Fifth Amendment right to remain silent?

10            JUROR NO. 34:  Yes, ma'am.

11            THE COURT:  And so, it's not at all uncommon for

12   defendants not to testify during trial.  That bothered you a

13   little bit in that case?

14            JUROR NO. 34:  It wasn't that it bothered me.  We

15   were just surprised that we didn't get to hear the side of the

16   story from him firsthand.

17            THE COURT:  Do you feel that that was used by the

18   jury as any basis to convict the defendant?

19            JUROR NO. 34:  No, ma'am.

20            THE COURT:  All right.  And did you have any problem

21   following the judge's instructions?  As you know, the judge has

22   to tell the jury various things about the law, and sometimes

23   jurors don't necessarily agree with how the judge describes

24   things.  I mean, did you have any of those types of problems as

25   a juror?

28

 1          JUROR NO. 34:  No, ma'am, we didn't have -- I don't

 2    think that even came up as a discussion in the jury room.

 3          THE COURT:  All right.  In paragraph 85 you indicated

 4    you were unsure as to whether or not the law -- the question

 5    was:  Do you believe that the law does too much to protect the

 6    rights of criminal defendants and not enough to protect the

 7    rights of crime victims and their families?  And you said you

 8    were unsure.

 9          Can you expand upon that answer a bit.

10          JUROR NO. 34:  There are times when I think that

11    maybe the law goes too far in the defense of a defendant and

12    not enough in the defense of the victims.

13          You will notice that I noticed a burglary at my

14    house.  I lost a lot of personal jewelry and many effects that

15    had personal significance.  I felt like I didn't get the level

16    of cooperation that I needed from the police to recover any of

17    my property.

18          About three weeks after that burglary, I had heard a

19    media coverage of a display of stolen articles that had been

20    recovered by the Metropolitan Police Department in D.C., and I

21    knew that my jewelry had been fenced in D.C.  And when I tried

22    to view the jewelry and see if I could identify any of my

23    property, I was told I wouldn't be allowed to do so.  And they

24    shut down the entire operation like the next day.  And I felt

25    like I had not been given the opportunity.

29

1              So in that particular case, I felt like my rights had

2    not been safeguarded.

3              THE COURT:  And were you more frustrated by the law

4    enforcement establishment than anything a defendant might have

5    done?

6              JUROR NO. 34:  Yes, ma'am.  Because we did receive

7    feedback that the defendant was caught, prosecuted, and was

8    jailed.

9              THE COURT:  All right.  Do you feel in any respect

10   you might harbor anti-prosecution feelings because of the way

11   in which you were treated as a victim in that case?

12             JUROR NO. 34:  No, ma'am.  I have an uncle who served

13   many years as prosecutor in Detroit and was a District Court

14   judge.  So I don't think I have any feelings one way or the

15   other about that.

16             THE COURT:  All right.  And that uncle, did he ever

17   talk to you about what it felt like to be a judge and a

18   prosecutor?

19             JUROR NO. 34:  Not extensively.  Since he lived in a

20   another state, I didn't have a lot of exposure to that.

21             THE COURT:  All right, thank you.  All right, ma'am,

22   if you would step down for a second, we will see if there is

23   anything further we need to ask you.

24             NOTE:  Juror number 34 leaves the courtroom.

25             THE COURT:  Mr. Kromberg, are there any follow-up

30

1    questions the Government would like for 34?

2            MR. KROMBERG:  No, Your Honor.

3            THE COURT:  All right.

4            MR. MacMAHON:  Just a moment, Your Honor.  Excuse me,

5    I am sorry.

6            No follow-up at this time, Your Honor.

7            THE COURT:  Well, this is the time?  All right.  Is

8    there any basis for anybody to argue that this juror should be

9    excused for cause?  Anything from the Government?

10           MR. KROMBERG:  No, Your Honor.

11           THE COURT:  How about you, Mr. MacMahon?

12           MR. MacMAHON:  Yes, Your Honor, we do think this

13   juror should be excused for cause.  The totality of the

14   experiences at the Pentagon, law enforcement, and otherwise

15   make it just -- I know that she says she can try and be fair,

16   but some of these answers to these questions don't indicate an

17   understanding.  That's obvious in the jury that she was in that

18   they took the defendant's silence and considered it.

19           But somebody who knew people in her position, her

20   position at the Pentagon with force protection, I just don't

21   think that person, no matter how honest they are, can be fair

22   and impartial in a case in which the actual attacks on the

23   Pentagon are going to be a discussion in the case at all.

24           So, we would ask that she be excused for cause.

25           THE COURT:  Well, that's one of the reasons we're

1  having some of these jurors come in, is looking at them and

2  hearing how they answer questions.  There was no hesitancy in

3  the way she answered questions.  I think she was articulate.

4  This juror has said she could be fair.  These were not

5  extraordinarily close friends or individuals who died at the

6  Pentagon.  And this woman struck me as being able to analyze

7  things and weigh things fairly.

8          I am not going to strike her for cause.  Obviously, a

9  peremptory can be used to challenge her.

10          Let's bring her in.

11          NOTE:  Juror number 34 returns to the courtroom.

12          THE COURT:  All right, ma'am.  You have made the next

13  cut, which means you are very seriously being considered now

14  for the final jury that is going to hear this case.

15          The rest of today and tomorrow you are free, you

16  don't have to worry about being here.  I cannot yet tell you

17  exactly when the trial will start, it depends upon how many

18  jurors we have.  It is possible 10 o'clock Monday morning may

19  be the beginning of the trial, which would be the very last

20  round, and it was a relatively short round of jury selection,

21  and then we would go straight into the trial.

22          So what I am going to ask you to do is keep checking

23  with that phone number you used to get here today.  Call after

24  6 p.m. today.  And if there is nothing else on the machine,

25  then please call tomorrow after 6 p.m. and you will know for

32

1   certain then.

2          Now, it is extremely important between now and the

3   time you come back to court again that you avoid any media

4   coverage about the case, not conduct any investigation into any

5   of these issues.  There is no reason why anyone, especially the

6   media, should be contacting you.  But occasionally, you know,

7   they are persnickety and they do.  If anyone tries to contact

8   you about this case, let me us know immediately.  And obviously

9   don't discuss anything with them.

10         Please respect the admonition earlier about not

11  discussing the case or the questionnaire with anyone other than

12  to say that you are being still considered for service.  All

13  right?

14         JUROR NO. 34:  Thank you.

15         THE COURT:  Very good.  So we will see you sometime

16  next week.  Thank you, ma'am, you're excused at this time.

17         NOTE:  Juror number 34 leaves the courtroom.

18         THE COURT:  All right, 39.

19         NOTE:  Juror number 39 enters the courtroom.

20         THE COURT:  All right, sir, if you would just

21  carefully come across the floor here and take a seat in the

22  witness box.

23         I want to thank you again, sir, for coming back to

24  the courthouse, and just ask you some brief questions.

25         First of all, since filling out the questionnaire on

1    Monday, have you had a chance to think about the questionnaire

2    and is there anything you would like to add to any of your

3    answers or anything further you would like to give us in the

4    way of explanation of any of the answers?

5            JUROR NO. 39:  No, Your Honor.

6            THE COURT:  All right.  Has anything else come to

7    your mind that you think we might want to know about that

8    wasn't already included in the questionnaire that might affect

9    our ability to evaluate you for jury service?

10           JUROR NO. 39:  No, Your Honor.

11           THE COURT:  Have you been exposed, to your knowledge,

12   to any media coverage about this case since Monday?

13           JUROR NO. 39:  No.

14           THE COURT:  Have you conducted any investigation into

15   any of the issues?

16           JUROR NO. 39:  No.

17           THE COURT:  All right.  Again, the time commitment is

18   out there.  Any problems at all with the schedule?

19           JUROR NO. 39:  No.

20           THE COURT:  Now, I notice that you live out in

21   Loudoun County.

22           JUROR NO. 39:  Yes, Your Honor.

23           THE COURT:  Do you anticipate having any problems in

24   getting here by 9:30 during the week?

25           JUROR NO. 39:  The only problem would be parking.

34

1    Getting here is not --

2        THE COURT:  Parking we can take care of.  That is one

3    of the few things we can still control.

4        JUROR NO. 39:  No problem.

5        THE COURT:  And again, we are going to run until

6    close to 6 o'clock at night.  But you can handle that commute?

7        JUROR NO. 39:  Yes, ma'am.

8        THE COURT:  All right.  I notice that your position

9    is director of Army Multimedia and Visual Information.  And

10    that's at the Pentagon, is that correct?

11        JUROR NO. 39:  Yes.

12        THE COURT:  All right.  Now, does that position at

13    all involve any work with terrorist types of issues?

14        JUROR NO. 39:  As the military has briefings and

15    sessions, classified and unclassified, my people -- I am the

16    director.  And my people cover those events, either through

17    photography or videotaping those events.  Sometimes we put

18    together some of the props and presentations for those

19    briefings.

20        But personally, I don't usually get involved with

21    that, with those.

22        THE COURT:  All right.  Now, were you at the Pentagon

23    on September 11?

24        JUROR NO. 39:  Yes, Your Honor.

25        THE COURT:  All right.  And in your answer to number

35

1    30 you indicated that some 24 co-workers were killed?

2              JUROR NO. 39:  Yes.

3              THE COURT:  All right.  So you actually heard the

4    plane hit --

5              JUROR NO. 39:  Yes.

6              THE COURT:  And saw all that?  Do you feel in any

7    respect that very personal experience could affect your ability

8    to be impartial in judging this case?

9              JUROR NO. 39:  No, I do not.

10             THE COURT:  Now, how do you think you would react if

11   witnesses or evidence in this case indicated praising of those

12   events?

13             In other words, a witness came in and testified that

14   so-and-so said this was a great thing that happened at the

15   Pentagon.  Or you are exposed to exhibits, letters, or e-mails,

16   or something that would appear to be praising those events.

17             Would that kind of information upset you to a degree

18   that you could not impartially judge the issues of the case?

19             JUROR NO. 39:  No, I don't think so, ma'am.  No.

20             THE COURT:  All right.  You indicated in your answer

21   to question number 31 that there were some changes in family

22   activities as a result.  Your oldest daughter's wedding had to

23   be postponed, I guess because family members had difficulty

24   flying?

25             JUROR NO. 39:  Getting flights.  We couldn't get the

1   flights.

2          THE COURT:  Did that rescheduling significantly upset

3   things in your family?  And again, would that kind of personal

4   effect affect you?

5          JUROR NO. 39:  No, ma'am.

6          THE COURT:  No?  You indicated in your answer to

7   question number 85, which addressed -- which asked:  Do you

8   believe that the law does too much to protect the rights of

9   criminal defendants and not enough to protect the rights of

10  crime victims and their families?  And you indicated yes.

11         Can you expand upon that answer.

12         JUROR NO. 39:  Well, I just feel that in many

13  situations, that the criminal or the alleged criminal is given

14  more rights than defendants because a lot of times there are

15  issues that happen within the court, within the evidence

16  gathering and those kinds of situations, that may cause the

17  trial to be changed, to be a mistrial, or something to happen

18  that would change the outcome one way or another, a guilty

19  person being innocent or an innocent person being guilty.

20         I kind of feel that there are things that within our

21  justice system, such as the evidence gathering, for instance,

22  that could be done improperly, incorrectly, not by the law.

23  For instance, maybe reading a person their rights, they didn't

24  give them all their rights, didn't give them at the right time.

25  Those kinds of things I think can change the outcome of a

1    situation.

2           So I think that everything is given to the benefit of

3    the doubt.

4           THE COURT:  And who in your understanding gets the

5    benefit of the doubt in a criminal case?

6           JUROR NO. 39:  The defendant.

7           THE COURT:  And do you agree with that proposition?

8           JUROR NO. 39:  Yes.  Yes.

9           THE COURT:  All right.  So, in other words, I am

10   still not quite sure I completely understand your answer when

11   you say you are unsure -- or, I am sorry, that you believe that

12   the law protects the rights of criminal defendants and doesn't

13   do enough to protect victims.

14          Do you think that victims do not get a fair treatment

15   in our legal system?

16          JUROR NO. 39:  No, I don't think -- maybe my wording

17   of that is not quite right.  I think there are more safeguards

18   in our legal systems for the person who is accused versus the

19   person who is accusing.

20          THE COURT:  And do you agree with that approach?

21          JUROR NO. 39:  Well, yes, to keep an innocent person

22   from being guilty, yes, and maybe being incarcerated for

23   something they didn't do.

24          THE COURT:  All right.  Thank you, sir.  If you would

25   step down for a second.  We will see if we have any follow-up

1    questions.

2              NOTE:  Juror number 39 leaves the courtroom.

3              MR. KROMBERG:  Nothing, Judge.

4              THE COURT:  All right.  Mr. Yamamoto.

5              MR. YAMAMOTO:  Your Honor, we would like the Court to

6    go into a little more detail with respect to the 24 individuals

7    and co-workers that were killed, how close he was to them, how

8    it affected him.

9              THE COURT:  Mr. Yamamoto, I think I have covered

10   that.  And I have got to tell you, if I were a defense

11   attorney, that last line of answers is exactly what every

12   defense attorney dreams about, a juror who can be absolutely

13   fair and who thinks it's right that the balance tips in favor

14   of the defendant.

15             I don't know what more you could want from a juror.

16             MR. YAMAMOTO:  I want everything, Your Honor.

17             THE COURT:  I know, but I think you've got more than

18   enough.  I'm not going to be probing, unless there is some

19   reason why I should, in other words an indicator, not just a

20   general blitz, the personal relationship of these jurors with

21   any victims of September 11.  If the juror is in a calm way

22   able to say that it is not going to affect them, then I think

23   that's sufficient.

24             And especially when I hear a juror who has expanded

25   upon his view of the criminal justice system and absolutely has

1    it right on all of the value and the balancing that goes on.

2           So I don't have any further questions to ask him

3    about the Pentagon.  Is there anything else you want me to ask

4    this juror?

5           MR. YAMAMOTO:  No, Your Honor.

6           THE COURT:  Is there any argument that this juror

7    should be stricken for cause?

8           MR. KROMBERG:  No, Your Honor.

9           THE COURT:  How about from the defense?

10          MR. YAMAMOTO:  No, Your Honor.

11          THE COURT:  All right.  Then let's bring 39 in.

12          NOTE:  Juror number 39 returns to the courtroom.

13          THE COURT:  All right, sir.  You are going to be

14   considered for the very final round, and that means it is

15   highly probable you may be a juror in this case.

16          You are going to be finished for today, so you can go

17   back to work today.  And tomorrow you are clear.

18          I cannot exactly tell you when you need to report

19   next week.  I am hoping it will be Monday by 10.  It may be a

20   little bit later, it depends upon how many jurors I have on

21   Monday.

22          In the meantime, however, I want you to remember the

23   promise you took on Monday.  And that is, you are not to

24   conduct any investigation into this case or any of its issues.

25   You are to avoid any media coverage about the case.  Not

40

1   discuss the questionnaire or your status, other than you can

2   tell people you are probably going to be a juror, or certainly

3   are being considered seriously to be a juror.

4           You shouldn't be contacted by anyone about this case.

5   That's why we're using a number for you.  But the media have

6   some interest, and if for some reason they should figure out

7   who you are, if you were to receive a call, please let us know.

8   All right?

9           All right, sir, so just check in with the same phone

10  number from which you received information about today after 6

11  o'clock today.  And if we don't have a message, then by 6

12  o'clock tomorrow there should be one.  All right?

13          JUROR NO. 39:  Okay.

14          THE COURT:  Thank you, sir.

15          NOTE:  Juror number 39 leaves the courtroom.

16          THE COURT:  All right, number 43.

17          NOTE:  Juror number 43 enters the courtroom.

18          THE COURT:  Good morning, sir.  Thank you for coming

19  back to court.

20          JUROR NO. 43:  Good morning.

21          THE COURT:  I just have a few questions I want to ask

22  you.  First of all, since you filled out the questionnaire on

23  Monday, was there any additional information you wanted to

24  bring to our attention?  In other words, any answers that you

25  wanted to change or amplify for us?

41

1            JUROR NO. 43:  No, ma'am.

2            THE COURT:  All right.  How about anything else that

3    may have come to mind that you think we might want to know

4    about that is not written in the questionnaire that you think

5    might be relevant to our evaluating you for jury service in

6    this case?

7            JUROR NO. 43:  It was pretty comprehensive.  I can't

8    think of anything that I would like to add.

9            THE COURT:  All right, sir.  Since Monday have you

10   been exposed to any media coverage about this case, to your

11   knowledge?

12           JUROR NO. 43:  No, ma'am.

13           THE COURT:  Have you conducted any investigation

14   either on the Internet or elsewhere about this case?

15           JUROR NO. 43:  No, ma'am.

16           THE COURT:  All right.  And again, the time

17   commitment was described on Monday.  Does that create any

18   problems for you?

19           JUROR NO. 43:  Well, it is somewhat of -- I would say

20   it is pretty consistent with everybody who has a position of

21   responsibility, it will create a bit of an issue for me, but it

22   is business related.

23           THE COURT:  All right.  But it is not insurmountable?

24           JUROR NO. 43:  No, ma'am.

25           THE COURT:  And won't be a distraction for you?  In

1   other words, obviously when someone is a juror, he or she has

2   to be able to give their full-time and attention to what is

3   going on in the courtroom.  Is there any danger that your

4   business commitments will be distracting you while you are here

5   as a juror?

6           JUROR NO. 43:  No.  But I do have one question.

7           THE COURT:  Yes, sir.

8           JUROR NO. 43:  Is there any reason why, at the

9   conclusion of the day's activity, could I consult with some of

10  my people to see procedurally what's going on?  Or is that

11  prohibited?

12          THE COURT:  You are director of national security

13  programs for a --

14          JUROR NO. 43:  Computer Sciences Corporation, a

15  private institution.

16          THE COURT:  In your job, do you get involved at all

17  with issues that are related to this case?

18          JUROR NO. 43:  No, ma'am.

19          THE COURT:  When you say security, national security

20  programs, is that computer security?

21          JUROR NO. 43:  No.  The work we do is in support of

22  the Defense Threat Reduction Agency and some of the Defense

23  Advance Research Program Agency as well.  So they are DoD

24  organizations, but they are acquisition, counterproliferation-

25  related and high technical science activities.

43

1          THE COURT:  So it is weapons and technology oriented

2     evaluations?

3          JUROR NO. 43:  Yes, ma'am.

4          THE COURT:  All right.  So you're not actually

5     getting into intelligence about groups, political groups in

6     Iraq or Iran or that sort of thing?

7          JUROR NO. 43:  There may be issues with some of my

8     people, but for me, no.

9          THE COURT:  All right.  There is no reason why, as

10    long as you're not spending too much time so you are tired that

11    you can't work here -- jurors, once they leave the courthouse,

12    can go back to work if they want to.

13          My only concern would be, as I said, if you pulled a

14    full shift and had three hours of sleep and you're coming to

15    court the next day.

16          JUROR NO. 43:  No, I assure you, I won't do that.

17          THE COURT:  All right, that's fine.  Then I have a

18    couple of follow-up questions.

19          You indicate that you have a military background, is

20    that correct?

21          JUROR NO. 43:  Yes, ma'am, that's correct.

22          THE COURT:  Can you tell us more specifically what

23    you were doing in the service?

24          JUROR NO. 43:  Yes, 26 years in the Army.  Primarily

25    in missile defense.  It's a responsibility for air defense

44

1   weapons, specifically Patriot, I think that would probably

2   bring to mind exactly what I did and that particular weapon

3   system.  Retired colonel.  Worked, last significant activity

4   was on the Army staff.

5           THE COURT:  So you spent some time at the Pentagon?

6           JUROR NO. 43:  Three tours.

7           THE COURT:  All right.  You were not there when the

8   Pentagon was attacked, were you?

9           JUROR NO. 43:  No, ma'am.  I was actually working in

10  Crystal City at the time.  So adjacent to the building.

11          THE COURT:  All right.  Now, because you have worked

12  at the Pentagon, and I am sure you have friends and colleagues

13  who might still be there, do you feel in any respect the attack

14  on the Pentagon, and the fact that it may be part of the issues

15  in this case on the fringe, because this case is not about that

16  event directly, do you feel that that might in any respect make

17  it difficult for you to be impartial in judging this case?

18          JUROR NO. 43:  No, ma'am.

19          THE COURT:  If a witness were described as having

20  made statements applauding the attack on the Pentagon, or if

21  there are physical exhibits like e-mails or public messages

22  praising what happened, do you think that kind of information

23  would upset you to a degree that you couldn't impartially judge

24  the case?

25          JUROR NO. 43:  No, ma'am.  I believe I could be

45

1    objective in that regard.

2           THE COURT:  All right.  Now, you indicated to the

3    question where I warned folks that they can't do Internet

4    investigation while the case is going on, that you need regular

5    access to the Internet.  I am not going to bar anybody from

6    using the Internet, but what I don't want is a juror sort of

7    being curious about an issue that has come up and going out --

8    in other words, the Internet or the encyclopedia, no tool can

9    be used to try the gather information about this case by any

10   juror.

11          Do you have any problem living with that restriction?

12          JUROR NO. 43:  No, ma'am, no problem.

13          THE COURT:  All right, that's fine.  Then, sir, I

14   will ask you to just step outside for a second.

15          NOTE:  Juror number 43 leaves the courtroom.

16          THE COURT:  Any further questions, Mr. Kromberg?

17          MR. KROMBERG:  No, Your Honor.

18          THE COURT:  How about from the defense?

19          MR. MacMAHON:  One moment, Your Honor.

20          THE COURT:  Yes, sir.

21          MR. YAMAMOTO:  Your Honor, we would like the Court to

22   follow up in the area of his employment at the Pentagon, would

23   the crash at the Pentagon affect his ability to be impartial.

24          THE COURT:  I thought I just asked that question.

25   And I even asked him whether he would have a reaction to

46

1    witnesses who praised the events, or if a document praised the

2    event, that that would affect him.  And I did ask him that

3    question.  I think it has been covered.

4              Is there anything else?

5              MR. YAMAMOTO:  No, Your Honor.

6              THE COURT:  All right.  Any basis for objecting to

7    number 43?

8              MR. KROMBERG:  No, Your Honor.

9              THE COURT:  How about from the defense?

10             MR. YAMAMOTO:  No, Your Honor.

11             THE COURT:  All right, let's bring him in.

12             NOTE:  Juror number 43 returns the courtroom.

13             THE COURT:  Sir, I want to thank you for appearing.

14   You are going to be considered for the very final round of this

15   case.  Which means there is a fairly high likelihood you may

16   wind up being one of the final jurors.

17             You are clear for the rest of today and tomorrow.  I

18   cannot tell you exactly when the start time is.  I am hoping it

19   is 10 o'clock Monday.  And that would be coming for the last

20   round of jury selection.

21             If you are chosen to be a juror, then we are going to

22   go right into the trial.  So the commitment would start as of

23   Monday on.

24             The only way you will know is by continuing to call

25   into that number.  After 6 o'clock today we may be able to tell

1    you for certain.  Certainly after 6 o'clock tomorrow we will

2    know for certain.

3              All right, sir?

4              JUROR NO. 43:  Yes, ma'am.

5              THE COURT:  Now, while you are in this sort of limbo,

6    the same restrictions apply.  That is, you are to avoid any

7    media coverage about this case.  Not conduct any investigation

8    about any of the issues in this case.  You are still not to go

9    into any details with any family members or friends about the

10   questionnaire or this case.  Although you can tell people you

11   are still being considered for jury duty.

12             And I don't expect anyone should be contacting you,

13   that's one of the reasons -- we didn't want the media bothering

14   anybody, and that's why we are giving you numbers rather than

15   names.  But if for any reason you think someone has called you

16   about your juror service, you are to let us know right away.

17             Do you understand?

18             JUROR NO. 43:  Yes, ma'am.

19             THE COURT:  Thank you, sir.  Then you are free to go

20   at this time.

21             NOTE:  Juror number 43 leaves the courtroom.

22             THE COURT:  All right, juror number 47.

23             NOTE:  Juror number 47 enters the courtroom.

24             THE COURT:  Good morning, ma'am.  Thank you for

25   coming back to court this morning.  I have just a few

48

1    questions.

2            I wanted to first of all ask you whether you have had

3    since Monday any further thoughts about any of the answers that

4    you provided to the juror questionnaire?

5            JUROR NO. 47:  No.

6            THE COURT:  Anything you wanted to add to that?

7            JUROR NO. 47:  No.

8            THE COURT:  Or anything else that you might want to

9    bring to our attention that you think might be relevant in our

10   evaluating you for the jury in this case?

11           JUROR NO. 47:  No.

12           THE COURT:  All right.  Since Monday have you been

13   exposed to any media coverage about this case or conducted any

14   investigation into any of the issues that we discussed either

15   in court on Monday or that were discussed in the questionnaire?

16           JUROR NO. 47:  No.

17           THE COURT:  All right.  And again, the time

18   commitment -- now, I know you work in the private sector,

19   correct?

20           JUROR NO. 47:  Yes.

21           THE COURT:  For the AFL/CIO?

22           JUROR NO. 47:  I work for the AFL/CIO Housing

23   Investment Trust.

24           THE COURT:  All right.  And that's right here in

25   Alexandria?

```
1              JUROR NO. 47:  No, it's in Washington, D.C.

2              THE COURT:  That's in Washington, D.C.  All right.

3    And you understand there is a fairly significant time

4    commitment?

5              JUROR NO. 47:  Yes.

6              THE COURT:  Is that going to be a problem in any

7    respect?

8              JUROR NO. 47:  No more than anybody else, I don't

9    think, no.

10             THE COURT:  All right, that's fine.  You indicated in

11   response to question number 71 that you've worked with a few

12   individuals that were Muslim, and their faith was not a topic

13   of conversation or issue.

14             I'm just curious, how did you know that they were

15   Muslim?

16             JUROR NO. 47:  One of the gentlemen in my office

17   would -- during Ramadan would fast.  And we would frequently go

18   to lunch or have conversations, and he would decline going to

19   lunch.  And so we would talk about it.  But it wasn't that we

20   went into in-depth conversations about his religion or that it

21   had any influence on our relationship.

22             THE COURT:  So you indicated that you have neither

23   positive nor negative feelings about Muslims or the Islamic

24   faith?

25             JUROR NO. 47:  Correct.
```

50

1          THE COURT:  The relationships with these co-workers,

2    are they particularly friendly or just --

3          JUROR NO. 47:  They were ex-co-workers, and I haven't

4    worked with them for a while.  One of the other co-workers who

5    was somebody who came over from Egypt when I was with a

6    different employer and he was doing a tour of duty in my

7    office.

8          No, their religion didn't affect our relationship at

9    all.  I have friends of many different faiths, and I don't have

10   any issues with people's faith.

11         THE COURT:  Did you have any, to your knowledge,

12   Muslim friends or co-workers in the September 11 time frame?

13         JUROR NO. 47:  There was one contractor in our

14   office, yes.

15         THE COURT:  At that time?

16         JUROR NO. 47:  Yes.

17         THE COURT:  Do you recall any discussions with that

18   contractor about how he was being treated or his views about

19   September 11?  I mean, did the issues ever come up?

20         JUROR NO. 47:  He was not somebody I was particularly

21   engaged with.  I heard through the grapevine a few things, but

22   nothing -- I mean, he worked in a different department at a

23   different project.  He wasn't somebody I engaged with.

24         THE COURT:  What kind of grapevine things were you

25   hearing?

51

1          JUROR NO. 47:  Just he said that were comments on the

2    Metro here and there.  He was of Pakistani decent.

3          THE COURT:  Was he concerned about his safety or

4    anything like that?

5          JUROR NO. 47:  No, no.  Once again, I didn't talk

6    with him very directly, so I am not aware if he was or wasn't.

7          THE COURT:  Did you hear anybody in your workplace

8    making negative or hostile comments about him or any of the

9    other Muslim workers because of September 11?

10         JUROR NO. 47:  No.

11         THE COURT:  Did you have any friends or colleagues

12   who were at the Pentagon when it was attacked?

13         JUROR NO. 47:  No.

14         THE COURT:  Now, you live in Alexandria?

15         JUROR NO. 47:  Yes.

16         THE COURT:  Could you see the smoke?

17         JUROR NO. 47:  I was actually downtown when it

18   happened, I was at work in D.C.  And I stayed in D.C. until --

19   probably didn't leave D.C. until about 4.  And at that time you

20   couldn't get anywhere.  Where I live, you can't see it from my

21   house, no.

22         THE COURT:  And is there anything about, you know,

23   your experiences of that day and the impact it may have had on

24   your personal life that you think could affect your

25   impartiality in judging this case?

52

1              JUROR NO. 47:  No.

2              THE COURT:  And you have never had any negative or

3    positive experiences of any unique sort with any members of the

4    Islamic faith?

5              JUROR NO. 47:  No.

6              THE COURT:  All right.  Do you mind stepping out for

7    just a second.

8              JUROR NO. 47:  Sure.

9              NOTE:  Juror number 47 leaves the courtroom.

10             THE COURT:  Are there any follow-up questions, Mr.

11   Kromberg?

12             MR. KROMBERG:  Judge, this is one prospective juror

13   that I did have a particular question on.  I think that she

14   said that she believes that anyone has the right to express

15   himself any way they want.  And I wanted to see if, I guess she

16   was such a First Amendment absolutist that crying fire in a

17   crowded theater is something that in her view is protected by

18   the First Amendment.

19             THE COURT:  All right.  What question number was

20   that?

21             MR. KROMBERG:  Good question.

22             MR. YAMAMOTO:  40, Your Honor.

23             THE COURT:  40?

24             MR. KROMBERG:  40.  Thank you.

25             THE COURT:  Well, she said she doesn't advocate the

53

1    use of violence.  But I will ask her.  I have been asking that.

2              MR. KROMBERG:  Thank you, Your Honor.

3              THE COURT:  All right, she can just stay there.

4              NOTE:  Juror number 47 returns to the courtroom.

5              THE COURT:  You don't have to walk all the way.  You

6    can just stay there, ma'am.

7              In your answer to question number 40, which was:

8    What is your reaction or opinion toward persons living in the

9    United States who chose to associate with groups or

10   organizations, including religious groups and organizations,

11   that discuss or advocate the use of violence as a means to

12   protest or express their opposition to the U.S. government's

13   policies?

14             Your answer was:  I believe everyone has a right to

15   their own beliefs and a right to express them.

16             When you talk about a right to express one's beliefs,

17   what you mean by that?

18             JUROR NO. 47:  I was thinking more in my answer along

19   the lines of freedom of speech.  I think people can say and do,

20   as long as they do it lawfully and follow the laws that are

21   there, I don't have a problem with people having different

22   opinions or expressing them.

23             THE COURT:  All right.  Then you go on to say you do

24   not advocate the use of violence.

25             Can you expand upon that.

54

```
1              JUROR NO. 47:  I personally don't advocate the use of
2    violence as a means of getting what it is you are looking for.
3    In a situation of war, if a country is to go to war, I think
4    that is a different use of violence.  That is a decision made
5    in the political system.  And sometimes I do think that there
6    is a necessity for the point in time to go to war.
7              But I think what I meant with that was if you have a
8    group that chooses to use violence to advocate their own means
9    in an unlawful way, I don't advocate the use of that.
10             THE COURT:  All right, thank you.  Just step back
11   inside there for a second.
12             NOTE:  Juror number 47 leaves the courtroom.
13             THE COURT:  Were there any questions the defense
14   wanted the Court to follow up with?
15             MR. MacMAHON:  No, Your Honor.
16             THE COURT:  Anything further, Mr. Kromberg?
17             MR. KROMBERG:  No, Your Honor.  Thank you.
18             THE COURT:  Does either side want to strike this
19   juror for cause?
20             MR. KROMBERG:  No, Your Honor.
21             THE COURT:  How about the defense?
22             MR. MacMAHON:  No, Your Honor.
23             THE COURT:  All right, let's bring her back in.
24             NOTE:  Juror number 47 returns the courtroom.
25             THE COURT:  You are getting your exercise this
```

55

1    morning.  Thank you.

2            You are being considered for the very final round of

3    jury selection.  That's going to occur I hope on Monday.  So

4    you're clear, you're free for the day today, and you're free on

5    Friday.

6            What you are going to need to do is to call into the

7    same number you used to contact the court for today's session,

8    you need to call that phone number after 6 o'clock today.  I am

9    not positive we will be able to give you the time today.  We

10   are going to hopefully have it done, but I am still questioning

11   jurors tomorrow.  That's the reason.  But certainly after 6

12   p.m. tomorrow, which is Friday, we will know for certain, and

13   that will give you then your reporting time next week.

14           Obviously, if you make the final cut, and if that

15   does occur Monday, we're going to go right into the trial.  So

16   you need to make, you know, preparations for that.

17           I want to caution you again to please follow the

18   instructions I gave you on Monday.  And that is to avoid any

19   media coverage about this case.  Not conduct any Internet

20   investigation or any other type of investigation about the

21   case.  And when I say the case, I mean, obviously, any of the

22   issues connected with it.

23           You are not to give any detailed information to

24   family members or friends about the case.  You can tell people

25   you're being considered for jury service, and that's it.

56

1          And we don't expect you will be contacted by any

2   members of the media or anyone, that's why we've used numbers,

3   but if for some reason you thought somebody had tried to talk

4   to you about this case, you should let us know right away.  All

5   right?

6          JUROR NO. 47:  Yes.

7          THE COURT:  So we will see you back here sometime

8   next week.  Thank you.

9          NOTE:  Juror number 47 leaves the courtroom.

10          THE COURT:  All right, number 57.

11          NOTE:  Juror number 57 enters the courtroom.

12          THE COURT:  Good morning, sir.

13          JUROR NO. 57:  Good morning.

14          THE COURT:  Thank you for your attendance.  I have

15   some general questions I want to ask you.

16          First of all, since you filled out the questionnaire

17   on Monday, was there anything you wanted to add to any of your

18   answers?  Any information you think you may not have given us

19   at that time?

20          JUROR NO. 57:  Yes.  Let's see, I don't think I

21   mentioned that I do have also a minor case of attention deficit

22   disorder, but I am taking Concerta, and that should not affect

23   my concentration or judgment or anything.

24          THE COURT:  I am sorry, what was the name of the

25   disorder?

57

1          JUROR NO. 57:  Attention deficit disorder.

2          THE COURT:  Oh.  All right.

3          JUROR NO. 57:  It is minor though.

4          THE COURT:  That is something you have had, I assume,

5     for years?

6          JUROR NO. 57:  Yes.

7          THE COURT:  And you take medication to keep it

8     focussed?

9          JUROR NO. 57:  Yes.

10          THE COURT:  If you start to have problems, is there

11     anything that we need to know about?  I mean, sometimes do you

12     find that you're having difficulty concentrating?

13          JUROR NO. 57:  Not with the medication, no.

14          THE COURT:  All right.  The medication, does it make

15     you at all drowsy or in any way change --

16          JUROR NO. 57:  No, it makes me more alert.  It is

17     consistent, yes.

18          THE COURT:  All right.  Other than that, is there

19     anything you may not have told us in the questionnaire that you

20     think might affect our decision whether to call you as a juror

21     or not in this case?

22          JUROR NO. 57:  No, everything else was in the

23     questionnaire, yes.

24          THE COURT:  All right, sir.  Since you were here on

25     Monday, have you experienced any media coverage or done any

58

1    investigation about this case?

2              JUROR NO. 57:  Absolutely not.  There was an

3    incident, I think my boss just -- I told him that I was on jury

4    duty, and I handed him in the paper.  And he said they are

5    selecting for the terrorist, accused terrorist trial.  And I

6    said -- at that point I said, I am just not allowed to discuss

7    any of this.

8              So nothing else was said.  I said, probably when this

9    is all over, I might be able to say something, but not now.

10             THE COURT:  All right, that's fine.

11             And in terms of the time commitment, because I

12   indicated on Monday it would be fairly significant, has that

13   created any issues for you since you were here on Monday?

14             In other words, is there anything in that respect you

15   need to bring to our attention?

16             JUROR NO. 57:  There are some slight things that are

17   going on, but not really, no.

18             THE COURT:  Well, do you think in any respect that

19   you're going to have problems at work or at home if you sit as

20   a juror in this case?

21             JUROR NO. 57:  That's still making an assumption

22   that, you know, I would be able to go home at about 5, 5:30

23   every day?

24             THE COURT:  No, no, no.  The trial could run as late

25   as 6 o'clock.  Between 5:30 and 6 would be the normal stopping

1  time.

2          JUROR NO. 57:  Okay.

3          THE COURT:  Is that going to be a problem?

4          JUROR NO. 57:  No, that won't be an problem.

5          THE COURT:  All right.  But we're not staying until 7

6  or 8 o'clock at night.  That kind of issue isn't going to

7  arise.

8          JUROR NO. 57:  Okay.

9          THE COURT:  You are doing all right with that?

10          JUROR NO. 57:  Yeah, I am okay with that.

11          THE COURT:  Okay.  You indicated that your wife is in

12  the process of being naturalized?

13          JUROR NO. 57:  Yes.

14          THE COURT:  First of all, what country is she from?

15          JUROR NO. 57:  Republic of China.

16          THE COURT:  From China?

17          JUROR NO. 57:  Republic of China.

18          THE COURT:  Okay.  Have there been any problems or

19  difficulties in the process?

20          JUROR NO. 57:  Well, we moved while she was being

21  naturalized before she got her Green Card, and we had to

22  reapply because it is different jurisdiction.  And that was the

23  only problem.

24          THE COURT:  All right.  Are you on schedule with the

25  naturalization process?

1          JUROR NO. 57:  She is completed on Tuesday.  She is

2     completed two days ago.

3          THE COURT:  Oh, so she has become naturalized?

4          JUROR NO. 57:  Yes.  Monday she wasn't.  Tuesday she

5     was, yes.

6          THE COURT:  How interesting.  All right.  Was she

7     sworn in at the INS office?

8          JUROR NO. 57:  Yes, she was.

9          THE COURT:  Not here at the courthouse?  All right.

10    Okay.  Have you had -- and you didn't have any difficulties

11    then with the Immigration authorities in terms of --

12         JUROR NO. 57:  No.

13         THE COURT:  Okay.  Now, you indicated in your answer

14    to question number 96 that you were declined a security

15    clearance with a particular agency.  I don't need to know the

16    name of the agency, but how long ago was that?

17         JUROR NO. 57:  I think it was like 1992.  So, about

18    13 years ago.

19         THE COURT:  And have you received a clearance since

20    then?

21         JUROR NO. 57:  No, I am still awaiting a follow-up

22    interview.

23         THE COURT:  All right.  Is there anything about your

24    being declined for that clearance that you feel that you might

25    -- well, you indicated you are sceptical about some of the

61

1    procedures that are used in clearances.

2              But do you have any animosity against the federal

3    government because you have been denied a clearance?

4              JUROR NO. 57:  Nothing other than like I guess the

5    polygraph process.  It was not accurate at all the way it was

6    done and everything.  I don't think it was that good, but

7    that's all.

8              The federal government, I work for the federal

9    government --

10             THE COURT:  You work for the Department of Veterans

11   Affairs?

12             JUROR NO. 57:  Yes.  And they have been -- it has

13   been a very positive experience working for them.  I have been

14   contracting with them for a long time too.  No animosity other

15   than usual, like work-related, you know, that somebody comes

16   with a request, it is usually like asking for the world, and we

17   just give them what we can.  Things like that.

18             THE COURT:  All right.  You're an IT specialist?

19             JUROR NO. 57:  Yes.

20             THE COURT:  Exactly what kind of IT work do you do?

21             JUROR NO. 57:  Systems analyst.  I was a programmer,

22   software developer for a number of years, and I am trying to

23   move into the project management part of it.

24             THE COURT:  All right.  And are you actually a

25   government employee, or do you work for a private company that

62

1   has a contract with the government?

2           JUROR NO. 57:  I am a government employee now.

3           THE COURT:  So you are in the Civil Service or FERS

4   or one of the federal systems?

5           JUROR NO. 57:  FERS.

6           THE COURT:  How long have you been in the federal

7   system?

8           JUROR NO. 57:  It is about seven months now.

9           THE COURT:  All right.  Before that, were you in the

10  private sector?

11          JUROR NO. 57:  Yes.

12          THE COURT:  All right.  But you are still trying to

13  get a security clearance.  Do you need that for the Department

14  of Veterans Affairs?

15          JUROR NO. 57:  No, I don't.  But there is other

16  places that I would like to go eventually, I guess, better

17  opportunities.

18          Where I was in 1992, I was a contractor until I lost

19  the clearance, I would still like to go back to work for them.

20          THE COURT:  All right.  Did you lose a clearance or

21  just never get it?

22          JUROR NO. 57:  No, I never got it.

23          THE COURT:  All right.  You indicated in your answer

24  to question number 26 that you have a nephew who was killed in

25  Iraq a few months ago.

63

1              How close were you to that nephew?

2              JUROR NO. 57:  Really I -- I really didn't visit them

3     and see them that often.  It is about once every two years I

4     saw them.  The last time I saw him, he was still a teenager.

5     But now when he was killed, he was like 24.  So it was still a

6     number of years.

7              THE COURT:  He was the child of your brother or your

8     sister?

9              JUROR NO. 57:  No.  He is a child of a cousin on my

10    mother's side.

11             THE COURT:  Cousin on your mother's side?

12             JUROR NO. 57:  Yes.

13             THE COURT:  All right.  So it is somewhat of a

14    distant relation?

15             JUROR NO. 57:  Yes.

16             THE COURT:  All right.  Do you feel in any respect

17    that his death might color or influence your ability to be an

18    impartial juror in this case?

19             JUROR NO. 57:  No, not really.  But, you know, I am

20    not sure, and I haven't thought about everything down the line,

21    the whole train of thought going down towards whether it would

22    be -- it would cloud my judgment or not, but right now I don't

23    see any problem.  I can still be impartial.

24             THE COURT:  All right.  You indicated in paragraph --

25    in question number 71 that you have former co-workers in your

64

1    previous job who were Muslim.

2               JUROR NO. 57:  Yes.

3               THE COURT:  And you had asked them if they had any

4    bad experiences after September 11.  What were their answers to

5    you when you asked those questions?

6               JUROR NO. 57:  Very short.  They said no at that

7    point.  It was like two or three months after September 11 when

8    I asked them, and they said no, no bad experiences.

9               THE COURT:  And no follow-up after that?

10              JUROR NO. 57:  No.

11              THE COURT:  Now, you said you haven't spoken with

12   them in about three years.  That's because what, you left that

13   job?

14              JUROR NO. 57:  Yes.

15              THE COURT:  And what company was that where you were

16   working?

17              JUROR NO. 57:  Let's see that was Ratecor

18   Technologies, and we were all contracted for US Internet

19   working -- it was in Annapolis, US Internet working in

20   Annapolis.

21              THE COURT:  Okay.  You indicated in some of your

22   questions that you were not sure -- question number 80 asked

23   you:  What is your opinion regarding the balance between church

24   and state in the United States today?

25              And then specifically you were asked:  Do you think

65

1    that there is too much consideration of religion, or too little

2    consideration, or about the right amount?

3            And then you had a question about that and you said:

4    Unsure, definition of religion, fundamentalism, Catholicism,

5    maybe too much fundamentalism and not enough common sense.

6            Can you just -- what was unclear to you about the

7    definition of religion?

8            JUROR NO. 57:  Well, it is kind of too general.  I

9    guess religion has always been a part of the government, but

10   you know, like determining whether it is good or bad I think,

11   if it is extreme on either side it would be bad.  So right now

12   I don't think it is that extreme, but like there is stories on

13   both sides.

14           THE COURT:  Okay.  In your answer to question number

15   84 you indicated -- the question was:  Do you believe that

16   defendants in criminal trials should have to prove that they

17   are innocent.  And your answer was:  Unsure.

18           Then you went on to explain:  Defendants have to

19   prove they are innocent because the prosecution is proving they

20   are guilty.

21           Can you can explain a little bit more what you mean

22   by that answer.

23           JUROR NO. 57:  I guess like degree or semantics.  I

24   think it's, you know, just when somebody is trying to prosecute

25   you, you do have to prove you are innocent.  I have to respond

1    to all the accusations.

2           But I guess in another sense, that -- like in China,

3    I guess it's you're guilty until you're proven innocent.

4    That's a whole different type of the government or a whole

5    different type of thinking.

6           And I don't believe, I don't like the way the Chinese

7    government does it, but the United States government, the

8    overall understanding that you are innocent until proven guilty

9    I think is better.

10          THE COURT:  All right.  I mean, that is in fact a

11   basic principle in our system, a defendant is presumed innocent

12   until proven guilty.  And the burden of proof is only on the

13   Government.

14          In other words, the Government either proves somebody

15   is guilty or they don't.  And unlike China, there is absolutely

16   no burden on a defendant to prove his innocence.

17          So I wasn't sure what you truly meant by that.  I

18   mean, do you understand that difference?  The Government has

19   the burden of proving a defendant's guilt.

20          JUROR NO. 57:  Oh.

21          THE COURT:  And you didn't understand that before?

22          JUROR NO. 57:  No.  Yeah, that I -- that was kind of

23   vague to me.  I mean, I probably learned it in high school, but

24   I just wasn't that clear on it.

25          THE COURT:  All right.  Then in your answer to number

67

1    85, the question there was:  Do you believe that the law does

2    too much to protect the rights of criminal defendants and not

3    enough to protect the rights of crime victims and their

4    families?  And you indicated you are unsure about that.

5            Can you add anything to that answer?  What is it that

6    you are unsure about?

7            JUROR NO. 57:  I really thought -- I guess I thought

8    like it should be two different points.  Like I guess the

9    courts and the justice has to -- has to do their job, but then

10   victims rights is done I guess in someplace else.  You know, if

11   you try to combine the two, then it gets a little bit more

12   complicated.

13           THE COURT:  Okay.  All right.  Thank you.  Why don't

14   you step down for a second.

15           NOTE:  Juror number 57 leaves the courtroom.

16           THE COURT:  Counsel, unless you have any objection, I

17   think this juror should be stricken for cause.  I think he has

18   an inherent misunderstanding of the legal system that I would

19   be concerned about being able to sufficiently clarify.

20           Anybody have any objection to this juror being

21   stricken for cause?

22           MR. KROMBERG:  No, Your Honor.

23           THE COURT:  How about from the defense?

24           MR. MacMAHON:  We don't, we don't object to striking

25   him.

1          THE COURT:  All right, then I am going to strike him.

2     Let's bring him in.

3          NOTE:  Juror number 57 returns to the courtroom.

4          THE COURT:  Sir, I want to thank you for your

5     attendance today.  We are going to excuse you as a juror.  That

6     means you no longer have to worry about reporting here for jury

7     duty.  And I want to thank you for your service.

8          I believe you can go down to the Clerk's Office and

9     tell them that you are no longer going to be a juror --

10    considered for jury duty in this case, and they will excuse you

11    at that point.  Thank you.

12         NOTE:  Juror number 57 leaves the courtroom.

13         THE COURT:  I think this might be a good time for us

14    to take a five-minute break.  We are moving along pretty well.

15         All right.  And we will reconvene at 11:30.

16         NOTE:  At this point a recess is taken; at the

17    conclusion of which the hearing continues as follows:

18         THE COURT:  I believe we should be at juror number

19    62.

20         NOTE:  Juror number 62 enters the courtroom.

21         THE COURT:  Good morning, ma'am.  If you would come

22    across the floor and go sit in the jury box -- in the witness

23    box.  Thank you for coming to court this morning.

24         Just a couple of questions.  First of all, is there

25    anything in your questionnaire answers that you think you would

69

1   like to amplify or change?

2         JUROR NO. 62:  I don't believe so, no.

3         THE COURT:  Anything in addition that was not in the

4   questionnaire, but any information that you think we might want

5   to know about in considering you for jury service?

6         JUROR NO. 62:  No.

7         THE COURT:  No?  Since Monday have you been exposed

8   to any media coverage or conducted any investigation into any

9   of the issues in this case?

10        JUROR NO. 62:  No.

11        THE COURT:  And again, the time commitment is not

12  going to be a problem for you if you are selected as a juror in

13  this case?

14        JUROR NO. 62:  No.

15        THE COURT:  All right.  You indicated in your

16  questionnaire that you have traveled to Bosnia, is that

17  correct?

18        JUROR NO. 62:  It was Yugoslavia at the time.

19        THE COURT:  You made that point in the answer.  Was

20  there any reason -- can you tell us what the purpose of the

21  trip was?

22        JUROR NO. 62:  I went for a religious trip.

23        THE COURT:  To visit sites?

24        JUROR NO. 62:  To Medjugorje is a place in Yugoslavia

25  that the Virgin Mary is supposedly appearing there.  So I went

1    with some family members.

2         THE COURT:  All right.  And I assume that you're

3    aware of the internal strife that has occurred in that region?

4         JUROR NO. 62:  Yes.

5         THE COURT:  And some of that involves conflicts

6    between Muslim and non-Muslim groups.  Is there anything about

7    your having been to that area and the nature of that kind of

8    conflict that -- because some of those issues may arise in this

9    case -- that you think could affect your ability to judge this

10   case impartially?

11        JUROR NO. 62:  No.

12        THE COURT:  All right.  You work in the Inspector

13   General's Office, correct?

14        JUROR NO. 62:  Correct.

15        THE COURT:  And that's for the EPA?

16        JUROR NO. 62:  Correct.

17        THE COURT:  All right.  And you do have -- you do

18   work a fair amount with law enforcement people you said?

19        JUROR NO. 62:  Yes.

20        THE COURT:  Do you feel in any respect you might tend

21   to believe the law enforcement side of a criminal case because

22   you have had on a professional basis involvement with law

23   enforcement people?

24        JUROR NO. 62:  Perhaps.  I don't believe so.  I

25   believe I'm impartial.  So if you were to ask me do I believe

1    that I could be impartial, yes, I believe I can be.

2          But obviously since I work with law enforcement, I

3    may have some bias that I am not aware of, but I believe I

4    could be impartial.

5          THE COURT:  Have you ever had to question a law

6    enforcement person's position on an issue or countermand it?

7          JUROR NO. 62:  No.

8          THE COURT:  As an Inspector General, do you sometimes

9    investigate the investigators?

10         JUROR NO. 62:  I do not.  Our office has on occasion

11   investigated some of the agents, but I have not participated in

12   that in my capacity.

13         THE COURT:  But has, either presently or in the past,

14   has part of your job been to conduct investigations?

15         JUROR NO. 62:  Me personally, no.

16         THE COURT:  So your job is more of an overviewer, is

17   that what it is?

18         JUROR NO. 62:  I am a manager in the office, and I

19   handle the Congressional and Public Affairs Office for the

20   Inspector General's Office.  I am an Assistant Inspector

21   General.

22         THE COURT:  All right.  In any of the matters that

23   you have overseen though, to your knowledge has your agency or

24   your office ever recommended prosecution or disciplinary

25   actions against one of its law enforcement people?

72

1                      JUROR NO. 62:  Yes.

2              THE COURT:  And did you have any problem with that

3       recommendation?

4                      JUROR NO. 62:  No.

5              THE COURT:  So you have been able to evaluate the

6       credibility or the behavior of a law enforcement person and

7       find that it was not proper under the right circumstances?

8                      JUROR NO. 62:  I have not been in the decision-making

9       position to make that evaluation, but I have been a participant

10      in the activities, and participated in meetings and such with

11      regard to the proceedings.  But I have not been the decision

12      maker on whether or not to take a disciplinary action or

13      prosecute an agent.

14             THE COURT:  All right.  If the Court at the end of

15      the trial were to instruct you that you have to evaluate each

16      individual witness' testimony on its own merits, and that means

17      you don't look at the person's skin color, or age, or

18      profession, but you look at what the person said, how

19      reasonable it is, and the other evidence that contradicts it or

20      supports it, would you be able to do that?

21                     JUROR NO. 62:  Yes.

22             THE COURT:  And the fact that a person might be an

23      FBI agent or a different type of law enforcement person, would

24      you be able to filter that out and just evaluate the testimony

25      on its own merits?

1            JUROR NO. 62:  Yes.

2            THE COURT:  All right.  Now, you indicated in your

3     answer to question number 85, which is:  Do you believe that

4     the law does too much to protect the rights of criminal

5     defendants and not enough to protect the rights of crime

6     victims and their families?  You indicated you were unsure.

7            Can you expand upon that answer for us.

8            JUROR NO. 62:  I think it's circumstantial.  I

9     couldn't make a judgment so globally about -- I think it's more

10    of a balance.  I think just on the question about religion, I

11    also indicated with respect to religion in government, I think

12    that it's a balance.  And in some circumstances I think the

13    pendulum is too far in one way and in other circumstances I

14    think perhaps the pendulum is too far in the other.  But I

15    think it is a balance.

16           And so, I wasn't sure how to answer that question

17    without a lot of explanatory notes.

18           THE COURT:  Well, actually, I need just a little bit

19    more meat on those bones on this issue.

20           JUROR NO. 62:  Okay.

21           THE COURT:  In what respect -- do you believe that

22    there is too much emphasis on the protection of the rights of

23    criminal defendants?

24           JUROR NO. 62:  No.

25           THE COURT:  All right.  Do you feel that there is

74

1   enough protection for the rights of crime victims?

2           JUROR NO. 62:  Yes.

3           THE COURT:  So I am not quite sure I understand why

4   you're unsure about your answer to that question.

5           JUROR NO. 62:  I guess in answering the question it

6   was hard for me to not think of circumstantial situations and

7   cases --

8           THE COURT:  Give us an example of what you were

9   thinking about.

10          JUROR NO. 62:  An example?  Let me think, without

11  being too topical.

12          I think sometimes in cases where there is a victim of

13  a violent crime and they have to testify, for example, and they

14  are very uncomfortable and it is emotionally difficult.  But

15  that is a necessary component of going through the judicial

16  process.  So in circumstances such as that or if somebody is

17  subpoenaed and would prefer because -- if they are a victim, I

18  suppose they wouldn't have to be subpoenaed.  But if they are

19  forced to testify and they are a victim or associated with the

20  victim of a crime, I think that it's unfortunate, but that's

21  part of the process.

22          THE COURT:  All right.  Then you indicate in question

23  number 86:  Do you believe that if a defendant does not testify

24  at trial, he is probably guilty?  And you indicated you are

25  unsure about that.

75

1          Can you explain what you meant by being unsure about

2     that.

3          JUROR NO. 62:  I don't believe just because someone

4     does not testify, that they are necessarily guilty; however, I

5     guess I have understood from comments and conversations that I

6     have been exposed to or had with individuals who work in law or

7     law enforcement, that often times people believe that if you

8     don't testify -- you can turn on the TV, Court TV and all of

9     the talking heads will offer their opinion that defendants that

10    don't testify, that that's a consideration that they may be

11    guilty.

12          I personally don't know that I believe that, but I

13    can't pretend like I have not heard that.

14          THE COURT:  All right.  Well, there is one thing --

15    it is one thing to have heard something, but I think what we're

16    trying to get, since the question was do you believe, is inside

17    of you yourself, do you hold that belief?

18          JUROR NO. 62:  No.

19          THE COURT:  Okay.  Okay.  You indicated in your

20    answer to number 92, which was the hardship question, personal

21    travel, but not a serious hardship.

22          That suggests to me that you do have some future

23    travel plans?

24          JUROR NO. 62:  Yes.  I am supposed to go skiing next

25    week.

76

1          THE COURT:  All right.  Now, again, would you in any

2     respect hold that against either the Government or the

3     defendant if you were required to give up that trip and stay

4     here and try this case?

5          JUROR NO. 62:  No.

6          THE COURT:  All right.  Thank you.  If you don't mind

7     just stepping outside for a second.

8          NOTE:  Juror number 62 leaves the courtroom.

9          THE COURT:  Any follow-up questions?

10         MR. KROMBERG:  No, Your Honor.

11         THE COURT:  How about you, Mr. MacMahon?

12         MR. MacMAHON:  Just a request for some follow-up,

13    Your Honor.  This potential juror has got some -- I am looking

14    at the, on page 24, the follow-up on question 34.  She has

15    actually worked in the Office of the President.  Her

16    significant other is in the Department of Justice.  If I can

17    get right to page 34.

18         THE COURT:  Right, 24.

19         MR. MacMAHON:  So I would ask the Court if you would

20    do some follow-up.  I know with the victim of the Pentagon

21    questions, that we were asking them about the September 11

22    attacks and discussion of people maybe approving it or

23    otherwise discussing it, but when you have got someone who is

24    this high up in the government, has these kind of positions --

25    one of the charges in the case is a conspiracy to wage war

77

1    against the United States.  And it isn't really just -- that's

2    in the superseding indictment.  That wasn't part of the

3    original case.

4           But I think if somebody has this kind of a role in

5    the government -- and the evidence the Government wants to put

6    on -- that the juror should be asked is there something that

7    would cause you to lean in favor of the Government or against

8    the defendant in a case where a Muslim defendant is charged

9    with conspiracy to wage war against the United States.

10          That is a much more specific question with respect to

11   a person in her position in the government.  And I would like

12   to know what the answer was to that.

13          THE COURT:  Well, I am not going to ask that

14   particular question.  I think that is asking her to prejudge

15   this case in a way that is not proper.  But I will ask her to

16   flesh out her answer to number 34.

17          NOTE:  Juror number 62 returns to the courtroom.

18          THE COURT:  Ma'am, if you would just speak in a good,

19   loud voice so we can hear you, you can stay there.

20          In your answer to number 34 had to do with family

21   members working for the government.  You indicate that -- let

22   me go back to the original question.  That your significant

23   other has worked for the Executive Office of the President.

24          When was that?

25          JUROR NO. 62:  In the early 1990's.

1          THE COURT:  So that was in the Clinton

2    administration?

3          JUROR NO. 62:  Yes.

4          THE COURT:  All right.  And the U.S. Department of

5    Justice.  In what capacity?

6          JUROR NO. 62:  Antitrust Division.  She was staff,

7    not a prosecutor.

8          THE COURT:  All right.  And then you have indicated

9    that you have members who, family members who have worked in

10   Congress and for the Department of Justice, ATF, and the U.S.

11   Marshals Service.

12         Can you just give us an idea of what capacity.

13         JUROR NO. 62:  My sister-in-law was a former, is a

14   former federal prosecutor.  My --

15         THE COURT:  In what jurisdiction?

16         JUROR NO. 62:  Washington, D.C.

17         THE COURT:  All right.

18         JUROR NO. 62:  She worked for the U.S. Attorney's

19   Office in D.C., as well as the Department of Justice.

20         I have seven brothers and sisters, and three of them

21   have worked on Capitol Hill in the course of working in

22   Washington.

23         I have two close friends, one of whom is an ATF

24   agent, and he used to work for the U.S. Marshals Service prior

25   to that.

1          And I think that covers it.

2          THE COURT:  All right.  Now, some of the allegations

3  in this case do involve, obviously, some fairly serious claims

4  and involve potential attacks on the seat of government here in

5  Washington.

6          Do you feel that because of the issues in this case

7  and not only your own work, but the work of so many of your

8  family members at the higher levels of government in

9  Washington, that that might affect your ability to be impartial

10 in judging this case?

11         JUROR NO. 62:  No.

12         THE COURT:  All right, thank you.  If you would step

13 back.

14         NOTE:  Juror number 62 leaves the courtroom.

15         THE COURT:  Anything further?  Any further questions?

16         MR. MacMAHON:  No, Your Honor.  Thank you.

17         THE COURT:  All right.  Anybody want to move to

18 strike this juror?

19         MR. KROMBERG:  No, Your Honor.

20         THE COURT:  Mr. MacMahon?

21         MR. MacMAHON:  Your Honor, I would.  Some of the

22 questions about defendant's rights, I know she got

23 rehabilitated when she got through them, but I don't think --

24 especially given some of the DoJ and other connections, that

25 concerns about the failure of a defendant to testify, I don't

80

1    think that the witness can be fair and impartial.

2         THE COURT:  I think she can.  I mean, you can

3    certainly exercise a peremptory.  But I don't detect -- and if

4    you look at all of her answers fairly -- and again, I think

5    some of the questions on paper can be misleading, which is why

6    we kept some of these people in the pool even though their

7    answers might have not been perfect --

8         MR. MacMAHON:  She may be a relative too, Your Honor.

9    I am just saying that as a matter of humor, if you look at the

10   name.  But she is not a relative.

11        THE COURT:  No, all right.  That's fine, I am going

12   to let 62 in.  So, let's bring her back in.

13        NOTE:  Juror number 62 returns to the courtroom.

14        THE COURT:  All right, ma'am.  You have gone on to

15   the last stage of consideration for jury duty in this case.

16        You are finished here for today, and you are clear

17   for tomorrow, but we are going to need you back here next week.

18   I am hoping that will be 10 o'clock Monday morning, but I am

19   not going to know until I see how many jurors I have at the end

20   of tomorrow.

21        So you're going to need to continue calling that

22   number that you used to get here today.  After 6 o'clock today

23   we may be able to give you more definite information.

24   Certainly after 6 o'clock Friday you will know for certain.

25        All right?

1               JUROR NO. 62:  Okay.

2               THE COURT:  My earlier cautions to you still apply.

3    That is, you are not to discuss the fact -- other than just

4    that you are going to be a potential jury, you can't go into

5    any of the details of this case with anyone.  You are to avoid

6    any media coverage and not conduct any investigation whatsoever

7    about the issues in this case.

8               Do you understand?

9               JUROR NO. 62:  Yes.

10              THE COURT:  Lastly, I do not expect that anyone will

11   contact you.  We have used numbers for people because we don't

12   want the media bugging our potential jurors.  But if for any

13   reason you think you are contacted about this case, you need to

14   let us know right away.

15              All right.  Thank you, you are excused at this time.

16              NOTE:  Juror number 62 leaves the courtroom.

17              THE COURT:  All right, number 67.

18              NOTE:  Juror number 67 enters the courtroom.

19              THE COURT:  Good morning, ma'am.  Thank you for

20   coming to court.  Just a few questions for you.

21              Is there anything in your answers to the jury

22   questionnaire that you wanted to change at this point?

23              JUROR NO. 67:  No.

24              THE COURT:  Or any additional information you would

25   like to bring to our attention that you think we might want to

82

1    know about to consider you for jury duty?

2              JUROR NO. 67:  No.

3              THE COURT:  Have you conducted any investigation or

4    heard any media coverage about this case since Monday?

5              JUROR NO. 67:  No.

6              THE COURT:  And again, the time commitment in terms

7    of the number of days and the hours during the days, does that

8    create any problem for you at all?

9              JUROR NO. 67:  No.

10             THE COURT:  All right.  I have a couple of specific

11   questions for you, ma'am.  You indicated in your answer to

12   question number 22 that the Dar al-Arqam Islamic Center was in

13   your neighborhood, is that correct?

14             JUROR NO. 67:  Yes.

15             THE COURT:  Did that create or does the presence of

16   that building create any problems or inconveniences for you or

17   your neighbors, to your knowledge?

18             JUROR NO. 67:  There have been some parking issues,

19   but other than that, no.

20             THE COURT:  Were those parking issues in the

21   beginning of the Center's existence, or do they continue today?

22             JUROR NO. 67:  I think it was more in the beginning.

23   I don't know that there has been a problem recently.

24             THE COURT:  All right.  Are you close enough to the

25   Center that some of the cars might be parked in your front

83

1   yard?

2           JUROR NO. 67:  No.

3           THE COURT:  All right.  Do you know any people who

4   attend the Center?

5           JUROR NO. 67:  Not personally.

6           THE COURT:  All right.  You indicated in your answer

7   to question number 30 that you and your co-workers witnessed

8   the attack plane at the Pentagon?

9           JUROR NO. 67:  Yes.

10          THE COURT:  Can you give us a little bit more detail

11  about that experience.

12          JUROR NO. 67:  We were aware of the World Trade

13  Center, and we had gone back up to our office and we were

14  sitting there, and the plane came at a very low altitude past

15  our building.  And we watched as it descended towards what I

16  figured was probably the Pentagon, and that's where it turned

17  out it was.  And it disappeared over some trees and then we saw

18  the fireball when it hit.

19          THE COURT:  All right.  Now, you actually didn't work

20  at the Pentagon at that time?

21          JUROR NO. 67:  No.

22          THE COURT:  You worked at one of the Crystal City

23  buildings?

24          JUROR NO. 67:  It's in Alexandria.

25          THE COURT:  One of the Alexandria buildings.  All

84

1    right.  And you said here that a coworker knew people killed at

2    the Pentagon.  Did you yourself know anybody killed there?

3              JUROR NO. 67:  No.

4              THE COURT:  Now, I assume you were pretty upset when

5    you saw what happened?

6              JUROR NO. 67:  Very.

7              THE COURT:  Do you feel in any respect that

8    experience might color or affect how you could approach this

9    case as a juror?

10             JUROR NO. 67:  I have thought long and hard -- when I

11   was answering the questionnaire, but I feel that I can look at

12   the evidence that's presented to me and judge fairly.

13             THE COURT:  All right.  Now, there may be witnesses

14   who may testify or be described as saying that they thought

15   that the attack on the Pentagon was a great thing, and they may

16   have rejoiced in it, there may be e-mail messages or

17   communications praising those events.

18             If that evidence were to come in, do you feel that

19   that would make it difficult for you to be impartial in

20   continuing to judge this case in an impartial manner?

21             JUROR NO. 67:  No.

22             THE COURT:  All right.  You indicated in your answer

23   to question number 31 that your parents cancelled a trip to

24   Europe which was scheduled in that time period, and that you

25   yourself are not comfortable flying after seeing that plane

85

1    crash.

2              Have you flown since September 11?

3              JUROR NO. 67:  Yes, I have.

4              THE COURT:  Are you still as uncomfortable, or has

5    that sort of disappeared?

6              JUROR NO. 67:  It has dissipated.  I have never

7    really liked to fly.  That didn't help.

8              THE COURT:  All right.  So again though, is that

9    really the only lingering effect that you feel personally from

10   the September 11 events?

11             JUROR NO. 67:  I still watch planes wondering if they

12   are going to crash.  You know, I mean it's not like it was --

13   it's not all the time, but every once in awhile it kind of

14   comes back.

15             THE COURT:  All right.  But does it come back to a

16   degree that you think it would interfere with your ability to

17   be a fair judge in this case?

18             JUROR NO. 67:  No.

19             THE COURT:  And in question 38 you think you may have

20   heard or read something in the media about a Virginia paintball

21   case?

22             JUROR NO. 67:  Yes.

23             THE COURT:  And you said:  Heard sometime ago that it

24   was a training for Islamic terrorists.

25             Do you recall like where you might have heard that or

1    anything more about --

2          JUROR NO. 67:  Probably in the news or in the paper.

3          THE COURT:  All right.  Do you feel -- was there any

4    other informations about paintball or Virginia jihad that you

5    recall hearing?

6          JUROR NO. 67:  No.

7          THE COURT:  Do you think in any respect what you've

8    heard has preset your mind such that you can't hear this case

9    impartially?

10         JUROR NO. 67:  No.

11         THE COURT:  All right.  In your answer to question

12   number 58 you indicated that you have been on a jury in the

13   state system, and that was a shoplifting case.  And the jury

14   found that person guilty?

15         JUROR NO. 67:  Yes.

16         THE COURT:  Do you remember, was it a six or a

17   12-person jury, if you remember?

18         JUROR NO. 67:  I believe it was 12.

19         THE COURT:  And you couldn't remember the year.  Was

20   it a long time ago?

21         JUROR NO. 67:  Maybe five, within the past five or

22   six years.

23         THE COURT:  Was that in Fairfax County or Alexandria?

24         JUROR NO. 67:  Fairfax.

25         THE COURT:  Was there anything about the trial or

87

1    your experience as a juror that was particularly negative or

2    positive?

3              JUROR NO. 67:  No.

4              THE COURT:  What did you think -- how did you feel

5    about being a juror?

6              JUROR NO. 67:  It was interesting.

7              THE COURT:  And was there much discussion or debate

8    within the jury room?

9              JUROR NO. 67:  Yes.

10             THE COURT:  There was?  And what is your overall

11   assessment of the criminal justice system having been a juror

12   once before?

13             JUROR NO. 67:  I thought it was fair.

14             THE COURT:  You thought it was fair.  Okay.  In your

15   answer to question number 88 you indicated -- the question was:

16   Do you tend to believe that a member of law enforcement, such

17   as a police officer or a federal agent, who testifies in court

18   is more likely to tell the truth than other witnesses, less

19   likely to tell the truth than other witnesses, or equally

20   likely?  And you indicated you thought they were more likely.

21             Do you want to expand upon that answer?

22             JUROR NO. 67:  Well, maybe I hope that they would be

23   more likely to tell the truth.  I guess they should tell the

24   truth.  Of course, everybody else is too, but hopefully they're

25   -- because they're part of the system, they should be telling

88

1    the truth.

2           THE COURT:  Well, you understand that part of the job

3    of a juror is to decide the truth saying of each and every

4    witness who comes in.  And each witness should be coming in

5    with sort of a clean slate, with no preconceptions on the part

6    of the juror to believe that person or disbelieve them.

7           And so, we are always concerned when somebody

8    indicates that they might tend to believe a police officer over

9    that of a non-police officer.

10          I guess my question to you is, if it's made clear to

11   you that you have to evaluate each witness' testimony on its

12   own merits, and the fact that somebody is a non-police officer

13   doesn't mean that he or she isn't necessarily telling the

14   truth, I mean, does that give you any concerns or problems?

15          JUROR NO. 67:  No.

16          THE COURT:  Do you have experience with law

17   enforcement people either as friends or as family members?

18          JUROR NO. 67:  I have a family member that's a U.S.

19   Park Police Officer.

20          THE COURT:  And how close a family member?

21          JUROR NO. 67:  Brother-in-law.

22          THE COURT:  In this area?

23          JUROR NO. 67:  Yes.

24          THE COURT:  So, has he discussed much of his

25   courtroom experience with you?

89

1              JUROR NO. 67:  No, not really.

2              THE COURT:  Is that family relationship part of the

3    reason why you have that feeling that you would expect law

4    enforcement people to be more trustworthy?

5              JUROR NO. 67:  I mean, I know him.  I feel he is an

6    honest person, so maybe that's where I am drawing from.

7              THE COURT:  Would you have any problem disbelieving

8    the testimony of a law enforcement officer if there were

9    evidence that the testimony didn't appear accurate to you?

10             JUROR NO. 67:  No.

11             THE COURT:  All right.  If you would step outside for

12   a minute, please.

13             NOTE:  Juror number 67 leaves the courtroom.

14             THE COURT:  Mr. Kromberg, are there any additional

15   questions the Government wants the Court to ask?

16             MR. KROMBERG:  No, Your Honor.

17             THE COURT:  All right.  Mr. MacMahon?

18             MR. MacMAHON:  Just a couple, Your Honor.  Number 82

19   is a question about do you believe that if the prosecution goes

20   to the trouble of bringing someone to trouble, he or she is

21   probably guilty?  We got an unsure answer to that one.

22             And also, I would like the Court to follow up --

23   obviously this lady had a very emotional experience seeing this

24   awful event at the Pentagon.  And her description of it, it is

25   very emotional.  I just wonder if the Court would follow-up and

90

1   ask her if somebody, given what she saw, actually put on

2   evidence of praising the attacks, why that wouldn't affect her

3   judgment.

4          I think we just need to flesh that out a little bit

5   more.  What she talked about with the people that saw it.  She

6   was one of the actual witnesses to the events that are going to

7   be somewhat at issue in this case.

8          THE COURT:  All right.  Let's bring her back in.

9          NOTE:  Juror number 67 returns to the courtroom.

10          THE COURT:  I think I am going to have her over here,

11   yeah.

12          Ma'am, there was another question I wanted to ask you

13   about.  Number 82, the question was:  Do you believe that if

14   the prosecution goes to the trouble of bringing someone to

15   trial, he or she is probably guilty?  And you indicated:

16   Unsure.

17          Can you explain your answer on that one.

18          JUROR NO. 67:  I don't remember answering that one.

19   Sorry.

20          THE COURT:  Okay.  Well, let me just ask you the

21   question then in general.  Do you believe that if the

22   prosecution goes to the trouble of bringing someone to trial,

23   he or she is probably guilty?

24          JUROR NO. 67:  No.

25          THE COURT:  You don't believe that?  Okay.  The other

1    thing, I just wanted to follow up with you briefly.

2              I asked you previously if a witness was described or

3    a person was described during the trial as having praised the

4    events at the Pentagon on September 11, and saying this was a

5    good thing, and America had it coming to it, that sort of

6    thing, or if there were written documents to that effect, you

7    said you didn't think that would affect your ability to judge

8    this case.

9              Can you explain why that wouldn't affect you.

10             JUROR NO. 67:  I guess every -- they can have their

11   opinions about it.  I don't know that I quite understand

12   violence as a way of protest, but I feel like I can listen to

13   everything that is provided in the trial and weigh it.

14             THE COURT:  All right.  Thank you.  If you would go

15   back, we will have you back here probably one more second.

16   Just stay by the door, please.

17             NOTE:  Juror number 67 leaves the courtroom.

18             THE COURT:  Mr. MacMahon, anything further?  Any

19   further questions?

20             MR. MacMAHON:  No, no follow-up, Your Honor.

21             THE COURT:  Either side want this juror stricken?

22             MR. KROMBERG:  No, Your Honor.

23             THE COURT:  How about you, Mr. MacMahon?

24             MR. MacMAHON:  Yes, we would ask that she be

25   stricken, Your Honor.  I don't believe any juror that actually

92

1  witnessed those events, and I note it -- could be fair and

2  impartial in this case.  A lot of the emotion in this courtroom

3  is going to deal with that issue.

4         And some of these law enforcement questions the Court

5  rehabilitated the witness on, but I just -- given the nature of

6  the charges in this case and the confusion that we see about

7  the various issues, the Taliban and terrorism, and waging war

8  against the United States, I really don't believe that someone

9  who is that emotional describing obviously a very emotional

10  thing to have seen can be deemed to be a fair and impartial

11  juror in our system.

12         THE COURT:  The fact that a person is emotional

13  doesn't necessarily mean they can't be.  It depends how

14  emotional.  And she is not hysterical.  She has slightly

15  increased breathing, that's it.

16         But all her other answers were reasoned and well

17  explained.  The one question she just misunderstood and her

18  unsure answer became a more appropriate answer.

19         And on the law enforcement issue, I listened and

20  watched her very carefully.  I think she can clearly follow the

21  Court's instructions.

22         This is not a juror who strikes the Court as having

23  any bias or predisposition in this case.  And I am not going to

24  strike her for cause.

25         MR. MacMAHON:  Thank you, Your Honor.

93

1        THE COURT:  So let's bring her in.

2        NOTE:  Juror number 67 returns to the courtroom.

3        THE COURT:  Ma'am, we are going to continue

4   considering you for service in this case as a juror.  Now, you

5   are finished here today, and tomorrow there will be no need for

6   you to be here.  So you can go on with your regular life.

7        However, we are hoping to get the trial started on

8   Monday with the very final round of jury selection.  And so, it

9   is highly likely you will be needed back here before 10 o'clock

10  on Monday.  You will need to keep calling into the number you

11  have been calling.  After 6 o'clock today, we may have the

12  answer for you.  If not, after 6 o'clock tomorrow, that will

13  definitely tell you what the situation is.

14       In the meantime, you must continue to follow my

15  earlier instructions on Monday.  And that is, you are not to

16  conduct any investigation into this case.  Avoid any media

17  coverage.  You are not to tell anybody anything about the

18  questionnaire or what the case involves.  You can tell people

19  you are still being considered for jury duty.

20       And we don't expect that anyone is going to contact

21  you.  You are known as a number because we don't want the media

22  contacting you.  But if you feel anyone has tried to reach you

23  or contact you, let us know right away.  All right?

24       Thank you.  You are free to go at this point.

25       NOTE:  Juror number 67 leaves the courtroom.

94

1          THE COURT:  Number 74 should be the next number.

2          NOTE:  Juror number 74 enters the courtroom.

3          THE COURT:  Thank you, sir, for appearing here today.

4   Just a couple of questions for you.

5          Is there anything that you answered on the

6   questionnaire, any of your answers that you want to add to or

7   expand upon for us at this point?

8          JUROR NO. 74:  No, ma'am.

9          THE COURT:  All right.  Is there any additional

10  information that might not have been provided in the

11  questionnaire that you think might be relevant to our

12  considering you for service on this jury?

13         JUROR NO. 74:  No, ma'am.

14         THE COURT:  Since Monday have you been exposed to any

15  media coverage or conducted any investigation about this case?

16         JUROR NO. 74:  No, ma'am.

17         THE COURT:  Since Monday has nothing come to your

18  mind as to the time commitment that might be a problem that we

19  need to know about?

20         JUROR NO. 74:  No, ma'am.

21         THE COURT:  All right, sir.  I know you live in

22  Manassas.  Do you anticipate any problem getting here by 9:30

23  in the morning?

24         JUROR NO. 74:  No, ma'am.

25         THE COURT:  No?  All right.  Where do you actually

1   work right now?

2            JUROR NO. 74:  Georgetown University.

3            THE COURT:  So you're commuting anyway?

4            JUROR NO. 74:  It is about the same distance.

5            THE COURT:  Okay.  In your answer to question number

6   85, which asked you:  Do you believe that the law does too much

7   to protect the rights of criminal defendants and not enough to

8   protect the rights of criminal victims and their families?  You

9   indicated yes.

10           Can you explain a little bit more of what you mean by

11  that answer.

12           JUROR NO. 74:  Well, my opinion, I think that the

13  system, even though it's flawed, it's the best thing there is

14  out there, but it seems like the defendants and the people

15  convicted -- taking, for instance, rape, you know, they give

16  the woman a hard time because she was raped and make her feel

17  like it was her fault.

18           Where the guy, especially -- how can I say this.

19  They lean more at protecting the defendant or the criminal.  I

20  have a hard time with the lawyer -- what is it?  The ACLU and

21  their rights.

22           THE COURT:  Well, you indicated, for example, though

23  in question number 84 that you believe that defendants in

24  criminal trials should not have to prove that they are

25  innocent.  Is that correct?

96

1          JUROR NO. 74:  Well, I may have misstated that, but

2   -- you're innocent until proven guilty, and I figure whoever is

3   prosecuting should have to prove you are guilty instead of

4   having you --

5          THE COURT:  Do you have any problem with that

6   principle of the legal system?

7          JUROR NO. 74:  Which principle?

8          THE COURT:  The principle that the Government has to

9   prove a person guilty?

10          JUROR NO. 74:  That's the way it should be.

11          THE COURT:  All right.  So the system is then set up

12   to protect the rights of people who are charged with a criminal

13   act.

14          JUROR NO. 74:  Yes.

15          THE COURT:  And you don't have a problem with that

16   set up?

17          JUROR NO. 74:  No.  It's not perfect, but it's the

18   best thing out there right now.

19          THE COURT:  All right.  Okay.  You indicated you need

20   smoke breaks?

21          JUROR NO. 74:  Yes.

22          THE COURT:  How serious is that need?

23          JUROR NO. 74:  Well, I have got about ten minutes

24   left on my meter, Your Honor.

25          THE COURT:  And what starts to happen?  No, but

1    seriously, I mean, the way we conduct trials here, it is about

2    an hour-and-a-half or an hour-and-three-quarters between

3    breaks.

4              JUROR NO. 74:  I can do that, I have done two hours

5    before.

6              THE COURT:  All right.  Okay.  Very good.

7              All right, sir, if you would step outside for a

8    second.  We will see if we have anything further for you.

9              NOTE:  Juror number 74 leaves the courtroom.

10             THE COURT:  Mr. Kromberg.

11             MR. KROMBERG:  Judge, on question 62 when the

12   prospective juror gave an answer, it was tough to tell whether

13   that was a positive experience or a negative experience.  I

14   assumed it was positive, but looking at it again, I thought we

15   ought to check.

16             THE COURT:  This is about the judge in the J&D court?

17             MR. KROMBERG:  Yes, Your Honor.

18             THE COURT:  I am not going to worry about juvenile

19   court.

20             Anything else from the defense?

21             MR. MacMAHON:  Nothing from the defense, Your Honor.

22             THE COURT:  Does anybody want the Court to consider a

23   for cause challenge to this jury?

24             MR. KROMBERG:  No, Your Honor.

25             MR. MacMAHON:  No, Your Honor.

98

1          THE COURT:  All right, let's bring him back in.

2          NOTE:  Juror number 74 returns to the courtroom.

3          THE COURT:  All right, sir, we are going to continue

4   considering you for service on this jury.  You are finished for

5   today and you are clear for tomorrow, but it's very likely we

6   will need you back here Monday at 10 o'clock.  And my hope is

7   then final selection will occur and we will go right away into

8   the trial.

9          And what we are doing is paring our numbers down to a

10  very small number.  So the likelihood of your serving on this

11  case is fairly high.

12         I am going to ask you that you continue to follow my

13  instructions.  And that is, conduct no investigation about this

14  case, avoid any media coverage about the case, don't discuss in

15  any respect with anyone any of the details about the

16  questionnaire or the case.  All you should tell folks is that

17  you are still under court direction, that you may be a juror in

18  this case.

19         All right?

20         JUROR NO. 74:  Yes, Your Honor.

21         THE COURT:  And we have used numbers to avoid the

22  media getting involved in this thing.  If for any reason, and

23  they shouldn't, but anyone should try to contact you and ask

24  you about the case, you should let us know right away and

25  obviously not talk to them.

99

1          All right?

2          JUROR NO. 74:  Yes.

3          THE COURT:  Please keep checking that telephone

4   number that you used to find out about today.  After 6 o'clock

5   today we may be able to tell you for certain what's going on.

6   If not today, you will know by 6 o'clock tomorrow for certain

7   about your next reporting time.

8          Thank you, sir, you are free to go at this point.

9          NOTE:  Juror number 74 leaves the courtroom.

10         THE COURT:  And we will call number 76.

11         NOTE:  Juror number 76 enters the courtroom.

12         THE COURT:  Good morning, ma'am.  Thank you for being

13  here.  Just some questions.

14         Is there anything in your answers to the

15  questionnaire that you at this point would like to change or

16  add on to?

17         JUROR NO. 76:  After thinking about the

18  questionnaire, there was a question related to if you served in

19  the military.

20         THE COURT:  Yes, ma'am.

21         JUROR NO. 76:  You, your spouse, or family.  I have

22  three brothers that served.  And I didn't put that down because

23  I didn't know the time frame that they served.

24         THE COURT:  Are any of them currently in the service?

25         JUROR NO. 76:  No, no, ma'am.

1              THE COURT:  Do you know which service they were in?

2              JUROR NO. 76:  I had two brothers who served in the

3    Army and one in the Air Force.

4              THE COURT:  Did any of them see combat either in

5    Desert Storm, Vietnam, or any other of the -- if you know?

6              JUROR NO. 76:  One brother was in the Reserves, and I

7    think he was sent during Desert Storm.  Only for a short time.

8              THE COURT:  Is there anything about any of your

9    family members' service in the military that you think might

10   make it difficult for you to be impartial in judging this case?

11             JUROR NO. 76:  No, ma'am.

12             THE COURT:  Okay.  Is there anything else that you

13   think you might want to bring to our attention that would not

14   have been included in the questionnaire but you think might be

15   of use to us in evaluating you for jury service in this case?

16             JUROR NO. 76:  At this time there is nothing that I

17   can think of.

18             THE COURT:  All right.  Have you conducted any

19   investigation into any of the issues in this case or been

20   exposed to any media coverage about this case since Monday?

21             JUROR NO. 76:  No, ma'am.

22             THE COURT:  And again, the time commitment that I

23   explained on Monday, you know, is that in any respect a problem

24   for you?

25             JUROR NO. 76:  No, ma'am.

1          THE COURT:  I mean, it's a sacrifice for everybody,

2     but what we're looking at is people who just really have a

3     major, major problem or who would not be able to make the time

4     commitment.

5          Is that an issue for you at all?

6          JUROR NO. 76:  Well, as you just said, time is the

7     issue for all of us.  But if it is my duty, I have to do it, I

8     have to do my duty.

9          THE COURT:  All right.  Now, I know you live in

10    Stafford County, and that's a bit of a commute from here.  Your

11    present position where you currently work, is it up here or is

12    it near home?

13         JUROR NO. 76:  I work at Fort Belvoir, which is maybe

14    about 10, 15 miles away from here.

15         THE COURT:  All right.  Do you expect that you would

16    have any problem getting here from home?  I mean, I know 95 is

17    unpredictable, but do you see any issue about your being able

18    to be here by 9:30, which is when we would be starting the

19    trial?

20         JUROR NO. 76:  No, ma'am.

21         THE COURT:  All right.  In your answer to question

22    number 30, you were asked:  Do you, your spouse, or any

23    immediate family members know anyone who was a victim of the

24    attacks on September 11?

25         And you indicated that soldiers that you counseled, a

1    spouse died or was injured at the Pentagon.

2              Can you go into a bit more information about that.

3              JUROR NO. 76:  Yes, ma'am.  Where I work, I provide

4    tuition assistance to soldiers to attend college.  The Army

5    pays their tuition cost.  And there was a captain who was one

6    of the students in our college program -- we have evening

7    college programs, and her spouse was caught up in the Pentagon

8    crisis.

9              Also, the sergeant major of the post, her husband

10   died in the Pentagon.

11             So I know the two -- I knew the two females.

12             THE COURT:  And I assume you were yourself personally

13   affected by that?

14             JUROR NO. 76:  Yes, ma'am.

15             THE COURT:  All right.  Now, you understand that some

16   of those events will be discussed in this case, the events of

17   the World Trade Center and the Pentagon.

18             Do you understand that?

19             JUROR NO. 76:  Yes, ma'am.

20             THE COURT:  All right.  There may very well be

21   evidence in this case that some of the witnesses may have

22   praised the events at the Pentagon and the World Trade Center,

23   seen those as good things, America getting its just due, that

24   sort of thing.  And there may be written documents to that

25   effect.

103

1              Now, do you feel, given your personal experience on

2      September 11, that that kind of evidence in this trial might

3      make it very difficult for you to be impartial in judging this

4      case in a calm and rational manner?

5              JUROR NO. 76:  I believe that I could be calm and

6      listen to the evidence, and based on the evidence determine

7      whether or not an individual was guilty or not guilty.

8              THE COURT:  All right.  In your answer to question

9      number 84, you were asked the question:  Do you believe that

10     defendants in criminal trials should have to prove that they

11     are innocent?  And you indicated yes.

12             Can you explain your answer to us.

13             JUROR NO. 76:  Defendants?

14             THE COURT:  Yes, that's what you said.  Some people

15     may have misunderstood the question, but I just wanted to make

16     sure whether that was your answer or whether you misunderstood

17     the question.

18             The question was:  Do you believe that defendants in

19     criminal trials should have to prove that they are innocent?

20             JUROR NO. 76:  I answered yes based on the fact that

21     if an individual is accused of something and they have lawyers

22     that are helping them, they should have to provide evidence to

23     exonerate them because, after all, they are being accused.  The

24     burden of the proof is on the person that is being accused.

25             THE COURT:  All right.  Thank you.  I think you can

104

1    step outside for a second, please.

2           NOTE:  Juror number 76 leaves the courtroom.

3           THE COURT:  That was such an unequivocally wrong

4    answer, that I think, unless there is any objection, I would

5    strike this juror for cause.

6           MR. MacMAHON:  No objection, Your Honor.

7           THE COURT:  Mr. Kromberg.

8           MR. KROMBERG:  No objection.  For the record, I think

9    the jurors will follow instructions, and this could be a

10   learning experience for everyone, but I think we are doing well

11   enough --

12          THE COURT:  That is so fundamental that I am

13   concerned about that kind of an answer.

14          All right, let's have the juror come back in.

15          NOTE:  Juror number 76 returns to the courtroom.

16          THE COURT:  Ma'am, we want to thank you for your

17   attendance today.  We are actually going to excuse you as a

18   juror at this point, so you don't have to worry about coming

19   back anymore.

20          If you will just check in with the Clerk's Office

21   downstairs, let them know that you have been permanently

22   excused.  You are free to go.  Thank you very much.

23          JUROR NO. 76:  Thank you.

24          NOTE:  Juror number 76 leaves the courtroom.

25          THE COURT:  All right.  We will now call juror number

1   79.

2          NOTE:  Juror number 79 enters the courtroom.

3          THE COURT:  Good morning sir.  Since answering the

4   juror questionnaire, have you decided or do you feel that there

5   are any things that you want to add to any of the answers that

6   you provided in that questionnaire?

7          JUROR NO. 79:  Nothing, nothing that I could think

8   of.

9          THE COURT:  All right.  Since Monday have you been

10  exposed to any media coverage about this case or conducted any

11  investigation into any of the issues about this case?

12         JUROR NO. 79:  No media.  I tried to avoid the news

13  pertaining to anything related to this.  But one thing,

14  however, is at work they knew I had jury duty, and someone

15  overheard something on the radio regarding that they were

16  choosing a jury for this trial.  So just one of my coworkers

17  has an idea that I might be involved in this case.

18         But other than that, nothing specific.

19         THE COURT:  All right.  You have not discussed the

20  case with the coworker?

21         JUROR NO. 79:  No.

22         THE COURT:  You understand you can't do that?

23         JUROR NO. 79:  Yeah, yeah, I do, that's why --

24         THE COURT:  Is there any new information about

25  yourself that you want to bring to our attention that you think

1    we might want to know about in order to consider -- continue

2    considering you for service on this jury?

3              JUROR NO. 79:  Nothing I could think of.

4              THE COURT:  All right, sir.  And again, the time

5    commitment that we've explained, is that a problem in any

6    respect for you?

7              JUROR NO. 79:  No, it's not.

8              THE COURT:  All right.  You are a naturalized United

9    States citizen, is that correct?

10             JUROR NO. 79:  Yes, I am.

11             THE COURT:  And you were born in the Philippines?

12             JUROR NO. 79:  Yes, I was.

13             THE COURT:  When were you naturalized?

14             JUROR NO. 79:  I was naturalized, I believe it was

15   around 2002.

16             THE COURT:  Okay.  Did you have any problems with the

17   naturalization process?

18             JUROR NO. 79:  No, I did not.

19             THE COURT:  So you don't have any views either

20   negative or positive about the federal government and how it

21   goes about making citizens?

22             JUROR NO. 79:  No.

23             THE COURT:  All right.  You indicated in your answer

24   to question number 24 that you have some friends who actually

25   are either currently employed or students in the philosophy or

1    computational biology departments or SRA -- you indicated that

2    a good friend of yours works for SRA.

3             JUROR NO. 79:  Yes.

4             THE COURT:  Has that friend talked to you much about

5    his work at SRA?

6             JUROR NO. 79:  No.  Well, it just related to more

7    like the technical field, nothing specific on the work.  More

8    like what the job is all about, IT related.  So, discussions.

9             THE COURT:  What is the name of your friend?

10            JUROR NO. 79:  Mike Vasquez.

11            THE COURT:  I am sorry?

12            JUROR NO. 79:  Mike Vasquez.  Michael Vasquez.

13            THE COURT:  Mike Vasquez.

14            JUROR NO. 79:  Yeah.

15            THE COURT:  All right.  I want to make sure, Mr.

16   MacMahon, that you check with your client to see whether he

17   might know that person.

18            MR. MacMAHON:  Thank you, Your Honor.

19            THE COURT:  Is that what you are doing?

20            MR. MacMAHON:  Not offhand, Your Honor.

21            THE COURT:  All right.  And have you ever seen the

22   defendant?

23            JUROR NO. 79:  No.

24            THE COURT:  Because you indicate that you've

25   interacted with students at George Mason and some of the

1   departments.

2          JUROR NO. 79:  Yeah.  I wasn't just sure because I

3   didn't know if they were specifically in a class with -- but I

4   know I go to class at George Mason, so I might have interacted

5   without knowing whether they are in the philosophy class or any

6   of the classes mentioned.

7          THE COURT:  All right.  Now, in 63, in your answer to

8   63 you indicated that in the mid-1990s you filed a complaint

9   against a Washington, D.C. police officer for insulting you and

10  your girlfriend.

11         Can you tell us what kind of an insult happened.

12         JUROR NO. 79:  Well, what happened, it was -- you

13  know, I was going to a club in D.C., and I was dropping off my

14  girlfriend in front of the club.  And I pulled over where all

15  the cars were pulling over.  And a cop went beside me and said

16  that, you know, he was going to give me a ticket for impeding

17  the flow of traffic.  And I just indicated I was dropping off

18  somebody.

19         And then, away from that incident, you know, he

20  insisted I was -- I was trying to explain to him that I was

21  just trying to do the same thing, and he insisted to give me a

22  ticket.  So I was like okay.

23         And when my wife was trying to explain what was going

24  on, that she was the one being dropped, they were threatening

25  her to put her in jail for, you know -- I guess to them

1  indicating that, you know, that she was talking back to the

2  cop.

3         And when she was trying to explain, they were trying

4  to pull up, pull up the window of the cop car.  And when she

5  started crying when they did that, they were threatening to put

6  her in jail.

7         And they were, I guess, insulting, is more like

8  mocking us.  And I felt that, you know, we were being treated

9  differently.

10         THE COURT:  Do you think that was in part because of

11  your Filipino background?

12         JUROR NO. 79:  Well, I don't know what -- if that was

13  the case.  That wasn't what I filed.  But what I indicated to

14  the court is I was being treated differently because everybody

15  else were parked, were dropping off people there, and they were

16  not stopped.  And I didn't do anything differently except I

17  was, you know, I was given a ticket.

18         THE COURT:  All right.  From that experience, do you

19  feel in any respect you might harbor any ill-feelings towards

20  the Government, or the prosecutors, or law enforcement agents

21  in this case?

22         JUROR NO. 79:  No.  It's just from that experience,

23  from the -- I guess you, the internal affairs part, I guess to

24  that extent at least I felt confident that there is, you know,

25  other process.  If I feel trapped on the situation, that there

1   is other means within the government that I could proceed to,

2   you know, file my concerns.

3            THE COURT:  All right.  You indicated in question

4   number 93 that you have a hearing problem.  Have you had any

5   difficulty understanding me today?

6            JUROR NO. 79:  No, I do not.

7            THE COURT:  And you didn't have any trouble on

8   Monday, right?

9            JUROR NO. 79:  Yeah.

10           THE COURT:  All right.  Are you at all shy about

11  raising your hand to let people know you can't hear?

12           JUROR NO. 79:  Well --

13           THE COURT:  In other words --

14           JUROR NO. 79:  I am not generally, but I don't know

15  what the process is in the court.

16           THE COURT:  Well, let me ask you this.  If you are

17  chosen to be a juror, we want to make sure you hear everything.

18  Would you have any difficulty in letting me know, raising your

19  hand or getting somebody's attention to say, I couldn't hear

20  that?

21           JUROR NO. 79:  Well, if that's the normal process,

22  that I could interrupt the proceedings, yes, I wouldn't have

23  problem asking to repeat the question.

24           THE COURT:  But you haven't been having any trouble

25  -- these courtrooms are pretty well set up for sound.  And we

111

1    do have an infrared machine -- you don't wear a hearing aid, do

2    you?

3              JUROR NO. 79:  No, I don't.

4              THE COURT:  But you haven't had any trouble hearing

5    me?

6              JUROR NO. 79:  No trouble at all.

7              THE COURT:  Okay.  All right.  All right, sir, if you

8    would just step outside for a second.

9              NOTE:  Juror number 79 leaves the courtroom.

10             THE COURT:  Any follow-up questions for either side?

11             MR. KROMBERG:  No, Your Honor.

12             THE COURT:  How about for the defense?

13             MR. MacMAHON:  No, Your Honor.

14             THE COURT:  Any for cause issues for either side?

15             MR. KROMBERG:  No, Your Honor.

16             MR. MacMAHON:  No.

17             THE COURT:  All right, let's bring this juror back

18    in.

19             NOTE:  Juror number 79 returns to the courtroom.

20             THE COURT:  All right, sir, we are continuing to

21    consider you for the service -- for jury service in this case.

22    You are done for today, so you can go back to work today.  And

23    you are clear tomorrow, no problem tomorrow.

24             I am hoping we will need you back here Monday for a

25    10 o'clock start time, and we will go right into the trial from

1    there.  So you need to keep calling the phone number you called

2    to get here today, and that will tell you where and when you

3    need to be here next.

4            Do you understand?

5            JUROR NO. 79:  Yes.

6            THE COURT:  All right.  Now, you must continue to not

7    discuss this case with anybody.  So if your co-workers ask you,

8    tell them you are still being considered for jury service and

9    the judge says you can't talk about the case.

10           THE WITNESS:  And that is what I mentioned, Your

11   Honor.

12           THE COURT:  Terrific.  Don't do any investigation

13   into this case, obviously.  Don't go on the Internet and try to

14   research any issues or in any respect research any issues.

15           Nobody should be contacting you about this case.

16   That's why we are using numbers.

17           JUROR NO. 79:  Okay.

18           THE COURT:  But if the media should try to talk to

19   you, please make sure you don't talk to them.  And let us know

20   right away that they have tried to contact you.

21           JUROR NO. 79:  I will, Your Honor.

22           THE COURT:  All right.  You are free to go at this

23   point.  Thank you.

24           NOTE:  Juror number 79 leaves the courtroom.

25           THE COURT:  All right.  We are going to bring another

1    group in.  And I wanted to just generally talk to them for a

2    second.  So we need to probably take a three-minute recess, and

3    then we will go ahead and bring in the next group of numbers.

4              NOTE:  At this point a recess is taken; at the

5    conclusion of which the hearing continues in the presence of a

6    new group of potential jurors as follows:

7    JURY PANEL IN

8              THE COURT:  Ladies and gentlemen, we are just going

9    to call role and we'll see if all the jurors are here.  Will

10   you please stand up when you are called and answer "here" or

11   "present."

12             THE CLERK:  Juror number 81?

13             JUROR NO. 81:  Here.

14             THE CLERK:  Juror number 82.

15             JUROR NO. 82: Here.

16             THE CLERK:  Juror number 89.

17             JUROR NO. 89:  Present.

18             THE CLERK:  Juror number 94.

19             JUROR NO. 94:  Here.

20             THE CLERK:  Juror number 96.

21             JUROR NO. 96:  Present.

22             THE CLERK:  Juror number 102.

23             JUROR NO. 102:  Here.

24             THE CLERK:  Juror number 107.

25             JUROR NO. 107:  Here.

1          THE COURT:  Great.  All right.  If you folks will go

2     with Mr. Wood into the jury room.  And actually I will ask if

3     juror number 81 would just go right into the witness stand.  We

4     are going to move as quickly as we can.

5          NOTE:  The potential jurors leave the courtroom

6     except juror number 81.

7          THE COURT:  All right.  Ma'am, since answering the

8     jury questionnaire on Monday, is there anything you wanted to

9     add to any of the answers you provided?

10          JUROR NO. 81:  Just that it's a really far distance

11     to come from my house to here.  It takes almost two-and-a-half

12     hours in the morning.

13          THE COURT:  Do you think that is going to make it

14     difficult?  We are going to have to start at 9:30 once the

15     trial gets started.

16          JUROR NO. 81:  Yeah.  I am not a morning person.

17          THE COURT:  But I mean, the question is, can you make

18     it if you are a juror?  Because we can't start until all the

19     jurors are here, and so that could be an issue.

20          JUROR NO. 81:  Well, I have to take 66 on the way

21     here, so it just depends on traffic.  And I had to leave this

22     morning before 6.

23          THE COURT:  All right.  And going home at night,

24     again, you're leaving here at 6.

25          All right.  You indicated that you thought that you

1  might know Mr. MacMahon.  Seeing him more closely, do you think

2  you know him?

3          JUROR NO. 81:  I think that he looks familiar.  I

4  spend a lot of time in Middleburg, Virginia because I live

5  about five miles from there.  But I don't know him personally.

6          THE COURT:  And to your knowledge, you have never

7  used his law firm services?

8          JUROR NO. 81:  No.

9          THE COURT:  Do you serve on any committees or civic

10  functions in the Warrenton/Middleburg area?

11          JUROR NO. 81:  Yes.  I am on the Fauquier County

12  Democratic Committee.

13          THE COURT:  I don't think he's on that.

14          JUROR NO. 81:  Right.  But that's my only committee

15  that I am on.

16          MR. MacMAHON:  I knew you were going to say that,

17  Your Honor.

18          JUROR NO. 81:  And I used to work at the Virginia

19  Gold Cup, which is a large civic organization, nonprofit in The

20  Plains.

21          THE COURT:  All right.  Have you ever been involved

22  with that, Mr. MacMahon?

23          MR. MacMAHON:  I have done legal work for the Gold

24  Cup Association, but it was four years ago.

25          JUROR NO. 81:  I worked there in 2000 and 2001.  I

1    worked for Great Meadow, the 501(c)(3).

2              THE COURT:  But you actually don't think you know Mr.

3    MacMahon?

4              JUROR NO. 81:  No.

5              THE COURT:  All right.  Have you conducted any

6    investigation or heard any media coverage about this case since

7    Monday?

8              JUROR NO. 81:  No.

9              THE COURT:  All right.  And other than what you've

10   told us in your questionnaire, are there any additional, and

11   what you just said this morning, any additional scheduling

12   issues that we need to be aware of?

13             JUROR NO. 81:  Well, I am actually going, if I have

14   to be here, I actually have to go to my job following the case

15   because I am running film banks from 5 p.m. to 9 p.m. for

16   pretty much the entire month of April.  And there is no way I

17   can get out of it.

18             THE COURT:  Well, you wouldn't be there at 5 p.m.

19             JUROR NO. 81:  Yeah, but they start at 5 p.m., so I

20   will have to be there as soon as I get there.

21             THE COURT:  And where is that located?

22             JUROR NO. 81:  They are in Tysons Corner, our film

23   bank is in Tysons Corner.

24             THE COURT:  You wouldn't get there much before 7.

25   But would you plan to work there and then go home from there?

117

1           JUROR NO. 81:  Yes.

2           THE COURT:  It wouldn't give you much sleep.  Do you

3  need a full night's sleep?

4           JUROR NO. 81:  That's what I was worried about, the

5  early morning, to be really honest.

6           THE COURT:  All right.  Why don't you step outside

7  for just a second.

8           JUROR NO. 81:  Okay.

9           NOTE:  Juror number 81 leaves the courtroom.

10          THE COURT:  I am aware that this is one of the jurors

11  whom the Government wanted the Court to dismiss for cause.  I

12  am concerned about the time situation.  I don't want jurors

13  falling asleep in this case.  And it sounds to me like this

14  juror is not going to be able to be awake given her schedule.

15          There are a lot of other issues in her background as

16  I went over this again this morning.  She is concerned about

17  the treatment of women by Islam, I think there are enough

18  issues, and she obviously has strong opinions about things,

19  that this juror probably should be excused.

20          Is there any objection to that?

21          MR. KROMBERG:  Obviously not from the Government.

22          THE COURT:  How about from the defense?

23          MR. MacMAHON:  No objection, Your Honor.

24          THE COURT:  All right.  We are going to go ahead and

25  excuse her.  Just bring her in.

1              NOTE:  Juror number 81 returns to the courtroom.

2              THE COURT:  Ma'am, we are going to go ahead and

3      excuse you.  Your schedule is simply too intense.  You're not

4      going to be able to give us the time and attention that we

5      need.

6              We thank you for your attendance.  When you leave

7      court, check out with the Clerk's Office, but you are complete.

8      Thank you.

9              NOTE:  Juror number 81 leaves the courtroom.

10             THE COURT:  All right.  Number 82.

11             NOTE:  Juror number 82 enters the courtroom.

12             THE COURT:  All right, sir.  Is there anything that

13     you put in your question -- any answer that you feel might need

14     be to expanded upon, or anything that isn't in your answers

15     that you think we should know about in terms of considering you

16     for service on this jury?

17             JUROR NO. 82:  No, I don't think so.

18             THE COURT:  All right.  Have you conducted any

19     investigation or been exposed to any media coverage about the

20     case since Monday?

21             JUROR NO. 82:  No.

22             THE COURT:  Again, is there any issue about the time

23     commitment for this trial that you want to raise with us at

24     this point?

25             JUROR NO. 82:  Not really, no.

1          THE COURT:  Well, you hesitated.  I mean, we need

2     jurors who can really be here for the duration.  So is there

3     anything that gives you a concern?

4          JUROR NO. 82:  My wife is in nursing school, and I

5     have three kids, but --

6          THE COURT:  Can you get that covered?  Because, I

7     mean, we are going to run until about 6 o'clock at night.

8          JUROR NO. 82:  Yeah, I can make it work.

9          THE COURT:  All right.  All right, sir.  Just a few

10     questions.  You indicate that you have a friend in Kabul at the

11     present time, is that right?

12          JUROR NO. 82:  He is home right now, but he is

13     traveling there extensively, yes.

14          THE COURT:  As you know, there will be some

15     discussion about the Taliban and Afghanistan in this case.  The

16     fact that you have somebody who is over there right now, would

17     that in any respect make it hard for you to be impartial in

18     judging this case?

19          JUROR NO. 82:  No.

20          THE COURT:  All right.  You indicated in your answers

21     to 30 and 31 that your wife had some friends who were involved

22     in the World Trade Center at the time of the attack, and that

23     also that some of your business plans were cancelled and people

24     who you know were affected.

25          Is there anything at all about those personal

1   experiences with the World Trade Center and the events of

2   September 11 that you think may interfere at all with your

3   impartiality in judging this case?

4        JUROR NO. 82:  Not that I can think of, no.

5        THE COURT:  If you were to hear evidence that people

6   praised the events at the World Trade Center and made comments

7   that America deserved these attacks, et cetera, do you feel

8   that that kind of evidence would make it difficult for you to

9   be impartial in judging this case?

10        JUROR NO. 82:  No.

11        THE COURT:  All right.  In your answer to number 41

12   you indicated -- the question there was:  Is there anything in

13   particular about a case involving charges related to potential

14   acts of terrorism that would make it difficult for you to serve

15   as a fair juror?  You indicated no.  And then you gave a little

16   explanation:  Not more than any other American.

17        Can you just explain what you mean by that.

18        JUROR NO. 82:  All I meant was I don't think that

19   anybody in America was not affected by the events of 9/11 and

20   wasn't emotionally impacted in some way, but I don't know that

21   that's a problem going forward.

22        THE COURT:  All right.  And in your answer to

23   question 71 you mentioned a friend whom you had worked with at

24   MCG Capital who is of the Muslim faith, and that you two had

25   talked a little bit about being Muslim in the post-

121

1    September 11 era.

2              JUROR NO. 82:  Right.

3              THE COURT:  Can you give us a bit more information

4    about those discussions.

5              JUROR NO. 82:  Well, I tried to remember those since

6    the questionnaire, and I have to admit, I don't remember a lot

7    about it.  The main -- I still work with him today.  I sat next

8    to him at the time of 9/11.  And the main thing that I took

9    away from my talks was he felt that the Muslims who were

10   involved in 9/11 were like, you know, outsiders who had

11   misinterpreted the Koran.  And that basically the religion he

12   followed was a peaceful religion.  And that he wasn't, you

13   know, supporting their actions.  And he thought it was, you

14   know, it was wrong and bad.

15             THE COURT:  Was he at all concerned about his

16   personal safety, or were you concerned about him for his

17   personal safety?

18             JUROR NO. 82:  Not at the time.  I mean, in the years

19   since we've talked a little bit about whether he has been

20   discriminated against or ever felt unsafe.  And I think he has

21   had a couple instances where that was a problem, but there has

22   never been anything significant or major.

23             THE COURT:  And he is still a colleague of yours

24   today?

25             JUROR NO. 82:  Yes.

122

1          THE COURT:  Would you call him a good colleague?

2          JUROR NO. 82:  I wouldn't call him a good friend.  I

3   mean, we went from sitting together for -- sitting right next

4   to each other for two years to now we are on separate floors.

5   But it is a small company, it is only 50 people.  So we are all

6   pretty close.

7          THE COURT:  And do you sometimes go to meals with

8   him, that sort of thing?

9          JUROR NO. 82:  Sure.

10          THE COURT:  Is he the only Muslim friend or associate

11   that --

12          JUROR NO. 82:  No.  I previously worked about four

13   years ago with a another friend of mine who is Muslim, and I

14   just happened to talk to him on the phone yesterday as well.

15   And we have remained friends since then.  I am probably closer

16   with him than the person I work with today.

17          THE COURT:  All right.  And when you answered 72 --

18   and you were asked:  Do you have any feelings positive or

19   negative about the Muslim -- or about Muslim or Islamic faith?

20   You indicated:  I have negative feeling about Muslims who

21   espouse violence against Americans.

22          JUROR NO. 82:  Yeah.  And that wouldn't be

23   specifically to Muslims.  It would be any group or political

24   party that espouses violence.

25          THE COURT:  All right.  You indicated in your answer

123

1   to question 85:  Do you believe that the law does too much to

2   protect the rights of criminal defendants and not enough to

3   protect the rights of crime victims?  You said you were unsure.

4           Can you explain a little bit more your answer to that

5   question.

6           JUROR NO. 82:  Can you read that again?  What was

7   that?

8           THE COURT:  The question was:  Do you believe that

9   the law does too much to protect the rights of criminal

10   defendants and not enough to protect the rights of crime

11   victims and their families?  You said you were unsure.

12           If you could add or explain what you mean by being

13   unsure.

14           JUROR NO. 82:  I think I just basically meant that I

15   don't have a clear opinion one way or the other.  I mean, I

16   think there have been times where either reading in the

17   newspaper about a trial or maybe things you see on TV, that it

18   appears that sometimes the prosecution is prevented from

19   entering into evidence previous facts that have happened that

20   could establish a pattern that's not allowed by the courts, and

21   sometimes I don't wonder if that's not going too far.

22           THE COURT:  All right.  Now, if there were

23   information missing in this trial, for example, would you find

24   that that would bother you and make it difficult for you to

25   focus on the evidence that was in the case.

124

1            JUROR NO. 82:  I don't know how I would know

2     something was missing, but --

3            THE COURT:  Okay.  You indicated in question 88 --

4     the question was:  Do you tend to believe that a member of law

5     enforcement, such as a police officer or federal agent, who

6     testifies in court is more likely to tell the truth than other

7     witnesses, less likely to tell the truth, or equally likely to

8     tell the truth?  You indicated you thought they were more

9     likely to tell the truth.

10           Do you want to explain that answer?

11           JUROR NO. 82:  I just think that a police officer or

12    any law enforcement official is more, I guess, used to this

13    kind of situation and understanding the consequences of lying

14    in such a situation.  And I just think -- I mean, I don't think

15    it's a big difference or whether somebody else would be

16    inclined to tell the truth or not, I just --

17           THE COURT:  Let me ask you this.  Would you have

18    difficulty in disbelieving a law enforcement officer who

19    testified if there were evidence that the testimony was not

20    accurate or was inconsistent with other evidence in the case?

21           JUROR NO. 82:  No.  No.

22           THE COURT:  Would you have a problem in evaluating

23    each individual witness on his or her own terms?

24           JUROR NO. 82:  Not that I can think of, no.

25           THE COURT:  I mean, one of the concerns and the

125

1    reason for that question, quite frankly, is every witness is

2    supposed to come into court basically with a clean slate, and

3    then the trier of fact evaluates that person's truthfulness

4    based upon what the person says, how he says it, what other

5    evidence is in the record to confirm it or to undercut it.

6            And so, jurors are not supposed to be prejudging the

7    credibility of a witness because of that witness' occupation --

8            JUROR NO. 82:  Okay.

9            THE COURT:  -- appearance, ethnicity, age.  Those

10   sorts of things are not considered proper.

11           I recognize you've indicated you have a tendency to

12   believe law enforcement first.  But with that caution given to

13   you by the Court, would you have difficulty in being able to

14   step back and evaluate each individual witness on his or her

15   own terms?

16           JUROR NO. 82:  I don't think so, no.

17           THE COURT:  All right.  And you indicated you didn't

18   think that was a strongly held belief, the one about tending to

19   believe a law enforcement officer.

20           JUROR NO. 82:  No.  I mean, I think they are equally

21   likely.  But if I had to pick one or the other, I would

22   probably be more inclined to believe a police officer is

23   telling the truth over a drug dealer, for example.

24           THE COURT:  How about an ordinary citizen, not a

25   criminal, but just an ordinary citizen?

1              JUROR NO. 82:  Probably equally likely.

2              THE COURT:  Okay.  All right.  If you would step

3    outside for a second, sir.

4              JUROR NO. 82:  Okay.

5              NOTE:  Juror number 82 leaves the courtroom.

6              THE COURT:  Mr. Kromberg, are there any additional

7    questions the Government wants the Court to ask?

8              MR. KROMBERG:  No, Your Honor.

9              THE COURT:  All right.  How about the defense?

10             MR. MacMAHON:  Your Honor, I think some follow-up on

11   the hardship questions might be appropriate.  I am not sure

12   that we got -- about being able to serve properly with the

13   children and the wife in school.

14             THE COURT:  He said he had no problem.  I mean, I

15   will take him at his word on that.  Usually they have -- he has

16   been asked that several times now.

17             Is there anything else you want the Court to ask him?

18             MR. MacMAHON:  I wasn't exactly sure what the answer

19   was with respect to the law enforcement question.  Maybe it was

20   a double negative question that he got asked, but it seems to

21   me that he does have an inherent bias in favor of law

22   enforcement.

23             THE COURT:  Well, what he said was between a drug

24   dealer and a law enforcement officer, he would go with the law

25   enforcement officer.  I don't have a problem with that because

1    there is no drug dealers in this case.  We don't have to worry

2    about that.

3           But I asked him, the last question was between an

4    ordinary citizen and a law enforcement officer, and he said

5    that was equal.

6           MR. MacMAHON:  Well, the way I heard the answer was

7    that there is a bias there.  And you can ask enough questions

8    to get around it, but he said a couple times that he did think

9    that.

10          THE COURT:  The problem is though he is also one of

11   the few jurors we have had so far who has had extensive

12   friendships and relationships with members of the Islamic

13   faith.  And I would think you would want that kind of diversity

14   in this jury pool.  And I thought he had very positive and good

15   things to say in that respect.  And so, you want a crossection

16   of jurors.

17          This question is an interesting one.  I mean, the law

18   enforcement one.  But I think the way he answered the last line

19   of questions, I don't think this juror is going to have any

20   problem in evaluating each witness on his own merits.

21          So I am going to overrule that objection and keep him

22   in.

23          NOTE:  Juror number 82 returns to the courtroom.

24          THE COURT:  All right, sir.  We are going to consider

25   you for service in this jury, but you're finished for today.

128

1    And you are able to go to work tomorrow, there will be nothing

2    involving your attendance tomorrow.

3              It is highly likely we will start the trial on

4    Monday.  And the start of the trial will be the very last round

5    of jury selection, and then we will go right into the trial.

6    So I will need you back here most probably Monday.

7              Now, the reason I'm hedging is if I don't have enough

8    jurors, I may have to push the case until Tuesday.  So you need

9    to continue monitoring that phone number, which is where we

10   give you your instructions.

11             If you call after 6 o'clock today, we may be able to

12   tell you for certain about Monday.  If not, certainly by 6

13   o'clock tomorrow we can.

14             In the meantime, please avoid any media coverage of

15   the case.  Again, continue to not conduct any investigation.

16   You are not to tell anybody anything about the case, other than

17   you can say you are still in consideration for jury service.

18             And you shouldn't be contacted by anyone.  We have

19   used numbers in this case to avoid the media trying to contact

20   you.  But if for any reason you thought you were being

21   approached by anybody, let us know right away.

22             All right?

23             JUROR NO. 82:  Okay.

24             THE COURT:  All right, fine.  You are free to go.

25             NOTE:  Juror number 82 leaves the courtroom.

129

```
1              THE COURT:  Number 89.

2              NOTE:  Juror number 89 enters the courtroom.

3              THE COURT:  All right, ma'am, if you would come over

4    here in the witness box.

5              Ma'am, is there anything that you want to add to the

6    questions -- to the answers you provided to the questionnaire

7    that you think we might want to know about?

8              JUROR NO. 89:  No.  I believe I answered everything

9    truthfully.

10             THE COURT:  All right.  You indicated in your answers

11   that you do suffer from migraines when you're under stress.

12   But you take medication for that?

13             JUROR NO. 89:  Yes, at the onslaught.

14             THE COURT:  All right.  Do you get enough advance

15   notice that you can take the medicine?

16             JUROR NO. 89:  Yes.

17             THE COURT:  And does the medication in any respect

18   make you drowsy or give you -- give you problems in terms of

19   concentrating or focussing your attention?

20             JUROR NO. 89:  No.  It relieves the pain as quick as

21   possible.

22             THE COURT:  All right.  But you could continue as a

23   juror if you had taken the medication?

24             JUROR NO. 89:  Yes, ma'am.

25             THE COURT:  All right.  And how much advance notice
```

130

1    do you get that you are going to be getting a headache?

2           JUROR NO. 89:  It depends.  Sometimes it's anywhere

3    from about ten minutes to about 30.

4           THE COURT:  They come on that quickly?

5           JUROR NO. 89:  Sometimes.  Sometimes they come on as

6    sinus headaches and then it switches over to migraine.

7           THE COURT:  Now, if it goes into a migraine, I assume

8    at that point you are almost incapacitated?

9           JUROR NO. 89:  No.  It depends on what's going on,

10   what the stress is.

11          Usually the stress -- what has happened in the past

12   is the stress has been contributed by the work that I was

13   doing.  And since I've switched jobs in the last year, I've

14   only had one really bad migraine that I have ended up missing

15   work for two days.

16          THE COURT:  All right.  Do you anticipate or think

17   that serving on a jury could be that kind of a stressor for

18   you?

19          JUROR NO. 89:  No, I don't, not at all.

20          THE COURT:  All right.  But again, you can control

21   the problem with the medication?

22          JUROR NO. 89:  Yes.

23          THE COURT:  Okay.  Now, since being here on Monday,

24   have you conducted any investigation into this case or had any

25   media exposure to the case?

1               JUROR NO. 89:  No, ma'am.

2               THE COURT:  Have you been able to reconsider in any

3     respect the time commitment, does that create any problems for

4     you at all?

5               JUROR NO. 89:  It just causes an imposition at work,

6     an executive assistant and two officers at a corporation, and I

7     would just have to juggle to get a temp in.  But it can be

8     worked.

9               THE COURT:  All right.  And you wouldn't have to go

10    back to work after serving on the jury for the day, would you?

11              JUROR NO. 89:  No.

12              THE COURT:  All right.  You indicated in answer 55 --

13    to question 55, that you were once a witness on behalf, as I

14    understand it, for somebody who was charged with alleged sexual

15    abuse?

16              JUROR NO. 89:  Yes, ma'am.

17              THE COURT:  Can you give us a little bit more

18    information about that situation.

19              JUROR NO. 89:  Sure.  He was a widower in our

20    neighborhood, a friend of mine and my family.  He had two young

21    girls.  And somebody made an anonymous phone call to CPS.  And

22    he is a Fairfax County officer.  And they took the children out

23    of the home, pressed charges against him.

24              I testified at his trial alleging that it was false.

25    And he was acquitted from those charges.

132

1          THE COURT:  All right.  And did that experience as a

2    witness in a criminal trial, do you think in any -- did you

3    have any particular positive or negative experiences in that

4    respect?

5          JUROR NO. 89:  No, I think it went very well.  I

6    mean, I don't feel one way or the other.

7          THE COURT:  Did you form any opinions about the

8    American criminal justice system as a result of being involved

9    in that trial?

10          JUROR NO. 89:  No, not in the system.  I just have a

11    problem with one agency within the system and how they went

12    about doing things.

13          THE COURT:  The state agency involved in that?

14          JUROR NO. 89:  Yes, CPS.

15          THE COURT:  Child Protective Services?

16          JUROR NO. 89:  Yes, ma'am.

17          THE COURT:  All right.  In any respect do you feel

18    that you might harbor any anti-prosecution or anti-enforcement

19    feelings because of how your friend was handled in that case?

20          JUROR NO. 89:  No.

21          THE COURT:  All right.  How about the trial itself

22    and the jury process, did you form any opinions about the

23    criminal justice system from that?

24          JUROR NO. 89:  No.  I think everything went fine.

25    Actually, I enjoyed it.  I mean, I believe in telling the

133

1    truth, and I enjoyed getting up and telling my side.

2             THE COURT:  You were called by the defense?  You were

3    a defense witness?

4             JUROR NO. 89:  Yes, I was.

5             THE COURT:  And I assume you were cross-examined by a

6    prosecutor?

7             JUROR NO. 89:  Yes, ma'am, I was.

8             THE COURT:  Was it often tough cross-examination?

9             JUROR NO. 89:  Yes, it was.

10            THE COURT:  Did you resent the prosecutor treating

11   the way he or she did?

12            JUROR NO. 89:  No.  I knew that she was going to come

13   full barrel, and she did.

14            THE COURT:  All right.  Do you feel in any respect

15   you might be particularly sympathetic for a witness who is

16   being grilled on cross-examination by either of the lawyers in

17   this case because you have been in that hot seat, so to speak?

18            JUROR NO. 89:  No.

19            THE COURT:  You indicated in your answers to question

20   82, let's start with that one first.  The question was:  Do you

21   believe that if the prosecution goes to the trouble of bringing

22   someone to trial, he or she is probably guilty?  And you

23   indicated unsure there.

24            Is that really the answer that you had intended to

25   give?

134

1          JUROR NO. 89:  Well, I was a little unclear about the

2  question.

3          THE COURT:  Okay.

4          JUROR NO. 89:  My thoughts are this.  That any time

5  somebody is brought up in court, there is usually some type of

6  reason that they have been brought.  But I strongly believe

7  that somebody is innocent until it's proven clearly that they

8  aren't otherwise.

9          THE COURT:  All right.  And in your answer to

10  question number 85, there was another unsure.  The questions

11  were a little bit complicated:  Do you believe that the law

12  does too much to protect the rights of criminal defendants?

13          Now, do you believe that?

14          JUROR NO. 89:  Well --

15          THE COURT:  And then it goes on to say:  And not

16  enough to protect the rights of crime victims and their

17  families?  And your answer was you were unsure.

18          I just would like you to expand upon that.

19          JUROR NO. 89:  I wouldn't say that they go out of

20  their way.  I guess I was a little confused with that question.

21          THE COURT:  Okay.  Why don't you tell us your views

22  about the criminal justice system in terms of how it treats

23  criminal defendants.

24          Do you think the system is fair to defendants?  Is it

25  too far in favor of defendants?  Is it about right?  I mean,

1   what's your view?  Since you have actually had some firsthand

2   experience with it.

3          JUROR NO. 89:  I think for the most part my belief is

4   that people are treated, you know, fairly, you know, right.

5   And I think that the thing that bothers me is probably the

6   reporting from the media, that it gets slanted one way or the

7   other until all the facts come out because they only hear a

8   small portion of it and then they build on that.

9          THE COURT:  All right.

10          JUROR NO. 89:  But I am a big believer that you are

11   innocent until they can prove otherwise.

12          THE COURT:  All right, thank you.  If you would step

13   outside for just a second.

14          NOTE:  Juror number 89 leaves the courtroom.

15          THE COURT:  Are there any further questions either

16   side wants the Court to ask this juror?

17          MR. KROMBERG:  No, Your Honor.

18          THE COURT:  How about from the defense?

19          MR. MacMAHON:  Just the only question I have, the

20   medication, somebody else may know the answer, is there any

21   side effects to the medication if the migraines are coming on?

22   I don't know if --

23          THE COURT:  I thought I had asked her that, if it

24   made her drowsy or dizzy.  I may not have used the words "side

25   effects," but she said there was no problem.

1          MR. MacMAHON:  Okay, then I don't have anything else,

2     Your Honor.

3          THE COURT:  I assume there is no objection with this

4     juror by either side?

5          MR. MacMAHON:  No, Your Honor.

6          MR. KROMBERG:  No, Your Honor.

7          THE COURT:  All right, let's bring her back in.

8          NOTE:  Juror number 89 returns to the courtroom.

9          THE COURT:  All right, ma'am, you're going to be

10    considered for the last and final round of jury selection in

11    this case.

12         Now, you are clear for today and tomorrow because we

13    won't get to that until Monday, and I am hoping we get to it

14    Monday.

15         While you are still under consideration, continue to

16    live by my earlier warnings.  That is, no investigation or

17    media coverage of this case.  Don't discuss with anybody any

18    details.  You can still tell your work colleagues, et cetera,

19    you are going to potentially be a juror, but that's it.

20         We are using a number to avoid the media contacting

21    you, and there shouldn't be any way they would find out who you

22    are.  But if for some reason if you get contacted by anyone

23    about this case, you should let us know right away.  All right?

24         JUROR NO. 89:  Yes, ma'am.

25         THE COURT:  Stay in touch with us by calling the

1   phone number you called to hear about today's appearance.

2   After 6 today we may be able to tell you more certainly about

3   next week.  Certainly by after 6 tomorrow you will know for

4   certain when and where to appear.  All right?

5           JUROR NO. 89:  Okay.

6           THE COURT:  Thank you.  You are free to go.

7           NOTE:  Juror number 89 leaves the courtroom.

8           THE COURT:  All right, number 94.

9           NOTE:  Juror number 94 enters the courtroom.

10          THE COURT:  Good morning, ma'am.

11          JUROR NO. 94:  Good morning.

12          THE COURT:  Since filling out the questionnaire on

13  Monday, have you had any further thoughts about the

14  questionnaire or any of your answers, anything you wanted to

15  change or add for us?

16          JUROR NO. 94:  No.

17          THE COURT:  All right.  Is there anything else about

18  yourself that you think we might need to know about in terms of

19  deciding whether to choose you as a juror in this case?

20          JUROR NO. 94:  No.

21          THE COURT:  Have you had any exposure to any media

22  coverage about this case or conducted any investigation about

23  any of the issues?

24          JUROR NO. 94:  Not at all.

25          THE COURT:  All right.  And in terms of the time

138

1    commitment, again, have you been able to rethink that schedule,

2    and is there any problem about the time commitment for the

3    trial that you want to bring to our attention?

4              JUROR NO. 94:  No.

5              THE COURT:  Now, you live in Prince William County.

6    We need to be able to start this trial at 9:30.  Do you

7    anticipate there being any commute or travel problems?

8              And the trial will run until about 6 o'clock.  Is

9    there going to be a problem at either end of day for you?

10             JUROR NO. 94:  Unfortunately, no.

11             THE COURT:  All right.  You work as a benefit

12   specialist with Computer Sciences Corporation?

13             JUROR NO. 94:  Yes, ma'am.

14             THE COURT:  Where is that office located?

15             JUROR NO. 94:  Sterling, Virginia, off of 28 near the

16   Dulles Airport.

17             THE COURT:  So your actual work commute is a lot

18   shorter than the commute to this courthouse?

19             JUROR NO. 94:  Yes.  This morning it took me an hour.

20   So, I will get to work about 9:30 usually, 9, 9:30, and it

21   takes me about 30 minutes.

22             THE COURT:  All right.  You indicated in your answer

23   to question number 30, that you had a -- your sister worked at

24   the World Trade Center on September 11, she was working there

25   on that day.  But she was not injured?

1          JUROR NO. 94:  No.  She was on her way to work and

2    was about a block away at the time.

3          THE COURT:  So she was not even in the building?

4          JUROR NO. 94:  She hadn't arrived, she stopped for a

5    bagel.

6          THE COURT:  All right.  Is there anything though

7    about what she may have told you about her experiences -- I am

8    sure she must have had friends who were either injured or lost

9    in that event --

10         JUROR NO. 94:  Actually, she doesn't talk about it

11   too much.  There were friends that she knew of that were there,

12   that were in the building, but I don't think anyone extremely

13   close to her were injured.

14         THE COURT:  All right.  And you indicated in your

15   answer to 31 that some of your friends cancelled travel plans,

16   and you indicated are more comfortable with traveling today.

17         Is that for you yourself?

18         JUROR NO. 94:  Yes.  I think at the time it was

19   something that we weren't used to here in this country, so it

20   made people start to rethink their actions that they were

21   taking as far as traveling.  It made people a little uneasy

22   about it, flying and that type of thing.  But now I think we

23   are at point where you just go on with life as it is.

24         THE COURT:  All right.  Do you feel that there have

25   been any lasting effects on yourself from those events?

140

1           JUROR NO. 94:  Maybe I don't --

2           THE COURT:  Let me ask the question more specific.

3    Do you feel any lasting effects that they may have had could

4    affect your ability to judge this case impartially?

5           JUROR NO. 94:  No.

6           THE COURT:  All right.  Now, as a benefit specialist,

7    your background really is HR, human resources?

8           JUROR NO. 94:  Yes, ma'am.

9           THE COURT:  Are you ever involved with having to do

10   fact finding in cases involving claims of discrimination or

11   various types of disputes employees may have?

12          JUROR NO. 94:  No.  Actually I do FMLA administration

13   mostly.  So it is just gathering information regarding medical

14   conditions of employees as far as the need to be out of work

15   for a reason, a legitimate reason.

16          THE COURT:  All right.  So you are not involved

17   actually in conducting actual investigations?

18          JUROR NO. 94:  No, I am not in ER.  Employee

19   relations, sorry.

20          THE COURT:  Okay.  In your answer to question number

21   81 -- and that question asked:  Do you believe that the rights

22   and liberties of freedom of speech, freedom of religion, and

23   freedom of association guaranteed by the First Amendment should

24   ever be limited or restricted?  And you indicated you're not

25   sure.

141

```
 1              Can you expand on that answer a little bit.
 2              JUROR NO. 94:  Can you repeat that again?  I am
 3  sorry.
 4              THE COURT:  Go ahead.
 5              JUROR NO. 94:  Could You repeat that question?
 6              THE COURT:  Yes.  The question was:  Do you believe
 7  that the rights and liberties of freedom of speech, freedom of
 8  religion, and freedom of association should ever be limited or
 9  restricted for any reason?
10              JUROR NO. 94:  And I said not sure.
11              THE COURT:  Yes.  Because --
12              JUROR NO. 94:  Because I feel like you should be able
13  to practice -- I am a Christian, but I feel like that's a
14  freedom that I have.  But I shouldn't restrict other people in
15  what they feel they want, their religion.  I can't impose --
16  they should have that freedom.  That's what this country is
17  based upon, freedom.
18              THE COURT:  All right.  You were asked the question:
19  Do you believe that sometimes innocent people are convicted of
20  crimes they did not commit?  And you indicated you are unsure.
21              Do you have any -- can you add on to that answer at
22  all?
23              JUROR NO. 94:  I think sometimes all the facts aren't
24  there.  So it depends upon how the facts are presented.  You
25  could be -- sometimes you could be innocent and, unfortunately,
```

142

1    everything is pointing against you.

2         So there is, you know, in my opinion -- maybe I am a

3    little nervous and answering the question incorrectly.  But the

4    way I feel is that sometimes you are in the wrong place at the

5    wrong time, or it depends upon what all the facts are.  There

6    are always two sides to a story.

7         THE COURT:  All right.  In your answer -- question

8    number 84 asked you:  Do you believe that defendants in

9    criminal trials should have to prove they are innocent?  And

10   you indicated yes.

11        Is that what you believe, or do you want readdress

12   that question?

13        JUROR NO. 94:  Excuse me?

14        THE COURT:  Sure.  The question was:  Do you believe

15   that defendants in criminal trials should have to prove that

16   they are innocent?

17        JUROR NO. 94:  We usually say you're innocent until

18   proven guilty.

19        THE COURT:  Correct.

20        JUROR NO. 94:  But reality, a lot of people -- a lot

21   of times you assume that the person is guilty and you have to

22   prove that they are innocent more than -- we as a society, I

23   think, bend more towards you're guilty, you need to prove to me

24   that you're innocent instead of you're innocent until proven

25   guilty.

143

1          THE COURT:  But we're really interested in what you

2     personally, not what society believes.  So the question is --

3          JUROR NO. 94:  Well, I guess I do feel that way too,

4     but I feel that you -- and unfortunately that you are

5     innocent -- you're innocent until proven guilty, but we judge

6     each other.  And I try not to judge people.  I try not to.

7          THE COURT:  Now, of course, if you are chosen to be a

8     juror, you are in fact going to be a judge within certain rules

9     and limits that we give you.

10          So the question is, as a judge, if you are chosen to

11     be a judge in this case, when you sit in the courtroom do you

12     have a belief as you sit as a judge that the defendant has to

13     prove that he is innocent?

14          JUROR NO. 94:  No.

15          THE COURT:  All right.  Who do you understand has the

16     burden of proof in a criminal case?

17          JUROR NO. 94:  The person who is prosecuting that

18     individual.

19          THE COURT:  And they have to prove the guilt of the

20     defendant?

21          JUROR NO. 94:  That they are guilty.

22          THE COURT:  All right.  The next question asked you

23     for your opinion.  This is your own personal belief, not what

24     the people around you believe, but what you believe.

25          Do you believe that the rights of criminal defendants

1    receive too much protection in the criminal justice system?

2              JUROR NO. 94:  Can you say that again?

3              THE COURT:  Do you feel that criminal defendants,

4    that their rights are overprotected in the criminal justice

5    system at the expense of the rights of crime victims?

6              That question was asking you to sort of compare the

7    two.  It is all right to say you don't know.

8              JUROR NO. 94:  I don't know.

9              THE COURT:  Because your answer was:  Unsure.  And we

10   just --

11             JUROR NO. 94:  I just don't know.

12             THE COURT:  Have you had any experience with the

13   criminal justice system?

14             JUROR NO. 94:  Not really.

15             THE COURT:  You have never been a juror?

16             JUROR NO. 94:  Never.

17             THE COURT:  And to your knowledge, any family members

18   or friends ever been prosecuted?

19             JUROR NO. 94:  No.

20             THE COURT:  Okay.  And have you ever had to be a

21   complainant in a case?  In other words, where you were the

22   victim of a crime and you needed to go to court and testify?

23             JUROR NO. 94:  No.

24             THE COURT:  Okay.  Do you have any beliefs about a

25   defendant's guilt or innocence based upon whether he testifies

1    at trial?

2           The question number 86 asks you:  Do you believe if a

3    defendant does not testify at trial, he is probably guilty?

4           What is your view about that?

5           JUROR NO. 94:  That's strictly my opinion.

6           THE COURT:  That's what we want to know.

7           JUROR NO. 94:  Usually that if they don't want to

8    testify, I feel that they are trying to hide something

9    themselves.

10          THE COURT:  Now, if the Court were to tell you that

11   you cannot consider the fact that the defendant -- I don't know

12   whether the defendant in this case will testify or not.  But

13   the Fifth Amendment of the Constitution gives people a right to

14   choose not to testify.  And if they invoke that right, the jury

15   can't consider that silence in any respect.

16          Would it be difficult for you to put aside your

17   personal beliefs on that issue?

18          JUROR NO. 94:  No.  No, I don't think so.

19          THE COURT:  All right.  All right.  If you would step

20   out for a second, please.

21          NOTE:  Juror number 94 leaves the courtroom.

22          MR. KROMBERG:  No questions, Judge.

23          THE COURT:  All right.  Mr. MacMahon.

24          MR. MacMAHON:  No follow-up, Your Honor.

25          THE COURT:  All right.  Either side want this juror

1    stricken for cause?

2              MR. KROMBERG:  No, Your Honor.

3              MR. MacMAHON:  No, Your Honor.

4              THE COURT:  All right.  The questions -- I mean, I

5    think on total, and that's why we're doing this process, when

6    you hear all of the answers, I think this juror can be

7    adequately fair.  I think she will listen to our instructions.

8    So we will go ahead.

9              NOTE:  Juror number 94 returns to the courtroom.

10             THE COURT:  All right, ma'am, sorry to have to have

11   you keep going back and forth.  You can stay right there.

12             You are still being considered for service on this

13   jury.  All right?  You're finished for today, and we will not

14   need you here tomorrow.

15             It is highly likely that you will need to be back

16   here Monday.  Now, I can't tell you for certain yet.  You will

17   need to keep calling that telephone number.  We may know for

18   certain at 6 o'clock today.  If not, 6 o'clock tomorrow the

19   answering machine will have the information.  All right?

20             JUROR NO. 94:  Okay.  I still am very nervous

21   standing here, so sorry about that.

22             THE COURT:  Well, don't be.  You have to continue to

23   not conduct any investigation and avoid the media coverage.

24   You can only tell folks you're still being considered for jury

25   duty and no details about the case.

1            We're using a number rather than your name simply

2     because we don't want the media contacting you because, you

3     know, it is going to be a while yet before you are called to be

4     a juror.  So if you think anyone has tried to contact you, let

5     us know.  But that's why we are doing it this way.

6            All right?

7            JUROR NO. 94:  Okay.

8            THE COURT:  All right.  You are free to go.  Thank

9     you.

10           NOTE:  Juror number 94 leaves the courtroom.

11           THE COURT:  Number 96.

12           NOTE:  Juror number 96 enters the courtroom.

13           THE COURT:  Since you filled out the questionnaire on

14    Monday, are there any things you want to add to any of your

15    answers or any additional information you would like to bring

16    to our attention you think we might want to know about?

17           JUROR NO. 96:  No, there is nothing.

18           THE COURT:  Have you been exposed to any media

19    coverage about this case or conducted any investigation?

20           JUROR NO. 96:  No.

21           THE COURT:  Any reconsideration about the time

22    commitment?  I know you're a first grade teacher.  Is that

23    going to be an issue?  Because you understand it is going to be

24    a two to three-week trial, and it's really full days.

25           JUROR NO. 96:  It's not great for first grade.

148

1          THE COURT:  Can you just move a little bit closer.

2          Here is the point.  We need to know this issue now

3   rather than getting you in that box --

4          JUROR NO. 96:  Right.  I can get a substitute.

5          THE COURT:  You can?

6          JUROR NO. 96:  But it would be -- I would need to

7   know as soon as possible so I can get a long-term sub as

8   opposed to someone, you know -- because I will have to go home

9   nightly to put my lesson plans together.

10         THE COURT:  Well, you live in Vienna, that is not too

11  bad a commute from here.

12         JUROR NO. 96:  No, I know.  And I am only a mile from

13  -- I teach one mile from my house.

14         THE COURT:  All right.  We don't restrict what jurors

15  do after jury duty, but obviously sitting in a courtroom six,

16  seven, eight hours a day and paying careful attention is

17  important.

18         JUROR NO. 96:  Right.

19         THE COURT:  And I am concerned about jurors who might

20  be spending many, many hours each day after jury work working

21  on lesson plans.  Because if you come to court tired -- will

22  you be able to schedule your work commitments and your --

23         JUROR NO. 96:  It depends upon how soon I know this.

24  That's my --

25         THE COURT:  Well, I can tell you, we're hoping to

149

1   start the trial Monday.  If you are -- there is going to be one

2   last round of jury selection.  If you are chosen to be one of

3   the 14 people who are going to hear this case, we would go

4   right into opening statements and taking evidence.  So it could

5   be as soon as Monday.

6          But I don't know whether you'll ultimately be chosen.

7   You see, that's the problem.

8          So having said that, I know next week we will only

9   sit Monday through Thursday.  I have other commitments on

10  Friday that I can't rearrange.  So Friday we would not be in

11  court.

12         Now, with this schedule, do you anticipate any major

13  problems?

14         JUROR NO. 96:  It is just going to school each day.

15  No.

16         THE COURT:  All right.

17         JUROR NO. 96:  No.

18         THE COURT:  In your answer to question number 71 you

19  indicated you had some Muslim students.  It didn't suggest that

20  you had a whole lot of interaction with them in terms of their

21  religion or their lifestyle.

22         JUROR NO. 96:  No.

23         THE COURT:  Have you in any respect developed any

24  attitudes, either particularly negative or positive towards --

25         JUROR NO. 96:  No.

150

1          THE COURT:  No?

2          JUROR NO. 96:  No.

3          THE COURT:  You said your daughter has a friend who

4    is Muslim?

5          JUROR NO. 96:  Yes, she came to our house this year

6    during Ramadan, and she spent the night, but we left food in

7    refrigerator for her so she could get food at 4 o'clock in the

8    morning.  So she ate her --

9          THE COURT:  Before the --

10         JUROR NO. 96:  Yeah.

11         THE COURT:  Did you have discussions with her about

12   Ramadan or her faith?

13         JUROR NO. 96:  A little bit.  Just a little bit.  My

14   daughter knew more, and she was -- I think she was trying to

15   shield me so I couldn't ask -- my daughter was afraid I was

16   going to embarrass her or something.  I don't know.  But I know

17   something about it.

18         THE COURT:  All right.  But again, is there anything

19   that you know about Islam that you think could cloud or affect

20   your judgment in this case?

21         JUROR NO. 96:  No.

22         THE COURT:  All right.  In your answer to question

23   number 82, you were asked the question?  Do you believe that if

24   the prosecution goes to the trouble of bringing someone to

25   trial, he or she is probably guilty?  And you indicated you are

1    unsure.

2              Can you explain that answer a little bit.

3              JUROR NO. 96:  Well, you know, I think lately in the

4    media we have found that many people have been brought to trial

5    who have not been guilty but were on death row, or something

6    like that.  So I don't know.

7              THE COURT:  So that does give you some concern?

8              JUROR NO. 96:  Yes.

9              THE COURT:  That innocent people may be coming to

10   trial?

11             JUROR NO. 96:  Right.

12             THE COURT:  In your answer to number 84 you were

13   asked the question:  Do you believe that defendants in criminal

14   trials should have to prove that they are innocent?  And you

15   indicated yes.

16             Is that the answer you intended for that question?

17   If so, can you explain to us --

18             JUROR NO. 96:  I guess it is really unclear to me.  I

19   guess, I guess you have to prove that you are innocent.

20             THE COURT:  Well, do you understand who has the

21   burden of proof in a criminal case in our --

22             JUROR NO. 96:  I probably don't.

23             THE COURT:  If the Court were to tell you that the

24   burden of proof is on the Government, in our legal system the

25   Government must prove a person is guilty, a defendant or a

152

1    person charged with crime has no obligation to prove their

2    innocence, do you have any problem following that direction

3    from the Court?

4              JUROR NO. 96:  No.

5              THE COURT:  I mean, would that give you a concern?

6    In other words, if you would come into court predisposed to

7    think because someone has been charged, he is probably guilty,

8    and unless he proves he is innocent, you are going to find him

9    guilty, would you have -- and you were told you can't approach

10   it that way.  The different approach is the person sitting in

11   the defendant's seat is presumed to be innocent, and it is only

12   if the Government proves that person is guilty of the specific

13   crimes charged in the case --

14             JUROR NO. 96:  If I were told to look at it like

15   that, then I would look at it like that.

16             THE COURT:  You wouldn't have any problem?

17             JUROR NO. 96:  No, I don't think so.

18             THE COURT:  All right.  The last thing, in question

19   95 you indicated that you don't like stress.  I don't think any

20   of us like stress.

21             JUROR NO. 96:  No.

22             THE COURT:  But since you put it down here, there may

23   be, for example, sometimes in the jury room when the case is

24   being deliberated, there may be strong views about the evidence

25   in the case, and people are going to be arguing about it back

153

1   and forth.  Now --

2            JUROR NO. 96:  That's where I could have trouble.

3            THE COURT:  You could have trouble with that?

4            JUROR NO. 96:  Yeah.

5            THE COURT:  In that respect, do you feel that if you

6   had an honestly held view about an issue in the case, and

7   jurors were arguing with you about that view, do you think you

8   could stick with your position --

9            JUROR NO. 96:  I am not sure.

10           THE COURT:  Okay.  All right, if you would step out,

11  please.

12           NOTE:  Juror number 96 leaves the courtroom.

13           THE COURT:  Any follow-up questions?

14           MR. KROMBERG:  No, Your Honor.

15           THE COURT:  How about from the defense?

16           MR. MacMAHON:  No, Your Honor.

17           THE COURT:  Well --

18           MR. MacMAHON:  Your Honor, she did answer the

19  question about if the defendant doesn't testify, does she take

20  any kind of an implication out of that.  She is unsure --

21           THE COURT:  Well, are either of you moving to strike

22  this juror for cause?

23           MR. MacMAHON:  No, Your Honor.

24           THE COURT:  You're not concerned about the issue

25  about stress?  You know, you want 12 independent judges in that

1    jury room.  And I myself am concerned in terms of her response

2    on that question.  I am not sure I am willing to strike a juror

3    over both of your objections, but--

4            MR. MacMAHON:  Can I have one second, Your Honor?

5            THE COURT:  Yes.

6            MR. KROMBERG:  Judge, we would move to strike for

7    cause.  There are several things.  I guess I was a little

8    surprised at some of the answers.  I wasn't expecting some of

9    the answers.  I thought she would know more.  And between the

10   lack of sophistication about the criminal justice system and

11   the stress issue, I am thinking that is probably not -- that

12   she is probably not the best juror that we can get.

13           THE COURT:  I don't think for either side.

14           MR. MacMAHON:  I think she can handle stress with her

15   job, Your Honor.  I don't think she should be stricken for

16   cause for that.  Some of the other jurors we have had and their

17   jobs and other things, I don't think that's a sufficient

18   reason.

19           THE COURT:  I agree with the Government.  I am

20   surprised that a public school teacher wouldn't understand the

21   most bedrock fundamental principle of criminal law, which is

22   that the burden is on the Government to prove a defendant's

23   guilt.  I am going to go ahead and strike her.

24           You can bring her back in.

25           NOTE:  Juror number 96 returns to the courtroom.

155

1        THE COURT:  Ma'am, I want to thank you for your

2   attendance today.  I think we are going to go ahead and strike

3   you from this case because I don't want the stress issue to

4   become a problem.

5        So if you would just check in at the Clerk's Office

6   downstairs to let them know you've been excused.  And we do

7   thank you for your attendance.

8        JUROR NO. 96:  Thank you.

9        NOTE:  Juror number 96 leaves the courtroom.

10       THE COURT:  All right.  Juror 102.  I believe we just

11   have two more.

12       NOTE:  Juror number 102 enters the courtroom.

13       THE COURT:  All right, sir, since filling out the

14   questionnaire and thinking about it, is there anything you want

15   to add to any of your answers or any additional information you

16   think we should perhaps know about in evaluating your for this

17   jury?

18       JUROR NO. 102:  No.  I tried to be as thorough as

19   possible on the initial questionnaire.

20       THE COURT:  All right.  Have you conducted any

21   investigation or had any media exposure to this case since

22   Monday?

23       JUROR NO. 102:  No.

24       THE COURT:  And in reconsidering the time frame and

25   the time commitment, has anything else come to your mind that

1    you think we ought to know about?

2              JUROR NO. 102:  No.

3              THE COURT:  So you are able to meet the time

4    situation in this case?

5              JUROR NO. 102:  Yes.

6              THE COURT:  Now, you live in Loudoun County.  Where

7    is your current duty station?  America Online is in Reston.  Is

8    that where you work?

9              JUROR NO. 102:  For four years I've worked at the

10   Dulles headquarters, but I've just moved into a new role that I

11   will now share, split time between their Reston tech center and

12   their Dulles headquarters.  So I will split time between Reston

13   and Dulles.

14             THE COURT:  All right.  Now, you know the commute

15   from your home to here is a lot farther than to Reston.  Are

16   you going to have any problems getting here on a regular basis

17   by 9:30?

18             JUROR NO. 102:  No.  As long as I plan for it, know

19   and plan for it, I can make it.

20             THE COURT:  All right.  And you know we finish around

21   6 o'clock.  So that doesn't give you a whole lot of time to get

22   back home, sleep, turn around and come back here.  Are you

23   going to be able to handle that schedule?

24             JUROR NO. 102:  Yes.

25             THE COURT:  All right.  You indicated in your answer

157

1    to question number 61 that you were asked whether anyone has

2    been the victim of a serious crime.  And you weren't quite

3    sure.  You said:  What's the definition of serious crime?  Does

4    that mean auto theft?

5              And I would say it does.  So why don't you tell us

6    what happened in that respect.

7              JUROR NO. 102:  I have been in this area for six

8    years.  The last four in Loudoun County, but two years prior to

9    that I lived in Silver Spring, Montgomery County.  During that

10   period I had a Toyota car that I owned was stolen from --

11   actually the library, of all places, while I was in the

12   library.

13             THE COURT:  Did they ever recover the car?

14             JUROR NO. 102:  It was recovered, yes.  There were

15   some things stolen out of it, like a -- I was actually

16   transporting a VCR and some other things, some other minor

17   things.  But the car was recovered and we were able to drive

18   it, but that was -- that was a theft.

19             THE COURT:  I assume that there was no prosecution

20   that resulted from that, to your knowledge?

21             JUROR NO. 102:  No, there wasn't.

22             THE COURT:  Do you have any frustrations or bad

23   feelings about how law enforcement handled that case?

24             JUROR NO. 102:  No, I don't.  I was actually happy

25   that they recovered the car.

158

1          THE COURT:  Okay.  You indicated in 71 that you have

2     a past coworker, a Mr. Kalifa, who is Muslim.  But you

3     indicated you had not discussed his faith with him.

4          How did you know he was Muslim?

5          JUROR NO. 102:  Well, I happen to know he is from the

6     country of Jordan.  And he has told me about trips he has

7     been -- that's where he grew up, he has revisited.

8          And I like to connect with people, I am a manager,

9     and so usually I try to build a rapport, people with different

10    backgrounds.  And so, I like to learn at least a few words in

11    their language.  And so, in his I learned like "as-sallam

12    alaikum" and a few other just basic Arabic words because he was

13    my employee.

14         THE COURT:  Is he the only, to your knowledge, the

15    only Muslim employee you have had?

16         JUROR NO. 102:  Yeah, he is the only Muslim, to my

17    knowledge, but there are -- I would say America Online is a

18    very heterogeneous environment, there are several people from

19    different -- with different heritages.

20         For example, I know, I have seen in meetings Muslim

21    women dressed in full garb, et cetera.

22         THE COURT:  All right.  In your interaction with

23    those co-workers, have you formed any particularly positive or

24    negative views about Islam or people who practice that

25    religion?

159

1          JUROR NO. 102:  No, I can't say that I have.  Most of

2    my interaction has been business related, about business.  I

3    can say all of it has been business related.

4          THE COURT:  In your answer to number 85, that

5    question asked:  Do you believe that the law does too much to

6    protect the rights of criminal defendants and not enough to

7    protect the rights of crime victims and their families?  And

8    your answer was you don't know.

9          Are you able to expand upon that answer at all?

10          JUROR NO. 102:  Okay.  Would you mind rereading the

11    question again?

12          THE COURT:  Yes.  The question is:  Do you believe

13    that the law does too much to protect the rights of criminal

14    defendants and not enough to protect the rights of crime

15    victims and their families?

16          JUROR NO. 102:  Okay.  I would say I could see both

17    sides of that particular argument, if you will, in that from my

18    civic studies and things, different courses I have had in high

19    school and beyond, I know that the law and the Constitution

20    itself is architected on the concept that, you know, it's

21    better to -- it's better -- let me see.  The best thing to do

22    is not to put innocent people behind bars.  And so, we need to

23    take everything we can we do to protect the innocent.  And so,

24    we have to, therefore, have due process.

25          So there is -- that is one side.  But I understand

1   how the system has maybe not thought about a victim and their

2   rights and how they are treated.

3           So I could actually see both sides of that argument.

4   And that's why I don't know.

5           THE COURT:  And you yourself haven't formed any

6   personal beliefs on those issues?

7           I mean, do you agree with the proposition that it is

8   better to let a guilty person go free than to convict an

9   innocent person?

10          JUROR NO. 102:  We all live under the rule of law in

11  this country, and I think it has been successful.  So that is

12  the law -- that's my understanding of -- I am glad you put it

13  into words because that's the phrase I was looking for.  I am

14  committed to the rule of law.  And that's the way I understand

15  or know how to interpret the way our Constitution has been

16  architected.

17          THE COURT:  All right.  If you could step down for a

18  second, sir.

19          JUROR NO. 102:  Yes.

20          NOTE:  Juror number 102 leaves the courtroom.

21          THE COURT:  Any follow-up questions either side want

22  the Court to ask?

23          MR. KROMBERG:  No, Your Honor.

24          THE COURT:  How about the defense?

25          MR. MacMAHON:  No, Your Honor.

161

1           THE COURT:  Any issue about cause here?

2           MR. MacMAHON:  None.

3           MR. KROMBERG:  No.

4           THE COURT:  All right, let's bring him back in.  Then

5    we just have one more, and then will have our brief lunch break

6    until 2 o'clock.

7           MR. MacMAHON:  Thank you, Your Honor.

8           NOTE:  Juror number 102 returns to the courtroom.

9           THE COURT:  All right, sir, we are going to continue

10   considering you for the jury in this case.  You are finished

11   for today, and there is no court obligation tomorrow.

12           I am hoping we have the trial start Monday morning.

13   So continue to call that phone number that gives you the

14   contact information.  We may know by the end of today.  If not,

15   after 6 o'clock tomorrow.

16           In the meantime, remember, you cannot conduct any

17   investigation into any of the facts of this case.  Avoid media

18   coverage.  And I do not expect that anyone is going to contact

19   you.  That's why we're calling you by number.  But if the media

20   or anybody should try to call you or bother you about the case,

21   you let us know right away.

22           All right?

23           JUROR NO. 102:  Thank you, Your Honor.

24           THE COURT:  Thank you.  You are free to go.

25           NOTE:  Juror number 102 leaves the courtroom.

162

1                    THE COURT:  Let's have 107 in, please.

2                    NOTE:  Juror number 107 enters the courtroom.

3                    THE COURT:  All right, sir, since answering the

4      questionnaire has anything else come to your mind in terms of

5      either your answers, anything you would like to add to any of

6      the answers or any additional information you would like to

7      bring to our attention that you think we should know about?

8                    JUROR NO. 107:  No.

9                    THE COURT:  No?  All right.  Have you been exposed to

10     any media coverage or conducted any investigation about this

11     case?

12                   JUROR NO. 107:  No.

13                   THE COURT:  And how about the time commitment, have

14     you had any reconsiderations about any business or family

15     obligations that might interfere with your trial service?

16                   JUROR NO. 107:  No.

17                   THE COURT:  No?  All right.  Now, you are a

18     naturalized United States citizen?

19                   JUROR NO. 107:  Correct.

20                   THE COURT:  And Taiwan is the country of birth for

21     you?

22                   JUROR NO. 107:  Yes, Your Honor.

23                   THE COURT:  When were you naturalized?

24                   JUROR NO. 107:  I think in 1990.

25                   THE COURT:  1990?

1              JUROR NO. 107:  Yes.

2              THE COURT:  And you haven't any problem with English,

3    is that correct?

4              JUROR NO. 107:  No.

5              THE COURT:  All right.  You indicated that you've

6    read a little bit about this case in the Washington Post.

7              JUROR NO. 107:  Yes.

8              THE COURT:  Can you tell me a bit more information

9    about how much you think you might know about this case.

10             JUROR NO. 107:  I think it was just an article I just

11   browsed through and did not pay much attention.

12             THE COURT:  Do you feel in any respect you have

13   formed any ideas about this case from what you have read in the

14   media?

15             JUROR NO. 107:  No.

16             THE COURT:  All right.  In paragraph 57 you indicate

17   that you were questioned by the FBI --

18             JUROR NO. 107:  Yes.

19             THE COURT:  -- in connection with a visit to the

20   Chinese consulate in Houston.

21             JUROR NO. 107:  Yes.

22             THE COURT:  Can you give us a bit more information

23   about that.  Were they polite when they interviewed you?

24             JUROR NO. 107:  Yes.  I was a faculty member at the

25   University of Oklahoma back then.  And it's in the spring of

1   '92.  And because my wife, she was a Chinese national back

2   then, and her Chinese passport was going to expire, so we drove

3   to Houston, the Chinese consulate office to extend that.

4           And when we drove, I think I drove, we drove to the

5   consulate, consulate office.  And I parked the car across the

6   street from the office.  And it was about, I think it was about

7   noontime.  So the office was, was in lunch break.  And so, we

8   left.

9           And a few hours later we came back and parked the car

10  probably across the street again and we went in, you know, to

11  have the paperwork done.

12          And after that, I think about a few months later I

13  got a call from an FBI agent, you know, they wanted to kind of

14  ask me to clarify what's the nature of my visit, why I visited

15  the office twice.  I just explained to him it's just to extend

16  the passport.

17          And that's it.

18          THE COURT:  Were you at all upset that the FBI called

19  you?

20          JUROR NO. 107:  Not quite.  They were doing their

21  job.

22          THE COURT:  All right.  You indicated here in

23  paragraph 58 that you have been a juror previously.

24          JUROR NO. 107:  Yes.

25          THE COURT:  And was that in a Virginia trial?

165

1            JUROR NO. 107:  It is in Fairfax County.

2            THE COURT:  Fairfax County?

3            JUROR NO. 107:  Yes.

4            THE COURT:  What was involved in the case, do you

5    remember?

6            JUROR NO. 107:  It was burglary case, burglary.

7            THE COURT:  Forgery?

8            JUROR NO. 107:  Yes.

9            THE COURT:  All right.  And the jury found the

10   defendant guilty?

11           JUROR NO. 107:  Correct.

12           THE COURT:  How long a trial was that, do you

13   remember?

14           JUROR NO. 107:  I don't recall.  I think it was

15   possible one -- it's half a day.

16           THE COURT:  All right.  Did you form any impressions

17   about the criminal justice system or how we try cases as a

18   result of being a juror in that case?

19           Was there anything you particularly liked or disliked

20   about how the trial was conducted?

21           JUROR NO 107:  I think it is just the legal system.

22   It is a process.

23           THE COURT:  Did you like the way the process worked?

24           JUROR NO. 107:  Yes.

25           THE COURT:  All right.  Now, when the jury was

166

1  deciding the case, were there disagreements among the jurors

2  about the case?

3          JUROR NO. 107:  Yes.

4          THE COURT:  And what did you think about that process

5  of the jurors disagreeing with each other?  I mean, obviously,

6  they finally came to an agreement?

7          JUROR NO. 107:  Yes, but it is just part of the

8  dynamics of the process.

9          THE COURT:  And what do you personally think about

10 that dynamic?

11         JUROR NO. 107:  I think that kind of helps you to

12 understand probably from different angles, different

13 perspective of seeing things, and just based on that form your

14 opinions.

15         THE COURT:  All right.  Now, I am sure that the judge

16 in that case told you that the Government, the prosecutor had

17 to prove the defendant's guilt beyond a reasonable doubt.

18         JUROR NO. 107:  Yes.

19         THE COURT:  Do you have any personal views or beliefs

20 about that standard of proof?  I mean, do you think it is a

21 wise standard of proof, or do you think that there should be a

22 different approach as to how we do criminal cases?

23         JUROR NO. 107:  I think in my view that's the

24 process.  That's how this society works as far as the legal

25 system is concerned.

1          THE COURT:  And do you think it is a good way of

2    working?

3          JUROR NO. 107:  Yes.

4          THE COURT:  All right.  You said in your answer to

5    question number 82, you were asked:  Do you believe that if the

6    prosecution goes to the trouble of bringing someone to trial,

7    he or she is probably guilty?  And your answer was:  Unsure.

8          Can you explain that answer.

9          JUROR NO. 107:  Because I am more -- I am analytical,

10   more analytical by training and by education.  So I would

11   rather see the evidence.  I would say whatever has been

12   presented, based on that I will form my opinion.  But without

13   that, I kind of either both ways.

14         THE COURT:  So, in other words, you want to see the

15   evidence before you decide an issue?

16         JUROR NO. 107:  Yes.

17         THE COURT:  Do you expect that a defendant in a

18   criminal case has to prove that he is innocent?

19         THE WITNESS:  So where I came from in Taiwan, there

20   was not a case.  There was a case that the defendants need to

21   prove, to prove things.

22         But I think in our society, in our system, you know,

23   we basically I think it's the burden of the Government to prove

24   that.

25         THE COURT:  And are you comfortable with that burden?

168

1           JUROR NO. 107:  Yes.

2           THE COURT:  All right.  All right, sir, if you would

3   step outside for a second.

4           NOTE:  Juror number 107 leaves the courtroom.

5           MR. KROMBERG:  No questions, Your Honor.

6           THE COURT:  All right.  Mr. MacMahon.

7           MR. MacMAHON:  Just a second, Your Honor, if I could.

8           The only follow-up question would be about when he

9   was in the faculty, I couldn't follow that as to what he was

10  teaching or what he was doing on the faculty.  I couldn't

11  follow everything that he said either, Your Honor, but --

12          THE COURT:  Well, I don't think that really is

13  terribly relevant.  I mean, he is -- on the criminal justice

14  questions, I think, although he took a little time, he got it

15  right.  He understands the difference between the Taiwanese

16  system and our system.  He has been a juror before.  He

17  understands that the burden of proof is on the Government.

18          I don't see any problem myself.  Any basis for a

19  cause strike on this juror?

20          MR. KROMBERG:  No, Your Honor.

21          MR. MacMAHON:  No, Your Honor.

22          THE COURT:  Let's bring him in.

23          NOTE:  Juror number 107 returns to the courtroom.

24          THE COURT:  All right, sir, you are still being

25  considered for the jury in this case.  You are finished for

1   today, and I you will not need to be here tomorrow.  There is a

2   good chance you will have to be here Monday.  I am hoping we

3   can actually start the trial on Monday.  There will be a final

4   round of jury selection, which will be much shorter than

5   today's.  And then whoever the 14 people are will go ahead and

6   try this case.

7          I need to continue to warn you that you are not to

8   conduct any investigation about this case and not to expose

9   yourself to the media.  You can only tell people you are still

10  being considered for jury duty, but nothing about the case.

11         And we have been using a number for you because we

12  don't want the media contacting you.  And so, if for any reason

13  you are contacted, they shouldn't, but if they do, let us know,

14  please.  All right?

15         But you are free to go.  Thank you, sir.

16         JUROR NO. 107:  Thank you.

17         NOTE:  Juror number 107 leaves the courtroom.

18         THE COURT:  All right, counsel, what we're going to

19  do then is recess until 2 o'clock.  I hope you brought your

20  running shoes and sandwiches or something with you, but I do

21  want to try to keep this as much on schedule as we can.

22         We have 15 jurors for the pool so far.  I am becoming

23  a bit more optimistic that we may actually get our number from

24  the group we have looked at.

25         And so, at this point I think you should be planning

170

1   to start this trial on Monday after we select the final jury

2   Monday morning.  But we will see where we are later today.

3           Tomorrow we are going to have more interruptions than

4   I would like because I have got to take a plea at 1 o'clock.

5   And I am assuming I can start at 11, et cetera.  But I'm really

6   pushing to try to finish it all tomorrow afternoon.

7           We will recess court until 2 o'clock.

8           NOTE:  At this point a lunch recess is taken; at the

9   conclusion of which the case continues in the presence of a new

10  group of potential jurors as follows:

11  JURY PANEL IN

12          THE COURT:  Good afternoon, ladies and gentlemen.

13  You have been brought back to court today because we are going

14  farther into your possible service in this case.

15          And so, we just need to call attendance at this time.

16  And we will call your number again, and if you would stand up,

17  please, and say whether you are here or not, that will be fine.

18          THE CLERK:  Juror number 12.

19          JUROR NO. 12:  Here.

20          THE CLERK:  Juror number 16.

21          JUROR NO. 16:  Here.

22          THE CLERK:  Juror number 18.

23          JUROR NO. 18:  Here.

24          THE CLERK:  Juror number 30.

25          JUROR NO. 30:  Here.

1           THE CLERK:  Juror number 35.

2           JUROR NO. 35:  Here.

3           THE CLERK:  Juror number 42.

4           JUROR NO. 42:  Here.

5           THE CLERK:  Juror number 45.

6           JUROR NO. 45:  Here.

7           THE CLERK:  Juror number 58.

8           JUROR NO. 58:  Here.

9           THE CLERK:  Juror number 65.

10          JUROR NO. 65:  Here.

11          THE CLERK:  Juror number 69.

12          JUROR NO. 69:  Here.

13          THE CLERK:  And juror number 78.

14          JUROR NO. 78:  Here.

15          THE COURT:  Very good.  Ladies and gentlemen, we are

16   going to try to move as quickly as we, but this is going to

17   take a little time, and I will ask that you just remain in the

18   jury room until we call you by number.

19          Juror number 12, you can just come right up here and

20   sit in the witness box, please.

21          NOTE:  The potential jurors leave the courtroom

22   except for juror number 12.

23          THE COURT:  Good afternoon, sir.

24          JUROR NO. 12:  Afternoon.

25          THE COURT:  Since filling the questionnaire on

172

1    Monday, have you thought about whether any of your answers need

2    any amplification or if there is any additional information you

3    think we ought to know about to consider you for service on

4    this jury?

5             JUROR NO. 12:  I don't think so.

6             THE COURT:  All right, sir.  Have you been exposed to

7    any media coverage about this case or conducted any

8    investigation concerning this case?

9             JUROR NO. 12:  No, sir -- no, ma'am.

10             THE COURT:  I want to ask you if you have

11    reconsidered the time commitment that would be required of a

12    juror and whether that creates any additional issues for you?

13             JUROR NO. 12:  No, it does not.

14             THE COURT:  All right.  Now, I see that you live in

15    Fauquier County.

16             JUROR NO. 12:  Yes, ma'am.

17             THE COURT:  Which is a bit of a distance from here.

18             JUROR NO. 12:  Yes, ma'am.

19             THE COURT:  And you are currently retired, is that

20    right?

21             JUROR NO. 12:  Yes, ma'am, retired military.

22             MR. KROMBERG:  Do you anticipate having any problem

23    in being able to be here by 9:30 in the morning?  Because

24    that's when we --

25             JUROR NO. 12:  No, no, I can make it by the time --

1    by 8 o'clock actually.

2            THE COURT:  All right, that's fine.  I see that your

3    wife has a law degree?

4            JUROR NO. 12:  Yes, ma'am.

5            THE COURT:  What kind of law, if any, has she

6    practiced?

7            JUROR NO. 12:  She has not.  We were married shortly

8    after -- well, she was in her second year at UVA, and then we

9    were married, and then she finished up at the University of

10   Maine.  So she has not practiced.

11           After that, we were stationed all over the world, so

12   we didn't get a much of chance at that point.

13           THE COURT:  Okay.  And you indicated to question 11

14   that somebody in your family has been naturalized?

15           JUROR NO. 12:  My wife.

16           THE COURT:  From what country does she come?

17           JUROR NO. 12:  From Canada.

18           THE COURT:  From Canada?

19           JUROR NO. 12:  Yes.

20           THE COURT:  All right.  Was there any problem in the

21   naturalization process?

22           JUROR NO. 12:  No.  She was born in Toronto and then

23   spent the -- almost the rest of her life in the United States.

24           THE COURT:  All right.  Now, you have been to India?

25           JUROR NO. 12:  Yes, I have.

174

1          THE COURT:  In your answer to question number 28.

2   And you indicate here that you have personal friends throughout

3   that area.  And you still do, is that correct?

4          JUROR NO. 12:  Yes.  I have a lot of military friends

5   that are in and out of the service that have been in and out of

6   the area over a long period of time.

7          THE COURT:  All right.  Now, we are definitely going

8   to be discussing issues involving Kashmir and the

9   Indian/Pakistani dispute over Kashmir.

10          JUROR NO. 12:  I am familiar with the region, but not

11   specifics about it.  Just, you know, where it is and a little

12   bit of some of the background of what is going on over the

13   years, but nothing particular.

14          THE COURT:  You have some friends though who are

15   Indian, is that correct?

16          JUROR NO. 12:  Yes.

17          THE COURT:  Do you know if they are Hindu, or Muslim,

18   or what their religion is?

19          JUROR NO. 12:  Hindu, I think.  A couple Sikhs, but

20   their --

21          THE COURT:  Have your Indian friends ever discussed

22   with you Kashmir or any of that sort of thing?

23          JUROR NO. 12:  No, no, they have not.

24          THE COURT:  Okay.  In question number 30 you

25   indicated that a few old co-workers were killed at the Pentagon

1    on September 11?

2            JUROR NO. 12:  Yes.

3            THE COURT:  How former -- how long ago had they been

4    co-workers of yours?

5            JUROR NO. 12:  Probably about eight or nine years

6    before the attack on the Pentagon.

7            THE COURT:  Is there anything about their deaths or

8    the attack on the Pentagon, since you have a connection with

9    the military, that you feel would make it difficult for you to

10   be impartial in judging this case?

11           JUROR NO. 12:  No, it would not.

12           THE COURT:  Now, if you were to hear evidence of

13   witnesses gloating or boasting over the attacks on the Pentagon

14   and saying things such as, you know, America deserved it, or if

15   you saw documents to that effect, would that kind of

16   information upset you to the point that you couldn't be

17   impartial about judging this case?

18           JUROR NO. 12:  No, not really.

19           THE COURT:  All right.  You indicated that you had a

20   question about if your brother-in-law was involved in the

21   Virginia jihad case.

22           JUROR NO. 12:  Yes.  My brother-in-law is now retired

23   from the Sheriff's Department in Fauquier County.  He was the

24   assistant to the sheriff.

25           THE COURT:  All right.

176

1        JUROR NO. 12:  And the timing of his retirement or

2   whether he was involved in anything to do with this case, I do

3   not know because we -- we both treated our vocations as

4   compartmentalized.  I didn't ask him about what things happened

5   in the Sheriff's Department and he didn't ask me about what

6   things happened in the military side.  So we kind of kept it

7   separated a lot.

8        THE COURT:  You were erring on the side of caution to

9   let us know that he might have been involved, but you don't

10  know if he was?

11       JUROR NO. 12:  I have no idea.

12       THE COURT:  Okay, very good.

13       JUROR NO. 12:  Unless I went out and specifically

14  asked him, there would be no way I could find out.

15       THE COURT:  All right.  Now, in your answer to number

16  88 -- you were asked the question:  Do you tend to believe that

17  a member of law enforcement, such as a police officer or

18  federal agent, who testifies in court is more likely to tell

19  the truth than other witnesses, less likely to tell the truth

20  than other witnesses, or equally likely to tell the truth than

21  other witnesses?  I am sorry.

22       JUROR NO. 12:  I think I said more likely.

23       THE COURT:  That's right, you indicated that.  Do you

24  understand that in a trial all witnesses are expected to be

25  approached on an equal basis?  And that the credibility of a

177

1    witness has to be judged based upon what the witness says, the

2    way in which it is said, the way in which it may be either

3    corroborated or undermined by other evidence in the case, but

4    that witness testimony is not to be judged because of who the

5    witness is?

6          So neither their ethnicity, their age, their

7    employment is supposed to be a factor.

8          Would you have difficulty in putting aside that

9    belief that you indicated on the questionnaire and approaching

10   the case in that manner?

11         JUROR NO. 12:  No, I don't think so.  And I think the

12   reason I answered the way I did was eyewitness reporting type

13   situations, they tend to be more aware of what's going on

14   around them and can report the facts.  Not only was the person

15   five-foot-three, but five-foot-three with brown eyes and red

16   hair.  And that's the basis of which I answered that question.

17         THE COURT:  All right.  But do you feel that you

18   would be able to judge a law enforcement officer's testimony on

19   the same plane as that of an ordinary civilian?

20         JUROR NO. 12:  Yes.

21         THE COURT:  All right.  You indicated that you use

22   hearing aids?

23         JUROR NO. 12:  Yes, ma'am.

24         THE COURT:  Have you had any trouble hearing me at

25   any point during any of the proceedings either on Monday or

178

1  today?

2          JUROR NO. 12.  No.  The only problem was seeing you

3  over the monitor on the top of the podium.

4          THE COURT:  I have the same problem.  Would you be at

5  all reluctant to indicate that you were having problems hearing

6  if for some reason --

7          JUROR NO. 12:  No, ma'am.

8          THE COURT:  All right, very good.  All right, sir, if

9  you would just step outside for a second.  We will just see if

10 there is anything further.

11         NOTE:  Juror number 12 leaves the courtroom.

12         THE COURT:  Mr. Kromberg.

13         MR. KROMBERG:  No questions, Judge.

14         THE COURT:  How about the defense?

15         MR. MacMAHON:  Yes, Your Honor.  Given the witness'

16 military rank and the allegation of waging war against the

17 United States, I think we would just should ask him if those

18 kinds of allegations were in the case, given his service

19 defending the country, whether that could influence his ability

20 to be impartial.

21         THE COURT:  All right.  Mr. Wood, if you don't mind.

22         NOTE:  Juror number 12 returns to the courtroom.

23         THE COURT:  Sir, as long as you speak in a good, loud

24 voice, you can stay right there.

25         JUROR NO. 12:  Okay.

179

1          THE COURT:  Some of the allegations in this case do
2     involve claims of efforts to get people to wage war against the
3     United States in the post-September 11 time frame.
4          Because of your extensive background in the military,
5     do you feel that in any respect those types of allegations
6     would make it difficult for you to be impartial in judging this
7     case?
8          JUROR NO. 12:  No, ma'am, I do not.
9          THE COURT:  You don't find yourself so pro-military
10    or having been in the military --
11         JUROR NO. 12:  No.  I think just because of my
12    background, that I have to weigh all the facts together.  And
13    that was part of the training that I had as a CO and in
14    aviation review boards and things like that, you have to weigh
15    all the facts.
16         THE COURT:  All right.  Thank you, sir.  If you would
17    step outside again for one more minute.
18         NOTE:  Juror number 12 leaves the courtroom.
19         THE COURT:  All right.  Any objection to number 12?
20         MR. MacMAHON:  No, Your Honor.
21         MR. KROMBERG:  No, Your Honor.
22         THE COURT:  All right.  Then he is in, and we will
23    bring him back.
24         NOTE:  Juror number 12 returns to the courtroom.
25         THE COURT:  Sorry for all the back and forth.  Sir,

1    you have made the next cut.  So we are still considering you

2    for the final jury selection, which will not occur before

3    Monday.  So the rest of today and all day tomorrow you are

4    clear.

5            You will need to keep checking that phone number that

6    indicates whether and when you need to be coming back here.  I

7    am hoping we're talking about Monday morning.  It is possible

8    it could slip a little bit, but we will let you know for

9    certain.  If you call after 6 o'clock tonight, or more likely

10   tomorrow after 6 o'clock, the message will have the information

11   for you.

12           In the meantime, continue to not conduct any

13   investigation in this case.  Avoid any media coverage.  You may

14   tell co-workers you are still being considered for jury duty,

15   but nothing about the case at all.

16           And we're using a number for you rather than a name

17   because we are trying to avoid any efforts by the media to

18   contact you.  Obviously, if anyone tries to talk to you about

19   this case, let us know right away.

20           JUROR NO. 12:  Yes, ma'am.

21           THE COURT:  Thank you, you are clear to go now.

22           NOTE:  Juror number 12 leaves the courtroom.

23           THE COURT:  All right, number 16.

24           NOTE:  Juror number 16 enters the courtroom.

25           THE COURT:  Good afternoon, sir.  Thank you for

181

1    coming back to court.  I need to ask you some follow-up

2    questions.

3            First of all, is there anything that you provided us

4    in your answers on the questionnaire, anything you want to add

5    to those answers?

6            JUROR NO. 16:  No.

7            THE COURT:  All right.  Any additional information

8    you would like to bring to our attention that you think we

9    might want to know about in order to evaluate you for jury

10   duty?

11           JUROR NO. 16:  No.

12           THE COURT:  Since Monday have you conducted any

13   investigation or been exposed to any media coverage about this

14   case?

15           JUROR NO. 16:  No.

16           THE COURT:  And again, I want to just go over with

17   you the time commitment for this trial.  And I note, I think

18   you have just started a new job, is that right?

19           JUROR NO. 16:  Yes.

20           THE COURT:  Now, is your having to be at this trial

21   for a couple of weeks -- I mean, it might not be as long as

22   three weeks, but it could run three weeks.

23           Does that create any problem for you at work?

24           JUROR NO. 16:  I would be missing some training time,

25   but that's about it.

1    THE COURT:  Well, I mean, is that something that

2 makes you uncomfortable?  Or do you think in any respect you

3 would resent being a juror in this case if you have to give up

4 that training?

5    JUROR NO. 16:  Yes.

6    THE COURT:  You think you might?  Do you feel in any

7 respect that might force you want to rush through the case or

8 get it over with quickly?

9    JUROR NO. 16:  Yes.

10    THE COURT:  All right.  You can just step outside for

11 one second, sir.

12    NOTE:  Juror number 16 leaves the courtroom.

13    THE COURT:  I am concerned about that answer.  And

14 unless anyone disagrees, I would excuse this juror for cause.

15    MR. MacMAHON:  We wouldn't want a juror with that

16 attitude in the box either, Your Honor.

17    THE COURT:  I assume the Government agrees with that?

18    MR. KROMBERG:  I liked his answers in general on the

19 questionnaire, but that is not a good answer here.

20    THE COURT:  All right.  Let's bring him back in.

21    NOTE:  Juror number 16 returns to the courtroom.

22    THE COURT:  I want to thank you for coming to court

23 today, sir, but given the fact that you've just started a new

24 job and your need to have that training, we are going to go

25 ahead and excuse you.  Just check in at the Clerk's Office as

1    you leave, but you are excused from this jury.  Thank you.

2              NOTE:  Juror number 16 leaves the courtroom.

3              THE COURT:  All right, number 18.

4              NOTE:  Juror number 18 enters the courtroom.

5              THE COURT:  Good afternoon, ma'am.  Thanks for coming

6    back to court.

7              Since filling out the questionnaire, is there

8    anything you would like to add to any of your answers?

9              JUROR NO. 18:  Not at this time, Your Honor.

10             THE COURT:  Okay.  Because this is the time, so is

11   there --

12             JUROR NO. 18:  I've been thinking about it.  There is

13   nothing else.  I think I filled out the questionnaire as best I

14   could.  Anything that was unsure, I made an explanation there

15   as well.

16             THE COURT:  Okay.  Is there any additional

17   information that you think we ought to know about in order to

18   evaluate you for jury service in this case?

19             JUROR NO. 18:  I was pretty honest in the

20   questionnaire, and I wrote out everything that I thought would

21   affect my decision in any way.

22             THE COURT:  All right.  Have you been exposed to any

23   media coverage --

24             JUROR NO. 18:  Based on your orders, I have not

25   watched any news or anything to that effect.

184

1        THE COURT:  And not done any investigation?

2        JUROR NO. 18:  No.

3        THE COURT:  All right.  The last thing is, just

4    because it is going to be very important that we have jurors

5    who can be here for the full time of the trial, have you had

6    any reconsideration as to the time commitment and the impact on

7    your schedule that the trial might have?

8        Again, we have to start at around 9:30 in the

9    morning, we will run until 6.  That's almost every day of the

10   week.

11       JUROR NO. 18:  Yes, ma'am, I understand that.  Not at

12   this time.  I have informed my employer that this may take two

13   to three weeks, as you have stated.  So they have excused me,

14   of course.  But nothing else.

15       THE COURT:  All right.  Now, in your answer to

16   question number 23 you were asked some questions about whether

17   the fact that the defendant or some of the witnesses were

18   Muslim might make it hard for you to be an impartial juror.

19   And you indicated yes.  And then your explanation was you're

20   unfamiliar with the practice of Islam to distinguish positive

21   practice from negative based upon events of September 11.

22       Can you explain a little bit more what you meant by

23   that answer.

24       JUROR NO. 18:  Yes, ma'am.  I prefer to have

25   education on all aspects of any religion or any culture.  And

1   the only thing because of September 11 that we have seen pretty

2   much has been the events and negative surroundings of the

3   Islamic religion.

4           I have not taken any personal interest in that

5   particular culture to seek out any knowledge that will portray

6   to me anything positive.  While being an educated person, I am

7   sure there are good and bad people in all religions, as I

8   stated in one of the questions, but I don't know enough outside

9   of what I have been exposed to to understand that religion, to

10  really make a sound judgment as to whether or not there are

11  good sides of it or not.

12          THE COURT:  In other words, if I understand --

13          JUROR NO. 18:  I know that was long-winded, but --

14          THE COURT:  What you're saying is so far you have

15  been exposed to mostly negative things about it?

16          JUROR NO. 18:  Yes.  And I have read a lot of

17  information surrounding September 11.  And most of that,

18  unfortunately, while it is trying to state the facts, it does

19  have bias in it.  And the bias is towards, of course, the

20  Islamic religion or any Muslims because of the events.

21          So it makes it a little difficult to find information

22  that is purely factual about the religion and the people

23  without having any bias because of September 11.

24          THE COURT:  Do you think though as a judge in this

25  case, which is a criminal trial, you would be predisposed to

1   find the defendant guilty just because he is a Muslim?

2            JUROR NO. 18:  No, I will not.  Because I can -- I am

3   educated enough to say that this is a matter of circumstances.

4   This individual, just because of his religion, as with race or

5   anything else, you just happen to be a victim of that for other

6   people's bad behavior.

7            THE COURT:  All right.  I think you gave a somewhat

8   similar answer, as I recall the questionnaire, to 41.

9            JUROR NO. 18:  Yes.

10           THE COURT:  Which was asking -- again, you were

11  concerned about your lack of knowledge.

12           JUROR NO. 18:  Yes, ma'am.

13           THE COURT:  And I understand that frustration.  You

14  did indicate that you thought you might have been exposed to

15  some news about a Virginia jihad.  You said news in regard to

16  the Center.  I guess you are talking about the --

17           JUROR NO. 18:  Yes, ma'am.

18           THE COURT:  Yeah.  Can you give us more detail about

19  that.

20           JUROR NO. 18:  I just recall some months ago there

21  was something on the news, I was probably doing something else,

22  multitasking, and because I live somewhere around that area, it

23  just struck me when the name was called of the particular area,

24  and I just kind of briefly heard something.  But I cannot for

25  the life of me even remember what it was.

1          THE COURT:  And the area that got your attention was

2    what?

3          JUROR NO. 18:  Falls Church area.

4          THE COURT:  Okay.  Does the fact that some of these

5    events may have occurred in the Falls Church area, would that

6    make it hard for you in any respect to be impartial in judging

7    this case?

8          JUROR NO. 18:  No, I think that it was the

9    recognition of the area and just some, I guess, heightened

10   interest that there was a particular center there that I was

11   not aware of.

12         THE COURT:  I see, all right.  You were asked in

13   question number 62 if you have ever had any particularly

14   favorable or unfavorable experiences with a lawyer or judge.

15   And you went on to explain you had a bad experience with

16   lawyers.

17         Of course, we have lawyers on both sides of this

18   case.

19         JUROR NO. 18:  Yes, I understand that.

20         THE COURT:  But in any respect, would that experience

21   in your view at all affect your ability to be impartial in

22   judging this case?

23         JUROR NO. 18:  I have to answer honestly, yes, I

24   think so.

25         THE COURT:  You are just so turned off on lawyers

1    that it may affect you?

2            JUROR NO. 18:  Yes, I am.

3            THE COURT:  And you would hold it against the party

4    whom that lawyer was representing?

5            JUROR NO. 18:  I will make every effort not to do

6    that, but I do have some negativity towards lawyers,

7    unfortunately.

8            THE COURT:  All right.  Why don't we have you step

9    outside for just a second.

10           JUROR NO. 18:  Sure.

11           NOTE:  Juror number 18 leaves the courtroom.

12           THE COURT:  Frankly, that bias might wash out.  As I

13   said, there are lawyers on both sides.  However, I would assume

14   at least one side would like this juror stricken for cause, or

15   not?

16           MR. MacMAHON:  I would like her stricken for cause,

17   Your Honor.  I don't know where that is going to run.

18           THE COURT:  I think it is too unchartered territory.

19   We will go ahead and excuse her.

20           MR. MacMAHON:  Thank you.

21           NOTE:  Juror number 18 returns to the courtroom.

22           THE COURT:  Ma'am, I think based on the fact that you

23   would have to be sitting and listening to lawyers for two or

24   three weeks, we are going to go ahead and excuse you from this

25   jury.  But thank you for coming to court today.  And if you

189

1    will check out with the Clerk's Office on your way out, let

2    them know you have been excused, that will end your obligation

3    to the Court.  Thank you.

4              JUROR NO. 18:  Yes, thank you, Your Honor.

5              NOTE:  Juror number 18 leaves the courtroom.

6              THE COURT:  All right, number 30.

7              NOTE:  Juror number 30 enters the courtroom.

8              THE COURT:  Thank you for coming back to court, sir.

9              Since answering the questionnaire, have you thought

10   about whether any of your answers need any clarification or

11   amplification or anything you would like to change in them?

12             JUROR NO. 30:  No, I don't believe there is anything

13   I would change in the questionnaire.

14             THE COURT:  All right.  Any additional information

15   you think we might need to know about to consider you for

16   service on this jury that wasn't covered in the questionnaire?

17             JUROR NO. 30:  Nothing that I can think of, Your

18   Honor.

19             THE COURT:  All right.  Since Monday have you been in

20   contact with any media sources about this case, read anything

21   in the paper, seen anything, or done any investigation on the

22   Internet or any other way?

23             JUROR NO. 30:  No, I have not.

24             THE COURT:  Have you had a chance to reconsider the

25   time commitment this case may take?  And if so, is there going

1    to be anything additional you want to bring to our attention in

2    that respect?

3              JUROR NO. 30:  Well, Your Honor, the only thing I

4    would mention is that I work for the chairman of the Senate

5    Finance Committee, and next week we're going to be managing a

6    bill on the Senate floor, and I am the supervisor for the

7    department that is in charge of the bill on the floor.  Which

8    means we will essentially be managing the floor of the U.S.

9    Senate next week.  And I am supposed to be there to staff the

10   chairman of the committee as he manages the floor.

11             And so, I don't know what they're going to do if I am

12   not there, but they will --

13             THE COURT:  Do you not have a deputy or somebody who

14   can stand in for you in that process?

15             JUROR NO. 30:  There is one staff person who is the

16   technical expert for the issue itself.  And of course, there is

17   a staff director and a deputy staff director that are also

18   there.

19             THE COURT:  I can tell you, we will not be in session

20   on Friday of next week if that helped in any respect.  I don't

21   know what their schedule is like on weekends -- you know, on

22   Fridays.

23             But, I mean, obviously, if you are chosen to be a

24   juror in this case, you are going to have to be here.  We will

25   take priority over what is going on on the Hill.

1          JUROR NO. 30:  Understood.

2          THE COURT:  So what I really to need to know, and I

3    need as honest a statement on this issue as you can give me, if

4    you are chosen to be a juror in this case, is that going to

5    create an insurmountable problem for you?

6          JUROR NO. 30:  No, Your Honor.

7          THE COURT:  All right.  Would you in any respect

8    resent or hold against either the prosecution or the defense

9    the fact that you have to be here rather than over on the

10   floor?

11         JUROR NO. 30:  No, absolutely not.

12         THE COURT:  All right.  You are working on a law

13   degree, is that correct?

14         JUROR NO. 30:  That's correct.

15         THE COURT:  And is that at George Mason or

16   Georgetown?

17         JUROR NO. 30:  No, it is at Washington College of

18   Law, American University.

19         THE COURT:  Washington.  All right.  And are you

20   planning to practice law when you get your degree?

21         JUROR NO. 30:  That's a very good question, Your

22   Honor.  I am not sure.  Possibly, possibly not.  I work in the

23   health policy area, and I may apply my law degree in that area.

24   I may also go to work for a law firm and work in health law

25   itself.

1          THE COURT:  All right.  But you are not interested in

2    criminal law?

3          JUROR NO. 30:  No, ma'am.

4          THE COURT:  All right.  And you indicated that your

5    spouse already has a JD?

6          JUROR NO. 30:  That's correct.

7          THE COURT:  All right.  And your spouse works for a

8    private law firm?

9          JUROR NO. 30:  She worked for a private law firm, but

10   now works for Senator Evan Bayh from Indiana.

11         THE COURT:  That's right.  All right.  But in more of

12   a counsel position than as a litigator, is that right?

13         JUROR NO. 30:  That's correct.

14         THE COURT:  Did your wife ever practice criminal law?

15         JUROR NO. 30:  No, ma'am.

16         THE COURT:  All right.  Do you understand that if you

17   were chosen to be a juror in this case -- we can't have a

18   shadow legal judge in the jury box.  And that means at the end

19   of the trial when I give the jury the legal instructions, you

20   know, fresh out of law school, you might disagree with how I

21   phrased a particular instruction of law.

22         Could you put aside that personal view and simply

23   follow what the Court has said?

24         JUROR NO. 30:  Yes, ma'am.

25         THE COURT:  You also couldn't be an informal legal

193

1    advisor to the jury.  So if the jurors were to say, what does

2    this mean, if I haven't explained it, you would not be able to

3    do that.

4              Would you be comfortable with that quiet role?

5              JUROR NO. 30:  Absolutely.

6              THE COURT:  All right.  You indicated that the

7    husband of a friend, if I understand it correctly, you

8    identified her as Dolly Judge -- this is on the issue about

9    knowing people who might have been killed on September 11.

10             JUROR NO. 30:  Yes.

11             THE COURT:  I guess it was the sister of the husband

12   of a friend.

13             JUROR NO. 30:  That's right.

14             THE COURT:  Died at the Pentagon?

15             JUROR NO. 30:  That's right.

16             THE COURT:  I assume this was a fairly close friend?

17             JUROR NO. 30:  Dolly Judge and I worked together in a

18   previous employment relationship, became good friends there.

19   And of course, it was a very personal experience for their

20   family.  And I felt about it just because of the impact I knew

21   it was having on my friend Dolly and her family.

22             THE COURT:  Do you feel in any respect because of

23   your personal involvement with that grieving progress, that it

24   might be difficult for you to be impartial in judging the facts

25   of this case?

194

1          JUROR NO. 30:  No.

2          THE COURT:  There may be evidence in this case of

3  statements made by witnesses praising the events on

4  September 11, making comments that America deserved it, that

5  sort of thing.  There may also be documents, exhibits to that

6  effect.

7          Do you feel that that kind of evidence in this case

8  would make it difficult for you in light of your personal

9  experiences to be impartial in judging this case?

10         JUROR NO. 30:  No, I do not.

11         THE COURT:  All right, sir.  If you don't mind, just

12  step outside for a second.

13         NOTE:  Juror number 30 leaves the courtroom.

14         THE COURT:  Anything further, Mr. Kromberg?

15         MR. KROMBERG:  No questions, Judge.

16         THE COURT:  Mr. MacMahon.

17         MR. MacMAHON:  Yes, Your Honor.  Just some concern

18  about if he is going to class at night during the trial, I

19  think we might get -- I didn't get an answer that I heard as to

20  that.

21         And the other one would be the question, given his

22  position in the Senate, some of the other connections that he

23  has, about the allegation of waging war against the United

24  States, whether that would have any impact or affect him at all

25  in terms of being fair and impartial.

1          THE COURT:  Okay.  Do you want to bring him back in,

2    please.

3          NOTE:  Juror number 30 returns to the courtroom.

4          THE COURT:  Sir, if you would just stay there and

5    answer in nice, loud voice, I think we'll be all right.

6          Are you presently in law school?

7          JUROR NO. 30:  Yes, ma'am.

8          THE COURT:  So those are night classes?

9          JUROR NO. 30:  Yes, Your Honor.

10         THE COURT:  What time do your glasses meet?

11         JUROR NO. 30:  Well, they meet from -- they start at

12   6 o'clock on Monday nights and go until 9, and Tuesdays and

13   Thursday I go to 10 p.m.  Wednesday I would not have classes.

14         THE COURT:  How would you balance your class

15   commitments and jury service?  Because we would running until

16   approximately 6 o'clock at night.

17         JUROR NO. 30:  Well, it is common for me actually to

18   miss my 6 o'clock class because of my job already.  So it

19   wouldn't be actually that different from my current situation,

20   to be honest about it.

21         THE COURT:  But you would then go from here and go as

22   late as you could to class, would you that be the plan?  Or

23   would you just not go that night?

24         JUROR NO. 30:  No, I would go, I would just go late

25   to class.

```
1              THE COURT:  That's your normal work habit now anyway?

2              JUROR NO. 30:  Yes, it is, Your Honor.

3              THE COURT:  You wouldn't be too tired the next day to

4   come back and sit for six, seven, eight hours in court and be

5   able to be an attentive juror?

6              JUROR NO. 30:  No, Your Honor.  That is my normal

7   schedule actually.

8              THE COURT:  All right.  The other question I have to

9   ask you is, because there are allegations in this case of

10  efforts to wage war against the United States or to incite

11  others to do so, and the fact that you have significant

12  connections to people on the Hill, and in the seat of the

13  government, do you feel in any respect the nature of that kind

14  of an allegation and your employment situation would make it

15  difficult for you to be impartial?

16             JUROR NO. 30:  No, I do not.

17             THE COURT:  All right.  If you would step outside

18  again for one more second.

19             NOTE:  Juror number 30 leaves the courtroom.

20             THE COURT:  Any issue about cause for this juror?

21             MR. KROMBERG:  No, Your Honor.

22             THE COURT:  Mr. MacMahon?

23             MR. MacMAHON:  Your Honor, I know his answers about

24  having enough energy to do all this, but I am not sure we would

25  have the full attention of a juror under those circumstances
```

197

1    going to work at night.  I heard his answers, but --

2         THE COURT:  I am satisfied he appears to be very

3    sharp.  He understands it.  And if he works in the pressure

4    cooker across the river, he will be able to do this.

5         All right, I am going to keep him in.

6         MR. KROMBERG:  Judge, if I may say one other thing.

7    Because we're trying to do this as an innominate jury,

8    sometimes we ask the questions and it is so obvious what the

9    person's position is, I assume the -- for example, the person

10   we just talked to, someone could figure it out.

11        And I am suggesting that we phrase our questions, try

12   to phrase the questions with people who have particularly

13   unique jobs perhaps, that it would be just a little tougher to

14   figure --

15        THE COURT:  I think that was his answer rather than

16   our question.

17        MR. KROMBERG:  Yes.

18        THE COURT:  I don't think I could phrase his job

19   description if I tried, but I understand that.

20        All right, let's bring him back in.

21        NOTE:  Juror number 30 returns to the courtroom.

22        THE COURT:  All right, sir, we are going to continue

23   considering you for service on this jury.  We are getting the

24   number down to a much smaller pool, and on Monday I hope we

25   will be able to make the final selection and then get right

1    into the trial.

2           That does mean you need to let your colleagues know

3    you may not be available next week.  There is no guarantee, but

4    it is an increasing possibility.

5           I am going to ask that you continue to not engage in

6    any investigation concerning any of the issues in this case,

7    and avoid any media coverage.

8           We have been using a number for you to try to

9    minimize any ability of the media or anyone else to contact

10   you.  If you receive any kind of a contact, let us know right

11   away.

12          And you will need to keep phoning that number that we

13   have.  After 6 today we may be able to tell you for certain

14   about next week.  Certainly after 6 tomorrow we will know for

15   certain.

16          All right?

17          JUROR NO. 30:  Okay.  Thank you.

18          THE COURT:  Thank you, sir.  You are free to go at

19   this time.

20          NOTE:  Juror number 30 leaves the courtroom.

21          THE COURT:  Number 35.

22          NOTE:  Juror number 35 enters the courtroom.

23          THE COURT:  Thank you, sir, for attending us this

24   afternoon.

25          I would like to ask you whether since filling out the

1   questionnaire, is there anything that you would like to change

2   or add to any of your answers or any additional information

3   that wasn't covered by the questionnaire but you think we might

4   want to know about?

5           JUROR NO. 35:  No, ma'am, not at this time.

6           THE COURT:  All right.  Have you conducted any

7   investigation or been exposed to any media coverage of this

8   case since Monday?

9           JUROR NO. 35:  No.

10          THE COURT:  In considering the time commitment for

11  this trial, is there any additional information you need to

12  bring to our attention about work or family schedules that we

13  might need to know about?

14          JUROR NO. 35:  My work is going to miss me, but I

15  think they can survive without me.

16          THE COURT:  All right.  Very good.

17          I note that you do live in Prince William County, and

18  your current employment station is the U.S. Army, but I don't

19  think we know where--

20          JUROR NO. 35:  Fort Belvoir, Virginia.

21          THE COURT:  All right.  So you already are commuting?

22          JUROR NO. 35:  Yes.

23          THE COURT:  I assume that you would have no trouble

24  making a 9:30 start time here?

25          JUROR NO. 35:  No, not at all, ma'am.

1          THE COURT:  All right.  You were a juror in the past,

2  as I understand it.  And you served in a Virginia state case,

3  is that right?

4          JUROR NO. 35:  Prince William County, yes.  I am not

5  sure of the year though, ma'am.

6          THE COURT:  That's all right.  And it was a robbery

7  case?

8          JUROR NO. 35:  Yes.

9          THE COURT:  And how long did that trial take?

10          JUROR NO. 35:  One day, ma'am.

11          THE COURT:  One day.  The jury convicted?

12          JUROR NO. 35:  Correct.

13          THE COURT:  Now, as a result of your being a juror in

14  that case, did you form any impressions about the criminal

15  justice system, either particularly negative or positive?

16          JUROR NO. 35:  I did.  I did, yes.

17          THE COURT:  Okay.  Can you tell us what that was?

18          JUROR NO. 35:  The selection between the blacks and

19  the whites made a difference in the trial case.

20          THE COURT:  And can you explain that a little bit

21  more.

22          JUROR NO. 35:  The initial -- am I allowed to give

23  you the results of the jury voting and stuff?

24          THE COURT:  That's all right at this time, sure.

25          JUROR NO. 35:  The initial, I think the jury was

1    maybe 8 and 4, with four blacks and eight whites.

2            THE COURT:  All right.

3            JUROR NO. 35:  The initial vote on guilty or not

4    guilty had three of the blacks for the black defendant voting

5    not guilty.  After about four hours of deliberation, everybody

6    convicted the robber.

7            THE COURT:  All right.  So there was a lot of back

8    and forth within the jury?

9            JUROR NO. 35:  Correct.

10           THE COURT:  Do you think it was -- were there any

11   other people -- you said there were four in favor of acquittal

12   at the beginning of the trial?

13           JUROR NO. 35:  I think we voted nine out of 12 as

14   guilty the first go around, with three voting no.  And they

15   were three blacks.  And after talking to them for the next

16   three or four hours, they all then voted guilty too as well.

17           THE COURT:  All right.  Did that process bother you

18   at all, the jury deliberation process?

19           JUROR NO. 35:  No.  I was just surprised that the

20   initial voting kind of went on race only.

21           THE COURT:  But as the deliberations went on, was it

22   more of a rational discussion of the evidence?

23           JUROR NO. 35:  Yes, ma'am.

24           THE COURT:  And the --

25           JUROR NO. 35:  Which brought them around, yes.

1          THE COURT:  I am sorry?

2          JUROR NO. 35:  The rational discussion of the

3     evidence brought the other three around, I believe.

4          THE COURT:  All right.  So have you formed any

5     overall impression about whether the criminal justice system

6     works in your view?

7          JUROR NO. 35:  Oh, I believe it works very well,

8     ma'am.

9          THE COURT:  All right.  The allegations in this case,

10    as you know, from what you heard on Monday and what we told you

11    in the juror questionnaire, do raise issues concerning the

12    events of September 11.

13          Now, you say you work at Fort Belvoir.  Do you have

14    any friends or family members who were at the Pentagon on

15    September 11?

16          JUROR NO. 35:  No close personal friends at all, but

17    I do know of a colonel that was injured that used to work in

18    the same location that I have, but I had no personal contact

19    with him or anything.

20          THE COURT:  All right.  And you made a small donation

21    to a victim's fund?

22          JUROR NO. 35:  Yes.

23          THE COURT:  But is there anything at all about the

24    events of September 11 and the allegations in this case that

25    you think could make it difficult for you to be impartial in

1    judging this case?

2              JUROR NO. 35:  No, ma'am, I don't believe so.

3              THE COURT:  All right.  There is also going to be

4    allegation in this case of efforts to incite others to wage war

5    against the United States.  And you work with the military.

6              Do you feel in any respect those types of allegations

7    and your current employment might make it difficult for you to

8    be impartial in judging this case?

9              JUROR NO. 35:  No.  My employment at Fort Belvoir, I

10   run the network.  I am a degreed engineer.  I have done some

11   quality and reliability engineering, but for the past seven

12   years I have just ran the network at the research and

13   development environment.

14             So I am not directly involved with getting equipment

15   out to the military or supporting their efforts or anything

16   like that.

17             THE COURT:  All right, sir.  Thank you.  If you would

18   just step down for a second.

19             NOTE:  Juror number 35 leaves the courtroom.

20             THE COURT:  Any further questions?

21             MR. KROMBERG:  No sir, Your Honor.

22             MR. MacMAHON:  No, Your Honor.

23             THE COURT:  I assume there is no challenge to this

24   jury?

25             MR. MacMAHON:  None for the defense, Your Honor.

204

1            MR. KROMBERG:  Not from the Government, Your Honor.

2            THE COURT:  All right, let's have him come back in.

3            NOTE:  Juror number 35 returns to the courtroom.

4            THE COURT:  All right, sir, you are still going to be

5    continued in the process for the final selection for the jury.

6    You are finished for today, and I am not going to bother you

7    tomorrow, so you can plan your life accordingly.

8            We are hoping to do the very final jury selection and

9    to start the trial on Monday.  And so, what you need to do is

10   keep calling in that phone number that will let you know.  We

11   probably -- I am not positive we can give you a definitive word

12   after until after 6 tomorrow, so you better warn your employer

13   that they might not see you Monday.

14           Continue to avoid any media coverage of this case.

15   And you clearly cannot investigate the case in any respect.

16           We have given you a number, I still haven't called

17   you by name, because we are trying to avoid the media or

18   anybody contacting you.  Obviously, if you are contacted, you

19   should let us you know.

20           Do you understand?

21           JUROR NO. 35:  Yes, ma'am.

22           THE COURT:  All right.  Then you are free to go for

23   now, sir.  Thank you.

24           NOTE:  Juror number 35 leaves the courtroom.

25           THE COURT:  All right, number 42.

205

1              NOTE:  Juror number 42 enters the courtroom.

2              THE COURT:  Thank you, ma'am, for coming to court

3    this afternoon.

4              JUROR NO. 42:  Certainly.

5              THE COURT:  Since filling out the questionnaire, has

6    there been anything further you think you would like to add to

7    any of your answers or any explanations that you think you need

8    to fill in?

9              JUROR NO. 42:  No, I don't believe so.

10             THE COURT:  All right.  Is there any additional

11   information that you didn't already provide in the

12   questionnaire that you think we might want to be aware of in

13   order to consider you for service on this jury?

14             JUROR NO. 42:  No, I don't believe so.

15             THE COURT:  All right.  Have you been exposed to any

16   media coverage or done any investigation on the issues in this

17   case since Monday?

18             JUROR NO. 42:  No, ma'am.

19             THE COURT:  And I want to go over with you one more

20   time the time commitment in this case.  Have you had time to

21   think more about that?  And is there any issue at all about,

22   either from family obligations or work, that you think could

23   interfere with your being a juror in this case?

24             JUROR NO. 42:  No, ma'am.

25             THE COURT:  Now, I noticed that you indicated to

206

1   question 93 that you are a diabetic?

2           JUROR NO. 42:  That's correct.

3           THE COURT:  As I understand it, you have a pump?

4           JUROR NO. 42:  Yes.

5           THE COURT:  Do you ever have problems then with that

6   condition?

7           JUROR NO. 42:  Not during the day.  Sometimes at

8   night I do, but that's waking up with low blood sugars.  But

9   not during the day.

10          THE COURT:  I have had diabetic jurors before, and we

11  have actually -- although we normally have a rule of no eating

12  in the courtroom, I make that exception.

13          JUROR NO. 42:  I carry Gluco Tabs and things like

14  that in my purse.

15          THE COURT:  All right.  And you are not shy about

16  taking them?

17          JUROR NO. 42:  Oh, not at all.

18          THE COURT:  All right.  Very good.  And would you be

19  at all shy if you started to feel tired or dizzy or have any

20  problems?

21          JUROR NO. 42:  No, ma'am.

22          THE COURT:  All right.  You indicated that you used

23  to be -- I think you said used to be a project manager at

24  Barcroft Hills?

25          JUROR NO. 42:  That is correct.

1          THE COURT:  And that's, what, just off of Route 7 in

2  Falls Church?

3          JUROR NO. 42:  Yes.

4          MR. KROMBERG:  You were there when the mosque was

5  being built?

6          JUROR NO. 42:  Yes.

7          THE COURT:  Was there anything at all about that

8  construction or anything about the mosque that was a problem

9  for you or for your facility?

10          JUROR NO. 42:  The only problem occurred on Friday

11  afternoons for parking.  We would close our parking lot due to

12  the overflow of parking for the mosque before they hired the

13  police officers to direct traffic.

14          THE COURT:  Because people otherwise had been parking

15  in your parking lot?

16          JUROR NO. 42:  That's correct.  It was private

17  property.

18          THE COURT:  Did it create bad feelings between --

19          JUROR NO. 42:  Oh, no, none whatsoever.  They were

20  very courteous, never was a problem.

21          THE COURT:  All right.  Did you get to meet any of

22  the members of the mosque through that?

23          JUROR NO. 42:  Only the residents that lived in my

24  building at the time, and I think there were two of them that

25  were actual members.

208

1          THE COURT:  Did you ever discuss their religious

2   beliefs or practices with them?

3          JUROR NO. 42:  No, not specifically.

4          THE COURT:  Did you ever form any either positive or

5   negative feelings about Islam or people who practice that

6   religion from that situation?

7          JUROR NO. 42:  No different from any other religion,

8   no.

9          THE COURT:  Okay.  You indicated in question 30 that

10  your father's wife's -- so I assume --

11         JUROR NO. 42:  Stepmother.

12         THE COURT:  -- sister was killed in the World Trade

13  Center, but you didn't know her very well.

14         JUROR NO. 42:  No.  I had met her three or four times

15  in my life.

16         THE COURT:  But obviously your stepmother must have

17  been very upset?

18         JUROR NO. 42:  Very.

19         THE COURT:  And so, this did affect your family more

20  directly than some others?

21         JUROR NO. 42:  My parents were divorced when I was

22  two.  I see my father and his family two or three times a year.

23         THE COURT:  All right.  So in any respect do you feel

24  that the World Center attack, and the fact that it and the

25  Pentagon attack are going to be discussed to some degree in

1    this case, would any of that in your view make it difficult for

2    you to be impartial in judging this case in light of your

3    family situation?

4            JUROR NO. 42:  No, I don't think it would be make me

5    impartial.  Obviously, the attacks affected everybody.  I don't

6    feel that I am more affected than others even though she was

7    killed in the Trade Center.

8            THE COURT:  All right.  You also mentioned, when I

9    first read it, I jumped, and the next line down you said it was

10   only five minutes and didn't make much difference, but that you

11   had been a hostage.

12           JUROR NO. 42:  Yes.

13           THE COURT:  Could you just give us a bit more detail

14   about what happened there.

15           JUROR NO. 42:  It was my first two weeks of managing

16   a property.  I grew up in a property management family.  My

17   mother is a property manager, and so I have sort of been in the

18   business since I was seven years old.  But I had never been in

19   a situation like this before.

20           A resident came to me, said she felt uncomfortable

21   going into her unit, and would I go with her to stand outside

22   the door and make sure that nobody was in the hallway waiting

23   for her.  Little did we know that he had somehow gotten into

24   the apartment and was waiting in the apartment.

25           So when she went in, she didn't say anything, and

1    asked me to come in with her.  And so I did.  He was behind the

2    door, closed the door and had a knife in his hand.  Pushed us

3    both into the kitchen, said he was going to kill her and then

4    blow up the building.  And then told me that I had to leave so

5    that he could figure out things with her.

6           I left and went upstairs to a board member's

7    apartment, called the police, had they come in the back of the

8    building so they couldn't be seen from where he was holding her

9    hostage because he said if I called the police, that he would

10   kill her.

11          The police handled the situation from there.  I was

12   in phone contact with him with the police for about three hours

13   during the stand-off.  And then he surrendered to police

14   without any further problem.

15          We did go to court over the matter.  She did not want

16   to prosecute, but finally did.  And he was -- in my situation,

17   it was found that I was in the wrong place at the wrong time

18   and that he did not mean to take me hostage.  Interesting.  But

19   that it was just sort of a circumstance.

20          And he was released I believe six months later.

21          THE COURT:  All right.  So you actually testified as

22   a witness in that criminal trial?

23          JUROR NO. 42:  Yes.

24          THE COURT:  As a result of that entire incident, did

25   you form any views or feelings about, first of all, the law

1    enforcement community and how it functions?

2              JUROR NO. 42:  I was very impressed with the law

3    enforcement community.  I was also very impressed with the

4    lawyers on both sides and how the case was handled.

5              I don't believe that -- I certainly did not have a

6    feeling that justice was not served or that there was any sort

7    of negative issue with the penal system.

8              THE COURT:  All right.  Now, you have been in the hot

9    seat as a witness.

10             JUROR NO. 42:  Yes.

11             THE COURT:  Were you fairly vigorously cross-examined

12   by the defense attorney?

13             JUROR NO. 42:  Extremely.

14             THE COURT:  Did you resent that or were you upset

15   with him?

16             JUROR NO. 42:  No, because it was his job.

17             THE COURT:  All right.  So I assume then that there

18   is nothing from your experience in that case either as a

19   witness, in court, or as a victim for a short period of time,

20   is there anything about those experiences that you think might

21   make it difficult for you to be an impartial judge in this

22   case?

23             JUROR NO. 42:  No.  Actually, I feel it makes me more

24   able to understand the situation and the process better.  I am

25   very interested.  It's something that is interesting to me.

212

1          THE COURT:  All right.  Thank you.  If you would just

2     step down, please.

3          NOTE:  Juror number 42 leaves the courtroom.

4          THE COURT:  Any further questions?

5          MR. KROMBERG:  No, Your Honor.

6          MR. MacMAHON:  No, Your Honor.

7          THE COURT:  Any cause issues?

8          MR. KROMBERG:  No, Your Honor.

9          MR. MacMAHON:  Not for the defense.

10          THE COURT:  All right, let's bring her back in.

11          NOTE:  Juror number 42 returns to the courtroom.

12          THE COURT:  Ma'am, thank you very much.  Your

13     insights were very interesting, and we are going to continue

14     you in the process for being considered for the final jury in

15     this case.

16          I know you will not be needed tomorrow because we are

17     still doing this process of other potential jurors.  I am

18     hoping we can start the trial Monday around 10 o'clock.  And

19     so, you need to sort of be thinking about that in terms of your

20     schedule.

21          JUROR NO. 42:  Certainly.

22          THE COURT:  If you will just call the contact number

23     we have given you for the court, the one that you got the

24     information about today's case.

25          JUROR NO. 42:  Certainly.

1          THE COURT:  And I am not sure by 6 o'clock today if

2     we will have a definitive answer.  Most likely it will be 6

3     o'clock tomorrow when we can tell you for certain.

4          In the meantime, avoid any media coverage.  Do not

5     conduct any investigation.  Obviously, don't discuss the case

6     with anyone.

7          We have given you a number in part because we want to

8     avoid the media trying to contact you.  If for any reason you

9     feel you have been contacted or someone has tried to, just let

10    us know.  All right?

11         JUROR NO. 42:  Yes, Your Honor.

12         THE COURT:  But you are free to go.  Thank you.

13         NOTE:  Juror number 42 leaves the courtroom.

14         THE COURT:  Number 45.

15         NOTE:  Juror number 45 enters the courtroom.

16         THE COURT:  Thank you for returning to court.

17         JUROR NO. 45:  No problem.

18         THE COURT:  Since filling out the questionnaire on

19    Monday, do you think there is anything you need to add to any

20    of your answers or any further explanation you want to give us?

21         JUROR NO. 45:  No.

22         THE COURT:  No?  All right.  Is there any additional

23    information that may not have been touched upon by the

24    questionnaire but you think we might want to know about in

25    terms of evaluating you for jury service in this case?

214

1        JUROR NO. 45:  No, I don't think so.

2        THE COURT:  Since Monday have you experienced any

3   media coverage or conducted any investigation concerning this

4   case?

5        JUROR NO. 45:  No.

6        THE COURT:  In terms of reconsidering the schedule,

7   the time commitment for this trial, is there anything in your

8   business or personal life that you think might be a conflict

9   for you or create a problem for you being here?

10       JUROR NO. 45:  Next week my husband is going to be

11  away on reserve duty.  And I have child care for the kids

12  during the day, but if there was any reason that we were --

13       THE COURT:  We wouldn't go past 6 o'clock, but I know

14  you live in Prince William County.  So realistically speaking,

15  you're not going to be getting home much before 7, I would

16  think.

17       JUROR NO. 45:  I have at-home child care, so it would

18  be okay.  But if for some reason we got sequestered or

19  something like that were to happen, then it would be a problem.

20       THE COURT:  No, this is not a sequestered jury.

21       JUROR NO. 45:  Okay.

22       THE COURT:  All right.  Now, will you have any

23  difficulty getting here by 9:30 in the morning from Prince

24  William County?  Because that is really when we want to try to

25  start the trial.

1              JUROR NO. 45:  I don't think so.  I can take the

2     train.

3              THE COURT:  You are going to take the train?

4              JUROR NO. 45:  Yes.

5              THE COURT:  All right.  You will need to check on

6     that.  We have had -- it's just fine, but we can't start until

7     all the jurors are here.

8              JUROR NO. 45:  Okay.

9              THE COURT:  All right.  I understand that you work

10    for the Administrative Office of the U.S. Courts?

11             JUROR NO. 45:  Yes.

12             THE COURT:  Do you feel in any respect that your

13    employment might create any conflict for you in being a judge

14    in this case?

15             JUROR NO. 45:  I don't think so.

16             THE COURT:  All right.

17             JUROR NO. 45:  I am a budget policy analyst, so I

18    don't know how that would impact.

19             THE COURT:  Can you speak a little closer to the

20    microphone.

21             JUROR NO. 45:  Oh, I am sorry.  I am a budget policy

22    analyst, so I don't know that that would have -- we look for

23    the money.

24             THE COURT:  You want to see how the AO spends its

25    money.  All right.  And your spouse works for the DEA.  Is he

216

1    an agent?

2            JUROR NO. 45:  No, he is an intelligence group

3    supervisor.

4            THE COURT:  So he does analysis?

5            JUROR NO. 45:  He supervisors a group of folks who do

6    that.

7            THE COURT:  All right.  You indicated in your answer

8    to question number 30 that you had some -- the parents of

9    neighbors were killed in the Egypt air crash -- which that is

10   not at all an issue in this case.

11           JUROR NO. 45:  Right.

12           THE COURT:  But that a friend of a friend lost her

13   son, a firefighter, in the World Trade Center.  Some of the

14   issues in this case are going to involve the events of

15   September 11.

16           Do you feel in any respect because you have a friend

17   who lost somebody, that that might affect your ability to be

18   impartial in judging this case?

19           JUROR NO. 45:  I don't think so.  It is sort of far

20   removed.  I just thought it would be necessary to put that on

21   there.

22           THE COURT:  That's fine, I would rather have jurors

23   give us too much than too little.

24           You indicated in your answer to number 71 that you

25   had a -- I think you described the person as a colleague who

217

1    you had worked with who discussed his Muslim faith with you.

2           JUROR NO. 45:  Oh, yes.

3           THE COURT:  And the context of his son who was dying,

4    I guess has since died of leukemia.

5           JUROR NO. 45:  Yes.

6           THE COURT:  Did those -- are you still a friend of

7    that person?

8           JUROR NO. 45:  We see each other occasionally, but we

9    don't have close contact anymore because I changed jobs.

10          THE COURT:  Did you form any impressions about Islam

11   on the basis of those discussions with that person?

12          JUROR NO. 45:  I just found it kind of interesting

13   the perspective that he had.  His son was very young.  And he

14   said when they went to Children's Hospital, his son was

15   suffering from leukemia, but then he said you could always see

16   how God had blessed you because there were people worse off

17   than you.  And I thought that was kind of interesting that he

18   felt his faith was so strong like that.

19          But otherwise, you know, I just thought it was

20   interesting.

21          THE COURT:  So I think the answer then is you don't

22   have any particularly positive or negative or certainly not

23   negative feelings about Islam?

24          JUROR NO. 45:  No.

25          THE COURT:  All right.  In question number 82 -- I am

218

1    sorry, that's not a problem.  I have jumped ahead here.

2              In question number 83 on the questionnaire, you gave

3    as an answer of:  Unsure.  The question was:  Do you believe

4    that sometimes innocent people are convicted of crimes they did

5    not commit?

6              Can you explain what you meant by an unsure answer

7    there?

8              JUROR NO. 45:  I really am not sure because you hear

9    people say, oh, yeah, people are accused of crimes they haven't

10   done and, you know, you end up hearing with the death penalty

11   that some innocent people are found innocent through the DNA

12   Project because later something, you know, is found out.  You

13   know, evidence is tested.

14             So, you know, those people were convicted of a crime,

15   they are on death row, and then they end up coming off because

16   of evidence that was found later or the evidence was

17   reanalyzed.

18             So I have heard of that.  And that's what I mean,

19   kind of unsure about it.

20             THE COURT:  All right.  And question number 87 asked

21   you:  Would you evaluate the testimony of a criminal defendant

22   in the same manner as you would the testimony of other

23   witnesses?  And you put:  Unsure.

24             And then you went on to say:  They would have reason

25   to want things to turn out in their favor.

1          Can you just explain a little bit more what you meant

2   by that answer.

3          JUROR NO. 45:  I guess I would -- I guess I would be

4   a little bit -- I don't know.  I think if the person was

5   accused of something very bad, if they tried to explain

6   themselves, it might not be -- you know, they would have a good

7   reason to lie, if they needed to, you know.  That's the only --

8          THE COURT:  All right.  If you don't mind, just step

9   down, please.

10          JUROR NO. 45:  Sure.

11          NOTE:  Juror number 45 leaves the courtroom.

12          THE COURT:  Any follow-up -- any further questions?

13          MR. KROMBERG:  No, Your Honor.

14          THE COURT:  How about from you, Mr. MacMahon?

15          MR. MacMAHON:  No, Your Honor, no further follow-up

16   from that last one.

17          THE COURT:  I am sorry.

18          MR. MacMAHON:  No, no, Your Honor.  Excuse me.

19          THE COURT:  All right.  Any argument about cause

20   here?

21          MR. KROMBERG:  No, Your Honor.

22          MR. MacMAHON:  Yes, Your Honor, if she is not going

23   the fairly listen to the testimony of the defendant.  She said

24   that if he testified, he would have a reason to lie.  She

25   doesn't have the same feeling about a law enforcement officer

220

1   who may be interested in getting a conviction.

2           THE COURT:  You know, it is interesting.  I was

3   thinking about that question as I look at this thing.  You

4   know, the standard jury instruction says, one of the things you

5   do look at is the degree to which any witness might be affected

6   by the outcome of the case.  And clearly the defendant will be

7   affected by the outcome of the case.

8           I don't see her answer to that question necessarily

9   meaning she is not qualified to be a juror.

10          MR. MacMAHON:  I think it is something that I

11  shouldn't have to worry about, a juror saying she is sure a

12  defendant is going to lie when he testifies when I try to make

13  a decision whether to put the defendant on the stand.  No other

14  juror has given that answer.  They have all said that they

15  would assume them altogether.

16          Everybody has interests when they testify in a case,

17  but not this specific answer with respect to a defendant.  It

18  has some constitutional implications to it as well.

19          So the defense would ask that she be stricken.

20          THE COURT:  All right, let's bring her back in.

21          NOTE:  Juror 45 returns to the courtroom.

22          THE COURT:  Ma'am, we are going to go ahead and

23  excuse you from further jury consideration.  You are free to go

24  at this point.  We thank you for coming today.

25          If you would just check in with the Clerk's Office on

221

1    your way out.  All right?  Thank you.

2              NOTE:  Juror number 45 leaves the courtroom.

3              THE COURT:  Number 58.

4              NOTE:  Juror number 58 enters the courtroom.

5              THE COURT:  Thank you, ma'am, for coming back to

6    court this afternoon.  Since filling out the questionnaire on

7    Monday, have you had any reconsideration of any of your answers

8    or felt that you wanted to add any additional explanations to

9    any of the answers?

10             JUROR NO. 58:  No.  I think I put down -- my age is

11   incorrect, but other than that, I think I was fine.

12             THE COURT:  We won't hold that against you.  Is there

13   any additional information that might not have been covered by

14   the questionnaire but you think might be relevant to our

15   considering you for service on this jury?

16             JUROR NO. 58:  Nothing further, no.

17             THE COURT:  All right.  Since Monday have you been

18   exposed to any media coverage or done any investigation into

19   this case?

20             JUROR NO. 58:  No.

21             THE COURT:  And how about the time commitment, do you

22   have any reconsideration as to whether you can sit as a juror

23   in this case?  In particular, any business or family matters

24   that have come up that you think might create a problem for

25   you?

222

1          JUROR NO. 58:  No, Your Honor.

2          THE COURT:  All right.  Now, I do see that you live

3    in Stafford County.

4          JUROR NO. 58:  Yes.

5          THE COURT:  And you're a substitute teacher, is that

6    right?

7          JUROR NO. 58:  Yes, I am, part-time.

8          THE COURT:  First of all, I assume then, if you're

9    not on call, there is not a problem?

10         JUROR NO. 58:  That is correct.

11         THE COURT:  All right.  And do you see any problem in

12   being able to get here by 9:30 from where you live?

13         JUROR NO. 58:  No.  It takes about an hour-and-a-half

14   and --

15         THE COURT:  All right.

16         JUROR NO. 58:  -- I will plan accordingly.

17         THE COURT:  In your answer to question number 41, in

18   which you were asked the following:  This case involves charges

19   related to potential acts of terrorism.  Would that in any

20   respect make it difficult for you to be impartial or fair in

21   judging this case?

22         And your answer was:  Not sure.  The matter is very

23   difficult by it's very definition.

24         Can you explain more what you meant by that answer.

25   Because the question we're asking is, can you be fair and

223

1   impartial given the nature of the issues?

2         JUROR NO. 58:  Right.  I am pretty sure I can be fair

3   and impartial, but I guess I was reading into it as a more

4   emotionally charged word, "terrorism," and how that certainly

5   evokes emotion.

6         But as far as being fair and impartial, I think I can

7   retain that.

8         THE COURT:  All right.  In your answer to question

9   number 72 you were asked if you have any feelings either

10  positive or negative about Muslims or the Islamic faith.

11        And you said:  From the little I know, I think the

12  majority are very moral, I just disagree theologically.

13        Again, can you explain a little bit more what you

14  meant by that answer.

15        JUROR NO. 58:  Disagreeing theologically just in

16  terms of my beliefs as a Christian and how they relate to my

17  view of God differ.  I know they differ than how the Muslims

18  view God.

19        THE COURT:  Do you have any friends or close

20  associates who are Muslim, to your knowledge?

21        JUROR NO. 58:  No.

22        THE COURT:  Has your church ever done any exchange

23  programs with Muslims?

24        JUROR NO. 58:  Well, actually, our church does have a

25  meeting with a mosque in Manassas.  I don't know the name of

224

1   the mosque, but several times a year, three or four times a

2   year they have an interchange of ideas called a meeting for

3   better understanding.  And I have not attended any of those

4   meetings.  My daughter has and has enjoyed them.

5          THE COURT:  Is there a particular reason why you

6   haven't gone to those meetings?

7          JUROR NO. 58:  Just haven't made the time to do it,

8   but I am interested.  And since my daughter is getting more

9   interested, I think I should probably join in too sometime.

10         THE COURT:  So sometimes she maybe talks to you about

11  what happens at those sessions?

12         JUROR NO. 58:  Not at length, no, she has not.

13         THE COURT:  Okay.  You were asked in question number

14  82:  Do you believe that if the prosecution goes to the trouble

15  of bringing someone to trial, he or she is probably guilty?

16  And you checked:  Unsure.

17         And then you said:  They must certainly think the

18  person is guilty, but that does not mean he is.

19         Can you just explain a little bit more your answer.

20         JUROR NO. 58:  I'm sure that an individual has been

21  investigated for some reason, and you would hope and trust that

22  the law enforcement agents are doing it in an honorable way and

23  with integrity, and yet you have to realize that things aren't

24  always what they seem.

25         THE COURT:  All right.  And so, that means that you

225

1    have an open mind when you come into court as to whether a

2    person who has been charged is innocent or guilty, is that

3    correct?

4            JUROR NO. 58:  Well, I would be charged to do that,

5    so I would do my best to do that, yes.

6            THE COURT:  But in your heart of hearts, which is

7    what we are looking at, would you be comfortable in performing

8    that role?  That's what we mean by an objective and neutral

9    juror.

10           JUROR NO. 58:  I think so.

11           THE COURT:  In your answer to question number 85,

12   that question was:  Do you believe that the law does too much

13   to protect the rights of criminal defendants and not enough to

14   protect the rights of criminal victims and their families?  And

15   again you checked:  Unsure.

16           And you said:  No experience here to have a

17   formulated an opinion.

18           Is there anything you want to add to that answer?

19           JUROR NO. 58:  No.  I am just not familiar with that

20   particular line of thinking because I haven't thought it

21   through and I haven't really done any reading on it.

22           THE COURT:  All right, that's fine.  If you would

23   step outside for just a second, we are going to see whether or

24   not we have anything further.

25           NOTE:  Juror number 58 leaves the courtroom.

226

1              THE COURT:  Any additional questions?

2              MR. KROMBERG:  No, Your Honor.

3              THE COURT:  How about from the defense?

4              MR. MacMAHON:  None from the defense, Your Honor.

5              THE COURT:  Any cause issues?

6              MR. MacMAHON:  None for the defense either, Your

7    Honor.

8              MR. KROMBERG:  No, Your Honor.

9              THE COURT:  All right, let's call this juror back in.

10             NOTE:  Juror number 58 returns to the courtroom.

11             THE COURT:  Ma'am, you're going to be continued in

12   the process for final selection on this jury.  We have one more

13   round, so to speak.

14             We're not going to need you tomorrow at all, and you

15   can leave today in a second.  But it's possible the trial will

16   begin on Monday with the very final round of jury selection.

17   And then if you are chosen, we would go right into the trial.

18             You will find out about what is going on by just

19   continuing to check that phone number that you checked for

20   today's session.  If you call after 6 o'clock today, we may not

21   -- I don't know if we'll have an answer for you yet, but I know

22   by 6 o'clock tomorrow we will.  So you just need to check with

23   that phone number.

24             In the meantime, please do not discuss this case with

25   anyone.  Do not do any research.  And avoid any media coverage.

1    All right?

2          Lastly, we've given you a number.  You may wonder why

3    we haven't called you by name.  We are just trying to minimize

4    the chance that the media may try to get ahold of you.  And so,

5    by just giving you number, it makes it more difficult.  No one

6    should be contacting you about this case.  If you get any

7    contact, you should let us know right away.

8          JUROR NO. 58:  Okay.

9          THE COURT:  Thank you, you are excused.

10         NOTE:  Juror number 58 leaves the courtroom.

11         THE COURT:  Number 65.

12         MR. MacMAHON:  Your Honor, just one second before she

13   leaves.

14         THE COURT:  Mr. Wood, just hold the juror one second.

15         MR. MacMAHON:  Thank you, Your Honor.  This

16   witness -- excuse me, this juror is a partner at Winston &

17   Strawn downtown --

18         THE COURT:  Number 65?

19         MR. MacMAHON:  He is coming.  I just wanted to make

20   that disclosure to the Court.  I don't know whether I have ever

21   met him before or not, but Tom Buchanan, Hiebert and Molster,

22   Chip Molster, they are old friends of mine, they are all with

23   that firm.  I just wanted to let the Court know that before

24   anything.  I didn't want to bring it up in front of the jury.

25         THE COURT:  I have got it.

228

1              MR. MacMAHON:  Thank you, Your Honor.

2              NOTE:  Juror number 65 enters the courtroom.

3              THE COURT:  Thank you for coming to court this

4   afternoon, sir.

5              Since filling out the questionnaire, have you had a

6   chance to think about whether there is anything you would like

7   to add to any of the answers or any additional explanation for

8   any of the answers?

9              JUROR NO. 65:  No, ma'am.

10             THE COURT:  All right.  Is there any additional

11  information that might not have been covered by the

12  questionnaire that you think might be relevant to our

13  evaluation of you for jury service in this case?

14             JUROR NO. 65:  I can't think of any.

15             THE COURT:  All right.  Since Monday have you

16  conducted any investigation or been exposed to any media

17  coverage about this case?

18             JUROR NO. 65:  No.

19             THE COURT:  And again, given the time commitment, has

20  anything developed in either your work or family situation that

21  you think could be a problem in terms of the trial commitment?

22             JUROR NO. 65:  No, ma'am.

23             THE COURT:  All right.  I understand that you are an

24  attorney?

25             JUROR NO. 65:  Yes, ma'am.

229

1          THE COURT:  And you practice with Winston and Strawn

2    in the city, is that correct?

3          JUROR NO. 65:  That's correct.  Through today.

4          THE COURT:  This is your last day?

5          JUROR NO. 65:  I have resigned effective today.

6          THE COURT:  Do you mind if I ask you where you are

7    going from here?

8          JUROR NO. 65:  One of my clients has asked me to work

9    for them full-time.

10         THE COURT:  So you are going in-house?

11         JUROR NO. 65:  Well, I am going to be outside --

12   inside/outside counsel.  I may probably hang my shingle in a

13   small shop, but work for them principally.

14         THE COURT:  All right.  The area of law that you

15   practice is what exactly?

16         JUROR NO. 65:  Corporate and project finance.

17         THE COURT:  All right.  Have you ever done any

18   criminal work as a lawyer?

19         JUROR NO. 65:  No, ma'am.

20         THE COURT:  Even white collar?

21         JUROR NO. 65:  No.

22         THE COURT:  All right.  You know that if you were

23   chosen to be a juror in this case, one of the concerns I always

24   have with lawyers being in the jury is we don't want a shadow

25   judge in that respect in the jury box.

230

1          Number one, if I were to instruct on a principle of

2    law that you might disagree with, back from your law school

3    days when you studied criminal law or evidence, can you put

4    aside your personal view of the law and follow the instructions

5    of the Court?

6          JUROR NO. 65:  I could.

7          THE COURT:  And would you be willing not to answer

8    fellow jurors' questions about -- if they had a law question,

9    and tell them that they would have to ask me and they can't ask

10   you?

11         JUROR NO. 65:  Yes, ma'am.

12         THE COURT:  No problem with that at all?

13         JUROR NO. 65:  Yes.  And it has been a long time

14   since I took criminal law, so I don't think I would be up on

15   the subject.

16         THE COURT:  How much trial courtroom experience do

17   you have?

18         JUROR NO. 65:  The only experience I have had

19   professionally has been in sitting in on a motion.  It related

20   to a transactional matter that I was involved in some years

21   ago.

22         THE COURT:  All right.  Now, did I read correctly in

23   your questionnaire that you were perhaps in the past interested

24   in employment with the Homeland Security office?

25         JUROR NO. 65:  A friend of mine last year mentioned

1  to me that he was talking with a friend of his who was at

2  Homeland Security, and I had been talking to him at the time

3  about considering doing other things.  He said, well, why don't

4  you shoot a resumé over to them.  Which I did referencing my

5  conversation with my friend.  And nothing ever came of it.

6  Nobody followed up with me, I didn't follow-up.

7          THE COURT:  In any respect do you feel that the way

8  in which that application was handled, that might harbor any

9  ill-will towards the government or any of those agencies?

10          JUROR NO. 65:  No, ma'am.

11          THE COURT:  All right.  And then it indicates here

12  that you had also applied for what I will call some security

13  agency-type positions before law school, and you had some

14  interviews.

15          Did you get any offers from those agencies?

16          JUROR NO. 65:  No, it hadn't developed to that stage.

17  When I got out of undergraduate school, I came to Washington,

18  worked for a short time for one of the Washington think tanks,

19  CSIS, and I had applied to several agencies.  At the same I had

20  applied to law school.  And I think at the time I had had my

21  interviews, I had received my acceptance to UVA.  And I simply

22  informed them that I wasn't going to pursue the interviews any

23  further.

24          THE COURT:  All right.  Given the nature of the

25  issues in this case involving allegations of connections to

232

1    terrorism and waging war against the United States, is there

2    anything about this case that gives you concern that you

3    couldn't be impartial in judging it?

4            JUROR NO. 65:  No, ma'am.

5            THE COURT:  You didn't indicate, but I just want to

6    double-check, you didn't have any friends or family members or

7    neighbors, to your knowledge, injured at the Pentagon or

8    involved in any of that?

9            JUROR NO. 65:  No, ma'am.

10           THE COURT:  All right.

11           JUROR NO. 65:  I think I did answer that in the

12   questionnaire.

13           THE COURT:  You may have.  I have been through so

14   many of these recently.  In question 71, which asked you about

15   whether you knew anybody who practiced Islam, you indicated

16   that you have known individuals over the years who are Muslim,

17   but you have not had any discussions with them about their

18   faith.

19           And they have not raised the issues with you?  It has

20   never come up?

21           JUROR NO. 65:  No, it has been, excuse me, very

22   limited contact.  I think the only context in which I really

23   had discussions -- and frankly, it may not have even been with

24   Muslims.  It has been about issues of Shariah law in places

25   like Qatar or elsewhere in granting a security interest because

1    there is a distinction between Islamic law and U.S. or what we

2    say Western legal regimes on taking a security interest in

3    property and that sort of thing.

4            THE COURT:  Okay.  Now, the fact that you're starting

5    a new position whether it's in-house or out-house, would that

6    in any respect be a problem for you for the next two or three

7    weeks if you were tied up in this trial?

8            JUROR NO. 65:  I don't see so.  I don't believe so.

9            THE COURT:  You don't think you're going to be pulled

10   upon at night after you have been -- if you were chosen to be a

11   juror in this case, sit here all day and then have to do

12   several hours of legal work of night?

13           JUROR NO. 65:  I don't think it will be several

14   hours.  But I am sure there may be phone calls with a client or

15   two, but I don't imagine it taking that much time.

16           THE COURT:  All right.

17           JUROR NO. 65:  In one sense, there is a luxury

18   because I am just transitioning without getting fully involved

19   in the matters of these clients.

20           THE COURT:  All right.  Thank you.  If you would step

21   outside for a second.

22           NOTE:  Juror number 65 leaves the courtroom.

23           MR. KROMBERG:  Judge, I do have a question.

24           THE COURT:  Yes, sir.

25           MR. KROMBERG:  On number 21, the question was:  Do

234

1   you have an opinion regarding establishing Shariah in the

2   United States.  And he said, yes, he has an opinion, but he

3   didn't really say what it was.  And I first thought that was

4   because he didn't really know about Shariah, but he obviously

5   does.

6            THE COURT:  He obviously does, about security

7   interests, yeah.

8            MR. KROMBERG:  So I would ask the Court to inquire

9   could he tell us what his opinion is on regarding establishing

10  Shariah in the United States.

11           THE COURT:  All right.  Anything from the defense?

12           MR. MacMAHON:  No, no, follow-ups, Your Honor.  I am

13  not going to object to the question.  I am not sure -- I think

14  I know what the answer is going to be.

15           THE COURT:  I would suspect I do too, but let's see.

16           NOTE:  Juror number 65 returns to the courtroom.

17           THE COURT:  You can just stay there.  In a noise,

18  loud voice, sir, there was one other question.  You were asked

19  about your opinion regarding the establishment of Shariah law

20  in the United States.  And you indicated that you have an

21  opinion, but you support the Constitution and the Bill of

22  Rights and the principles supporting them.

23           Can you just be more explicit.  What is your opinion

24  about Shariah law in the United States?

25           JUROR NO. 65:  Well, I must admit, I don't much about

235

1    Shariah law.  And, therefore, what I do know is the

2    Constitution and the Bill of Rights and our legal system, which

3    I feel perfectly comfortable with.

4            So I can't take specific exception on Shariah law

5    points other than the fact that what I do know, I support, and

6    it seems to work well.

7            THE COURT:  All right, thank you.  Just step outside

8    one more second, please.

9            NOTE:  Juror number 65 leaves the courtroom.

10           THE COURT:  Is there any objection to this juror?

11           MR. MacMAHON:  None for the defense, Your Honor.

12           MR. KROMBERG:  No, Your Honor.

13           THE COURT:  All right.  Let's have him come back in.

14           NOTE:  Juror number 65 returns to the courtroom.

15           THE COURT:  Sorry for all the back and forth.  I

16    think this is still the best way we can do this.

17           You're still being considered for service on this

18    jury.  We're not going to need you tomorrow, so you can plan

19    your life without any worry about the Court.

20           There is a decent possibility that the case will

21    actually start Monday with the very final jury selection.

22    There wouldn't be any more questioning, it would just be

23    exercising of peremptories.

24           And so, you will know for certain by calling the

25    court number that you have been calling, most likely after 6

236

1    o'clock tomorrow.  I won't know for certain until then.

2             Please continue to follow my directions not to

3    discuss this case with anyone, not to conduct any investigation

4    whatsoever.  Don't go looking up Shariah law, you don't need to

5    know it at this point.  Don't expose -- don't listen to any

6    media coverage if there is any.

7             And we have been using numbers for our jurors to

8    minimize any possibility the media may try to interview

9    witness -- I am sorry, interview jurors.  So no one should be

10   contacting you.  But if you have any contact, please call us

11   right away.

12            Thank you.  You are excused to go at this time.

13            NOTE:  Juror number 65 leaves the courtroom.

14            THE COURT:  All right.  Number 69.  And I believe, if

15   my count is correct, we have 21 qualified jurors at this point.

16   So we're doing quite well.

17            NOTE:  Juror number 69 enters the courtroom.

18            THE COURT:  All right, ma'am, thank you for coming

19   back to court today.

20            Since filling out the questionnaire on Monday, is

21   there anything you would like to add to any of your answers or

22   any additional information in any of your explanations?

23            JUROR NO. 65:  I think the only additional thing that

24   I left out on there was I am a school teacher in an SOL year,

25   and SOLs are coming up the end of May.  And it is very key for

1   me to be in the classroom right now.

2             THE COURT:  Well, I was wondering about that, that

3   was going to be one of my questions.  What grade do you teach?

4             JUROR NO. 65:  I teach third grade.

5             THE COURT:  And they can't get a substitute for you

6   for two or three weeks if you were to be a juror in this case?

7             JUROR NO. 65:  I can get a substitute.  It's just

8   whether that substitute is capable of performing everything

9   that I need to be done to the degree that I would like it to be

10  done.

11            THE COURT:  Well, if you were chosen to be a juror

12  and they put I guess a temporary permanent sub in for that time

13  period, would you have to be working much with that sub?

14            JUROR NO. 65:  Yes.

15            THE COURT:  And would that be on a day-to-day basis,

16  or could that be done on the weekend to prepare that person for

17  the following week?

18            JUROR NO. 65:  It would depend upon the person.  It

19  would probably be done either on the weekend or on the

20  evenings, during the evenings.  But it would be -- I would plan

21  weekly.  I would plan ahead for the whole -- at least two weeks

22  ahead.

23            THE COURT:  Well, the trial is likely to start this

24  coming Monday.

25            JUROR NO. 65:  Right.

238

1          THE COURT:  And you probably won't -- it is still not

2   a guarantee even if you come back here on Monday you will be

3   one of final jurors, but the likelihood increases.  Which means

4   you might have to spend this weekend preparing.

5          JUROR NO. 65:  Right.

6          THE COURT:  How much time really would that take for

7   you to do, to prepare the sub?

8          JUROR NO. 65:  Well, I have an idea of where I'm

9   going, it's just laying out all of the plans.  It will probably

10  take just a full day to do.

11         THE COURT:  Does it help at all if one day next week

12  you were not here?  Friday I know next week we will not be

13  sitting.

14         JUROR NO. 65:  Okay.

15         THE COURT:  Would it work with the sub, that that

16  person would be there Monday through Thursday, and then you

17  would go back in on Friday?

18         JUROR NO. 65:  Actually, the longer the sub can be

19  there, if I have a long-term sub, it is better for the students

20  to just have a continuous basis to not throw them off.

21         THE COURT:  All right.  And this third grade class

22  that you have, is it general ed, special ed?

23         JUROR NO. 65:  It's general ed, but the majority of

24  my class are ESL students.

25         THE COURT:  So they have special issues?

239

1              JUROR NO. 65:  Yes.

2              THE COURT:  Do you handle the ESL aspect of their

3   training?

4              JUROR No. 65:  I see them -- they leave my classroom

5   for a hour a day for language arts, and they are in there the

6   rest of the time.

7              THE COURT:  All right.  You indicated in your answer

8   to question number 30 that the father of one of your students

9   was killed, as I understand it, on September 11 in the

10  Pentagon?

11             JUROR NO. 65:  Yes, ma'am.

12             THE COURT:  And were you involved in counseling that

13  student?

14             JUROR NO. 65:  No, ma'am.

15             THE COURT:  That was third grade in those days too?

16             JUROR NO. 65:  No, that was second grade.

17             THE COURT:  Second grade.  Is there anything about

18  that student's experience and your involvement with that

19  student and the nature of the issues in this case that gives

20  you any concern that you might have problems being impartial in

21  this case?

22             JUROR NO. 65:  I don't think so.

23             THE COURT:  Now, some of the evidence in this case

24  may involve witnesses' statements about cheering the facts that

25  these events occurred on September 11, indicating America

1   deserved it.  There may be documents, e-mails, et cetera, that

2   praise the events.

3            Do you think that type of evidence in this case might

4   make it difficult for you to be impartial in judging the case?

5            JUROR NO. 65:  Well, obviously, being a U.S. citizen,

6   I think that I would definitely show some partiality there, but

7   I would try to view it fairly.

8            THE COURT:  All right.  You indicated in numbers 28

9   and 29 that you have some very close friends who have just

10  come, I guess come back from Iraq.  And you also, your father's

11  best friend was killed in Iraq at the end of the Gulf War.

12           Do either of those two situations in your mind, do

13  you think they might affect your ability to judge this case?

14           JUROR NO. 65:  No, I don't think so.

15           THE COURT:  There are allegations in this case of

16  efforts to incite other people to take arms up against the

17  United States.

18           Do you think in any respect those types of

19  allegations might make it difficult for you to be impartial in

20  judging the case?

21           JUROR NO. 65:  Again, probably the same with my

22  previous answer about being a U.S. citizen.  But other than

23  that, no.

24           THE COURT:  All right.  You indicated that your

25  husband is an EMT, correct?

241

1                    JUROR NO. 65:  Yes.

2                    THE COURT:  And he was involved in some of the rescue

3      efforts at the Pentagon?

4                    JUROR NO. 65:  Yes.

5                    THE COURT:  I assume he talked to you about those

6      efforts?

7                    JUROR NO. 65:  We have talked briefly about them, but

8      he does not elaborate a whole lot on them.  He has talked to

9      other people about it when I have been present.

10                   THE COURT:  Did he ever have to get counseling

11     himself?  A lot of the EMT people did in those cases as a

12     result of that.

13                   JUROR NO. 65:  Yes, ma'am, I believe that he did.

14                   THE COURT:  And do you think in any respect, again

15     because of that kind of personal involvement on your family's

16     part, that the nature of the issues in this case might make it

17     difficult for you to be impartial in judging it?

18                   JUROR NO. 65:  No, ma'am.  I did not know him at that

19     time.  And so, it has been after the fact, well after the fact.

20                   THE COURT:  All right.  You served on a jury in 1997,

21     is that right?

22                   JUROR NO. 65:  Yes.

23                   THE COURT:  Was that here in Virginia?

24                   JUROR NO. 65:  Yes.

25                   THE COURT:  Fairfax County?

1              JUROR NO. 65:  Yes, ma'am.

2              THE COURT:  Now, that was civil case or a criminal

3    case?

4              JUROR NO. 65:  It was a civil case.

5              THE COURT:  And somebody was charged with being

6    negligent?

7              JUROR NO. 65:  Yes.

8              THE COURT:  What was the nature of the negligence, if

9    you remember?

10             JUROR NO. 65:  It was traffic accident.

11             THE COURT:  And was somebody hurt?

12             JUROR NO. 65:  Yes.  A back injury.

13             THE COURT:  Okay.  Do you remember how many people

14   were on that jury?

15             JUROR NO. 65:  I believe it was nine.

16             THE COURT:  Nine people?

17             JUROR NO. 65:  I believe so.

18             THE COURT:  All right.  And you found the defendant

19   liable and awarded damages, is that right?

20             JUROR NO. 65:  Yes.

21             THE COURT:  What did you think about the trial, the

22   court process in general as a juror?  Do you think the system

23   worked well in that case?

24             JUROR NO. 65:  I do.  I think it was a fair

25   assessment.

1           THE COURT:  And was there much deliberation in the

2      jury?  Was there much disagreement about whether the person was

3      liable for the accident or how much damages should be given?

4           JUROR NO. 65:  No.  We were pretty much all in

5      agreement.  And there was very -- maybe -- very little

6      deliberation.

7           THE COURT:  All right.  In paragraph 85 of the

8      questionnaire you were asked:  Do you believe that the law does

9      too much to protect the rights of criminal defendants and not

10     enough to protect the rights of crime victims and their

11     families?  And you said yes.

12          Can you explain your answer a little bit more.

13          JUROR NO. 65:  Well, I just think that we have a very

14     good justice system.  And I believe that depending upon the

15     lawyer that you get, they can find you innocent or guilty when

16     it's actually the opposite.

17          THE COURT:  Okay.  Now, the question though was

18     asking you whether you think there is too much protection of

19     the rights of criminals.

20          Do you feel that the criminal justice system overly

21     protects the rights of people who are charged with crime?

22          JUROR NO. 65:  Oh.  No.

23          THE COURT:  Do you feel that victims are shortchanged

24     in the legal system?

25          JUROR NO. 65:  I think overall that we try to -- the

244

1    legal system tries to judge each case fairly.

2              THE COURT:  All right.  All right, if you would step

3    outside for a minute, please.

4              NOTE:  Juror number 65 leaves the courtroom.

5              MR. KROMBERG:  No questions, Judge.

6              THE COURT:  All right.

7              MR. MacMAHON:  No questions, Your Honor.

8              THE COURT:  Any concerns?

9              MR. KROMBERG:  No challenges, Judge.

10             MR. MacMAHON:  Your Honor, the defendant would move

11   to strike this juror for cause.  She said, first of all, there

12   is the issue of her hardship and the students --

13             THE COURT:  It is not her hardship, it would be the

14   third graders.

15             MR. MacMAHON:  I understand.  But the bigger issue I

16   think is -- I mean, that's for the jurors to decide, whether

17   they have a hardship, I understand, Your Honor.

18             But the issue, she said twice that she would show

19   some partiality to the Government because of the charges in the

20   case.

21             And the Court asked her another question about it.

22   And she said, yes, I would show some partiality.  One because

23   of the issue of terrorism, the other one because of the issue

24   of waging war.

25             And he is entitled to an impartial juror, not one

245

1    that just has minimal partiality or some partiality.

2              THE COURT:  Well, I am more concerned, frankly, about

3    the problem of elementary school kids being deprived of their

4    teacher in SOL season.  That is such a dicey thing these days.

5              And I think I am going to err on the side of caution

6    in this case and go ahead and grant your request to excuse this

7    juror.

8              MR. MacMAHON:  Thank you, Your Honor.

9              NOTE:  Juror number 65 returns to the courtroom.

10             THE COURT:  Ma'am, I want to thank you for your

11   attendance.  In considering your whole overall situation, I am

12   concerned about the SOL program.  And we are going to go ahead

13   and excuse you.

14             Just check out with the Clerk's Office when you leave

15   here and let them know that you have been excused as a juror.

16   Thank you.

17             JUROR NO. 65:  Okay.  Thank you very much.

18             NOTE:  Juror number 65 leaves the courtroom.

19             THE COURT:  Juror number 78 is the last juror we have

20   in this first batch.  And I think then since it has been a long

21   day, we're going to take a slightly longer midafternoon break,

22   and then we will finish up the rest of the group.  All right?

23             NOTE:  Juror number 78 enters the courtroom.

24             THE COURT:  Good afternoon, sir.  Thank you for

25   coming back to court.

246

1             Since filling out the questionnaire on Monday, have

2      you thought about any additional information in any of your

3      answers or anything in addition that you would like for us to

4      know about before we evaluate you?

5             JUROR NO. 78:  No, ma'am.

6             THE COURT:  No?  All right.

7             JUROR NO. 78:  Not at this time.

8             THE COURT:  Have you had any exposure to any media

9      matters concerning this case or conducted any investigation

10     since Monday?

11            JUROR NO. 78:  No, ma'am.

12            THE COURT:  All right.  Has anything changed in

13     either your work or family situation that would create a time

14     problem for you or a conflict of any kind?

15            JUROR NO. 78:  No, ma'am, it hasn't.

16            THE COURT:  All right.  Now, you live in Stafford

17     County.  I have been asking this question for those people who

18     have long commutes.

19            JUROR NO. 78:  Yes, I do.

20            THE COURT:  But do you think that in any respect you

21     would have problems being here by 9:30 in the morning given

22     that commute?

23            JUROR NO. 78:  No, ma'am.

24            THE COURT:  Where is your current employment

25     location?

1          JUROR NO. 78:  Current employment location is right

2     off 395, two-and-a-half miles south of the Pentagon.  So it's

3     in the Shirlington area.

4          THE COURT:  All right, that's fine.  And you do -- I

5     can't quite tell what you do.  National Strategies Support.

6     Can you just give us an idea of that entails.

7          JUROR NO. 78:  I am basically a defense contractor.

8          THE COURT:  All right.

9          JUROR NO. 78:  I am retired Air Force.  And I am

10    currently vice-president and a director of a group, a business

11    sector within our company that does a lot of -- they are all

12    government contracts, primarily with DoD, Department of

13    Defense.

14         THE COURT:  Are you supporting any of the efforts in

15    Iraq or Afghanistan right now?

16         JUROR NO. 78:  Not directly.

17         THE COURT:  All right.  As you know, this case

18    involves allegations connected with September 11, and more

19    specifically some allegations that efforts were being made to

20    recruit people to wage war against the United States.

21         Given your past experience with the military and your

22    current work as a military contractor, do you feel in any

23    respect that the nature of the allegations in this case and

24    your background might make it difficult for you to be

25    completely impartial in judging this case?

1              JUROR NO. 78:  The short answer is yes, ma'am.  I

2    tried to describe that in the questionnaire too where it is

3    hard -- I know a lot of information based on my background and

4    my current work.  Which means basically I would have to attempt

5    to try to forget whatever I know.

6              And so, it's a qualified yes as in I don't know how I

7    would be in that situation, to anticipate, but I do know a lot

8    about current operations and what's going on based on my

9    contract base.

10             THE COURT:  Well, most of the events that are

11   involved in the allegations in this case I think are in the

12   immediately post-September 11 up through probably 2003, maybe

13   -- are we into 2004 in this case too, the allegations?

14             MR. KROMBERG:  No, Your Honor, the last --

15             THE COURT:  Spring of 2003.

16             MR. KROMBERG:  Spring of 2003.

17             THE COURT:  So were you in that consultant position

18   in that time frame?

19             JUROR NO. 78:  Yes, ma'am, I was.  I retired on

20   August of '99.

21             THE COURT:  So I would assume then you were somewhat

22   involved in matters after September 11?

23             JUROR NO. 78:  Yes, I was.

24             THE COURT:  Okay.  And if I understand you correctly,

25   and that's an honest answer, you are not sure you could

249

1   separate --

2           JUROR NO. 78:  Honestly, I am not sure.  I mean, I

3   feel like I could, I would like to think I could, but I am not

4   sure.

5           THE COURT:  All right.  If you would step outside for

6   just a second, please.

7           NOTE:  Juror number 78 leaves the courtroom.

8           THE COURT:  I think based on that answer, I will

9   excuse this juror unless there is any objection.

10          MR. MacMAHON:  None from the defense, Your Honor.

11          THE COURT:  All right.  We will go ahead and excuse

12  him.

13          NOTE:  Juror number 78 returns to the courtroom.

14          THE COURT:  I think, sir -- thank you for your

15  honesty.  That last answer I think suggests that we should go

16  ahead and just excuse you.  But we thank you for your

17  attendance.

18          All right.  You are free to go at this point.

19          NOTE:  Juror number 78 leaves the courtroom.

20          THE COURT:  All right.  By my count, we have ten

21  remaining jurors downstairs.  And that will be it for today.

22  So we're doing quite well.

23          I want to take about a -- I will give you all a

24  12-minute break.  Is that enough time?  I hope you got lunch.

25  You want a little bit more than?

250

1          MR. KROMBERG:  No, Judge, I am all in favor of

2    getting this done.

3          THE COURT:  Accomplished.  Because some of these

4    jurors have been sitting here now since well before 2 o'clock.

5          MR. KROMBERG:  Your Honor, you're doing all the work

6    here.  And if you can do it, we can sit here.

7          THE COURT:  Is that all right for the defense?

8          MR. MacMAHON:  Your Honor, maybe a little bit longer.

9    Dr. Al-Timimi also would like to pray.  We have gotten to that

10   time.  It might take him a couple minutes to do that as well.

11         THE COURT:  All right.  How about until 4 o'clock?

12         MR. MacMAHON:  That's very generous, Your Honor.  I

13   think we can do five of if you want us to negotiate with you.

14         THE COURT:  Five of, that's fine.

15         All right, we will recess court.

16         MR. MACMAHON:  Thank you.

17         NOTE:  At this point a recess is taken; at the

18   conclusion of which the case continues in the presence of a new

19   group of potential jurors as follows:

20   JURY PANEL IN

21         THE COURT:  Good afternoon, ladies and gentlemen.  I

22   know you have been waiting patiently since 2 o'clock, this

23   process just takes a little extra time.  We are going to be

24   able finally get to you all.

25         We are just going to call attendance to make sure

251

1    that everybody we think is here is here.  And we are just going

2    to call your number.  When you hear your number, if you will

3    just stand and say "here" or "present," that will be fine.

4              THE CLERK:  Juror number 80.

5              JUROR NO. 80:  Here.

6              THE CLERK:  Juror number 83.

7              JUROR NO. 83:  Here.

8              THE CLERK:  Juror number 84.

9              JUROR NO. 84:  Here.

10             THE CLERK:  Juror number 91.

11             JUROR NO. 91:  Here.

12             THE CLERK:  Juror number 95.

13             JUROR NO. 95:  Here.

14             THE CLERK:  Juror number 97.

15             JUROR NO. 97:  Here.

16             THE CLERK:  Juror number 101.

17             JUROR NO. 101:  Here.

18             THE CLERK:  Juror number 104.

19             JUROR NO. 104:  Here.

20             THE CLERK:  Juror number 109.

21             JUROR NO. 109:  Here.

22             THE CLERK:  Juror number 115.

23             JUROR NO. 115:  Here.

24             THE COURT:  Very good.  If juror number 80 will just

25    come and take a seat in the witness box, and we'll ask the

252

1    remainder of the group to go back into the other room.

2              NOTE:  The potential jurors leave the courtroom

3    except for juror number 80.

4              THE COURT:  Good afternoon.

5              JUROR NO. 80:  Good afternoon.

6              THE COURT:  Thank you for coming back to court, sir.

7    Just a couple of questions.

8              First of all, since filling out the questionnaire on

9    Monday, have you had any further thoughts about the

10   questionnaire and your answers and anything you would like to

11   add to the answers or any of the explanations?

12             JUROR NO. 80:  I do not.

13             THE COURT:  All right, sir.  Have you had any

14   exposure to any media coverage about the case, or conducted any

15   investigation into any of the issues concerning this case since

16   Monday?

17             JUROR NO. 80:  I have not.

18             THE COURT:  Has anything changed in your work or home

19   schedules that would make the trial difficult for you to

20   participate in in terms of its time commitment?

21             JUROR NO. 80:  Nothing new.

22             THE COURT:  Nothing new.  All right.  And you did

23   indicate that there were, other than needing occasional breaks,

24   you didn't have any problem as a juror in this case.  And I

25   didn't see any scheduling conflicts indicated on the

1    questionnaire.

2            Did you have any?

3            JUROR NO. 80:  I understand that work is not an issue

4    that I can bring up.

5            THE COURT:  Well, not unless it's a crisis.  I mean,

6    we're letting some school teachers out, one was an AP math

7    teacher who couldn't get a substitute to teach calculus.  But

8    is it of that nature?

9            JUROR NO. 80:  I couldn't characterize it as a

10   crisis, Your Honor.

11           THE COURT:  All right.  Okay.  You've indicated in

12   your question to question 31 that since September 11 you have

13   traveled less by air.  Is it a direct result of September 11?

14           JUROR NO. 80:  It was immediately following, but not

15   currently.

16           THE COURT:  All right.  In paragraph 58 you indicated

17   that you've had some experience as a juror, and that you served

18   on a jury in -- actually, I have to ask you that.

19           Do you remember where?  Was it Fairfax County?

20           JUROR NO. 80:  It was a Fairfax County jury.

21           THE COURT:  All right.  And it sounds as though it

22   was a civil case because you said it involved property damage.

23           JUROR NO. 80:  It was a civil case, Your Honor.

24           THE COURT:  All right.  But it was a jury trial?

25           JUROR NO. 80:  Yes, it was.

254

1            THE COURT:  Do you remember how many jurors were in

2      on that?

3            JUROR NO. 80:  It was more than six.  I am not sure

4      if it was 12 or not.

5            THE COURT:  All right.  And the jury found for the

6      plaintiff, is that correct?

7            JUROR NO. 80:  Yes, ma'am.

8            THE COURT:  What kind of property damage are we

9      talking about?

10           JUROR NO. 80:  As I recall, it was to an automobile.

11           THE COURT:  All right.  Did the jury take long in

12     coming to a decision?

13           JUROR NO. 80:  The case lasted only one day,

14     including the deliberations of the jury.

15           THE COURT:  But do you remember when you went back

16     into the jury room, was there some discussion among the jurors

17     as to, first of all, whether the defendant was liable; and,

18     secondly, how much damages, if any, were proper in the case?

19           JUROR NO. 80:  There was, Your Honor.

20           THE COURT:  All right.  And what did you think of the

21     jury process in deciding the case?

22           Did you have any reactions to it, whether you thought

23     it was a great process, a bad process, efficient, inefficient?

24     Did you have any reactions to it?

25           JUROR NO. 80:  It was not efficient, Your Honor.

255

1              THE COURT:  Not efficient.  What was inefficient
2    about it?

3              JUROR NO. 80:  People -- the jurors were seeking to
4    find guilty or innocent based upon the evidence presented
5    versus trying to find either for the plaintiff or the
6    defendant.

7              So it was a large amount of time spent in what's the
8    process that we're trying to deal with.

9              THE COURT:  In other words, they had mixed up
10   criminal with civil?

11             JUROR NO. 80:  Yes, ma'am.

12             THE COURT:  I see.  And how did that get straightened
13   out?

14             JUROR NO. 80:  A lot of conversation, Your Honor.

15             THE COURT:  All right.  From your experience as a
16   juror, have you formed any conclusions about the trial system
17   in America?

18             I mean, do you feel in any respect that that
19   experience as a juror might affect your ability to act as a
20   juror in this case?

21             JUROR NO. 80:  No, ma'am.

22             THE COURT:  No?  All right.  You understand this is a
23   criminal case, it is a different standard of proof, and it
24   would be quite different?

25             JUROR NO. 80:  I do.

1          THE COURT:  All right.  In your answer to question

2    number 83, which has to do with some criminal justice

3    questions, you indicated to the following question:  Do you

4    believe that sometimes innocent people are convicted of crimes

5    they did not commit?  You indicated you were unsure.

6          Can you explain a little bit more your answer.

7          JUROR NO. 80:  Perhaps I think occasionally you will

8    read about in the media or hear on the news where someone who

9    has been convicted, many years later has been found to be

10   innocent for whatever reason.

11         So I think that draws to my mind a question as to

12   whether or not you're always 100 percent correct.

13         THE COURT:  All right.  Does that give you some

14   concerns?

15         JUROR NO. 80:  It certainly does.  You certainly

16   wouldn't want to convict someone who is innocent.

17         THE COURT:  All right.  And in your -- and question

18   number 85 asked you:  Do you believe that the law does too much

19   to protect the rights of criminal defendants and not enough to

20   protect the rights of crime victims and their families?  And

21   there you again checked:  Unsure.

22         And if you could explain the basis for that answer.

23         JUROR NO. 80:  Sure.  Again you hear, you read in the

24   media or you hear on the news of instances where people have

25   gone to law enforcement and have asked for protection because

1    someone has threatened them.  And in some cases you have

2    situations where the law enforcement is either unable or

3    unwilling to do anything as a result because a crime hasn't

4    been committed.

5              So there are certain concerns in my mind about

6    victims' rights.

7              THE COURT:  All right.  What about the protection of

8    criminal defendants in criminal proceedings, do you feel that

9    there is too much protection given?

10             JUROR NO. 80:  No, ma'am.

11             THE COURT:  No?  All right.  All right, sir, if you

12   would step outside for a second, we will see whether we have

13   any follow-up questions.  If you would just go with Mr. Wood,

14   please.

15             NOTE:  Juror number 80 leaves the courtroom.

16             MR. KROMBERG:  No questions.

17             THE COURT:  Any further questions?

18             MR. MacMAHON:  Just two brief ones, Your Honor.  In

19   question 35 he indicates that he has a lot of friends in the

20   ATF and the FBI, I believe.  I would like to see if we could

21   explore a little bit about that.

22             And also, I think it's unclear, and it would go to in

23   terms of honoring the instructions of the Court in the jury

24   room, I am not sure what he was saying happened in the jury

25   room about clarifying things, whether he did something to tell

1   them a different burden of proof or --

2          THE COURT:  I don't think we got into that at all.  I

3   thought he said they were talking guilt and innocence rather

4   than liability.  But --

5          MR. MacMAHON:  My notes, Your Honor, I am sorry, I am

6   not directly at the podium, he said there was lots of

7   conversation to clear things up.

8          It struck me -- I don't know what it was, if he

9   explained them the law.  I don't think it would be hard for you

10  to clarify that issue.

11         THE COURT:  That one doesn't concern me, but 35 I

12  will ask him.  Just have him stay there.

13         MR. MacMAHON:  Thank you, Your Honor.

14         NOTE:  Juror number 80 returns to the courtroom.

15         THE COURT:  Sir, you indicated on your questionnaire

16  that you had lot of close friends employed by the ATF and the

17  FBI, and a godson or nephew who is a deputy sheriff, and some

18  correctional officer family members.

19         Do you think in any respect that your having family

20  members and close friends in law enforcement might affect your

21  ability to be impartial in any respect in judging this case?

22         JUROR NO. 80:  No, ma'am.

23         THE COURT:  Do you feel you might favor the testimony

24  of the law enforcement people over that of civilian witnesses

25  simply because of your family connections to law enforcement?

259

1              JUROR NO. 80:  No, ma'am.

2              THE COURT:  All right, sir.  If you would step

3    outside for just a second.

4              NOTE:  Juror number 80 leaves the courtroom.

5              THE COURT:  Any objection to number 80?

6              MR. KROMBERG:  No, Your Honor.

7              MR. MacMAHON:  No, Your Honor.

8              THE COURT:  All right.  Have him come back in.

9              NOTE:  Juror number 80 returns to the courtroom.

10             THE COURT:  All right, sir, you have made the final

11   cut, which means we are still considering you for this final

12   jury selection.

13             We are not going to need you tomorrow.  So you can go

14   about your obligations tomorrow, but it is very likely that

15   we'll need you back on Monday.  And the way to determine that

16   will be to call the number you have been calling.  All right?

17             If you do come back to court on Monday and if you are

18   selected to be one of the 14 jurors in this case, then we are

19   going to go right into the trial.  So you may want to make

20   contingency plans at your office.

21             I will ask that you continue to not discuss this case

22   with anyone, not conduct any investigation about the case, and

23   avoid any media coverage.

24             And just so you know, we've been sort of referring to

25   you by number, in part to prevent or minimize any media contact

260

1   with you as a potential juror.  So I do want to know if anybody

2   has attempted to contact you.  All right, sir?

3              JUROR NO. 80:  Certainly.

4              THE COURT:  All right.  And you are excused to go at

5   this point.

6              JUROR NO. 80:  Thank you.  When should I call back?

7              THE COURT:  Probably we won't have a definitive

8   answer until 6 o'clock tomorrow.  I know it is bumping up

9   against the weekend, but I just have to make sure I have enough

10  jurors Monday morning, and then I can give the green light and

11  everything is set to go.

12             So I would say it is highly likely that you will be

13  pack here Monday morning.

14             JUROR NO. 80:  Thank you.

15             THE COURT:  All right, thank you.  You are excused.

16             NOTE:  Juror number 80 leaves the courtroom.

17             THE COURT:  Number 83.

18             NOTE:  Juror number 83 enters the courtroom.

19             THE COURT:  Thank you, sir.  I know you were here

20  this morning and then you came back this afternoon.  We really

21  appreciate your attendance.

22             Let me ask you, since filling out the questionnaire

23  on Monday, have you had any further thoughts about your answers

24  to any of the questions or is there any additional information

25  you would like to bring to our attention?

1              JUROR NO. 83:  No, ma'am.

2              THE COURT:  All right.  Since Monday have you been

3    exposed to any media coverage about this case or conducted any

4    investigation into any of the issues concerning this case?

5              JUROR NO. 83:  No, I haven't.

6              THE COURT:  Has anything changed in your personal or

7    business life that might now make it difficult for you to meet

8    the schedule for this trial?

9              JUROR NO. 83:  No.

10             THE COURT:  All right.  You indicated that your -- I

11   believe you indicated that your spouse is employed by the FBI,

12   is that correct?

13             JUROR NO. 83:  Yes, that's correct.

14             THE COURT:  And she is in -- what position exactly

15   does she have with the FBI?

16             JUROR NO. 83:  She is an interpreter, a linguist.

17             THE COURT:  What languages does she work on?

18             JUROR NO. 83:  It's not Arabic.  But if you don't

19   mind, to name the language is almost to identify the person.

20   They don't have a lot of linguists.

21             THE COURT:  Can you move a little bit closer to the

22   microphone.  I'm sorry.

23             JUROR NO. 83:  They don't have a lot of linguists.

24   To name the language is practically to name the person.  It's

25   not Arabic though.  I believe the --

262

```
1              THE COURT:  Well, Arabic --
2              JUROR NO. 83:  The defendant seem to be Iraqi.  It
3    isn't Arabic, so she wouldn't have been involved in the case.
4              THE COURT:  Hold on a second though.  Urdu is one of
5    the languages that we might have at issue --
6              MR. KROMBERG:  I think the only two languages would
7    be Urdu and Arabic, Judge.
8              THE COURT:  All right.  Is your wife involved at all
9    in either of those two languages?
10             JUROR NO. 83:  Yes, she is, sometimes with Urdu.
11             THE COURT:  She sometimes is?
12             JUROR NO. 83:  Yes.
13             THE COURT:  Does your wife use your last name, or
14   does she have -- does she have a separate name?
15             JUROR NO. 83:  She uses my last name.
16             THE COURT:  Because I think there might be an issue
17   about translation in this case, correct?
18             MR. KROMBERG:  Your Honor, the last time we did not
19   use an interpreter for the Urdu, we just had one of the
20   Pakistani witnesses, one of the cooperating witnesses do the
21   interpreting that we needed.  And we're planning to do the same
22   thing this time.
23             We were not planning on having any Urdu documents
24   translated other than there were those posters that Your Honor
25   may recall from the Lashkar-e-Taiba.  And that the witness, the
```

263

1    cooperating witness, who is a prisoner, is the one who

2    interpreted that.

3           THE COURT:  All right.  But as I understand it, the

4    Government in its case will not be relying on any translations

5    by FBI translators of these languages?

6           MR. KROMBERG:  That's correct.  I might also note,

7    Judge, that when we thought we might have to have an Urdu

8    translator, it was someone not related -- someone not related

9    to this prospective juror, with a totally different name.

10          THE COURT:  All right.  Now, I think you indicated,

11   didn't you, that your son also is a translator?

12          JUROR NO. 83:  Yes.  Not for either of those two

13   languages.

14          THE COURT:  I'm sorry?

15          JUROR NO. 83:  Not for either of those two languages.

16          THE COURT:  All right.  And is your wife a native

17   born American?

18          JUROR NO. 83:  No, she is not.

19          THE COURT:  What country does she come from?

20          JUROR NO. 83:  Pakistan.

21          THE COURT:  All right.  Do you still have family --

22   does she have family back there?

23          JUROR NO. 83:  Not immediate relatives.

24          THE COURT:  All right.  Have you visited that area?

25          JUROR NO. 83:  Yes.

264

1          THE COURT:  All right.  Have you ever heard of LET or

2    Lashkar-e-Taiba?

3          JUROR NO. 83:  I have heard of --

4          THE COURT:  Before you --

5          JUROR NO. 83:  In the questionnaire it's

6    Lashkar-e-Taiba, I have heard of it, yes.

7          THE COURT:  And had you heard of it before the

8    questionnaire and before this case?

9          JUROR NO. 83:  Yes.

10         THE COURT:  Have you done any personal research or

11   any work involving that entity?

12         JUROR NO. 83:  No, I have not.

13         THE COURT:  Now, you had worked for the Department of

14   State?

15         JUROR NO. 83:  Yes.

16         THE COURT:  And you had postings abroad.  Did you

17   have postings abroad in any of these areas?

18         JUROR NO. 83:  I have been posted in Pakistan over

19   30 years ago.  And I have also been posted in countries in the

20   Persian Gulf and North Africa.

21         THE COURT:  All right.  So, obviously, if you have

22   been posted in India, you have --

23         JUROR NO. 83:  I visited India.

24         THE COURT:  That was just visiting.  All right.  But

25   you have worked in Pakistan.  And I am sorry, what other

265

1    countries have you been posted to?

2            JUROR NO. 83:  Persian Gulf countries and North

3    Africa, also South America.

4            THE COURT:  All right.  Now, in terms of your posting

5    to the Middle East, I assume then that you have had

6    opportunities to meet with Muslims?

7            JUROR NO. 83:  Of course.

8            THE COURT:  Have you formed any views about Islam or

9    members of the Islamic faith based on those contacts?

10           JUROR NO. 83:  As I stated in the questionnaire, I am

11   a Muslim myself.

12           THE COURT:  All right.  And which sect do you belong

13   to?

14           JUROR NO. 83:  Well, technically Suni, but when I

15   became a Muslim, in my mind I simply became Muslim, not a

16   member of a sect.

17           THE COURT:  So you are not overly sympathetic with

18   the disputes between Shiites and Sunis?

19           JUROR NO. 83:  Well, I am more familiar with the Suni

20   point of view than the Shiite point of view, but I am not

21   involved in the disputes.

22           THE COURT:  Would you have any problems if some of

23   the witnesses, and I don't know if this is going to be the case

24   or not in this case, or this issue will even come up, but if

25   some of the witnesses, for example, practice the Shiite version

1  of Islam, would that give you issues about evaluating their

2  credibility because of their orientation?

3        JUROR NO. 83:  No, a Muslim is a Muslim.

4        THE COURT:  All right, sir.  You indicated that

5  you've read some about this case, is that correct?

6        JUROR NO. 83:  The questionnaire asked about two

7  cases, which I have seen articles about.  I don't know which

8  one refers to this case.  But in either case, they were not

9  things that I read deeply into because, frankly, the coverage

10  has not been very clear, and I am more interested in

11  international things rather than domestic.

12        THE COURT:  All right, sir.  Were you at all familiar

13  with the mosque that was described in the questionnaire?

14        JUROR NO. 83:  No, I am not.

15        THE COURT:  Have you ever been there?

16        JUROR NO. 83:  Not to my knowledge.  I would say no.

17        THE COURT:  That is --

18        JUROR NO. 83:  I couldn't be there without my

19  knowledge.

20        THE COURT:  I'm sorry?

21        JUROR NO. 83:  I have not been there.

22        THE COURT:  Okay.  All right.  You obviously will

23  have more personal experience with and knowledge about some of

24  the political issues in this case than the average juror, just

25  from your background and experience.  One of the problems with

1    a juror who has a lot of personal knowledge is we don't want

2    shadow witnesses in the jury room.

3            JUROR NO. 83:  Right.

4            THE COURT:  Because the jury has to decide the case

5    on the same quantum of information that all the jurors get in

6    the courtroom.  And that can sometimes be a problem, frankly,

7    for a subject matter expert.

8            So, for example, if during the course of

9    deliberations some of the jurors were to have questions about

10   Lashkar-e-Taiba that you might be able to answer, but perhaps

11   were not answered during the trial, would you be able to remain

12   silent and tell them you can't discuss it with them?

13           JUROR NO. 83:  Well, fortunately, about

14   Lashkar-e-Taiba, about all I know of it is that I believe that

15   it's connected with Kashmir, but I don't really have any depth

16   of knowledge on the subject.

17           But to answer your general question, yes, I would

18   try, but --

19           THE COURT:  I mean, Chechnya is another area that the

20   average person doesn't seem know a lot bit.  You obviously know

21   a little bit more about it just from what I have seen in your

22   answer here.

23           JUROR NO. 83:  Yes.

24           THE COURT:  All right.  Given the nature of the

25   issues in this case, and the fact that there will be, I expect,

1   evidence of what some would consider to be radical Islamist

2   views, in your own professional experience and your own

3   religious beliefs do you feel in any respect you might have

4   difficulty in evaluating this case in a fair and impartial

5   manner?

6           JUROR NO. 83:  Well, I am certainly opposed to

7   radicalism of any kind, but I would think I could be fair.

8           THE COURT:  All right.  And can you tell me, sir, do

9   you feel that you or your family have suffered from any anti-

10  Muslim bias in the post-September 11 environment?

11          JUROR NO. 83:  No, we have not.  In fact, neighbors

12  actually were very supportive.

13          THE COURT:  All right.  All right.  If you don't mind

14  stepping outside for a second, let me see if we have any

15  follow-up questions.

16          NOTE:  Juror number 83 leaves the courtroom.

17          THE COURT:  Any additional questions?

18          MR. KROMBERG:  Yes, Judge.  I just haven't gotten

19  much of a sense of what kind of Muslim he is.  Many of the

20  witnesses in this case and many of the witnesses no matter what

21  strain they are, they will say, I'm the only kind of Muslim

22  there is.  And if he says, well, I'm just a Muslim, that's not

23  very helpful.

24          I think it would be helpful to ask, okay, what

25  religious organizations are you affiliated with and what

269

1    mosques have you attended, what religious publications have you

2    subscribed to or read.

3           And it would be helpful to ask, when you answered

4    that you were against establishing Shariah in the United

5    States, why are you against that?

6           THE COURT:  Any objection to those questions being

7    asked?

8           MR. MacMAHON:  No, Your Honor.  And I would actually

9    add one.  I think the question is not really a Suni/Shiite

10   divide here.  I think from reading the transcript of the Khan

11   case, the question is Wahabi, is the political; however, you

12   want to put it, the school of thought that is at issue.  And a

13   lot of the witnesses in that case were asked about it.

14          THE COURT:  All right.  Let me ask you this directly.

15   Are there any specific aspects of the defendant's religious

16   belief's that you think might be a problem for this juror that

17   you want me to ask about?

18          MR. MacMAHON:  Well, the answer is I think that the

19   Government's case here is that these guys are all a bunch of

20   crazy Wahabis, the whole paintball crowd, led by him -- he will

21   know exactly what that question is.

22          THE COURT:  Well, I understand.  I know what Wahabis

23   are too.  So you want me ask it that way?

24          MR. MacMAHON:  If you want to ask him if he knows

25   what Wahabis are.  And if he has formed any opinions about

270

1    that, if that would affect his ability to act as a juror, yes,

2    I think that would be the way to ask the question.

3            THE COURT:  By the way, there were two things.  Mr.

4    Kromberg, you need to be extremely careful in addressing the

5    Court.  Forget the other cases ever existed.

6            MR. KROMBERG:  Yes, Your Honor.

7            THE COURT:  This was a juror, I don't think anything

8    was said that was improper, but it was getting close to the

9    line.  I don't want the jury to have any sense yet.

10           I mean, down the road they will know that there were

11   other adjudications because you are going to have defendants

12   testifying and they are going to have to say they have been

13   found guilty, but I just think we need to keep that to a

14   minimum at this point.

15           MR. MacMAHON:  Just two other things, Your Honor.

16           THE COURT:  There were other organizations that got

17   raised in other cases.  One was I think CAIR, C-A-I-R.  Do I

18   have that wrong?

19           MR. MacMAHON:  Counsel of Islamic American Relations.

20           THE COURT:  Do you want me to ask this man if he

21   knows anything about that?  Or is that not enough of an issue

22   to be an issue?

23           MR. KROMBERG:  I don't think that is an issue in this

24   case.

25           THE COURT:  All right.

1           MR. KROMBERG:  Last year I think it was Randall

2   Royer --

3           MR. MacMAHON:  He was the local -- I think he was the

4   American spokesman for CAIR.

5           MR. KROMBERG:  The one that came up last year that I

6   recall was Harkat ul Mujahideen.

7           MR. MacMAHON:  Harkat ul Mujahideen.

8           MR. KROMBERG:  Which is a Pakistani group.  And there

9   was an Indonesian group, I think Lashkar Jihad.  They are not

10  going to be at issue in this case.

11          THE COURT:  All right.

12          MR. MacMAHON:  But what is going to be an issue in

13  this case as it is going on is we have an expert who is going

14  to testify about Al-Qaeda in this case.  And I don't know

15  whether -- if there is -- I mean, the only reason is there must

16  be some connection between Dr. Al-Timimi and Al-Qaeda or the

17  Court wouldn't have allowed it in.  So we might as well ask him

18  about Al-Qaeda if that's what we're going to do.

19          The other concerns I have, one, he has got a job

20  application pending at Homeland Security --

21          THE COURT:  Look, do you want me to excuse this juror

22  for cause?  I have some concerns given --

23          MR. MacMAHON:  I think so, Your Honor.

24          THE COURT:  All right.  I am not uncomfortable with

25  that.  I may have missed it, and it is late in the day, but I

272

1    thought he balked unusually so about his wife and being a

2    translator for the FBI, and I think probably the best thing is

3    just to excuse this juror.  He really has too much information.

4              Any strong objection?

5              MR. KROMBERG:  No, Judge.

6              MR. MacMAHON:  Thank you, Your Honor.

7              THE COURT:  All right, that's fine.

8              NOTE:  Juror number 83 returns to the courtroom.

9              THE COURT:  Sir, I want to thank you for your

10   attendance, and I know it has been long day for you, but we are

11   going to go ahead and excuse you from any further involvement

12   in this trial.  And I do want to thank you for your attendance.

13             If you check in with the Clerk's Office, if you can

14   get in there -- I am not sure, they close the doors at 4

15   o'clock -- just one second.

16             If you just would call the Clerk's Office tomorrow to

17   let them know, but we will also tell them that you have been

18   excused.  So you are free to go at this point.  Thank you.

19             THE MARSHAL:  He needs the number for the Clerk's

20   Office.

21             THE COURT:  All right, we will get that for you.

22             That's all right, sir, don't worry about it.  You are

23   just excused at this point.

24             NOTE:  Juror number 83 leaves the courtroom.

25             THE COURT:  All right.  Number 84.

273

1     NOTE:  Juror number 84 enters the courtroom.

2     THE COURT:  All right, sir, if you will just go over

3 here to the witness box.

4     Since filling out your questionnaire on Monday, have

5 you thought about any additional information you might need to

6 bring to the Court's attention concerning any of your answers?

7     JUROR NO. 84:  No, ma'am.

8     THE COURT:  All right.  Is there any additional

9 information you think we ought to know that wasn't covered in

10 the questionnaire that might be relevant to considering you for

11 service on this jury?

12     JUROR NO. 84:  No, I don't believe so.

13     THE COURT:  All right.  Have you had any exposure to

14 any media coverage about this case or conducted any

15 investigation about this case since Monday?

16     JUROR NO. 84:  No, ma'am.

17     THE COURT:  Has anything changed in your personal or

18 business life that would make sitting as a juror in this case

19 difficult for you?

20     JUROR NO. 84:  No, ma'am.

21     THE COURT:  All right, sir.  I understand from your

22 answer to question number 28 that you visited India last year?

23     JUROR NO. 84:  No, ma'am.  I didn't.  I may have

24 misread the question.  I understood it that had any of my close

25 friends visited.

274

1            THE COURT:  So you have a close friend who has family

2    members in India?

3            JUROR NO. 84:  Yes, ma'am.

4            THE COURT:  All right.

5            JUROR NO. 84:  Our neighbor.

6            THE COURT:  All right.  Now, has that friend ever

7    talked to you about what goes on in India and his family or

8    anything like that?

9            JUROR NO. 84:  Not beyond talking about their family,

10   that is the extent of their conversation.

11           THE COURT:  Any discussions about the

12   Pakistani/Indian dispute over Kashmir or anything like that?

13           JUROR NO. 84:  We have had no discussions about that,

14   no.

15           THE COURT:  All right, sir.  Now, you indicated in

16   paragraph 33 that you were involved in a special production

17   called America's Heros of Freedom that was about the victims of

18   September 11?

19           JUROR NO. 84:  Yes, ma'am.

20           THE COURT:  All right.  Now, my understanding is you

21   yourself were not present at the Pentagon when it was attacked,

22   is that correct?

23           JUROR NO. 84:  No, ma'am, I was not.

24           THE COURT:  All right.  But that you -- I assume was

25   this video made at the Pentagon?

1          JUROR NO. 84:  No, ma'am.  This was a live

2    presentation that was done at the venue where I work.  It was

3    done by an outside group of promoters who wanted to address the

4    issues of that day.

5          THE COURT:  All right.  Because you are in venue

6    management, as I understand I, is that right?

7          JUROR NO. 84:  Yes, ma'am.

8          THE COURT:  Which means, what, you help to put on --

9          JUROR NO. 84:  I work as the technical director, and

10   I do a lot of operations duties.  Essentially I assist with

11   maintaining the stage, the stage equipment, assisting in

12   installing the show, and also in the upkeep of the building

13   itself.

14         THE COURT:  All right.  But then you didn't -- you

15   were not involved in interviewing people or putting any videos

16   or anything together itself?

17         JUROR NO. 84:  No, ma'am, nothing like that.

18         THE COURT:  All right.  Is there anything about your

19   work on that project that you think might affect your ability

20   to be impartial in judging this case since some of those events

21   may be subject to --

22         JUROR NO. 84:  Sure.  I don't believe that would have

23   any impact on my impartiality.

24         THE COURT:  All right, sir.  And my understanding is

25   you don't have any, to your knowledge, friends or associates

1    who are Muslim?

2            JUROR NO. 84:  Not Muslim, no, ma'am.

3            THE COURT:  All right.

4            JUROR NO. 84:  My friends from the Middle East are

5    Christians.

6            THE COURT:  Have your Christian Middle Eastern

7    friends ever discussed with you their views about their Islamic

8    brethren?

9            JUROR NO. 84:  No, ma'am.

10           THE COURT:  No?  So as I understand your

11   questionnaire, you don't have any attitudes either terribly

12   positive or terribly negative towards members of the Islamic

13   faith?

14           JUROR NO. 84:  No, ma'am, I have no information to

15   make that kind of judgment.

16           THE COURT:  All right.  Very good.  If you would step

17   down for a second.

18           NOTE:  Juror number 84 leaves the courtroom.

19           THE COURT:  Are there any other questions for this

20   juror?

21           MR. KROMBERG:  No, Your Honor.

22           MR. MacMAHON:  No follow-up, Your Honor.

23           THE COURT:  All right.  Any basis to strike this

24   juror?

25           MR. KROMBERG:  No, Your Honor.

277

1          MR. MacMAHON:  None for the defense, Your Honor.

2          THE COURT:  All right, let's bring him back in.

3          NOTE:  Juror number 84 returns to the courtroom.

4          THE COURT:  Sir, you are still going to be considered

5     for the final cut for this jury.  Tomorrow you are clear

6     because we will be making those final decisions on Monday.

7          My hope is that we will Monday morning have a small

8     pool of jurors, the actual 14 will be chosen from that.  And

9     once that is done, then we are going to go right into the

10    trial.  And there is no guaranty, but there is a higher

11    probability that you might be one of those people.  So you need

12    to plan your life accordingly.

13         Now, the phone number you have been calling to find

14    out about your status is still the number you should call.  We

15    probably won't know definitively until about 6 o'clock

16    tomorrow.  So if you call the number late tomorrow, you should

17    be told for certain what time you need to appear on Monday.

18         In the meantime, avoid any contact with any media

19    about the case.  Do not conduct any investigation.  Don't

20    discuss the case with anyone.

21         We've been using a number for you to try to minimize

22    any contact the media might make with you.  And they shouldn't

23    be.  But if they do, or anyone else tries to contact you,

24    please let us know.  All right?

25         JUROR NO. 84:  Yes, ma'am.

278

1          THE COURT:  You are free to go at this time.  Thank

2     you.

3          NOTE:  Juror number 84 leaves the courtroom.

4          THE COURT:  And we will now call number 91.

5          NOTE:  Juror number 91 enters the courtroom.

6          THE COURT:  Good afternoon, ma'am.  Thank you for

7     coming back to court.

8          Since filling out the questionnaire last Monday, or

9     this past Monday, have you thought about anything you might

10    want to add to any of your answers or any additional

11    information that you might wanted to provide us with?

12         JUROR NO. 91:  No.

13         THE COURT:  Are you aware of anything that has

14    changed in your personal life or business commitments that

15    might change your ability to be eligible for this trial?

16         JUROR NO. 91:  Not really.  I mean, two weeks or

17    three weeks away from work is always a problem, but --

18         THE COURT:  But not insurmountable, as I understand

19    it?

20         JUROR NO. 91:  Not insurmountable.

21         THE COURT:  All right.  Very good.  Have you

22    conducted any investigations into any of the issues concerning

23    this case or seen any media coverage of the case?

24         JUROR NO. 91:  No.

25         THE COURT:  All right.  You have -- can you explain

1    to me just a little bit exactly what you do, if you can tell us

2    that.

3              JUROR NO. 91:  Sure.  I am a civilian employee of the

4    Air Force.  I am currently in charge of what is called the

5    National Security Personnel System, which is a new personnel

6    system that is being designed and implemented in the Department

7    of Defense.  And I am responsible for the Air Force component

8    of it.

9              THE COURT:  And when it says national security, is

10   this intelligence work, or is this --

11             JUROR NO. 91:  No, it is called national security

12   because it is for the Department of Defense.  It is not

13   specifically intelligence work.

14             THE COURT:  All right.  Now, you have had an

15   extensive -- you and your spouse have had an extensive

16   connection with the Air Force?

17             JUROR NO. 91:  I am not married.

18             THE COURT:  I am sorry, you have had an extensive

19   experience with the Air Force?

20             JUROR NO. 91:  Right.

21             THE COURT:  And what, 30 years?

22             JUROR NO. 91:  33 years.

23             THE COURT:  33 years.  And you went to the Air War

24   College?

25             JUROR NO. 91:  I did, a nonresident, but yeah.

280

1          THE COURT:  Okay.  Some of the allegations in this

2     case may involve claims of efforts to recruit people to wage

3     war against the United States.

4          Given your connection to the military and the nature

5     of those allegations, do you think that might in any respect

6     make it difficult for you to be an impartial juror in deciding

7     this case?

8          JUROR NO. 91:  I don't know, but I don't think so.

9          THE COURT:  And that's a fair answer, but I need to

10    probe it with you a little bit more.

11         JUROR NO. 91:  Okay.

12         THE COURT:  Because we do, to the extent humanly

13    possible, want jurors who can really come in with a blank

14    slate, so to speak, with just no predispositions one way or

15    another.  And some of these issues are tough, and especially

16    for people who are closely connected with the military.

17         So if you have any concerns about your ability to be

18    impartial, we really do need to know that now.

19         JUROR NO. 91:  I can't honestly say.  I have got to

20    say that I work in the Pentagon, but I was not in the Pentagon

21    on September 11.  But I have been very -- all my adult life I

22    have been connected to the military.

23         Now, will that make me impartial?  I don't know.  I

24    don't always agree with what the military is doing.  I don't

25    always agree with what administrations are doing.  But does

1    that flavor my judgment in a way that another citizen's

2    judgment would not be flavored?  I don't know, I really don't

3    know.

4           THE COURT:  All right.  You indicated in questions 54

5    and 55 that you have had a family member, I think a brother,

6    who had allegations filed against him.  And you said you don't

7    know if it came to a police involvement.  So the case -- he was

8    never prosecuted then?

9           JUROR NO. 91:  No, no.

10          THE COURT:  All right.  Do you know where the

11    allegations came from concerning your brother?

12          JUROR NO. 91:  He was a custodian in a school and was

13    accused of stealing.  I don't know who accused him.

14          THE COURT:  All right.  And then you also indicated

15    that you have been a witness, as I understand it?

16          JUROR NO. 91:  Right.

17          THE COURT:  You were deposed in a child abuse death

18    case?

19          JUROR NO. 91:  Right.  I was a social worker, and

20    that was my involvement in that.

21          THE COURT:  All right.  But you didn't have -- and

22    then you appeared as a witness in small claims court.

23          JUROR NO. 91:  Right.

24          THE COURT:  That's a separate matter?

25          JUROR NO. 91:  That's a separate matter, right.

282

1          THE COURT:  Were you a witness or a complainant in

2     that?

3          JUROR NO. 91:  A witness.  It involved -- it was the

4     same job, it involved a physician, I think it was, that was

5     trying to collect medical fees from an enlisted member and his

6     wife, and I was the health benefits advisor.  So I was there to

7     talk about what their entitlements were or were not.

8          THE COURT:  All right.  And then you have testified

9     also in administrative hearings for the EEO and in personnel

10    cases?

11         JUROR NO. 91:  Right.

12         THE COURT:  Were you ever an investigator of any kind

13    for EEO matters?

14         JUROR NO. 91:  An investigator?  No.

15         THE COURT:  No?  All right.  Were you ever actually a

16    witness in any court of law like this one?

17         JUROR NO. 91:  No.

18         THE COURT:  Just the administrative level.  When you

19    were a witness, were you questioned by attorneys or by

20    administrative law judges?

21         JUROR NO. 91:  Both.

22         THE COURT:  And I assume you had both direct and

23    cross-examination?

24         JUROR NO. 91:  Right.

25         THE COURT:  Was there anything about being a witness

283

1    that particularly upset you, or you might somehow have

2    flashbacks if you were a juror in this case and have special

3    empathy for a particular person because they are being grilled

4    on the stand or anything like that?

5              JUROR NO. 91:  No, no.

6              THE COURT:  Okay.  You indicated in your answer to

7    question number 88 that you -- it is more likely -- I am sorry.

8    Question 88 is:  Do you tend to believe that a member of law

9    enforcement, such as a police officer or federal agent, who

10   testifies in court is -- and you indicated more likely to tell

11   the truth than other witnesses.

12             Is that your answer on that question?

13             JUROR NO. 91:  Yes.

14             THE COURT:  And does that -- where does that belief

15   come from?

16             JUROR NO. 91:  Well, maybe it's a hope.  I mean, I

17   would hope people in that line of work are telling the truth

18   because of what they are doing for a living.

19             THE COURT:  Do you think though that you would

20   actually -- if confronted between a civilian and a law

21   enforcement officer, that you would automatically believe the

22   law enforcement officer over the civilian because of the law

23   enforcement officer's position?

24             JUROR NO. 91:  Initially perhaps, but not necessarily

25   if other sides were brought out.

284

1          THE COURT:  Okay.  All right.  If you don't mind

2    stepping out for a second.

3          NOTE:  Juror number 91 leaves the courtroom.

4          THE COURT:  All right.  Are there any further

5    questions the Government has?

6          MR. KROMBERG:  Judge, I think it would be worth

7    asking her if the Court instructed her that she has to evaluate

8    everybody with a blank slate, would she be able to do that?  I

9    think that she would probably and honestly say yes.

10          THE COURT:  Well, if this were the only concern I

11    had -- I mean, the first line of questioning itself -- it is

12    hard for people -- some people will say, it wouldn't bother me

13    and you are never quite sure whether it will or won't.  Others

14    may be are too honest and say, I think it might, but I am not

15    sure, and in the end they might not.

16          But I think when I have two problematic areas, since

17    we have enough people in the pool -- but let me hear from the

18    defense.

19          MR. MacMAHON:  I don't have any follow-up questions,

20    Your Honor.  I, of course, was concerned about the question

21    about the law enforcement officer.

22          But the inability to say that she could be impartial

23    because of her -- that's an honest question given her

24    background.  I would be surprised to hear the opposite.

25          THE COURT:  I am going to strike her.  I don't think

285

1     this juror could be sufficiently impartial.

2              NOTE:  Juror number 91 returns to the courtroom.

3              THE COURT:  Ma'am, I want to thank you for your

4     attendance in court today.  We are going to go ahead and excuse

5     you as a juror at this point, so there is no further

6     involvement with this case.

7              The Clerk's Office is closed, so I will just ask you

8     to leave the building, and we will make sure that they know

9     that you have completed your service.  Thank you.

10             NOTE:  Juror number 91 leaves the courtroom.

11             THE COURT:  All right, number 95.

12             NOTE:  Juror number 95 returns to the courtroom.

13             THE COURT:  All right, sir.  Thank you for coming

14    back to court today.

15             Since filling out the questionnaire, have you thought

16    about whether there is anything you would like to add to any of

17    your answers?

18             JUROR NO. 95:  No.

19             THE COURT:  All right.  Has anything changed in your

20    personal or work obligations that you feel now might interfere

21    with the time scheduled for this trial?

22             JUROR NO. 95:  Nothing has changed.

23             THE COURT:  All right.  And as I recall, I mean, you

24    did not indicate any major problems or I would have caught that

25    in my first go through in this --

286

1              JUROR NO. 95:  I will have to cancel a few trips, but

2    that's --

3              THE COURT:  Well, all right.  Now, we asked you

4    whether there would be -- your answer to number 92 was no, that

5    there would not be a serious hardship if chosen for the case.

6              And so, I -- this is your chance if there really is a

7    problem, you should let us know.

8              JUROR NO. 95:  Most of my work is I have to travel.

9    And so -- but it's a hardship on my company, not on me.  So I

10   responded in that way.

11             THE COURT:  All right.  We appreciate that.

12             Now, my understanding is that you have been exposed

13   to a bit of the news coverage about this case?

14             JUROR NO. 95:  Just newspaper reports.

15             THE COURT:  Do you remember them in any detail?

16             JUROR NO. 95:  Not a lot of detail.  I remember

17   reading in the paper about a mosque in Falls Church.  And I

18   live in Annandale, which is nearby.  My son goes to one of the

19   Falls Church high schools, and a number of the students there

20   are Muslim.  And as a result, I took an interest in reading the

21   newspaper articles.

22             But that's about it.

23             THE COURT:  From what you have read, have you formed

24   any preconceptions whatsoever about the issues in this case?

25             JUROR NO. 95:  I seem to remember that some of the

1    people associated with the case have already been tried.  That

2    sticks out in my head, and that they were convicted.  But

3    that's about all that I can remember from the newspaper

4    reports.

5              THE COURT:  Would that quantum of information in any

6    respect lead you to feel that you might have problems in being

7    impartial in judging the case against the defendant who is on

8    trial in this case?

9              JUROR NO. 95:  No, I don't think so.

10             THE COURT:  All right.  In paragraph 55 you have

11   indicated that you have twice been subpoenaed and testified in

12   an ongoing child custody dispute involving one of the members

13   of your congregation?

14             JUROR NO. 95:  Yes.

15             THE COURT:  Has that been in Fairfax County?

16             JUROR NO. 95:  Yes.

17             THE COURT:  All right.  So you have been in the

18   Circuit Court?

19             JUROR NO. 95:  Yes.

20             THE COURT:  And it must be acrimonious if it has

21   happened more than once?

22             JUROR NO. 95:  Yes.

23             THE COURT:  All right.  And you testified on behalf

24   of which party?

25             JUROR NO. 95:  The mother in this case.

1          THE COURT:  Who is trying to keep the child?

2          JUROR NO. 95:  Who is trying to have joint custody of

3    the child, but currently has no custody.

4          THE COURT:  All right.  And so, I would assume the

5    first time you went to court, the wife was not successful and

6    that's why it has happened a second time?

7          JUROR NO. 95:  Correct.

8          THE COURT:  Have you formed any opinions about the

9    legal system based upon your experience as a witness in those

10   proceedings?

11         JUROR NO. 95:  About the legal system?  I think that

12   particular judge made an error by prohibiting the mother from

13   seeing the child, but that's just a personal opinion and not

14   necessarily based upon the legal issues.

15         The mother is mentally ill, and that's fairly well

16   established.  And I think the judge is protecting the child

17   from the -- from what harm may come from the mother.  And so, I

18   can see the judge's point of view, but at the same time it's a

19   hardship on the mother and I think also on the child.

20         THE COURT:  All right.  How about the lawyers who

21   have been in on the case, I assume you have been grilled on

22   cross-examination?

23         JUROR NO. 95:  The lawyer for the husband I think is

24   a jerk, but other than that --

25         THE COURT:  All right.  But is there anything about

289

1   your having been in the hot seat, so to speak, that you think

2   might affect your ability to judge this case?

3            JUROR NO. 95:  No, I don't think that has any impact

4   on this.  I was just answering the question.

5            THE COURT:  That's fine, but we actually had one

6   juror for whom the experience of being a witness was enough to

7   turn her off on the legal profession.  So it can happen.

8            In your answer to question number 82, you were asked

9   the question:  Do you believe that if the prosecution goes to

10  the trouble of bringing someone to trial, he or she is probably

11  guilty?  And you checked yes.

12           I would like you to explain the basis for that.

13           JUROR NO. 95:  In order for them to bring a case to

14  trial, there has to be some evidence that would justify or

15  warrant arresting and prosecuting someone.  And I don't think

16  that they would waste their time -- this is just the logic of

17  the situation to me -- they wouldn't waste their time if it was

18  a hopeless case.

19           THE COURT:  Well now, if the Court were to tell you

20  that under our legal system a person, although charged with a

21  crime, comes into a courtroom with an absolutely clean slate,

22  just like yours or mine, and you can't convict that person

23  simply because they have been charged, the person can only be

24  convicted if during the trial itself the Government produces

25  enough evidence to prove guilt beyond a reasonable doubt, and

290

1    that is the legal principle and the critical one in criminal

2    justice, would you have difficulty accepting and living by that

3    principle in light of this belief you have --

4              JUROR NO. 95:  I can accept it and live by it if

5    necessary.

6              THE COURT:  Well, it would be necessary.

7              JUROR NO. 95:  Yeah.  That's what I am saying.

8              THE COURT:  The point is though that do you think in

9    any respect --

10             JUROR 95:  That's not the way the question originally

11   was phrased though.  The question was phrased, do you think

12   somebody is probably guilty.  Yeah, I think they are probably

13   guilty because there is some evidence that they are or we

14   wouldn't be at trial.

15             THE COURT:  All right.

16             JUROR NO. 95:  That's what I intended to answer.

17             THE COURT:  And I understand it.  So my question is

18   sort of the next tier.  Which is, given that basic belief with

19   the overlay of the Court's instructions and the fact that what

20   I have just told you is a bedrock principle of criminal law in

21   this country, would that preliminary belief that you have

22   interfere with your ability to follow the Court's instructions?

23             JUROR NO. 95:  I don't think so.

24             THE COURT:  Okay.  You --

25             JUROR NO. 95:  But I have never served as a juror, so

1    I don't --

2         THE COURT:  I understand that.  Now, there is a

3    couple of other questions about criminal law that I just want

4    to ask you.

5         You were asked if you believe whether the law

6    protects the rights of criminal defendants too much and does

7    not enough protect the rights of the victims of crime and their

8    families.  And you indicated you were unsure about that.

9         Do you want to explain a little bit more about that.

10        JUROR NO. 95:  I wasn't quite sure what the question

11   was trying to get at.

12        THE COURT:  If the Court --

13        JUROR NO. 95:  It didn't strike me as being something

14   that I had really cared or thought about that much.

15        THE COURT:  Have you given much thought to the

16   criminal justice system?

17        JUROR NO. 95:  Not really.  I never been in a

18   criminal court before, to be honest with you.  And I have never

19   had any friends who have ever been convicted of crimes or

20   anything like that, or family members.

21        So it is never something I have been drawn into or

22   had really formed an opinion about that much.

23        THE COURT:  All right.  Do you believe that if a

24   defendant does not testify at trial, he is probably guilty?

25        JUROR NO. 95:  I don't really have an opinion on that

1    either.  I think I checked unsure on that one too.

2         THE COURT:  You checked:  Unsure.  Now again, if the

3    Court instructed -- the Court would instruct you if you were a

4    juror in this case that because the Fifth Amendment gives the

5    defendant an absolute right to not testify, if he remains

6    silent, the jury can't use that silence as any evidence of

7    guilt, can't draw any inferences from it, or anything like.

8         Now, would that be difficult for you?

9         JUROR NO. 95:  I don't think so, but --

10        THE COURT:  All right.  Thank you.  Why don't you

11   step down for a second, sir.

12        NOTE:  Juror number 95 leaves the courtroom.

13        THE COURT:  Any follow-up questions?

14        MR. KROMBERG:  Judge, I would be interested in

15   knowing what Taylor Corporation does that the prospective juror

16   is a business manager about.

17        THE COURT:  Okay.  Anything, Mr. MacMahon?

18        MR. MacMAHON:  No, Your Honor.

19        THE COURT:  I did not probe with this defendant,

20   but -- I am sorry, this juror, but I can if you would like me

21   to, his involvement with members of the Islamic faith.  Because

22   he does appear to have had a fair amount of involvement, and we

23   don't have that many people in the pool with that perspective.

24        MR. MacMAHON:  Which question is that, Your Honor?

25        THE COURT:  71 and 72.  He indicated he has got

293

1    friendly relations with members of the Islamic faith and that

2    they have discussed their respective faiths.  I think I am

3    going to probe that with him too.

4           All right.  Ask the juror to come back in, Mr. Wood.

5           NOTE:  Juror number 95 returns to the courtroom.

6           THE COURT:  Sir, we will let you stand there if you

7    just speak up in a good, loud voice.

8           Can you just briefly tell us what Taylor Corp does.

9    What kind of work it performs?

10          JUROR NO. 95:  Taylor Corporation is a roughly

11   $2 billion organization, 16,000 employees.  It is a holding

12   company that owns about 90 different operating companies.  We

13   are organized into ten different groups of companies.  One of

14   the groups is a commercial printing group.  We have 11

15   commercial printing companies.

16          The group that I am in charge of is our marketing

17   communications companies.  Those are mostly agencies, marketing

18   agencies that provide marketing services to, in one case large

19   corporations, in another case the place where my office is out

20   of in this area is a company called Marketing General, which

21   provides marketing services to large national associations.

22          THE COURT:  All right.  So not a government

23   contractor?

24          JUROR NO. 95:  Not at all.  Not at all.

25          THE COURT:  All right.  And you indicated that you

294

1  have friendly relations with members of the Islamic faith?

2       JUROR NO. 95:  Yes.

3       THE COURT:  And you have had discussions about

4  your -- I know you are a Mormon --

5       JUROR NO. 95:  Some limited, yes.

6       THE COURT:  And you indicated you've got both

7  positive and negative feelings about members of that faith?

8       JUROR NO. 95:  Well, positive in the sense that the

9  ones that I have become friends with I find to be very

10  respectful and sincere, faithful people that I have had very

11  positive interactions with.

12       I find offensive the whole concept of a holy war or

13  attacks against the U.S.  The whole 9/11 thing very much

14  angered me, as it did many of us, I think.

15       THE COURT:  Do you feel that your feelings about that

16  might influence your ability to be judge this case?  Because

17  you know a lot of that is going to be discussed in this case.

18       THE WITNESS:  I don't know.

19       THE COURT:  All right.  Thank you, sir.  Step

20  outside, please.

21       NOTE:  Juror number 95 leaves the courtroom.

22       THE COURT:  All right.  Any challenge to this juror?

23       MR. KROMBERG:  No, Your Honor.

24       MR. MacMAHON:  Yes, Your Honor.  The defendant would

25  move to strike.  He had too many I don't know answers.

295

1    Especially some of the criminal justice questions before and

2    then this one as well.

3            THE COURT:  I agree with you.  I am going to strike

4    this juror.  I think it would be difficult for him.  All right.

5            NOTE:  Juror number 95 returns to the courtroom.

6            THE COURT:  Thank you, for your attendance, sir.  We

7    are going to go ahead and excuse you from the jury pool at this

8    point.  So you are finished with us, and you may fulfill your

9    business trips in the future.

10           JUROR NO. 95:  All right.  Thank you very much.

11           THE COURT:  But thank you very much.

12           NOTE:  Juror number 95 leaves the courtroom.

13           THE COURT:  All right, I believe we are now at juror

14   number 97.

15           NOTE:  Juror number 97 enters the courtroom.

16           THE COURT:  Good afternoon, ma'am.  Thank you for

17   coming back to court.

18           Since filling out the questionnaire on Monday, have

19   you thought about anything you might want to add to any of your

20   answers or any additional information you think we might want

21   to know about?

22           JUROR NO. 97:  No.

23           THE COURT:  No?  All right.  Has anything changed in

24   your personal or business lives that might affect your

25   availability to try this case?

296

```
1              JUROR NO. 97:  No.

2              THE COURT:  No?  Have you experienced any media

3    coverage or conducted any investigation concerning this case

4    since Monday?

5              JUROR NO. 97:  No.

6              THE COURT:  If you can pull up just a bit closer to

7    the microphone.

8              JUROR NO. 97:  Okay.

9              THE COURT:  Now, I understand that you are an

10   Assistant Dean for Students at Howard Law School, is that

11   correct?

12             JUROR NO. 97:  That's correct.

13             THE COURT:  You also have a law degree?

14             JUROR NO. 97:  Yes, I do.

15             THE COURT:  And you teach at the law school, is that

16   correct?

17             JUROR NO. 97:  Yes, I do.

18             THE COURT:  Have you ever taught criminal law,

19   evidence, trial techniques, any of those subjects?

20             JUROR NO. 97:  Not, not as a part of the law school.

21   I do teach a trial advocacy workshop to a group of high school

22   students in the summer, at a summer camp.

23             THE COURT:  All right.  You worked as a clerk in the

24   Bronx County Criminal Court for a couple of months?

25             JUROR NO. 97:  Yes.
```

297

```
 1              THE COURT:  Now, when you say clerk, was that in the
 2     Clerk's Office or as law clerk?
 3              JUROR NO. 97:  As a law clerk.
 4              THE COURT:  As a law clerk.  Outside of that
 5     experience, did you have any professional experience in
 6     criminal justice?
 7              JUROR NO. 97:  No.
 8              THE COURT:  So were you ever a prosecutor?
 9              JUROR NO. 97:  No.
10              THE COURT:  Or a criminal defense attorney?
11              JUROR NO. 97:  No.
12              THE COURT:  All right.  And how about appellate work,
13     did you ever do any appellate work on criminal cases?
14              JUROR NO. 97:  Not on criminal, not on any criminal.
15              THE COURT:  All right.  Have you ever practiced as a
16     trial lawyer?
17              JUROR NO. 97:  Not as a trial -- well, when I first
18     got out of law school, I worked for Legal Services of Central
19     New York.  And we never went to trial, but I was in the GPU,
20     which is the Garbage Pail Unit, so we got landlord/tenant,
21     mainly administrative entitlement cases.
22              THE COURT:  All right.  Is your primary job though
23     now at Howard as Assistant Dean for Students?
24              JUROR NO. 97:  That's my primary job, yes.
25              THE COURT:  So I assume most of your job is spent in
```

298

1      administrative work and not in the classroom?

2                JUROR NO. 97:  Yes, it is.

3                THE COURT:  Okay.  You know, one of the concerns I

4      always have in having lawyers in a jury is I can't have a

5      shadow judge in the jury.

6                JUROR NO. 97:  Absolutely.

7                THE COURT:  If you were chosen to be a juror in this

8      case, first of all, would you have any difficulty in following

9      the instructions of the Court even if you disagreed?

10               For example, if I gave you a definition or principles

11     about credibility of witnesses or something like that, or

12     discussed with you the elements of a particular offense that is

13     involved in the case, and you said, oh, that can't be right, or

14     I remember it differently from law school, can you put aside

15     that personal view and follow the instructions of the Court?

16               JUROR NO. 97:  I believe I can.

17               THE COURT:  And would you be willing to not answer

18     any of the jurors' questions if they said, oh, you're lawyer,

19     can you tell us what does this concept mean, would you be able

20     to tell the jurors, you have to ask the judge, I can't tell

21     you?

22               JUROR NO. 97:  Yes, I would.

23               THE COURT:  All right.  You indicated in paragraph 27

24     that you currently, if I understand it correctly, you have a

25     son-in-law who is a captain in the Army, is that correct?

1          JUROR NO. 97:  That's correct.

2          THE COURT:  And apparently -- is he in Iraq, or was

3     he recently?

4          JUROR NO. 97:  He is in Iraq at the present time.

5          THE COURT:  He is right now?

6          JUROR NO. 97:  He is right now.

7          THE COURT:  Although Iraq itself is not involved in

8     this case, there are allegations involving the whole general

9     Middle East sort of world and possibly issues like that.  And

10    certainly the war on terrorism will be an issue in this case,

11    and to the extent that that matter in Iraq is connected to

12    that.

13         Would the fact that you have a family member over

14    there, given the nature of the issues in this case, do you

15    think in any respect that might make it difficult for you to be

16    impartial in judging this case?

17         JUROR NO. 97:  No.

18         THE COURT:  There may be allegations in this case

19    that there were efforts being made to recruit people to fight

20    on behalf of enemies of the United States and to fight against

21    the United States.

22         Again because you have a family member in the

23    military actively engaged in combat, do you fell in any respect

24    those types of allegations would make it difficult to be

25    impartial?

300

```
 1            JUROR NO. 97:  No.

 2            THE COURT:  All right.  In paragraph 55 you indicated

 3   that you were once a witness in a case against a former

 4   student.  Did that case actually go to trial?

 5            JUROR NO. 97:  Yes, it did.

 6            THE COURT:  In a state or federal court?

 7            JUROR NO. 97:  Federal.

 8            THE COURT:  In the District of Columbia or here?

 9            JUROR NO. 97:  No, it was in the Southern District of

10   New York.

11            THE COURT:  All right.  And so, it was a criminal or

12   a civil case?

13            JUROR NO. 97:  It was a criminal case.

14            THE COURT:  Criminal fraud.  Who called you, the

15   prosecution or the defense?

16            JUROR NO. 97:  The prosecution.  They actually called

17   the university, and I went as the representative of the

18   university.

19            THE COURT:  All right.  And you took the stand, so I

20   assume you were cross-examined then by the defense attorney?

21            JUROR NO. 97:  Yes.

22            THE COURT:  Was there anything about your experience

23   as a witness in that trial that you feel might affect your

24   ability to be an impartial judge in this case?

25            JUROR NO. 97:  No.
```

301

1          THE COURT:  By that I mean, for example, part of a
2    jury's job is to judge the credibility of witnesses.
3          JUROR NO. 97:  Yes.
4          THE COURT:  Having been in the witness box, you know
5    what it feels like to be examined and cross-examined.  Would
6    you hold against the lawyer who was examining or
7    cross-examining a witness some of the experiences that you had?
8          In other words, would your past experience taint how
9    you would evaluate this case?
10          JUROR NO. 97:  I don't think so.  It was very brief.
11    So I don't think so.
12          THE COURT:  All right.  Did I understand correctly
13    from paragraph 71 that your former husband was Muslim?
14          JUROR NO. 97:  That's correct.
15          THE COURT:  And I will have to ask you this, what
16    kind of relationship do you have with your former husband and
17    his family?
18          JUROR NO. 97:  An amicable one.
19          THE COURT:  Amicable?  Do you know what, if any,
20    particular type of Muslim he is?
21          JUROR NO. 97:  He is a Suni Muslim.
22          THE COURT:  A Suni Muslim.  And did you go to
23    services with him?
24          JUROR NO. 97:  I did not.
25          THE COURT:  Was he a convert or was he a life-long

302

1    Muslim?

2           JUROR NO. 97:  He was a convert.

3           THE COURT:  Did he convert while you were married or

4    before?

5           JUROR NO. 97:  He converted shortly after we got

6    married.

7           THE COURT:  All right.

8           JUROR NO. 97:  He was not a Muslim at the time that

9    we were married.

10          THE COURT:  Is he American born?

11          JUROR NO. 97:  He is American born.

12          THE COURT:  And his family also converted?

13          JUROR NO. 97:  No.  His immediate family did not.  He

14    married and then had another family.  So that's the family that

15    I am referring to.

16          THE COURT:  I see.  I see.  Is there anything about

17    your experience living with him as he went through the

18    conversion that you feel might affect your impartiality in this

19    case?

20          JUROR NO. 97:  No.

21          THE COURT:  Did you form any views -- I know you have

22    checked that you don't have any, but just to give you one more

23    opportunity, any particular negative or positive feelings about

24    Islam or Muslims from that experience?

25          JUROR NO. 97:  No, I didn't.

1        THE COURT:  All right.  Is there anything at all

2   about this case that you think might make it difficult for you

3   to be an impartial juror?

4        JUROR NO. 97:  Based on the limited amount of

5   information that we have been given, no.

6        THE COURT:  All right.  Do you mind stepping outside

7   for a second.

8        NOTE:  Juror number 97 leaves the courtroom.

9        THE COURT:  Any --

10       MR. KROMBERG:  No questions, Judge.

11       THE COURT:  Any questions?

12       MR. MacMAHON:  No questions, Your Honor.

13       THE COURT:  All right.  How about any argument -- I

14   think this was a juror whom the Government wanted stricken for

15   cause.

16       MR. KROMBERG:  Judge, I still think so.  Someone who

17   teaches law on a regular basis to first year law students and

18   teaches it to high school students, I just don't think that

19   should be a person in the jury box.

20       THE COURT:  Well, I asked her directly, and I have in

21   the past talked to lawyer friends of mine who wound up being

22   jurors, and I have asked them, you know, what their role is in

23   the jury room.  Because I worry about that.  And the ones I

24   have spoken to have said, you know, they didn't even tell the

25   other jurors they were lawyers.  There is really no reason why

304

1    other jurors would know she is a lawyer.

2         I mean, her answers I thought -- you know, you can

3    certainly exercise a peremptory, but I didn't hear anything

4    that would give me a reason to feel there is a for-cause basis

5    to strike this juror.

6         What is the defendant's position?

7         MR. MacMAHON:  No objection, Your Honor.

8         THE COURT:  All right.  Then we're going to let her

9    stay on the list.

10        NOTE:  Juror number 97 returns to the courtroom.

11        THE COURT:  Ma'am, we are still going to consider you

12   for this case.  What's happening is I am trying to get a small

13   enough pool together that we can actually go ahead on Monday

14   and actually pull the jury that will hear this case.  So you

15   are clear to go back to work -- it's probably too late today,

16   but tomorrow.  There is no court for you here tomorrow.

17        You need to keep calling that phone number that we

18   gave you, the contact number.  And call after 6 tomorrow night,

19   that will tell you for certain what time you need to be here on

20   Monday.

21        In the meantime, continue not to read anything about

22   the case or listen to any media coverage.  Do not do any

23   investigation.  Obviously, don't tell people any of the

24   details.  It's all right to say you're a juror, but that's it.

25        And we have been referring to you by number to

1    prevent the media from trying to contact you and ask you all

2    about the case.  So you shouldn't be contacted.  But if you

3    were to be, please let you us know right away.  All right?

4              JUROR NO. 97:  Yes.

5              THE COURT:  And you are free to go now.  Thank you.

6              NOTE:  Juror number 97 leaves the courtroom.

7              THE COURT:  All right, juror number 101.

8              NOTE:  Juror number 101 enters the courtroom.

9              THE COURT:  Thank you for coming back to court, sir.

10   Just a couple of questions.

11             Since answering the questionnaire on Monday, have you

12   thought about whether there is anything you need to add to any

13   of your answers?

14             JUROR NO. 101:  Nothing I can think of, no.

15             THE COURT:  All right.  Has anything changed in your

16   personal or business life that might make serving on this jury

17   difficult in terms of time commitments?

18             JUROR NO. 101:  No.

19             THE COURT:  No?  Have you conducted any investigation

20   into any of the issues concerning this case or seen any media

21   coverage of the case?

22             JUROR NO. 101:  No.

23             THE COURT:  Okay.  You indicated you do research.

24   And what you kind of research do you do?

25             JUROR NO. 101:  Cancer research.  I work for a

306

1    biotech company.

2            THE COURT:  All right.  And it indicates here on

3    question number, I think it was 24, that you have two friends

4    at SRA and one acquaintance at GMU.

5            Now, the friends at SRA, can you just tell us their

6    names, please.

7            JUROR NO. 101:  James Williams and Jeff Forbes.

8            THE COURT:  Are either of those names issues for us?

9            MR. MacMAHON:  No, Your Honor.

10           THE COURT:  All right.  All right.  You indicated in

11   your question to question number 54, as I understand it, that

12   somebody in your family or yourself was once charged with

13   conspiracy to possess marijuana, and then those charges were

14   dropped?

15           JUROR NO. 101:  That was me.

16           THE COURT:  That was you.  Okay.  Can you give us a

17   little bit more detail.  What jurisdiction did that happen in?

18           JUROR NO. 101:  It was Ocean City, Maryland on spring

19   break.

20           THE COURT:  Okay.

21           JUROR NO. 101:  A friend of mine was approached by an

22   undercover officer.  He asked us if we wanted to buy marijuana.

23   My friend said yes, and we were arrested for that.

24           THE COURT:  Now, did that case go to trial?

25           JUROR NO. 101:  Yes, but I was acquitted because the

307

```
1    arresting officer didn't show up.
2           THE COURT:  And it was just a bench trial, just a
3    judge in the courtroom?
4           JUROR NO. 101:  Yes.
5           THE COURT:  All right.  Were you taken into custody
6    with handcuffs and all?
7           JUROR NO. 101:  Yes.
8           THE COURT:  Did you have to spend the night in jail?
9           JUROR NO. 101:  Yes, I did.
10          THE COURT:  How did you feel about that?
11          JUROR NO. 101:  Being arrested?
12          THE COURT:  Yes.
13          JUROR NO. 101:  I didn't like it at all.
14          THE COURT:  Okay.  Do you harbor any ill will towards
15   either the police or the prosecutors because of what happened
16   to you in that case?
17          JUROR NO. 101:  Oh, no.  It was a stupid thing that I
18   did and --
19          THE COURT:  Okay.  In question number 55 you were a
20   witness in a criminal case in Arlington?
21          JUROR NO. 101:  I was, yes.
22          THE COURT:  What kind of a criminal case was that?
23          JUROR NO. 101:  A friend of mine -- let's see.  A
24   friend of mine had a gun pulled on him.  And somebody who saw
25   it told me.  And so, I wound up being a witness for the
```

1   prosecution trying to -- against this guy who pulled the gun

2   originally.

3           THE COURT:  Okay.  And the case actually went to

4   trial?

5           JUROR NO. 101:  It did, yes.

6           THE COURT:  You had to sit in a box like the one you

7   are in and you were asked questions?

8           JUROR NO. 101:  Yes.

9           THE COURT:  What happened in that case, do you know?

10          JUROR NO. 101:  The case was acquitted.  The guy --

11  the defendant was acquitted because of, I guess a lack of -- it

12  was all hearsay, I guess.

13          THE COURT:  Okay.  Now, were you cross-examined

14  fairly vigorously by the defense attorney?

15          JUROR NO. 101:  I was, yes.

16          THE COURT:  How did you feel about that?

17          JUROR NO. 101:  I didn't find it a pleasant

18  experience.  I didn't like -- I was not told ahead of time I

19  was going to be subpoenaed to be a witness.  I found it stapled

20  to the door in my dorm.  So I was really not happy about having

21  to be part of the whole process there.

22          I didn't find it a very comfortable experience, being

23  cross-examined.

24          THE COURT:  The reason I ask you those questions, of

25  course, is as a juror one of your jobs in this case would be to

1    evaluate the testimony of witnesses.

2              JUROR NO. 101:  Yes.

3              THE COURT:  And so, we're going to have a lot of

4    people sitting in that box and they are going to be questioned,

5    and then they are going to be cross-examined.  And I just want

6    to know whether your experience as having been a witness, and

7    also frankly having been a defendant once, do you feel that

8    those experiences might in any way affect your impartiality?

9              JUROR NO. 101:  I don't believe so, no.  Both of

10   those were a long time ago.

11             THE COURT:  All right.  In question number 87 you

12   were asked:  Would you evaluate the testimony of a criminal

13   defendant in the same manner as you would the testimony of

14   other witnesses?  And you indicated you're unsure.

15             Can you explain that answer to us.

16             JUROR NO. 101:  I feel that in a criminal situation

17   where a defendant is a witness, that person would have a lot

18   more reason to lie than other witnesses.

19             So I would have -- I mean, I think somebody like that

20   would have a lot more at stake than the other witnesses in the

21   trial, would have more incentive to not be totally truthful.

22             THE COURT:  Would you necessarily disbelieve a person

23   who was a defendant just because he was a defendant?

24             JUROR NO. 101:  No, no, I wouldn't necessarily.

25             THE COURT:  Did you testify at your trial?

310

1              JUROR NO. 101:  No, I didn't.

2              THE COURT:  All right.  But do you think you could

3       evaluate the testimony of the defendant or any other witness on

4       its own merits?

5              JUROR NO. 101:  I would do that to the best of my

6       ability, yes.

7              THE COURT:  Okay.  You also indicated in question

8       number 88, you were asked:  Do you tend to believe that a

9       member of law enforcement, such as a police officer or federal

10      agent, who testifies in court is more likely to tell the truth

11      than other witnesses, less likely, or equally likely?  And you

12      checked more likely.

13             JUROR NO. 101:  Yes.

14             THE COURT:  Can you explain the reason for that

15      answer.

16             JUROR NO. 101:  I believe -- well, I think that

17      police officers, law enforcement officers in general, have much

18      more experience with this, being in court, being a witness.

19      They have much more experience examining the details of events.

20      I feel that a lot of times when witnesses, people witness

21      something, a crime, it can be such a traumatic, dramatic event,

22      that it can affect their memories later.

23             And being in court, being on the witness stand, can

24      also be a traumatic event for somebody that can affect them.

25             I feel like police officers have much more experience

311

1    with this kind of thing and are much more likely to remember

2    events and be able to retell them accurately, how they

3    occurred.

4            THE COURT:  Well, if you had an experienced non-law

5    enforcement person, but somebody who testified a lot, like a

6    coroner, or an expert witness who is in court all the time,

7    would you have the same extra confidence in their testimony as

8    you do a law enforcement person?

9            JUROR NO. 101:  Yeah.  I was thinking mostly in terms

10   of somebody, you know, a layperson off the street who is not

11   regularly -- doesn't regularly have experience with the court.

12           THE COURT:  All right.  Now, you know at the end of

13   the trial the Court has to give the instructions to the jury.

14   One of the instructions that the jury would get is that they

15   would be told that you have to evaluate the testimony of each

16   witness on its own merits.

17           So you look at what the witness says, how he or she

18   says it, whether it is corroborated by other evidence in the

19   case, or undercut by other evidence in the case.  And a juror

20   is not supposed to look at the status of the person to

21   determine whether or not that testimony is credible.

22           So that whether you're a civilian or a law

23   enforcement person, that fact by and of itself is not supposed

24   to have any impact.

25           Do you think you could follow that instruction of the

312

1    Court in evaluating the testimony in this case?

2              JUROR NO. 101:  I think I could.

3              THE COURT:  Okay.  And you are a trained -- is your

4    background biology or chemistry?

5              JUROR NO. 101:  Psychology actually.

6              THE COURT:  Psychology, all right.  But you are a

7    researcher?

8              JUROR NO. 101:  Yes.

9              THE COURT:  All right.  If you don't mind stepping

10   outside for a second.

11             NOTE:  Juror number 101 leaves the courtroom.

12             MR. KROMBERG:  No additional questions.

13             THE COURT:  Okay.

14             MR. MacMAHON:  No additional questions, Your Honor.

15   I am sorry.

16             THE COURT:  That's all right.  Anybody have any

17   concerns about this juror?

18             MR. KROMBERG:  No, Your Honor.

19             MR. MacMAHON:  No, Your Honor.

20             THE COURT:  All right.  That's good.  I will agree

21   with you on that.

22             All right.  Let's bring him back in.

23             NOTE:  Juror number 101 returns to the courtroom.

24             THE COURT:  All right, sir, you have made the next

25   and final cut of this case.  So let me just tell you the plan.

313

1          You are free tomorrow.  Friday we are not going to be

2    needing you.  Most likely you will be back here Monday morning

3    at 10 o'clock.  You will know that for certain by checking that

4    telephone number that you have been contacting.

5          JUROR NO. 101:  Okay.

6          THE COURT:  All right.  We probably won't have it

7    posted until 6 o'clock tomorrow, but that will give you the

8    definitive.

9          In the meantime, I ask you not to discuss this case,

10   obviously, with anybody.  Not to conduct any investigation.

11   Avoid any media coverage.

12         And just so you know, we've referred to you by number

13   to minimize the chance that the media might try to talk to you.

14   We don't want you talking to anybody because you are going be a

15   juror possibly in this case.  But please let us know if you get

16   contacted by anybody.

17         JUROR NO. 101:  Absolutely.

18         THE COURT:  All right.  Thank you, sir.  You are free

19   to go.

20         NOTE:  Juror number 101 leaves the courtroom.

21         THE COURT:  Number 104.  We have just three more to

22   go, folks.

23         NOTE:  Juror number 104 enters the courtroom.

24         THE COURT:  Good afternoon, sir.  Thank you for

25   coming back to court.

314

1          Since filling out your questionnaire, I would like to

2     know whether there is anything you thought you might want to

3     add to any of your answers or any of the explanations?

4          JUROR NO. 104:  Just wanted to -- I made reference to

5     journalism, and I just wanted to make it clear, I am not a

6     working journalist now.  I don't have any outlet or news

7     organization with which I am affiliated.

8          THE COURT:  Well, you are currently the Associate

9     Director, as I understand it, at the U.S. International

10    Broadcasting Bureau?

11         JUROR NO. 104:  That's correct.  But I don't get

12    involved -- it is transmission and marketing and things like

13    that.  It's not journalism.

14         THE COURT:  Is that a government agency?

15         JUROR NO. 104:  Yes, it is.

16         THE COURT:  And part of the State Department?

17         JUROR NO. 104:  No.  It's one of the smallest federal

18    agencies.  It is an independent agency.

19         THE COURT:  And its mandate is exactly what?

20         JUROR NO. 104:  All nonmilitary U.S. International

21    broadcasting, Voice of America, Radio Free Europe, in this case

22    Radio Sawa.  All of the nonmilitary broadcasting overseas.

23         THE COURT:  Okay.  Has anything changed in your

24    business or personal life that would make your service on this

25    jury at all difficult in terms of time commitments?

1          JUROR NO. 104:  No.  I gave an accurate answer.

2     There is always an inconvenience, but it's not a serious

3     inconvenience.

4          THE COURT:  All right.  Since Monday have you

5     conducted any investigation about this case or been exposed to

6     any media coverage about it?

7          JUROR NO. 104:  No.

8          THE COURT:  Okay.  In your answer to question number

9     28, you indicated that you have traveled extensively,

10    obviously, and you have actually worked in Iraq.  And that your

11    chief -- in 29 you indicated that your chief of staff was

12    killed in Baghdad in October of 2003.

13         You've also indicated that a co-worker's sister was

14    killed at the World Trade Center.

15         So, obviously, you have had some very direct contact

16    with some of the matters that circulate around this case.  Do

17    you feel in any respect because of the nature of those

18    experiences and the nature of what you know about this case so

19    far, you might have any difficulty in being impartial in

20    judging this case?

21         JUROR NO. 104:  No.

22         THE COURT:  Okay.  You mentioned that you know of

23    Eric Kohlmann?

24         JUROR NO. 104:  Evan Kohlmann.  I don't know him

25    personally.  The answer was meant to convey -- I thought the

1    question was generally have you ever heard of these people.

2    And I may be wrong, but I thought I recognized the name as a

3    commentator on terrorism.

4         THE COURT:  To your knowledge, has he commented on

5    any of your broadcasts?

6         JUROR NO. 104:  To my -- I don't have anything to do

7    with the editorial content, so he may have commented -- I mean,

8    made statements, but I don't know.  And I tend to doubt it.

9         THE COURT:  It sounds as though you must be a fairly

10   astute reader of information about terrorism?

11        JUROR NO. 104:  Oh, yes.

12        THE COURT:  All right.  Have you heard of LET or

13   Lashkar-e-Taiba before coming to court?

14        JUROR NO. 104:  No.

15        THE COURT:  Do you feel that you have any degree of

16   expertise about the conflict in Kashmir?

17        JUROR NO. 104:  I understand what the issues are.

18   But, no, I don't have any expertise in it, no.

19        THE COURT:  In hearing about Kohlmann, have you heard

20   anything one way or the other, like he is a good expert, he is

21   a weak exert, anything at all?

22        JUROR NO. 104:  No.  And it's only sort of the

23   glancing knowledge of watching the crawl at the bottom of the

24   TV screen as he is talking if it is the person I think it is.

25   No, not in-depth at all.  It was just sort of name recognition.

1          THE COURT:  All right.  Is there anything about the

2     degree that you have recognized his name, would that affect

3     your ability if he were to testify in this case as to how you

4     would evaluate his testimony?

5          JUROR NO. 104:  No.

6          THE COURT:  Okay.  You were asked some questions

7     about sort of your understanding or belief about the law

8     enforcement, the legal system.  And question number 88, you

9     were asked:  Do you tend to believe that a member of law

10    enforcement, such as a police officer or a federal agent, who

11    testifies in court is more likely to tell the truth than other

12    witnesses, less likely to tell the truth, or equally likely to

13    tell the truth?  You indicated more likely.

14         And I would like you to explain the basis for that.

15         JUROR NO. 104:  I assumed that would be perhaps a

16    controversial question.  Simply because, and I've only been a

17    federal employee for the past four years, it's not a career

18    that I have been in very long, I have worked with some law

19    enforcement agents and have been impressed with their

20    dedication.

21         I think the main reason I said that is because if you

22    take the universe of people testifying in court, they not only

23    have the dedication to the job, but they also have a very real

24    stake in that if they testify falsely, it could lead to

25    termination, it could end their career, it has consequences

318

1    that go beyond sort of the average run-of-the-mill person.

2            So it's a judgment call.  But if I had to say on

3    balance, I would say, yeah, they probably have a little bit

4    bigger sword hanging over them because of the requirement of

5    the job to testify accurately.

6            THE COURT:  Well, I would be instructing the jury at

7    the end of this case that in evaluating the credibility of a

8    witness, what a jury has to do is they have to evaluate what

9    the witness says, and basically how the witness says it, the

10   degree to which it has been well corroborated or contradicted.

11           And one of the concerns is that we don't want jurors

12   judging or prejudging the credibility of testimony simply

13   because of who the person is who is speaking, it's an ad

14   hominem.  So that's why that question is, as you detected, a

15   concern.

16           Given that instruction by the Court, do you feel in

17   any respect that your sort of preconception about what to

18   expect from a law enforcement witness, that you could put that

19   aside and evaluate each witness' testimony on its own merits?

20           JUROR NO. 104:  Yes, I do.

21           THE COURT:  Okay.  Because you do have more

22   experience and background in some of the parts of the world

23   that may be discussed in this case, we have to be very careful

24   in having experts, shadow experts in the jury box.

25           And in fact, there may be clippings from Al Jazeera

319

1    in this case.  Sometimes there are in these types of cases.  I

2    am not sure.  There may be Web site clips, et cetera.  And some

3    of them you may have seen since you apparently have some

4    interest in these areas.

5            It's extremely important if you were to be chosen as

6    a juror that you not be providing background information or any

7    quantum of information to this jury that they would not have

8    been getting through the courtroom itself.

9            Would you be able to sort of go moot if they were to

10   ask questions about, you know, well, sir, what you do you know

11   about this?  In other words, when the jury was by itself.

12   Would you be able to not volunteer any information, in fact not

13   act as a shadow expert --

14           JUROR NO. 104:  Yeah.  I don't have any concerns

15   about that.  I could certainly keep my mouth shut.

16           But I would ask the Court, you know, can you take

17   your own information base -- meaning if you know a particular

18   source is more or less likely to be credible, I assume you can

19   weigh that, right?

20           THE COURT:  Well, that's the problem.  That's the

21   really for the lawyers to point that out.  That's why we ask

22   jurors if they know any of the witnesses or if they have

23   information about the case itself.

24           JUROR NO. 104:  No, I don't have any information

25   about the case.  And I would be -- I would not lead anyone or

1   bring outside information or background.

2          THE COURT:  All right.  And again, you have not read

3   any media stories about this case, to your knowledge?

4          JUROR NO. 104:  No.

5          THE COURT:  And don't recall anything about

6   references to a Virginia jihad or to a Virginia paintball case?

7          JUROR NO. 104:  No.  The agency is forbidden by law

8   to broadcast in the United States.  And by definition, all of

9   our focus has to be outside the borders.

10         So.  I tend to do that in my private life too.  I

11  tend to read ravenously about things that happen overseas, but

12  probably not terribly well informed about things in my own

13  backyard.

14         THE COURT:  All right.  And how about Chechnya, have

15  you read much about Chechnya?

16         JUROR NO. 104:  Read about it because, obviously, of

17  the violence in Chechnya.  I don't know if I mentioned it in

18  there, but I used to live in Moscow, so I know some of the

19  issues vis-a-via the center and the former Soviet republics and

20  the freestanding political subdivisions in Russia now.

21         But, no, I don't have any particular expertise or

22  knowledge or opinion on Chechnya.

23         THE COURT:  All right.  In the course of your

24  international travels and in your work, have you formed any

25  close friendships with any members of the Islamic faith?

1          JUROR NO. 104:  Close friendships perhaps overstates

2     it, but certainly friendships.  Simply distances keep you from,

3     you know, sort of having it.  But there are people that every

4     time in a particular city, I will give them a call and have

5     dinner and that sort of thing.

6          THE COURT:  Because you indicated in questions 71 and

7     72 -- 71, you have had brief discussions, but nothing in depth.

8          And then in 72 you talked a little bit about your

9     feelings about the Islamic faith, both the positive and the

10    negative.

11         JUROR NO. 104:  Right.

12         THE COURT:  Is there anything you wanted to add to

13    either of those answers?

14         JUROR NO. 104:  Well, in the course of doing business

15    in Arab world, when someone excuses themselves at a particular

16    times, you know, you can look at your watch and recognize that

17    they are, you know, they are going off to pray.  And then they

18    confirm, yes, you will excuse me, I was off praying.

19         Or trying to make sure that you don't show up in a

20    country during, you know, the wrong times for religious

21    services.  You are sensitive of it, you are conscious of it.

22         But I try not to make it a practice of probing into

23    any particular person's orientation or degree of acceptance of

24    or embrace of the religion.

25         THE COURT:  All right.  Thank you.  If you would step

1    outside, sir, for a second.

2             NOTE:  Juror number 104 leaves the courtroom.

3             MR. KROMBERG:  Judge, I have no questions.  In fact,

4    I think I would take 12 jurors like that.

5             The interesting question comes up of the lawyers

6    often argue you don't have to check your common sense and

7    knowledge at the door, but at the same time there is this issue

8    that he has a different knowledge base than everybody else.

9             But as his questionnaire shows, he may be the ideal

10   juror and he can see all sides of this.

11            THE COURT:  All right.  Let me hear from the defense.

12   First of all, any further questions you want us to ask?

13            MR. MacMAHON:  No further questions either, Your

14   Honor.

15            I would agree with Mr. Kromberg except for the fact

16   that some witnesses can have too much knowledge, and that's

17   what concerns me about this witness.  It would be one thing to

18   have a doctor in a malpractice case, and then you get an

19   orthopedic surgeon and that's the issue in the case.

20            I mean, this person has detailed -- I can't tell

21   whether he reads Arabic.  He is watching Al Jazeera, I guess

22   maybe he is watching the bottom of it he is saying.

23            But, I mean, with some of the issues we've talked

24   about in this case about things in Saudi Arabia and otherwise,

25   he probably has more knowledge of those things that certainly I

323

1    do, maybe even Mr. Kromberg does.

2         And whether he could actually go into detail about

3    keeping all this away from his other jurors, I think it is a

4    bit of a crap shoot, but --

5         THE COURT:  Well, I don't think I am going to excuse

6    him for cause.  I will ask him about his knowledge of the

7    Arabic language, I think that is relevant.  But let's bring him

8    back in.

9         NOTE:  Juror number 104 returns to the courtroom.

10        THE COURT:  Sir, I forgot to you ask, do you speak,

11   read, or write Arabic?

12        JUROR NO. 104:  No.  No.  Not all.

13        THE COURT:  Does Al Jazeera have banners then?

14        JUROR NO. 104:  Pardon me?

15        THE COURT:  Does Al Jazeera have banners?

16        JUROR NO. 104:  All of the major Arabic broadcasters

17   have a logo, it's usually superimposed on the upper right-hand

18   corner, and sometimes it is Arabic script.  But you get to

19   where you can quickly say, oh, no, that logo is Jazeera or Abu

20   Dabi TV.  It is basically a fairly sophisticated, site

21   advertising, logo campaign.

22        THE COURT:  All right.  But you don't speak or read

23   any Arabic?

24        JUROR NO. 104:  No.  I understand -- no.  The answer

25   is no.

324

1          THE COURT:  All right, thank you.  Step out for just

2     one more second, please.

3          NOTE:  Juror number 104 leaves the courtroom.

4          THE COURT:  I don't find any cause basis to excuse

5     this juror, so I am going to bring him in back in on Monday.

6          MR. MacMAHON:  Thank you, Your Honor.

7          NOTE:  Juror number 104 returns to the courtroom.

8          THE COURT:  All right, sir, we are going to bring you

9     back on Monday.  You are still in the final consideration for

10    this jury.

11         I will ask that you continue not to discuss this case

12    in any respect with anyone, conduct absolutely no investigation

13    into any of the issues connected with it, and avoid any media

14    coverage that there might be.  All right?

15         To find out for certain when and where to come, you

16    need to call the number that you called for today's hearing.  I

17    would recommend you not call before 6 o'clock tomorrow.  We

18    will have everything solidly in place at that point.

19         If you are chosen to be a juror Monday morning, we

20    are going to go right into the trial.  So you should make

21    contingency plans at your office.  All right?

22         JUROR NO. 104:  That's fine.  But the selection

23    process does continue then?

24         THE COURT:  Yes.  We are getting a smaller pool.

25    There will be one last round.  So it is still not a guarantee

325

1    that you will actually be a juror, but it increases because the

2    numbers are getting smaller.

3            The last thing I just wanted you to know is you have

4    been identified by a number to prevent the media from bothering

5    you.  We don't want our jurors being interviewed before the

6    trial.  So you shouldn't be contacted.  If you were to be, we

7    would want you to let us know right away.

8            JUROR NO. 104:  Sure.

9            THE COURT:  Thank you, sir.  You are excused at this

10   time.

11           NOTE:  Juror number 104 leaves the courtroom.

12           THE COURT:  All right, juror 109.

13           NOTE:  Juror number 109 enters the courtroom.

14           THE COURT:  Good afternoon, sir.  I am sorry you have

15   been here all I day, but we are almost done.

16           Since filling out the questionnaire on Monday, have

17   you thought about whether you need to change any of your

18   answers or add anything to your answers in the questionnaire?

19           JUROR NO. 109:  No.

20           THE COURT:  Has anything changed in your business or

21   personal life that would give you a conflict now with the time

22   commitment for this trial?  Because we have to have jurors who

23   can be here from basically 9:30 in the morning until 6 for the

24   next two to three weeks.

25           JUROR NO. 109:  Well, my understanding was that

326

1    business was irrelevant to you all.

2             THE COURT:  Well, it is irrelevant unless it is just

3    a catastrophic disaster at the business.  I would certainly

4    consider that if there were a real major problem.

5             JUROR NO. 109:  I don't have any catastrophes.

6             THE COURT:  We say hardship.  We really mean it to be

7    very serious.  I mean, if you were a solo practitioner and your

8    entire income would stop for three weeks, that is a hardship

9    situation.

10            But I need to know now if there are issues because

11   what I don't want is to have you come, if you were chosen to be

12   a juror, and then midway in the trial for some reason have to

13   drop out.

14            JUROR NO. 109:  I thought I had answered that, that

15   there is not.

16            THE COURT:  Okay, that's fine.  Just making sure.

17   Have you seen any media coverage or conducted any investigation

18   about this case since Monday?

19            JUROR NO. 109:  No.

20            THE COURT:  All right.  You indicated in your

21   questionnaire that you had a family member, a sister, who was

22   seriously attacked some 20 years ago.

23            JUROR NO. 109:  Yes.

24            THE COURT:  Was there ever a criminal prosecution

25   that resulted from that?

327

1            JUROR NO. 109:  Yes, there was.

2            THE COURT:  Do you know what happened in that case?

3    Was the person found guilty or acquitted?

4            JUROR NO. 109:  The person was found guilty.

5            THE COURT:  Did you or your family go to the trial?

6            JUROR NO. 109:  Yes.

7            THE COURT:  Did you yourself go?

8            JUROR NO. 109:  For portions of it, yes.

9            THE COURT:  Were you called as a witness?

10            JUROR NO. 109:  No.

11            THE COURT:  All right.  Did you form any impressions

12    about the criminal justice system from that experience of the

13    trial and what happened to your sister?

14            JUROR NO. 109:  Not really.

15            THE COURT:  Where was the case tried?

16            JUROR NO. 109:  Here in Alexandria.

17            THE COURT:  Alexandria.  And what happened to the

18    defendant in the case?  Do you know what kind of sentence he

19    got?

20            JUROR NO. 109:  He was sentenced to jail.

21            THE COURT:  Do you know -- was it a sentence that

22    satisfied your family?

23            JUROR NO. 109:  I don't think there was any thought

24    by anyone in my family of a sentence that could satisfy or not

25    satisfy.

328

1            THE COURT:  All right.  But again, just so I am

2   clear, was there anything about that incident that left you

3   with -- some people are very dissatisfied with what happens in

4   a criminal case.

5            JUROR NO. 109:  No.  The one impression that I think

6   I came away with, I can't remember his name -- he used to be

7   the prosecutor here in Alexandria, and now he is a judge.

8            THE COURT:  John Kloch?

9            JUROR NO. 109:  Yes.  I thought he did a good job.

10           THE COURT:  All right.  How about the defense

11  attorney, do you have any memory about your reaction to him or

12  her?

13           JUROR NO. 109:  I do remember the judge at the end

14  complimenting the defense attorney on doing a good job with a

15  very difficult case.  But I have no recollection of who the

16  defense attorney was.

17           THE COURT:  All right.  Given the nature of the

18  issues in this case, which we talked a little bit about on

19  Monday and they were discussed a bit in the questionnaire, is

20  there anything about allegations of trying to get people to

21  wage war against the United States, or allegations involving

22  claims of radicalism or terrorism, that give you concern about

23  your ability to be impartial in judging the case?

24           JUROR NO. 109:  No.

25           THE COURT:  All right.  If you don't mind stepping

329

1    outside for just a second, I will see if there are any other

2    questions we need to ask you.

3              NOTE:  Juror number 109 leaves the courtroom.

4              THE COURT:  Mr. Kromberg, was there anything further

5    from you?

6              MR. KROMBERG:  Yes, Your Honor.  This is actually one

7    that we had submitted a question.

8              THE COURT:  I am sorry.  Which number did you want?

9              MR. KROMBERG:  This is in response to question number

10   40.  This is the one that he does go on to the supplemental

11   page.  And it is a very interesting answer --

12             THE COURT:  It is Jeffersonian.

13             MR. KROMBERG:  Yes, Your Honor.

14             THE COURT:  Absolutely.  I read that and thought this

15   man probably went to UVA.  Didn't Jefferson say ever 20 years

16   we needed a revolution?  I mean, that's what he said.

17             MR. KROMBERG:  That may be, but I don't want the

18   juror, to say it is this 20 -- we're the 20th year.  That's why

19   I submitted that suggested question, Judge, if that could be

20   asked.

21             THE COURT:  That doesn't give me concern.  I read the

22   answer and thought this was a very thoughtful answer.  And

23   that's not enough to continue this.

24             Anything that the defense wants the Court to ask?

25             MR. MacMAHON:  No, Your Honor.  I think that is

330

1    almost he wrote a federalist paper, is what that is, one of the

2    Jeffersonian positions.

3            THE COURT:  Other than that argument, Mr. Kromberg,

4    is there any argument about a for-cause basis for excusing this

5    witness -- or this juror?

6            MR. KROMBERG:  No, Your Honor.

7            THE COURT:  All right.  All right, have him come in.

8            NOTE:  Juror number 109 returns to the courtroom.

9            THE COURT:  Sir, we are going to continue considering

10   you for jury service.  Believe it or not, you are finished for

11   today.  And you don't have any problems with us tomorrow, so

12   you are free to go back to your regular life then.

13           We will want you back here Monday morning.  That is

14   going to be a final selection.  It will be very short.  But if

15   you are chosen on Monday, we're going to go right into the

16   trial, so you probably should make contingency plans for that.

17   All right?

18           JUROR NO. 109:  All right.

19           THE COURT:  Now, just a couple of things.  Please

20   remember my earlier caution about not discussing the case with

21   anyone, not conducting any investigation, and avoiding any

22   media coverage about the case.

23           We have referred to you by number to try to prevent

24   any media folks from trying to interview you before trial or

25   anything like that.  So you shouldn't be contacted by anyone.

331

1    But if you were to be, you need to let us know right away.  All

2    right?

3              JUROR NO. 109:  Yes, ma'am.

4              THE COURT:  Thank you.  You are free to go at this

5    point.

6              NOTE:  Juror number 109 leaves the courtroom.

7              THE COURT:  Juror 115.

8              NOTE:  Juror number 115 enters the courtroom.

9              THE COURT:  Sorry for you to be the last person.

10             JUROR NO. 115:  That's all right.

11             THE COURT:  It actually wasn't your -- these numbers

12   were pulled randomly.

13             JUROR NO. 115:  Oh, okay.

14             THE COURT:  It just happens to be -- yes, I see that.

15   Since filling out the questionnaire on Monday, have you thought

16   about whether any of your answers needed any amplification or

17   anything additional added?

18             JUROR NO. 115:  No, not really.

19             THE COURT:  All right.  Has anything changed in your

20   personal or business lives that would require to you change

21   your commitment?  In other words, can you make all the time

22   commitments for this trial?

23             JUROR NO. 115:  Yes.

24             THE COURT:  Okay.  Have you conducted any

25   investigation or watched any media coverage of this case since

332

1    Monday?

2              JUROR NO. 115:  No.

3              THE COURT:  You indicate you are kindergarten

4    teacher.  Now, the amount of time you might lose from the

5    classroom is not going to be a problem?

6              JUROR NO. 115:  I know they would have a sub, and I

7    know the sub would be good.  I would be willing to do that.

8              THE COURT:  Would you have to do any work at night

9    after sitting as a juror?

10             JUROR NO. 115:  What I would probably do is if I was

11   selected, I would go in on the weekends and get ready for the

12   next week.

13             THE COURT:  And that would be enough for you to be

14   able to do it that way?

15             JUROR NO. 115:  That's what I would have to do.

16             THE COURT:  Now, you live in Stafford County.  Do you

17   expect that you would have any significant problem in getting

18   here by 9:30?  Because that's when we need to start the trial.

19   I know that is going to be a bit of a haul.

20             JUROR NO. 115:  That's a haul, but as long as traffic

21   keeps moving, I would be okay.

22             THE COURT:  You will have to leave enough time.

23             JUROR NO. 115:  Yes.

24             THE COURT:  And we will be running until close to 6.

25   So is there any issue in terms -- because you probably won't

1    get home much before 7.

2              JUROR NO. 115:  Oh, I know.

3              THE COURT:  Okay.  And as I understand it, your

4    spouse works at the Department of Justice?

5              JUROR NO. 115:  Yes, he does.

6              THE COURT:  In telecommunications?

7              JUROR NO. 115:  Yes.

8              THE COURT:  Do you feel in any respect because the

9    prosecution is brought by U.S. Attorneys who are part of the

10   Department of Justice, that you might tend to favor the

11   prosecution end of things because your husband works for the

12   same overall organization?

13             JUROR NO. 115:  No.  He is very technical.  So I

14   don't really know exactly what all he does, but it is the

15   technical part of DoJ.

16             THE COURT:  All right.  In question 44, and I think

17   also in 48, you indicated you thought you had heard something

18   about this case on the TV news.

19             Do you have any details as to what you remember

20   hearing?

21             JUROR NO. 115:  No.  It was -- as far as I can

22   remember, it was years ago, a couple years ago, maybe just in

23   passing listening to the 11 o'clock news on TV something, but I

24   really don't remember any details.  I just remember a little

25   bit of the charges, I guess, that you told us about.

334

```
1            THE COURT:  Do you feel in any respect what you might
2    have heard could affect your ability to judge this case
3    impartially?
4            JUROR NO. 115:  No.
5            THE COURT:  Okay.  Now, you indicated in paragraph 54
6    that when you were very young, you had a misdemeanor charge
7    filed against you.  It was for shoplifting?
8            JUROR NO. 115:  Yeah.  $10 pair of shoes.
9            THE COURT:  And did you have to go to court?
10           JUROR NO. 115:  I paid a fine.  I just went in and
11   paid a fine.
12           THE COURT:  In a courtroom before a judge though?
13           JUROR NO. 115:  Yeah.
14           THE COURT:  As a result of that experience -- were
15   you actually arrested by a police officer?
16           JUROR NO. 115:  I was in the store, the police
17   officer came to the store, but I was -- no fingerprints.  No, I
18   was allowed to leave and go.
19           THE COURT:  All right.
20           JUROR NO. 115:  I wasn't taken to a police station or
21   anything like that.
22           THE COURT:  As a result of that experience, did you
23   form any attitudes about the police or the court system?
24           JUROR NO. 115:  No.  Because I know I was dumb, I did
25   a stupid thing.
```

335

1          THE COURT:  Okay.  You were asked a series of

2    questions about criminal law.  And one of the questions, number

3    84 was:  Do you believe that defendants in criminal trials

4    should have to prove that they are innocent?  And you checked

5    yes.  And then you have the comment:  Beyond a reasonable

6    doubt.

7          Could you explain what you meant by that answer.

8          JUROR NO. 115:  Well, I know that it is not up --

9    well, the defendant will have to prove his point, but I know

10   the lawyers will have to do their work also.  And the way I

11   understand the criminal system is you have to -- nothing can be

12   proven 100 percent, so it has to be beyond a reasonable doubt.

13   You have to truly believe that the person did do the crime

14   before you convict him, I think.

15         THE COURT:  All right.  But the burden of proving

16   that somebody is guilty is actually on the prosecution, not on

17   the defendant.

18         JUROR NO. 115:  Okay.  Well, that's true, yeah.

19         THE COURT:  So I was concerned when I saw the beyond

20   a reasonable doubt.  I mean, you understand that standard?

21         JUROR NO. 115:  Right.

22         THE COURT:  Are you comfortable with the concept that

23   it is the Government's job to prove a person's guilt and --

24         JUROR NO. 115:  Yeah, now that you point it out, I

25   can understand the question better, yeah.

1          THE COURT:  Was that your understanding, what I just

2   said?

3          JUROR NO. 115:  Yes.

4          THE COURT:  Okay.  Now, the next question you were

5   asked was:  Do you believe that the law does too much to

6   protect the rights of criminal defendants and not enough to

7   protect the rights of victims of crime and their families.  You

8   said you were unsure.

9          Can you explain why you are unsure.

10         JUROR NO. 115:  I don't know, just -- I don't really

11  know.  I guess I marked unsure because I don't really know.  I

12  think that we worry a lot about the criminal's rights, and a

13  lot of times I think we are not so concerned about the victim's

14  rights.

15         But I don't know, I think in certain cases it goes

16  one way or the other.  That's why I marked unsure.

17         THE COURT:  All right.  Then there was the question:

18  Would you evaluate the testimony of a criminal defendant in the

19  same manner as you would the testimony of other witnesses?  And

20  you checked you were unsure.

21         Can you explain that answer.

22         JUROR NO. 115:  Well, I guess you want to believe the

23  defendant, I guess, but you have these witnesses that are up

24  there giving their testimony, and the defendant does too,

25  and -- I don't know, I think it would just be kind of hard to

1    put his testimony above the witnesses or the witnesses above

2    the testimony of the defendant.  I just -- I don't know.

3          THE COURT:  Well, it is a hard question to answer in

4    the abstract.

5          JUROR NO. 115:  Yes, it is.

6          THE COURT:  Because usually to figure out whether you

7    believe a witness or not, you have got to see or hear them

8    testify.

9          JUROR NO. 115:  Right, that's what I think.  A

10   witness could appear that he is telling the truth, the total

11   truthful, but then maybe he is not.  And you just don't really

12   know.

13         THE COURT:  All right.  The last question is similar

14   to that, was asking you whether you might tend to believe the

15   testimony of a law enforcement officer over that of a non-law

16   enforcement officer just because the person is a law

17   enforcement officer.

18         And again, the Court would be telling you that you

19   have got to look at each individual witness' testimony on its

20   own merits.

21         JUROR NO. 115:  Right.

22         THE COURT:  And look at what the person said and how

23   they said it and what supports that testimony or what

24   contradicts it.  You don't look at what the person's race, or

25   age, or occupation is to make that call.

1           JUROR NO. 115:  Right.  What was the answer I gave on

2     that?

3           THE COURT:  You gave the answer that you thought it

4     was more likely that a law enforcement person would tell the

5     truth than another witness.

6           JUROR NO. 115:  Well, I guess you just assume that

7     the law enforcement person is going to be telling the truth, so

8     that's why I wrote that.

9           THE COURT:  Could you put that assumption aside in

10    evaluating the evidence if the Court told you to do that?

11          JUROR NO. 115:  Yes.

12          THE COURT:  Okay.  All right, ma'am, if you would go

13    back just for a second in the hall there, we will see if we

14    have any other questions.

15          NOTE:  Juror number 115 leaves the courtroom.

16          THE COURT:  Any follow-up questions for the

17    Government?

18          MR. KROMBERG:  No, Your Honor.

19          THE COURT:  How about for the defense?

20          MR. MacMAHON:  No, Your Honor.

21          THE COURT:  How about issues about cause?

22          MR. KROMBERG:  No, Your Honor.

23          MR. MacMAHON:  Your Honor, I would just -- I would

24    move to strike her for cause.  She seemed a little shaky on

25    some of these criminal rights questions --

339

1          THE COURT:  I think there are too many.  One question

2   I could see, but I agree with you.  There are to many on that

3   one.  I will go head and strike her.

4          MR. MacMAHON:  Thank you, Your Honor.

5          NOTE:  Juror number 115 returns to the courtroom.

6          THE COURT:  Ma'am, I want to thank you for your

7   appearance here today.  We are going to go ahead and excuse you

8   from the jury and thank you for your attendance.  You don't

9   need to come back to court.

10          All right.  Thank you.

11          NOTE:  Juror number 115 leaves the courtroom.

12          THE COURT:  All right.  If my count is correct, I

13   think we have 27.

14          MR. KROMBERG:  That's what we have, Your Honor.

15          MR. MACMAHON:  That's what we have.

16          THE COURT:  Okay, great.  And frankly, the magic, the

17   minimum magic number is 32.  If I got 32 and you used every one

18   of your peremptories, we would still have our jury.  And I

19   think we will have more than that.

20          So I think that enables you all for your planning

21   purposes -- because I think we have what, 15 left for tomorrow?

22          THE CLERK:  Yes.

23          THE COURT:  And the odds are we are going to get more

24   than five out of 15.  We have not been running into a

25   significant number of problems.

1          So for planning purposes, gentlemen, we are starting

2     this trial Monday morning.  We will start at 10 with the

3     exercise of peremptories.  Once we have seated the jury, I will

4     give you a few minutes to stretch your legs, I don't know

5     whether we will have to reassemble the courtroom or not, and we

6     will go right into opening statements and the presentation of

7     evidence.

8          Okay?  And we are going to try to start Tuesday,

9     Wednesday, and Thursday at 9:30.  If we get further ahead of

10    schedule, I may give us a couple mornings to take a 10 o'clock

11    start.  We will see, I will keep that flexible.  But definitely

12    Friday of next week this trial will not be in session.

13          Are there going to be any preliminary matters that we

14    need to address before the trial gets started on Monday?

15          MR. MacMAHON:  Your Honor, we filed a motion, I think

16    it can probably wait until they try to move in some of the

17    exhibits, a motion in limine regarding some of the exhibits

18    that we received.  And if the Court wants to hear that in

19    advance or wait until the exhibits are put in --

20          THE COURT:  The only issue would be whether Mr.

21    Kromberg or Mr. Gibbs was going to raise those issues at all in

22    their opening statement.  So that's I guess the only thing you

23    need to talk with them about.  Otherwise I don't really want to

24    clutter up tomorrow any more than we have to.  I would rather

25    just get this case started.  But you will decide that.

341

1          How much time do you each want for opening statement?

2    I know we are moving fast, but I want to get this done now.

3          MR. KROMBERG:  30 minutes apiece, Your Honor.

4          THE COURT:  Okay.  That was reasonable.  You know

5    with me, if you make a reasonable request, you will get it.  If

6    you are asking for the moon, you will get nothing.  So that was

7    good.

8          MR. MacMAHON:  I have never asked for more than

9    30 minutes to do anything in this court, Your Honor.

10         THE COURT:  You don't have to use it.  Sometimes I

11   think those long opening statements are counterproductive.  So

12   that's the maximum.

13         All right.  We will reconvene at 11 clock.  I will

14   give you a lunch break.  While you are having your lunch break,

15   I have got to take a guilty plea.  So we will try to go from 11

16   o'clock to 1, and take the lunch break.  I think that works.  I

17   might have something else on my calendar.

18         But anyway, we are going to move as quickly as we

19   can, but I don't think we have a danger of having to bring more

20   jurors in.  That's what I was concerned about.

21         MR. KROMBERG:  Your Honor, last year the Court did

22   not sit -- the Court sat on Wednesday starting later during the

23   trial, but there was no jury.  We are not going to sit on -- we

24   are not going to have this trial on Friday --

25         THE COURT:  We can't this week.

1          MR. KROMBERG:  Typically if we go for a couple weeks,

2     should we plan on starting Wednesday, full day Wednesday as

3     well?

4          THE COURT:  Yeah.  I think there was something -- we

5     had students coming in, prearranged hoards of high school kids,

6     and that's why we couldn't do that.

7          MR. KROMBERG:  So just follow days Monday, Tuesday,

8     Wednesday, Thursday?

9          THE COURT:  Yeah.  Now, I am covering for two other

10    judges next week, so I may have pleas that become a problem,

11    but I am trying to schedule those before 9:30.  So we should be

12    okay.

13         MR. KROMBERG:  Mr. MacMahon and Mr. Yamamoto and we

14    have, I think, worked out a number of stipulations.  And I

15    wanted to make sure the Court knew that we were working things

16    out.

17         THE COURT:  Excellent.

18         MR. KROMBERG:  And Mr. Tamimi, I believe, is agreeing

19    to them.  Which is going to save a significant amount of time

20    and effort and enable us to focus on the issues.

21         THE COURT:  All right.  Very good.  So unless there

22    is anything further, I will see you tomorrow.

23         MR. MacMAHON:  There is nothing.  He has to get

24    Pretrial, Your Honor.  So if we had more to do, I was going to

25    ask that he be executed.  He has to go to Pretrial ever day

343

1    that there is a hearing.

2          THE COURT:  Bracelet?  Oh, there is no bracelet in

3    this case.  Why every day?

4          MR. MacMAHON:  They have asked him to come every day

5    that there is a hearing in the court, and they are closing in

6    15 minutes.  So he wants to make --

7          THE COURT:  I don't think that's necessary.  You all

8    should -- go tell them that I don't think that's necessary

9    unless there has been some problem that I am not aware of in

10   this case.

11         MR. MacMAHON:  No, there hasn't been any problem,

12   Your Honor.

13         THE COURT:  That's going to be too much.  If they

14   have a problem, they should see me about that.

15         MR. MacMAHON:  Thank you, Your Honor.

16         THE COURT:  All right, we will recess court for the

17   day.

18         NOTE:  The March 31, 2005 portion of the case is

19   concluded.

20         ------------------------------------------------

21

22              I certify that the foregoing is a true and
         accurate transcription of my stenographic notes.
23

24              /s/  Norman B. Linnell
         _____
         Norman B. Linnell, RPR, CM, VCE, FCRR
25