344

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
     -vs-                     :    Case No. 1:04-cr-385
                              :
                              :
ALI AL-TIMIMI,                :
             Defendant.       :
                              :
------------------------------:
```

JURY SELECTION HEARING
(Day 2 of 2)

April 1, 2005

Before:   Leonie M. Brinkema, USDC Judge

APPEARANCES:

Gordon D. Kromberg and John T. Gibbs,
Counsel for the United States

Edward B. MacMahon, Jr. and Alan H. Yamamoto,
Counsel for the Defendant

The Defendant, Ali Al-Timimi, in person

345

```
 1              NOTE:  The April 1, 2005 portion of the case begins

 2   in the presence of a new group of potential jurors as follows:

 3   JURY PANEL IN

 4              THE CLERK:  Criminal case 2001-385, United States of

 5   America versus Ali Al-Timimi.  Will counsel please note your

 6   appearances for the record.

 7              MR. GIBBS:  Good morning, Your Honor.  John Gibbs on

 8   behalf of the United States, along with Gordon Kromberg.

 9              THE COURT:  Good morning.

10              MR. MacMAHON:  Good morning, Your Honor.  Edward

11   MacMahon and Alan Yamamoto on behalf of Dr. Al-Timimi.

12              THE COURT:  Good morning.  Ladies and gentlemen,

13   thank you for appearing in court today.  At least you are not

14   having to schlep through bad weather.

15              We are going to continue the voir dire process.  Each

16   of will you will be asked some individual questions.  And what

17   we need to know first of all is who is here.  So we are going

18   to call your number, if you will just stand and say "present"

19   or "here," and then you go back to your seat.

20              THE CLERK:  Juror number 14.

21              JUROR NO. 14:  Here.

22              THE CLERK:  Juror number 22.

23              JUROR NO. 22:  Here.

24              THE CLERK:  Juror number 33.

25              JUROR NO. 33:  Here.
```

346

1             THE CLERK:  Juror number 37.

2             JUROR NO. 37:  Here.

3             THE CLERK:  Juror number 41.

4             JUROR NO. 41:  Here.

5             THE CLERK:  Juror number 55.

6             JUROR NO. 55:  Here.

7             THE CLERK:  Juror number 61.

8             JUROR NO. 61:  Here.

9             THE CLERK:  Juror number 64.

10             JUROR NO. 64:  Here.

11             THE CLERK:  Juror number 66.

12             JUROR NO. 66:  Here.

13             THE CLERK:  Juror number 75.

14             JUROR NO. 75:  Here.

15             THE COURT:  All right.  If juror number 14 would come

16   around and go sit in the witness box.  I will ask that the

17   other jurors go into the jury room, and we will call you as

18   quickly as we can.  Thank you.

19             NOTE:  The potential jurors leave the courtroom

20   except juror 14.

21             THE COURT:  Ma'am, since filling out the

22   questionnaire on Monday, have you thought about any of your

23   answers and whether you need to add anything to any of those

24   answers?

25             JUROR NO. 14:  No, ma'am.

1          THE COURT:  Is there any additional information that

2    you think wasn't covered by the questionnaire but we might want

3    to know about in terms of considering you as a juror in this

4    case?

5          JUROR NO. 14:  No, ma'am.

6          THE COURT:  All right.  Has anything changed in your

7    personal or business life that you think now might create a

8    conflict for you in terms of your ability to be a juror in this

9    case?

10         JUROR NO. 14:  No, ma'am.

11         THE COURT:  Okay.  Have you conducted any

12   investigation or heard any media coverage about this case since

13   Monday?

14         JUROR NO. 14:  No, ma'am.

15         THE COURT:  Just a few questions as follow-up to your

16   questionnaire.

17         You indicated in your answer to question number 40 --

18   and 40 asked you to give us your reaction or opinion about

19   people who live in the United States who choose to associate

20   with groups, including religious groups and organizations, that

21   discuss or advocate the use of violence.

22         Do you remember that question?

23         JUROR NO. 14:  Yes.

24         THE COURT:  And your answer was:  My reaction is that

25   I think people who associate with groups that -- I am not sure

348

1    I can read your word.  But encourage the use of violence, is

2    just as guilty as the group and/or organizations.

3           Can you explain a little bit more what you meant by

4    that answer.

5           JUROR NO. 14:  Like if you know that --

6           THE COURT:  Can you move into the microphone a little

7    bit.

8           JUROR NO. 14:  I guess if you know that an

9    organization is like doing stuff, like -- what was the question

10   again?

11          THE COURT:  Well, I just would like you to explain to

12   us a little bit more your reaction to that question, or your

13   opinion about people who associate with groups of people where

14   the group of people promotes or talks about violence against

15   the government.

16          Do you think that people should ever associate with

17   those types of people?

18          JUROR NO. 14:  No.

19          THE COURT:  Would you find somebody guilty of a

20   criminal offense just because he was associating with that type

21   of person?

22          JUROR NO. 14:  Yes.

23          THE COURT:  All right.  You indicated in your answer

24   to question number 82 -- and that question was:  Do you believe

25   that if the prosecution goes to the trouble of bringing someone

349

1    to trial, he or she is probably guilty?

2            Do you remember that question?

3            JUROR NO. 14:  Yes.

4            THE COURT:  All right.  Your answer was you were

5    unsure.  Can you explain why you gave an unsure answer?

6            JUROR NO. 14:  Because I didn't really like

7    understand the question.

8            THE COURT:  Well, the question is, when you hear that

9    somebody has been charged with a crime, do you assume that that

10   person is guilty of that crime?

11           JUROR NO. 14:  No, not really.

12           THE COURT:  All right.  Why don't you assume that?

13           JUROR NO. 14:  Because you are not guilty until --

14           THE COURT:  I am sorry?

15           JUROR NO. 14:  Well, just because you are found

16   guilty --

17           THE COURT:  I am sorry, I can't hear you.

18           JUROR NO. 14:  Just because you are found guilty

19   doesn't mean that you are.

20           THE COURT:  Okay.  All right.  If you would step

21   outside for just a second.

22           NOTE:  Juror number 14 leaves the courtroom.

23           THE COURT:  Unless either side wants the Court to ask

24   more questions of this juror, she strikes the Court as really

25   not able to comprehend any of the details of this case, has

1    preconceptions about associational rights that would be counter

2    to the issues in this case.  And I would plan on excusing her

3    for cause unless there is any objection.

4              MR. GIBBS:  Judge, the Government wouldn't object.

5    In fact, we would join the Court in that.

6              MR. MacMAHON:  Thank you, Your Honor.  I don't need

7    to go any further.  Yes.

8              THE COURT:  That's fine.  All right.

9              NOTE:  Juror number 14 returns the courtroom.

10             THE COURT:  Ma'am, we want to thank you for coming to

11   court today.  We are going to go ahead and excuse you from this

12   jury, so you don't need to report back to court.  If you will

13   just go by the Clerk's Office and let them know you have been

14   excused.  Thank you.

15             NOTE:  Juror number 14 leaves the courtroom.

16             THE COURT:  And we will now call in juror number 22.

17             NOTE:  Juror number 22 enters the courtroom.

18             THE COURT:  Ma'am, if you would come over here to the

19   witness box.  Thank you for coming back to court today.

20             Since filling out the questionnaire on Monday, have

21   you thought about whether any of your answers need any

22   additional information or if there is anything else you would

23   like to bring to our attention that you think we might want to

24   know about to consider you for service on this jury?

25             JUROR NO. 22:  No, I don't think so.

1          THE COURT:  Have you conducted any investigation or

2    heard any media coverage about this case since Monday?

3          JUROR NO. 22:  No.

4          THE COURT:  Has anything changed in your personal or

5    business life that now would create a time conflict for you if

6    you were called to serve as a juror in this case?

7          JUROR NO. 22:  No.

8          THE COURT:  All right, ma'am.  You live in Prince

9    William County.  And we are going to try to start this trial at

10   9:30.  Is that going to be any problem for you getting here by

11   that time?

12         JUROR NO. 22:  As long as traffic --

13         THE COURT:  I understand that.  But will you be able

14   to leave early enough to be here?

15         JUROR NO. 22:  Yes.

16         THE COURT:  I note that you are registered nurse.

17   Now, you understand that you will have a fairly significant

18   time commitment for this trial.  How will you balance that with

19   your work obligations?  Can you take a leave of absence?

20         JUROR NO. 22:  My work provides for jury service and

21   allows for me to be here.  So, it should be no problem.

22         THE COURT:  All right.  You won't have to pull a

23   night shift or be doing something while you are still a juror?

24         JUROR NO. 22:  No, ma'am.

25         THE COURT:  All right, that's fine.  You indicated in

352

1    your answer to question number 34 that you and your spouse have

2    military or civilian intelligence experience, is that correct?

3              JUROR NO. 22:  We both at one time worked for the

4    Central Intelligence Agency.

5              THE COURT:  All right.  I am not at all convinced

6    there is any CIA evidence in this case, but is there anything

7    about your former association with that agency that you think

8    could make it difficult for you to be impartial in judging this

9    case?

10             JUROR NO. 22:  No, ma'am.

11             THE COURT:  Were you at all involved -- if you can

12   tell us, and if you can't, I understand that, in any activities

13   involving the Middle East or the Southeast Asian regions of the

14   world?

15             JUROR NO. 22:  No, ma'am.

16             THE COURT:  All right.  In your answer to number 55

17   you indicated that you were deposed in a medical civil case

18   regarding a friend's death.  Now, did that matter ever go to

19   trial?

20             JUROR NO. 22:  No, it was settled.

21             THE COURT:  So you just were deposed?

22             JUROR NO. 22:  Correct.

23             THE COURT:  And I assume you were asked questions by

24   attorneys for both sides in that proceeding?

25             JUROR NO. 22:  Yes, ma'am.

353

1          THE COURT:  Was the grilling on cross-examination
2    particularly intense, or was it all sort of civil?
3          JUROR NO. 22:  It was very civil.
4          THE COURT:  Is there anything about your having
5    served in the capacity of a witness that you think might affect
6    your ability to be impartial in judging this case?
7          JUROR NO. 22:  No.
8          THE COURT:  All right.  Thank you, ma'am.  If you
9    would just step outside for a second.
10         NOTE:  Juror number 22 leaves the courtroom.
11         THE COURT:  Are there any further questions from the
12   Government?
13         MR. GIBBS:  None, Judge.  Thank you.
14         THE COURT:  How about you, Mr. MacMahon?
15         MR. MacMAHON:  Just briefly.  The question, given the
16   CIA relationship here, the question that we were asking
17   yesterday about the allegation of waging war against the United
18   States, that would be a specific question I think for someone
19   in this position.
20         THE COURT:  All right.  Ask the juror to come back
21   in.  I will try to remember to ask one that routinely so we
22   don't have to have this back and forth.
23         MR. MacMAHON:  Thank you, Your Honor.
24         NOTE:  Juror number 22 returns to the courtroom.
25         THE COURT:  Ma'am, if you will just answer in a nice,

354

1   loud voice one last question for you.  Some of the allegations

2   in this case may involve claims of efforts to get other people

3   to wage war against the United States.

4           Given your previous connection with the CIA and just

5   your current status as an American, do you think in any respect

6   those allegations might make it difficult for you to be

7   impartial in judging this case?

8           JUROR NO. 22:  No, I don't think so.

9           THE COURT:  All right.  If you would step outside,

10  please.

11          NOTE:  Juror number 22 leaves the courtroom.

12          THE COURT:  Anything further?

13          MR. GIBBS:  No, Judge.

14          THE COURT:  Any basis to strike this juror?

15          MR. MacMAHON:  No, Your Honor, no further questions.

16          THE COURT:  All right, then she's in.  Let's have her

17  come back.

18          NOTE:  Juror number 22 returns to the courtroom.

19          THE COURT:  All right, ma'am, we are going to

20  continue considering you for service in this jury.  You are

21  finished for today, believe it or not.  You will need to be

22  back here Monday.  We are going to start the trial at 10

23  o'clock, and I'm assuming the jury section will probably want

24  you reporting by 9 o'clock, is that right?  By 9 o'clock.

25          You are to continue working under the warning I gave

355

1    you on Monday.  That is, you are not to conduct any

2    investigation or listen to any media coverage about this case.

3    All right?

4          You can tell your family or friends you're going to

5    probably be a juror in this case, or at least you are coming

6    back for one more consideration.  And if you are chosen on

7    Monday to be an actual juror for this case, we are going to go

8    right into the trial.  So you would be here all day Monday and

9    the rest the week, except for Friday.  We will not be in

10   session on Friday.  So you can plan to go to work or whatever

11   you want on Friday.

12         We have been using a number for you rather than a

13   name.  You might be wondering about that.  We are trying to

14   avoid the media trying to interview our jurors.  So that's why

15   we have done that.  You shouldn't be contacted by anyone about

16   this case.  But if you were to be contacted, I would want to

17   know about that right away.  All right?

18              JUROR NO. 22:  Yes.

19              THE COURT:  So you are free to go.  We will see you

20   back here on Monday.  Thank you.

21              NOTE:  Juror number 22 leaves the courtroom.

22              THE COURT:  Number 33.

23              NOTE:  Juror number 33 enters the courtroom.

24              THE COURT:  All right, ma'am, thank you for coming

25   back to court.  Let me ask you some questions.

1          Since Monday when you filled out the questionnaire,

2    were there any answers you wrote on the questionnaire that you

3    think you might want to add to or change in any respect?

4          JUROR NO. 33:  None that I can think of.

5          THE COURT:  All right.  Is there any other

6    information that might not have been covered by the

7    questionnaire that you think we might want to know about to

8    consider you for service on this jury?

9          JUROR NO. 33:  I can't think of any.

10         THE COURT:  Has anything changed in your personal or

11   business life since you filled out the questionnaire that you

12   think now might create a conflict for you in terms of the time

13   commitment of the trial?

14         JUROR NO. 33:  No, I am okay with it.

15         THE COURT:  All right.  Have you conducted any

16   investigation or been exposed to any media coverage about this

17   case since Monday?

18         JUROR NO. 33:  No.  The only thing I heard is that

19   they -- I heard on the news that they selected a panel to give

20   a questionnaire.  And that's all I heard.

21         THE COURT:  All right.  And you need to try to avoid

22   any media coverage about this case.  All right?

23         JUROR NO. 33:  Yeah.

24         THE COURT:  You indicated in your answer to question

25   number 40, which talked about your reaction or opinion towards

357

1  people who live in the United States who choose to associate

2  with groups or organizations, including religious groups and

3  organizations, that discuss or advocate the use of violence as

4  a means to protest or express opposition to U.S. government

5  policies.  And your answer was:  Should be arrested if American

6  citizens, should be deported if not.

7          Can you explain a little bit more what you meant by

8  that answer.

9          JUROR NO. 33:  Well, I just don't think you should be

10 against the government.

11         THE COURT:  But you recognize that honest debate

12 about government policies -- I mean, there are, for example,

13 people today who strongly feel that the war in Iraq is a

14 mistake.

15         Do you think people who take that position should be

16 arrested?

17         JUROR NO. 33:  Well, maybe not.  Maybe I didn't quite

18 understand the question.

19         THE COURT:  All right.  Can you explain to us just a

20 little bit more your views though about that issue.

21         JUROR NO. 33:  Right.  I think everybody has a -- can

22 voice their own opinion.

23         THE COURT:  Where will you draw the line between

24 opinion and action?

25         JUROR NO. 33:  Violence, if it gets violent.

1          THE COURT:  All right.  Now, you know from what we

2     said in court on Monday and some of the questions in the

3     questionnaire, that some of the issues in this case may involve

4     evidence that, for example, witnesses expressed joy at the

5     events of September 11.  There may be e-mail messages or

6     documents that say, you know, America had this coming to it,

7     and this is its just reward for the way it conducts itself.

8          With that kind of evidence in the case, would you

9     find it difficult to be impartial in judging the case as to

10    this particular defendant?

11         JUROR NO. 33:  I don't think I would have a problem

12    with that type of evidence.

13         THE COURT:  All right.  And there may be allegations

14    in this case of efforts to get people to wage war against the

15    United States.

16         Would you have difficulty again in being impartial in

17    judging the evidence in light of those types of claims?

18         JUROR NO. 33:  I think I can look at the evidence

19    impartially.

20         THE COURT:  All right.  In question number 82 you

21    were asked:  Do you believe that if the prosecution goes to the

22    trouble of bringing someone to trial, he or she is probably

23    guilty?  And you indicated you were not sure.

24         Can you explain to us a little bit more that answer.

25         JUROR NO. 33:  Well, I mean, everyone is supposed to

1   be innocent until proven guilty.

2            THE COURT:  Are you comfortable with that belief?

3            JUROR NO. 33:  Yes, I am.

4            THE COURT:  All right.  So you are just not sure, in

5   other words, whether somebody is guilty or innocent when they

6   first come to trial?

7            JUROR NO. 33:  Right.

8            THE COURT:  All right.  In number 84 you were asked:

9   Do you believe that defendants in criminal trials should have

10  to prove that they are innocent?  And you checked:  Unsure.

11           Can you explain that answer.

12           JUROR NO. 33:  Well, I am not sure.  They shouldn't

13  have to, but sometimes it appears that they do have to.  So

14  that's why I said I was unsure.

15           THE COURT:  All right.  But you understand then that

16  in our legal system, the defendant does not have to?

17           JUROR NO. 33:  Well, I understand that they shouldn't

18  have to, but it appears that sometimes they do have to.

19           THE COURT:  When you say that, can you explain -- is

20  that based upon what you see happening on television?

21           JUROR NO. 33:  Yes, probably.

22           THE COURT:  All right.  I understand.  In other

23  words, when the lawyers for the defendant get very flowery and

24  start putting on all sorts of evidence?

25           JUROR NO. 33:  Yes.

360

1              THE COURT:  All right.  But you understand that it is

2      the Government, the prosecution's job to prove a defendant

3      guilty?

4              JUROR NO. 33:  I do understand that.

5              THE COURT:  All right.  All right, if you will step

6      down, please, we will see if there are any other questions for

7      you.

8              NOTE:  Juror number 33 leaves the courtroom.

9              THE COURT:  Any other questions from the Government?

10             MR. GIBBS:  No, Judge.  Thank you.

11             THE COURT:  How about from the defense?

12             MR. MacMAHON:  No, Your Honor.

13             THE COURT:  Any issue about cause for this juror?

14             MR. GIBBS:  No, Judge.

15             MR. MacMAHON:  No, Your Honor.

16             THE COURT:  All right, very good, let's bring her in.

17             NOTE:  Juror number 33 returns to the courtroom.

18             THE COURT:  Ma'am, I want to thank you.  We are going

19     to continue considering you for service on this jury.  You are

20     clear for today, but you will be need to be back here Monday

21     morning at 9 o'clock.  On Monday we are going to select the

22     final 14 who will hear this case, and the case will go right

23     into trial.  So if you are chosen, you will be here all day

24     Monday.

25             In the meantime, I want to make sure you continue to

361

1    not discuss anything about this case with anybody.  You can

2    tell your colleagues and your family you are going to be a

3    juror, you may be a juror, you will certainly have to be here

4    Monday, but nothing about the case.  And you are not to conduct

5    any investigation, and certainly avoid any media coverage.  All

6    right?

7            JUROR NO. 33:  Thank you.

8            THE COURT:  The last thing is, we have been calling

9    you by a number, and you might wonder about that.  We are

10   trying to keep the media from trying to contact you.

11   Obviously, no one should be contacting you.  And if they are,

12   you are to let us know right away.  All right?

13           JUROR NO. 33:  Yes.

14           THE COURT:  Thank you.  We will see you back here on

15   Monday.  Have a nice weekend.

16           NOTE:  Juror number 33 leaves the courtroom.

17           THE COURT:  And we will call 37.

18           NOTE:  Juror number 37 enters the courtroom.

19           THE COURT:  Thank you, ma'am, for coming back to

20   court.  Just a few questions.

21           JUROR NO. 37:  You are welcome.

22           THE COURT:  Since filling out the questionnaire on

23   Monday, have you thought about any of your answers and is there

24   anything you wanted to change in any of the answers?

25           JUROR NO. 37:  No.

1          THE COURT:  Is there any additional information that
2   may not have been included in the questionnaire but you think
3   might be relevant to our considering you for serving on this
4   jury?
5          JUROR NO. 37:  I don't think so.
6          THE COURT:  Has anything changed in your personal or
7   business lives that might affect your ability to give the kind
8   of time to this case that is going to be required?
9          JUROR NO. 37:  No.
10          THE COURT:  All right.  Have you conducted any
11   investigation or heard any media coverage about this case?
12          JUROR NO. 37:  No.
13          THE COURT:  Now, I notice from your questionnaire
14   that there was an indication on the hardship question, that you
15   needed your salary, and that could be an issue.
16          JUROR NO. 37:  I checked that.
17          THE COURT:  And you are all right, aren't you, on
18   that?
19          JUROR NO. 37:  Yes.
20          THE COURT:  Because you work for the county school
21   system?
22          JUROR NO. 37:  Yes.
23          THE COURT:  All right, very good.  I understand from
24   question number 18 that you actually speak some Urdu?
25          JUROR NO. 37:  Just a few phrases.

363

1          THE COURT:  And that's because at one point you were

2    married, as I understand it, to a Pakistani?

3          JUROR NO. 37:  Yes.

4          THE COURT:  And you lived a fairly significant amount

5    of your life for several years in Karachi, is that correct?

6          JUROR NO. 37:  Yes.

7          THE COURT:  When you were living in Pakistan, did the

8    topic of Kashmir ever come up in any of your discussions at

9    home?

10          JUROR NO. 37:  Family members would talk about it.

11          THE COURT:  And is there anything about those

12    discussions that you think might have sowed some preconceptions

13    in your mind that might be an issue in this case?

14          JUROR NO. 37:  No.

15          THE COURT:  All right.  Now, you said that your

16    husband and his family were Muslim.  Did they practice a

17    particular -- were they members of a particular branch of

18    Islam?

19          JUROR NO. 37:  Actually, my ex-husband didn't

20    practice at all.  It is more my mother-in-law and

21    sisters-in-law that did.

22          THE COURT:  All right.  Do you know if they

23    considered themselves to be Shiite --

24          JUROR NO. 37:  Suni Muslims.

25          THE COURT:  They were Suni Muslims?  I assume you a

364

1  lot of discussions with them about their faith?

2          JUROR NO. 37:  Some.

3          THE COURT:  From those discussions and your living in

4  that country, did you form any attitudes or beliefs about

5  Islam, either of a positive or a negative sort?

6          JUROR NO. 37:  I just think I became more

7  knowledgeable about it.  I think I am accepting of any

8  religion, so I don't really -- I don't know if I quite

9  understand what you're asking.

10          THE COURT:  Well, for example, it is not uncommon for

11  many American women, for example, to be troubled by some of

12  tenets of Islam as it treats women.  Did that ever become an

13  issue for you?

14          JUROR NO. 37:  No.

15          THE COURT:  All right.  Did you ever visit any of the

16  mountainous regions of Pakistan, or were you mostly in Karachi?

17          JUROR NO. 37:  We went to -- I had relatives in

18  Islamabad.  And from there we took a day trip up further north.

19          THE COURT:  I am sorry?

20          JUROR NO. 37:  We took a day trip further up north, I

21  think it was called Nathia Gali.  That is further up north.

22  That was a day trip out of Islamabad.

23          THE COURT:  All right.  Do you, Mr. Gibbs, want to

24  run any of the geographical locations for the LET spots by this

25  juror?

1          MR. GIBBS:  Sure, Judge.  The particular places that

2     I wanted to ask you about were Lahore, Muridke, Muzafrabad?

3          JUROR NO. 37:  I have been to Lahore.

4          THE COURT:  And how long were you in Lahore?

5          JUROR NO. 37:  It was one night.

6          THE COURT:  All right.  When you were in Lahore or in

7     that region, did you ever go into any offices where there were

8     political posters posted?

9          JUROR NO. 37:  No.  It was a family visit.

10          THE COURT:  A family visit.  All right.  And did you

11     ever hear about Lashkar-e-Taiba or LET when you were in

12     Pakistan?

13          JUROR NO. 37:  No.

14          THE COURT:  No?  Was your former husband's family at

15     all politically active in Pakistan?  I mean, in terms of

16     running for political office, being involved in any political

17     movements, holding public office, anything like that?

18          JUROR NO. 37:  My ex-husband was interested in

19     running for local government.  They actually were not directly

20     from Karachi, they were from a village that was about eight

21     hours outside of Karachi from the area of Sind.  And I know

22     there was one year where he ran for local office, and I don't

23     know, I don't even remember what the position was about, but he

24     didn't win.

25          THE COURT:  All right.  You indicated in question

1    number 44 that you do remember reading something about this

2    case in the Washington Post.

3          Do you feel in any respect that what you might have

4    read could color or influence your ability to sit as a juror in

5    this case?

6          JUROR NO. 37:  No.

7          THE COURT:  Okay.  In paragraph 54 you indicated that

8    one of your sons had some issues with juvenile court.

9          JUROR NO. 37:  Yes.

10         THE COURT:  Did that actually go to an actual trial?

11   What happened with those charges?

12         JUROR NO. 37:  Yeah, it went to court.  He pleaded

13   guilty.  He was put in a juvenile detention center.  And they

14   have a program at JDC for -- I am forgetting things.  They have

15   a program right in JDC that works with juveniles, I forget the

16   name of it, but he got kicked out of that one.  He didn't

17   follow the rules.

18         So then he was put into Barrett Juvenile Detention

19   Center.  And he spent -- he was there for I think seven months.

20   He came home last May.

21         THE COURT:  All right.  Now, he is your child with

22   your former husband, is that right?

23         JUROR NO. 37:  Yes.

24         THE COURT:  And you are here in the States by

25   yourself now and your former husband is back in Pakistan?

367

1              JUROR NO. 37:  Yes.  I am here with my three
2    children.
3              THE COURT:  All right.  Has your son had any other
4    problems with the law since those events in May?
5              JUROR NO. 37:  No.  He is still on juvenile probation
6    until June.  He should be off in June.
7              THE COURT:  All right.  From your involvement with
8    the juvenile justice system, have you formed any attitudes or
9    views about the criminal justice system in the area that you
10   think might affect your ability to be a juror in this case?
11             JUROR NO. 37:  It wouldn't affect me.
12             THE COURT:  Well, do you feel your son has been
13   treated fairly by the system?
14             JUROR NO. 37:  And I think I put a partial response
15   to this on one of my responses.  I mean, obviously, we have had
16   dealings with police officers while all of this was going on,
17   and some dealt with us in a better way than others.  I don't
18   know if that answers what you're asking.
19             THE COURT:  The real question is, you know, as a
20   juror you have to be able to be very neutral and detached?
21             JUROR NO. 37:  Right.
22             THE COURT:  And if something has happened in your own
23   personal life, especially involving court proceedings, you
24   know, it might may it difficult for you to have that kind of
25   neutrality.

368

