Case 1:04-cr-00385-LMB   Document 418   Filed 09/01/15   Page 1 of 30 PageID# 1695

**Filed with Classified Information Security Officer**

CISO _M̲S̲l̲l̲e̲t̲_

Date _8/31/15_

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. 1:04-cr-385-LMB |
| v. | ) | |
| | ) | Hon. Leonie M. Brinkema |
| ALI AL-TIMIMI, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION TO COMPEL DISCLOSURE OF UNREDACTED DOCUMENTS TO CLEARED DEFENSE COUNSEL AND PRODUCTION OF INDEX OF UNDISCLOSED EVIDENCE

On August 8, 2015, the United States Court of Appeals for the Fourth Circuit remanded the above-captioned case in light of new evidence that defendant Dr. Ali Al-Timimi acquired after the filing of the notice of appeal. Released by the government in heavily redacted form, this evidence (described herein as the "Squad IT-3" document) raises new questions over the extent to which the government may have withheld material evidence from the defense (potentially misrepresenting the record to this Court in the process) and further calls into question the testimony of key witnesses in Dr. Al-Timimi's trial. *See* Exhibit A (original document) and Exhibit B (analysis of original). In addition to this Squad IT-3 document, the defense has also acquired another new piece of evidence concerning Dr. Al-Timimi—a document that was released by the government just one day after this Court issued its final order on the defendant's discovery claims last year. The document is a redacted 2003 interview with FBI Special Agent Wade Ammerman—a key figure in the investigation, trial, and later the

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

second remand in this case. This document (hereinafter "the Ammerman Report") (Exhibit C) not only corroborates the defense's analysis of the Squad IT-3 document, but also speaks directly to vital issues that the defense attempted to raise both at trial and on remand, including a suspicious unannounced visit by Anwar Aulaqi to Dr. Al-Timimi's home late one night in October 2002. Both of these documents are critical to resolving the questions of potentially withheld evidence and false representations in this case. Lead defense counsel, Jonathan Turley, is cleared to review classified information and has long held a TS/SCI security clearance. To allow for a full record and consideration of the evidence in this case, Dr. Al-Timimi asks that, at a minimum, Mr. Turley be allowed to review both of these previously undisclosed documents in unredacted form so that he may file, if warranted, classified briefing on their significance and meaning.

As this Court noted in one of the earliest hearings after the first remand, courts are often in the difficult position of being given *ex parte* evidence without the benefit of adversarial and expert analysis. For example, serialized investigative files or passing references are recognizable to a defense in a way that might not be obvious to a court. Given the overuse of the *ex parte* process in this case in the past[1] and the availability of cleared counsel, there is no apparent basis for the government to enjoy an exemption from the normal adversarial process of allowing the defendant's cleared counsel to review and analyze the newly discovered documents in question. Moreover, these documents reference even more undisclosed case files that may in turn contain more undisclosed (and unreviewed) material documents. In light of the recent admission of Assistant United States Attorney Gordon Kromberg that he never previously reviewed the Squad

---

[1]     The Court previously ordered the government to declassify *ex parte* submissions in light of the largely legal arguments contained within them. The courts have been clear that the use of *ex parte* filings for such legal arguments is grossly inappropriate and a violation of due process protections.

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

IT-3 document, there is good cause to order the creation of a standard index of undisclosed documents. Absent such an index, the Court would be faced with the task of rendering a decision without any knowledge of whether the government has knowingly concealed material evidence. Only with such an index can the Court render a decision on the full record of what has been disclosed and what has been withheld in this case.

## BACKGROUND

Both of these previously undisclosed documents—the Squad IT-3 document and the Ammerman Report—reference events and individuals critical to Dr. Al-Timimi's defense strategy at trial. The Aulaqi visit to Dr. Al-Timimi was one such event, and a simple review of the record explains why. On October 7, 2002, Dr. Al-Timimi spoke with foreign figures about the letter to Congress seeking a peaceful dialogue between the United States and the Muslim world. One week after this letter and shortly after Al-Timimi made international calls to these figures,[2] Aulaqi was allowed into the country through the reported intervention of Special Agent Wade Ammerman and soon thereafter appeared without notice at the home of Dr. Al-Timimi. These two new documents refer to active investigations involving Dr. Al-Timimi during precisely that period—directly overlapping the alleged activities Dr. Al-Timimi is accused of in this case. In pre-trial motions, the defense specifically sought 2002 evidence and surveillance that would have encompassed the investigations referenced in these documents. Not only did the government repeatedly advise the defense that it possessed no pre-2003 investigative or FISA evidence material to this case, it also represented to this Court in 2007 that it had again searched the National Archives and Records Administration (NARA) and turned over to this Court all

---

[2] The defense repeatedly sought pre-2003 discovery, including the motion found at Dkt. No. 43 from January 2005, which specifically raised the communications between Dr. Al-Timimi and Hawali from 2001 to 2003.

material relating to Dr. Al-Timimi.[3] While the defense repeatedly objected to its inability to

independently explore the extent to which the government might be withholding material

evidence, the government continued to insist that such objections were purely "speculative" and

that it had already conducted exhaustive searches of NARA and other sources for any relevant

material. These two newly discovered documents, however, appear to directly contradict such

representations. More importantly, the information contained in these documents (not

considering the additional documents they reference) is precisely what the defense has sought

since the indictment of Dr. Al-Timimi.

*The Squad IT-3 document.* Lead defense counsel received the Squad IT-3 document in

March 2015 from NARA. The document references the Washington Field Office (WFO) of the

Federal Bureau of Investigation (FBI) and confirms prior investigations of Dr. Al-Timimi that

were not disclosed to the defense. *See* Exhibit A (Squad IT-3 document); Exhibit B (analysis of

Squad IT-3 document). The Squad IT-3 document is the evidence that the defense has long

sought to show that the withholding of material evidence was not "mere speculation." Indeed,

the defense had requested this particular document, which was referenced in earlier productions,

because it believed that it would constitute a significant piece of evidence due to the October

2002 date (and reference of both Al-Timimi and Aulaqi). The document shows that, as of

October 23, 2002, three investigations were ongoing: 199N-WF-217423, 199N-WF-222852,[4]

and a third redacted investigation. Additionally, the document describes not only an

---

[3] In 2007, the government assured the Court that it had been given a full accounting of all
investigations involving Dr. Al-Timimi and the Court used these representations to conclude that
there was nothing material, to wit, "evidence that could be relevant to either undercutting the
government's case, undercutting its witnesses, or undercutting its theory of the case or any
evidence that might assist the defense in making its case" that was not disclosed to the defense.
Transcript, August 24, 2007 [Dkt. No. 239] at 12-13.

[4] 199N-WF-222852 appears to be the WFO Aulaqi investigation that was discontinued on
May 6, 2003.

