IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:04cr385 |
| | ) | |
| ALI AL-TIMIMI | ) | |

OPPOSITION TO MOTION TO COMPEL

On August 31, 2015, Ali Al-Timimi moved this Court to compel the United States to

provide to his counsel unredacted copies of two redacted documents that he obtained from the

National Archives and Records Administration ("NARA").  The motion should be denied because

Al-Timimi is no more entitled to those documents now than he was when his request for the same

documents was first denied in 2007.[1]

I.      The Documents in Question Were Previously Filed with the Court

In July 2013, Al-Timimi (hereinafter "Timimi") moved to compel discovery regarding

Anwar Al-Aulaqi (hereinafter "Aulaqi").  At that time, he suggested that a) in October 2002,

Aulaqi may have been a government agent controlled by FBI Special Agent ("SA") Ammerman;

(b) in October 2002 - - and perhaps at the behest of SA Ammerman - - Aulaqi solicited Timimi to

recruit young Muslim men for jihad; (c) Timimi refused Aulaqi's solicitation; and (d) the

government possessed information documenting Timimi's refusal of Aulaqi's solicitation; but

---

[1]  This pleading in opposition to the defendant's motion was not filed until November 5, 2015, because even though the defendant's motion was apparently placed on the public docket in unclassified form on October 6, 2015, *see* Docket #418, undersigned counsel was not aware of its placement on the public docket until the defendant referenced it in a status report to the Fourth Circuit filed on November 4, 2015.

(e) the government failed to provide it in discovery in order to protect itself from the embarrassment it would suffer if it became known that it had used Aulaqi as an informant.  Docket ##300, 301, 307.  In April 2014, this Court ruled that the government had not violated its discovery obligations with respect to information regarding Aulaqi, and denied Timimi's motion.

Now, Timimi claims that the unredacted copies of the so-called "Squad IT-3" Document and the memorandum for the record of the 9/11 Commission regarding its interview of FBI SA Ammerman (hereinafter "the Ammerman Memo") will corroborate his suggestions about the relationships between Aulaqi, Timimi, and SA Ammerman.  Because unredacted copies of both documents were filed with this Court in this very litigation years ago, however, the Court already knows that neither document supports Timimi's speculations in any way.

By order of August 14, 2015, this Court directed the United States to provide to the Court an unredacted copy of the Squad IT-3 Document.  The United States did so that same day.  At that time, however, undersigned counsel had forgotten that he had filed a copy of that same unredacted document with this Court in this same case more than eight years earlier.  Indeed, that same document was filed with this Court on February 20, 2007, as Attachment 10 to Docket #212, the Government's Ex Parte and Under Seal Classified Filing Regarding Documents from the NARA Database.  Moreover, the Ammerman Memo was previously provided to the Court on that same date, as Attachment 32 to that pleading.  In short - - and regardless of any other reason - - Timimi's argument today that evidence about his meeting with Aulaqi was withheld from him before 2005 should be rejected because the Court considered the significance of that very evidence in 2007, and recognized it at that time to be irrelevant to Timimi's defense.

II.     Procedural History

If government counsel had recognized before Timimi moved to remand the case again that

the Squad IT-3 Document and the Ammerman Memo had both been filed with this Court in 2007,

it is possible that the second remand never would have happened; for that lapse government

counsel apologizes to the Court and to Timimi (who had no way of knowing that the documents

had been filed with the Court eight years earlier).  Nevertheless, the fact that government counsel

failed to recognize in early 2015 that the documents that Timimi now seeks had been produced to

the Court in 2007 is a manifestation of the difficulties faced by the parties in litigating today

allegations about what occurred more than a decade ago.  In light of those difficulties, we

recapitulate here parts of the case's procedural history that are relevant to the posture of the case

today:

1.  On September 23, 2004, Timimi was indicted for counseling and inducing others to

conspire to levy war against the United States, aid the Taliban, aid Lashkar-e-Taiba, violate the

Neutrality Act, and to use firearms and explosives in furtherance of those underlying crimes of

violence.  Docket Item #1.[2]

2.  At the time of the indictment, Timimi was represented by attorneys Martin McMahon

and James Vann.  Docket Items #3, 5.   Upon their withdrawal from the case shortly thereafter,

Edward MacMahon appeared as Timimi's new counsel.  Docket Items #14, 15.

3.  On November 19, 2004, Timimi moved the Court to order the government to provide

tapes or debriefing notes of the conversation that he claimed to have occurred between Timimi and

Aulaqi in October 2002.  In support of that motion, Mr. MacMahon wrote:

---

[2]  A superseding indictment was returned on February 3, 2005.  Docket Item #47.

> In October of 2003, Anwar Nasser Aulaqi, an Imam who had contact with
> the September 11 hijackers, came for an unannounced visit to Mr. Al-
> Timimi's home accompanied by Nabil Garbeih, a government witness in
> the paintball trial.  Upon information and belief, at that meeting, Aulaqi
> was recording his conversation with Mr. Al-Timimi.  At that meeting,
> Aulaqi attempted to get Mr. Al-Timimi to discuss issues related to the
> recruitment of young Muslims which entireties were rejected.  Tapes of that
> conversation would aid Mr. Al Timimi in defending against these charges
> as they would show that he did not, even in response to entreaties from a
> government agent, seek to recruit anyone for violent jihad.  Tapes or
> debriefing notes of that conversation must be produced.

Docket #18, at p.12.  A hearing was held on Timimi's outstanding motions on December 3, 2004,

but no mention of Aulaqi was made at the hearing.  Transcript of Hearing, Docket #144.  After the

hearing, the Court denied the motion for discovery regarding Aulaqi.  Docket #25.

4.  On January 21, 2005, Timimi moved for the production of all recordings in the

government's possession of any of Timimi's conversations with the Saudi cleric Safar Hawali.

Docket #43.  At the hearing on that motion on January 28, 2005, no mention was made of Aulaqi.

