

**U.S. Department of Justice**

*United States Attorney's Office*

*Eastern District of Virginia*

| | |
|---|---|
| *2100 Jamieson Avenue* | *703/299-3721* |
| *Alexandria, Virginia 22314* | *FAX 703/299-3981* |

November 3, 2004

Edward B. MacMahon, Jr.
P.O. Box 903
107 East Washington Street
Middleburg, Virginia 20118

    Re:    <u>U.S. v. Al-Timimi, Crim. No. 1:04cr385; Discovery Letter #2</u>

Dear Ed:

    1.  Enclosed is a proposed discovery order regarding your client, Ali Al-Timimi.  Please sign the order where indicated if you are in concurrence and return it to me at your earliest convenience for filing.

    2.  In accordance with the government's discovery obligations in the above-captioned case, this is to notify you that, in accordance with the provisions of the Foreign Intelligence Surveillance Act of 1978 (FISA), 50 U.S.C. § 1801 et seq., notice is hereby given that information obtained or derived pursuant to the authority of the aforementioned Act will be used in the following proceeding: <u>United States v. Ali Al-Timimi</u>, Crim. No. 1:04cr385.

    3.  In accordance with the government's discovery obligations in the above-captioned case, enclosed are copies of the reports of your client's interviews with the FBI, undertaken on the following dates:

| Date | Type | Pages |
|---|---|---|
| June 27, 2003 | FD-302 | 7 |
| August 21, 2003 | FD-302 | 11 |
| November 17, 2003 | FD-302 | 13 |
| June 24, 2004 | FD-302 | 13 |
| August 6, 2004 | FD-302 | 4 |

I am not aware of any other relevant oral statement made by your client in response to interrogation by any person then known to your client to be a government agent.

    4.  Also enclosed is a list of items in our custody that were obtained in connection with the search warrant at your client's residence on February 25, 2003.  To make arrangements to inspect and/or copy these items, as well as those other documents, photographs, and objects that are in our possession and that are either to be used in our case in chief or may be material to your defense (including those

Letter to Edward B. MacMahon, Jr.
November 4, 2004
Page 2

documents and items seized from the residences of alleged co-conspirators), please contact FBI Special
Agent John Wyman at 202.278.4326, or FBI Special Agent Wade Ammerman at 202.278.4331.

    5.  Enclosed is a copy of the NCIC printout reflecting your client's criminal record.

    6.  This letter further is to inform you that we intend to introduce evidence of your client's
antipathy for the United States and hopes for its destruction  - - as well as his admiration for the Taliban
(and allied organizations and individuals such as the Lashkar-e-Taiba and its founder, Hafez Saeed) to
help prove his intent to induce others to fight against the United States in Afghanistan.  To the extent
that this evidence constitutes evidence of prior bad acts pursuant to F.R.E. 404(b), then this letter
constitutes notice that we intend to present such evidence.

    7.  This letter also is to request you to permit the agents and/or me to inspect any items in the
defendant's possession, custody, and/or control which he intends to offer as evidence at the trial.
Similarly, please disclose to me a written summary of any testimony your client intends to use at trial
under Rules 702, 703, and 705 of the Federal Rules of Evidence.

    8.  For your records, also enclosed is a copy of what I have noted as "Discovery Letter #1, which
I sent to Martin McMahon on October 15, 2004.

    Thank you for your cooperation.

                                    Sincerely,

                                    Paul J. McNulty
                                    United States Attorney

                            By:

                                    Gordon D. Kromberg
                                    Assistant United States Attorney

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

**REDACTED**

Date of transcription    07/01/2003

On 06/27/2003, Ali Mehdi Al-Timimi, born on                    in Washington, D.C., Social Security Account Number                    was interviewed at the law offices of Martin McMahon and Associates, 1150 Connecticut Avenue, Northwest, in the presence of his attorney Martin McMahon and McMahon's two associates, Todd Gallinger and Chris Smith.  After being advised of the identities of the interviewing agents and the nature of the interview, Timimi provided the following information:

Al-Timimi (hereinafter Timimi) and his attorney inquired if Timimi was the target of an ongoing investigation involving a Federal Grand Jury in the Eastern District of Virginia that had resulted in several persons being indicated on 06/25/2003. Timimi was advised that he was a target of that investigation.

Timimi is aware of a Pakistan based organization, previously lead by an individual named HAFIZ SAYEED.  The organization that SAYEED managed has two separate wings, the Lashkar-e-Taiba (hereinafter LET) and the Markaz ad Dawa.  The Markaz ad Dawa is the religious wing of the organization and it focuses on teaching Islam and social welfare programs.  The LET is the military wing of the same organization.  The LET helps the Pakistani government by fighting a proxy war for the Pakistanis in Kashmir, against the Indians.  Timimi asserts that the LET assists the Pakistani government because the regular Pakistani army looks the other way as the LET fighters go off to fight against India. Towards the end of the interview Timimi stated that the organizational terms LET and Markaz ad Dawa are often used interchangeably and they are essentially the same organization.

Timimi is aware of the military style tactics employed by the LET.  The activities of the LET have been well publicized over the years by various forms of media, including The Washington Post newspaper.  The LET employs cross border shelling and conducts raids on police stations and military camps.  The military tactics used by the LET includes the use of "fidayen" and guerilla attacks. The "fidayeen" style attacks employed by the LET are typically considered suicide missions carried out by commandos.

| | | |
|---|---|---|
| 'vestigation on | 06/27/2003 | at Washington, D.C. |
| ile # | | |
| | | Date dictated    NA |
| by | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned  it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

# REDACTED

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On 06/27/2003 , Page ___2___

    Timimi used to receive the LET's Taiba Bulletin over the internet. Timimi does not know how he got on the LET's mailing list for the bulletin. Timimi did not subscribe to or ask to receive the bulletin, one day he just started receiving it. Timimi recalls that the Taiba Bulletin discussed military activities carried out by the LET and posted press statements by HAFIZ SAYEED. Timimi removed his name from the Taiba Bulletin mailing list once the LET was designated as a terrorist organization. Timimi could not recall for how long it was that he received the Taiba Bulletin, adding that it did not go all the way back to the mid-1990's, nor was it a short time period as a matter of weeks. Timimi thinks that an individual named Abu BARA was the person in charge of the Taiba Bulletin. Timimi recalls that Abu BARA indicated in an e-mail communication to Timimi that Abu BARA thought that he and Timimi knew each other. Timimi does not recall ever meeting Abu BARA. Timimi advised that during his speaking engagements he meets a number of people and perhaps Abu BARA thinks that he knows Timimi because Abu BARA spoke to Timimi at one of his lectures.

    Timimi used to visit the LET website regularly, which he recalled had a web address that was something like markazdawa.org. Timimi advised that "markaz dawa" means "dawa center" in English and speculated that he might have also visited a website with the address dawacenter.com. Timimi advised that tapes of his lectures were posted on the LET website.

    Timimi's religious belief system is similar to that espoused by the organization comprising the LET and the Markaz ad Dawa. With regards to the LET's military tactics, Timimi believes that the LET has always had a big question with regards to USAMA BIN LADEN's fatwa authorizing the targeting of civilians. Timimi thinks that the LET, unlike USAMA BIN LADEN is purely focused on fighting against non-civilians, that is Indian soldiers.

    Timimi is well aware of the media coverage regarding the LET's attack on the Indian Parliament. Timimi recalls that he has "read all about it". Timimi advised that as an academic, he keeps up with such current events, including the activities of the LET. Timimi had his doubts as to whether the LET actually conducted the attack and thinks that at the time of the attack, the U.S. government might have tried to use the incident to cast the LET in a bad light.

REDACTED

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On _06/27/2003_ . Page ___3___

    Timimi is also well aware of the LET's attack on the Red
Fort. Timimi also "read all about it". This was a "big event" and
garnered a lot of news coverage.

    It was common knowledge that the LET ran military style
training camps in Pakistan.

    Following the U.S. war in Afghanistan, rumors were widely
circulated that the LET was assisting members of the Taliban as
they fled from Afghanistan to Pakistan after Afghanistan's
collapse.

    Timimi first met HAFIZ SAYEED at an Islamic conference
organized by a group called the AHLE HADIS, a group of people who
follow the Sunnah. The conference was in the early to mid 1990's,
possibly 1993, 1994, or 1995. This particular conference was
typically held in Urdu on the first day and then in Arabic on the
second day. On the year that Timimi was invited to the conference,
they had decided to have a portion of the second day of lectures
presented in English. Also in attendance at the conference was
HAFIZ SAYEED. Timimi and SAYEED stayed at the same hotel in
Birmingham. Sometime during their visit, Timimi, SAYEED, and other
speakers met privately and discussed different topics, including
the topic of Kashmir. Most of the discussion was in Urdu, but
Timimi had a translator to assist him in his communications with
the others present. SAYEED spoke about the LET and his
organization's role in fighting in Kashmir. During this
discussion, SAYEED argued with another participant with regards to
whether a political or military solution would be the catalyst for
solving the Kashmir problem. It was SAYEED's position that the
military solution was the only way to effect the changes desired.

    Timimi has not had any substantive contact with SAYEED
since the Ahle Hadis conference. Timimi speculates that he and
SAYEED may have attended the same conferences over the years, and
therefore may have encountered each other. However, Timimi and
SAYEED have not maintained e-mail or telephone contact.

    Timimi recalled at least one occasion when he was invited
to speak at a Markaz ad Dawa annual conference in Pakistan. Ali
Timimi did not attend because of his long-standing policy of not
traveling to Pakistan or affiliating with any particular group.
Timimi has never participated in Markaz ad Dawa conferences, either
in person or by teleconference. Timimi has never written anything
for Markaz ad Dawa.

REDACTED

Continuation of FD-302 of ____Ali Mehdi Al-Timimi_____, On _06/27/2003_ , Page ___4___

Sometime after the conference, Timimi met HAFIZ SAYEED's brother at an Islamic conference in Boston. HAFIZ SAYEED's brother introduced himself to Timimi and advised that his brother, HAFIZ SAYEED, had met Timimi in 1993 or 1994, whatever year it was that they met. HAFIZ SAYEED's brother told Timimi that HAFIZ SAYEED says "assalamualaykum". Timimi thinks that HAFIZ SAYEED's brother was studying in Boston. Sometime around 1999 or 2000, Timimi gave a small talk at a hotel in Boston. During this visit to Boston, Timimi again met HAFIZ SAYEED's brother.

Timimi advised that he knows an individual named Yong KWON. Timimi recalls KWON because of his unique appearance, being that he is oriental. KWON used to attend Timimi's lectures at the Dar al Arqam on Friday nights. Timimi thinks that KWON was somewhat irregular in his attendance at Timimi's lectures. KWON also used to attend Timimi's lectures at individual homes prior to the Dar al Arqam's opening in 1999. Timimi's lectures at Dar al Arqam used to be attended by approximately fifty to one hundred people, many of whom were irregular in their attendance. Timimi did not establish a personal relationship with Kwon until around the time that Timimi moved from his old residence in Skyline (Falls Church, Virginia) to his current residence in Fairfax, Virginia. This move occurred in June 2001, possibly on June 1st or June 6th. KWON was one of about eighteen people who helped Timimi move his belongings from his old residence to his new residence. Sometime during the move, Kwon told Timimi that he lived nearby. After this move, KWON started driving Timimi to Dar al Arqam on Friday nights for Timimi's lecture. Timimi was out of town during a portion of July and August 2001. Timimi stopped lecturing at Dar al Arqam after 09/11/2001. As such, KWON probably only drove Timimi to Dar al Arqam about five times total.