```
1              So we are not trying to probe into your private life
2     greatly, but we do need to understand some of those experiences
3     and how they might affect you as a juror.
4              JUROR NO. 37:  I believe I could be impartial.
5              THE COURT:  All right.  But do you feel your son has
6     been overall treated fairly by the system?
7              JUROR NO. 37:  By the court system?
8              THE COURT:  We will start with the court system, yes.
9              JUROR NO. 37:  Yes.
10             THE COURT:  And you had, as I understand your
11    answers, you had some good police officer experiences and some
12    bad ones?
13             JUROR NO. 37:  Right.  And the same actually with the
14    probation officer.  We have had a good experience and a bad
15    one.
16             THE COURT:  All right.  Do you think overall though
17    that the criminal justice system, which is basically the court
18    system, what happens when you get into court, do you feel that
19    it is basically a fair or unfair system?
20             JUROR NO. 37:  I think it is fair.
21             THE COURT:  All right.  The nature -- where were you
22    on September 11?  Were you in Pakistan?
23             JUROR NO. 37:  I was here.  I was at school actually.
24             THE COURT:  All right.  And did you go back to
25    Pakistan after September 11?
```

369

```
 1              JUROR NO. 37:  No.

 2              THE COURT:  Did September 11 have any impact on that

 3    decision, or was that already --

 4              JUROR NO. 37:  No, that decision was already made.

 5              THE COURT:  All right.  And living in Pakistan in --

 6    when was the last time you were in Pakistan?

 7              JUROR NO. 37:  1997, in the summer.

 8              THE COURT:  Were you exposed at that point to any

 9    what we would possibly call sort of radical Islamic

10    discussions, activities, any of that sort of thing?

11              JUROR NO. 37:  No.

12              THE COURT:  Were you ever -- did anyone -- did you

13    have any problems as an American living in Pakistan?

14              JUROR NO. 37:  There were a lot of occasions where we

15    were told to stay home, that it was unsafe to leave the house

16    and be out and about.

17              THE COURT:  Was that because you were American or a

18    woman?

19              JUROR NO. 37:  Foreigner.

20              THE COURT:  Foreigner?

21              JUROR NO. 37:  Yes.

22              THE COURT:  How do you feel about that?

23              JUROR NO. 37:  Upset, scared.  That was one of the

24    reasons that I eventually left.

25              THE COURT:  All right.  And again, do you feel
```

370

1   because of the nature of the allegations in this case, some of

2   which deal with some fairly heated rhetoric -- and there will

3   be possibly evidence of people praising the events of

4   September 11 as just rewards for American misconduct.  There

5   may be evidence of efforts being made to enlist people to

6   engage in action against the United States.

7           Do you feel that because you have lived in Pakistan,

8   had connections with Pakistanis, or just because of the nature

9   of the charges in this case, that those types of issues would

10  make it difficult for you to be impartial in judging the issues

11  in this particular case?

12          JUROR NO. 37:  I don't think so.

13          THE COURT:  All right.  If you would step outside for

14  a second, please.

15          NOTE:  Juror number 37 leaves the courtroom.

16          THE COURT:  Are there any additional questions either

17  side wants the Court to ask?

18          MR. GIBBS:  None from the Government, Judge.

19          THE COURT:  How about from the defense?

20          MR. MacMAHON:  Your Honor, just with respect to the

21  -- because she is divorced from a Muslim man, and I know of

22  cases where there has been problems with visitation and

23  otherwise between Pakistan and some of these countries, whether

24  there is any bias -- there is going to be a lot of Muslim male

25  witnesses in this case for both sides.

371

1          THE COURT:  You know, I did ask the question directly

2     as an American woman did she harbor any attitudes towards -- I

3     can't give you it verbatim, but I think I touched on that topic

4     already.  And she didn't seem to have any problems.

5          MR. MacMAHON:  I think you got close to it, but I

6     don't think it would hurt to ask the specific question.  Other

7     than that, we don't have anything else.

8          THE COURT:  Well, give me the specific question you

9     want me to ask.

10          MR. MacMAHON:  Well, just if her experience with

11     Muslim men and what happened in Pakistan with the divorce, has

12     any -- would make it difficult for her to be fair and impartial

13     in judging the witnesses, not just Dr. Al-Timimi, but other

14     ones as well.

15          THE COURT:  All right.

16          NOTE:  Juror number 37 returns to the courtroom.

17          THE COURT:  All right.  Ma'am, if you will just

18     answer from right there in a good, loud voice because we have

19     to be able to hear you.

20          Again, we are not trying to probe your personal life,

21     but I do need to ask you.  Was your divorce amicable?

22          JUROR NO. 37:  Yes, it was.  I was over here with my

23     children, I filed for it, and it was never contested.  So I

24     guess you would call it that.

25          THE COURT:  All right.  Has your former husband ever

372

1    been back since the divorce to see you or the children?

2              JUROR NO. 37:  No.

3              THE COURT:  Is he helping you out with support?

4              JUROR NO. 37:  No.

5              THE COURT:  Do you harbor any animosity towards him

6    at all?

7              JUROR NO. 37:  Not at this point.

8              THE COURT:  All right.  Now, many of the witnesses in

9    this case will be Pakistani males or men from the Middle East

10   and members of the Islamic faith.

11             Is there anything about your experiences with Islamic

12   men or Pakistani men that you feel might affect your ability to

13   listen to those witnesses' testimony and evaluate it on its own

14   merits in a fair and objective manner?

15             JUROR NO. 37:  No.

16             THE COURT:  All right.  Thank you, if you would step

17   outside again.

18             NOTE:  Juror number 37 leaves the courtroom.

19             THE COURT:  Any further questions for this juror?

20             MR. GIBBS:  No, Judge.

21             THE COURT:  Mr. MacMahon?

22             MR. MacMAHON:  Yes, Your Honor.  I just think the

23   testimony about fearful and other experiences in Pakistan I

24   think could cloud her judgment in the case.

25             THE COURT:  Well, she has consistently said that they

373

1    would not.  And I think just the fact that she has been in

2    Pakistan by itself is not enough to disqualify her.

3              Mr. Gibbs.

4              MR. GIBBS:  Judge, we would have no objection to

5    having this juror challenged for cause.  I think some of her

6    answers were pretty hesitant.

7              THE COURT:  If you both want her out, that makes it a

8    much easier record.  I will go ahead and excuse her.

9              MR. MacMAHON:  Thank you, Your Honor.

10             MR. GIBBS:  Thank you, Judge.

11             NOTE:  Juror number 37 returns to the courtroom.

12             THE COURT:  Ma'am, we thank you for your attendance

13   today.  We are going to go ahead and excuse you from this jury.

14   And so, that means you no longer have to come back to court.

15             As you leave, would you please check out with the

16   Clerk's Office downstairs.

17             JUROR NO. 37:  Okay.  Thank you.

18             THE COURT:  All right.  Thank you.

19             NOTE:  Juror number 37 leaves the courtroom.

20             THE COURT:  We are at juror number 41 now.

21             NOTE:  Juror number 41 enters the courtroom.

22             THE COURT:  Thank you, for coming back to court, sir.

23             JUROR NO. 41:  Thank you.

24             THE COURT:  Since filling out the questionnaire on

25   Monday, have you thought about whether you wanted to add

374

1  anything to any of your answers?

2           JUROR NO. 41:  No, Your Honor.

3           THE COURT:  All right.  Is there anything else about

4  you or your background that you think we should know in order

5  to evaluate you further for service on this jury?

6           JUROR NO. 41:  Well, I was born in Cambodia.

7           THE COURT:  We know that, yeah.

8           JUROR NO. 41:  And I went through the Khmer Rouge

9  period.  And I came here to the United States in 1980.  And I

10  live in this area ever since.

11          THE COURT:  All right.  Has anything changed in your

12  family life or at work that would make it difficult for you to

13  serve as a juror in this case given the amount of time that the

14  trial may take?

15          JUROR NO. 41:  No, Your Honor.  No, ma'am.

16          THE COURT:  All right.  Have you conducted any

17  investigation or heard any media coverage about this case since

18  Monday?

19          JUROR NO. 41:  No.

20          THE COURT:  All right.  I know you were born in

21  Cambodia, but you've never traveled, as I understand it, to

22  India or Pakistan or been to any of those countries, is that

23  correct?

24          JUROR NO. 41:  No.

25          THE COURT:  All right.  Your experiences living in

1    Cambodia under the Khmer Rouge, which must have been difficult,

2    a difficult time, do you feel in any respect that experience

3    might make it difficult for you to be a fair and impartial

4    juror in this case?

5            JUROR NO. 41:  In respect of the Khmer Rouge, Khmer

6    Rouge is a suppression government type body.  And my opinion is

7    that everything, you have to be fair and faithful and honesty

8    to the point that the case that is presented to you.

9            THE COURT:  All right.  I see that you had a brother

10   who had a little trouble with the law.  Let me be sure I have

11   got the write question here.  Did you have a brother who had a

12   DWI?

13           JUROR NO. 41:  I think so because he never told me

14   about it, but I know he is in trouble, he was in jail that I

15   know of.

16           THE COURT:  He is in jail?

17           JUROR NO. 41:  He was in jail and then later on

18   released.

19           THE COURT:  Did you have to go to trial with him?

20           JUROR NO. 41:  No.

21           THE COURT:  Do you know anything about the details of

22   his case?

23           JUROR NO. 41:  No.

24           THE COURT:  Do you feel in any respect he has been

25   treated unfairly by the courts or by the police?

376

1           JUROR NO. 41:  No.

2           THE COURT:  All right.  In question number 82 you

3    were asked:  Do you believe if the prosecution goes to the

4    trouble of bringing someone to trial, that person is probably

5    guilty?  And you indicated you were not sure.

6           Can you explain that answer to us a little bit.

7           JUROR NO. 41:  Well, sometimes as you see on the news

8    that the law enforcement is not as honest as it is supposed to

9    be, and sometimes the guilty party also is not as honest as

10   supposed to be until you see the both sides.

11          THE COURT:  All right.  There is no death penalty

12   involved in this case, so you do not have to worry about that.

13   I believe you had put that down as a comment you were concerned

14   about.

15          JUROR NO. 41:  Yes.

16          THE COURT:  All right.  Now, because you've come to

17   this country and chose this country for your citizenship, you

18   know some of the charges in this case involve claims that

19   people were trying to get other people to wage war against the

20   United States.

21          Do you feel in any respect that those type of charges

22   would make it difficult for you to be impartial and fair in

23   judging this case?

24          JUROR NO. 41:  No.

25          THE COURT:  All right.  Thank you.  If you would step

377

1    down, please.

2              JUROR NO. 41:  Thank you, Your Honor.

3              NOTE:  Juror number 41 leaves the courtroom.

4              THE COURT:  Any further questions for this juror?

5              MR. GIBBS:  No, Judge.

6              THE COURT:  How about from the defense?

7              MR. MacMAHON:  None from the defense, Your Honor.

8              THE COURT:  And I find no basis for cause.  Is there

9    anyone who is moving to strike?

10             MR. GIBBS:  No, Judge.

11             MR. MacMAHON:  No, Your Honor.

12             THE COURT:  All right, fine.  Let's bring him back

13   in.

14             NOTE:  Juror number 41 returns to the courtroom.

15             THE COURT:  Sir, I want to thank you for coming to

16   court.  You are still being considered for this jury.  You are

17   finished for today, but you are going to need to be back here

18   Monday at 9 o'clock.

19             At 10 o'clock the actual final jury selection will

20   occur.  And if you are chosen, then we are going to go right

21   into the trial.  So you would be here all day Monday if you are

22   chosen.  All right?

23             JUROR NO. 41:  Thank you.

24             THE COURT:  I would like you to continue following my

25   earlier instructions.  That means you are to avoid any media

378

1    coverage of this case and not conduct any investigation.

2              Do you understand that?

3              JUROR NO. 41:  Yes.

4              THE COURT:  And you are not to tell anybody any

5    details about your job as a juror or what's going on in this

6    trial.  You can tell people you may be a juror, but that's all.

7    All right?

8              JUROR NO. 41:  Yes.

9              THE COURT:  We have been referring to you as number

10   41 because we are trying to avoid the media interviewing any of

11   our jurors.  So you shouldn't be receiving any contact from

12   anybody about this case.  But if that were to happen, let us

13   know immediately.  All right?

14             So we will see you back here on Monday.  Thank you.

15             JUROR NO. 41:  Thank you.

16             NOTE:  Juror number 41 leaves the courtroom.

17             THE COURT:  Number 55.

18             NOTE:  Juror number 55 enters the courtroom.

19             THE COURT:  Good morning, sir.  Thank you for coming

20   back to court.

21             JUROR NO. 55:  Yes, ma'am.

22             THE COURT:  Just a couple of follow-up questions.  In

23   terms of the answers that you provided to the questionnaire on

24   Monday, is there anything you want to add or change in any of

25   those answers?

379

```
 1              JUROR NO. 55:  I don't think so.

 2              THE COURT:  All right.  Is there anything else, any

 3    information about yourself or your family that might not have

 4    been covered by the questionnaire but you think might be

 5    relevant to our consideration of you for jury duty in this

 6    case?

 7              JUROR NO. 55:  Well, my niece's husband was in Iraq.

 8    That's probably about the only other thing.

 9              THE COURT:  How recently was that?

10              JUROR NO. 55:  He just got back in February.

11              THE COURT:  All right.  Do you think in any respect

12    that that relationship might affect your impartiality in this

13    case?

14              JUROR NO. 55:  No.

15              THE COURT:  All right.  Have you conducted any

16    investigation or heard any media coverage about this case since

17    Monday?

18              JUROR NO. 55:  No.

19              THE COURT:  And nothing has changed in your life

20    personally or business that might change your commitment to the

21    time?  Because it is a big time commitment.