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

investigation of Dr. Al-Timimi but also the association with Aulaqi during the very period at issue (October 2002). [5]

The Squad IT-3 document also shows six related pre-2003 investigations of Dr. Al-Timimi. The reference to 199N-WF-217423 is itself important because it is believed to be an investigation with FISA material predating 2003. The defense was able to previously present to this Court evidence indicating pre-2003 FISA material, despite the denial of such surveillance evidence by AUSA Kromberg to trial counsel in 2005. Before the trial, defense counsel repeatedly raised the absence of pre-2003 investigation material, including the absence of pre-2003 FISA material. *See, e.g.*, Hr'g Tr., Jan. 28, 2005 [Dkt. No. 145] at 9:14-19. The fact that such evidence was requested by the defense and denied by the government led to the critical stipulation between the parties that "the defendant was subject to court-authorized electronic surveillance for a significant portion of 2003." Gov't. Exh. 12-60, April 13, 2005. Stipulation 60 however, reflected the clear understanding that Dr. Al-Timimi was *not* subject to court-authorized electronic surveillance before 2003. Reaffirming this understanding, FBI Special Agent Ammerman testified that his investigation of Dr. Al-Timimi began in February 2003. (Trial Tr. 1337:6 (Apr. 11, 2005)). After the remand of this case, current counsel repeatedly raised the issue of pre-2003 investigations. In the post-remand hearings, this Court was sufficiently concerned about the existence of pre-2003 surveillance and subsequently ordered the government to search the NARA records for evidence of such an investigation.[6] However, in

---

[5]     The Squad IT-3 document was generated by the WFO and approved by Special Agent Donald DeMay, who interviewed Dr. Al-Timimi on September 27, 2001, and works with key agents involved in the Al-Timimi case, including Special Agents Ammerman and John Wyman. The document appears to have been drafted by Special Agent Wyman, as evidenced by his initials, "jvw."

[6]     This search was done after former counsel Mr. MacMahon (working on the *Moussaoui* case), came across material in the National Archives indicating that Dr. Al-Timimi had been the

Case 1:04-cr-00385-LMB    Document 418    Filed 09/01/15    Page 6 of 30 PageID# 1700

January 2007, the district court reiterated that it understood the government's contention to be

that there was no material investigation of Dr. Al-Timimi until 2003. *See* Hr'g Tr. Jan. 16, 2007

[Dkt. No. 220] at 38:9-11.

In addition to the pre-trial motions, current counsel asked for discovery of undisclosed

prior investigations of Dr. Al-Timimi, as well as investigations of Aulaqi during the critical

period of 2002 when he appeared unannounced at Dr. Al-Timimi's house and unsuccessfully

attempted to seek his help in recruiting young men for terrorist activities. Dr. Al-Timimi

unequivocally rejected Aulaqi's request, and later sought to establish that the government knew

of the meeting and had related investigatory information. These documents reference

investigations that are clearly material to this question. For example, the NARA document

references an investigation with the designation 199N-WF-217423, which has been referenced in

other NARA documents obtained during the remand. This document shows 266 documents

within the then pending 199N-WF-217423 investigation.

The references in this document to Dr. Al-Timimi and International Terrorism (IT) (as

well Usama Bin Laden (UBL) and Al-Qaeda) make it obviously material to the basis for the

search warrant on Dr. Al-Timimi's house and the original indictment in this case. Additionally,

the document makes specific reference to the "recent visit to the Washington D.C. area by

Anwar Aulaqi." It further reveals information (redacted) concerning the following event: "On

Sunday, 10/13/2002, Aulaqi made public appearances at the Dar al Hijrah Mosque and the Dar

Al Arqam Islamic Center." That is the night that the defense believes the critical visit occurred

---

subject of a government investigation prior to 9/11. In a later declaration, Mr. MacMahon
reiterated that "I had no knowledge of any contemporaneous FISA of any of the 'Virginia Jihad'
defendants before 2003," and that such knowledge would have had a profound impact on his
strategy and examinations. Def's Rebuttal To Gov't Resp. To Mot. To Compel Discovery
Captured Pursuant To Foreign Intelligence Surveillance Act [Dkt. No.328, Exh. B].

Case 1:04-cr-00385-LMB   Document 418   Filed 09/01/15   Page 7 of 30 PageID# 1701

at the house of Dr. Al-Timimi.[7]

Mr. Kromberg admitted on appeal that he had never reviewed this document despite defense discovery motions before trial and years of remanded proceedings and motions seeking such undisclosed evidence. Gov. Rep. Br. at 2 ("We have located the still-classified redacted copy of the 'Squad IT-3 Document,' and agree that it refers to Al-Timimi. Further, we agree that it refers to the course of an investigation involving him."). The defense believes that the serial investigations, including redacted investigation files, contain potentially hundreds of unreviewed material documents.

*The Ammerman Report.* The second document, which was disclosed to lead defense counsel after the remand in this case, also contradicts representations made by the government as well as the sworn testimony of Ammerman. *See* Exhibit A. The document, dated October 16, 2003, contains information given to Commission Investigator Michael Jacobson by at the FBI Washington Field Office. The report notes that NARA had requested its declassification, but that it was not actually declassified and released until the day after the final order in this case. *Id.* ("Filed: 5/21/2014, Entered: 5/22/2014"). In a tie-in with the Squad IT-3 document, the document states "[Ammerman] has worked IT [International Terrorism] for that whole time, and is currently assigned to IT-3 (Don Demay's squad)." *Id.* The document also reinforces recent reports (shared with the Fourth Circuit) that the government (including Ammerman) was in contact with Aulaqi at the time when the defense was seeking information on his whereabouts. Where Squad IT-3 refers to the confirmed presence of Aulaqi at Dar Al-Arqam in October 2002 (the night of the visit to Dr. Al-Timimi's house), the Ammerman Report states outright that

---

[7]     Defense counsel conferred with both Dr. Al-Timimi and former trial counsel Mr. MacMahon. Both were adamant that neither the document, nor the underlying information, were disclosed to the defense. Mr. MacMahon has submitted a declaration to the Fourth Circuit, which is found in Exhibit F.

Ammerman knew about the visit at the house—long the allegation of the defense in support of its motions for further discovery. *Id.* at 3 ("Aulaqi is in contact with Tamimi, the imam of the Dar Al-Arqam mosque. When Aulaqi came back to the U.S. in October 2002, he went to Timimi's home."). The defense has been seeking all evidence of this meeting, including any reports or documents referencing the meeting. The document also includes new information on the paintball investigation, including Ammerman's direct role, and reinforces post-trial disclosures that the investigation went back to 2000. The document also discusses the investigation of the Dar Al-Hijrah mosque by the FBI and reinforces views of the defense that the original LET conspirators—including critical witnesses or co-conspirators such as Donald Surratt, Randall Royer, and Seifullah Chapman—attended the Dar Al-Hijrah mosque (which Al-Timimi did not attend), *not* the Dar Al-Arqam learning center (where Al-Timimi lectured). The involvement of these men with Dar Al-Hijrah rather than Dar Al-Arqam was a critical issue for the defense due to Dr. Al-Timimi role at the latter center. The document also references Aulaqi wanting to return and the absence of any warrant—key issues about whether Ammerman gave truthful statements to the Commission on his reported role in having the warrant lifted on Aulaqi, arranging for him to be released from custody at the airport, and facilitating his entry (and ultimately his visit with Al-Timimi). Finally, the document references an investigation of the organization of the disclosure of the interception of Soliman Al-Buthe, a director of Al-Haramain located in Saudi Arabia and a key figure raised before and during the trial of Dr. Al-Timimi. Al-Buthe was directly referenced in the first remand of this case as an area of material evidence that may have been withheld by the government.