5.  On February 16, 2005, and on March 10, 2005, the government made classified *ex parte*

filings with respect to Timimi's discovery demands regarding his conversations with Hawali.

Docket ## 48, 66.  On the basis of the representations made by the government in its various

filings, on March 21, 2005, the Court denied as moot Timimi's motion for production of the

recordings he claimed to be in the government's possession with respect to his conversations with

Hawali.  Docket #68.

6.  Trial commenced on April 4, 2005.  In the course of the trial, the government introduced

recordings of five telephone calls that were captured pursuant to FISA: one between Timimi,

Royer, and Hammad, and four between Timimi and Al-Buthi.  As part of the defense case and

pursuant to CIPA, the defense introduced Stipulation #60, to the effect that the government had

captured thousands of Timimi's telephone calls and an extensive number of email messages during 2003.

7.   The essence of the proof against Timimi was that, on September 16, 2001, he induced and counseled others to go to fight in Afghanistan against the American troops that he foresaw about to invade that country to punish the Taliban for sheltering Al-Qaeda.  This evidence primarily was provided by the witnesses who attended that meeting, including Yong Kwon, Mohammed Aatique, and Khwaja Hasan.  To a lesser extent, the evidence was provided through (a) the testimony of Nabil Garbieh, who only attended the meeting for a short time, but later was told about it by Randall Royer; and (b) a recording of Royer, who, in the course of a conversation with Kwon that was covertly videotaped, referred to what Timimi said in that meeting.

8.   The evidence from Kwon, Aatique, Hasan, Garbieh, and the videotape of Royer was buttressed by testimony from Donald Surratt and Andre Thompson that Timimi made similar statements at another meeting in October 2001.[3]  Moreover, that evidence was corroborated by captured emails and publicly-available writings and speeches, in which Timimi espoused support for the Taliban, support for Al-Qaeda, and hatred for the United States.   SA John Wyman testified at length regarding admissions made by Timimi in the course of a series of meetings with the FBI and prosecutors in 2003 and 2004.  Evan Kohlmann testified as an expert witness regarding the background and context of the foreign individuals and organizations that were referenced by the other witnesses and evidence.  SA Ammerman testified to the authenticity of documents and other items seized in connection with the execution of search warrants, as well as prior consistent statements of Yong Kwon.

---

3 Thompson testified about what he was told by Ibrahim Al-Hamdi, who attended the October meeting but who did not testify in the trial of Timimi.

9. On April 26, 2005, Timimi was convicted of the charges against him. Docket #107. On July 13, 2005, he was sentenced to life in prison. Docket #132. The next day, he appealed his convictions to the United States Court of Appeals for the Fourth Circuit. Docket #132.

10. On February 16, 2006, Timimi moved to vacate his appeal so that this Court could consider his allegation that the government failed to provide him with pre-trial discovery to which he was entitled. Media reports had recently indicated that the National Security Administration ("NSA") intercepted international telephone calls without warrants. Timimi reasoned that the NSA intercepts likely captured his conversations with Hawali that he claimed to have been exculpatory, and that the government had failed to produce to him pre-trial the recordings of those conversations as required. The government consented to Timimi's motion to vacate his appeal but, in doing so, expressly noted that it did not concede that any pre-trial discovery was improperly withheld. In light of Timimi's motion and the government's consent, the Fourth Circuit vacated his appeal on April 25, 2006, and remanded the case for this Court to consider issues raised by Timimi and order whatever relief or changes in the case, if any, that this Court considered appropriate. Docket #164.

11. On May 15, 2006, Jonathan Turley appeared in this Court as new counsel for Timimi. Docket #169.

12. On June 20, 2006, Timimi moved for an order requiring the government to confirm or deny that a variety of government agencies had collected previously undisclosed evidence with respect to a list of individuals he proposed to submit to the Court. Docket #175. At a hearing on July 21, 2006, the Court granted that order to the extent that it directed Timimi to serve the government with the list of the particular individuals with respect to whom he sought records of government surveillance. Docket #182.

13. At the hearing on July 21, 2006, and to ascertain whether the FISA intercepts in this case were predicated on undisclosed intercepts from the NSA, the Court directed the government to file with the Court, *ex parte* and under seal, all documents used to support the FISA warrant referenced in this case. Docket #182. On October 2, 2006, the specified FISA documents were filed with this Court. Docket #192.

14. On July 31, 2006, and through counsel from the United States Department of Justice, the United States filed an *ex parte* and classified pleading responding to Timimi's allegations regarding NSA intercepts of his conversations with Hawali. Docket #185. At the time, neither the undersigned counsel, co-counsel (and DOJ Trial Attorney) John Gibbs, nor any case agent from the FBI was cleared to see that filing.

15. As the result of a letter sent to the Court (and then to the parties) by Timimi's former counsel, Edward B. MacMahon, on September 26, 2006, [4] the parties were diverted from the plan set forth on July 21st (Docket #182) to focus on the existence of records of government surveillance of particular individuals to be listed by Timimi. Mr. MacMahon's letter ("the September 26th Letter") indicated that, in the course of reviewing materials at the National Archives as part of the case of *United States v. Moussaoui*, Mr. MacMahon had seen a file that appeared to show that Timimi had been the subject of an FBI investigation before September 11, 2001.

16. Timimi argued that the September 26th Letter raised questions about the adequacy of the pre-trial discovery provided to him because Mr. McMahon claimed to be unaware of any

---

[4] Although the docket reflects the appointment of Mr. MacMahon on August 8, 2005, as CJA counsel for Timimi on appeal, Docket # 138, undersigned counsel failed to locate a record of Mr. MacMahon's explicit withdrawal as counsel of record in this case.

discovery that had been provided regarding any investigation of Timimi pre-dating 9/11; in Timimi's view, the existence of information about an investigation of Timimi prior to 9/11 signaled a discovery violation because such information necessarily would have been discoverable. Docket ## 198, 199, 201, 202, 206.