Timimi recalls being invited to a dinner at KWON's house on 09/16/2001. Timimi recalls that the following were present at KWON's house for this dinner: CALIPHA BASHA, HAMAD ABDUR-RAHEEM, MASAUD KHAN, YONG KWON, AATIQUE (last name unknown), ISMAIL ROYER, and possibly AHMED KHAN. Timimi is less certain about whether AHMED KHAN was also in attendance. Timimi recalled that at one point during the dinner, NABIL GHARBIEH came with a friend, but promptly left. Timimi does not recall whether MAHMOOD HASAN was also in attendance. Timimi advised that he has known ROYER for a long time, but does not have as close a relationship with ROYER as he does with KWON. ROYER claimed to people that he fought in Bosnia.

00653

FD-302a (Rev. 10-6-95)

**REDACTED**

Continuation of FD-302 of _____Ali Mehdi Al-Timimi_____ , On 06/27/2003 , Page 5

During the dinner gathering at KWON's house, Masaud KHAN discussed the prospects for Muslims in the United States. KHAN speculated that there might come a time when Muslims would be put into internment camps. KHAN was concerned about how to respond if the authorities came to his house. Timimi encouraged those in attendance to go live in a Muslim country. Timimi is not aware of any travels by KHAN to Pakistan to join the LET. Timimi has heard that KHAN's family was tortured by the Russians during the Afghan war with the Russians.

There came a point in the dinner at KWON's house when Timimi decided to leave. As he was leaving, he overheard ROYER talking to a couple of people (Timimi couldn't recall which people) about how he could provide them a point of contact in Pakistan. Timimi was under the impression that ROYER may have been offering a contact for the members of the LET. Timimi recalls that before he left KWON's house, he admonished ROYER and the people he was talking to about considering going to Pakistan to partake in jihad with the LET.

During the aforementioned dinner, the person Timimi identified as AATIQUE told Timimi that he planned to travel to Pakistan. Timimi was not aware of intentions by AATIQE to partake in jihad with the LET.

A few days after the dinner meeting at YONG KWON'S house, Timimi met with YONG KWON and MAHMOOD HASAN. Timimi then became aware that they were planning a trip to Pakistan. Timimi advised them against getting involved with any questionable groups in Pakistan, such as the LET. Timimi told Kwon and Hasan not to make it their intention to do jihad, only to make it their intention to do hijrah. Timimi later heard rumors that KWON went to Pakistan and was killed. Timimi denied that he had any role in inspiring KWON to go to Pakistan to join the LET.

Timimi recalls a dinner gathering, prior to 09/11/2001, during which ROYER spoke to those in attendance about the LET. ROYER advised that he helped set up the LET web site, but did not indicate that he had participated in military activities with the LET. Royer advised that the LET was strong in its following of the Prophet and told others that the LET was made up of good Muslims, with good character.

Timimi is also acquainted with IBRAHIM HAMDI. Timimi recalls conversations with HAMDI in the year 2002, a time when

FD-302a (Rev. 10-6-95)

**REDACTED**

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On _06/27/2003_ , Page ___6___

HAMDI was going through a divorce. Timimi recalls at least one
instance when HAMDI indicated to Timimi that he had been in contact
during a trip to Pakistan with the LET and Markaz ad Dawa.

Timimi knows an individual named ALI ASAD CHANDIA.
CHANDIA was not present at KWON's house for the dinner on
09/16/2001. CHANDIA used to work at the Dar al Arqam as a
volunteer. CHANDIA was tasked with scheduling and coordinating
Timimi's various speaking engagements. Timimi recalls that about a
month after the 09/11 terrorist attacks, he learned that CHANDIA
had made plans to travel to Pakistan. Timimi became concerned that
CHANDIA might try to join the LET. As a result of these concerns,
Timimi asked HAMDI to travel to CHANDIA'S Maryland home to persuade
him not to join the LET. Timimi could not cite specific reasons
why he thought CHANDIA might undertake such endeavors, other than
the fact that CHANDIA, like all young Muslim men talk with great
bravado about their desire to partake in jihad. In those days,
young men were very interested in Jihad and martyrdom. Chandia,
just like other young men Timimi was familiar with, used to ask
hundreds of questions regarding jihad. Timimi lectured on the
topic of jihad, in addition to lectures that he provided on a
number of other topics.

Timimi knows an individual named SAIF CHAPMAN. Timimi
heard rumors that CHAPMAN went Pakistan to be with the LET. Timimi
does not have any first hand knowledge of CHAPMAN's association
with LET.

About a month after the 09/11 terrorist attacks on the
United States, a Saudi scholar named Sheikh UQLA wrote a paper
justifying the 09/11 attacks. Sheikh UQLA used for his
justification the premise that American citizens, by voting for
their national leaders, were vicariously responsible for US foreign
policy in countries such as Israel and Iraq. Timimi stated that he
and other scholars need to be well versed in all sides of religious
arguments and that scholars frequently all viewpoints on a
particular issue. This being said, Timimi did not consider Sheikh
UQLA's opinions to be sensible and did not espouse such opinions
himself.

In anticipation of a war between the United States and
Iraq, Timimi conferred with a Saudi scholar named Safar Al-Hawali
about writing a letter to the US Congress. Timimi suggested the
idea of Hawali writing a letter to Congress with the message that
both countries and all religions could co-exist. Timimi felt

00655

FD-302a (Rev. 10-6-95)

**REDACTED**

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On 06/27/2003 , Page ___7___

Sheikh Al-Hawali would be a good person to right this letter in that he is a recognized Muslim scholar.

In 1987 Timimi studied at the Islamic University at Medina in Saudi Arabia. Timimi occasionally acts as a reference to assist students in gaining admission to the Islamic University at Medina. Timimi does not recall whether he served as a reference for SABRI BEN-KHALA or AHMED ABU ALI, who are currently students at the Islamic University of Medina.

Timimi recalled a time when he was offered a position as a board member of the Islamic Assembly of North America (IANA). Ali Timimi refused the position.

Timimi stated that a Muslim can lie only when the Muslim is under the penalty of death, that is when the Muslim's life is threatened. Timimi advised that this rule would also apply to a situation when a Muslim is at war, which in itself is deception.

During the interview, Timimi provided the interviewing agents with a paper entitled "Muslims in America in the Face of Accusations of 'Fundamentalism' and 'Terrorism'", "Delivered at Purdue University, October 20, 1993". Timimi encouraged the interviewing agents to review this document and advised that the document is an example of his past stance on such topics.

Timimi also provided the interviewing agents with a series of e-mails between Timimi and Idris SURRATT, dated 01/17/2002, 01/19/2002, 01/21/2002, and 03/22/2002. The e-mail addresses used by SURRATT for these communications are _____ and                      The e-mail addresses used by Timimi are                  . .   and

Copies of the aforementioned documents, provided by Timimi during the interview, are submitted separately to the case file within an FD-340, 1A Exhibit.

00656

- 1 -

**REDACTED**

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    08/26/2003

        On 08/21/2003, Ali Mehdi Al-Timimi, born on            / in
Washington, D.C., Social Security Account Number          , was
interviewed at the United States Attorney's Office (USAO) for the
Eastern District of Virginia (EDVA) in Alexandria, Virginia.
Present during the interview were Al-Timimi's attorneys Martin
McMahon and Chris Smith.  In addition to the interviewing agents,
also present from the government were Assistant United States
Attorneys Grodon Kromberg and David Laufman, Department of Justice
Trial Attorney John Gibbs, Chief of the EDVA Criminal Division
Justin Williams, and Counsel to the U.S. Attorney Brian Miller.
After being advised of the identities of the interviewing agents
and the nature of the interview, Timimi provided the following
information:

        Al-Timimi (hereinafter Timimi) advised that he is
convinced that the government is after the wrong man.  Timimi
claims to have done more than any other English speaking Muslim
lecturer to speak against terrorism.  Timimi cited his 1993 lecture
at the Purdue University as an example of his stance on terrorism.
Timimi's speech at Purdue has been widely disseminated.  Timimi
feels that it was as a result of this speech at Purdue, that agents
from the Federal Bureau of Investigation (FBI) and the United
States Secret Service (USSS) pitched him to become their informant
in 1994.  Timimi turned down the recruitment pitch because he
associated with "non-violent circles" and thus would not be in a
position to provide useful information.

        Timimi advised that he is a popular speaker on Islamic
topics.  Copies of Timimi's tapes have been distributed and sold
all over the world.  Timimi advised that during his lectures, he
has consistently tried to convince his listeners that participation
in jihad is not the appropriate course of action.  Timimi cited an
example of when he was in Singapore in 1999 and he was introduced
telephonically to an individual in Indonesia (Timimi could not
remember his name) who wanted to participate in jihad.  Over the
course of three days, Timimi spoke to this individual from
Indonesia and tried to talk him out of his plans for jihad.  Timimi
later came to learn that due to his conversations with this

---

vestigation on    08/21/2003    at  Alexandria, Virginia

ile #                                        Date dictated    NA

by

This document contains neither recommendations nor conclusions of the FBI  It is the property of the FBI and is loaned
it and its contents are not to be distributed outside your agency.

00657

REDACTED

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On 08/21/2003 , Page ___2___

Indonesian individual, JAAFER TALIB, a representative of LASKAR
JIHAD in Indonesia, characterized Timimi as a deviant.  TALIB
discouraged people from sitting with Timimi.  Timimi was not aware
that HAMMAD ABDUR-RAHEEM, a former student of Timimi at the Dar al
Arqam, was associated with Laskar Jihad in Indonesia.  Timimi also
did not recall during his trip to Singapore, recommending that
someone speak to SABRI BENKAHLA.  Timimi does not recall writing a
letter of introduction to BENKAHLA for anyone that he met during
his trip to Singapore.

        Timimi recalled another example of when he convinced a
listener not to participate in Jihad.  In 2001 Timimi lectured at a
conference in Leicester, England.  During that conference, Timimi
discussed the concept of globalization.  Timimi advised that
although globalization is detrimental to the Muslim world and the
Muslim cultural identity, it also has some benefits, such as
technology.  During the conference, Timimi came to know a young man
who asserted that there was no other way to combat globalization
than by jihad.  Timimi said that he spent the next three weeks
convincing this man that jihad was not in his best interest.

        Timimi was presented with four-pages, consisting
primarily of Arabic text, downloaded from the following web-site:
http://www.alfjr.com/showthread.ph...3f362812e5f309d4d&threadid=130909, .
Timimi recognized the web-site and advised that the comments
contained therein were made by him in relation to the crash the
Space Shuttle in early 2003.  Timimi said that he did not actually
post the comments on the web-site, someone else did.  Upon review
of the information contained therein, Timimi confirmed that he had
made the statements.  Timimi advised that although his statements
were "severe", they were not inconsistent with comments made by
others about the crash of the space shuttle.  Timimi asserts that
his main contention, like others who commented on the crash, was
that the crash was an omen of things to come.  Timimi compared his
comments to those made by Samuel Huntington in "The Clash of
Civilizations".

        Timimi confirmed that he made the statements about
Muslims being overjoyed at the adversity that befell their greatest
enemy and that the shuttle crash made me feel that Western
supremacy that began 500 years ago was coming to a quick end.
Timimi considers the current policies utilized by the U.S.
administration as a "menace to Muslims and humanity throughout the
world".  Timimi could not explain the apparent inconsistency in his
statement about the problems with the current U.S. policy and his

REDACTED

Continuation of FD-302 of    Ali Mehdi Al-Timimi                    , On 08/21/2003   , Page    3

comments in the article about 500 years of Western dominance coming
to an end.  Timimi offered that a solution to the world's problems
was to have dialogue about the issues of the day, not to go out and
get bayonets and guns.