22              JUROR NO. 55:  No.

23              THE COURT:  Now, you live in Prince William County.

24              JUROR NO. 55:  Yes.

25              THE COURT:  Beautiful area, but a tough commute to
```

380

1  Alexandria.  We are going to try to start this trial at 9:30

2  every morning, although we will not be sitting next Friday.

3         Are you going to have any problem getting here by

4  9:30?

5         JUROR NO. 55:  No, no.

6         THE COURT:  All right.  Because we can't start until

7  all the jurors are here.

8         JUROR NO. 55:  Sure.

9         THE COURT:  Okay.  Now, you are self-employed, is

10  that right?

11         JUROR NO. 55:  Yes.

12         THE COURT:  And you are not going to -- and I know

13  you are a musician.  What kind of a musician are you?

14         JUROR NO. 55:  Right now I am an instructor more than

15  anything.  I am working on intellectual property of my own, but

16  right now I am getting by with teaching, teaching private

17  instruction, going to people's home and teaching.

18         THE COURT:  All right.  Are you going to be able

19  during the course of this trial to rearrange those lessens?

20         JUROR NO. 55:  Yes.  I've already informed all that

21  that might be the case.

22         THE COURT:  All right.  You said in your answer to

23  question number 30 that your wife knew somebody who died in

24  the -- or who was affected by the U.S. embassy bombings in

25  Kenya.

1              JUROR NO. 55:  Yes.

2              THE COURT:  I guess the person didn't die.  They

3    were, what, just there when it happened?

4              JUROR NO. 55:  I really don't know the details.  I

5    just know that she had mentioned that she knew -- I think it

6    was a coworker, like a husband of a coworker or someone like

7    that in that capacity.  I don't know all the details.  And I

8    haven't asked her because I didn't want to discuss anything

9    about the case.

10             THE COURT:  That's exactly right, you can't do that.

11   But is there anything about what your wife may have told you

12   about that that you think might affect your ability to be

13   impartial in judging this case?

14             JUROR NO. 55:  No.

15             THE COURT:  Now, some of the allegations in this case

16   may involve evidence that people were cheering and were pleased

17   about the events of September 11.

18             JUROR NO. 55:  Yes.

19             THE COURT:  And that America deserved what happened,

20   that sort of thing.

21             In any respect would that kind of evidence, if it

22   came out at trial, make it difficult for you to be impartial in

23   judging this case?

24             JUROR NO. 55:  That's a tough question, Your Honor.

25             THE COURT:  That's why we are asking it.

382

1              JUROR NO. 55:  Yeah, I know.  I believe in the
2      process, so I believe that I would have to be impartial.  I
3      would have to in my own conscience would have to be impartial
4      regardless.
5              THE COURT:  All right.  You think you can do that?
6              JUROR NO. 55:  I think I can, yeah.
7              THE COURT:  All right.  Also, similarly, there may be
8      charges or allegations of efforts to incite others to take up
9      arms against the United States post-September 11.
10             Would you be able despite those types of allegations
11     to be impartial in judging the issues in this case?
12             JUROR NO. 55:  I believe I can, yes.
13             THE COURT:  All right.  Thank you, if you would step
14     outside for a second.
15             NOTE:  Juror number 55 leaves the courtroom.
16             THE COURT:  Any further questions from the
17     Government?
18             MR. GIBBS:  No, Your Honor.
19             THE COURT:  How about from the defense?
20             MR. MacMAHON:  No, Your Honor.
21             THE COURT:  All right.  Any objection to this juror?
22             MR. GIBBS:  No, Your Honor.
23             MR. MacMAHON:  No, Your Honor.
24             THE COURT:  All right, let's bring him in.
25             NOTE:  Juror number 55 returns to the courtroom.

383

1           THE COURT:  Sir, you are still in the running for

2     consideration.  This is the second round.  The last round will

3     be on Monday.

4           On Monday, the final 14 jurors will be chosen, and

5     then we will go right into the trial.  So if you are chosen on

6     Monday, that does mean that you will be here all day.

7           I want to ask you to continue to not conduct any

8     investigation, and do exactly what you have been doing, not

9     talk to anybody about this case.

10           We have been using a number for you rather than your

11     name to try to prevent the media from trying to reach you and

12     talk to you about the case.  And you are not to talk to them.

13     And if they were to contact you, please let us know right away.

14           So you definitely will need to be back here Monday,

15     no later than 9 o'clock, and checking in with the Clerk's

16     Office downstairs.  And then you will come up here around 10.

17     And then, as I say, we will do the final jury selection.  All

18     right?

19           JUROR NO. 55.  That's in the jury assembly room where

20     we were today?

21           THE COURT:  Yes, that's what you would do.  Just

22     check in with the -- whatever you have been doing is what you

23     would continue to do.

24           JUROR NO. 55:  Okay.

25           THE COURT:  Thank you.  We will see you on Monday.

384

1                    NOTE:  Juror number 55 leaves the courtroom.

2                    THE COURT:  Number 61.

3                    NOTE:  Juror number 61 enters the courtroom.

4                    THE COURT:  Good morning, ma'am.  Since filling out

5      the questionnaire on Monday, has anything come to your thoughts

6      about any answers that might need to be changed or anything you

7      wanted to add to any of your answers?

8                    JUROR NO. 61:  No, ma'am.

9                    THE COURT:  Is there anything else that might not

10     have been covered by the questionnaire, but information about

11     you or your family that you think we might need to know in

12     order to evaluate you for service on this jury?

13                   JUROR NO. 61:  No.

14                   THE COURT:  Has anything changed in your personal or

15     business lives that might affect your availability for the time

16     for this trial?

17                   JUROR NO. 61:  No.

18                   THE COURT:  All right.  Have you conducted any

19     investigation or heard any media coverage about this case since

20     Monday?

21                   JUROR NO. 61:  No.

22                   THE COURT:  You are a DoD employee, is that right?

23                   JUROR NO. 61:  Yes, ma'am.

24                   THE COURT:  A long time DoD employee?

25                   JUROR NO. 61:  Long time.

385

1            THE COURT:  And you knew several people who were

2    killed at the Pentagon?

3            JUROR NO. 61:  Acquaintances.  They were not friends.

4    I did not know them personally.

5            THE COURT:  All right.  Do you actually work at the

6    Pentagon?

7            JUROR NO. 61:  Yes, I do.

8            THE COURT:  And where were you on September 11?

9            JUROR NO. 61:  I was home.  I was not at work.

10           THE COURT:  All right.  How soon after that did you

11   go back to work at the Pentagon?

12           JUROR NO. 61:  I didn't report back to work for

13   probably a week.  And my office for about two months was over

14   at Crystal City.  So we probably didn't go back to the Pentagon

15   until about two-and-a-half months after the incident.

16           THE COURT:  Was the area where you actually worked

17   part of the area affected?

18           JUROR NO. 61:  I was close to the area, but I was not

19   in the area affected.

20           THE COURT:  All right.  Now, given that personal

21   experience, I mean being connected to the Pentagon, and the

22   fact that the events of September 11 may play some part in this

23   case, do you think in any respect it would be difficult for you

24   to be impartial and objective in evaluating the issues in this

25   case because of your connection to the Department of Defense

386

1    and the Pentagon?

2              JUROR NO. 61:  No, ma'am.

3              THE COURT:  All right.  Now, there may be allegations

4    in this case about efforts being made to recruit people to take

5    up arms against the United States.

6              Do you feel that those charges might make it

7    difficult for you to be impartial in judging this case?

8              JUROR NO. 61:  No.

9              THE COURT:  Your husband works in the Arlington

10   Rescue office?

11             JUROR NO. 61:  He is retired.  At the time of 9/11 he

12   was working with the Arlington County Fire Department.

13             THE COURT:  Did he actually respond to any of the

14   scene?

15             JUROR NO. 61:  He was at the scene.  He was there

16   working in the operations center for the department.

17             THE COURT:  All right.  So I am sure he discussed

18   with you that experience.

19             JUROR NO. 61:  He really did not say much of it at

20   all.  I believe the first two weeks he was probably there maybe

21   12, 16 hours a day.

22             THE COURT:  Did he need any counseling afterwards?

23             JUROR NO. 61:  No, ma'am.

24             THE COURT:  All right.  Is there anything about his

25   involvement in those rescue efforts that you think might affect

387

1    your ability to be impartial in judging the facts of this case?

2                JUROR NO. 61:  I don't think so.  He was there on the

3    ground.  Like I said, he was in the control center.  He really

4    wasn't involved in any of the rescue or recovery team efforts.

5                THE COURT:  All right.  All right, ma'am, if you

6    don't mind, just be careful as you step down, and stay out

7    there for one second.

8                NOTE:  Juror number 61 leaves the courtroom.

9                THE COURT:  Any further questions from the

10   Government?

11               MR. GIBBS:  No, thank you, Judge.

12               THE COURT:  Mr. MacMahon?

13               MR. MacMAHON:  No, Your Honor.

14               THE COURT:  All right.  Any issues about this juror's

15   qualifications?

16               MR. GIBBS:  No, Judge.

17               THE COURT:  How about from the defense?

18               MR. MacMAHON:  Yes, Your Honor.  Again, with the --

19   she said she didn't think so with respect to the issue about

20   her husband and being impartial as to these things.  And with

21   her relationship with the government and the Pentagon, I don't

22   think she would be a fair and impartial juror in the case.

23               THE COURT:  Well, I have asked her that question I

24   think two different ways, and she said the same thing both

25   times.  I didn't notice equivocation on that.

388

1                So I am going to overrule that objection.

2                MR. MacMAHON:  Thank you, Your Honor.

3                THE COURT:  And this juror does mean we have met the

4    minimum threshold, so there will be a trial on Monday.  I mean,

5    we have got our 32.  I am going to continue with all the jurors

6    we have pulled here today, so you may have a few extra jurors

7    to work with since we are already committed.

8                Let's bring her back in.

9                NOTE:  Juror number 61 returns to the courtroom.

10               THE COURT:  Ma'am, thank you for your attendance.

11   You still in the running for the final jury in this case.

12               What's going to happen is you can leave today.  We

13   will need you back here tomorrow, probably at 9 o'clock.  I am

14   sorry, not tomorrow, Monday.  Monday.  If you want to

15   double-check, you can always call the telephone number that we

16   have been giving you.  But it is definite that you will be here

17   on Monday.

18               JUROR NO. 61:  Okay.

19               THE COURT:  If you are chosen to be one of the 14

20   individuals who will hear the case, then we are going to go

21   right into the trial on Monday.  So that would be a full day

22   here.  All right?

23               While you are awaiting that final court appearance,

24   remember not to conduct any investigation about this case.

25   Avoid any media coverage.  Do not go into any detail other than

389

1     telling people you are being considered for jury duty.

2          And we gave you a number in this case because we are

3     trying to avoid the media contacting you.  So you shouldn't be

4     contacted by anyone about this case.  But were that to happen,

5     let us know right away.  All right?

6          JUROR NO. 61:  Yes, ma'am.  Thank you.

7          THE COURT:  Thank you.  We will see you back here on

8     Monday.

9          NOTE:  Juror number 61 leaves the courtroom.

10         THE COURT:  Number 64.

11         NOTE:  Juror number 64 enters the courtroom.

12         THE COURT:  Good morning, sir.  Thank you for coming

13     back to court.

14         Since filling out questionnaire on Monday, have you

15     thought about your answers and whether any of them need to be

16     changed or any additions added to the questionnaire?

17         JUROR NO. 64:  No, everything as is.

18         THE COURT:  All right.  Is there any additional

19     information about yourself or your family that was not covered

20     by the questionnaire but you think might be of use to us in

21     determining whether you should be a juror in this case?

22         JUROR NO. 64:  No, I don't think so, Your Honor.

23         THE COURT:  All right.  Has anything changed in your

24     family or work obligations that might make it difficult for you

25     to meet the time requirements of this case?

390

1          JUROR NO. 64:  Well, there is nothing that has

2   changed, but one thing I probably would relay is that in my

3   particular occupation, we are currently involved in an

4   exercise, without getting into too much detail, that involves

5   U.S. military, some of the federal agencies, and some of our

6   allied coalition partners.  And this is the time of the year

7   that we do it, and it gets a bit busy.

8          My only concern is that my backup or alternate is, in

9   all fairness, is probably not totally up to speed and might

10  feel a little bit uncomfortable with things that may and could

11  pop up from time to time during this exercise.

12         And that's it in a nutshell.

13         THE COURT:  And you said that in question number 92,

14  I saw that.  I guess the real question is, while it might be

15  uncomfortable for that person or it might be inconvenient,

16  unless it would absolutely throw off the exercise, in other

17  words, the exercise would have to be cancelled or could be a

18  real major problem, I don't think that would be enough to

19  prevent you from being a juror in this case.

20         JUROR NO. 64:  Oh, Your Honor, I totally concur.

21  Life goes on.

22         THE COURT:  All right.  Now, are you going to have

23  obligations though with those projects so that after -- if you

24  are chosen to be a juror, would you have to go to your office

25  after that and do work on those matters?

1          JUROR NO. 64:  Well, what I will be doing is I will

2     be checking probably during the early morning hours prior to

3     arrival, you know, if I am chosen.  And afterwards, I will go

4     ahead and check just to make sure things went smoothly.  If

5     they need some sort of assistance from a distance, I will just

6     go ahead and do that, I am just that kind of person.

7          THE COURT:  All right.  Are you in IT?  Can you tell

8     us what kind of work you do?

9          JUROR NO. 64:  Yeah, I am in communications security.

10    I think some of the folks here that are probably involved in

11    some of the federal business are probably familiar with

12    encryption devices and things that you use.  So that's what I

13    kind of do.  One of the things that I also did when I was in

14    the military.

15          So that kind of stuff.

16          THE COURT:  So you are a communications person.  All

17    right.

18          Now, again, without going into any detail, is any of

19    the work you are currently doing or that you have done in the

20    last five years, did it involve communications from the Middle

21    East or the Asian continent, if you can tell us that?  And if

22    you can't, I understand.

23          JUROR NO. 64:  No, not -- I can talk about that.  I

24    have haven't done anything with the Middle East since my

25    military years.

392

1          THE COURT:  All right.  Now, some of the allegations

2  in this case, as you know, involve the events of September 11,

3  the attacks on the Pentagon.

4          The fact that you work with the Department of Defense

5  and have a military background, do you feel in any respect

6  those personal life experiences would make it difficult for you

7  to be impartial in judging the issues of this case?

8          JUROR NO. 64:  I don't think so.

9          THE COURT:  All right.  Also, you have spent a little

10  time in India, as I understand it?

11          JUROR NO. 64:  Yes, Your Honor.  U.S. Embassy

12  posting.  Military assignment.

13          THE COURT:  How long were you there?

14          JUROR NO. 64:  I was there for about a

15  year-and-a-half at the U.S. Embassy in New Delhi.

16          THE COURT:  Did you ever travel up to Karachi, up to

17  Kashmir, or over to Pakistan as part of those duties?

18          JUROR NO. 64:  No, never had to go up to those

19  locations.  Everything I did was basically in the New Delhi

20  area.

21          THE COURT:  All right.  You saw in the questionnaire

22  there was some questions about Kashmir.  Did you form any

23  impressions about that conflict while you were over there?

24          JUROR NO. 64:  Your Honor, bottom line, during all of

25  my military travels and that sort of thing, I really never

393

1  formed any kind of concrete negative or positive opinion.  I

2  was normally under direction or orders, and I simply executed

3  those, and I just moved on.

4          THE COURT:  All right, sir.  I note that you live in

5  Stafford County.  Where is your duty station right now?  Where

6  do you normally report?

7          JUROR NO. 64:  Oh, I actually work in Arlington,

8  Virginia.

9          THE COURT:  So you are used to the commute?

10         JUROR NO. 64:  I bought a hybrid specifically for

11  that reason.

12         THE COURT:  All right.  So you won't have any problem

13  getting here by 9:30?

14         JUROR NO. 64:  No, unless the state decides to snatch

15  us off the HOV.

16         THE COURT:  All right, that's fine.  In your answer

17  to question number 84 -- that question was:  Do you believe

18  that defendants in criminal trials should have to prove that

19  they are innocent?  And you checked yes.

20         Can you explain why you checked that particular

21  answer.

22         JUROR NO. 64:  Actually, Your Honor, I am glad you

23  brought the question up.  I might have gone -- that particular

24  question, I may have gone through it pretty quickly.

25         THE COURT:  Do you want to change that answer?

394

1           JUROR NO. 64:  I don't believe that is probably my

2    answer.

3           THE COURT:  What is your answer to that question?

4    What is your personal belief about whether a defendant in a

5    criminal trial should have to prove that he is innocent?

6           JUROR NO. 64:  Your Honor, could I ask what the

7    options were, were there two or three?

8           THE COURT:  There were no options.  We are just

9    curious as to your belief about that.

10          What is your understanding, if you have one, as to

11   who has the burden of proof in a criminal trial?

12          JUROR NO. 64:  Well, Your Honor, it might be a little

13   vague, and then again it might be a little bit direct.  Out of

14   my personal experience from, you know, without getting into any

15   kind of detail, when these sorts of things kind of pop up and

16   they have to occur, I simply think you just make a decision

17   based upon where the cards lay, where they fall.

18          So when you talk about should the defendant prove

19   innocence, should those against the defendant prove where they

20   were wrong, I think the facts need to simply be laid on the

21   table.  That's just simply the way I have looked at things.

22          Does that answer the question?

23          THE COURT:  Well, there is no right or wrong answer.

24   I am just trying to find out where you are coming from.  But

25   have you ever heard of the concept of the presumption of

395

1    innocence?

2             JUROR NO. 64:  Oh, Yes.

3             THE COURT:  What is your understanding of that?

4             JUROR NO. 64:  That you are presumed innocent until

5    proven guilty.

6             THE COURT:  And do you agree with that position?

7             JUROR NO. 64:  I have to say yes to that question.

8             THE COURT:  Why did you say you have to say yes?

9             JUROR NO. 64:  Well, I have always believed that you

10    should be presumed innocent until you are proven guilty.

11             THE COURT:  All right.  Were you ever involved either

12    as a judge, or an advocate, or a friend, or a witness in any

13    court-martials?

14             JUROR NO. 64:  During military years from time to

15    time you are called to either witness a court martial

16    proceeding or be a witness to such.  On occasion I had.  And it

17    is really a bit vague.  Those things just happen to happen in

18    the military, and you just need to go ahead and be a witness if

19    called upon.

20             THE COURT:  All right.  So you have been a witness in

21    court-martials?

22             JUROR NO. 64:  Yes, ma'am.

23             THE COURT:  Do you remember about how many?

24             JUROR NO. 64:  No more than three.

25             THE COURT:  And do you know who called you, the

1   prosecution or the defense?

2           JUROR NO. 64:  On maybe -- on either occasion it was

3   either the defense or prosecution.

4           THE COURT:  So you think you have been for both

5   sides?

6           JUROR NO. 64:  Oh, yes, different locations around

7   the world, whenever it popped up.

8           THE COURT:  For example, when you were called by the

9   defense, do you remember like why were you called as a witness?

10  Was it a character witness?  Or were you an eyewitness at the

11  event and you saw it differently?  Why were you called as a

12  witness?

13          JUROR NO. 64:  Character witness.

14          THE COURT:  Character witness.  When you were called

15  for the prosecution, why were you called?

16          JUROR NO. 64:  I think the prosecution might have

17  received some information wherein I might have been helpful to

18  the prosecution of the case.  And then that determination was

19  kind of made whether I was or not as things went on.

20          THE COURT:  All right.  Did you form any conclusions

21  about sort of the trial process, having been a witness a couple

22  of times, having to sit in the box and be asked questions by

23  the lawyers?

24          JUROR NO. 64:  No particular conclusion, Your Honor.

25  I really did not.

397

```
 1              THE COURT:  Does the trial process seem to work in

 2      your view?

 3              JUROR NO. 64:  I think it works.  I think it -- I

 4      hate to give a military answer, but probably promotes good

 5      discipline and all that sort of stuff.

 6              THE COURT:  All right.  Do you feel in any respect

 7      that you would have difficulties in being impartial in judging

 8      this case?

 9              JUROR NO. 64:  Truthfully, I have to say, I would

10      save to say no.  I am a black and white kind of person.  I am

11      cut and dried.

12              THE COURT:  Okay, thank you.  Step down, please.

13              JUROR NO. 64:  Thank you.

14              NOTE:  Juror number 64 leaves the courtroom.

15              THE COURT:  Mr. Gibbs, any further questions from the

16      Government?

17              MR. GIBBS:  Judge, the only question we had, in

18      number 68, talking about his religious affiliation.

19              THE COURT:  I am sorry, I hope we are looking at the

20      same person.  Aren't we dealing with 64?

21              MR. GIBBS:  No, question number 68.

22              THE COURT:  Oh, I am sorry.  Too many numbers in this

23      case.

24              MR. GIBBS:  That's right.

25              THE COURT:  Go ahead.
```

1          MR. GIBBS:  In question 68 he was asked about his

2     religious affiliation.  He put NA.  We would like a little more

3     clarification as far as if he is an agnostic or an atheist,

4     what religion he was born into.  And also if his wife or

5     children practice.

6          THE COURT:  All right.  Anything further from the

7     defense?

8          MR. MacMAHON:  Just a couple, Your Honor.  I think

9     you asked him a question and he answered about law enforcement,

10    I believe it was.  And he said, without disclosing things from

11    my personal experience.  Maybe he told you about that when he

12    talked about the court-martials he had been in, but I think if

13    you could probe into that a little more.  I am not sure what he

14    meant by that at all.

15         And question number 40 as well I think could use some

16    follow-up.  It is an opinion, the association question.  And

17    his answer is that I think they should be investigated.  And I

18    would ask that the Court would follow up on that as well.

19         THE COURT:  All right.  And I think because his voice

20    is low enough, I am going to ask to have the witness come back

21    here.

22         NOTE:  Juror number 64 returns to the courtroom.

23         THE COURT:  A couple of follow-up questions, sir.

24         I realize it's a personal question, but we do need to

25    know it for this case.  Number 68 asked you about your

399

1    religious affiliation.

2              Have you ever been affiliated with any religious

3    organization?

4              JUROR NO. 64:  Well, I was born a Baptist.

5              THE COURT:  Okay.

6              JUROR NO. 64:  Yeah, that's basically it.

7              THE COURT:  And currently you are not affiliated with

8    any church?

9              JUROR NO. 64:  Well --

10             THE COURT:  Or do you still think of yourself as a

11   Baptist?

12             JUROR NO. 64:  Oh, yes, I do.

13             THE COURT:  All right.

14             JUROR NO. 64:  I thought you meant do I go to church

15   every Sunday and stuff like that.

16             THE COURT:  No, you don't have to go to church every

17   Sunday to be a juror in this case.  But you say a few times a

18   year you go.  How about your spouse and children, do they

19   belong to any church?

20             JUROR NO. 64:  Oh, yes, and they are also Baptists.

21             THE COURT:  They are Baptists?  Do they go a little

22   bit more often than you do?

23             JUROR NO. 64:  Probably every week, weather

24   permitting.

25             THE COURT:  All right, that's fine.  Question number

400

1   40 asked the following question:  What is your reaction or

2   opinion towards people who live in the United States who choose

3   to associate with groups or organizations, including religious

4   groups and organizations, that discuss or advocate the use of

5   violence as a means to protest or express their opinions

6   against United States government policies?

7          That was the question.  And your answer was you

8   thought that they should be investigated.

9          Can you explain a little bit more what you mean by

10  that answer.

11         JUROR NO. 64:  Well, I think when -- if you tend to

12  think or if there is a possibility that a small fire might

13  potentially turn into a blaze, you should probably check it out

14  to make sure it doesn't get to that point.  So that's kind of

15  what I mean about that.

16         THE COURT:  That's what you meant by that?

17         JUROR NO. 64:  Right.

18         THE COURT:  Now, do you think that people should be

19  prosecuted simply because they go to a meeting that might have

20  some pretty fiery political rhetoric, or they write e-mails or

21  letters in which they express very strongly anti-government or

22  anti-American views?

23         For example, strong opposition to the war in Iraq.

24  Or strong opposition to policies concerning foreign countries.

25         JUROR NO. 64:  I think that kind of thing is probably

401

 1   a person's prerogative and probably their right to express

 2   their opinions on this sort of thing.  But I think if you kind

 3   of go back to whether or not you should use violence to get

 4   your point across on that kind of stuff, I think that's

 5   probably a problem.

 6            Does that kind of answer the question?

 7            THE COURT:  Again, there is no right or wrong answer.

 8   It gives us more information, that's why we asked you that

 9   follow-up question.

10            I am not 100 percent clear, have you yourself ever

11   been involved in any law enforcement work outside of if your

12   communications work supports law enforcement?

13            But I mean, outside of that, put the communications

14   business aside, have you ever been in any law enforcement, done

15   any law enforcement work yourself?

16            JUROR NO. 64:  Any kind of law enforcement per se

17   that I may have been involved in probably was during my embassy

18   duty assignments.  And that was basically internal security for

19   the embassy themselves.

20            So we basically enforced the rules, security rules

21   and regulations of the U.S. embassies, but not a law officer

22   per se.

23            THE COURT:  All right.  So, in other words, you have

24   never been in the position of conducting investigations?

25            JUROR NO. 64:  Never.

402

1          THE COURT:  All right.  Or making arrests or anything

2     like that?

3          JUROR NO. 64:  Never.

4          THE COURT:  All right.  So when you -- when you look

5     at the law enforcement question, you're thinking about

6     assisting in making sure that communication systems are secure

7     against possible intrusion, is that the kind of thing you're

8     talking about?

9          JUROR NO. 64:  Oh, no, no, I am not talking about

10    that.  When I think about what I have done as it pertains to

11    law enforcement?

12         THE COURT:  Right.

13         JUROR NO. 64:  It pertains specifically to directions

14    we might have received from a regional security officer at a

15    U.S. Embassy, or the Deputy Chief of Mission, or the Ambassador

16    himself on how he wanted to enforce rules, embassy rules and

17    regulations only pertaining to the embassy, inside the embassy

18    itself.  Not out in the local public and that sort of stuff.

19         That's what I'm talking about.

20         THE COURT:  All right.

21         JUROR NO. 64:  Does that --

22         THE COURT:  I think that answers the question.  All

23    right.  If you would step down again, please.

24         JUROR NO. 64:  Okay, thank you.

25         NOTE:  Juror number 64 leaves the courtroom.

403

1          THE COURT:  Anything further for this witness -- or
2    this juror?

3          MR. GIBBS:  No, Your Honor.

4          THE COURT:  Mr. MacMahon?

5          MR. MacMAHON:  Yes, Your Honor, we challenge him for
6    cause.  I am not sure all the answers to these questions were
7    that concise as to whether he could be fair and impartial.  I
8    am not clear that he could be.  There were a lot of wondering
9    answers to a lot of the questions that the Court asked as far
10   as I could tell.

11         THE COURT:  Well, I didn't see them as wondering.
12   And I did not hear him say anything that would suggest that he
13   can't be impartial.  I mean, he does have that sort of military
14   rigid speak.  That doesn't mean he can't be impartial.

15         And he has testified that he has been called as a
16   witness both for the prosecution and the defense in
17   court-martial matters.

18         So I am not going to grant that request, and we will
19   continue with this gentleman in the pool.

20         NOTE:  Juror number 64 returns to the courtroom.

21         THE COURT:  Sir, you are still under consideration
22   for this jury.  You are finished with us for today.

23         What is happening is we are getting a smaller group
24   of jurors who will come back on Monday for the final selection.
25   If you are chosen to be a juror in this case, then the trial is

404

1    going to start Monday as soon as the jury is selected, so you

2    would be here all day on Monday.  And then the trial would be

3    going on thereafter.  All right?

4              JUROR NO. 64:  Yes, ma'am.

5              THE COURT:  You are to continue following my earlier

6    instructions.  That means you are not to conduct any

7    investigation whatsoever about this case.  And you are to avoid

8    any media coverage about the case.

9              Do you understand?

10             JUROR NO. 64:  Understood, Your Honor.

11             THE COURT:  All right.  You may tell your colleagues

12   that you are still under an obligation to come to court for

13   jury duty.  You can't give anybody any details or information

14   about this case.

15             Do you understand?

16             JUROR NO. 64:  Understood.

17             THE COURT:  We have been referring to you by number

18   because we're trying to avoid the media talking to our jurors.

19   And so, no one should be contacting you about this case.  If

20   for any reason you think you have been contacted, you should

21   let us know right away.  All right?

22             JUROR NO. 64:  Very well.

23             THE COURT:  I believe the reporting time Monday would

24   be 9 o'clock.  If you want to double-check, just call that

25   telephone number we have been giving you.  All right?

405

1          Thank you.  You are free to go.  We will see you back

2    here Monday.

3          JUROR NO. 64:  Thank you, Your Honor.

4          NOTE:  Juror number 64 leaves the courtroom.

5          THE COURT:  All right, juror number 66.

6          NOTE:  Juror number 66 enters the courtroom.

7          THE COURT:  Good morning, sir.

8          JUROR NO. 66:  Good morning.

9          THE COURT:  Or afternoon now.  Since filling out the

10    questionnaire on Monday, I wanted to know whether there were

11    any things that came to your mind whereby you would want to

12    change any of your answers or add anything to the

13    questionnaire?

14          JUROR NO. 66:  It did come to my memory that I had

15    seen a newspaper article about somebody training at a paintball

16    facility for some kind of anti-American militant group.

17          THE COURT:  All right.  Is there anything about that

18    article that you think might affect your ability to judge this

19    case impartially?

20          JUROR NO. 66:  No.

21          THE COURT:  All right.  Has anything changed in your

22    personal or business lives that would make it difficult for you

23    to give the time commitment to this case that is going to be

24    necessary?

25          JUROR NO. 66:  No.

406

1                THE COURT:  All right.  You are, as I understand it,

2       a general engineer for the Network Control Center of the U.S.

3       International Broadcasting Bureau?

4                JUROR NO. 66:  That's correct.

5                THE COURT:  All right.  And I understand that's a

6       government agency that is involved in broadcasting news

7       programs overseas, is that right?

8                JUROR NO. 66:  Correct.

9                THE COURT:  All right.  In the course of that work,

10      have you yourself ever been involved in broadcasting, or are

11      you just on the technical end of things?

12               JUROR NO. 66:  Just technical, no broadcasting.

13               THE COURT:  All right.  My understanding is that you

14      have not been in any of the geographical locations that we

15      mentioned in the questionnaire, is that right?

16               JUROR NO. 66:  No.

17               THE COURT:  All right.  In question number 34 you

18      indicated that your spouse works for the Defense Intelligence

19      Agency and has done so since November of 2004?

20               JUROR NO. 66:  That's correct.

21               THE COURT:  Did she work for any other governmental

22      agencies before that time?  In other words, before the DIA,

23      where was she working?

24               JUROR NO. 66:  Yes, Department of State.

25               THE COURT:  All right.  In what capacity?

407

```
 1                JUROR NO. 66:  As a project manager.