Lead counsel has confirmed that former counsel, Ed MacMahon, never saw the Ammerman Report or received this critical information from the government. He maintains that

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

this document—like Squad IT-3—was material and would have been critical information for the defense at trial. He is further willing to appear at the next hearing or any subsequent hearing to attest to these facts.

## ARGUMENT

Both the Squad IT-3 document and Ammerman Report are indicative of a larger body of evidence that the defense believes that the government has withheld from both the Court and counsel. The information contained in these documents is clearly material, covering claims that the government successfully introduced at trial over the objections of the defense (including unsubstantiated allegations that Dr. Al-Timimi was connected to international terrorism or Al-Qaeda) and implicating the dubious testimony of key witnesses at trial. An examination of these documents and the referenced investigations is necessary to determine the scope of undisclosed evidence. On their face, these investigations suggest an overlap with the period of the alleged criminal acts by Dr. Al-Timimi. For example, 199N-WF-217423 (hereinafter "the 423 investigation") was clearly ongoing by October 2002, continued past the June 2003 indictment of the paintballers, and was active in October 2003. Indeed, it appears to have been operative as early as 2001. The investigation would have necessarily encompassed the activities of Royer, Kwon, Chapman, Hasan, Surrat, Aatique and others. Kwon, Hasan, Surrat, and Aatique pleaded guilty in October 2003. Witnesses and charged individuals related to the Virginia Jihad activities were also part of an investigation denoted as 226192 (hereinafter "the 192 investigation"). Some 302s have this designation for critical suspects. Royer and Khan appear to have other designations. 199N-WF-222852 is believed to be a related Aulaqi investigation that was opened on September 27, 2001. This Court previously ordered the release of information but later rescinded that oral decision. At the time of the order, the Court expressed deep concern over the

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

allegations of the defense that there was still undisclosed evidence of investigations of Dr. Al-Timimi in connection with Al Qaeda. Hr'g. Tr., Jan. 16, 2007 [Dkt. No. 220] at 31. When the Court later rescinded its earlier oral order, it said that it had been assured by the government—in camera filings—that Dr. Al-Timimi "has not been the subject of any investigations other than the one which resulted in his trial or that any other investigations in which he was a subject or during which he was referenced contain no information that would constitute Brady material or which was required to be produced under the discovery orders entered in this case." Order, Jan. 24, 2007 [Dkt. No. 210] at 2. Dr. Al-Timimi, however, was in fact subject to other undisclosed investigations and that these investigations contained clearly material evidence. The question of the scope of undisclosed evidence should be answered before this Court renders a decision on what to order into the record, and certainly before this case is sent back to the Fourth Circuit.

*Legal standards.* The defense maintains that this material is discoverable under a host of different standards, including but not limited to Rule 16 and *Brady*. The Squad IT-3 document and the Ammerman Report raise a classic example of the government withholding material evidence favorable to the accused in violation of the guarantee of due process and a fair trial. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (discussing precedent). Under *Brady*, a defendant must show that favorable evidence was withheld and "material," by way of a "reasonable probability" that disclosure would have produced a different result at trial. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). A defendant can establish a *Brady* violation by showing (1) that undisclosed information was favorable to the defendant either because it was exculpatory or impeaching; (2) that the information was material; and (3) that the prosecution knew about the evidence and failed to disclose it. *United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015) (citing *United States vs.*

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

*Wilson*, 624 F.3d 640, 661 (4th Cir. 2010)). As the Fourth Circuit stated in *Parker*: "This standard does not require a showing that a jury more likely than not would have returned a different verdict." *Parker*, supra, at 558. Rather, the "reasonable probability" standard is satisfied if "'the likelihood of a different result is great enough to undermine confidence in the outcome of the trial.'" *Id.* at 14-15 (quoting *United States v. Bartko*, 728 F.3d 327, 339 (4th Cir. 2013)). In this case, the evidence would not only show the prior unsuccessful effort to tie Dr. Al-Timimi to Al-Qaeda, but it would also offer concrete support for prior allegations of false testimony by key witnesses like Special Agent Ammerman and false representations by the prosecution.

The Fourth Circuit considers evidence to be exculpatory and favorable to the defense if it "*may* make the difference between conviction and acquittal." *Wilson*, 624 F.3d at 661 (emphasis added). Evidence that weakens or disproves an important element of the prosecution's case against the defendant is clearly exculpatory because the weakened or disproven element may make the difference between conviction and acquittal. *See McDowell v. Dixon*, 858 F.2d 945 (4th Cir. 1988). Evidence that could allow the defense to effectively cross-examine prosecution witnesses is also favorable evidence to the defense, and if the suppression of this evidence would deprive the defendant of a fair trial, this evidence must be disclosed. *See United States v. Bagley*, 473 U.S 667, 678 (1985) (explaining that the prosecution committed a constitutional error by withholding evidence that may have been helpful in conducting cross-examination of government witnesses). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," and if its suppression undermines confidence in the outcome of the trial. *Bagley*, 473 U.S. at 678.

Even if the court decides that the Squad IT-3 document should not have been disclosed

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

on exculpatory grounds, the document certainly should have been disclosed for impeachment purposes. The Supreme Court has stated that material evidence relating to the credibility of a key witness must be disclosed, *Giglio v. United States*, 405 U.S. 150, 152 (1972). This clear precedent was further amplified by the Fourth Circuit in *United States v. Parker*, 790 F.3d at 558, where the Court of Appeals overturned convictions for illegal gambling after the discovery of undisclosed impeachment evidence. The government had failed to disclose a prior investigation that would have shown its identification of a participant in the alleged scheme that would have undermined both the testimony and the theory of the government. *Id.*; *see also United States v. Pelullo*, 105 F.3d 117, 123 (3d Cir. 1997) (remanding for a new trial due to government's failure to disclose evidence that "could have been used by defense to undermine the credibility" of an IRS and FBI agent's testimony and formal reports when the "credibility of the[se] government witnesses was so central to the government's case"). The same materiality test that applies to exculpatory evidence applies to impeachment evidence. *Parker*, 790 F.3d at 559-60. Dr. Al-Timimi has sought disclosure of the long-denied pre-2003 investigations that would have not only shown his refusal to associate with Al-Qaeda but that also contradicts the testimony of key witnesses like Ammerman on his suspected associations and how this investigation of Dr. Al-Timimi began.

Additionally, as this Court previously explained, Rule 16 should be read broadly. Op. (April 28, 2014) at 6. The Ammerman Report is notably not an investigatory report of the Justice Department but a report of the 9/11 Commission. Even assuming the Squad IT-3 document is an investigatory report and, therefore, undiscoverable under Rule 16(a)(2), the government's argument that the document is exempt only prevails if Squad IT-3 is considered inculpatory rather than exculpatory. *See United States v. Fort*, 472 F.3d 1106, 1110 (9th Cir.