17.  In December 2006, the United States filed oppositions to Timimi's motion to compel disclosure of the document referenced by Mr. MacMahon in the September 26th Letter.  In essence, the United States reiterated that Timimi had been provided with all discovery to which he was entitled.  Docket ##200, 204.

18.  On January 16, 2007, this Court held a hearing upon Timimi's motion to compel.  At the hearing, the Court heard testimony from FBI Special Agents Mamula and Linden about their attempts to locate the document referenced by Mr. MacMahon in the September 26th Letter.

19.  Pursuant an Order issued on January 24, 2007, the Court ruled that the government's *ex parte* pleadings had established that Timimi's allegations of discovery violations to date were unfounded; the Court explicitly noted that **either** Timimi had not been the subject of any investigations other than the one which resulted in his trial, **or** such other investigations contained no information that was required to have been produced to him in discovery.  Docket #210.  With respect to the issues raised by the September 26th Letter, the Court directed the United States to file a statement from NARA as to whether an electronic database of documents relating to the 9/11 Commission existed and if so, whether that database was searchable.  Docket #210.

20.  On February 15, 2007, the United States filed a statement from NARA, explaining that NARA maintained an electronically searchable database of documents relating to the 9/11 Commission known as the "DMS" database.   As the NARA statement explained, NARA

conducted a search of the DMS database for all documents referencing Timimi, and then provided those files to the FBI.  Docket # 211.

21.  On February 20, 2007, the United States provided the Court with copies of most of those DMS documents *ex parte* for the Court's *in camera* review, as well as a summary chart regarding those documents.  Docket #212.  Within those DMS documents were the unredacted versions of the "Squad IT-3" document and the Ammerman Memo.[5]  None of the documents contained exculpatory evidence or new evidence that tended to impeach the credibility of any government witness at trial.  Accordingly, Timimi was not entitled to review any of them.

22.  On February 22, 2007, the United States provided Timimi with reports of the statements he made to FBI agents on January 26, 1994 (in connection with the investigation into the first bombing of the World Trade Center), and September 27, 2001 (in connection with the investigation into the attacks of 9/11).[6]  Neither of those statements was relevant to the charges of which he was convicted, and neither was required to have been provided to Timimi pre-trial by any discovery rule.

23.  On July 23, 2007, Timimi again moved the Court for access to the government's *ex parte* filings in this case.  Docket ##221, 222.  In essence, he sought reconsideration of this Court's ruling of January 24, 2007 (Docket #210).   On August 9, 2007, he moved the Court for access to

---

[5]  Other reports that referenced both Timimi and Awlaki were included as Attachments 11 and 22 to that same pleading. *See also* the Government's Memorandum of Law Regarding Evidence Obtained Pursuant to the Foreign Intelligence Surveillance Act, Docket #192, filed on October 2, 2006, at p. 14-15, and the related FISA application, at pp. 16-17 and 27, for additional information that the Court may find relevant to this topic.

[6]  According to the notes of undersigned counsel from December 2004, the report of Timimi's statement to FBI agents on September 27, 2001, had been previously provided to his counsel (Mr. Yamamoto) on December 22, 2004.

the records of the 9/11 Commission in the National Archives to search for the document referenced in the September 26th Letter.  Docket ##224, 225.  On August 24, 2007, this Court denied those motions.  Docket #231.  Reverting back to the plan originally set on July 21, 2006, *see* Docket #182, the Court ordered Timimi to serve the government with the list of the particular individuals with respect to whom he sought records of government surveillance.  Docket #231.

24.  In accordance with the Court's order of August 24, 2007, Timimi served the government with a discovery request on September 14, 2007, encompassing Aulaqi and 11 other individuals or subjects.  Docket #237,  Exhibit 1.  On October 19, 2007, the government moved to quash various aspects of the discovery request, including that part of the request that sought intercepts of Aulaqi that were not exculpatory for Timimi.   Docket #237.

25.  On November 7, 2007, an attorney for the U.S. Department of Justice filed a pleading to address the question of whether the NSA intercepted conversations involving the individuals listed by Timimi in his discovery request of September 14, 2007.  Docket #243.   As with the pleading with respect to NSA intercepts that was filed by the same DOJ attorney on July 31, 2006 (Docket #185), the November 7th pleading was classified at a level too high for undersigned counsel, DOJ Trial Attorney John Gibbs, or the FBI case agents to see it.

26.  On November 20, 2007, the parties appeared for a hearing on the government's motion to quash Timimi's discovery request.  At the hearing, the Court announced that its rulings would be held in abeyance until the government granted security clearances for undersigned counsel, the defense attorney, and the Court's clerk to see the pleadings regarding the NSA surveillance program.   Docket #246.

27.  On March 6, 2008, the United States filed an unclassified status report and also an *ex parte in camera* status report regarding Timimi's discovery request of September 14, 2007.  The

10

unclassified report indicated that undersigned counsel had been cleared for the NSA surveillance program.  Docket ## 248, 249.

28.  On April 18, 2008, Al-Timimi again moved for access to the *ex parte* filings made by the government in this case.  Docket ## 251, 252.

29.  On May 14, 2008, the United States filed an *ex parte* and *in camera* status report regarding Timimi's discovery request of September 14, 2007.   Docket #258.  The next day, the United States filed an unclassified status report regarding Timimi's discovery request; the unclassified report stated that the search of NSA records had been completed, and that, for the reasons explained in the classified pleading filed the previous day, Timimi received in discovery pre-trial everything to which he was entitled.  Docket #257.

30.  At a hearing on May 16, 2008, this Court encouraged the United States to consider whether redactions and substitutions could be made to the classified status report filed on May 14, 2008, so that it would not have to be filed on an *ex parte* basis, and so that Timimi's cleared defense attorney might, as a result, better be able to understand the Court's ultimate ruling. Transcript, May 16, 2008, at pp.4-5.