    Timimi was questioned about an article written by Caryle
Murphy for the Washington Post under the title "Muslim Lecturer
Fits Easily in Two Worlds, Mosque Leader, GMU Doctoral Candidate
May have Promoted Violence", dated 08/08/2003, and particularly
with regards to a specific section of this article which contained
the following:

        [T]imimi declined to be interviewed but responded to
        written questions via email and through a lawyer's
        spokesman, Todd Gallinger.  His remarks after the
        shuttle crash, Gallinger said, are apparently a
        reference to an Internet posting in which a "Sheikh
        Dr. Ali Al-Tamimi" stated after the crash that "the
        heart of every believer leaped with joy at the
        disaster of his greatest enemy."  Gallinger said
        that Timimi does not recall making that statement
        and that if he did, it was taken out of context.
        "He definitively did not say in the context of
        violent conflict," said Gallinger, although Timimi
        does believe that U.S. foreign policy "victimizes
        Muslims throughout the world" and that U.S. culture
        "is taking Muslims away from their religion."
        Timimi believes that the posting may have been
        written by someone who overheard a private
        conversation and mis-quoted him, Gallinger said.

    Timimi advised that Gallinger's statements to the
reporter were not accurate.  Timimi said that he did indeed make
the statements contained in the web-posting about the crash of the
space shuttle and that these statements were not taken out of
context and he was not "mis-quoted".

    As for Timimi's interaction with the "Taiba Bulletin",
Timimi was aware that Royer established this news service for the
Lashkar-e-Taiba (LET).  Timimi never posted any messages on the
Taiba Bulletin.  Timimi was aware of the LET's annual conference.
Timimi never attended, nor was Timimi ever invited, to the LET
conference.  Timimi was aware from his reading the Taiba Bulletin
that the LET used to blow up bridges and buildings.  Timimi was
also presented with a print-out from a Yahoo News Group titled

REDACTED

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On _08/21/2003_ , Page __4__

"Muslim World News".  The message on this web-site was posted from "Taiba Bulletin", email address: nadqpk@yahoo.com.  Timimi did not recognize this news group and did not recall accessing this news group or receiving mail from this individual.

Timimi advised that in the past he has been placed in positions of trust with the United States government.  In 1992, while Timimi was employed by Unisys, he worked on a project with the Department of Transportation (DOT) in which he created a contact database for the Director of the DOT, ANDY CARD.  In conjunction with this project, Timimi entered personal information for about 500 or 600 individuals into a database to be used by Card while conducting DOT business.  Timimi feels that he was trusted enough that he had access to personal information for a great number of important people, to include cabinet leaders and their children.  At the end of the project, Card wrote Timimi a letter of commendation for his work at DOT.  Timimi also worked for the U.S. Navy.

Timimi contends that Muslims in the world can be loosely categorized into the following four groups or trends: Modernists, who compromise their believes to mimic dominating social culture; Academics, who talk a lot about Islamic education and Islam in the form of intellectual critique; the Political Sector, who deal with political issues related to Islam; and those who are involved with jihad camps and who actually pick up guns and go fight.

Timimi was invited to the dinner meeting at Yong KWON's house (note: referenced in related indictment and during previous interview with Timimi) so that he could provide his opinion on what was going on in light of the events that transpired on 09/11/2001.  Timimi advised that at that time, he and others were very concerned about the potential for backlash against Muslims in the United States.  The men at KWON's house were extremely agitated and concerned.  During this meeting, someone suggested that all of the brothers should gather their families together and stay in one house.  The young men were scared that they would be dragged from their homes and thought that they would feel more secure if they all stayed together in one house.  The men were expecting something like a fight-out at the "OK Corral".  Timimi recalls that he provided advice to those at the meeting in the following generalized manner: first, turn to God and let this pass; second, avoid public places; and third, if you feel pressure, you should leave.  Timimi felt that the men were extreme in their predictions of what might happen to them in the United States.  Timimi told

REDACTED

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On _08/21/2003_ , Page ___5___

them that he thought the worst that could happen would be
internment camps.  Timimi thought that these men must have been
pre-disposed to training and jihad prior to the dinner gathering
that he participated in at KWON's house.

Timimi was read a quote attributed to Randall Royer in an
article written by Karen Branch-Brioso and printed in the Saint
Louis Post Dispatch on 06/12/2003.  Timimi was specifically
questioned about the following comments attributed to "Ismail
Royer, 30, the former St. Louisan and member of the paintball group
who attended al-Timimi's lectures.":

[W]e were all kind of confused about this
situation.... So Ali came and said, basically 'The
United States is going to declare war on the
Muslims, and it's not going to be restricted to any
one area.'  Ultimately he thought it was going to be
like World War III between the United States and the
Muslim world...

Timimi responded by saying that Royer was fundamentally
wrong in his statement detailed within the newspaper article.
Timimi does not believe Royer is intentionally lying, but just
wrong.  Timimi did not think that World War III or anything
analogous to the hour or day of judgement was approaching at the
time of the Kwon dinner meeting.  Timimi previously lectured on the
topic of Signs of the Hour of Judgement.  Timimi said that there
would be many signs of the end times, signs which were not present
shortly after 09/11/2001.  There would have had to have been a
complete change in the way the world was to see signs of the
Armageddon.

Timimi did not encourage, assist, or facilitate the
travel of anyone, including those with whom he met at Kwon's house
on or about 09/15/2001, to jihad related training camps or battle
grounds.

Timimi mentioned that he used to be closer to Nabil
GHARBIEH than any other individual identified in the indictment.
Timimi suggested that Gharbieh could comment on how Timimi
encouraged Gharbieh to go out and travel and see the world.

Timimi advised that after 09/11/2001, he moved to a
higher level with regards to his contribution to the Muslim
community.  Prior to 09/11/2001, Timimi primarily gave talks at the

REDACTED

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On 08/21/2003 , Page ___6___

Dar al Arqam to a limited number of local individuals. After
09/11/2001, Timimi stopped lecturing at the Dar al Arqam. During
the time when lectures at Dar al Arqam were suspended, Timimi held
a couple of lectures at his house. Once the Dar al Arqam lectures
reconvened, Timimi stopped the lectures at his house. Timimi felt
he would be more productive by associating with more influential
and international individuals. In that capacity, Timimi traveled
to Saudi Arabia to meet with Sheikh SALMAN AL-AUDA. During this
visit, Timimi convinced AL-AUDA and other prominent Muslim leaders
to draft a letter which was eventually entitled "How We Can
Coexist". Timimi claims to have written many of the early drafts
of this paper. The paper was eventually signed by about 100
people. Timimi provided a copy of this paper to the USAO/EDVA
during a previous meeting. Timimi said that he has never advocated
Muslims achieving their goals through violence. Timimi pointed out
that the final version of the "How We Can Co-Exist" letter did not
condemn USAMA BIN LADEN and left hanging the issue of whether USAMA
BIN LADEN was wrong. BIN LADEN later responded to the letter,
calling those who signed it "un-Islamic".

Sometime after 09/11/2001, Timimi was approached by
Sheikh Safar AL-HAWALI with questions about how he could go about
sending a letter to the U.S. President about the upcoming U.S.
military action in Afghanistan. Timimi suggested that Hawali hand-
deliver the letter to the U.S. Ambassador in Saudi Arabia. Timimi
did not have any involvement in the drafting of Hawali's letter
regarding Afghanistan. Timimi later assisted Hawali in drafting
and delivering a letter to the United States Congress regarding
potential United States military action in Iraq.

Timimi said that he is well schooled on theological and
philosophical concepts related to Islam. Timimi is not as well
educated in areas related to jurisprudence. Timimi typically
lectures on topics such as God, angels, and paradise. Timimi is
not a cleric and does not have a staff. During Timimi's lectures
however, people frequently ask about topics such as jihad which are
not completely in line with the topic of his lecture. Timimi
prepares for his lectures by writing his lecture notes in short-
hand, such as "5156" which refers to a particular verse in the
Qur'an. Timimi cannot always prepare for the questions asked by
his audience. Typically, Timimi responds to questions asked during
the question and answer phase with unprepared or "off-the-cuff"
remarks. Timimi has been educated on the theoretical concepts
related to jihad. Timimi does not feel however that his education
qualifies him to make rulings on the topic.

REDACTED

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____, On _08/21/2003_ , Page ___7___

Timimi advised that jihad (referring to warfare) is broken down into a communal and a non-communal obligation. In the communal obligation, as long as there are enough people willing and able to fight than an individual obligation does not apply. In the non-communal or individual obligation to participate in jihad, this can only occur in one of three cases. The first case is when the leader of the Muslims calls you up to fight, similar to the draft. The second is a geographical principal and relates to when a country is attacked by an outside force. In this case, it is obligatory for those within the country being attacked to defend themselves. It is also obligatory for Muslims in neighboring countries to assist those in the country being attacked by the oppressor, if those within the country being attacked cannot defend themselves adequately. This obligation continues in concentric circles until enough Muslims can join the fight to fend off the attacker/oppressor. The third situation is when one is on the battlefield and the battle actually comes to you. That is when one finds oneself in a location without war and then without warning finds oneself in a situation where one is in the midst of battle. Timimi said that the third option is unlikely because he could not think of a situation where the aforementioned scenario would logically occur. With regard to all of the above cases, the obligation to fight in jihad does not attach until the actual attack occurs.

During the interview, Timimi wrote some notes on a 5x7 inch sheet of white lined notebook paper. These hand-written notes were provided to the interviewing agents and are submitted separately to the case file in a 1A envelope. Timimi advised that topics related to jihad are commonly discussed in standard Islamic thought. Written beneath a notation for communal obligation, was the following "(necessitates the existence of an Imam over all Muslims)". However, when describing the three scenarios related to the non-communal/individual obligation, Timimi advised that the scenario described under case number one was not likely to occur because at present, there is not considered one legitimate leader of all Muslims who could call one up for obligatory jihad. Timimi was asked whether Mullah Omar, the former leader of the Taliban, was considered a leader of all Muslims. Timimi said that there has not been a legitimate ruler of all Muslims since about the year 1500. Even though many considered Mullah Omar as potentially serving this role, he was not actually the leader.

In relation to the discussion about of whether Mullah Omar represented the leader of all Muslims, Timimi presented and

REDACTED

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____, On _08/21/2003_, Page ___8___

read from a two-page typed paper entitled "Shaikh Ali Timimi on the Taliban and the Statues", by "Shaikh Ali Timimi, 7 March 2001". Timimi offered the information provided in this two-page paper as an example of past comments he has made with regard to the Taliban. A copy of this article is submitted separately to the case file, along with the interview notes, in a 1A envelope.

Timimi advised that the rules related to obligatory jihad should not be confused with rules related to whether an individual's participation in jihad is legitimate or permissible. Whether an individual's participation in a communal jihad is permissible or considered legitimate is a theoretical question based on a number of different conditions. Such conditions include whether the individual has obtained permission from his parents, paid off his debts and cared for his family, among others. In that regard, just because a jihad may not be considered "obligatory" based on the rules outlined above, it could still be considered valid, and as such an individual who died on the battlefield would receive the rewards due to a martyr if the necessary conditions were met. Timimi added that "those who die on the battlefield are the best of martyrs". There is no question that warfare is part of the Islamic law and religion. One cannot deny that. Islam is not a pacifist religion. There are conditions however, to whether one's participation in jihad is authentic. What some people do in the name of "jihad" is not authentic.