 2                THE COURT:  For what kind of a project, if you can

 3     tell us?

 4                JUROR NO. 66:  New embassy buildings.

 5                THE COURT:  Embassy buildings?

 6                JUROR NO. 66:  Yes.

 7                THE COURT:  Were any of those embassy buildings

 8     involved with any of the embassies that have been attacked in

 9     the last few years, like in Kenya or Nairobi?

10                JUROR NO. 66:  No.

11                THE COURT:  All right.  Some of the allegations in

12     this case may involve claims of efforts being made to incite

13     people to take up arms against the United States.

14                The fact that your wife and you both worked for the

15     federal governmental, do you think in any respect would that

16     make it difficult to be impartial in judging this case?

17                JUROR NO. 66:  No.

18                THE COURT:  I think that's the only questions I have

19     for you.  If you don't mind, just step down for a second.  We

20     will see if there are any further ones.

21                JUROR NO. 66:  Okay.

22                NOTE:  Juror number 66 leaves the courtroom.

23                THE COURT:  Anything further from the Government?

24                MR. GIBBS:  No, Judge.

25                THE COURT:  How about from the defense?
```

408

```
 1              MR. MacMAHON:  Your Honor, in question number 68 the
 2    juror says that -- it indicates that he is a born-again
 3    Christian.  When you deal with the Space Shuttle remarks that
 4    we're going to have to deal with this case, the Israeli
 5    rhetoric in there, and there are some fundamentalist Christians
 6    who feel a particular affinity towards Israel.  And if we are
 7    going to have this anti-Israeli rhetoric, I think we should ask
 8    this person if there is anything about his religious beliefs
 9    that would make him unfair to someone who had anti-Israeli
10    political views.
11              THE COURT:  All right.  That's the only question you
12    want the Court to ask?
13              MR. MacMAHON:  Yes, Your Honor.
14              THE COURT:  All right.  If you would bring him back
15    in.
16              NOTE:  Juror number 66 returns to the courtroom.
17              THE COURT:  Sir, if would just answer in a good, loud
18    voice from where you are, that would be fine.
19              You indicated in the question concerning religious
20    affiliation that you are a born-again Christian.  And we wanted
21    to ask you, because there may be some very strong anti-Israel
22    rhetoric in this case, do you feel that because of your deeply
23    held religious views you might have difficulty in being
24    impartial in judging this case if some of the evidence showed
25    very virulent anti-Israeli positions?
```

409

```
 1            JUROR NO. 66:  No.

 2            THE COURT:  All right, thank you.  If you would step

 3   outside for just one more second.

 4            NOTE:  Juror number 66 leaves the courtroom.

 5            THE COURT:  All right.  Any basis to challenge this

 6   juror?

 7            MR. MacMAHON:  Not for the defense, Your Honor.

 8            MR. GIBBS:  Not for the Government, Your Honor.

 9            THE COURT:  All right.  We will bring him back in,

10   please.

11            NOTE:  Juror number 66 returns to the courtroom.

12            THE COURT:  Sir, thank you.  We are still considering

13   you for this jury.  We are finished for today.  The final round

14   of jury selection is going to be Monday morning.  We are going

15   to ultimately choose 14 jurors of a now much smaller pool.

16            If you are chosen to be a juror, we are going to go

17   right into the trial on Monday.  So it would be a full day

18   commitment.

19            Next week we would be in session all days except

20   Friday.  Friday is definitely not going to be for this trial.

21   So you could make arrangements for your scheduling for next

22   week.

23            I am going to ask that you continue to follow my

24   earlier instructions.  And that is, you are not to conduct any

25   investigation into this case or any of the issues.
```

410

1            Are you comfortable with that?

2            JUROR NO. 66:  Yes.

3            THE COURT:  All right.  And avoid any media coverage.

4    I don't expect there will be much, but there could be some, and

5    I want you to just avoid that.

6            You may tell family members or friends that you are

7    still in consideration for jury duty.  You are not to discuss

8    any details about this case or the questionnaire with anyone.

9            And you understand that?

10           JUROR NO. 66:  Yes.

11           THE COURT:  All right.  We have been using a number

12   to identify you because we're trying to prevent the media from

13   questioning our jurors, and that's why we have done that.  We

14   want to make sure that no one contacts you.  If you think

15   anyone has tried to talk to you about the case, please let us

16   know immediately.

17           All right?

18           JUROR NO. 66:  All right.

19           THE COURT:  And we will see you back here on Monday.

20           JUROR NO. 66:  Is Friday no court for every week, or

21   is that just next week?

22           THE COURT:  No, I can't guarantee that.  I have got

23   dockets that have been scheduled for weeks, and there is a

24   program at the courthouse that can't be changed, so I am not

25   available on Friday.

411

1        But the following Friday, if we are on schedule and

2   moving well, I will try to give the jurors and the parties

3   Friday off, but there is no guarantee.  All right?

4        JUROR NO. 66:  Okay.

5        THE COURT:  All right.  Thank you, sir.  And you can

6   check in at that phone number if you have any questions about

7   -- but Monday you need to be back here.  I think the reporting

8   time will be 9 o'clock.

9        JUROR NO. 66:  Okay.  Thank you.

10       THE COURT:  Thank you.  You are free to go.

11       NOTE:  Juror number 66 leaves the courtroom.

12       THE COURT:  Now, we have moved so efficiently this

13  morning, folks, the last juror that we have up here is 75.  We

14  had told the remaining group, because we didn't want them

15  sitting here all day, that they were not needed back here until

16  2 o'clock.

17       Now, the whether is gorgeous, and that means you all

18  are going to get a good, long lunch break.  I have a plea and

19  some other things I am going to do in that time frame.  But

20  once we finish with this juror, we will recess until 2, and

21  then we will finish the last, I think it is 6.  So it's not

22  going to be too long an afternoon.

23       All right.  So let's bring in number 75.

24       NOTE:  Juror number 75 enters the courtroom.

25       THE COURT:  Thank you, sir, for coming back to court.

412

1    We just have a few questions for you.

2              JUROR NO. 75:  Thank you.

3              THE COURT:  Since filling out the questionnaire on

4    Monday, have you thought about whether any of your answers

5    needed any correction, or if there was anything you wanted to

6    add to the questionnaire?  Is there anything?

7              JUROR NO. 75:  Nothing, as far as I know.

8              THE COURT:  All right.  Okay.  Is there anything

9    about your family or yourself that might not have been covered

10   by the questionnaire but you think might be of relevance to our

11   decision in considering you for this jury?

12             JUROR NO. 75:  No, Your Honor.

13             THE COURT:  All right.  Has anything changed in your

14   family or work situations that would now make it difficult for

15   you to give the time to this case?

16             JUROR NO. 75:  No.

17             THE COURT:  All right.  Have you conducted any

18   investigation or heard any media coverage about this case since

19   Monday?

20             JUROR NO. 75:  No, I haven't.  My wife told me there

21   was something about it on Channel 8, but I didn't see it.  I

22   didn't hear anything about it.  She said there was something

23   about a case that was being tried here on Channel 8, and that's

24   been it.  I haven't watched the news since then.

25             THE COURT:  All right.  I am not prohibiting you from

1    watching the news, but if you are going to be a juror in this

2    case, if there is anything about the case, you immediately shut

3    it off.

4            JUROR NO. 75:  My work doesn't allow me to get home

5    usually in time for that anyway.

6            THE COURT:  All right.  Let me ask you just a little

7    bit about your work.  What kind work does Abacus Technology

8    Corporation do?

9            JUROR NO. 75:  We like to claim that we're a high

10   tech consulting firm.  We do most of our work for the U.S.

11   government.  And of that, most of the work is for the U.S. Air

12   Force, mostly around the country doing information technology

13   kinds of things, network engineering design, and things like

14   that.

15           THE COURT:  And you are consultant vice-president for

16   that company?

17           JUROR NO. 75:  I am vice-president/chief technology

18   officer.  So I like to claim I'm still a consultant, but I am

19   pretty old for that now.  So I do -- most of my job is helping

20   manage the company.

21           THE COURT:  All right, sir.  Now, there may be

22   allegations in this case that there were efforts being made to

23   recruit people to wage war against the United States.

24           Given that you are involved with the armed services

25   in your work, do you feel in any respect those types of

414

1    allegations might make it difficult for you to be impartial in

2    judging this case?

3            JUROR NO. 75:  No, Your Honor.

4            THE COURT:  All right.  And am I correct that you saw

5    service in Vietnam yourself?

6            JUROR NO. 75:  Yes, Your Honor, I did.  I was an

7    infantry first lieutenant.

8            THE COURT:  All right.  Is there anything about the

9    fact that you actually saw action in combat, and again the

10   nature of the allegations in this case, and there may be some

11   references to the American war effort in Afghanistan right

12   after September 11, that you think might make it difficult for

13   you to be impartial in judging this case?

14           JUROR NO. 75:  I don't think so.  It has been

15   30 years since I served in the military, and I think the little

16   bit I have seen, everything has changed 180 degrees since when

17   I was in the military.

18           THE COURT:  All right.  I understand you visited the

19   World Trade Center site in New York City?

20           JUROR NO. 75:  Yes, Your Honor.  I took my -- we took

21   our daughter and her roommate to New York City for a weekend

22   during spring break this year, and we went by to see the World

23   Trade Center, such as it is.  It is being all constructed now,

24   there is nothing that lets you know that anything happened

25   there now.

415

1          THE COURT:  All right.  There may be evidence in this

2    case that people rejoiced or were pleased about the bombing at

3    the Trade Center and at the Pentagon, and felt that America had

4    it coming to it.

5          Your having been to the site and again your work with

6    the Government, do you feel in any respect those allegations

7    and your personal experiences might make it difficult for you

8    to be impartial in judging this case?

9          JUROR NO. 75:  No.  I got -- I guess I should say

10   that my wife was a protester against the Vietnam War when I was

11   in the military, so I know that there is freedom of speech

12   allowed for things like that, and support it.

13         THE COURT:  All right, sir.  You indicate that you

14   know some people who work at SRA?

15         JUROR NO. 75:  Yes, Your Honor, I do.

16         THE COURT:  Can you tell us who those people are?

17         JUROR NO. 75:  Okay.  I think Renny DiPentima is

18   currently the President of SRA.  I worked for him as a

19   contractor when he was at the Social Security Administration

20   back in 1987.  And he and I when we see each other now say hi

21   to each other and talk about old times, not necessarily good

22   old times, but old times.

23         And then Anita Stanton, who is their vice-president

24   for Defense Department marketing, I have known her for about

25   ten years, trying to do some joint ventures and things like

416

 1  that.

 2          An ex-Abacus employee just joined SRA, Leslie Zigler,

 3  in the marketing department.  I think that's it.

 4          THE COURT:  All right.  Mr. MacMahon, do we have any

 5  issues with those three names?

 6          MR. MacMAHON:  Could you ask the juror to repeat the

 7  first -- I am sorry, Your Honor.

 8          THE COURT:  The first person was --

 9          MR. MACMAHON:  Yes.

10          JUROR NO. 75:  The first person is Renny DiPentima,

11  who is the President of SRA now for --

12          MR. MacMAHON:  Thank you.  There is no problem with

13  that person, Your Honor.

14          THE COURT:  All right, that's fine.  In number 55 you

15  indicated that you have given depositions in some EEO cases?

16          JUROR NO. 75:  Yes, Your Honor.

17          THE COURT:  And how many times have you been called

18  as a witness in an EEO matter?

19          JUROR NO. 75:  I have given depositions only in I

20  think two or three cases.  I have never been called as a

21  witness to the courtroom hearings.

22          THE COURT:  In the two or three cases where you were

23  called, was it your company that was a defendant in the EEO

24  action?

25          JUROR NO. 75:  Yes, Your Honor.

417

1            THE COURT:  And you were called as a defense witness,

2     or were you called as a witness for the --

3            JUROR NO. 75:  Defense witness.

4            THE COURT:  All right.  And what types of issues were

5     involved in those cases, if you know?

6            JUROR NO. 75:  Age discrimination was one.  Another

7     was sexual harassment.  And I think the third that I can

8     remember was probably sexual harassment.

9            THE COURT:  All right.  And do you know whether those

10    matters ever went all the way to litigation?

11           JUROR NO. 75:  No.  My company is currently involved

12    in a litigation of a trial this week out in Montgomery County

13    for another case, but I wasn't deposed for it.

14           THE COURT:  All right.  And why were you being

15    deposed in the three cases that you were?

16           JUROR NO. 75:  I was the second level supervisor.

17    The supervisor of the supervisor, if that's the term.

18           THE COURT:  Who made the personnel decision affecting

19    that person?

20           JUROR NO. 75:  Yes.  It was a hiring/firing decision

21    and things like that.

22           THE COURT:  Were they all three hiring/firing

23    decisions?

24           JUROR NO. 75:  No.  The sexual harassment was

25    on-the-job situations.  We had people working at client sites

418

1  who encountered hostile work environments and sexual

2  harassment.

3        THE COURT:  Okay.  Was there anything about your

4  experience as a witness -- because I assume you were questioned

5  by both management and the employees' attorneys, anything about

6  being a witness that you think might affect your ability to

7  judge this case fairly?

8        JUROR NO. 75:  No, Your Honor.

9        THE COURT:  Did you experience any particularly harsh

10 cross-examination when you were a witness?

11       JUROR NO. 75:  No, none.

12       THE COURT:  Did you develop any attitude towards

13 trial lawyers or lawyers who were asking questions as a result

14 of your experience as a witness?

15       JUROR NO. 75:  No, Your Honor, not as a witness.  As

16 a juror when I was in the Fairfax County court case, I had a

17 chance to see a bad attorney last year, and that was not very

18 good.

19       THE COURT:  We are going to get to that in a second.

20 Not one of the ones who is in this courtroom, of course?

21       JUROR NO. 75:  No.

22       THE COURT:  All right.  When exactly did you serve as

23 a juror in the state system?

24       JUROR NO. 75:  Your Honor, I think it was about a

25 year ago in Fairfax County.

419

1          THE COURT:  So it would have been January, February,
2     March 2004?
3          JUROR NO. 75:  I think so.  I am not sure, but I
4     think it was a about year ago.
5          THE COURT:  All right.  And You said it was Fairfax
6     County?
7          JUROR NO. 75:  Yes, ma'am.
8          THE COURT:  It sounds like it was a civil case.  It
9     involved injuries from an automobile accident?
10         JUROR NO. 75:  Yes, Your Honor.  It was an automobile
11    accident.  The driver was the plaintiff, he was suing for money
12    for injuries that he thought should be paid by the other
13    driver.
14         THE COURT:  And the jury, as I understand it, found
15    for the driver, the defendant?
16         JUROR NO. 75:  We found -- we didn't find for the
17    plaintiff.  We found for the defendant.  No, we didn't award
18    any money to the driver who claimed he was innocent -- claimed
19    he was injured.
20         THE COURT:  All right.  You don't have to tell us the
21    name of the lawyer, but was it the plaintiff's lawyer or the
22    defendant's lawyer who you though did a bad job?
23         JUROR NO. 75:  It was the defendant's lawyer.
24         THE COURT:  Even though the defendant won?
25         JUROR NO. 75:  Yes.

420

1               THE COURT:  All right.

2               JUROR NO. 75:  He had a good story to tell in spite

3     of his lawyer.

4               THE COURT:  All right.  And I assume there were what,

5     six, nine jurors in that jury room?

6               JUROR NO. 75:  There were at least eight.

7               THE COURT:  At least eight.  What did you think about

8     the jury deliberation process?

9               JUROR NO. 75:  I thought we did a very good job.

10              THE COURT:  All right.

11              JUROR NO. 75:  We looked at the issues.  It was a

12    very quick decision.  It was surprising, after we had each had

13    a chance to talk for a minute, we took a quick vote and the

14    decision was made.  It was very fast.

15              THE COURT:  All right.  Is there anything that you

16    experienced as a juror in that case that you think might affect

17    your ability to be an impartial juror in this case?

18              JUROR NO. 75:  No.

19              THE COURT:  And you understand that was a civil case,

20    this is a criminal case, different standards of proof and that

21    sort of thing?

22              JUROR NO. 75:  Yes.

23              THE COURT:  All right.  In question number 88 on the

24    questionnaire asked you a question, and you changed your

25    answer, and I just want to make sure I understand what happened

421

 1    there.

 2             The question is:  Do you tend to believe that a

 3    member of law enforcement, such as a police officer or a

 4    federal agent, who testifies in court is -- and you had three

 5    choices.  The first was, more likely to tell the truth than

 6    other witnesses.  And then you had the choice, less likely to

 7    tell the truth.  And the third one was, equally likely.

 8             And you checked, I guess originally, equally likely.

 9    And then you crossed that out, and then you left the check for

10    more likely to tell the truth.

11             Can you explain what happened.

12             JUROR NO. 75:  I am still unsure about that because I

13    think the law enforcement individuals, law enforcement people

14    tend to state the facts when they get on the -- when they

15    testify.  They are testifying facts as they see them and they

16    interpret them.

17             Are they going to do it better than other people?  I

18    think they are better trained to tell the facts as they have

19    seen and observed the facts.

20             There is still the perception thing, I think.  And

21    that's where I think the issue was, are the facts that they say

22    the facts of the case or the facts they perceive them.  And

23    that's why I had a question with that.

24             I think the law enforcement people can relate facts

25    as they see them very well.  And I think they are trained to do

422

1    that.  And because of that, when they get into a trial

2    situation, they do a good job of doing that.  Versus other

3    people who talk from a less rigorous background in that.

4              THE COURT:  The question or the concern about that

5    particular question is it is expected that every witness is

6    evaluated on his or her own merits based upon what the witness

7    says, how they say it, other evidence that may corroborate or

8    contradict it.

9              And the concern is that just because a person is of a

10   particular employment or a particular race or age, doesn't give

11   them any special sort of star by their credibility.

12             So I am not quite sure how you feel about that

13   question in that context.

14             THE WITNESS:  I can accept that, but I still think

15   that the law enforcement organization people are better trained

16   when they come into a courtroom environment.  They have been

17   into a courtroom environment more often than other people have,

18   and I think they are better trained in terms of how to relay

19   what they have seen and how they have dealt with the case.

20             I think they are going to be a lot more specific with

21   things like that.

22             THE COURT:  They may be, but does mean that they are

23   inherently more credible?

24             JUROR NO. 75:  No.  Oh, no.

25             THE COURT:  So as I understand your answer to that

423

1    question, you're saying that they're going to be more trained

2    in observing and relating?

3                    JUROR NO. 75:  Yes.

4                    THE COURT:  But in terms of how inherently credible

5    they are, do you feel that they are inherently more credible as

6    a witness --

7                    JUROR NO. 75:  I have to think everybody is credible

8    that is coming in.

9                    THE COURT:  All right.  Thank you, sir.  If you would

10   step outside for a minute.

11                   NOTE:  Juror number 75 leaves the courtroom.

12                   THE COURT:  Any further questions from the

13   Government?

14                   MR. GIBBS:  No, Judge.

15                   THE COURT:  How about from the defense?

16                   MR. MacMAHON:  Two requests, Your Honor.  On question

17   number 68, the potential juror says that he was born Catholic

18   and is now agnostic.

19                   Of course, there is going to be a lot of discussion

20   in this case of very strongly held religious beliefs, and

21   whether that would indicate some inability to listen to that

22   and judge it fairly.

23                   And question 81, I think the Court could do some

24   follow-up on his -- what the line is and what his answer is

25   there to question 81.  That is obviously a very important

424

1   issues in this case.  One of the exact charges is giving aid.

2   I think the question --

3           THE COURT:  Of course, his wife was an anti-Vietnam

4   war protester in the war's heyday.  I mean, I would think that

5   answers the question as to his attitude on that issue, but I

6   will ask it.

7           MR. MacMAHON:  Thank you, Your Honor.

8           THE COURT:  All right.

9           NOTE:  Juror number 75 returns to the courtroom.

10          THE COURT:  Sir, if you would just stay there and

11  answer in a good, loud voice, we can probably hear you.  All

12  right?

13          JUROR NO. 75:  I can hear you fine, thank you.

14          THE COURT:  Well, we have to hear you, you are more

15  important.

16          Just two follow-up questions.  You indicated on the

17  question concerning your religious affiliation, that you are

18  presently an agnostic.

19          JUROR NO. 75:  A devout agnostic, yes.

20          THE COURT:  A devout agnostic.  That's all right.

21  There may be evidence, in fact there will be a great deal of

22  evidence in this case about very vigorously held religious

23  beliefs.

24          Now, do you feel that because of your views as an

25  agnostic, that the fact that people are going to be explaining

425

1    activities and discussing what they did in terms of their

2    religious views, that that might make it difficult for you to

3    be impartial in judging this case?

4            JUROR NO. 75:  No, not at all.

5            THE COURT:  The fact that you are a strong agnostic

6    -- and you also have expressed very strong views about

7    separation of religion from any kind of public activities.

8            Do you feel in any respect that your personally

9    strongly held views might interview with your ability to judge

10   the facts of this case?

11           JUROR NO. 75:  No.

12           THE COURT:  All right.  The other question I had for

13   you is in answering the question -- I have lost my number.

14   What number was that --

15           MR. MacMAHON:  81, Your Honor.

16           THE COURT:  81, thank you.  You were asked:  Do you

17   believe that the rights and liberties of freedom of speech,

18   freedom of religion, and freedom of association should ever be

19   limited or restricted?  And you indicated yes.

20           And then you explained:  Speech may need to be

21   restrained to avoid giving aid to enemy.  Religion and

22   association should never be restrained.

23           Can you explain both aspects of that answer.

24           JUROR NO. 75:  Well, I think a war time environment,

25   you have to restrict certain kinds of speech.  I can go back to

426

1    Vietnam and say that my wife knew where I was in Vietnam

2    before I could even write and tell her because she heard my

3    unit had been assigned to Cambodia.  She knew it before I could

4    even tell her because I was not there, but she knew it.

5         I think that was wrong.  I think things have changed

6    since that time.  I think that regarding religion and

7    expression, I think you have to have the right to protest.

8         And I think I have a strong feeling that religion has

9    a right to be pursued without government intervention, without

10   government involvement.  The government shouldn't be involved

11   with it.  It is one of our given rights.

12        Expression is the same kind of thing.  I think

13   protesting is allowable, it should be encouraged, but speech

14   has to be restricted in times of war.  There has to be some

15   restraints put on it in that sense for it.

16        THE COURT:  All right.

17        JUROR NO. 75:  I don't think a total restriction, I

18   am obviously not in favor of that, nobody is.  But I think

19   there has to be some give and take with that.

20        THE COURT:  Thank you, sir.  If you would just step

21   outside for one more second.

22        NOTE:  Juror number 75 leaves the courtroom.

23        THE COURT:  Any further questions for this jury?

24        MR. GIBBS:  No, Judge.

25        MR. MacMAHON:  No, Your Honor.

427