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

2007) (holding that investigatory reports (such as an FD-302) fall under the exemption unless exculpatory). *See also*, *United States v. LiCausi*, 167 F.3d 36, 51 (1st Cir. 1999); *United States v. Garrett*, 238 F.3d 293, 304 (5th Cir. 2000) (noting that documents were non-producible under Rule 16(a)(2) unless mandated by *Brady*); *United States v. Horvwalt*, No. 93-5193, 1995 WL 478148, at *2 n.1 (4th Cir. Aug. 14, 1995) ("Although the government argues that it was entitled to refuse discovery of any alleged police reports under Rule 16(a)(2) of the Federal Rules of Criminal Procedure, this rule does not override the constitutional mandates required by *Brady* and *Giglio*.")

Other courts have stressed that any exemptions are confined to "documents that are made in connection with investigating or prosecuting [a present] or any other case against a defendant." *Fort*, 472 F.3d at 1114. Ironically, this was the very distinction that government relied upon—the distinction between intelligence investigations and prosecutions—in explaining the testimony of Ammerman. Unless such documents were created in connection with the criminal investigation or prosecution of Dr. Al-Timimi, they should be discoverable. This is further confirmed by the Third Circuit, which has held that an ATF report is not exempt under 16(a)(2) where "the ATF Report was a computer-generated printout from a government database maintained for broader purposes than the prosecution" of the defendant. *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 257 (3d Cir. 2005).

There is no question of this Court's power to order the relief sought in this motion when faced with allegations of withheld discovery and potential perjury or misrepresentation. "The purposes underlying the use of [district] courts' supervisory powers are broad and include implementing remedies for violations of recognized rights and remedies designed to deter illegal conduct." *Fahie*, 419 F.3d at 258. "Unquestionably, such powers include the authority to order

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

appropriate discovery which would illuminate the fundamental issue." *United States v. Siriprechapong*, 181 F.R.D. 416, 430 (N.D. Cal. 1998). In this case, an appropriate discovery order would require the government to supply a detailed affidavit—resembling the Vaughn index employed in FOIA litigation—which would include the documents in the numerical series referenced in Squad IT-as well as any other undisclosed documents involving Al-Timimi or key figures in his case (including but not limited to trial witnesses as well as Al-Buhti, Hawali, Aulaqi, and Khalid) in relation to the paintball investigation, terrorism investigations, LET. This affidavit would allow the Court to make a "reasoned independent assessment" of whether *Brady* requires the disclosure of these documents, as well as give the opposing counsel an opportunity to effectively argue the exculpatory (or impeaching) nature of the documents. *Vaughn v. United States*, 936 F.2d 862, 867 (6th Cir. 1991); *cf. Campaign for Responsible Transplantation v. FDA*, 219 F. Supp. 2d 106, 116 (D.D.C. 2002) ("Without a proper Vaughn index, a requester cannot argue effectively for disclosure and this court cannot rule effectively.").

*Materiality.*    At trial, the Court adopted a broad approach to materiality in overruling objections to the incorporation of such evidence as the Space Shuttle article. At the time, the Court stated that, even though the Space Shuttle commentary did not address the underlying crimes or conduct (and occurred 16½ months after the alleged September 16, 2001 criminal solicitations), it was still admissible to show intent. In the December 3, 2004 hearing, the Court made clear that "the intent of the defendant is going to be a critical factor in this case, and obviously, statements that a defendant makes are a very significant piece of evidence to one's intent." Hr'g Tr., Dec. 3, 2004 [Dkt. No. 144] at 34; *see also id.* ("In other words, I think the probative value is so critical because the statements of a defendant are important windows into that person's intent."). On December 30, 2004, the Court emphasized again the "the heart and

Case 1:04-cr-00385-LMB   Document 416   Filed 09/01/15   Page 15 of 30 PageID# 1709

soul of this case" involves the words of Dr. Al-Timimi and the "intent of those words." Hr'g Tr.,

Dec. 30, 2004 [Dkt. No. 40], at 7. The Court decided to adopt a broad standard of materiality

despite First Amendment concerns:

> But the reaction of the defendant and statements that he made about those events are
> clearly relevant again to the state of mind and what the defendant intended when he met
> with various people. So I recognize that it's problematic, and I recognize that this case is
> permeated with First Amendment issues.

Hr'g Tr., March 18, 2005 [Dkt. No. 146], at 35.

The government has insisted that Dr. Al-Timimi's statements *to anyone at any time* were

material when they dealt with 9-11, terrorism, disasters, his views of Islam, or the United States

generally. This previously broad view of materiality was expressed in the Government's

Response to Defendant's Pretrial Motion:

> At the least, Timimi's statement regarding the Space Shuttle is relevant and material to
> the proof against him because it shows his motive to counsel his followers to aid the
> Taliban, levy war against the United States. Similarly, it is relevant and material because
> it further shows that his advice and counseling to Kwon, Hasan, Khan, Royer, and the
> others was not inadvertent or made by mistake, and it was not misheard by his listeners.

Dkt. No. 16 at 11 n.4. Indeed, the government viewed lectures made over a twelve year period

as material to the trial. In its post-trial motions, the government emphasized that the case turned

on what Dr. Al-Timimi understood and advocated as the proper course of Muslims in the post

9/11 world:

> Yet, where Timimi was charged with soliciting treason, it was proper to argue to the jury
> what Timimi believed Muslims were religiously obligated to do, because his intent was
> an essential element of the charges against him. Accordingly, it plainly was for the
> United States to argue that the evidence established that, after 9/11, Timimi believed that
> Muslims were obligated to fight against American troops in Afghanistan, because that
> belief helped to establish his criminal intent.

Gov't Resp. to Def.'s Post-Trial Motions [Dkt. No. 125] at 12. The government stressed

that his alleged views were "corroborated by captured e-mails and publicly – available

writings and speeches, in which Al-Timimi espoused support for the Taliban, support for

Al-Qaeda, and hatred for the United States." Gov't Opp. to Def.'s Mot. For Access to

Records of the 9/11 Comm. [Dkt. No. 35], at 3. The government agreed that any topics

or subjects raised by the indictment are material, including such general subject

categories as "peace." Hearing Tr., Jan. 28, 2005 [Dkt. No. 145], at 7 ("Your Honor, I

agree with what Mr. Yamamoto said, that if they are discussing making peace, that could

be *Brady*, and if we have such a thing, it would be turned over, but just conversations

about anything other than the topic of the indictment is not *Brady* . . . ").

It is difficult to see how the government can now claim that associations, meeting,

and statements of Dr. Al-Timimi specifically related to international terrorism and

specific actors from his trial would not meet this broad standard. These two documents

(and potentially those documents referenced within) contain material information related

to four general areas: (1) pre-2003 investigations; (2) the alleged Al-Qaeda connection of

Dr. Al-Timimi; (3) Dr. Al-Timimi's interaction with Anwar Aulaqi; and (4) witness

testimony and impeachment.