31.  On May 28, 2008, this Court granted an *ex parte* motion made by the United States for a protective order under CIPA, authorizing the United States to substitute a revised classified status report (to which Mr. Turley would have access), for the *ex parte* status report filed on May 14, 2008.  Docket #262.  That same day, the United States filed the revised classified status report setting forth the basis for the conclusion that, as stated before, Timimi received in discovery pre-trial everything to which he was entitled.  Docket #258.

32.  On August 1, 2008, Timimi again moved for access to the *ex parte* filings made by the government in this case.  Docket # 264.  In October 2008, he moved for relief regarding various

contentions that he had been denied pre-trial discovery relating to communications intercepted by the NSA; Aulaqi was not a subject of those contentions.  Docket ## 265, 266, 267, 268, 269, 270.

33.  At a hearing on October 23, 2008, this Court stated that it saw no evidence of any material discovery violation:

> [T]he bottom line is still whether or not whatever it was that might have existed that should perhaps have been turned over, whether it could have reasonably made a difference.  In the end, that's got to be the final thing the Court looks at, and I will say at this point, I haven't seen it.

Transcript of Hearing, October 23, 2008, at p.10.  To give the Court "one last chance" to evaluate whether the government had withheld any information that reasonably could have been expected to assist the defendant's case, *id.,* the Court directed the government to respond to five specific inquiries by Timimi regarding NSA intercepts; none involved Aulaqi.  Docket #271.  The United States responded to those five specific inquiries through a pleading filed on December 22, 2008. Docket #280.

34.  As a result of the inclusion in Timimi's December 2008 public filings of some of the same information that his counsel obtained through access to the revised classified status report filed by the United States on May 28, 2008, the Court ordered that two of his filings be removed from the public file, and directed his counsel to scrupulously adhere to the Protective Order entered in this case in 2004.  Docket ##281, 282.   In light of that order, virtually all of Timimi's subsequent filings were made through the Classified Information Security Officer and later cleared for filing on the public docket.  *See, e.g.,* Docket ##300, 301, 305, 306, 307, 311, 312, 319, 320, 321.

35.  On July 19, 2013, Timimi again moved for relief regarding his contention that he had been denied pre-trial discovery relating to the NSA program; the FISA intercepts; Khwaja Hasan's

phone records; and the identity of Ajmal Khan. Docket #305, 306, 319, 320, 321, 323, 324, 325, 326, 334, 335, 338, 339. He also moved for relief regarding his contention that he had been denied pre-trial discovery relating to Aulaqi. Docket #300. The United States opposed those motions in general, and the motion regarding Aulaqi in specific. Docket #304. This Court held a hearing on the outstanding motions on October 4, 2013. Docket #337.

36. By order of April 28, 2014, this Court denied the outstanding motions for discovery, including the one relating to Aulaqi. Docket ##344, 345, 349, 350. In May 2014, this Court denied Timimi's motions for "clarification" and reconsideration of its order and opinion of April 28, 2014. Docket ## 346, 347, 348, 351, 352, 357.

37. On June 4, 2014, Al-Timimi appealed this Court's orders. Docket #358.

38. On August 4, 2015, the Court of Appeals remanded Timimi's case to this Court based on Timimi's claims regarding the Squad IT-3 Document and the Ammerman Memo.

III.    The Facts Before the Court Are the Same Now as They Were Before

At the hearing in this case on October 4, 2013, undersigned counsel stated in response to allegations that the government improperly withheld discovery regarding the meeting between Timimi and Aulaqi in October 2002:

> Mr. Turley has no right to know whether there was an asset in to Aulaqi at that time. He has no right to know whether Aulaqi was a government asset at that time, but you asked me eight years ago whether we had a recording of what happened, and I said no. We still don't.

Transcript of Hearing, October 4, 2013, at p. 8. We reiterate those words now.

As set forth above, Timimi has argued for years that the government failed to provide him with discovery materials as required by law, but this Court has consistently recognized that his

arguments were baseless.  For example, by order of January 24, 2007, this Court rejected Timimi's

request for access to the government's *ex parte* filings, and stated:

> The *in camera* pleadings (docket #s 48, 66, 185, and 200) establish either
> that the defendant has not been the subject of any investigations other than
> the one which resulted in his trial or that any other investigations in which
> he was a subject or during which he was referenced contain no information
> that would constitute *Brady* material or which was required to be produced
> under the discovery orders entered in this case.

Docket #210 (emphasis added). [7] That finding remains true today.

With specific reference to Aulaqi, Timimi has been making the same argument since

November 19, 2004.  Docket #18, at p.12.  Yet, unredacted versions of the Squad IT-3 Document

and the Ammerman Memo were filed with this Court in February 2007.  Docket #212.  As a result,

there is no "new" evidence before the Court.  Moreover, the unredacted versions of those

documents provide no support to Timimi's speculations regarding evidence held by the

government regarding the substance of the meeting between Timimi and Aulaqi in October 2002.

Just as the Court denied Timimi's access to these documents in 2007, Docket # 231; it should deny

him access to those same documents today.

This Court carefully considered Timimi's arguments regarding the alleged discovery

materials involving Aulaqi, and rejected them.  In April 2014, this Court wrote:

> Defendant seeks "surveillance evidence, field reports, and recordings" of a
> brief meeting in October 2002 between himself and Anwar al-Aulaqi, an
> American-born cleric killed by a drone strike in Yemen more than two
> years ago.  Dkt. No. 301, at 3.  Defendant contends that the meeting "could
> not have happened without the government's knowledge or facilitation"
> because al-Aulaqi was the subject of intense FBI scrutiny at the time. . . .
> Defendant goes so far as to suggest that at the time of their meeting al-

---

[7] The Court's phrasing of its ruling in the alternative apparently was designed to resolve
the discovery allegations regarding the existence of other investigations involving Timimi without
necessarily disclosing the existence of such investigations.