Based on the above, jihad in regions such as Kashmir and Chenchnya are considered by many to be a legitimate jihad, even though not necessarily obligatory. It was Timimi's opinion that Muslim men from Western Europe and America should not lend their efforts to these fights and instead should focus on obtaining their education. In that under the rules of the communal obligation, as long as there are enough people willing and able to carry out the fight, than others should assist in other ways and should pursue areas that serve the community best, such as getting their education. Timimi advocated dialogue and collective organization among Muslims in an effort to achieve their goals.

Timimi is not a "jihadi". Timimi has never participated in Jihad related combat or training himself. Timimi has never encouraged others to do the same. During the mid-1980's, many of Timimi's peers were going off to fight in Afghanistan against the Russians. There was as draw for young able-bodied men to go and fight. Timimi however, decided to focus on his studies. There is a similar jihadist environ out there today in cyberspace. Timimi

00664

REDACTED

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On _08/21/2003_ , Page ___9___

is not connected such jihadist topics and instead continues to
remain focused on academic and intellectual issues.

Timimi was asked whether he recognized statements made
during a lecture entitled ROLE OF MUSLIM STUDENTS IN NORTH AMERICAN
UNIVERSITIES. The statements read to Timimi related to communal
and non-communal obligatory jihad, when it is required to remove
dis-believers from attacked lands, and specifically related to an
individual who used to be a General in an army and therefore was in
possession of military skills. Timimi recalled giving such a
lecture, and advised that the statements read sounded like things
he would have said in response to questions asked by the audience
on the topic of jihad.

Timimi advised that he did not know that Kwon and Hasan
were planning to attend a training camp run by the LET when they
left the United States shortly after 09/11/2001. Timimi met with
Yong KWON and Mahmood HASAN a couple of days after the dinner
meeting at KWON's house. They told Timimi that they were leaving
the United States for hijrah. The topic of jihad was never
discussed or implied by Kwon and Hasan. However, Timimi felt
compelled to caution Kwon and Hasan that they should not make it
their intention to fight in jihad and to limit their intentions to
hijrah. Timimi explained that even though the topic of jihad was
never mentioned, other than Timimi's cautionary statement, "the war
drums were beating" and "things were spinning out of control". It
was clear from the press reports that the "US was moving into war".
Following this meeting, Timimi became even more concerned about
Kwon's and Hasan's intentions and actually asked someone else to
call them to try and convince them not to travel at all. Timimi
would not provide the name of this individual, advising that he and
his attorneys are working with the individual and trying to
encourage him to write a statement.

Timimi is currently pursuing his PHD at George Mason
University (GMU). In connection with these studies, Timimi works
on a state of Virginia sponsored research project related to the
causes of breast cancer. The building at which Timimi works houses
a number of administrative offices related his and other research
projects. Housed within the same building, are the offices of the
head of a Bio-Defense project. Timimi frequently talks to this
individual about questions related to scientific research. The
actual research for the Bio-Defense project is conducted at a
separate building. Timimi does not have access to that building.
The building at which Timimi works is of an administrative nature

REDACTED

and is not set up with the types of ventilation and other safety measures contained within the other building. Timimi does not have any interaction with scientific research of a sensitive nature.

Timimi provided the following additional comments with regards to his relationships with some of the individuals charged in a related indictment:

Ismail Royer - Timimi knew him to be a spokesperson for the COUNCIL ON AMERICAN ISLAMIC RELATIONS (CAIR).

Ibrahim Hamdi - Rumors were prevalent about Hamdi's travel overseas and attendance at a training camp. Timimi does not have any first-hand knowledge of Hamdi's intentions to go and train or fight overseas. Likewise, Hamdi never discussed details of his intentions or activities overseas, other than one reference that Hamdi made to Timimi while they were discussing Hamdi's divorce. Hamdi told Timimi that the divorce he was going through was more difficult than an activity that he engaged in (Timimi could not recall what activity) at the camp. Timimi did not ask follow-up questions to determine exactly what Hamdi meant by this comment, but assumes that Hamdi was referring to a military training camp. Hamdi was careful not to disclose the specifics of his trip.

Sabri Benkahla - Timimi does not have any knowledge of Benkahla's travel to any sort of a jihad or military training camp. All Timimi knew about Benkahla is that he was studying at the Islamic University of Medina.

Yong Kwon- Timimi was not even aware of Kwon's last name before the search of his residence in February 2003. Timimi recalls that Kwon asked him to witness his will prior to going to Saudi Arabia for hajj.

Saif Chapman - Timimi met Chapman many years ago at a time when Chapman was a security guard at the Saudi School. Timimi had been out of contact with Chapman for many years. Timimi never discussed overseas military or jihad training and/or the LET.

Timimi was not personally aware of the paint-ball activities being carried out by many of his students from Dar al Arqam. Timimi has recently heard from others he has talked to about this case, that he and other directors from the Dar al Arqam met about the paint-ball activities and thereafter encouraged those

REDACTED

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On 08/21/2003 , Page 11

participating in the activities to stop. Timimi does not specifically recall this happening.

        Timimi has long been friends with an individual named SOLIMAN AL-BOTHI. Al-Bothi is not an Islamic scholar. Al-Bothi used to work with Salman AL-AUDA on his web-site. This is the same web-site that YUSEF ESTES used to operate in the United States. Al-Bothi used to work for the AL-HARAMAIN office in Saudi Arabia. Al-Bothi resigned from this position a long time ago. Timimi introduced Mahmood Hasan to Al-Bothi. HASAN assisted Al-Bothi with the pre-launch work for Al-Bothi's English language web-site. Timimi learned that Hasan was not qualified to run the web-site once it was up and running and found a job teaching in Saudi Arabia instead.

        Timimi has met with Stanley Cohen about his legal situation. Timimi has not visited any of the defendants in jail.

        Timimi does not know an individual named IBRAHIM BUISIR in Ireland.

        Timimi knows an individual named ABU MUNTASIR, with JIMAS in the United Kingdom. Timimi advised that ABU MUNTASIR is Timimi's "best defense". Timimi offered to talk more about ABU MUNTASIR during the next interview.

- 1 -

**REDACTED**

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    11/18/2003

Ali Mehdi Al-Timimi, born on                in Washington, D.C., Social Security Account Number            , was interviewed at the United States Attorney's Office (USAO) for the Eastern District of Virginia (EDVA) in Alexandria, Virginia.  Present during the interview were Al-Timimi's attorneys Martin McMahon, Chris Smith, and Stephanie Fell.  In addition to the interviewing agents, also present from the government were Assistant United States Attorneys Neil Hammerstrom, Grodon Kromberg and David Laufman, Department of Justice Trial Attorney John Gibbs, and Counsel to the U.S. Attorney Brian Miller.  After being advised of the identities of the interviewing agents and the nature of the interview, Timimi provided the following information:

In support of Timimi's statements, Timimi and his attorneys provided the following information during the interview:

1)   Three (3) page resume;

2)   Two (2) page document titled "Letter to the 107th Congress of the United States Regarding the Resolution on the Use of Force Against Iraq", by Dr. Safar Al-Hawali, Dated October 6, 2002;

3)   Thirteen (13) page document titled "Muslims in America in the face of Accusations of Fundamentalism and Terrorism", by Ali Al-Timimi, Purdue University, October 20, 1993;

4)   Twenty-four (24) page document titled "How We Can Coexist", apparently printed from AmericanValues.org (Timimi advised that he was instrumental in convincing the individuals that authored and signed the letter to pursue this method of dialogue with the United States);

5)   One United States Passport for Ali Mehdi Al-Timimi, DOB: 12/14/1963, POB: District of Columbia, USA, Passport Number 013401548, Date of Issuance: 10/20/1987 at Washington, D.C., Date of Expiration: 10/19/1997

---

Investigation on    11/17/2003    at   Alexandria, Virginia

Date dictated    NA

or conclusions of the FBI.  It is the property of the FBI and is loaned your agency

00668

REDACTED

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On _11/17/2003_ , Page ___2___

[Administrative Note: Timimi's passport was photo-copied and returned to Timimi during the interview]  Timimi advised that the travel documented therein, which does not include trips to Pakistan and Afghanistan, supports his assertion that he is not a "jihadi";

6)  One (1) page document bearing the heading "Australia Lectures, Ali Al-Timimi, Australia, August, 2000, Lecture 1, The Purpose of our Existence";

7)  Two (2) page document bearing the heading "Political Revival in Islam, IANA Fifth Annual Conference, December 1997", which Timimi advises contains a summary of a lecture provided by Timimi;

8)  Three (3) page document titled "The Many Faces of Wahhabism", dated 07/02/2003, apparently published by Strategic Forecasting, LLC, www.stratfor.com;

9)  Three (3) page document bearing the heading "The Characteristics of Ahl as-Sunna, United Kingdom, February 1994", which Timimi advises contains a summary of a lecture made by Timimi;

10)  Two (2) page affidavit bearing the heading "Haytham Abu-Hantash", dated 11/15/2003;

11)  One (1) page affidavit bearing the heading "Affidavit of Yousuf Idris", dated 08/12/2003;

12)  One (1) page affidavit bearing the heading "Affidavit of Adel Tahir", dated 08/11/2003;

13)  One (1) page affidavit bearing the heading "Affidavit of Kamel Elmekki", dated 08/11/2003;

14)  One (1) page affidavit bearing the heading "Affidavit of A. Idris Palmer", dated 08/04/2003;

15)  One (1) page affidavit bearing the heading "Affidavit of Soliman Al-Buthi", dated 08/04/2003, indicating that Al-Buthi's address is Box 92684, Riyadh 11663, Saudi Arabia;

**REDACTED**

Al-Timimi (hereinafter Timimi) advised that no one has done more than himself in the western speaking world to speak out against the "jihadist" interpretation of Islam. Timimi advised that he is not a "jihadi" for the following reasons, he has never been to a jihad camp, he has never participated in jihad, and he does not shout and yell during his lectures in a manner that would encourage his listeners to go and participate in jihad. Timimi added that if he was a "jihadist" he would be trying to hide his tracks and would not speak so openly during lectures and conferences. Timimi said that the content of his lectures and writings are widely distributed and therefore well known. Timimi said that he is not proficient with the Arabic language and therefore only lectures in English. Timimi has never given a lecture or written a document regarding jihad in Arabic. Timimi conceded that his article on the recent crash of the Space Shuttle was written in Arabic. However, Timimi advised that he made no attempt to hide his comments and in fact he freely posted the article on the Internet and identified himself as the author, thus taking ownership for the statements made therein.

Timimi used an analogy to compare how people confronted the problem of slavery with the current manner in which people confront problems between Islam and the West. In an effort to confront the problem of slavery, Frederick Douglas chose to pursue a dialogue with Abraham Lincoln in an attempt to convince Lincoln that slavery was wrong; Harriet Tubman operated the underground railroad and provided a means of logistical assistance and support to slaves wishing to escape to freedom; and John Brown resorted to violence to confront the problem. Timimi compared himself to Frederick Douglas in his approach to dealing with the current day problems facing Islam and the West.