```
1              THE COURT:  All right.  Any basis to strike?
2              MR. MacMAHON:  No, Your Honor.
3              MR. GIBBS:  No, Judge.
4              THE COURT:  All right.  Very thoughtful juror.  We
5    have an excellent pool I think for this case.  Let's bring him
6    back in.
7              NOTE:  Juror number 75 returns to the courtroom.
8              THE COURT:  All right, sir, you are still in the
9    running for this jury.  We are finished with you for today.
10             What is going to happen Monday morning is we've been
11   narrowing down the pool.  14 people will be chosen for the
12   jury.  If you are one of those 14, then we are going to go
13   right into the trial.  So you would be here all day Monday.
14             We will not be in session on Friday for planning
15   purposes or contingency plan purposes, I can guarantee you
16   Friday would be off.
17             I want to make sure that you continue to live by my
18   earlier cautions.  You are not to conduct any investigation
19   whatsoever about this case or listen to any media coverage.
20   All right?
21             JUROR NO. 75:  Yes, ma'am.
22             THE COURT:  You may tell your family or your
23   employees or colleagues that you are still under consideration
24   for duty on the jury.  You are not to go into any details at
25   all about the case.
```

428

1        We have given you a number rather than calling you by

2  name because we don't want the media trying to interview you.

3  So you shouldn't receive any contacts at all about this case.

4  But if that were to happen, we need to know about it right

5  away.  All right?

6        JUROR NO. 75:  Yes, Your Honor.

7        THE COURT:  I expect there will be a 9 o'clock

8  reporting time on Monday.  You can check with that telephone

9  number if you have any questions about that, but definitely

10  Monday.  And the trial will start up here at 10, but I know

11  they want you here earlier.

12        All right?

13        JUROR NO. 75:  Thank you.

14        THE COURT:  Thank you.  You are free to go at this

15  time.

16        NOTE:  Juror number 75 leaves the courtroom.

17        THE COURT:  All right.  What we will be doing then is

18  reconvening at 2 o'clock for six remaining jurors, and that's

19  all we have left from the entire pool that was summonsed here.

20  And then once we're done, and I would expect we would be done

21  by 3, unless I really get bogged down, we will proceed Monday

22  morning at 10 o'clock.

23        And unless there is any -- this is the last chance

24  for any pretrial stuff.

25        We have 35 qualified right now.  So we have three

429

1    beyond what we need.  And I think we'll probably pull a few

2    more.  So we are not quite at 40, but we are just about there.

3    And that's more than enough given the amount of information you

4    have about these jurors.

5          All right.  Is there anything else that we need to

6    address before 2 o'clock?

7          MR. GIBBS:  No, Judge.

8          THE COURT:  No?

9          MR. MacMAHON:  Your Honor, may I ask a question?

10         THE COURT:  Yes.

11         MR. MacMAHON:  Can we leave this stuff here?  Are you

12   going to be using this courtroom.

13         THE COURT:  No, I am going to take the plea

14   downstairs.  So we will lock this up, Mr. Wood.  It will be

15   locked up, so don't try to get in here too much before 2.

16         MR. MacMAHON:  Okay.  I just didn't know if you

17   wanted us to clear all this out.

18         THE COURT:  But obviously, the questionnaires, once

19   we are done with this process, we want them back.  All right.

20   There will be one complete set of the filled out questionnaires

21   in the permanent records of the court, sealed, if for any

22   appellate reasons they need to be addressed.

23         But we will go ahead and shred the rest of them

24   because that was the agreement we had.  All right?

25         MR. MacMAHON:  Thank you, Your Honor.

430

1          THE COURT:  All right.  Very good.  We will recess

2     court until 2 o'clock.

3          NOTE:  At this point a lunch recess is taken; at the

4     conclusion of which the hearing continues in the presence of a

5     new group of potential jurors as follows:

6     JURY PANEL IN

7          THE COURT:  Good afternoon, ladies and gentlemen.

8     Thank you for coming to court this afternoon.  And I am sorry

9     that you have had to be here a few hours and we couldn't get to

10    you before now.  At least you had nice weather.  I hope some of

11    you got outside and enjoyed it.

12          I want to just have the clerk call attendance to make

13    sure we have everybody here.  Just stand up, please, and say

14    "present" or "here" when you hear your number called.  I am

15    pretty sure we will have you all out of here by about 3 o'clock

16    at the latest.

17          THE CLERK:  Juror number 77.

18          JUROR NO. 77:  Here.

19          THE CLERK:  Juror number 88.

20          JUROR NO. 88:  Here.

21          THE CLERK:  Juror number 93.

22          JUROR NO. 93:  Here.

23          THE CLERK:  Juror number 98.

24          JUROR NO. 98:  Present.

25          THE CLERK:  Juror number 105.

431

1                    JUROR NO. 105:  Here.

2                    THE CLERK:  Juror number 106.

3                    JUROR NO. 106:  Here.

4                    THE COURT:  Excellent.  All right.  If juror number

5        77 will just come over here and step into the witness box, and

6        I will ask the other jurors to go with Mr. Wood.  We will move

7        this process as quickly as we can.

8                    NOTE:  The potential jurors leave the courtroom

9        except for juror number 77.

10                   THE COURT:  Good afternoon, ma'am.  I am just going

11       to ask you a few questions following up on your questionnaire.

12                   First of all, since answering the questionnaire on

13       Monday, are there any additional things you wanted to add to

14       any of your answers or any changes you wanted to make to the

15       questionnaire?

16                   JUROR NO. 77:  Not that I know of.

17                   THE COURT:  All right.  Is there anything in addition

18       about yourself or your family that was not covered by the

19       questionnaire but you think might be relevant to our

20       considering you for service on this jury?

21                   JUROR NO. 77:  The only thing that has come to my

22       mind is I know it asked in the questionnaire whether or not

23       either myself or my spouse was a naturalized citizen.  And I

24       answered no, which is true.

25                   My husband is not a United States citizen, he is a

432

1    permanent resident from Canada, actually in the process of

2    removing the conditional from the permanent resident part.  So

3    we are in that process.

4              And I don't know whether that has any bearing or not.

5              THE COURT:  Well, it is certainly something we

6    appreciate knowing.  Have you or your husband had any

7    difficulties with the American Immigration authorities?

8              JUROR NO. 77:  None whatsoever.

9              THE COURT:  So his status in that situation would not

10   affect your attitude towards the U.S. government in that

11   respect?

12             JUROR NO. 77:  No.

13             THE COURT:  Okay, very good.  Well, has anything

14   changed in your personal or business life that would make the

15   time commitment necessary for this case more difficult?

16             JUROR NO. 77:  No.

17             THE COURT:  All right.  I see you live in Prince

18   William County.  And I know it is a long trip up here to

19   Alexandria.

20             Do you feel in any respect that you would have

21   difficulty in getting up here?  We are going to try to start at

22   9:30 in the morning.

23             JUROR NO. 77:  Not unless there is some unusual

24   traffic jam on 95 or the beltway.

25             THE COURT:  All right, thank you.  You indicated in

433

1   question number 30 that you have a close friend who survived

2   the Pentagon attack on September 11.

3          JUROR NO. 77:  Yes.

4          THE COURT:  Is this someone who has talked with you

5   much about that experience?

6          JUROR NO. 77:  Not since the initial day or two after

7   the event.  We haven't really spoken about that incident really

8   since then.

9          THE COURT:  All right.  Now, there will be -- there

10  may be evidence in this case about people being pleased about

11  the attacks on the Pentagon and the World Trade Center, and

12  comments about America had it coming to it, that sort of thing.

13         Do you think because you have had a close friend who

14  was directly affected by that, and the nature of the

15  allegations in this case, you might have problems in being a

16  completely impartial juror?

17         JUROR NO. 77:  I don't believe any more than any

18  other American.  I don't think so.

19         THE COURT:  All right.  You indicated in your answer

20  to question number 54 that your daughter was once charged with

21  possession of marijuana?

22         JUROR NO. 77:  That's correct.

23         THE COURT:  How long ago was that?

24         JUROR NO. 77:  About a year ago.

25         THE COURT:  All right.  And do you mind telling us

434

1    how old your daughter is?

2            JUROR NO. 77:  She is 22 right now.

3            THE COURT:  Okay.  Has that matter been resolved or

4    is it still spending?

5            JUROR NO. 77:  It was actually in relation to a

6    traffic stop, and she has finished her probationary period, and

7    she will appear again before a judge in May to finalize

8    everything that she has gone through, everything that they have

9    recommended.

10           THE COURT:  So was it probation before judgment, is

11   that what she --

12           JUROR NO. 77:  Yes.

13           THE COURT:  That was the disposition?  So she will

14   keep a clean record?

15           JUROR NO. 77:  Yes.

16           THE COURT:  All right.  Now, as a result of that

17   incident, have you developed any attitudes or beliefs about the

18   criminal justice system?

19           I mean, do you feel that your daughter was treated

20   fairly or unfairly in any respect?

21           JUROR NO. 77:  I believe she was treated fairly.  It

22   hasn't engendered any negative feelings in me whatsoever toward

23   the justice system.

24           THE COURT:  Or how about had any overwhelmingly

25   positive feelings?

435

1          JUROR NO. 77:  Nothing really one way or the other.

2          THE COURT:  All right.  You also indicated in number

3    55 that you have been a witness in a divorce proceeding.  Was

4    that for a friend or family member?

5          JUROR NO. 77:  For a friend.

6          THE COURT:  Now, did you actually have to testify in

7    a court of law in that?

8          JUROR NO. 77:  Yes, I did.

9          THE COURT:  And the proceeding in which you

10   testified, were there any problems that arose in terms of your

11   testimony?

12         JUROR NO. 77:  No.

13         THE COURT:  Were you cross-examined as part of being

14   a witness?

15         JUROR NO. 77:  Yes.  It has been a long time.

16         THE COURT:  All right.  Do you recall whether you had

17   a particularly negative or positive attitude towards the

18   lawyers involved in the case and how they treated you as a

19   witness, for example?

20         JUROR NO. 77:  No.  I barely remember.

21         THE COURT:  All right.

22         JUROR NO. 77:  Just trying to be honest when I filled

23   out that question.  I really don't have much of a memory of it.

24         THE COURT:  Is there anything at all about that

25   experience that you think could affect your ability to be an

436

1    impartial juror in this case?

2          JUROR NO. 77:  No.

3          THE COURT:  All right.  The last question I was going

4    to ask you about was number 85.  The question there was:  Do

5    you believe that the law does too much to protect the rights of

6    criminal defendants and not enough to protect the rights of

7    crime victims and their families?  And you checked:  Unsure.

8          And we would just like you to explain a little bit

9    more what you meant by unsure.

10         JUROR NO. 77:  I understand -- actually, I guess in

11   all honesty, to be technically correct, I would have to say no

12   because I believe that the law is followed.  There is just not

13   a lot within the law that does actually protect victims.

14         I think that there has been more focus on that

15   recently, there are victim advocates that are assigned to

16   courts and that kind of thing.  So I believe that is something

17   that is being addressed, but I think the question was the law,

18   whether the law -- can you tell me again how it was worded.

19         THE COURT:  You are right, it just says "the law."

20         JUROR NO. 77:  And I don't know that the law

21   specifically necessarily deals with the feelings or the

22   problems or the complications that arise for victims.

23         THE COURT:  All right.  What about just the

24   proposition, do you think that the law protects the rights of

25   criminal defendants too much?

437

1           JUROR NO. 77:  No.

2           THE COURT:  All right.  Thank you.  If you will step

3      outside for a second.

4           NOTE:  Juror number 77 leaves the courtroom.

5           THE COURT:  Any further questions from the

6      Government?

7           MR. KROMBERG:  No, Your Honor.

8           THE COURT:  How about from the defense?

9           MR. MacMAHON:  Your Honor, number 81, question number

10     81, excuse me, on page 20.  The potential juror's answer is:

11     But the restrictions of freedoms of speech, unless those

12     freedoms are abused to the point of treason.

13          Of course, that's essentially the charge in this

14     case, a seditious conspiracy.

15          THE COURT:  I will ask her what she meant by that

16     answer.

17          MR. MacMAHON:  If you will follow up on that, please.

18          NOTE:  Juror number 77 returns to the courtroom.

19          THE COURT:  As long as you answer in a good, loud

20     voice, let me just ask you one more question.

21          You answered one question about your belief

22     concerning the rights and liberties of freedom of speech,

23     religion, and association, whether they should ever be limited

24     or restricted for any reason.  And you checked no.

25          And then you said:  Unless those freedoms are abused

438

1    to the point treason.

2            Can you explain what you mean by abused to the point

3    of treason.

4            JUROR NO. 77:  Somehow I knew you were going to ask

5    me this question.  Again, you know, I believe that the law

6    protects all of us.  And that just because we don't like what

7    someone else may think and it doesn't agree with our own

8    beliefs, doesn't mean that we should limit their freedoms,

9    because ultimately that can be turned on me.  And I don't want

10   my freedoms limited.

11           And I don't know how our wonderful country with all

12   of its wonderful freedoms, we leave ourselves vulnerable in

13   that sense because of our freedom of speech and because of all

14   of the wonderful freedoms that we all want and we all enjoy.

15           Freedom of speech, you know, does present problems.

16   Freedom of expression, freedom of association, all of this, all

17   of these freedoms --

18           THE COURT:  I guess my question perhaps to help is,

19   what in your mind would be a point of treason?

20           JUROR NO. 77:  Point of treason?  I guess inciting

21   overthrow of our governmental.

22           THE COURT:  All right, thank you.  You can step

23   outside.

24           NOTE:  Juror 77 leaves the courtroom.

25           THE COURT:  Anything further from the Government?

439

1          MR. GIBBS:  No, Judge, thank you.

2          THE COURT:  How about you, Mr. MacMahon?

3          MR. MacMAHON:  No.

4          THE COURT:  Any reason to strike this juror?

5          MR. GIBBS:  Not from the Government, Judge.

6          MR. MacMAHON:  Yes, from the defendant, Your Honor.
That last question, I think seeking the overthrow of the
governmental maybe just wasn't artfully answered, but since
that is actually the charge in the case, you are allowed to
advocate the overthrow of the government.  We had the
federalist papers definition yesterday.  And I think that that
would disqualify her from --

13          THE COURT:  I don't think so.  If you listen to the
way she answered all of the other questions.  She is a strong
believer in the importance of the freedoms of speech, and
obviously would be looking at the very appropriate and careful
line drawing.

18          And she is right, it is not an unlimited right.  And
I don't think you have that problem here.

20          So I am going to overrule that objection.

21          NOTE:  Juror number 77 returns to the courtroom.

22          THE COURT:  Ma'am, you are still being considered for
service in this jury, but you will be finished with us for
today.

25          What's going to happen Monday morning is we're taking

440

1   the very small number of remaining jurors, and 14 will actually

2   be chosen to try this case.  So if you are one of those 14,

3   then you are going to -- we are going to go right into the

4   trial.  So Monday would be a full trial day.  All right?

5           I don't yet know whether next week there will be any

6   -- I am sorry, next Friday I know there will not be trial.  So

7   in terms of potential plans for your week, if you are a juror,

8   it is Monday through Thursday of next week.  The week after we

9   will take -- later on we will know whether it is Friday that

10  week.

11          I want to caution you to avoid any media coverage

12  about the case.  And you didn't hear any media things about

13  this?

14          JUROR NO. 77:  No.

15          THE COURT:  Okay.  You are not to discuss this case

16  with anybody or conduct any investigation.

17          We have been referring to you by number because we're

18  trying to prevent the media from contacting you.  So if for any

19  reason you think somebody has contacted you about the case, you

20  need to let us know.  All right?

21          JUROR NO. 77:  Yes.

22          THE COURT:  The telephone number for the court, you

23  know how to check in.  I believe the 9 o'clock is the time they

24  are going to want you on Monday morning, certainly no later

25  than 9 o'clock.  All right?

1          Very good, we will see you then.  Thank you.

2          NOTE:  Juror number 77 leaves the courtroom.

3          THE COURT:  And we will call in juror number 88.

4          NOTE:  Juror number 88 enters the courtroom.

5          THE COURT:  Good afternoon.

6          JUROR NO. 88:  Hi.

7          THE COURT:  Hi.  Just a couple of follow-up questions

8    to the questionnaire that you filled out on Monday.

9          Are there any answers or anything that you wrote on

10   the questionnaire that you might want to change or add to?

11         JUROR NO. 88:  No.

12         THE COURT:  All right.  Has anything changed in your

13   personal or business life that you think might now create a

14   time conflict for you if you are chosen as a juror?

15         JUROR NO. 88:  No.

16         THE COURT:  And is there any other information about

17   yourself or your family that might not have been covered by the

18   questionnaire that you think we might want to know about?

19         JUROR NO. 88:  I don't think so.

20         THE COURT:  All right.  Have you conducted any

21   investigation or been exposed to any media coverage about this

22   case?

23         JUROR NO. 88:  No, I have not.

24         THE COURT:  All right.  You indicated in your answer

25   to question number 30 that you actually knew one of the pilots

442

1    of one of -- a Pilot Charlebois?

2              JUROR NO. 88:  Yes, I did.

3              THE COURT:  But you indicated that he was not a close

4    friend.  But how well did you know him?

5              JUROR NO. 88:  I mean, I hadn't seen him since high

6    school, but we were in a couple of classes together and I knew

7    who he was.  And of course when his name was announced, I knew.

8              THE COURT:  Did you go to any services for him?

9              JUROR NO. 88:  No, I did not.

10             THE COURT:  All right.  Now, the events of

11   September 11 will most likely be a part of this case, and there

12   may be evidence about people rejoicing at those events, and

13   making comments about America deserved these attacks, et

14   cetera.

15             Do you feel in any respect because you knew somebody

16   who was killed on September 11, that those allegations and that

17   personal experience might make it difficult for you to be

18   impartial as a judge in this case?

19             JUROR NO. 88:  No, I don't think so.

20             THE COURT:  All right.  You indicated that you

21   cancelled a trip right after September 11, but now you are

22   traveling again?

23             JUROR NO. 88:  Yes, that's correct.

24             THE COURT:  Because of the impact on your personal

25   life, do you think you would have any difficulty in being

443

1    impartial in judging this case?

2            JUROR NO. 88:  I'm sorry?

3            THE COURT:  Because of the impact of September 11 on

4    your personal life, do you feel in any respect you would have

5    difficulty being impartial in judging this case?

6            JUROR NO. 88:  No.

7            THE COURT:  In question number 55 you indicated that

8    you have been a plaintiff in a civil suit.

9            Did you actually have to go to trial and testify?

10           JUROR NO. 88:  Yes, I did.

11           THE COURT:  What happened in that case?

12           JUROR NO. 88:  I won.

13           THE COURT:  You won a judgment?

14           JUROR NO. 88:  Yes, I did win a judgment.

15           THE COURT:  Were you satisfied with how the legal

16   system operated in that case?

17           JUROR NO. 88:  Yes, I was.

18           THE COURT:  Was it a jury trial?

19           JUROR NO. 88:  Yes, it went to jury trial.  It seemed

20   a little overkill for the situation, but yeah.

21           THE COURT:  Did you form any conclusions or

22   impressions about jury trials as a result of that experience?

23           JUROR NO. 88:  No, I did not.  I actually served on a

24   jury as well, which I indicated in there.

25           THE COURT:  We will get to that.  Okay.  You

444

1    indicated that your former husband had been charged with DWI

2    many years ago.  Were you married at that time?

3              JUROR NO. 88:  Actually, no, I was not married at

4    that time.

5              THE COURT:  All right.  Is there anything about that

6    experience, what he might have told you that might affect your

7    ability to judge this case?

8              JUROR NO. 88:  No, not at all.

9              THE COURT:  All right.  Let's talk about your jury

10   experience.  So you served twice in 1998.  Was that like the

11   same --

12             JUROR NO. 88:  It was in the same time span, yes,

13   that's correct.

14             THE COURT:  All right.  And both of those were

15   criminal cases.  How long were those trials, if you can recall?

16             JUROR NO. 88:  I think the first one was maybe two

17   days or something like that.

18             THE COURT:  The arson case?

19             JUROR NO. 88:  The arson one, yes.  And the second

20   one I think was a day or two.  It was not a long trial.

21             THE COURT:  And in both cases the jury convicted?

22             JUROR NO. 88:  Yes, we did.

23             THE COURT:  Now, in terms of the jury deliberation

24   process, how did that process go in those two cases?

25             JUROR NO. 88:  I found it fascinating actually, but

445

1   the process went as it should have.  I mean, we all came to an

2   agreement.  Not everybody did at one time.  So there was a lot

3   of discussion, a lot of going over all the evidence again.

4           But in the end, we came to a conclusion.

5           THE COURT:  Were you satisfied with the way in which

6   the jurors went about their job?  That is, that they were using

7   appropriate criteria for making their judgments?

8           JUROR NO. 88:  Yes, I was.

9           THE COURT:  Was there anything about the behavior of

10  the lawyers, either the prosecutors or the defense attorneys,

11  that particularly struck you?

12          JUROR NO. 88:  No.

13          THE COURT:  Is there anything about either of those

14  two jury experiences that you think could affect your ability

15  to be impartial in judging this case?

16          JUROR NO. 88:  No, not at all.

17          THE COURT:  Okay.  You indicate in paragraph 61 that

18  you had a stepsister who was violently attacked in '95, and a

19  cousin and his wife were killed by a drunk driver in 1994?

20          JUROR NO. 88:  Yes, that's correct.

21          THE COURT:  Did either of those two incidents result

22  in any kind of a trial?

23          JUROR NO. 88:  My cousin, the DWI, my cousin and his

24  wife who were killed, it did result in a trial.  And I believe

25  the gentleman did do time.  I am not familiar with the

446

1   situation.

2           THE COURT:  Did you testify at all in that case?

3           JUROR NO. 88:  I am sorry?

4           THE COURT:  Did you have to testify?

5           JUROR 88:  No, I did not.  It was in North Carolina.

6           THE COURT:  All right.  Any sense within your family

7   or yourself that your cousin and spouse were not treated fairly

8   in the court proceedings?

9           JUROR NO. 88:  No, not at all.

10          THE COURT:  What about with your stepsister, was that

11  case ever brought to --

12          JUROR NO. 88:  No, they never found him.

13          THE COURT:  And did that leave any feelings in your

14  family or yourself about the effectiveness of law enforcement?

15          JUROR NO. 88:  Not at all, no.

16          THE COURT:  All right.  In question number 85, that

17  asked you:  Do you believe that the law does too much to

18  protect the rights of criminal defendants and not enough to

19  protect the rights of crime victims and their families?  And

20  you indicated:  Unsure.

21          Can you explain that answer a little bit more.

22          JUROR NO. 88:  I guess I am still unsure about that.

23          THE COURT:  Are you unsure about the question or

24  about the answer?

25          JUROR NO. 88:  Well, I think about the answer because

447

1    I think it depends upon the situation to me.  So I can see

2    where sometimes people feel like maybe they didn't get -- I

3    don't know.  How do I say this?

4          Maybe that they have done too much to protect the

5    person who actually did the crime as opposed to the person, the

6    victim itself.

7          THE COURT:  All right.  But now that's sort of an

8    objective answer.  We are trying to find out what you yourself

9    believe.

10         JUROR NO. 88:  Yeah.

11         THE COURT:  Well, for example, you have been a juror

12   twice.

13         JUROR NO. 88:  Right.

14         THE COURT:  When you heard the judge give the

15   instructions and when you watched how the trial was conducted,

16   did you think that there were too many rights given to the

17   defendant in that case?

18         JUROR NO. 88:  No, not at all.

19         THE COURT:  All right.  I assume because your

20   stepsister was a victim of a crime, is that where your concern

21   about victims' rights were coming from?

22         JUROR NO. 88:  Yeah.  But I don't think that she --

23   you know, it never went to trial, they never caught the

24   gentleman, so I guess that's not probably relevant to it.

25         THE COURT:  Well, the victims in the two cases that

448

1   you tried, the arson and the robbery, were there victims who

2   testified in those cases?

3           JUROR NO. 88:  Were there victims what?

4           THE COURT:  Were there victims who testified in those

5   two cases?

6           JUROR NO. 88:  Yes.  And, you know, it was really an

7   interesting process for me to go through because one of the --

8   oh, actually, no, I am thinking of the defendants both

9   testified, not the victims.  They were not there.

10          The arson didn't hurt -- it only hurt the property,

11  there was nobody there.  And the victim who had property stolen

12  was not present.

13          THE COURT:  All right.  So can you give us any more

14  understanding of what you say when you're unsure about the

15  balance between the rights of victims and the rights of

16  criminal defendants?

17          JUROR NO. 88:  I don't know.  I guess when I was

18  reading the question, all these different cases came to mind

19  that is going on.  And maybe the Schiavo case since it was like

20  right out there and I am trying to process that in my mind.

21          Overall, because I have been a juror, I am fascinated

22  by the process and how it works.  And I understand now where if

23  you are not in the jury box, and you are not given

24  instructions, and you are not there listening to all the facts,

25  it's hard for outside people to make judgments on, you know,

449

1   how it's weighed one way or the other.

2           So I have a very good understanding for that now

3   having served as a juror.  That what happens in the court

4   cases, you know, what you see and then what you make your

5   decision on.

6           THE COURT:  All right, thank you.  You can step

7   outside.

8           JUROR NO. 88:  I hope that helps.

9           THE COURT:  Yes, it did.  Thank you.

10          JUROR NO. 88:  Okay.

11          NOTE:  Juror number 88 leaves the courtroom.

12          THE COURT:  Any further questions from the

13  Government?

14          MR. GIBBS:  No, Your Honor.  Thank you.

15          THE COURT:  Mr. MacMahon?

16          MR. MacMAHON:  No, Your Honor.

17          THE COURT:  Any basis to strike?

18          MR. GIBBS:  Not from the Government.

19          MR. MacMAHON:  Not for the defense.

20          THE COURT:  All right, that's fine.  We will bring

21  her back in.

22          NOTE:  Juror number 88 returns to the courtroom.

23          THE COURT:  Ma'am, thank you.  We're still

24  considering you for this jury.  All right.  The last and final

25  round will be on Monday.  We are going to select the 14 at that

450

1    point, and then we're going to go right into the trial.  So if

2    you're selected, you will be here all day.

3              JUROR NO. 88:  Okay.

4              THE COURT:  I will ask you to continue to remember

5    not to watch any media coverage at all about this case, conduct

6    no investigation, do not discuss this case in any respect with

7    anyone.  You can tell people that you are being considered for

8    jury service.

9              And we have been using a number for you because we

10   are trying to make sure the media doesn't try to contact you.

11   For that reason, if for any reason somebody does contact you

12   about this case or you think somebody has, please let us know

13   right away.  All right.

14             I believe the time will be 9 o'clock for Monday.  You

15   should check that phone number and they will give you the exact

16   reporting time.  Thank you.  See you Monday.

17             JUROR NO. 88:  Yes, ma'am.

18             NOTE:  Juror number 88 leaves the courtroom.

19             THE COURT:  Number 93.

20             NOTE:  Juror number 93 enters the courtroom.

21             THE COURT:  Good afternoon, sir.  Since filling out

22   your questionnaire, have you thought about your answers and

23   whether there is any need to add anything or change anything in

24   the answers or the comments you made in the questionnaire?

25             JUROR NO. 93:  No, I haven't.

451

1          THE COURT:  All right.  Has anything changed in your

2    personal or business commitments that would make it difficult

3    now for you to be a juror in this case?

4          JUROR NO. 93:  No.

5          THE COURT:  All right.  Is there any additional

6    information about yourself or your family that was not covered

7    by the questionnaire but you think might be relevant to our

8    considering you for service on this jury?

9          JUROR NO. 93:  Not that I know of.

10         THE COURT:  Have you been exposed to any media

11   coverage or conducted any investigation into the issues

12   surrounding this case since Monday?

13         JUROR NO. 93:  No, I haven't.

14         THE COURT:  You indicated in your answer to question

15   number 54 that your son was charged with DUI.  About how long

16   ago was that?

17         JUROR NO. 93:  I think it was about six months ago.

18         THE COURT:  Six months ago.  Is your son a minor or

19   is he over the age --

20         JUROR NO. 93:  No, he is not a minor.

21         THE COURT:  And the charge has then been reduced to

22   something lesser, and I assume it's all over with at this

23   point?

24         JUROR NO. 93:  It's all over with as far as I can

25   tell, yeah.

452

1          THE COURT:  All right.  Was there a trial, or was

2    that worked out by some sort of a negotiation, if you know?

3          JUROR NO. 93:  I didn't attend it.  I think it was

4    mainly negotiation, although he had to go before the judge.

5          THE COURT:  All right.  Do you in any respect feel

6    that your son was treated unfairly or improperly in that

7    proceeding?

8          JUROR NO. 93:  No.

9          THE COURT:  All right.  You indicated that you have

10   served twice before as a juror.

11         JUROR NO. 93:  Yes.

12         THE COURT:  Was that in Fairfax County?

13         JUROR NO. 93:  No, Arlington County.

14         THE COURT:  Arlington County.  Now, there were two

15   times in 1987, were these sort of back to back within the same

16   term?

17         JUROR NO. 93:  Yes.

18         THE COURT:  Okay.  And one was an uttering case and

19   one was a sexual abuse case?

20         JUROR NO. 93:  Yes.

21         THE COURT:  Was there anything about those

22   experiences as a juror that was particularly positive or

23   particularly negative for you?

24         JUROR NO. 93:  Not particularly.  The sexual abuse

25   case was, for me, I just heard unusual things, and I just

453