**(1) Pre-2003 investigations**. As discussed above, from pre-trial to the post-remand

proceedings, one issue has remained predominant: the insistence that no material investigation

of Dr. Al-Timimi occurred before 2003. In both pre-trial and post-remand hearings, the

government insisted that there was no material FISA intercepted evidence or investigations that

pre-dated 2003. On remand, Mr. Kromberg answered affirmatively when expressly and

unambiguously asked to confirm the court's understanding that "the government insists that there

was no material investigation of Timimi until 2003."[8] On its face, the Squad IT-3 document is

---

[8]     In 2006, Dr. Al-Timimi's trial counsel wrote a letter to the court stating that, during the

Case 1:04-cr-00385-LMB   Document 418   Filed 09/01/15   Page 17 of 30 PageID# 1711

itself evidence of a material investigation before 2003 and refers to hundreds of other potential

material documents.[9]  After the disclosure of pre-2003 investigations during the remand, the

government argued (and this Court accepted) that "there was a mutual understanding before trial

that defendant had been on the government's radar for several years before the criminal

investigation started in 2003." Mem. Opinion, April 28, 2014, at 17 [Dkt. No. 350]. Trial

counsel MacMahon has filed multiple declarations refuting such an understanding and stating

that he was repeatedly told that there was no prior investigation and accordingly evidence to

review from such investigations. *See* Exhibit D (2006 MacMahon Declaration); Exhibit E (2013

MacMahon Declaration); Exhibit F (2015 MacMahon Declaration).  This defense understanding

was reaffirmed with the testimony of Special Agent Ammerman that the investigation began in

early 2003. (Trial Tr., April 11, 2005 [Dkt. No. 152], at 1337:6; *see also* Hr'g Tr., Jan. 16, 2007

[Dkt. No. 220] at 38:9-11, (court stating that the government "insists that there was no material

investigation of Timimi until 2003").  Moreover, specifically in relation to FISA, in the recently

declassified pre-trial CIPA documents, the government told this Court that "Defendant Al-

Timimi did not become the subject of FISA electronic surveillance until January 2003." Gov't

---

course of representing another client, he had come across 9/11 Commission documents
indicating that Dr. Al-Timimi had been the subject of a government investigation long before the
period of time stated by the government. Later, FBI Agent Christopher Mamula testified on the
limited efforts to find the information using paper finding aids (Hr'g Tr. 13:25-42:7, Jan. 16,
2007 [Dkt. No. 220]). A limited number of documents from the 9/11 Commission records,
allegedly containing Dr. Al-Timimi's name, were turned over to the Court *ex parte*. Dr. Al-
Timimi, however, was denied access to this material through cleared counsel and to conduct his
own search. (Dkt. No. 231). It now appears that some of these missed documents involved
Mamula himself and statements that he gave (and presumably recalled) giving to the 9/11
Commission.

[9]      Notably, a search of the National Archives by Special Agent Chris Mamula of pre-9/11
documents produced no additional documents. While lead defense counsel examined Special
Agent Mamula and questioned his method of reviewing the available files, Mamula insisted that
he was "looking for anything that certainly could point us to the issue of Al-Timimi." Hr'g Tr.,
Jan. 16, 2007 [Dkt. No. 220] at 26.

Ex Parte In Camera Reply [Dkt. No. 66], at 1 n.1.

The Ammerman Report reaffirms Ammerman's role on the "squad" and the IT investigation involving Dr. Al-Timimi. This report is coming directly from an interview with a key witness at the trial of Dr. Al-Timimi who is discussing pre-2003 investigations into the very associations and activities—including the "paintball" activities—that were used for the search warrant, indictment, and trial of Dr. Al-Timimi. In addition, the Ammerman Report again reaffirms that Ammerman and the WFO were closely monitoring Aulaqi's movement and were responsible for his entry into the country shortly before he visited Dr. Al-Timimi. Ammerman's knowledge of the visit appears to be based on either surveillance, witness statements, or field reports. Likewise, the investigation and surveillance of the Dar Al-Hijrah mosque directly relates to co-conspirators and witnesses at trial. Defense counsel sought to establish that the conspiracy to travel to Pakistan was formed and planned at the Dar Al-Hijrah mosque (which Al-Timimi did not attend), and not the Dar Al-Arqam learning center where Al-Timimi lectured.

### 2. The Al-Qaeda Allegation

From the outset of this case, the government sought to associate Dr. Al-Timimi with Al-Qaeda and international terrorism. For example, in his affidavit supporting the search warrant in this case, Special Agent Ammerman repeatedly referenced Al-Qaeda and stated that Dr. Al-Timimi mirrored the views of the organization, associated with Al-Qaeda suspects, and used his position to get young Muslims to fight alongside Al-Qaeda. *See* Exhibit E (2013 MacMahon Declaration). The filing made in lieu of a bill of particulars also referenced Al-Qaeda repeatedly and stressed Dr. Al-Timimi's connection to "Foreign Terrorist Organizations." Gov't Response to Def.'s Supp. Pre-Trial Motions [Dkt. No. 23], at 7 ("Attempting to conspire to provide material support and resources to foreign terrorist organizations"). Al-Qaeda was repeatedly

raised in both the original indictment, *see* Dkt. No. 1 at 2-3, and the final superseding indictment. *See* Dkt. No. 47 at 2-3.

The government then proceeded to raise Al-Qaeda repeatedly at both pre-trial and trial.[10] Indeed, in pre-trial hearings, the defense objected to the continued effort to bring the Al-Qaeda allegation into the trial given the lack of any disclosure or explanation of Dr. Al-Timimi's association or connection to Al-Qaeda. *See, e.g.*, Def.'s Motion in limine Regarding Items Found in Search of Masoud Khan's House [Dkt. No. 54] at 3. For example, the government emphasized the Al-Qaeda connection in Jury Instruction 44h, over the objections of the defense. Jury Instruction 44h ("Attempting and conspiring to provide material support and resources to Al-Qaeda, in violation of Title 18, United States Code, Section 2339B"); Tr. Vol. 8 [Dkt. No. 155] at 2170 (objections to the Al Qaeda association); Tr. Vol. 9 [Dkt. No. 156] at 2178 (same). Special Agent Wyman (who is referenced in Squad IT-3) expressly raised "Al-Qaeda and [the FBI] effort to investigate the risk of detonating a weapon of mass destruction in the United States." Tr. Vol. 7 [Dkt. No. 154] at 1772 ("Well, in addition to the, you know, the investigating – investigation we were conducting, we knew of extensive ties between Timimi, Hawaali, and other elements of the broader Al-Qaeda network."). Ammerman also raised the threat of Al-Qaeda. Vol. 6 [Dkt. No. 153] at 1441 ("There's long been a concern that Usama Bin Laden or someone in the Al-Qaeda network may attempt to detonate a Weapons of Mass Destruction device in the United States, so we were concerned not only about Usama Bin Laden and Al-Qaeda itself but also those who were associated with him."). While the defense continued to object to the references to Al-Qaeda, it did not have any evidence, such as the Squad IT-3 document, to show that these very agents were part of earlier investigations into Al-

---

[10]     This included the government's calling witnesses to testify on Al-Qaeda. Gov's Resp. to March 2005 Motions as to Ali Al-Timimi [Dkt. No. 62] at 9, 11.