Aulaqi may have been a government "asset" or, at the very least, was accompanied to defendant's residence by someone who was an asset.

Defendant argues that any information regarding what was said that night, if it exists, must be disclosed under Brady or Rule 16 for two reasons. First, it would impeach the testimony of FBI Special Agent Wade Ammerman, who led the criminal investigation and testified at trial that the investigation only began after receipt of an anonymous tip in November 2002, one month after the meeting with al-Aulaqi took place, implying that Ammerman lied to obscure the existence of illegal surveillance. Second, the evidence sought would be exculpatory to the extent it shows that defendant turned down al-Aulaqi's entreaty to recruit young men at Dar al-Arqam for violent jihad against the United States. Id. at 18. The government curtly responds that defendant "has been provided with all information to which he is entitled by law." Dkt. No. 304, at 2. In its public position, the government neither concedes nor denies that such evidence exists.

In a highly classified document to which only the Court, and none of the Court's cleared staff, has been allowed access, the government has provided sufficient information to satisfy the Court that the government has not violated its obligations under either Brady or Rule 16. See Dkt. Nos. 185, 331 (classified). Moreover, the government's position- that defendant cannot compel disclosure "of the extent and nature of the government's investigative tools or tactics" in this instance - has merit. Dkt. No. 304, at 1. Under *Rovario*, it appears to the Court that disclosing whether or not agents were listening in on the meeting or had an asset listening in for them "would endanger the secrecy of that information." 353 U.S. at 59-60. This concern is only heightened by the government's legitimate interest in preserving the integrity of ongoing counterterrorism operations. Defendant cannot make a correspondingly weighty showing - in this context, that a record likely exists of defendant making an explicitly exculpatory statement to al-Aulaqi. Short of that, the balance between defendant's need for any information relating to al-Aulaqi and the government's interest in nondisclosure favors the latter. *See id*. at 60-61.

Docket #350, at pp. 9-11.

This Court's conclusions in 2014 regarding Aulaqi were correct when they were made.

Particularly in light of the contents of the unredacted versions of the Squad IT-3 Document and the

Ammerman Memo, those conclusions are just as valid today.

Classified materials are not to be disclosed to an individual merely because he has a security clearance; to the contrary, they are to be disclosed only to cleared individuals who have a "need to know."  In this case, Timimi's counsel has no "need to know" the redacted portions of the Squad IT-3 Document or the Ammerman Memo because there is nothing discoverable in them. Allowing Timimi's counsel access to the unredacted versions of these documents would not only provide him discovery to which he is not entitled, but also defeat the protections to national security created by the document classification system.

IV.     Forgotten Facts About the Discovery that Was Provided to Timimi Pre-Trial

The gist of Timimi's argument appears to be his contention that the government failed to reveal pre-trial that it possessed evidence of the meeting between Timimi and Aulaqi in October 2002.  For example, in his latest pleading, Timimi argues that he should be entitled to see the Ammerman Memo because it "directly references the visit to Dr. Al-Timimi's home that has been the subject of ten years of defense inquiries and yet never revealed."  Al-Timimi's Motion to Compel Disclosure of Unredacted Documents . . . ., filed August 31, 2015 (hereinafter "2015 Motion to Compel"), at p. 22.  The argument that the government never revealed Aulaqi's visit to Timimi's home in pre-trial discovery is false.  Moreover, the suggestion that records of the substance of the meeting might be exculpatory to Timimi was conjured up long after the meeting occurred.

A.  A Summary of What Occurred During the Meeting with
Aulaqi was Disclosed to Timimi by the Government in 2004

Over the years since the Timimi trial, information has doubtless been lost in the fog of faulty memory.  For example, at the hearing on October 4, 2013, undersigned counsel told this Court that "I don't know what happened at that meeting, and we don't - - and he doesn't get to find

16

out the status of the government's coverage of Aulaqi other than to know that the government has no recording of the meeting between Aulaqi and Timimi." Transcript of Hearing, October 4, 2013, at p. 8. The statement that "he doesn't get to find out the status of the government's coverage of Aulaqi other than to know that the government has no recording of the meeting between Aulaqi and Timimi" was correct, but the statement that "I don't know what happened at that meeting" reflected a failure of memory by undersigned counsel. After all, - - and as described below - - undersigned counsel provided to Timimi in pre-trial discovery a report of interview describing that very meeting.[8]

In the course of preparing this pleading, undersigned counsel came across a discovery letter to Timimi's second counsel (Mr. Edward McMahon) that enclosed what had apparently been forgotten by all parties for over a decade: the FBI FD-302 report of the interview of a witness who was present for the entire meeting between Timimi and Aulaqi, and who described what happened in it.

Indeed, on November 3, 2004, the government provided to the defense in pre-trial discovery the report of the interview of a witness who was present for the entire meeting. FD-302, Report of Interview 6/24/2004, included with Discovery Letter #2 from AUSA Gordon D. Kromberg to Edward B. MacMahon, November 3, 2004 (hereinafter "Discovery Letter #2", and a redacted version of which is attached as an exhibit to this pleading).

---

8 At that same hearing, undersigned counsel told this Court that "we" did not learn of the meeting between Aulaqi and Timimi until after Nabil Gharbieh became a cooperator after his house was searched in February 2003. Transcript of Hearing, October 4, 2013, at p. 8. That statement reflected a failure of recollection in 2013, because - - with hindsight - - it is now obvious that the government learned of the meeting earlier than that. The fact remains, however, that as undersigned counsel accurately stated in 2013, "we didn't know about it at the time it happened."

The witness who told the FBI on June 24, 2004, about the meeting between Timimi and Aulaqi did so in the presence of Martin MacMahon and two other attorneys for Timimi. In fact, the witness was Timimi himself.

In light of the fact that Timimi provided the government in June 2004 with Timimi's own description of his 2002 conversation with Aulaqi, the government's knowledge of the existence of the Timimi/Aulaqi meeting was hardly a fact that needed to be disclosed to Timimi in pre-trial discovery. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 871 (1982) ("No one knew better than he what the deported witnesses actually said to him.").