Timimi reiterated previous statements by advising that he did not know well the "kids" who attended the dinner meeting at Kwon's house. Timimi said that he only had a passing knowledge of these kids and did not even know the last names of many of them. Timimi is aware of the guilty pleas entered by several of the individuals charged in the case. Timimi believes that the individuals who pleaded guilty are wrong in their recollection of what was going on at the time of the Kwon dinner meeting. Timimi believes that when the Kwon dinner meeting occurred, Mullah Omar had not yet made the statements that he is alleged to have said by those who have pleaded guilty. Timimi further advised that the Taliban did not decide how they would respond to President Bush's

REDACTED

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On _11/17/2003_ , Page __4__

demands (which Timimi believes were made during Bush's speech on Thursday) for USAMA BIN LADEN until after the Kwon dinner meeting.

[Administrative Note:  Timimi was presented with a copy of the front page of the Washington Post on 09/16/2001, containing text from a news story that contains statements made by Mullah Omar.]

During the time following the 09/11/2001 attacks, Timimi paid close attention to current events.  Timimi advised that he read the Washington Post, among other news sources, and also watched the news.  Following a review of the Washington Post front-page presented during the interview, Timimi said "I stand corrected" and commented that he was off in his estimate of when Mullah Omar made his statements.  Timimi added that the statements described in the Washington Post article are a "far cry" from what these guys (referring to those who have plead guilty) are saying.

Timimi attended a number of conferences sponsored by the Islamic Assembly of North America (IANA).  Timimi does not recall meeting or introducing others to individuals from Australia. Timimi recalls that some Australians came to Virginia and visited the Dar al Arqam.  Timimi did not meet or see these individuals at an IANA convention.  Timimi never discussed with the Australians the topic of jihad, or jihad training and/or paint-ball activities at the Dar al Arqam.  Timimi does not recall the names of the individuals from Australia, but thinks they were either from Melbourne or Sydney.  Timimi thinks that the Australians were affiliated with an Islamic center that went by the letters "ICSA" or something like that.  Timimi recalls that one of the individuals he met from Australia was a body-builder of Lebanese descent who was born in Australia.

Timimi advised that he also met this same individual, the body-builder, during a trip he took to Australia.  Timimi traveled to Australia and gave a short lecture, in Arabic, at an Arabic speaking Mosque.  At this Mosque, Timimi encountered people that he believed were "gravitated towards jihad".  After Timimi's lecture, someone commented that Timimi spoke Arabic in a similar way to an individual who ran another Mosque.  Timimi traveled to this Mosque, possibly in Sydney, and met the Imam.  The Imam was was the body-builder described above whom Timimi met in Virginia.  Timimi does not recall the name of the body-builder.  The body-builder, who ran the Mosque, organized physical training for the young men who attended the Mosque.  Timimi was given a tour of the Mosque and was

REDACTED

Continuation of FD-302 of     Ali Mehdi Al-Timimi     , On 11/17/2003 , Page     5

shown a gym in the basement of the Mosque. The training consisted of activities such as boxing. Timimi did not discuss jihad with the body-builder. The body-builder did not provide any indication to Timimi that law enforcement was interested in him or his Mosque.

[Administrative Note: Timimi was presented with a four-page document entitled "Suicide Attacks are They Suicide? A Sharia Viewpoint".]

Following a review of the article, Timimi advised that he recognized the article as one that he had written, most likely for posting on the Al-Jazirah E-List. Timimi noticed that the article contained spelling and grammatical errors which further indicates to Timimi that he was probably only going to send the message to the e-list. In this article, Timimi specifically commented on the fact that those attacks carried out with good intentions and with the intended result being of some benefit to Muslims or harm to unbelievers, should NOT to be considered suicide in Islam. Timimi said that killing oneself as part of a military operation is Islamically permissible. The issue becomes complex however when trying to define a military operation. For example, in Palestine attacks on soldiers would be allowed, while attacks on civilians are questionable. Timimi does not know whether this article was ever published or used by others in a public manner.

[Administrative Note: Timimi was presented with a photo-copied business card seized from Timimi's house on 02/25/2003, administratively contained within evidence item 1B26, Item 25. The business card contained the following text: Markaz-Ud-Daawa Wal-Irshad, head office: 5-Chamberlane Road, O/S Mochi Gate, Lahore, Pakistan, Tel: 7231106, Fax: 92-42-7228894, Peshawar 840646, Islamabad 440260, Muzafferabad 2563, Karachi 479431.]

Following a review of the photo-copied business card, Timimi expressed his surprise that this business card would have been found in his house. Timimi does not know how or when he came to possess the business card. Timimi speculated that perhaps he had been provided the business card by HAFIZ SAYEED during their one meeting in 1994, but Timimi does not recall SAYEED giving him the card. Timimi also speculated that he could have received the business card at one of the many conferences or conventions that he has attended or perhaps the business card was attached to some of the LET magazines (possibly called Voice of Islam) that he possessed. Timimi never referred to this business card for the purpose of obtaining for himself or for providing to others a point

REDACTED

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On _11/17/2003_ , Page ___6___

of contact at the LET. Timimi did not provide the information contained on this business card to anyone, including the individuals who attended the Kwon dinner meeting.

[Administrative Note: Timimi was presented with a copy of an eight (8) page article printed from a web-page located by SA            on 10/31/2003 at the following web-site address: http://web.archive.org/web/20010824202920/supportersofshariah.org/eng/asap/shaheed.html. The article was entitled "An American Born Shaheed, An Example for All of Us".]

After reviewing the eight (8) page article, Timimi advised that he recognized this as an article that he previously sent to his brother. Timimi's brother told Timimi that the FBI had asked him (Timimi's brother) about this e-mail. Timimi does not know why or when he would have sent this e-mail to his brother. Timimi recalled that the article related to an American who died while participating in jihad, however, Timimi did not recall that the American died fighting with the LET. Timimi routinely sent interesting articles to his brother via e-mail. Timimi was not trying to encourage his brother to engage in jihad or to join the LET.

[Administrative Note: Timimi was presented with pages four (4) and five (5) of a nine (9) page article, entitled "Islamic Hijrah Defined and Detailed", printed from a web-page located by SA            .   on 10/31/2003 at the following web-site http://web.archive.org/web/20010809104839/www.supportersofshariah.org/eng/asap/hijrah-...]

After reviewing page four (4) of this article, Timimi advised that the types of hijrah described by the article's author are commonly accepted reasons for hijrah. Timimi agreed that the purpose of hijrah can fall into two categories, depending on whether the hijrah is to avoid something in the place where the Muslim is residing or it is for the purpose of achieving an objective in the land one is emigrating to. The book that the author of the article cites as the source of his/her summary of hijrah, Al-Qadhi Abu Bakr ibn ul Arabi, is a well-known Islamic text that is a widely accepted authority on such topics. Timimi advised that the type of hijrah that he was encouraging those at the Kwon dinner meeting to do was described by the article's author in point number three (3) of the first category. Point number three reads as follows:

**REDACTED**

Continuation of FD-302 of      Ali Mehdi Al-Timimi                          , On 11/17/2003 , Page    7

Hijrah to flee physical persecution. This is a
concession (Rukhsah) from Allah SWT, for us,
for the protection of ourselves and our
families. Our best examples in this category
are Prophets Ibrahim and Musa (as), when they
were persecuted by their people. Ibrahim (as)
said, "I am emigrating to my Lord." (:26), "I
am going to my Lord Who will guide me." (:99)
and Allah says about Musa, "So he left it
(Egypt) fearful of anticipating. He said, "My
Lord! Save me from the wrongdoing people."
28:21

During the discussion about this article, Timimi wrote in
blue ink a line pointing to text item number three (3), described
above.

[Administrative Note: Timimi was presented an article
titled O ALTIM.DOC,
Timimi was directed to
two (2) pages in particular that fell under the heading "Jihad in
the Path of Allah". Timimi was asked to comment on one hi-lighted
sentence that reads "Please put the verses of the sura At tauba".]

Following a review of these two pages, Timimi advised
that prior to 09/11/2001, ALI ASAD CHANDIA attempted to create a
consolidated collection of Timimi's past comments on a variety of
topics. Chandia listened to recordings of Timimi's lectures and
summarized his thoughts in this paper. Chandia presented the paper
to Timimi for his review and comments. The notation "Please put
the verses of the sura At tauba" was Chandia's notation to Timimi
asking Timimi for assistance. Chandia and Timimi had several
discussions regarding this project. Chandia did not go a very good
job because he did not use Timimi's verbatim statements. Timimi
determined that he would have to devote more time than he wanted to
reviewing Chandia's paper in order to ensure its accuracy. Timimi
did not have the time necessary to devote to Chandia's project and
therefore the project was never completed.

Timimi was asked to recall when and why it was that he
decided to un-subscribe from the Taiba Bulletin. Timimi estimates
that he un-subscribed after he learned that the LET was designated
as a terrorist organization. Timimi was asked why records from
Yahoo! would reveal that he actually did not un-subscribe from the
Taiba Bulletin until May 2003. Timimi does not recall why he would

REDACTED

have un-subscribed at that time, but speculated that perhaps he chose to un-subscribe to all Yahoo! groups at that time and not the Taiba Bulletin in particular.

Timimi called Sheikh SAFAR AL-HAWALI shortly after 09/11/2001 and asked AL-HAWALI for his take was on the recent events and on what would happen in the future. Sometime after this telephone call, AL-HAWALI contacted Timimi and told Timimi that he (AL-HAWALI) was preparing a letter to the President. AL-HAWALI and Timimi did not discuss the specific content of AL-HAWALI's letter to the President. Timimi did not have any involvement in drafting this letter. AL-HAWALI asked Timimi for his advice on how he could best get his letter to the President. Timimi suggested that AL-HAWALI should deliver the letter to the United States Ambassador to Saudi Arabia. For some unknown reason, AL-HAWALI was unable to pursue this method of delivery and instead AL-HAWALI decided to send his letter to the President via the Internet. AL-HAWALI went public with his letter to the President and an accompanying statement to Muslims on the recent events at the same time. Timimi recalls that he first read AL-HAWALI's statements when they appeared in his e-mail or when he saw them posted on web-sites. AL-HAWALI's were widely distributed and were the topic of much discussion.

Timimi advised that AL-HAWALI is not his formal teacher, since Timimi only studied under AL-HAWALI at the Islamic University of Medina for a brief time. Obviously during the time that AL-HAWALI was in jail in Saudi Arabia, Timimi did not have contact with AL-HAWALI. Timimi respects AL-HAWALI's opinions on a variety of topics and frequently refers to AL-HAWALI or his positions for guidance. Timimi considers his views on Islam to be in line with those of Hawali and advised that neither are aligned with USAMA BIN LADEN and that neither are considered "jihadis". Timimi has visited AL-HAWALI at his house. Timimi is aware of the widely circulated opinion that AL-HAWALI is one of USAMA BIN LADEN's spiritual leaders. Timimi thinks that opinion is based on USAMA BIN LADEN's specific mention of AL-HAWALI's imprisonment as a reason for his actions. Timimi has discussed this matter with AL-HAWALI and feels confident that AL-HAWALI does not agree with the tactics used by USAMA BIN LADEN.

During Timimi's visit to Saudi Arabia in December 2001, Timimi learned of a much stronger association between Sheikh UQLA and USAMA BIN LADEN. Prior to Timimi's trip to Saudi Arabia, he

REDACTED

Continuation of FD-302 of _____ Ali Mehdi Al-Timimi _____ , On 11/17/2003 , Page __ 9 __

was aware of UQLA's support of BIN LADEN, but not aware that UQLA and BIN LADEN maintained communication.