```
1    hadn't been exposed to them before.  But other than that, no.

2              THE COURT:  How many days, if can you recall, did

3    those trials run?

4              JUROR NO. 93:  Two or three days.  I think the

5    uttering trial was only one day, and the other one was two or

6    three days.

7              THE COURT:  All right.  And in the process of the

8    jury deliberation, was there anything that went on within the

9    jury room that particularly troubled you in terms of how the

10   jurors went about thinking about the case and reaching their

11   decisions?

12             JUROR NO. 93:  No.

13             THE COURT:  How about positive feelings, were you

14   impressed with how it was done?

15             JUROR NO. 93:  I thought the process went fairly

16   smoothly.

17             THE COURT:  All right.  By training you are an

18   economist?

19             JUROR NO. 93:  Correct.

20             THE COURT:  So you are a social scientist.  Did you

21   find -- were you at all troubled or concerned about any

22   disconnect between how a scientist would approach things and

23   how the trial process approaches matters?

24             JUROR NO. 93:  No.

25             THE COURT:  All right.  Did you have any problems
```

454

1    with the judge's instructions about the law, the burden of

2    proof, that sort of thing?

3             JUROR NO. 93:  I think people just have to interpret

4    that, and I didn't have any particular trouble.

5             THE COURT:  What do you mean by interpret?

6             JUROR NO. 93:  Well, I think that some of the

7    instructions cause you to have to use your subjective judgment

8    as far as a juror is concerned.

9             THE COURT:  Such as what?  Reasonable doubt as to --

10   can you give us an example of what you mean by subjective

11   judgment?

12            JUROR NO. 93:  Well, I guess when you are given

13   particular instructions, you have to think about what you heard

14   and how that applies to the instructions you were given.

15            THE COURT:  Okay.  You were asked the question:  Do

16   you believe that if the prosecution goes to the trouble of

17   bringing someone to trial, he or she is probably guilty?  And

18   you checked the Unsure box.

19            Can you amplify on that answer.

20            JUROR NO. 93:  I think I just tried to say that to me

21   it was a neutral situation.

22            THE COURT:  It was neutral?

23            JUROR NO. 93:  Yes.

24            THE COURT:  So, in other words, at the beginning of a

25   trial you have no preconceptions one way or the other?

455

1            JUROR NO. 93:  I wouldn't.

2            THE COURT:  You would not?  All right.

3            All right, sir, if you don't mind stepping outside

4    for just a second.

5            NOTE:  Juror number 93 leaves the courtroom.

6            THE COURT:  Any further questions from the

7    Government?

8            MR. GIBBS:  No, Your Honor.

9            THE COURT:  How about from the defense?

10           MR. MacMAHON:  Your Honor, the same.  This gentleman

11   is Jewish, and we have the same issue with the Space Shuttle

12   comment.

13           And also remember here, all these LET pictures that

14   the Government wants to put in that have Israeli flags burning

15   and things.  I think we should find out whether that would --

16           THE COURT:  All right.  Let's bring him back in.

17           NOTE:  Juror number 93 returns to the courtroom.

18           THE COURT:  Sir, you can just answer from there as

19   long as it is a good, loud answer.

20           You indicated on the questionnaire that your

21   religious affiliation is Jewish.  And there may be evidence in

22   this case both in terms of political fliers and pamphlets

23   evidencing very, very strong anti-Jewish and anti-Israeli

24   feelings.

25           Do you feel in any respect because of your religion,

456

1     that that kind of evidence in this case might make it difficult

2     for you to be impartial in judging this case?

3                    JUROR NO. 93:  No, I don't.

4                    THE COURT:  All right.  Thank you, sir.  If you could

5     just step outside for a second.

6                    NOTE:  Juror number 93 leaves the courtroom.

7                    THE COURT:  All right.  Anything further?

8                    MR. GIBBS:  No, Judge.

9                    MR. MacMAHON:  No, Your Honor.

10                   THE COURT:  Any basis for a cause strike on this

11    juror?

12                   MR. GIBBS:  Not from the Government.

13                   MR. MacMAHON:  No, Your Honor.

14                   THE COURT:  All right.  Very good, let's bring him

15    back in.

16                   NOTE:  Juror number 93 returns to the courtroom.

17                   THE COURT:  Sir, we are going to -- we are going to

18    continue considering you for this case.

19                   The very last stage of the jury selection is going to

20    occur Monday morning.  At that time the 14 people who hear this

21    case will be decided, and we are going to go right into the

22    trial at that point.  So if you are chosen, you will have to be

23    here all day.

24                   I can tell you that we will not be in session next

25    Friday because of Court's scheduling matters.  So if you are

457

1   chosen as a juror for next week, you can rely on being clear on

2   Friday.  And then the following week we might go all five days

3   the following week, I don't know yet.

4          Please continue to follow my earlier instructions.

5   Do not conduct any investigation about this case.  Avoid any

6   media coverage about the case.  You may tell people that you

7   are still being considered for service on a jury, but do not go

8   into any details about this case.

9          You may notice we've been referring to you as a

10  number.  That has been done in part to prevent the media from

11  trying to contact you.  And so, you shouldn't be receiving any

12  contacts about this case.  But were you to, you should let us

13  know right away.  All right?

14         I believe you need to be here by 9 o'clock on Monday.

15  The telephone number you have been checking in with will let

16  you know definitively.  All right?

17         Thank you, sir.  We will see you Monday.

18         NOTE:  Juror number 93 leaves the courtroom.

19         THE COURT:  All right, juror number 98.

20         MR. KROMBERG:  I apologize, Your Honor.

21         THE COURT:  That's all right, Mr. Kromberg.

22         MR. KROMBERG:  I was working on a response so we

23  could talk about the motions in limine today.

24         NOTE:  Juror number 98 enters the courtroom.

25         THE COURT:  Good afternoon, sir.  Thank you for

458

1    coming back to court.

2              JUROR NO. 98:  Yes, ma'am.

3              THE COURT:  Since filling out the questionnaire on

4    Monday, have you had a chance to think about your answers and

5    your comments on the questionnaire?  And did you want to change

6    any of them or add anything to them?

7              JUROR NO. 98:  I can't think of anything.  I know I

8    may have not answered a couple of them the way I may have

9    answered them today, but I can't remember which ones they were.

10             THE COURT:  Well, if they're important, we'll get to

11   them.  Has anything changed in your work or personal schedule

12   such that being a juror for the amount of time involved in this

13   case might be a problem?

14             JUROR NO. 98:  The only thing is I was informed

15   yesterday that I could have an interview next Wednesday,

16   Thursday, or Friday for a new promotion in my job.

17             THE COURT:  Well, next Friday we will not be in

18   session.  Would you be able to arrange that interview for

19   Friday?

20             JUROR NO. 98:  If they still have an opening.  I told

21   them I would call them and let them know as soon as possible.

22             THE COURT:  All right, sir.  You indicated in your

23   questionnaire that you have a little bit of a hearing problem?

24             JUROR NO. 98:  Yes, ma'am.

25             THE COURT:  Have you had any difficulty hearing me

459

1    either today or on Monday when I was giving you all the

2    instructions?

3            JUROR NO. 98:  No, ma'am.

4            THE COURT:  Would you be shy about raising your hand

5    if you couldn't hear something and asking us to repeat it?

6            JUROR NO. 98:  No, ma'am.

7            THE COURT:  All right.  You live out in Bealton?

8            JUROR NO. 98:  Yes, ma'am.

9            THE COURT:  Would you have any difficulty getting

10    here by 9:30 every morning for trial?

11            JUROR NO. 98:  After about two-and-a-half hours of

12    traffic, it's not a problem.

13            THE COURT:  Is that about how long it is going to

14    take you --

15            JUROR NO. 98:  It took me two hours and 15 minutes

16    this morning.

17            THE COURT:  For an 11 o'clock -- wow.

18            All right.  You indicated in number 54 that one of

19    your sons has been charged with breaking and entering?

20            JUROR NO. 98:  Yes, ma'am.

21            THE COURT:  Is that a pending charge, or is that

22    something that happened in the past?

23            JUROR NO. 98:  In the past.

24            THE COURT:  What happened to that charge?  Was it

25    dismissed, or was he found guilty --

460

1             JUROR NO. 98:  He was found guilty.

2             THE COURT:  Did he have to go to trial, or did he

3    plead guilty?

4             JUROR NO. 98:  He pleaded guilty.

5             THE COURT:  All right.  Did you work with him on that

6    case?  I mean, were you with him when he went to court?

7             JUROR NO. 98:  No, ma'am.

8             THE COURT:  Is there anything about how your son was

9    treated in that case that you feel has left a bad impression or

10   good impression in your mind?

11            JUROR NO. 98:  He got what he deserved.

12            THE COURT:  All right.  Do you think the legal system

13   treated him fairly?

14            JUROR NO. 98:  Yes, ma'am.

15            THE COURT:  Okay.  You indicated in question number

16   85, you were asked:  Do you believe that the law does too much

17   to protect the rights of criminal defendants and not enough to

18   protect the rights of crime victims?  You indicated yes.

19            Can you explain to us that answer.

20            JUROR NO. 98:  I don't know that I can explain it.

21   That's just my feeling.

22            THE COURT:  Do you think that the law favors criminal

23   defendants too much?

24            JUROR NO. 98:  Sometimes.

25            THE COURT:  Can you give us an example of when it's

461

1    too much?

2              JUROR NO. 98:  No, ma'am.

3              THE COURT:  All right.  And you indicated that you're

4    unsure about whether a criminal defendant's testimony should be

5    evaluated the same way as anybody else.

6              Can you explain that answer.

7              JUROR NO. 98:  I don't remember the question.

8              THE COURT:  The question was:  Would you evaluate the

9    testimony of a criminal defendant in the same manner as you

10   would the testimony of other witnesses?

11             JUROR NO. 98:  Was that in the context of using

12   informants and --

13             THE COURT:  No, that was just by itself.  You said

14   you were unsure.

15             JUROR NO. 98:  Right, right.  I guess I am still

16   unsure.

17             THE COURT:  All right.  I think that's all I have got

18   for you.  If you don't mind stepping outside, we will see if

19   there are any other questions.

20             NOTE:  Juror number 98 leaves the courtroom.

21             THE COURT:  Mr. Gibbs.

22             MR. GIBBS:  The one question I think I would ask, or

23   I would request, is given his answer about defendants and

24   victims, whether or not -- if in fact that's his view, could he

25   still be fair and impartial in a case where he would have to

462

1   judge -- stand in judgment of a defendant.

2            THE COURT:  Well, you know, frankly, since we have

3   extra jurors and given the commute that he's got, plus this

4   promotion that is coming up, I would be inclined to strike him

5   unless either side objected to that.

6            MR. MacMAHON:  No objection, Your Honor.  I am

7   concerned about the answers to those questions as well.  I

8   think he is a hardship candidate.

9            MR. GIBBS:  That's fine, Judge.

10           THE COURT:  All right, fine.  Let's have him come

11  back in.

12           NOTE:  Juror number 98 returns to the courtroom.

13           THE COURT:  Sir, I want to thank you.  And I am sorry

14  it was such a long drive here.  But in part because you are so

15  far from the courthouse and you have got that promotion coming

16  up next week, we are going to excuse you from the jury.  So you

17  are finished with us.  You don't need to come back anymore.

18           And when you leave the building, just check in with

19  the Clerk's Office, let them know that you're finished.

20           JUROR NO. 98:  And the Clerk's Office is --

21           THE COURT:  On the second floor.

22           JUROR NO. 98:  Second floor.

23           THE COURT:  Yeah.  Just let them know that you have

24  been excused as a juror.

25           JUROR NO. 98:  Thank you very much.

463

1          THE COURT:  All right.  You are free to go.

2          NOTE:  Juror number 98 leaves the courtroom.

3          THE COURT:  Number 105.

4          NOTE:  Juror number 105 enters to the courtroom.

5          THE COURT:  Thank you for coming back to court, sir.

6          Since filling out the questionnaire on Monday, have

7   you had a chance to think about your answers and your comments

8   and whether you would want to add anything or change anything

9   to the questionnaire?

10          JUROR NO. 105:  No, Your Honor, I wouldn't change

11   anything.  I have thought about it, but I wouldn't change

12   anything.

13          THE COURT:  Is there anything you want to add to it

14   since you said you have been thinking about it?

15          JUROR NO. 105:  No.

16          THE COURT:  Has anything changed in your personal or

17   business life that you think might affect your ability to give

18   the kind of time commitment that is going to be required?

19          JUROR NO. 105:  No, Your Honor, nothing.

20          THE COURT:  All right.  Is there anything additional

21   about your family or yourself that was not covered by the

22   questionnaire but you think might be relevant to our evaluation

23   of you for the jury in this case?

24          JUROR NO. 105:  No, ma'am.

25          THE COURT:  Have you conducted any investigation or

464

1    experienced any media coverage about this case?

2                JUROR NO. 105:  I have not.

3                THE COURT:  All right.  You indicated in your answer

4    to question number 31, which addressed whether anybody changed

5    any of their plans after September 11, you indicated you and

6    your wife I guess had to rearrange your wedding plans a little

7    bit for that, right?

8                JUROR NO. 105:  It was travel plans.  A few years

9    later, it was this past September.  So it was the anniversary

10   of the event.  So we just felt a little -- didn't want to

11   travel on the actual anniversary of the event.

12               THE COURT:  Is that because you are nervous about

13   traveling on September 11?

14               JUROR NO. 105:  I don't know that we were necessarily

15   nervous.  It was just something that we didn't want -- we

16   didn't really -- maybe we were, I don't know.  It just didn't

17   feel that it was something that we wanted to link to our

18   wedding plans.

19               THE COURT:  All right.  There will be discussions of

20   September 11 and the events that happened, and there may be

21   evidence that people were pleased about those events and

22   thought that America had those attacks coming to it.  That kind

23   of evidence in this case.

24               Do you think in any respect because of your own

25   personal feelings about September 11, that that kind of

465

1    evidence might make it difficult for you to remain impartial in

2    judging this case?

3              JUROR NO. 105:  I don't think so.

4              THE COURT:  All right.  In paragraph 55 you indicated

5    that you appeared as a character witness for somebody who was

6    charged with uttering.

7              JUROR NO. 105:  That's how I remember the charge.

8              THE COURT:  That's all right.  But what court did you

9    appear in, if you remember?

10             JUROR NO. 105:  Gosh, I wish I could remember.

11             THE COURT:  Was it in Virginia?

12             JUROR NO. 105:  It was in Virginia.  Warrenton.

13             THE COURT:  In Warrenton?

14             JUROR NO. 105:  Warrenton.

15             THE COURT:  All right.  And how many years ago was

16   that?

17             JUROR NO. 105:  It was roughly four years ago.  Four

18   or five years ago.

19             THE COURT:  Do you live in that area?

20             JUROR NO. 105:  I do not.  I live -- at the time I

21   resided in Burke.  Now I reside in Chantilly.

22             THE COURT:  Okay.  Warrenton is a small town.  And I

23   know, Mr. MacMahon, you have a lot of practice out in that

24   area.

25             You didn't see the defense attorney in the courthouse

466

1    that day, did you.

2              JUROR NO. 105:  I did not.

3              THE COURT:  Now, this was a friend of yours who

4    called you as a character witness?

5              JUROR NO. 105:  Acquaintance, friend.

6              THE COURT:  And you actually took the stand?

7              JUROR NO. 105:  I took the stand briefly.

8              THE COURT:  And so, I assume you were cross-examined

9    by the prosecutor?

10             JUROR NO. 105:  I was.

11             THE COURT:  Was there anything particularly memorable

12   about that experience, being on the witness stand?

13             JUROR NO. 105:  Nothing in particular.  Actually, the

14   prosecution I think passed actually, now that I think about it.

15             THE COURT:  All right.  Do you feel in any respect,

16   your having sat in the hot seat, so to speak, as a witness once

17   before -- once before, yes.  Do you feel in any respect that

18   that experience might affect how you would judge this trial if

19   you were a juror?

20             JUROR NO. 105:  No, I do not.

21             THE COURT:  You wouldn't hold it against a particular

22   side if that side's lawyer was particularly vigorous in

23   examining a witness?

24             JUROR NO. 105:  No.  It was a benign experience.

25             THE COURT:  All right.  You indicated that your wife

467

1    may have been charged with a DUI sometime ago.  Is there

2    anything about that experience -- for example, did your wife

3    indicate that she had a negative or bad experience with law

4    enforcement connected to that?

5              JUROR NO. 105:  No, she did not.  I mean, she was

6    guilty as charged and did something stupid, and I just know

7    minor details about the event, but --

8              THE COURT:  So, no lasting impressions?

9              JUROR NO. 105:  No lasting impressions.

10             THE COURT:  Okay.  Can you expand a little bit about

11   your answer to question number 81.  You don't have to do a long

12   one.  That addresses your question about restricting the

13   freedoms of speech, association, and religion.  You indicated

14   that there should never be restrictions.

15             And then you gave sort of an explanation and you

16   said:  Restricted, I don't think so.  Again, a slippery slope.

17   One could always argue that we are always at war -- I think

18   it's against terror, I couldn't quite read your --

19             JUROR NO. 105:  Sorry, my writing.

20             THE COURT:  -- your answer.  And then you went on to

21   on the attachment saying:  Then where does the restriction

22   stop?  Heavily monitored, yes, by all means.  Protect the U.S.

23   and its citizens, absolutely.  But sometimes restricting,

24   sometimes not, constitutional rights, doesn't seem quite right.

25   I know this places a heavy burden on law enforcement, but it

468

1    seems tricky to me.

2           Is there any way you can add a little bit more to

3    that?  Obviously, you see both sides to the issue.

4           JUROR NO. 105:  Well, I am not sure how much more to

5    add.  I guess what I was trying to convey is that I think that

6    the rights as set forth in the Constitution should stand as

7    they are.

8           And while war is a particular concerning time and

9    offers particular circumstances which I guess that -- on this

10   particular case, law enforcement has to pay attention.  There

11   are certain events, such as I guess demonstrations or whatever,

12   other events might be happening with the FBI in CONUS to engage

13   in intelligence activities to make sure that the citizens are

14   acting lawfully under the law.

15          But I guess, you know, denying a certain population

16   their rights, I guess is what I was trying to say, doesn't feel

17   to me like the right thing to do.  But monitoring to make sure

18   that everybody operates within the law while exercising their

19   rights seems to me the best course.

20          THE COURT:  All right.

21          JUROR NO. 105:  So that's what I was trying to

22   convey.  I know I was jumping around a little bit.

23          THE COURT:  Well, these are tough questions, and we

24   obviously want people to give us their best answer in a

25   relatively short amount of time.

469