Qaeda. Consequently, it was unable to use such evidence to argue for the exclusion of the Al-Qaeda evidence or to cross-examine these witnesses regarding the links with Al-Qaeda. The government has even sought to tie an Al-Qaeda investigation to Dr. Al-Timimi in briefing in other cases before the Fourth Circuit.[11]

The Ammerman Report further shows that Dr. Al-Timimi was subject to investigations of these connections in which Ammerman, who would later testify to these investigations, participated. The files referenced in the Squad IT-3 document (indicating a large body of material related to Dr. Al-Timimi) are reinforced by Ammerman's statements on prior investigations concerning international terrorism and various persons who would be featured in Dr. Al-Timimi's trial.

### 3. The Anwar al-Aulaqi Association

Anwar al-Aulaqi was the widely acknowledged influence behind the attacks by Nidal Malik Hasan, an Army psychiatrist convicted of the 2009 Fort Hood shootings, and Umar Farouk Abdul Mutallab, who, in 2009, attempted to blow up Northwest Airlines Flight 253, and himself.[12] Ultimately, President Obama ordered Aulaqi killed in a drone attack in Yemen on September 30, 2011. There is growing evidence that Ammerman personally intervened to release Aulaqi and that Ammerman was corresponding with Aulaqi during the Virginia Jihad trial.[13] Shortly after Ammerman's intervention in 2002, Aulaqi showed up, unannounced, at Dr.

---

[11]    In its brief in the Sabri Benkahla appeal, the government told the Fourth Circuit that "[i]n 2004, the FBI was investigating individuals suspected of connections to Al-Qaeda. This included Timimi, because Timimi had been a student of Hawali, a Saudi cleric associated with Bin Laden." Brief for the United States, *United States v. Benkahla* 07-4778 at 13. In fact, as indicated in Squad IT-3 document, it was investigating this connection before 2003.

[12]    Brian Ross and Lee Ferran, *How Anwar al-Awlaki Inspired Terror From Across the Globe*, ABC News (Sept. 30, 2011), http://abcnews.go.com/Blotter/anwar-al-awlaki-inspired-terror/story?id=14643383#.UeSXyNKsjTo.

[13]    Both this information, and the connection to Al-Timimi, has been featured in the media.

Al-Timimi's home in an attempt to recruit him for terrorism. The Squad IT-3 document shows conclusively that Dr. Al-Timimi was the subject of an earlier investigation into that very association.

Dr. Al-Timimi has sought information not only about the October 2002 visit but also about Aulaqi's relationship with other witnesses and parties involved in the investigation of the "Virginia Jihad," and the activities surrounding Dr. Al-Timimi. In addition to the earlier pre-trial demand, Dr. Al-Timimi has repeatedly requested this information during the remand period[14] and sought alternative sources for information.[15]

When the Aulaqi information led to renewed demands for discovery and charges of prior misrepresentations to this Court and prior counsel, Mr. Kromberg assured the Court that the government did not know about the visit to Dr. Al-Timimi's house before 2003. The Ammerman Report shows that the government certainly knew about the visit in 2003 but not how or when it was first informed of that information. However, Squad IT-3 clearly shows pre-

---

*See, e.g.*, Catherine Herridge, *Disagreement Over Whether 9/11 Hijackers Had Support Inside U.S., Report Says*, Fox News (March 27, 2015), http://www.foxnews.com/politics/2015/03/27/disagreement-over-whether-11-hijackers-had-support-inside-us-report-says/ ("Details of al-Awlaki's re-entry, the role agent Ammerman played, and the cleric's appearance in the Timimi case were not provided to Timimi's defense during his original trial, and continue to be withheld during his appeal.")

[14]     Def.'s (Redacted) Mem. In Supp. Mot. To Compel Discovery Related to Anwar al-Aulaqi [Dkt. No. 335] at 7-8; see also *id.* at Ex. F at 5 (Sept. 14, 2007 discovery letter from Jonathan Turley to Gordon D. Kromberg seeking "Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators" including Aulaki documents or surveillance, including but not limited to his "visit to Dr. Al-Timimi's home in October 2002 when he was accompanied by Nabil Gharbieh and Rubeel Iqbal").

[15]     This included the NARA 9/11 Commission-related records. In September 2012, after negotiating issues of scope and search terms with NARA, defense counsel received permission from NARA authorities to search its electronic database of 9/11 Commission-related documents for material relevant to this remand. Defense counsel was not permitted to view any of the 9/11 Commission documents containing Dr. Al-Timimi's name, and was able to view only a declassified subset of those documents containing Aulaqi's name.

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

2003 connections between Aulaqi and Dr. Al-Timimi in one or more investigations and that Aulaqi was under intense surveillance during that period of the visit to Dr. Al-Timimi's house.

The Ammerman Report shows more links between Aulaqi and Dr. Al-Timimi by not just the investigations before 2003 but the very witness who testified on the investigations leading to the indictment of Dr. Al-Timimi. This document also directly references the visit to Dr. Al-Timimi's home that has been the subject of ten years of defense inquiries and yet never revealed. Ammerman's knowledge of the visit further indicates an undisclosed source of knowledge either in the form of surveillance, a witness, or an asset (including the possible cooperation of Aulaqi himself or associates like Nabil Gharbieh and Rubeel Iqbal). Notably, the document also refers to the interest of the FBI in Aulaqi's pattern of seeking "closed door meetings" with potential recruits, including his meeting with some of the 9/11 hijackers. *Id.* at 2-3.

### 4. The Calling and Examination of Witnesses

Without repeating the analysis above, all of these issues are also directly related to the calling of witnesses, including Aulaqi, or the examination or impeachment of witnesses like Ammerman. Ammerman's knowledge of the visit and interaction with Aulaqi stands in stark contrast to the statements to prior defense counsel, Mr. MacMahon, who has said that Mr. Kromberg told him that the government had no knowledge of such a visit or the whereabouts of Aulaqi. Again, Mr. MacMahon has supplied three sworn declarations directly contradicting representations made to this Court by Mr. Kromberg on these discovery issues. *See* Exhibits D, E, F.

These documents also serve to further undermine the credibility and knowledge of Ammerman. Ammerman was put on the stand to share his expertise in identifying and investigating international terrorists in relation to his work on the Virginia Jihad investigation.