In retrospect, we wish that in 2013 we had remembered Timimi's statements from 2004 about his meeting with Aulaqi in October 2002, so that we could have included a reference to them in our opposition to his 2013 discovery motion for information about that meeting. For that matter, we wish that we had remembered those statements in late 2004, so that we could have included a reference to them in our opposition to his initial motion for discovery about that meeting then. That we failed to remember them is regrettable. It is possible, however, that Timimi's statements regarding his meeting with Aulaqi were easily forgotten because they were so obviously immaterial to any issue connected to Timimi's guilt or innocence. Indeed, while SA Wyman testified at length at trial about the statements that Timimi made in the course of his interviews with the FBI, he made no reference to what Timimi said about his meeting with Aulaqi; after all, on the basis of what Timimi said happened at that meeting, it was irrelevant.

B.  The Assertion that Aulaqi Solicited Timimi to Recruit
for Jihad Was Conjured Up After Timimi was Indicted

Throughout the 2015 Motion to Compel, Timimi documented many factual assertions, and attached numerous exhibits to support those assertions.  Oddly, however, he provided no supporting document or citation for the central factual assertion of his entire argument.  In specific, he provided no support for his assertion that Aulaqi appeared at Timimi's house "and unsuccessfully attempted to seek his help in recruiting young men for terrorist activities."  2015 Motion to Compel, at p. 6.  Absent acceptance of the truth of that assertion, there is no reason to believe that the conversation with Aulaqi in October 2002 could have any bearing on Timimi's guilt or innocence the previous year.  In light of the significance of that assertion, one might expect Timimi to have included a citation to the record or an attachment to his pleading of a supporting document - - but he did not do so.

The reason for the absence of a citation to the record or the attachment of a document to support the fundamental factual assertion of Timimi's motion regarding Aulaqi is that none exists; Timimi's own statements establish that he conjured it all up only after he was indicted.  After all, *before* he was indicted, Timimi described to the government what occurred at the meeting with Aulaqi.  As recounted in the FBI's report of its interview with Timimi, Timimi told the FBI on June 24, 2004 that:

> Sometime after 09/11/2001, Aulai appeared at Timimi's house in the middle of the night.  Timimi invited Aulaqi in for tea and provided him with a small gift, possibly perfume, in an effort to be hospitable.  Aulaqi had provided a lecture at the Dar al Hijrah earlier in the same night he visited Timimi.  Someone else brought Aulaqi to Timmi's house.   Timimi could not remember who this third person was.  Aulaqi told Timimi that he was visiting the United States from Yemen.  Aulaqi told Timimi that he relocated to Yemen because the FBI agents had threatened him and told

19

> him that they intended to plant drugs in his house.  Aulaqi asked Timimi
> whether he thought the FBI would do such things.  Timimi told Aulaqi that
> it was possible. . . . Aulaqi did not mention anything about his alleged
> connections to some of the 09/11 hijackers.

Discovery Letter #2 (attachment).  The report reflects that Timimi made no mention of Aulaqi

soliciting him to recruit for jihad.  In contrast, Timimi's first suggestion that Aulaqi solicited him

to recruit for jihad did not occur until November 2004, months after Timimi was indicted.  Docket

#18, at p.12.

The interview of Timimi that occurred on June 24, 2004, was the fourth in a series of

meetings with the FBI in which Timimi engaged between June 2003 and August 2004, in an

attempt to convince the government that he should not be prosecuted.  On each of those occasions,

Timimi spoke with SA Wyman and SA Ammerman - - in the presence of his lawyers - - *for hours*;

as reflected in the attachments to Discovery Letter #2, his conversations with them are recounted in

over 40 pages of reports.

In the course of the interviews, Timimi attempted to convince the government that any

witnesses that said that he encouraged them to fight in violent jihad right after 9/11 were wrong.

Indeed, he asserted that he regularly devoted himself to *discouraging* Muslims from engaging in

terrorism against the United States.

For example, on June 27, 2003, Timimi told the FBI that, before leaving the dinner at

Kwon's house the weekend after 9/11, he admonished Royer and others at the dinner about going

to Pakistan to participate in jihad, and later advised Kwon and Hasan against traveling to Pakistan

to train with Lashkar-e-Taiba.  FD-302, reflecting interview on 6/27/03, at p.5.  To corroborate his

assertion that he discouraged Royer, Kwon, Hasan, and others from leaving the United States to

engage in terrorism, he provided the FBI with a copy of what he claimed was a speech that he gave

at Purdue University in 1993; the text of the speech reflected the words of a Muslim thinker who would discourage his followers from engaging in terrorism.

Further, on August 21, 2003, Timimi told the FBI that he had "done more than any other English speaking Muslim lecturer to speak against terrorism." FD-302, reflecting interview on 8/21/03, at p.1. He said that it was a result of his speech at Purdue in 1993 that the FBI pitched him to become an informant in 1994; he said that he refused because he associated with non-violent circles, and would not be in a position to provide useful information. *Id.* During that same interview, Timimi explained how he spent three days in Singapore in 1999 trying to talk an individual out of wanting to participate in jihad, *id.*, and how he spent *three weeks* convincing another individual out of the same desire after a conference in Leicester, England. *Id*. at 2.

The reports of Timimi's interviews reflect that, on November 17, 2003, Timimi repeated his assertion that no one had done more than himself in the western speaking world to speak out against the "jihadist" interpretation of Islam. FD-302, reflecting interview on 11/17/03, at p.3. On that occasion, he provided investigators with six affidavits and nine other documents in support of his claim that he was a man of peace who discouraged Muslims from traveling overseas to defend the Taliban or engage in terrorism. The reports of Timimi's interviews with the FBI further reflect that, again on June 24, 2004, Timimi provided more details on his effort in August or early September 2001 to talk an Algerian individual at the conference in Leicester, England out of his plan to become a suicide martyr.