[Administrative Note: Timimi was presented with a six (6) page document, written in Arabic, bearing the title "The Eminent Sheikh Humood Bin Uqla Ash-Shu'aibi's Statement on the Events that Took Place in America.]

Timimi immediately recognized the document presented as being a Fatwa issued by Sheikh UQLA. Timimi advised that this fatwa was used by BIN LADEN to justify the 09/11/2001 attacks. Timimi recalled that he had this particular fatwa in his house at the time of the FBI's search. Timimi handed this particular fatwa to the searching agents, or at least directed them to where this fatwa could be found, amongst other UQLA related materials that Timimi maintained. Timimi was certain that he did not refer to this fatwa during the Kwon dinner meeting. Timimi does not think that this fatwa had been issued at the time of the Kwon dinner meeting. Timimi might have referred to this fatwa during meetings he had at later dates, along with the statement issued by AL-HAWALI, in an effort to provide examples of what scholars were saying about the events. Even if the fatwa had been released at the time of the Kwon dinner meeting, Timimi is certain that he did not refer to it then. Timimi does not recall giving a copy of the UQLA fatwa to anyone at the Kwon dinner meeting.

[Administrative Note: Timimi was presented with a ten (10) page document, written in English, bearing the title Sheikh Humood Bin Uqla Ash-Shu'aibi's Fatwa on the Recent Events, containing a number of hand-written English notations.]

Timimi advised that the document presented appeared to be a translation of the previously presented UQLA fatwa. Timimi did not recognize the hand-written notations marked on the document and does not recall ever seeing this document. Timimi does not recall DONALD THOMAS SURRATT ever providing Timimi with a copy of the English translation of UQLA's fatwa.

[Administrative Note: Timimi was presented with a 3 page e-mail, dated December 13, 2001, from altimimi@yahoo.com to flowe@northwestern.edu, nsast6+@pitt.edu, tamim11@yahoo.com, TariqN@aol.com, and Shibli@Zaman.net. The subject line on this e-mail reads: A call to reflect and repentance.]

REDACTED

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ .On _11/17/2003_ .Page __10__

Timimi recognized this e-mail as one he had sent. He was unable to provide any specific details on the identities of the persons who were the recipients of the e-mail. Timimi initially advised that he never met the people identified by e-mail addresses flowe@northwestern.edu or Shibli@Zaman.net. Timimi later advised that he might have met flowe@northwestern.edu at an IANA convention. Timimi believes that flowe@northwestern.edu is an African American from Chicago. Timimi believes that tamim11@yahoo.com is an Afghani who lives in Florida. Timimi knows an individual named Nazeeh AL-OTHMANI, whom he met in Mecca, Saudi Arabia. Timimi could not recall whether AL-OTHMANI is the user of the nsast6+@pitt.edu e-mail address. Timimi identified TariqN@aol.com as an individual living in Tennessee or Kentucky named Tariq NELSON. Timimi then advised that this individual's name was Tariq NASSER.

The seventh paragraph in this e-mail reads "I do not want to be labor the point, but, my earnest belief is that the brothers have been motivated in their positions by a great amount of emotionalism, and times, I am afraid to say delusion." In making his reference to "the brothers", Timimi was not speaking of the persons to whom the e-mail was addressed. Timimi may have used the term "the brothers" in this paragraph to refer to people who had previously posted opinions on the internet. Timimi could not recall what those opinions may have been. Timimi may have also been referring to the 09/11 hijackers when he used the term "the brothers".

The first paragraph on the second page of this e-mail discusses the range of opinions amongst Islamic scholars in regards to recent events (the 09/11 terrorist attack). Timimi writes that there is a proliferation of opinions..."As Sheikh Safar has commented in his 30 page declaration to the ummah (unfortunately translated into English)...the general body ummah was of a single opinion regarding the events until the scholars began to speak." Timimi reiterated that he holds Safar Al-Hawali in high esteem and is aware of his writings and positions on the United States.

[Administrative Note: Timimi was presented with a 22 page article entitled A Statement to the Ummah Concerning the Recent Events, by the Eminent Sheikh Safar bin 'Abdir-Rahmaan al-Hawaali. This document is written in English. Timimi was also presented with an Arabic version of this Al-Hawali article that was discovered in Timimi's residence during a search on 02/25/2003.]

REDACTED

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____, On _11/17/2003_ , Page __11__

Upon reviewing these two documents, Timimi acknowledged that the Arabic document found in his residence was the same one that was written in English under the title <u>A Statement to the Ummah Concerning the Recent Events</u>. Timimi compared several passages contained in the English article to the same passages in the Arabic article and surmised that the English version was an accurate translation of the Arabic version. Timimi advised that this article is the one he was referring to in his e-mail when he mentioned Sheikh Safar's declaration. Timimi was well acquainted with the contents of Sheikh Safar's declaration prior to sending out his e-mail. When Timimi mentioned Hawali's declaration in his e-mail, he was adopting Hawali's views as his own. Timimi could not recall anything that Hawali was saying about 09/11/2001 that he (Timimi) did not agree with.

[Administrative Note: Timimi was asked whether he agreed with the following summary/paraphrase of Hawali's position on the 09/11 attacks:

The attacks were only wrong because the attackers acted on their own without consulting the "scholars";

Even though the attackers acted without consulting the scholars (jumped the gun) they should still be considered mujahideen if their intentions were good; and

The actions of the attackers were now history, what is done is done, and thus Muslims now have to determine whether they should abandon other Muslims or stand by them regardless of whether they agree with how the fight started.]

Timimi responded by affirming that the summary/paraphrase presented by the interviewing agent was a good one.

Thereafter, Timimi was directed to several specific passages in the Hawali declaration. In particular, Timimi was presented with the following: Page 14, which contains a passage proclaiming the Pentagon and World Trades Center as legitimate targets to attack, and also contains a sentence describing the Al-Qaeda attacks in Aden (USS Cole), East Africa (US Embassies), and America as miracles; Page 11, which contains a paragraph professing that the US missile attacks allowed Al-Qaeda take revenge on the

REDACTED

Continuation of FD-302 of ___ Ali Mehdi Al-Timimi _____ , On 11/17/2003 , Page 12

U.S.; Page 5, which contains a section bearing the heading "Five" under which is a paragraph describing the 9/11 attackers as mujahideen; Page 8, which contains a paragraph describing one's obligation to support those who have acted in accordance with their faith and the implications that would befall jihad if the "people of knowledge started attacking the people of jihad"; and Page 12, which contains a paragraph under the heading "Ten" that relates to the intentions of the 9/11 attackers.

Timimi responded to the AL-HAWALI's sentiments by putting AL-HAWALI's statements into the context of an intellectual analysis of the situation. Timimi pointed out that AL-HAWALI is not as pro-Bin Laden as the media portrays him. In no way did Timimi express any disagreement with AL-HAWALI's statements. Likewise, Timimi did not advise that AL-HAWALI's position that which was described in the article presented during the interview, rather Timimi asserted that there was simply a difference of opinion between himself and the interviewing agents on how AL-HAWALI's statements should be interpreted.

[Administrative Note: During an interview of Timimi on 08/21/2003, Timimi advised that he did not know that Kwon and Hasan were planning to attend a training camp run by the LET when they left the United States shortly after 09/11/2001. Timimi met with Yong KWON and Mahmood HASAN a couple of days after the dinner meeting at KWON's house. They told Timimi that they were leaving the United States for hijrah. The topic of jihad was never discussed or implied by Kwon and Hasan. However, Timimi felt compelled to caution Kwon and Hasan that they should not make it their intention to fight in jihad and to limit their intentions to hijrah. Timimi explained that even though the topic of jihad was never mentioned, other than Timimi's cautionary statement, "the war drums were beating" and "things were spinning out of control". It was clear from the press reports that the "US was moving into war". Following this meeting, Timimi became even more concerned about Kwon's and Hasan's intentions and actually asked someone else to call them to try and convince them not to travel at all. Timimi would not provide the name of this individual, advising that he and his attorneys are working with the individual and trying to encourage him to write a statement.]

During the present interview, Timimi again refused to provide the identity of this person he asked to contact Kwon and Hasan in order to convince them not to travel. Timimi and his

REDACTED

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____, On _11/17/2003_ , Page __13_

attorney's are working with this person to make sure he is going to tell the same story that Timimi presented to the FBI.

[Administrative Note: Timimi was presented with a photocopy of a two page document with the heading obl.txt, that was retrieved from the residence of Masoud Khan in Gaithersburg, MD on 05/08/2003. The second paragraph reads "So here is America, Allah has struck it in one of its vital points, so He destroyed her greatest of buildings. And unto Allah is all praise (al-hamd) and He has favored us with this blessing (al-minna).]

Ali Timimi reviewed the above document and stated that it was a Bin Laden fatwa. Timimi recognized this fatwa as one he had seen before on the Al-Jazeera internet site.

At the time of the search on Timimi's residence on 02/25/2003 he had in the house several magazines published by the LET. These magazines were not seized during the search. Timimi offered to turn these magazines over to the US Government.

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/25/2004

On 06/24/2004, Ali Mehdi Al-Timimi, born ⬛ ⬛ ⬛ ⬛ in
the United States, Social Security Account Number⬛ ⬛
was interviewed at the United States Attorney's Office (USAO)
for the Eastern District of Virginia (EDVA).  Present during the
interview were Timimi's attorneys Martin McMahon, Chris Smith,
and Stephanie Fell.  In addition to the interviewing agents,
present from the U.S. Government were Assistant United States
Attorneys Neil Hammerstrom, Gordon Kromberg, David Laufman, and
Steve Campbell.  Also present were Rob Spencer, the EDVA
Criminal Chief, and John Gibbs, Department of Justice Trial
Attorney.  Ali Timimi had previously been advised of the
identity of the interviewing agents.  After being advised of the
nature of this interview, Timimi provided the following
information:

Ali Timimi agreed that he was freely and voluntarily
submitting to this interview, he stated his willingness to
answer questions posed in this interview.  Timimi advised that
he would voice his objection to any questions or areas of
inquiry that Timimi did not want to address and would request
that the questioning be redirected to more acceptable topics.
Timimi expressed his particular desire to address issues
directly related to his involvement, association, and influence
on the members of the Virginia Jihad Network.

Timimi has been speaking publically around the world
for nearly 20 years and in that time as many as 500 different
audio recordings have been made of his lectures.  Timimi speaks
mostly on topics of Islamic doctrine and belief, this is in
keeping with Timimi's training in philosophy and theology.
Timimi is not trained, nor does he speak formally on Islamic
jurisprudence, in this regard Timimi does not make religious
rulings.

In speaking all over the world, Ali Timimi addresses
contemporary topics of interest to Muslims, including jihad.
The topic of jihad is a fundamental belief in Islam and an issue
frequently discussed and debated by Muslims.  In this regard
Timimi is often asked questions about jihad during question &
answer sessions of his lectures.

---

Investigation on    06/24/2004    at  Alexandria, Virginia

Date dictated    NA

by  F. Wade Ammerman
    John V. Wyman

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ____Ali Mehdi Al-Timimi_____ , On 06/24/2004 , Page   2

      Ali Timimi has learned over the years that people can construct whatever they want out of something they see or hear. As an example, Timimi illustrated that a person looking at a painting of a boat might not see a boat, they might think they are actually looking at a banana.  Ali Timimi pointed to this boat example as reasoning for why his lectures must be looked at in their totality in order to put the message of his lecture into the proper context.  Furthermore, in order to fully understand the meaning of Timimi's lectures, a person should be familiar with the scholars and literary works Timimi refers to and quotes in his presentations.