```
1              But given the nature of the allegations in this case
2    as understand them from what we've told you so far, do you know
3    of any reason why you could not be a completely fair and
4    impartial juror in this case?
5              JUROR NO. 105:  I know of no reason.
6              THE COURT:  All right.  Thank you, sir.  If you would
7    step down, please.
8              NOTE:  Juror number 105 leaves the courtroom.
9              THE COURT:  Any follow-up questions?
10             MR. GIBBS:  Not from the Government, Judge.
11             THE COURT:  How about from the defense?
12             MR. MacMAHON:  None from defense, Your Honor.
13             THE COURT:  Any reason to strike this juror?
14             MR. GIBBS:  No, Judge.
15             MR. MacMAHON:  No, Your Honor.
16             THE COURT:  All right, let's bring him back in.
17             NOTE:  Juror number 105 returns to the courtroom.
18             THE COURT:  All right, sir.  We are continuing to
19   consider you for this jury.  We are done for this day.  Monday
20   is last day of jury selection when the final 14 will be chosen,
21   and then we are going to going to right into the trial.  So if
22   you are chosen, be prepared to be here all day.
23             We will not be in session on Friday.  So if you are
24   chosen to be a juror, you can make business plans or whatever
25   for next Friday.  I can't guarantee you the Fridays after that,
```

470

1   but for next week that's the case.

2           Please continue to follow my instructions.  That is,

3   avoid any media coverage about the case.  Do not conduct any

4   investigation about the case.  You may not discuss it or your

5   role with anyone.  You can tell people you are being considered

6   for service on a jury and that's it.

7           We have given you a number in part to prevent the

8   media from trying to interview you or contact you.  And so, you

9   shouldn't receive any contacts about this case.  But if that

10  were to happen, let us know right away.  All right?

11          JUROR NO. 105:  Yes.

12          THE COURT:  I believe you need to be here by 9

13  o'clock on Monday.  The trial itself will start at 10, but

14  there is time for checking in and that sort of thing.  If you

15  call the court's phone number if you are unclear, they will

16  give you the time certain, but certainly no later than 9

17  o'clock.

18          All right, sir, you are free to go at this time.

19  Thank you.

20          NOTE:  Juror number 105 leaves the courtroom.

21          THE COURT:  All right, number 106.

22          NOTE:  Juror number 106 enters the courtroom.

23          THE COURT:  Thank you, sir.  I'm sorry you're the

24  very last one, and it was a randomized numbering system.  But

25  we appreciate your patience.

471

1              JUROR NO. 106:  Certainly.

2              THE COURT:  Since filling out the questionnaire on

3    Monday, have you thought about the questionnaire and any of the

4    answers or comments you wrote on it, and is there anything you

5    would want to change or add to the questionnaire?

6              JUROR NO. 106:  I don't think so.

7              THE COURT:  All right.  Has anything changed in your

8    personal or professional life such that the time commitment for

9    this case could now be a problem?

10             JUROR NO. 106:  Well, I can only say that I am

11   engaged in a review at work now involving travel.  I was in New

12   Jersey earlier this week.  And I am supposed to be in New

13   Jersey again on Monday and Tuesday.  But certainly this is more

14   important, and I can do this if necessary.

15             THE COURT:  I mean, if you rearrange those plans --

16   we can't have you working too hard at night if you're going to

17   be a juror in this case.

18             So one of our concerns with people who have very,

19   very pressing professional lives is that they will try to

20   balance nine or ten hours here and then go and work, and then

21   come back the next day, and that wears you down pretty quickly.

22             So if you are chosen to be a juror, are you going to

23   be able to sort of compartmentalize your business obligations

24   and give us your full time and attention?

25             JUROR NO. 106:  Yes.

472

1          THE COURT:  All right.  Have you conducted any

2   investigation or been exposed to any media coverage since

3   Monday about this case?

4          JUROR NO. 106:  No, I have not.

5          THE COURT:  All right.  Now, you indicated -- I know

6   you have a law degree.

7          JUROR NO. 106:  Yes, I do.

8          THE COURT:  Did you ever practice criminal law?

9          JUROR NO. 106:  No, I did not.

10         THE COURT:  You have been working in procurement

11  work.  Is that how you have used your law degree?

12         JUROR NO. 106:  Yes, it is.

13         THE COURT:  All right.  And you are employed by the

14  Department of the Navy?

15         JUROR NO. 106:  Yes, I am.

16         THE COURT:  Do I understand correctly it has been

17  about -- most of your career has been with the Navy?

18         JUROR NO. 106:  Yes, it has been.

19         THE COURT:  All right.  Now, you did indicate that

20  you had been involved in the Ill Wind investigation?

21         JUROR NO. 106:  Yes, I was.

22         THE COURT:  And exactly what did you do in that case?

23         JUROR NO. 106:  I provided support in terms of

24  looking at contracts that had been identified by investigators

25  as potentially having been tainted by inappropriate activity on

473

1    the part of individuals.  I looked at the contracts themselves

2    to see whether or not there was any indication of something

3    that needed to be corrected as a result of the actions.

4            THE COURT:  All right.  Now, that case was run partly

5    out of the U.S. Attorney's Office for this district, as I

6    recall?

7            JUROR NO. 106:  Yes, it was.

8            THE COURT:  Was Joe Aronica the attorney in charge of

9    that?

10           JUROR NO. 106:  I believe he was the U.S. Attorney at

11   the time.

12           THE COURT:  Working on that case?

13           JUROR NO. 106:  I am not sure if he personally was

14   working on it.  I think there was somebody else.

15           THE COURT:  All right.  Did you work with any of the

16   prosecutors who are here today on that case?

17           JUROR NO. 106:  No, I didn't.

18           THE COURT:  All right.  And did you spend time at the

19   U.S. Attorney's Office in Alexandria?

20           JUROR NO. 106:  I visited it once or twice.

21           THE COURT:  And it probably was at the old location,

22   not at the one next to the courthouse?

23           JUROR NO. 106:  It wasn't here, that's correct.

24           THE COURT:  It was downtown.  Is there anything about

25   your association with the U.S. Attorney's Office on that case

474

1   that you think might lead you to tend to favor the prosecutor's

2   side of this case?

3           JUROR NO. 106:  No, there really isn't.

4           THE COURT:  All right.  Did you sometimes recommend

5   that particular contractors not be prosecuted after you

6   conducted your investigation?

7           JUROR NO. 106:  I had nothing whatsoever to do with

8   those kinds of decisions.

9           THE COURT:  But you provided some of the raw data

10  that was used to make those decisions, didn't you?

11          JUROR NO. 106:  No.  I was really involved after the

12  fact just to make an assessment of what the impact was in order

13  to determine whether or not administratively within the Navy we

14  needed to take action.

15          THE COURT:  Okay.  I see.  All right.  Now, have you

16  ever practiced criminal law at all?

17          JUROR NO. 106:  No, I have not.

18          THE COURT:  Do you understand that if you were chosen

19  to be a juror, you would have to follow the instructions as

20  given to you by the Court?

21          JUROR NO. 106:  Absolutely.

22          THE COURT:  And if one of my descriptions of a

23  principle of law differed from what you remembered from law

24  school, would you be able to put aside your own personal view

25  of the law and follow that given by the Court?

475

1          JUROR NO. 106:  Yes, I could.  If I could just add, I

2    really don't remember much.  I was in law school a long time

3    ago.

4          THE COURT:  All right.  Similarly though, if any of

5    the jurors, if they found out you were a lawyer, started to ask

6    you for legal advice about the case, like what is this, what

7    does this concept mean, what does this term mean, would you be

8    able to decline to answer that question and advise your

9    colleagues that they needed to check with the judge about that?

10          JUROR NO. 106:  Yes, I could.

11          THE COURT:  In other words, we don't want a shadow

12    legal advisor in the jury room.  Can you abide by that rule?

13          JUROR NO. 106:  Absolutely.  I would have no intent

14    of telling them I was a lawyer.

15          THE COURT:  All right.  Because of your long-time

16    association with the Department of the Navy, I need to ask you,

17    one of the allegations in this case may be that efforts were

18    being made to recruit people to wage war against the United

19    States.

20          Given the nature of that kind of an allegation and

21    your close association with the armed services, do you feel in

22    any respect you might have problems in being completely

23    impartial and objective in deciding this case?

24          JUROR NO. 106:  No, I really don't.

25          THE COURT:  All right.  All right, sir.  If you would

476

1    step outside for a second, we will see if there is anything

2    further.

3              NOTE:  Juror number 106 leaves the courtroom.

4              THE COURT:  Any follow-up questions, Mr. Gibbs?

5              MR. GIBBS:  No, Your Honor.

6              THE COURT:  How about from the defense?

7              MR. MacMAHON:  Just a couple, Your Honor.  With

8    respect to the Ill Wind investigation, I think he told --

9              THE COURT:  Were you involved in that at all?

10             MR. MacMAHON:  No, I wasn't, Your Honor.

11             THE COURT:  I am sorry.

12             MR. MacMAHON:  There was a question whether he

13   testified as a witness for the Government.  I don't know

14   exactly whether -- I think he detailed his experience, but --

15             THE COURT:  I think he couldn't have because he just

16   said all of his stuff was after the fact.  Remember, he was

17   apparently asked to consider methods to avoid this problem

18   occurring in the future.  So I did not hear that to be an

19   issue.

20             MR. MacMAHON:  Question 72.  And again, this is

21   another potential juror of the Jewish faith, Your Honor, with

22   the questions we got into before about the Lashkar-e-Taiba

23   symbols that the Government wants to put in, the Space Shuttle

24   comments.  And this answer here I think gives us even more

25   pause to delve into that where it says he is not sure if he has

477

1    positive or negative feelings about Muslims.

2              THE COURT:  All right.  I will check with him on

3    that.

4              NOTE:  Juror number 106 returns to the courtroom.

5              THE COURT:  If you could just stay there, but answer

6    in a nice, loud voice so we can hear you.

7              You indicated in question 68 that your father is

8    Jewish, your mother Protestant, and you have been raised sort

9    of non-denominationally, but obviously had some Jewish heritage

10   in your background.

11             There may be evidence in this case either through

12   posters or actual statements of very strong anti-Israeli,

13   anti-Jewish sentiments.

14             Do you feel in any respect because of your Jewish

15   heritage that you might find it difficult to remain impartial

16   and objective with that kind of evidence in this case?

17             JUROR NO. 106:  I don't believe I would have a

18   problem staying impartial.

19             THE COURT:  I am sorry?

20             JUROR 106:  I do not believe I would not be able to

21   stay impartial.

22             THE COURT:  All right, sir.  On the question about

23   whether you have any particularly positive or negative feelings

24   about Islam, the Islamic faith, or Muslims, you indicated you

25   weren't sure.

478

1              Can you give us more information about that answer.

2              JUROR NO. 106:  I don't remember specifically how

3    that question -- was that exactly how the --

4              THE COURT:  Yeah.

5              JUROR NO. 106:  I mean, I guess I have concerns about

6    fundamentalism in general, but I don't specifically remember

7    what I was trying to say when I answered it that way.

8              THE COURT:  Well, you did say you have concerns about

9    religious fundamentalists of all stripes.  Is what you meant by

10   that?

11             JUROR NO. 106:  Right.

12             THE COURT:  Not just Islam?

13             JUROR NO. 106:  Exactly.

14             THE COURT:  All right.  Okay, thank you.  Go ahead.

15             JUROR NO. 106:  I guess the point I was trying to

16   make is that I am concerned that all fundamentalists are too

17   narrowly focussed and don't see a larger picture or respect

18   other people's views.

19             THE COURT:  When you say all fundamentalists, you

20   mean fundamentalist Christians, Jews, Muslims, whatever?

21             JUROR NO. 106:  Right, that's what I was getting at.

22             THE COURT:  All right.  Thank you.  Just step outside

23   for just one second.

24             JUROR NO. 106:  Sure.

25             NOTE:  Juror number 106 leaves the courtroom.

479

1          THE COURT:  Anything further?

2          MR. GIBBS:  No, Judge.

3          MR. MacMAHON:  No, Your Honor.

4          THE COURT:  All right.  Any reason to strike this

5   jury?

6          MR. GIBBS:  No, Judge.

7          MR. MacMAHON:  I am concerned about the connections

8   with the Justice Department and Ill Wind, but it was long

9   enough ago that I am confident that you won't let us strike

10  him, so --

11          THE COURT:  I am not going to strike him for that,

12  not given his role.  If he had been an investigator, that might

13  be different, but I specifically asked him that question and he

14  said he was not.  So, I think he can be fair.

15          All right.  Let's bring him in.

16          NOTE:  Juror number 106 returns to the courtroom.

17          THE COURT:  All right, sir.  We are going to continue

18  considering you for this jury.  That means you will need to be

19  here for certain on Monday.

20          Now, Monday there will be the final selection.  And

21  once the 14 are selected, we are going to go right into the

22  trial.  So if you are one of those 14, you will be here all

23  day.

24          We will not be in session next Friday.  So if you are

25  a juror and you need to arrange business matters on Friday, you

480

1    can do so.  Don't count on every Friday thereafter.  It just is

2    a scheduling problem that we have for next week.  All right?

3            JUROR NO. 106:  Certainly.

4            THE COURT:  Now, while you're awaiting your final

5    call here, continue to abide by my earlier instructions.  That

6    means you cannot conduct any investigation into any of the

7    issues connected with this case.  And avoid all media coverage.

8            Do you understand?

9            JUROR NO. 106:  Yes, I do.

10           THE COURT:  You are not to discuss this case or your

11   status other than you can tell people you are still under

12   consideration as a juror.

13           And so that you understand, we have been referring to

14   you by a number because we're trying to minimize any media

15   contacts with our jurors.  And that's why we are not, you know,

16   brandishing your name about.  You shouldn't receive any

17   contacts about this case.  But if you were to, you need to let

18   us know right away.  All right?

19           JUROR NO. 106:  I will do that.

20           THE COURT:  The trial starts 10 o'clock on Monday.  I

21   think they are going to want you here by 9 o'clock, just check

22   in with the Clerk on that phone number and they will give you

23   the certain details.  All right?

24           JUROR NO. 106:  I will do that.

25           THE COURT:  Very good.  We will see you Monday.

481

1    Thank you.

2              NOTE:  Juror number 106 leaves the courtroom.

3              THE COURT:  Well, believe it or not, although I

4    didn't think we would, we apparently have 40, which was the

5    number I had hoped we would have.  So you have got actually the

6    full complement of jurors from which to choose that we had

7    initially talked about.

8              And as I said, I myself am quite impressed with the

9    quality of the questions and the answers, and I think you will

10   have a very fair and representational jury pool to pull from on

11   Monday.

12             Now, so that we can start promptly at 10 o'clock on

13   Monday, are there any last minute preliminary things we need to

14   address?

15             MR. MacMAHON:  If I may, Your Honor, since we have

16   enough jurors to go around, I just wanted to renew with respect

17   to just three of the jurors that you've already let in.  Since

18   we have enough and there is not a concern about losing them.

19             And the only three that I am concerned about are 34,

20   39 and 67.  Number 34 was the person who worked at the Pentagon

21   and five of their friends were killed in the plane crash.  I

22   continue to believe that's a very serious problem in terms of

23   given the allegations of this case.  And I know what they said.

24             And then I have number 39 was the person who had 24

25   co-workers die at the Pentagon.

482

1          And number 67 is the person that actually saw the

2     plane hit.

3          And again, since we have enough jurors, I really

4     think that in my experience in cases with people involved in

5     these kinds of traumatic events, especially since they

6     specifically relate to this case, they have such memories

7     seared into their minds and otherwise that it really would be

8     better if we struck them at this time and proceeded without

9     them.

10          Thank you, Your Honor.

11          THE COURT:  Mr. Kromberg.

12          MR. KROMBERG:  Judge, this community, Northern

13     Virginia, is full of people who will never forget September 11.

14     And to say that if you happen to be in this community on

15     September 11 and you happen to work in the Pentagon or you

16     happen to see the plane hit, that you can't on a jury that --

17     the events of 9/11 -- this is not the Moussaoui case.  This is

18     a case about someone who says, there is going to be a war in

19     Afghanistan, I want you to go fight.

20          The people who were at the Pentagon should not be

21     disqualified on that basis.  You did a -- the Court did a

22     searching inquiry, and there was no reason to disqualify them

23     then, there should be no reason to disqualify them now.

24          THE COURT:  All right.

25          MR. MacMAHON:  If I can close, Your Honor.

483

1          THE COURT:  Yes, sir.

2          MR. MacMAHON:  If that's what the case was all about,

3     I wouldn't have any problem with it.  We had a motion in limine

4     dealing with Mr. Hasan's testimony withdrawn about Dr.

5     Al-Timimi supposedly celebrating the attacks on the World Trade

6     Center and the Pentagon.  That's the opening salvo in the case

7     by the Government.

8          If we were just going to talk about what happened on

9     the 16th of September and what happened on October 15, maybe it

10    wouldn't be such a big deal, but the Government intends to

11    start the emotional attack in this case out with the day of

12    9/11, Your Honor.

13         And that's what concerns me about it.  I know

14    everybody was traumatized that day, I was, I am sure everyone

15    in the room was, but these are eyewitnesses to these events.

16         THE COURT:  Well, I think you overstate slightly

17    their connection.  I mean, what I was looking for -- and again

18    this never shows up on the cold record, but I will put it on

19    the record for the record, I'm watching as jurors answer these

20    questions, both body language, facial expressions, the tone of

21    voice, whether their voice quivers, how quickly they respond.

22    All that stuff is lost on a transcript.

23         And I was looking for that.  And it is clear to me

24    the way these jurors answered that they were calm, they were

25    firm.  There wasn't the kind of emotional hesitation that you

484

1    often see or hear in a courtroom that leads you to believe that

2    the words don't mesh with the emotion.  I don't see that

3    disconnect.

4            And that's one of the reasons we brought these jurors

5    in for individual voir dire just like this, so we could make

6    that evaluation.

7            I don't believe that in and of itself the experiences

8    of these three jurors disqualify them when everything else in

9    their questionnaire and what they have said in court indicates

10   that they can be objective and fair in evaluating this case.

11           So the objection is overruled.  And we will go with

12   the 40 that we've got.  Again, both sides have their full

13   complement of peremptories to exercise as they wish.

14           All right.  Is there anything else, Mr. Kromberg?

15           MR. KROMBERG:  Your Honor, the defense made a number

16   of motions in limine --

17           THE COURT:  Which I, frankly, haven't looked at

18   today.

19           MR. KROMBERG:  That's right.  And I have a response,

20   but it might -- I suspect that we can just talk about them, and

21   that might solve some of these problems because -- the defense

22   did not brief them in depth, by any means.  So, it is basically

23   one sentence with respect to each exhibit that the defense

24   wanted to keep out.

25           But I think the Court had told us yesterday that if

485

1    we didn't resolve it today, then, therefore, the parties

2    wouldn't be able to use it -- use any -- refer to any of these

3    in their opening argument.  Of course, since that's only going

4    to affect one side here, it is important to us that we get this

5    resolved.

6              THE COURT:  Why don't you tell me what the things

7    are.

8              MR. KROMBERG:  Well, the first is the Taiba

9    Bulletins.  The defense says we shouldn't be able to use any of

10   the Taiba Bulletins because there is no proof that Mr. Timimi

11   ever read them.

12             The Government's proof is going to be that Mr. Timimi

13   told Agent Wyman that he read them.  Not that he read every one

14   of them, but that he was subscribed to the Taiba Bulletin, and

15   that he did visit the website, and he did read and he was

16   extremely well informed on every matter involving Islamic

17   affairs in the world.

18             The second one is the defense moves to bar the

19   posters, those Lashkar-e-Taiba posters on the grounds there is

20   no proof that Mr. Timimi ever saw them.

21             Evan Kohlmann is expected to testify that he found

22   them on the website, the posters on the Lashkar website in

23   1999, I believe.  It may have been 2000.  And, as I said, Mr.

24   Timimi admitted to the agents that he visited the Lashkar