First and foremost, Ammerman is accused of playing a critical role in not only facilitating the release of Aulaqi from custody at the airport and entry into the United States but, ultimately, his ability to leave the country where he assumed a high-ranking position in Al-Qaeda. These documents reinforce a growing view that Aulaqi manipulated Ammerman and the FBI in securing his own release and entry, even when both Ammerman and the FBI were aware (as discussed in this document) that he could be criminally charged. Yet, neither Ammerman nor the FBI used those crimes to arrange the arrest of Aulaqi and instead facilitated his entry and allowed his exiting from the country. Instead, Ammerman and his office targeted people like Dr. Al-Timimi for investigation and prosecution, while allowing Aulaqi to roam free and ultimately leave the country where he would help lead Al-Qaeda. As previously noted with the Court, Congress has demanded answers on how the arrest warrant in Colorado could have been rescinded, as Special Agent Ammerman apparently claimed to Customs officials that day, since no one would presumably have been at the local U.S. Attorney's office in Colorado at the time of Aulaqi's arrest at the airport. *See* Aug. 15, 2012 Letter from Congressman Frank R. Wolf to FBI Director Robert Mueller [Dkt. No. 335-8], at 8 (noting that the questionable timeline of events surrounding al-Aulaqi's release from detention on October 10, 2002 has "never been adequately explained," and asking if the Washington Field Office of the FBI (the "WFO") and Agent Ammerman "want[ed] Aulaqi released to assist in [the] investigation of Timimi"). Ammerman took these extraordinary actions despite prior reports tying Aulaqi to Al-Qaeda.[16] On October

---

[16] On October 1, 2002, the WFO transmitted a memorandum marked "secret" and "priority" to FBI headquarters; the unredacted portion of the subject line of this memo reads, "Aulaqi." (marked as AWLAKI-895-898). Then, on October 3, 2002, the Director of the FBI authored a Secret Memo, referencing a National Security investigation by the Washington Field Office ("199N-WF-222852"). (*Id.* at 5-6, AWLAKI-899-900). The subject of this fully redacted memorandum is "Anwar Aulaqi; IT-UBL/Al-Qaeda." (*Id.*) Seven days later, al-Aulaqi entered the United States with Special Agent Ammerman's apparent assistance; that same day, a fax was

22, 2002, the WFO sent a memorandum to the Counterterrorism Unit titled "Anwar Nasser Aulaqi, IT-UBL/AlQaeda, OO:WFO," whose synopsis contains the term "asset reporting." See Dkt. No. 335-9, at 14. Other newly released documents highlight the startling efforts expended by the Department of Justice in allowing Aulaqi to remain free in the United States in 2001 and early 2002.[17] In 2001 and early 2002, the new documents show, Aulaqi was under surveillance by the FBI. *Id.* During this surveillance, the FBI observed Aulaqi engage prostitutes at local hotels, and indeed interviewed the prostitutes. *Id.* Despite witnessing the commission of these crimes, the FBI did not arrest him or even detain him. *Id.* This accommodation of Aulaqi continued despite the fact that, according to another document obtained this month, a "computer database record" in February 2002 listed Aulaqi's name with the warning to "approach with caution" under the heading of "terrorist organization member." *Id.*

The government now says that confirmation that Ammerman's office had prior investigations targeting Dr. Al-Timimi as well as Aulaqi and Al-Qaeda would not be discoverable under any of the orders pre-trial or post remand. That position is itself telling and alarming in the context of this case. For example, the Court accepted the claim that there was "no material investigation" of Dr. Al-Timimi before 2003. *See* Special Agent Ammerman affirmatively testified at trial that the investigation of Dr. Al-Timimi began in February 2003. (Trial Tr., April 11, 2005 [Dkt. No. 152] at 1337:6; Hr'g Tr., Jan. 16, 2007 [Dkt. No. 220] at 38:9-11).[18] In his Affidavit in Support of Application for Search and Seizure Warrants on Dr. Al-

---

sent from the FBI at JFK airport that included Aulaqi's plane ticket, customs form, passport and Social Security card. (*Id.* at 7-13, AWLAKI-901-907).

[17]    Catherine, Herridge, *Terror leader Awlaki paid thousands for prostitutes in DC area, documents show,* Fox News, July 2, 2013, http://www.foxnews.com/politics/2013/07/02/terror-leader-awlaki-paid-thousands-for-prostitutes-in-dc-area-documents-show/#ixzz2ZEUUxkCK.

[18]    Notably, Ammerman was asked "were you involved in the investigation of Ali Al-Timimi and others here in Northern Virginia?" Trial Tr., April 11, 2005 [Dkt. No. 152] at 1337.

Case 1:04-cr-00385-LMB    Document 418    Filed 09/01/15    Page 25 of 30 PageID# 1719

Timimi's house, Ammerman states that he was made aware of Dr. Al-Timimi's activities at the

Dar Al-Arqam mosque on November 19, 2002, following a tip from a confidential informant.

Ammerman Aff. at ¶ 17. Later in the affidavit, Special Agent Ammerman indicates that he had

never heard of Dr. Al-Timimi before that same tip. *Id.* at ¶ 21 ("*Upon learning of Timimi* from

CI-1 and CI-2…I researched Timimi on the internet.") (emphasis added).[19] Thus, not only does

this document call into question Special Agent Ammerman's assertion that the investigation of

Dr. Al-Timimi began with a confidential tip only one day after this decision, but it casts into

even deeper doubt the government's bedrock contention during this remand, that there are no

intercepts material to Dr. Al-Timimi's defense that have not already been disclosed.

It now appears likely that Special Agent Ammerman must have known about Dr. Al-

Timimi before that "tip," given his undisputed involvement in the Aulaqi matter. Had this

evidence been disclosed to the defense before trial, Special Agent Ammerman would have been

examined on the stand as to his claimed lack of knowledge regarding Dr. Al-Timimi before the

"tip." The defense could also have explored Special Agent Ammerman's role in facilitating,

directly or indirectly, an effort by Aulaqi to use Dr. Al-Timimi for possible terrorist activities. If

---

The question was not just about Dr. Al-Timimi but the group of individuals. He affirmed that
the investigation began in 2003. He was then asked "how did that investigation begin" and he
answered that it began with search warrants. *Id.*

[19]     Special Agent Ammerman's alleged tip came just one day after the United States Foreign
Intelligence Court of Review ruled that the Foreign Intelligence Surveillance Act did not require
the government to show the FISA court that its primary purpose in conducting electronic
surveillance was not criminal prosecution. *See generally In re Sealed Case*, 310 F.3d 717, 746
(FISA Ct. Rev. 2002). In an August 13, 2003, 9/11 Commission Memorandum for the Record,
obtained by defense counsel, Duncan Wainwright, Assistant Division Counsel for the FBI WFO,
stated that this decision led to a great deal of previously forbidden information sharing between
intelligence and criminal investigators. *See* Memorandum for the Record, Interview of Duncan
Wainwright, Assistant Division Counsel, WFO, FBI by 9/11 Commission [Dkt. No. 335-11], at 4
(Aug. 13, 2003). Moreover, he explicitly admits that the criminal prosecution of the "Virginia
Jihad" case was one of only a few criminal cases resulting from the sharing of such FISA
information. *Id.* This same memorandum appears to reference AUSA Kromberg as being "very
supportive" of a related effort. *Id.* at 5.