In short, in the year before he was indicted, Timimi spent hours with the FBI in attempts to convince the government that his past actions were inconsistent with the allegation that he induced his followers to defend the Taliban against America in Afghanistan. He went into great detail about his efforts to discourage terrorism among Muslims in America and around the world. He

provided specific, discrete examples of individuals all over the world that he tried to convince to stay away from violence.  And yet, when he discussed with the FBI in June 2004 the meeting with Aulaqi that occurred in his own home in October 2002, he failed to mention his supposed rejection of Aulaqi's attempt to solicit him to recruit for terrorism.  If Timimi had actually rejected Aulaqi's solicitation to recruit for jihad in October 2002, would Timimi not have told the FBI about it *then?*

Before he was indicted, Timimi gave the FBI multiple examples of how he rejected violence.  Yet, after he was indicted, Timimi claimed that the FBI knew that he had rejected Aulaqi's solicitation of him to recruit others for terrorism.  Timimi's failure to raise that extraordinary claim during his interviews with the FBI before he was indicted indicate that it was conjured up only after he was indicted.[9]

V.      Trial Testimony of SA Ammerman

A.      SA Ammerman's Testimony Was Not Disputed at Trial

Timimi harps on the harm he allegedly suffered as a result of his inability to cross-examine SA Ammerman about Aulaqi and the start of the investigation of Timimi.  In fact, however, nothing said at trial by SA Ammerman was disputed.  Indeed, his testimony was virtually all of a custodial nature.  As a result, impeaching his credibility on the basis of his interaction with Aulaqi (or the date of the inception of the investigation) would not have affected the jury's findings.

SA Ammerman's trial testimony can be divided into five topics.  They include (a) the authentication of items seized from Timimi's residence; (b) the authentication of items seized from the residence of Masaud Khan; (c) the circumstances of the FBI's initial contacts with Yong Kwon;

---

9  Finally - - and as reflected on Discovery Letter #2 - - Timimi spoke with the FBI again on August 6, 2004.  The report of that (post-indictment) interview reflects discussion of possible cooperation with the FBI by Timimi.  If Timimi had actually rejected Aulaqi's solicitation to recruit for jihad in October 2002, would Timimi not have told the FBI about it then?

(d) the arrangements that the FBI undertook for Kwon to contact Royer and Timimi in early 2003; and (e) summary charts of telephone calls made between Kwon and others.

Nothing that SA Ammerman said at trial was disputed. *See* Transcript of Trial, 4/11/05, at pp. 1336 – 1394 (direct exam); 1394 – 1403 (cross exam); and 4/12/05 at pp. 1410 – 1436 (cross exam); 1436-1446 (redirect). Indeed, the Government did not even mention his name during closing arguments.[10] In light of the uncontested nature of the facts to which he testified, the idea that impeaching his credibility would have made a difference to the trial is fanciful.

     B.     All Parties Knew Pre-Trial that the Investigation Pre-Dated 2003

Notwithstanding the fact that SA Ammerman's testimony was not contested at trial, it also was accurate. The portion of his testimony that is the focus of Timimi's arguments now is set forth below:

> Q.  And as part of your duties with the FBI, were you involved in
>      the investigation of Ali Al-Timimi and others here in Northern
>      Virginia?
>
> A.  Yes, sir.
>
> Q.  When did that investigation start?
>
> A.  February of 2003.
>
> Q.  And how did that investigation begin?
>
> A.  Initially with a round of search warrants that were conducted
>      at numerous residences, one of which belonged to a Mr. Timimi.

Transcript of Trial, April 11, 2005, at p. 1337.

---

[10]  Although Timimi mentioned SA Ammerman during the defense closing argument, that portion of his argument consisted of pointing out that SA Ammerman found no evidence of Timimi's involvement with smallpox, anthrax, or nuclear weapons. Transcript of Trial, April 18, 2005, at p. 2233.

The transcript set forth above reflects at least two significant points.  First, SA Ammerman did *not* testify that his investigation of *Timimi* began in February 2003; he testified that the investigation of Timimi "*and others here in Northern Virginia*" started at that time.  To the extent that the investigation of "*others here in Northern Virginia*" (where such "others" were eventually connected to the investigation of Timimi but not originally connected to it) began in February 2003, there is no inconsistency between SA Ammerman's testimony and the fact that Timimi was investigated by the FBI earlier than 2003.

Second, Timimi indisputably knew before trial that the investigation of him (and the others in Northern Virginia) started before 2003.  After all, Timimi received in pre-trial discovery SA Ammerman's affidavit in support of the application that was used to support the search of Timimi's residence in February 2003 - - and that affidavit detailed information that was provided to the FBI about Timimi by confidential informants in 2002.  Docket #300, Exhibit J.

As this Court properly found in April 2014:

> A criminal investigation of defendant began in early 2003 after the Federal Bureau of Investigation ("FBI") received an anonymous tip from someone at Dar al-Arqam. This was not the first time defendant had come to the attention of federal authorities.  His name appears in internal FBI memoranda as far back as 2000.  The FBI had also contacted him directly in 2001 to arrange multiple interviews a week after the September 11 attacks.  Defendant even complained a month later that the FBI had started harassing his brother because of their relationship.

Docket 350, at p. 2.

This Court's conclusion is supported by mounds of evidence, including some from years earlier that had been forgotten by the time the Court considered Timimi's motions regarding Aulaqi in 2013.  For example, SA Wyman testified at Timimi's trial that the FBI interviewed Timimi in September 2001 about the attacks of 9/11.  Transcript of Trial, April 12, 2005, at p.

1583, 1709-11.  Indeed, as the government established at trial through Government Exhibit 10H1a,

Timimi commented in an internet chat session in October 2001 that his brother had been harassed

by the FBI because of his relationship to Timimi.