      Ali Timimi is aware that tapes of his lectures are widely distributed throughout the world.  He does not receive any income from institutions that sell his tapes.

      [Agent note:  Timimi was asked to provide brief explanations of the circumstances of his lectures listed below. These lectures, contained on audiocassette, were seized during the execution of Federal search warrants and/or provided to the FBI by the Dar al-Arqam Islamic Center in response to a Federal Grand Jury subpoena]

      The tape series Principles of Fiqh was a weekly lecture series conducted by Timimi at a mosque in Washington, DC in the early 1990's.

      The tape series Tawheed and Shirk was a lecture by Timimi conducted as part of a seminar at a mosque in New York City in the early 1990's.

      The tape Was History Violated When Budaah's Statues Were Annihilated is an example of a contemporary issue Timimi that discussed.  Timimi provided this lecture at the Dar al-Arqam Islamic Center.

      The tape Role of Muslim Students in North American Universities was provided by Timimi at a time and location Timimi couldn't specifically recall.  Timimi thought that he might have given this lecture during a Ramadan holiday.

      The tape Jehilliyah at the end of the 20th Century was a lecture Timimi provided on two occasions, once in Singapore and once in Philadelphia, in the early 1990's.

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On _06/24/2004_ , Page ___3___

      The tape series The Keys to Paradise is a compilation of lectures Timimi has given over several years. The compilation of these lectures was a marketing ploy to sell more tapes. Timimi's discussion about jihad in these lectures is an example of how a listener must hear the entire lecture and have some basic knowledge of Islam to understand his message. It is also important for non-Muslims to realize that although jihad, which means war, is a integral part of Islam, it does not mean terrorism.

      The tape series The Luminious Creed was a presentation given by Timimi in the United Kingdom in the mid 1990's.

      The tape Purification of the Soul was an 18 week lecture series given by Timimi at the Dar al-Arqam Islamic Center. This lecture drew its content from a book written by Ahmed Farid, this book is available in English. This lecture was given in the year 2001, a few months preceding the 09/11 terrorist attack on the United States.

      The tape A Word of Advice to the Salafis in the UK was presented by Timimi in London sometime between 1994-1996.

      The tape series Signs of the Day of Judgement was a lecture series given by Timimi at the Dar al-Arqam Islamic Center in the year 2000. This lecture drew its content from a classical book written by Ibn Kathir about 600 years ago.

      Ali Timimi is aware that non-Muslims, particularly Americans, associate the Islamic tenet of Jihad with terrorism. In his presentations and discussions Timimi teaches people that Islam forbids the killing of innocents, even during an armed jihad (war). To understand how Islam embraces jihad, one should consider that every Muslim youth thinks of himself as a soldier, not necessarily with a gun, but by his deep seated desire to fulfill a role in an Islamic society. In one of Timimi's most sever political lectures, The New World Order, Timimi begins and ends the lecture with a statement which propagates peace.

      Other than Hafiz Sayeed and the men from the Virginia Jihad Network, Timimi has not met anyone else affiliated with the Lashkar-e-Tayyiba. Timimi recalled a time when he may have received an e-mail from a person who called himself Abu Baraa, Timimi believed this person to be an LET official. Timimi never

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On 06/24/2004 , Page ___4___

met Abu Baraa personally. Timimi was unable to recall specific circumstances of messages passed over e-mail with Abu Baraa.

Ali Timimi is very well educated on virtually every Islamic issue throughout the world. Because of his level of education and Islamic awareness, Timimi is well acquainted with the activities of the LET. Timimi knows that the LET conducts training camps for mujahideen who aspire to fight against the country of India over the disputed Kashmir region. Timimi is able to surmise that these training camps include the use of weapons. Since he has not been to an LET training camp, Timimi is not able to recite the specific regimen of instruction used at LET training. This being said, Timimi's vast Islamic knowledge is sufficient for him to be aware of the basic types of training LET must conduct in order to prepare its fighters for combat. Based on his breadth of knowledge, Timimi expects the LET to espouse anti-American sentiments. Timimi has read some of LET's Taiba Bulletins but he can't recall ever reading any anti-American comments in the bulletins.

During Timimi's travels in the Middle East and the Arab World he has heard people speak about LET. One common belief is that because LET trains so many mujahideen fighters, and LET training camps are so widely known, the LET has been infiltrated by intelligence agents. This perception of the LET being infiltrated by intelligence agents serves to persuade many Arabs not to associate with LET.

Timimi could not specifically recall any newspaper articles or television documentaries he may have seen about LET. Timimi could not recall watching or being made aware of an ABC News story on the LET which alleged a link between LET and Usama Bin Laden. The time Timimi spends pursuing his Ph.D. work precludes him from watching a lot of television.

No member of the Virginia Jihad Network ever described their LET training experience to Ali Timimi, with the exception of Ibrahim Hamdi. Timimi recalls a time when Ibrahim Hamdi was going through a divorce, Hamdi told Timimi that going through a divorce was more difficult than the training he received. In as much as Hamdi was known throughout the community as having attended LET training, Timimi knew Hamdi was referring to his LET training when making this comment.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On _06/24/2004_ , Page ___5___

      Timimi was aware that Ismail Royer had at one time spent time at an LET office in Pakistan. Royer told Timimi about assisting in setting up internet communications for the LET and Royer would occasionally describe the LET as having a good ideology.

      Mahmood Hasan did not tell Timimi about his (Hasan's) LET training experience at any time after Hasan returned to the United States from his LET training. Likewise, Hasan never commented to Timimi that he attempted to enter Afghanistan. Timimi had no conversation with any of the Virginia Jihad subjects about their experience at the LET after they returned from the United States at the end of 2001.

      On 09/16/2001, Timimi received a call on his residential or cellular telephone from Yong Kwon. Kwon advised that he had several brothers coming to his house and invited Timimi to join them. Timimi accepted the invitation over the objection of his wife, who didn't want to be left alone in the wake of the 09/11 terrorist attack on the United States. Despite his wife's objections, Timimi went to Kwon's house with the expectation he would be there for a short time. Yong Kwon came to Timimi's house and the two of them drove back to Kwon's residence.

      At the 09/16/2001 meeting at Yong Kwon's residence, Timimi did not tell anyone that LET was on the correct path. Timimi does not recall discussing the Uqla fatwa and believes the Uqla fatwa may have been published one day after the Kwon meeting (on 09/17/2001). Timimi provided the interviewing agents with a copy of a calendar for the month of September 2001. Marked on this calendar for the date 09/16/2001 is a notation for "Kwon Dinner". Marked on this calendar for the date 09/17/2001 is a notation for "UQLA". Timimi advised that he converted the Hijrah date for the Uqla fatwa to the Julian date. By Timimi's calculation, the Uqla Fatwa was not released until 09/17/2001, one day after the Kwon dinner meeting.

      Timimi can't recall reading from any fatwa at Kwon's house and denies giving any fatwa to Masaud Khan to read and then destroy. All of the comments Timimi made at the dinner originated in his head and not from a documentary reference. Timimi does not recall any security procedures being implemented at the Kwon meeting, such as unplugging telephones or closing the blinds on the windows. Timimi does not recall any

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On _06/24/2004_ , Page ___6___

discussion about the Kwon meeting being an "Amana" (trust). Timimi does not recall the arrival of Nabil Gharbieh or his friend Sherdil at Kwon's residence.

Timimi recalls giving some advice to the brothers gathered at Kwon's residence. He stated that the anti-Muslim backlash of the 9/11 terrorist attack would be a test for the Muslim Community. He advised the brothers not to be fearful and predicted that the worst that could happen would be Muslim leaders being sent to internment camps. Timimi advised everyone to pray, leave for a Muslim country if feasible, and to stay out of the public view. Timimi predicted that the United States would use the events of September 11th to initiate a large-scale attack. Timimi advised that war in Afghanistan was likely. Timimi predicted a quick operation but cautioned that American forces in the Middle East would turn into a protracted affair. Timimi may have told the group that mujahideen would flow to Afghanistan. Timimi does not recall telling anyone that jihad in Afghanistan was obligatory, however Timimi may have told the group that jihad in Afghanistan was permitted.

Timimi can't remember stating this at the Kwon gathering, but he thought the U.S. might use the war in Afghanistan as an excuse to use tactical nuclear weapons. Timimi was also of the belief that a war in Afghanistan would be used for another aim, that being to start a war with Iraq or Yemen. Timimi likewise can't recall if he voiced this belief at Kwon's residence.

When leaving the Kwon gathering, Timimi overheard Ismail Royer and a few other persons (can't recall who), talking about a phone number in Pakistan. Timimi couldn't state exactly what was said between Royer and these other guys but whatever it was he became aware the men were talking about making arrangements to partake in jihad training in Pakistan. In response to this observation, Timimi gave a hand motion in a disapproving manner.

Timimi was at the Kwon gathering for about 20-30 minutes. Kwon took Timimi back to his residence.

Timimi remembers a time about three years ago when Yong Kwon was preparing to go on the Hajj. In preparation for his trip, Kwon wrote a will and asked Timimi to review it. Timimi

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____, On 06/24/2004 , Page ___7___

is unaware of how he fit into Kwon's will or the role Kwon wanted Timimi to fill as executor of his estate.

Timimi recalled statements made during a previous interview in which he advised that he did not discuss signs of the end times during the Kwon dinner meeting on 09/16/2001. Timimi advised that the main sign of the end times will be the presence of Jesus on earth. Timimi also advised that during the Kwon dinner meeting he did not comment on whether the 09/11/2001 attacks could have been considered permissible.

Timimi would not reveal the identity of the person Timimi asked to contact Hasan and Kwon to discourage them from joining a jihad group in Pakistan.

Timimi met with Kwon and Hasan at a restaurant prior to their departure for Pakistan. Kwon and Hasan did not mention their plans to go to Pakistan to train with the LET or their goal of going to Afghanistan to fight. Kwon and Hasan told Timimi that they planned to get married. Kwon and Hasan gave no indication to Timimi that their intentions for travel were anything other than Hijrah. Nonetheless, Timimi felt compelled to urge Kwon and Hasan to make it their intention only to go for the purpose of Hijrah and not for the purpose of jihad. Timimi encouraged Kwon and Hasan to speak with Jaffar Idris about the matter as well.

Timimi was presented with a Maryland Driver's license photograph of Ali Asad Chandia. Chandia identified the person presented in the picture as Ali Asad or Chandia. During the year 2000, Chandia served as Al-Timimi's secretary. In this capacity, Chandia assisted Timimi with the scheduling of his lectures at locations other than Dar al Arqam. Chandia frequently asked Timimi questions about jihad. Chandia was especially interested in the subject of jihad and being from Pakistan it appeared to Timimi that Chandia was predisposed to the ideal of Islamic militancy. Chandia read much of the jihadi literature. One time Chandia asked Timimi about the writings of ABU BUSAIR. Timimi tried to discourage Chandia from reading such materials. Chandia never told Al-Timimi about any experience that he had with the LET.

During the month of October 2001, Timimi held two or at the most three lectures at his house. Timimi remembers Ibrahim Hamdi, Hammad Abdur-Raheem, and Caliph Basha attending meetings

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____ A.S. Mehdi Al-Timimi ____ , On 06/24/2004 , Page ___ 8 __

at his house. Timimi does not remember Chandia attending any lectures at his house during this time period. Even though Timimi does not specifically recall Chandia being present at his lectures, Timimi would not be surprised if Chandia was present because Chandia logically would have been one of the brothers invited to such lectures. Timimi does not recall any discussion about the LET during the meetings at his house. Likewise, Timimi does not recall any discussion of jihad in Afghanistan during the meetings at his house. Timimi never commented on whether it was obligatory for people to go fight in Afghanistan.