25   website.

486

1          The next issue is the firearms.  The defense is

2    moving to exclude all the firearms that were seized in this

3    case.

4          There are two reasons the firearms are admissible.

5    One is the defense is going to go hard after the credibility of

6    the Government witnesses, obviously, including Kwon, who is

7    going to say that the reason the people were gathered at his

8    house on September 16 is because he understood from Timimi that

9    he should gather the guys with guns.  Well, this is proof that

10   they have guns.

11         It is also, in a First Amendment case, when the

12   defense has said that this is protected speech and it may come

13   down to the imminence of the harm, the fact that every

14   single -- excuse me, not every single one.  That the gaggle of

15   these guys had AK-47s, including Randall Royer driving around

16   the city of Alexandria with it, tends to show that there was in

17   fact imminent harm when this speech was being said.

18         The next one, I don't really understand it, but they

19   moved to say that we should not be able to use photographs of

20   the various people in this case.

21         I would just say that the names of some of the people

22   are difficult enough for the jurors to gather that it might

23   helpful to have a picture of Caliph Abdur-Raheem up on the

24   board when we are speaking about him and Hammad Abdur-Raheem

25   when we are speaking about him.  So, I don't really understand

487

1    what that one was about.

2              MR. MacMAHON:  Your Honor, if I may, I don't mean to

3    interrupt, because there is a bunch of them, I am going to lose

4    track --

5              THE COURT:  Because I haven't read the motion, just

6    very quickly, it gives me an overview.  And I can be figuring

7    out what I have to think about.

8              MR. MacMAHON:  I don't know whether what we should do

9    is just take a short break and actually go get the exhibits

10   that you can take a look at or whether we can continue like

11   this.  I am just --

12             THE COURT:  And how many more do we have on this

13   list?

14             MR. MacMAHON:  There are five pages.  That's what I

15   am saying, I am going to lose track myself.

16             THE COURT:  I don't want to --

17             MR. KROMBERG:  I don't think that --

18             THE COURT:  Just tell me what do you need to make

19   your opening statement, Mr. Kromberg?

20             MR. KROMBERG:  Actually, I haven't figured that part

21   out yet.  They just basically said the Government can't use

22   anything because all their exhibits are no admissible for one

23   reason or another.

24             The exhibits that the Court has said three times

25   already are admissible, they are moving to suppress again.  The

488

1    Terrorist Handbook, the Usama Bin Laden statement that was

2    seized at Khan's house.  The Court has said it again and again,

3    but they are in the motion now.  And unless we go through them,

4    I suppose I am not allowed to mention them.

5              I mean, these are some of the basic things in the

6    case.

7              THE COURT:  All right.  I really think what we ought

8    to do is I need to file -- was there a courtesy copy of that

9    motion sent up to chambers?  Or do you have an extra copy?

10             MR. KROMBERG:  Right here.

11             THE COURT:  All right.  Let me take it downstairs and

12   take a look at it.

13             I am just wondering if I can -- well, hold on a

14   second.  I may be able to do this faster than that.  Just give

15   a second.

16             All right.  Mr. MacMahon, I haven't got your motion

17   in front of me, but the list of the items that are at issue, is

18   that accurate in the Government's response?

19             All I am really looking for is a checklist of what

20   the issues are.

21             MR. MacMAHON:  Yeah, I think this is it.  And I think

22   we can limit it to some of the more -- I wasn't intending on --

23   I was just noting an exception, but there are some that are

24   more important than others that we could probably look at,

25   unless the Court wants to go through them one by one.

489

1          THE COURT:  I can do this fairly quickly.  I am not

2    going to go through them one by one because I think generically

3    they can be addressed.

4          The Taiba Bulletins are clearly relevant to this

5    case.  They go to what LET was all about.  And whether your

6    client saw them or not is a separate issue.

7          But, I mean, in terms of establishing -- yeah, there

8    was evidence in the other case that these places were almost

9    like health camps, you know, CampMed in the Himalayas.  I mean,

10   there is a decent argument that they are not, they are into

11   other things as well.

12         And so, the Government has got a right to put that

13   on.  And I know you will have evidence that rebuts some of

14   that.  But, I mean, that's the nature of a trial.  The evidence

15   is out there.

16         There is nothing inherently prejudicial about that

17   evidence.  And you will have plenty of an opportunity to

18   address it.

19         But I think that is absolutely relevant to the issues

20   in this case.  So, to the extent that you are objecting to the

21   Taiba Bulletins, that objection will be overruled.

22         In terms of the firearms, I understand they are not

23   pretty, but they are the facts of the case, some of the facts

24   of this case.  They are there.  And I think the Government has

25   got a right to let the jury see them.  And you have got a right

490

1    to explain them away.

2           Half this jury by the way, at least as I recall going

3    through these questionnaires, have had firearms, have shot

4    firearms and understand that these are legal weapons.  I mean,

5    I know that evidence will come in.  There is no evidence that

6    anybody unlawfully --

7           MR. MacMAHON:  All these firearms are purchased by

8    these people before the time frame of this indictment.  The

9    indictment here starts on September -- with respect to my

10   client starts on the 15th of September.  Every one of these

11   firearms is purchased in 1999 or 2000, Your Honor.

12          I mean, it is just such a stretch.  And it is so

13   prejudicial to be holding AK-47s around here that don't have

14   his fingerprints on them, never even knew they had them.

15          THE COURT:  But the problem is that part of this case

16   is charges of either conspiracy or aiding and abetting.  In

17   other words, connection with people.  And certainly some of

18   these firearms were still in the active possession of some of

19   the people on the periphery of this case, like I believe Khan

20   when he was in -- wasn't the search of his house in May of

21   2003?

22          MR. KROMBERG:  Yes.

23          THE COURT:  So, again, I think that it's sufficiently

24   connected to this case that it is not improper for it to come

25   in.

1            And the photographs, you don't have an objection to

2     photographs, do you?

3            MR. MacMAHON:  No, Your Honor.  Actually, if we

4     could, I would just as soon move along, I was just making

5     objections to these.  I don't need to -- the next page I am not

6     going to argue about for purposes of this.  I mean, they are

7     going to try to put some of these things that he has no

8     connection in, and I will just use it for cross.

9            THE COURT:  All right.

10           MR. MacMAHON:  But if we could go to page 3, I think

11     that's where we get into some of the ones that I think we need

12     to address.

13           7H19 is a page from the Federal Register that says

14     that Soliman Al-Buthi is now designated as a terrorist.  That's

15     dated September of 2004, I believe, Your Honor.

16           THE COURT:  All right.

17           MR. MacMAHON:  2005, excuse me.  Excuse me, September

18     of 2004.  Okay.  And this is a person that Dr. Timimi talks to

19     on the phone with the Space Shuttle article.  And that was in

20     February of 2003.

21           So, the Government, the same sovereign that is

22     prosecuting the case, a year-and-a-half later declares this

23     person to be a terrorist.  There is no way for me to rebut it,

24     to bring him over here to say it didn't happen.  It is

25     obviously something that happened long after the fact here.

492

1          That's grossly prejudicial, for the Government to

2    create their own list of who they want to tell the jury is a

3    terrorist and who isn't.  And that just seems to me to be a

4    completely unreasonable and unfair position for the Government

5    to take.

6          THE COURT:  All right.  Is there evidence that the

7    defendant continued to have contact with Al-Buthi after the

8    time this announcement occurred in the Federal Register?  Is

9    there any evidence in this case of that fact?

10          MR. KROMBERG:  No, Judge.

11          THE COURT:  All right.  I will then support that.  I

12    will affirm that.  And 7H19 does not go into evidence,

13    certainly not in the Government's case in chief.

14          Remember, the caveat that runs through all my rulings

15    on motions in limine is subject to some door not being opened.

16    If a door is opened or the Government in good faith thinks it

17    has been, they need to approach the Court first --

18          MR. KROMBERG:  That will be fine, Judge.

19          THE COURT:  -- to reconsider it.  And the same thing

20    will apply in your case, Mr. MacMahon.

21          MR. MacMAHON:  Thank you, Your Honor.

22          THE COURT:  All right.

23          MR. MacMAHON:  Then 10A25 to 10A27.  And you don't

24    have these in front of you.

25          THE COURT:  What are these -- these are questions

493

1    that people would put to Mr. Timimi at various times?

2            MR. MacMAHON:  That's a leap that we have.  I guess

3    this was found at his house in the search.  And the actual --

4    they are Xerox copies of notes from a charity in Suffolk,

5    England.  And someone would ask him, what's the Islamic

6    position on suicide bombers.  I mean, they are really awful

7    questions.

8            And the way this happens is these are the questions

9    that the sisters, as they say, have to ask because they are

10   around the back because they are separated.

11           These questions are found at his house.  There is

12   absolutely no connection between the events in Suffolk,

13   England, undated, untimed, no proffer from the Government as to

14   when it would have happened.

15           And there isn't even any evidence for them to show

16   that the questions were asked to him, if he picked it up or

17   what.  And it is clearly prejudicial to him.

18           I gave a talk at Dar Hijrah a couple weeks ago and I

19   got handed one of these notes from other side of the room.  And

20   I have it my file now, somebody asked me a question about the

21   case.

22           And so, to take something that is totally undated and

23   they just pick and choose among -- Al-Timimi, you will find

24   from the search warrant, is a pack rat, Your Honor.  He has

25   everything literally that he ever had.

494

1              And these things, you can't, without knowing who

2      asked the question, whether the question was even asked to

3      Al-Timimi, the Government shouldn't be allowed without some

4      foundation to bring that up in this case.

5              THE COURT:  Well now, wait.  Now, the search of the

6      defendant's home that yielded these documents, that occurred

7      when?

8              MR. MacMAHON:  The search of the defendant's house

9      occurred I believe in March of '03.

10             MR. KROMBERG:  February.

11             MR. MacMAHON:  February of '03.

12             THE COURT:  All right.  And these are photocopies or

13     the actual notes?

14             MR. MacMAHON:  I think they are the actual notes,

15     Your Honor.  But we think it was from something that may have

16     happened in 1998 when he was in England.  But I don't know

17     exactly when he was in Suffolk, England at an Islamic

18     conference.

19             THE COURT:  All right.

20             MR. MacMAHON:  But you would have to actually see the

21     questions.  I mean, they are cherry-picked to be the worst

22     possible ones.  I guess it is their right to do that, but if

23     they can't link it up any better than that, I don't think it is

24     -- we have seen these questionnaires about how everybody has

25     got all these issues confused anyway.

495

1              So, this is --

2              THE COURT:  Well, all right, I am --

3              MR. KROMBERG:  I can clarify that, Judge, if I may.

4              Mr. Timimi answered questions about those pieces of

5      paper to Agent Wyman.  Agent Wyman is expected to testify that

6      I showed them to Mr. Timimi and I asked, are these examples of

7      questions that you answered in the context of what do you tell

8      people in your lectures about jihad.

9              So, one of the questions I think was, is it true that

10     we can't go on jihad anymore in jihad -- or Chechnya?  Or is it

11     true that suicide bombing is not allowed.  And Agent Wyman is

12     going to testify to what Mr. Timimi's answers were about what

13     he says during his lecture when people ask him about going on

14     jihad.

15             THE COURT:  All right.  In that narrow context, that

16     does give context to these questions.  I mean, I think it is

17     always fair game for the prosecution to be able to elicit what

18     responses a defendant has made to questioning unless there is a

19     Miranda or some other issue that I assume we don't have in this

20     case.

21             I mean, I don't believe there was a motion to

22     suppress statements in this case.

23             MR. KROMBERG:  No, there was not, Your Honor.  This

24     was in the presence of multiple attorneys of Mr. Timimi's, Your

25     Honor.

496

1            THE COURT:  All right.  No, in that context, and only

2       in that context, these can come in.  All right.  So, these

3       would be the specific statements or slips of paper about which

4       the defendant was explicitly questioned.

5            MR. KROMBERG:  Yes, Your Honor.

6            THE COURT:  All right.  So, that is A25 through 27,

7       10A25 through 27.  Those are still in.

8            MR. MacMAHON:  And the last one would be on page 4,

9       Your Honor.

10           THE COURT:  All right.

11           MR. MacMAHON:  They have given us pictures that they

12      say, they are going to claim were found on Al-Timimi's computer

13      of Ibn Khatab, Bin Laden, the attack of the World Trade Center

14      and the crash of the Space Shuttle.  That isn't actually

15      correct.

16           I have asked on several occasions, I asked the agent

17      how they found these things on the computer because there are

18      lots of different ways pictures can end up on a computer.  If

19      you are just serving the net, computer files can be saved.

20      Were they found in a My Pictures file?  Were they found here?

21      And the agent can't tell me any idea where they came from in

22      the computer at all.

23           Obviously showing a picture of the Space Shuttle crew

24      to this jury is really -- I mean, I have serious problems with

25      this whole Space Shuttle thing that I have argued and the Court

497

1    has ruled, and I respect that, but to take these pictures of

2    these events and try to put them in front of the jury is such

3    an obvious attempt to go after their emotion that that is just

4    beyond the pale, Your Honor.

5         MR. KROMBERG:  If I could respond about being beyond

6    the pale.  There is a picture of Usama Bin Laden standing in

7    library.  And there is a picture of Ibn Khatab just standing.

8    And we are using those to -- well, for Khatab, the witnesses

9    are going talk, say, that's Khatab, that's the guy who is

10   talked about over here.

11        We haven't even got into the issue of Russian Hell

12   2000 when Khatab murdered the soldier.  But that's another

13   story.  But this is just a picture of Khatab.

14        THE COURT:  So, you are not going to use the exhibit

15   to say, this was found on the defendant's computer?  You are

16   just going to show Kwon or one of these people, who is that in

17   that picture?

18        MR. KROMBERG:  That's Khatab and Bin Laden.  The

19   World Trade Center pictures are the same thing.  We are not

20   trying to show that that was found on Mr. Timimi's computer.

21        The only one that we might try to show, I don't know

22   if we can at this point, I don't know if we physically

23   logistically can show that the picture of the Space Shuttle

24   crew was found on his computer, but I don't know the answer to

25   that.  And if I can't show that, I don't think it is relevant

498

1    myself.

2            THE COURT:  Well, pictures are worth a thousand

3    words.  This jury would have no idea what Khatab looks like.

4    They wouldn't even know how to spell the name.

5            You can certainly use a photograph, without

6    designating where it came from, to illicit that testimony.

7            There is absolutely no need in this case or, frankly,

8    in my view almost any other case, to have pictures of the World

9    Trade Center being blown up.  If anyone in this jury -- and we

10   have spent a lot time with this jury.  You-all know this better

11   than you have known any jury probably in the last few years

12   anyway in this court.  Every one of them will know what the

13   World Trade Center looked like.

14           We don't need that put in this case.  And I am not

15   going to have that going, nor the Space Shuttle Columbia.

16   Those are not necessary for the Government's case.

17           So, those pictures will not come in.

18           MR. KROMBERG:  Thank you, Your Honor.

19           THE COURT:  All right.

20           MR. MacMAHON:  One last one, Your Honor.  I am sorry,

21   I skipped it on page 2.

22           THE COURT:  Page 2?

23           MR. MacMAHON:  Page 2.  2A1 and 2C2.  Which is the

24   issue of the unmanned aerial vehicle.

25           THE COURT:  That evidence is so critical in my view

499

1    to this case.  Whether your client -- your client's connection

2    to it, you can try -- you know, you can certainly argue around,

3    that is a legitimate defense, but the Government has got a

4    right to put that in.

5           MR. MacMAHON:  If I have may, Your Honor.  I

6    understand you have already told me that.  But proof that will

7    show that the defendant met with Abu Khalid, the procurement

8    agent for Lashkar-e-Taiba.

9           I have sent Mr. Kromberg a letter asking for any

10   information on Abu Khalid.  I mean, I don't have to take it at

11   face value that Abu Khalid is the procurement agent.  And, of

12   course, the evidence is he was driven to his house supposedly

13   one day and stayed for a few minutes and left.

14          So, I understand what the Court says about this

15   involvement in this, but I should have some -- is there Brady?

16   Is there something on who Abu Khalid is?  Do I have his

17   passport?  Do I have his visa?  Do I have anything?

18          Is it going to come forward and the Government says

19   it and it's true?  That's not fair to Dr. Al-Timimi in terms of

20   defending the case.

21          THE COURT:  I have no idea what the Government has

22   got there, but the point is the specific issue in the motion in

23   limine, as I understand it, is 2A1 and 2C2.  And if that's the

24   order slip and the other stuff that we saw in the other case --

25          MR. KROMBERG:  Correct, Judge.  And it is the

500

1    information from Vesta Technology.

2          THE COURT:  Yeah.  I mean, that evidence is third-

3    party generated, relatively clear evidence.  And as a motion in

4    limine, that evidence would not properly be stricken from the

5    case.  All right.

6          MR. MacMAHON:  Thank you, Your Honor.

7          THE COURT:  Now, I would agree with you, I am not at

8    all positive that there is any direct evidence, that I recall,

9    not direct evidence.  It is strong circumstantial evidence --

10          MR. KROMBERG:  I say to the Court now that the

11    information linking Mr. Timimi to Abu Khalid is not strong

12    evidence.  It is that you have to draw inferences from it.

13          But the evidence will be, and it is no surprise here,

14    that one of the witnesses is going to say that he saw

15    unindicted conspirator number two, Chandia, because his name is

16    going to be mentioned on Monday, Chandia with Abu Khalid.

17          And Chandia was -- we have the information from last

18    year's trial that Masaud Khan and Chapman were working for or

19    getting things, unmanned aerial vehicle parts for Abu Khalid.

20          And then we have Abu Khalid with Chandia, who the

21    evidence will be also went to the Lashkar camp later than the

22    other guys.

23          And then we have Abu Khalid -- excuse me.  We have a

24    witness saying that Mr. Timimi said that Chandia brought by a

25    person matching the description generally of Abu Khalid to

501

1    visit Timimi.

2            And that's what it is.  And it's not the strongest

3    part of the case, but any means, but that's what it is.

4            THE COURT:  All right.  That is not a basis to grant

5    a motion in limine.  So, that part of the motion is denied.

6            If the rest of these issues are not critical, again

7    looking through them quite quickly, Mr. MacMahon, I don't think

8    there is anything here -- this is PowerPoint, this 10A16, a

9    PowerPoint evidence -- is that a PowerPoint presentation that

10   the defendant made?

11           MR. KROMBERG:  It is a group of -- it is a document

12   that each page has slides on it.  And there is a slide on there

13   that talks about when jihad is, I forget exactly, but when it

14   was permissible and when you are obligated to go on jihad.  And

15   this is evidence of what Mr. Timimi went around the world

16   telling Muslims when they have an obligation to go on jihad.

17           THE COURT:  And that information was, what, seized?

18           MR. KROMBERG:  It was seized as a document.  It was

19   seized in his house.  There was also a copy of it seized from

20   his computer, but we are not dealing with that.  We are only

21   dealing with the document seized in his house.

22           THE COURT:  All right.  Anything further so we can

23   get this trial started in a relatively smooth fashion on

24   Monday?

25           MR. MacMAHON:  We will just retain these objections.

502

1    If they try to put some of this evidence in, we will see if we

2    tie it all up, Your Honor.  But that's it for today.

3           THE COURT:  All right, that's fine.  We will see you

4    at 10 o'clock up here Monday morning.

5           We will recess court for the day.

6    -------------------------------------------------

                        JURY SELECTION CONCLUDED

7

8

9

10

11

12

13

14

15

16

17

18

19

20           I certify that the foregoing is a true and

21       accurate transcription of my stenographic notes.

22

23

24
                        _____
25                      Norman B. Linnell, RPR, CM, VCE