Special Agent Ammerman or the government wanted Aulaqi to be able to conduct such meetings in the United States, it bears directly on his relationship with the government and the purpose of such meetings. Finally, the information would have also allowed the defense to pursue potential exculpatory evidence from the exchange between Aulaqi and Dr. Al-Timimi.[20]

In addition, the Ammerman Report reveals other plainly relevant information that would have been the subject of further discovery requests and examination at trial. This includes Ammerman's manifest lack of knowledge about the underlying facts concerning key figures and locations. First, the Commission reports that Ammerman told them that Aulaqi's meetings with men like the 9/11 hijackers or potential recruits are "nothing to be alarmed about." Exh. C at 2-3. Second, the document shows glaring errors in Ammerman's knowledge of key figures and places in the Al-Timimi case. For example, he states that Dr. Al-Timimi was the "imam of the Dar Al-Arqam mosque." Exh. C at 3. Dr. Al-Timimi was not the imam of the Dar Al-Arqam, which shows a fundamental misunderstanding of his role as well as the structure of the Center. Not only was the key investigator wrong about who was the imam (it was Haytham Hantash), but also his focus was on the Dar Al-Hijrah mosque, not Dar Al-Arqam. Dr. Al-Timimi had nothing to do with Dar Al-Hijrah. Third, as noted earlier, Ammerman stated under oath that the investigation began in early 2003. (Trial Tr., April 11, 2005 [Dkt No. 152] at 1337:6); *see also* Hr'g Tr., Jan. 16, 2007 [Dkt. No. 220] at 38:9-11. Indeed, as noted above, Ammerman said that he received an anonymous tip and had to go to the Internet to look up Dr. Al-Timimi's name. Ammerman Aff. at ¶ 21. Yet, this document shows Ammerman discussing his prior knowledge of and focus on Dr. Al-Timimi. Former lead counsel has submitted multiple sworn statements

---

[20]     This information also has bearing on any prior undisclosed surveillance related to Aulaqi and Al-Timimi. The high degree of surveillance reflected in these new sources strongly suggest electronic and physical surveillance that remains undisclosed in the case.

directly contradicting the government's claim that there was an "understanding" that Dr. Al-Timimi was previously under investigation, noting that the government denied such investigations to him and his colleagues. This new document not only corroborates the defense's position, but also further shows that Ammerman had given formal interviews on that very body of evidence. Ammerman could have and would have been impeached on his statement that the investigation of the Virginia Jihad started no later than June 2002. Ammerman insisted on the stand that the investigation began with the raid. Trial Tr., April 11, 2005 [Dkt. No. 152], at 1337.

Ammerman is not the only witness who would have been questioned on the basis for these documents (and the documents referenced within them). The information could also have been used to examine Khwaja Mahmood Hasan, Nabil Gharbieh,Rubeel Iqbal, and other suspects on their role in this critical period, particularly in relation to the Aulaqi visit. The information would have also led trial counsel to question FBI Agent Mamula about statements made to the 9/11 Commission about Aulaqi and Hamad Abdur-Raheem. Mamula is referenced in the document, and also spoke with the 9/11 Commission, telling them that Hammad Abdur-Raheem was under surveillance during 9/11. Abdur-Raheem was listed in Count 2 of Dr. Al-Timimi's superseding indictment for Solicitation to Levy War. Mamula also told the 9/11 Commission that he works for Don DeMay and had three assets in the investigation. These two documents would have raised Mamula's own conflicting account to the Commission and particularly the later disclosure that he not only had three assets running in the investigation but that Mamula was the one who visited Gharbieh's residence in November 2002. Likewise, these documents would have been used to examine Mr. Wyman and his knowledge from the prior investigations and findings. These include the Squad IT-3 work that investigated Dr. Al-Timimi

for the underlying conduct and associations alleged in this trial. Indeed, at the outset, Wyman

testified as to his background and knowledge of the "investigation of Yong Kwon, Mahmood

Hasan, Masaud Khan, and the other individuals" associated with the case and underlying actions.

Trial Tr., April 12, 2005 [Dkt. No. 153], at 1510. While the government asked Wyman about his

interaction with key witnesses like Royer, Abdur-Raheem, and others, he was specifically asked

about when he first "met" these key witnesses in person. *Id.* at 1515. The government was

already aware that Wyman and his colleagues had prior investigations of some of these key

witnesses and the content of those documents remain undisclosed to the defense to this date.

Likewise, Wyman testified to changing the information for the superseding indictment based on

interviews with Dr. Al-Timimi but never revealed that he was also working with a host of

information that pre-dated 2003. *Id.* at 1627-28. This specifically included his interaction with

Al-Buthe and Al-Haramayn (referenced in the new documents). *Id.*

The obvious conflicts between representations made to the Court and made under oath by

government witnesses raises core due process issues that should not be kept from the

consideration of either the district court or the appellate court. *See United States v. Kelly,* 35

F.3d 929, 933 (4th Cir. 1994) (citing *Napue v. Illinois,* 360 U.S. 264, 269 (1959)); *Hall v. United*

*States,* 30 F. Supp. 2d 883, 891-92 (E.D. Va. 1998). Such misrepresentation denies the

fundamental rights of a defendant "whether the government solicited testimony it knew or should

have known to be false or simply allowed such testimony to pass uncorrected." *Hall,* 30 F.

Supp. 2d at 891-92 (citing *United States v. Agurs,* 427 U.S. 97, 103 (1976)). The seriousness of

such an allegation has been repeatedly recognized by the Supreme Court, which has held that

convictions must be set aside when there is "any reasonable likelihood that the false testimony

could have affected the judgment of the jury." *Agurs,* 427 U.S. at 103; *Hall,* 30 F. Supp. 2d at

Case 1:04-cr-00385-LMB   Document 416   Filed 09/01/15   Page 29 of 30 PageID# 1723

891. This includes not only when there is a question of false evidence on the merits of the allegation (as here), but also when there is evidence that calls the credibility of witnesses into question. *Agurs*, 427 U.S. at 103. As noted in *Napue,* "the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." 360 U.S. at 269. In the instant case, the jury heard not only a misleading timeline of the underlying investigation of Dr. Al-Timimi, but also was not informed of investigations looking specifically into the issues raised during the trial, including the alleged association with Al-Qaeda. In addition, the very agents testifying were involved in the earlier investigations and had knowledge of the falsity of the representations made at trial.

## CONCLUSION

In light of the foregoing, Dr. Al-Timimi respectfully requests that the Court order the disclosure to cleared lead counsel of the unredacted copies of the Squad IT-3 and Ammerman Report documents, and further order the creation of an index of all related documents and evidence pertaining to Al-Timimi. The index should include all documents and evidence related to the investigations referenced in the Squad IT-3 and Ammerman Report documents, as well as any other undisclosed evidence pertaining to Al-Timimi that relates to international terrorism investigations, Aulaqi, the Virginia Jihad or paintball case, and any of the witnesses or key figures raised in that investigation. In creating the index, the government should conduct searches that include all reasonable spelling variations of "Aulaqi" and "Al-Timimi"—including but not limited to "Awlaki" and "Tamimi." The index should further include the title, date, author (including agency, office, and officer who produced or wrote the document), and a brief description of the document in how its content relates to the aforementioned material elements.

Respectfully submitted,

_____/s/_____

Thomas Michael Huff, Virginia Bar No. 73587
Thomas M. Huff, Attorney-at-Law (Local Counsel)
P.O. Box 2248
Leesburg, VA 20177
Telephone: 703.665.3756
Facsimile: 571.354.8985
thuff@law.gwu.edu

Jonathan Turley (*pro hac vice*, lead counsel)
The George Washington University Law School
2000 H Street, NW
Washington, D.C. 20052
(202) 994-7001 (telephone)
(202) 508-6200 (facsimile)
jturley@law.gwu.edu

Attorneys for Defendant Ali Al-Timimi

Dated: August 31, 2015