Indeed, at the interview of Timimi by SA Wyman and SA Ammerman on November 8,

2003, Timimi himself discussed the FBI's investigation of him back in September 2001; he told

the FBI that his brother told him that, after 9/11, the FBI had asked his brother about Timimi's

transmittal of an article lauding an American who died as a suicide bomber.  FD-302, reflecting

interview on 11/8/03, at p.6, attached to Discovery Letter #2.

Further, in his discovery motion of January 21, 2005, Timimi argued that the Government

must possess intercepts of Timimi's communications with Hawali from 2001 and 2002, *because

Timimi was under investigation at that time*.  As Timimi argued:

> Also, it is important to note that, on September 18, 2001, Dr. Al-Timimi
> was contacted by the F.B.I.  The F.B.I. had previously informed Dr. Al-
> Timimi's brother, a businessman in California, that they were looking for
> Dr. Al-Timimi.  Shortly thereafter, Dr. Al-Timimi met with the F.B.I. and
> was asked questions about alleged terrorist groups in Virginia and the
> events of the [sic] September 11.

Docket #43, at p. 3.

Moreover, at sentencing, Timimi argued that the prosecution of him was the result of a

vendetta against him that long pre-dated 2003.  As Mr. MacMahon argued:

> What happened in this case in the light most favorable to the government,
> Your Honor, is that Ali Timimi was investigated for 9/11.  The FBI came to
> his house looking for him for 9/11, as if he had something to do with that.

Transcript of Sentencing, July 13, 2005, at p. 27.  In light of the arguments that Timimi made pre-trial and at his own sentencing, it is ludicrous for him to argue 10 years later that he did not know that he was under investigation before 2003.[11]

In short, all parties knew before Timimi's trial that an investigation of Timimi pre-dated February 2003.  But with the passage of time, the parties may have forgotten why SA Ammerman phrased his testimony the way he did.  As best can be reconstructed with the passage of a decade, he phrased his testimony the way he did to minimize the risk of injecting unfairly prejudicial evidence into his testimony.  After all, by that time, Timimi had repeatedly argued that he would be unfairly prejudiced by references to the 9/11 investigation.  *See* Appellant's Motion for Remand, or, in the Alternative, An Order Allowing the Inclusion of the FBI Document, filed June 29, 2015, at p. 7 (Docket #51 in the Fourth Circuit) ("in pre-trial hearings, defense objected to the continued effort to bring the Al-Qaeda allegation into trial").

In light of Timimi's argument that any connection to 9/11 would unfairly tar Timimi at trial, the government strove to avoid providing justification for that argument.  Indeed, this very subject was discussed at a hearing pre-trial:

> And finally, this issue of whether or not Mr. Timimi was affiliated with a foreign power, I'm perfectly willing to stipulate that all evidence about his affiliations with foreign terrorists could come into the trial, but I'm willing to bet that Mr. MacMahon is not willing to do that. So that's an issue, I suspect, that Mr. MacMahon doesn't want to go near with Mr. Timimi's

---

11 Timimi made similar arguments shortly after he was sentenced.  Based on a declaration of Mr. Edward MacMahon, Timimi argued to the Fourth Circuit in February 2006 for a remand of his appeal to pursue his allegations that NSA intercepts were improperly not disclosed to him; he argued that the NSA likely intercepted Timimi's communications, because he "was a person of interest for the government in its terrorism investigations after September 11, 2001 when the NSA operation began."  Docket #237, at Exhibit B, p.8.  Later in 2006, Timimi told this Court that, "[o]n September 20, 2001 (just 9 days after 9-11), the FBI interviewed Dr. Al-Timimi's brother and told him that Dr. Al-Timimi was connected to the attacks."  Docket 208, at p. 5.

affiliations with foreign terrorists, and he probably wants us to keep this
trial narrowed on what happened between September 11 and May 2003.

Transcript of Hearing, December 3, 2004, at p. 18-19.  Accordingly, SA Ammerman's testimony

was structured to minimize focus on the investigation into Timimi's activities unconnected to his

followers at the Dar al-Arqam.  We suspect that, had SA Ammerman testified about the actual start

of all investigations into Timimi - - and mentioned, for example, that he had been questioned both

after the 1994 bombing of the World Trade Center and again in connection with the investigation

into the attacks of 9/11 - -  then Timimi would now be arguing that SA Ammerman unfairly

prejudiced him by doing so.

<u>Conclusion</u>

For the reasons set forth in this Court's Order of January 24, 2007, its statement from the

bench in open court on October 23, 2008, and its memorandum opinion of April 28, 2014 (docket

##210, 350, and Transcript of Hearing, October 23, 2008, at p. 10), as well as those set forth above,

the defendant's motion should be denied.

Respectfully submitted,

Dana J. Boente
United States Attorney


_____/s/_____

Gordon D. Kromberg
Assistant United States Attorney
Virginia Bar No. 33676
Assistant United States Attorney
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 837.8242 (fax)
gordon.kromberg@usdoj.gov

27

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of November 2015, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notification of such filing

(NEF) to all attorneys of record, and will serve it by email to:

> Thomas Michael Huff, Virginia Bar No. 73587
> Thomas M. Huff, Attorney-at-Law
> P.O. Box 2248
> Leesburg, VA 20177
> Telephone: 703.665.3756
> Facsimile: 571.354.8985
> thuff@law.gwu.edu
>
>
> Jonathan Turley (pro hac vice, lead counsel)
> The George Washington University Law School
> 2000 H Street, NW
> Washington, D.C. 20052
> (202) 994-7001 (telephone)
> jturley@law.gwu.edu
>
>
> _____
> Gordon D. Kromberg
> Assistant United States Attorney
> Virginia Bar No. 33676
> Assistant United States Attorney
> Attorney for the United States
> 2100 Jamieson Avenue
> Alexandria, VA  22314
> (703) 299-3700
> (703) 837.8242 (fax)
> gordon.kromberg@usdoj.gov