Timimi recalls that one evening at the beginning of Ramadan, early-November 2001, Chandia came to Timimi's house and told him that he was planning to go to Pakistan. Chandia made no mention to Timimi about his plans to join LET or to fight in Kashmir or Afghanistan. Timimi was aware at this time of press reporting that indicated Colin Powell had commented on the possibility of designating the LET as a foreign terrorist organization. Later in the same evening, Timimi spoke with Ibrahim Al-Hamdi. Timimi cannot remember under what circumstances it was that he encountered Hamdi. Timimi asked Hamdi to visit with Chandia and discourage him from joining LET while he was in Pakistan.

In late January 2002, Timimi returned to the United States from a trip to Saudi Arabia. After he returned, Chandia began to assist Timimi with the drafting of articles to submit to a web-site run by SALMAN AL-AWDAH called islamtoday.com. Chandia mentioned to Timimi that he met an Imam while he was in Pakistan who had studied in Mecca. Chandia asked Timimi whether he knew this individual. Timimi did not know the individual and told Chandia that Timimi studied in Medina, not Mecca. Other than Chandia's mention of the Pakistani Imam, Chandia did not provide any other information about his trip to Pakistan.

Timimi met with Masaud Khan on a couple of occasions after 09/11/2001. Timimi does not recall meeting with Chandia and Khan at a restaurant to discuss the FBI's interest in their activities. Likewise, Timimi does not recall talking to Chandia and Khan about Yong Kwon's return to the United States and Kwon's intention to cooperate with the United States Government.

Timimi mentioned an individual named ABU MUNTASIR during a previous interview. Abu Muntasir is the head of an organization based in the United Kingdom named JIMAS. Timimi

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ___Ali Mehdi Al-Timimi___ , On 06/24/2004 , Page ___9___

lectured at a number of JIMAS conferences. Timimi has known ABU
MUNTASIR for a long period of time. Timimi recalls lecturing at
a JIMAS conference in Leichster, England in late-August to
early-September 2001. It was during this conference that Timimi
fielded questions from an young Algerian man who was interested
in being a suicide martyr. This man argued that globalization
was not the answer and that jihad was the only way. Timimi
devoted time and effort to convince this man that violence was
not the answer.

[Agent note: Timimi was presented with photocopies
JIMAS stationary seized from Timimi's residence on 02/25/2003.
The stationary presented to Timimi contained hand-written
questions about jihad.]

Timimi could not recall when he received the questions
documented on the JIMAS stationary. Timimi was frequently asked
questions about jihad during his lectures. Timimi advised that
such questions were common and would often occur even during
non-jihad related conferences.

Timimi heard about the preaching of a man named ANWAR
AULAQI from IDRIS PALMER. Timimi learned that Aulaqi moved into
the area but did not meet Aulaqi personally until a later date.
Timimi learned that cassettes containing Aulaqi's lectures had
become popular amongst the youth. Timimi first met Aulaqi at
the August/September, 2001 JIMAS conference, where both were
speakers. Timimi had previously suggested to Abu Muntasir that
JIMAS might want to book Aulaqi as a conference speaker.

Sometime after 09/11/2001, Aulaqi appeared at Timimi's
house in the middle of the night. Timimi invited Aulaqi in for
tea and provided him with a small gift, possibly perfume, in an
effort to be hospitable. Aulaqi had provided a lecture at the
Dar al Hijrah earlier in the same night he visited Timimi.
Someone else brought Aulaqi to Timimi's house. Timimi could not
remember who this third person was. Aulaqi told Timimi that he
was visiting the United States from Yemen. Aulaqi told Timimi
that he relocated to Yemen because the FBI agents had threatened
him and told him that they intended to plant drugs in his house.
Aulaqi asked Timimi whether he thought the FBI would do such
things. Timimi told Aulaqi that it was possible. Timimi has
not had any contact with Aulaqi since this one visit to Timimi's
house. Aulaqi did not mention anything about his alleged
connections to some of the 09/11 hijackers.

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ____Ali Mehdi Al-Timimi_____ , On 06/24/2004 , Page ___10___

       Timimi was presented with a series of photographs, in response to which, Timimi provided the following information:

       #1 (Faheem LOHDI) - Did not recognize.

       #2 (Moustafa CHEIKHO) - Did not recognize.

       #3 (Willy Virgil BRIGITE) - Seen this person in the newspaper, does not know personally.

       #4 (Ibrahim al MUSA) - Did not recognize.

       #5 (Waseem LOHDI) - Looks like a Pakistani who worked as an economist at the World Bank. Timimi only met this person on one or two occasions.

       #6 (Mohammed Ajmal KHAN) - Does not recognize.

       #7 (Sheikh Abdel Salam ZOUD) - Does not recognize.

       #8 (Fayez an NACHAR) - Does not recognize.

       #9 (Sheikh Muhammad Jamal OMRAN) - Looks familiar but does not recognize.

       #10 (Unknown Subject) - Does not recognize.

       Sometime between February 2002 and June 2002, Chandia came to Timimi's house to provide Timimi with off information related to their research for Salman Al-Awdah's web-site. When Chandia arrived at Timimi's house, he was in the company of a Pakistani man who spoke with a British accent. This person spoke very little. Timimi attributed the man's silence to possibly being of a different religious sect or possibly being in "awe" of Timimi. Timimi clarified his comments about people sometimes being in "awe" of him. Timimi advised some of the younger men he meets are in "awe" of him because of Timimi's level of knowledge about a number of topics, not just being limited to those relating to religion, and his broad range of life experiences. Recordings of Timimi's lectures are distributed throughout the world and as such many people are aware of Timimi's stature as a religious figure.

       The Pakistani man said that he was staying with Chandia and that he was from Manchester, England. Timimi, who had been

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ___Ali Mehdi Al-Timimi_____ , On _06/24/2004__ , Page ___11___

to England on a number of occasions himself, asked what Mosque
the person attended.  The person responded by saying that he
stayed to himself.  Neither Chandia nor the Pakistani made any
mention of any connections between this person and LET.  This
person did not indicate the purpose of his trip to the United
States nor did he mention where he was going or with whom he was
meeting.  Timimi described the person as being about thirty to
thirty-five years of age, small frame, short black hair, clean
shaven or very short beard, and light complexion.  Timimi could
not recall the person's name.  All of the conversations
involving this individual were in English.  Following this one
encounter, Timimi never saw the person again and never discussed
the man or his activities further with Chandia.  Timimi was
asked to refer back to Picture #6 and compare the picture to his
recollection of the British Pakistani whom he had just
described.  Timimi advised that he person Chandia brought to his
house did not have a beard, like the person in Picture #6.
Timimi said that he was unable to determine whether the person
pictured was the same as the individual he met because the
person in the photo had a beard.

     Timimi attended a going away dinner for JAFAR IDRIS at
the Dar al Arqam on the night of 09/11/2001.  During this
gathering, Idris and Timimi talked about who may have been
responsible for the attacks that occurred earlier in the day.
Timimi commented that if the attacks had been carried out by BIN
LADEN than the reason they [the hijackers] had done what they
did was because they considered MULLAH OMAR the CALIPHA and thus
they considered their actions part of a legitimate offensive
war.  In response to Timimi's comments, HAYTHAM ABU HANTASH said
that no circumstances could justify the killing of innocents.
ABU HANTASH was emotional.  Timimi cooly responded to HANTASH,
saying that one cannot make an absolute statement that the
killing of innocents is wrong because under certain
circumstances innocents can in fact be killed during a time of
war.  Timimi could not recall providing further justification to
HANTASH about why such actions would be considered legitimate,
but advised that he was based this assertion on his knowledge of
Islamic thought that justifies the killing of innocents when
they are used by the enemy as human shields.  Timimi would not
characterize his discussion with HANTASH as an argument even
though HANTASH was emotional.  Timimi advised that JAFAR IDRIS
would have been the final arbiter on any dispute, however,
Timimi does not recall IDRIS contributing to the discussion.

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of _____Ali Mehdi Al-Timimi_____ , On _06/24/2004_ , Page __12__

　　　　　Timimi referenced a trip to Australia previously
discussed with the interviewing agents.  Timimi advised that
during this trip, Timimi stayed with an Australian of Saudi
descent by the last name QAHTANI.  Timimi stayed with QAHTANI
for one night during his trip.  Timimi also stayed one night
with the Australian bodybuilder [Agent Note: described during
previous interview] and another night with a native Australian.
Timimi could not recall the name of the native Australian.
During his trip to Australia, Timimi noticed that many of the
people he encountered were predisposed to a jihadi or extreme
version of Islam.  Timimi could not provide any additional
details other than his general perception of their views.

　　　　　Timimi recalled comments he made during a previous
interview about his lectures being posted on an LET web-site.
Timimi discovered that some of his lectures were posted on an
LET web-site by conducting Internet searches on his own name.
Timimi's lectures were widely distributed and it was common for
his lectures to be posted and distributed by individuals and
entities with whom Timimi was not affiliated.

　　　　　Timimi was presented with a series of exhibits which
represented photocopies of Arabic documents seized from Timimi's
house on 02/25/2003.  In response to these exhibits, Timimi
provided the following information:

　　　　　　　　A1 - Timimi recognized the handwriting contained
　　　　　　　　thereon as his own.  Timimi recalled drafting the
　　　　　　　　document in response to comments made by the head of
　　　　　　　　the National Religious Radio Broadcasters, who
　　　　　　　　described Islam as a pagan religion.

　　　　　　　　A4 - Timimi could not verify whether or not the
　　　　　　　　handwriting contained thereon was his own.  Timimi
　　　　　　　　eventually concluded that the handwriting was probably
　　　　　　　　not his own.  Timimi recognized a portion of the
　　　　　　　　document as containing four points that Timimi
　　　　　　　　regularly discussed during his lectures.

　　　　　　　　A6 - Timimi advised that the handwriting contained
　　　　　　　　thereon looked like his own.

　　　　　　　　A14 - Timimi said that the handwriting contained
　　　　　　　　thereon was not his own.

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ____Ali Mehdi Al-Timimi_____ , On _06/24/2004_ , Page __13__

A16 - Timimi recognized the handwriting contained thereon as his own.

A18 - Timimi recognized the handwriting contained thereon as his own.

A26 - Timimi said that the handwriting contained thereon was not his own.

A33 - Timimi said that the handwriting contained thereon was not his own. Timimi thought that the handwriting might be that of his wife.

A34 - Timimi advised that the handwriting contained thereon was possibly his own. The handwriting contained on page 197 appeared to that of his wife.

A35 - Timimi recognized the handwriting contained thereon as his wife's.

A36 - Timimi recognized the handwriting contained thereon as his own.

A37 - Timimi recognized the handwriting contained thereon as his own.

A41 - Timimi recognized the handwriting contained thereon as his own.

A43 - Timimi recognized the handwriting contained thereon as his own. Timimi recalled that he drafted the notes in an effort to summarize a lecture by Safar al-Hawali about the first Gulf War.

A44 - Timimi recognized the handwriting contained thereon as his own. Timimi advised that the notes contained thereon represented a summary of a Safar al-Hawali lecture.

A45 - Timimi recognized the handwriting contained thereon as his own. Timimi advised that the notes contained thereon represented a summary of a Safar al-Hawali lecture.