IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.  1:04cr385 |
| | ) | |
| ALI AL-TIMIMI | ) | |

RESPONSE TO ORDER OF APRIL 19TH

Ali Al-Timimi's motion for acquittal on Counts 7 and 8 should be denied.  As explained more fully below, Timimi's conduct remains encompassed by Section 924(c), regardless of the decision in *Sessions v. Dimaya*.

Background

Until his arrest in 2004, Ali Al-Timimi was a noted lecturer on Islamist topics around the world.  He was effective, in part, because he is a native English speaker who lectured with great eloquence and fervor.  Indeed, his lectures were sold around the world.  Further, Timimi maintained close connections to extremist leaders around the world.  Much of his scholarly credentials within the Islamist world was based on his studies with Safar Hawali, one of so-called "Awakening Sheiks" in Saudi Arabia.  He also was associated with Anwar Awlaki, with whom he met in Northern Virginia as late as 2002.

Timimi was prosecuted as the culmination of an investigation into individuals who attended the Dar al-Arqam Islamic Center in Falls Church, Virginia, where Timimi was the featured teacher until September 11, 2001.  Before 9/11, Timimi encouraged young men

attending the Islamic Center to prepare for jihad around the world.  At least in part due to his encouragement, at least four of his followers (Benkahla, Royer, Hamdi, and Chapman) traveled to Pakistan before 9/11, to engage in jihad training with the Pakistani terrorist group, Lashkar-e-Taiba ("LET").

Right after 9/11, Timimi counseled his followers to go to Afghanistan to fight against the American troops that he predicted would soon arrive to overthrow the Taliban.  As a result of his counsel, at least another four of his followers (Aatique, Khan, Kwon, and Hasan) immediately left Virginia for Pakistan to obtain training from LET, as an intermediate stop on their way to fight against American troops in Afghanistan.

In large part because the Taliban fell so quickly in November 2001, none of the individuals he counseled to fight in September 2001, actually made it to Afghanistan.  Three of them (Khan, Chapman, and Hammad Abdurraheem) were convicted at a bench trial in 2004, of various charges including seditious conspiracy, conspiracy to aid the Taliban, providing material support to LET, and violating the Neutrality Act by preparing to attack countries with whom the United States was at peace.

Six others (Aatique, Kwon, Hasan, Royer, Hamdi, and Surratt) pled guilty to related charges in 2003 and 2004; all but one (Surratt) received sentences of between 10 years and 20 years in jail.   Two more were convicted at separate trials in 2006; one (Chandia) was sentenced to 15 years in jail upon his convictions for providing material support to LET, and the other (Benkahla) was sentenced to 10 years in jail upon his convictions for grand jury perjury and obstruction of justice.   In a separate prosecution, another one of Timimi's followers, Omar Abu

2

Ali, was convicted of various terrorism charges, and sentenced to 35 years in jail, after

confessing to his membership in Al Qaeda and involvement in bombings in Saudi Arabia in

2003.  In short, Timimi inspired many of his followers to attempt to take violent action in

furtherance of a global jihad against the United States and its allies.

In September 2004, Timimi was indicted by a grand jury in Alexandria, Virginia, on the

following charges:

| Count | Offense | Statutory cite |
|-------|---------|----------------|
| 1 | Induce others to conspire to use firearms in furtherance of crimes of violence | 18 U.S.C. §§ 924(n) and 2 |
| 2 | Solicit others to levy war against the United States | 18 U.S.C. §§ 373 and 2381 |
| 3 | Induce others to conspire to levy war against the United States | 18 U.S.C. § 2384 and § 2 |
| 4 | Attempt to aid the Taliban | 50 U.S.C. § 1705 |
| 5 | Induce others to attempt to aid the Taliban | 50 U.S.C. § 1705 and § 2 |
| 6 | Induce others to conspire to prepare military expeditions against countries with whom the United States was at peace | 18 U.S.C. § 960 and § 2 |
| 7 & 8 | Induce others to use firearms in furtherance of crimes of violence | 18 U.S.C. § 924(c) and § 2 |
| 9-10 | Induce others to carry explosives during the commission of felonies | 18 U.S.C. § 844(h)(2) and § 2 |

After a two-week trial in April 2005, Timimi was convicted on all charges.  On July 13,

2005, he was sentenced to life in prison.  His appeal, however, has yet to be heard.

Immediately after his sentencing, Timimi filed a notice of appeal.  In 2006, before briefs

were filed, however, he moved the Fourth Circuit to remand his appeal for this Court to consider

his allegations that the government failed to provide him with information he claims was

collected by the National Security Agency.  Accordingly, in April 2006, the appeal was vacated

and the case remanded to this Court for consideration of Timimi's allegations.  In 2014, this

Court denied Timimi's various post-remand motions.  Timimi then renewed his appeal to the

Fourth Circuit.

In June 2015, Timimi sought and obtained another remand of his appeal, this time on the

grounds that of his assertion that the government had failed to provide to him in discovery

evidence that Timimi refused [what Timimi claimed was] a request to recruit Timimi's followers

for jihad made in 2002, by Anwar Awlaki, who [Timimi claimed] was then a government agent.

In July 2016, the Fourth Circuit granted Timimi's motion to expand the scope of the

remand also to consider the applicability of *Johnson v. United States*, 135 S.Ct. 2551 (2015), to

Timimi's convictions for aiding and abetting violations of 18 U.S.C. § 924(c).  Accordingly, in

October 2016, Timimi moved for acquittal for his convictions under Section 924(c)(3)(B).  On

November 21, 2016, this Court stayed that motion pending the Supreme Court's decision in

*Dimaya*.

On April 17, 2018, the Supreme Court issued its decision in *Dimaya*.  On April 19, 2018,

this Court directed the United States to show cause why Timimi's motion should not be granted.

As explained below, his motion should be denied.

<u>Argument</u>

In 2005 (to the best of our recollection), this Court instructed the jury that the following

offenses constituted crimes of violence for purposes of Counts 1, 7, and 8 of the indictment:

> a.      Levying war against the United States and conspiring to do so, in
> violation of Title 18, United States Code, Sections 2381 and 2384;

b.      Attempting and conspiring to supply services to the Taliban, in violation of Title 50, United States Code, Section 1705;

c.      Beginning, providing for, preparing a means for, and taking part in military expeditions and enterprises to be carried on from the United States against the territory and dominion of foreign states, districts and peoples with whom the United States was at peace - - and conspiring to do so - -  in violation of Title 18, United States Code, Sections 371 and 960;

d.      Enlisting and entering oneself or another to go beyond the jurisdiction of the United States with intent to be enlisted and entered in the service of any foreign prince, state, colony, district, and people as a soldier - - and conspiring to do so - - in violation of Title 18, United States Code, Sections 371 and 959;

e.      Conspiring to commit at any place outside the United States acts that would constitute the offense of murder or maiming if committed in the special maritime and territorial jurisdiction of the United States, in violation of Title 18, United States Code, Section 956(a);

f.      Conspiring to damage or destroy specific property situated within a foreign country and belonging to a foreign government or to any political subdivision thereof with which the United States is at peace, and any railroad, canal, bridge, airport, airfield and other public utility, public conveyance, and public structure and any religious educational and cultural property so situated, in violation of Title 18, United States Code, Section 956(b);

g.      Attempting and conspiring to providing material support and resources, knowing or intending that they are to be used in preparation for, or in carrying out a violation of Section 956 of Title 18, United States Code, in violation of Title 18, United States Code, Section 2339A;

h.      Attempting and conspiring to provide material support and resources to Al-Qaeda, in violation of Title 18, United States Code, Section 2339B;

i.      Enlisting and engaging with intent to serve in armed hostility against the United States  - - and conspiring to do so - - in violation of Title 18, United States Code, Sections 371 and 2390.

5

To the best of our recollection, in doing so, this Court did not instruct the jury that these predicate crimes were encompassed only by Section 924(c)(3)(A), only by Section 924(c)(3)(B), or both.

In light of *Dimaya,* it would have been error to instruct the jury that the predicate crimes necessarily were crimes of violence, if those crimes did not fit within Section 924(c)(3)(A).  As explained below, the predicate crimes necessarily *did* fit within Section 924(c)(3)(A).  Since they necessarily fit within Section 924(c)(3)(A) anyway, there was no instructional error, and the impact on Timimi's convictions from *Dimaya* is moot.

Moreover, even if the predicate crimes involved in Timimi's case did not necessarily fit within Section 924(c)(3)(A), trial evidence showed that - - as explained below - - the actual conduct solicited and induced by Timimi properly *was* encompassed under the correct post-*Dimaya* interpretation of Section 924(c)(3)(B).  Admittedly, if the predicate crimes involved in Timimi's case did *not* necessarily fit within Section 924(c)(3)(A), then, under the correct post-*Dimaya* interpretation, the question of whether such conduct properly fit under Section 924(c)(3)(B) *should* have been for the jury to determine.

In light of *Dimaya*, we now know that - - if the predicate crimes did not necessarily fit under Section 924(c)(A) - - then it was error to instruct the jurors that those predicate crimes *necessarily* constituted crimes of violence.  In that event, it should have been left to the jurors to determine whether the predicate crimes actually induced, solicited, or committed by Timimi constituted crimes of violence under the correct post-*Dimaya* interpretation of Section

924(c)(3)(B).  In light of the evidence at trial, however, if any such error occurred, it was harmless.

"A court commits a constitutional error subject to harmless error analysis when it omits an element of an offense from its jury instructions."  *United States v. McFadden*, 823 F.3d 217, 224 (4th Cir. 2016).  "Trial errors resulting from a failure to submit an element of an offense to the jury are not structural defects, but instead, are subject to harmless or plain error analysis." *United States v. Vazquez*, 271 F.3d 93, 103 (3d Cir. 2001) (*en banc*).

As the Supreme Court has explained, "an instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair." *Neder v. United States*, 527 U.S. 1, 9 (1999).  Indeed, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt."  *Id.* at 16.

"To establish harmless error in such a case, the government must show beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *McFadden*, 823 F.3d at 224. "The reviewing court must conduct a thorough examination of the record, and if the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error . . .  it should not find the error harmless." *Id.*  ("Both the Supreme Court and this Court have held that an erroneously omitted jury instruction may be

deemed harmless error if the omitted element is supported by overwhelming evidence admitted at trial").[1]

The trial testimony of Kwon, Hasan, and Aatique established that Timimi induced them to go to the LET camps to get jihad training in furtherance of a plan to fight against American troops expected to arrive in Afghanistan  - - or at least to fight on behalf of mujahideed elsewhere in the world.  That trial testimony - -  as corroborated by the recordings of Royer, the testimony of Surratt, and the testimony of Garbieh  - - established that in September 2001, Timimi endeavored to persuade them to fight against American troops expected to arrive in Afghanistan.

That same evidence established that Timimi attempted to provide support to the Taliban himself, and counseled and induced others to conspire to provide support to the Taliban. Timimi's intent to persuade them to wage war against America (and support the Taliban) is further corroborated by his email of October 21, 2001, when he wrote that Muslims were obligated to support Mullah Omar, the Taliban, "and the Arabs with them" with their bodies, their wealth, and their words.  GX 10D19.

That same evidence established that in September 2001, Timimi counseled and induced his followers to conspire to mount a military expedition against India or Russia, countries with whom we were at peace.  As the tapes of Royer's conversations with Kwon reflected, Timimi told his listeners that they should join the mujahideen anywhere in the world if they could not

---

[1] Internal citations and quotation marks are omitted throughout this pleading.

fight against American troops expected to arrive in Afghanistan.  The testimony of Kwon, Hasan, and Aatique established that they did, indeed, conspire to violate the Neutrality Act

Kwon testified that Timimi heard Royer describe at Hamdi's house his experiences at the LET camps.  Moreover, Special Agent Wyman testified that Timimi admitted that he knew that jihad trainees at LET camps used automatic weapons.  Timimi admitted that he sent his brother an article from the Supporters of Shariah website, "An American Born Shaheed," GX 10J11a, which recounted the training of a young American Muslim at LET, and his death in combat in Kashmir shortly thereafter.  That article stated:

> We were test firing the mounted grenade launcher on our kalashnikovs (AK-47 assault rifle)  We were firing old grenades that in had been in storage for quite a long time. . . . I walked outside only to see abu adaam [the American] practicing his firing stances and maneuvers with his AK-47 in the hot sun.

GX 10J11a, at pages 4-5.  In sum, the evidence established that Timimi counseled and induced Kwon, Hasan, Aatique, and Khan to conspire to use firearms in furtherance of crimes of violence; that Timimi well knew the types of weapons that his followers would conspire to use; and that they did, in fact, conspire to use those weapons in furtherance of the crimes of violence procured by Timimi.

Based on the trial evidence seen by this Court, the findings of the jury, and a proper interpretation of Section 924(c)(3)(B), this Court should find that any error with respect to the definition of "crime of violence" provided to the jury in 2005 was harmless.

I.    <u>The Conduct Solicited or Induced by Timimi Violated Section 924(c)(3)(A)</u>

Under 18 U.S.C. § 924(c), it is a federal crime to use or carry a firearm during and in relation to a crime of violence, or to possess a firearm in furtherance of a crime of violence.  The statute defines "crime of violence" as a federal offense that is a felony and - -

> (A)    *has as an element the* use, attempted use, or *threatened use* of physical force against the person or property of another, or

> (B)    that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3) (emphasis added).  Trial evidence establish that, based on the actual conduct solicited or inducted by Timimi, such offenses were "crimes of violence" under Section 924(c)(3)(A), in that those predicate crimes surely *threatened* the use of physical force against the person or property of another.

One definition of "*threaten*" is "to give signs or warning of," or "to portend."  *Webster's Ninth New Collegiate Dictionary* 1229 (1991).  When two or more people share the specific intent to embark on a military expedition against another country - - or to assist a foreign terrorist group, or make war on the United States of America - - that agreement, without more, "*portends*" the use of force, because the existence of the conspiracy makes the occurrence of the conspiracy's object far more likely.  As a result, the crimes that Timimi solicited and induced included - - as an element - -  the *threatened* use of force, and thereby each qualifies as "crime of violence" under the "force" clause of 18 U.S.C. § 924(c)(3)(A).  *See United States v. DiSomma*,

951 F.2d 494, 496 (2d Cir. 1991) ("DiSomma's crime of conviction, conspiracy to commit robbery, is a crime of violence because one of its elements is actual or threatened use of force").

This construction is entirely consistent with Congress's intent in defining a "crime of violence." Courts have long recognized that conspiracies to commit substantive offenses pose as great, or greater, dangers to society as the substantive offenses themselves. After all, "collective criminal agreement - -  partnership in crime - - presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Iannelli v. United States*, 420 U.S. 770, 778 (1975).

Inasmuch as the crimes solicited, induced, and committed by Timimi surely *threatened* the use of physical force against the person or property of another, it was no error for this Court to instruct the jurors that those predicate crimes were "crimes of violence" for purposes of Section 924(c).  As a result, *Dimaya* does not affect Timimi's convictions.

II.      *Dimaya* and the Non-Categorical Approach

Trial evidence also established that, based on the actual conduct that Timimi solicited and induced, his offenses were "crimes of violence" under the proper interpretation of Section 924(c)(3)(B).  In light of *Dimaya*, the proper interpretation of Section 924(c)(3)(B) is to determine whether a predicate offense is a "crime of violence" for purposes of that statute by examining the defendant's actual conduct in his particular case.

 Section 924(c)(3)(A) - - which defines "crime of violence" by reference to the "element[s]" of an offense - - requires a categorical approach, under which courts examine the

statutory definition of the crime that involved the firearm.  The government has previously

argued that Section 924(c)(3)(B) also requires a categorical approach, under which courts must

decide whether the requisite substantial risk of force inheres in the "ordinary case" of the crime

at issue.  In light of the Supreme Court's decision in *Dimaya*, however, that interpretation of

Section 924(c)(3)(B) raises serious constitutional questions.  Applying doctrines of constitutional

avoidance, the government now contends that - - as this Court previously suggested[2] - - the

better reading of § 924(c)(3)(B) is under a conduct-specific, rather than a categorical, approach.

The arguments in favor of such a reading appear below.

As this Court has already recognized (*see* Exhibit A), courts should instead construe

Section 924(c)(3)(B) to require that the classification of an offense as a "crime of violence"

under that provision be based on *the defendant's actual conduct in that case*.  That inquiry

presents a mixed question of law and fact that must either be resolved by a jury.  *See United

States v. Gaudin*, 515 U.S. 506, 509-10 (1995).  Such a construction comports with the text and

context of the statute; is supported by the canon of constitutional avoidance; and is consistent

with Supreme Court authority.

In *Dimaya*, the Supreme Court held that the definition of a "crime of violence" in 18

U.S.C. § 16(b) - - the language of which is nearly identical to Section 924(c)(3)(B) - - is

unconstitutionally vague as incorporated into the Immigration and Nationality Act (INA), 8

---

[2]  *See* Transcript of Hearing, *United States v. Chapman*, 1:03cr296-6, May 27, 2016, at
pp. 13-14, relevant portions of which are attached to this pleading as Exhibit A (further
referenced below).

U.S.C. § 1101(a)(43)(F).  138 S. Ct. at 1212, 1223.  The Supreme Court determined that "[t]wo features" on which it had previously relied to invalidate the "residual clause" of the Armed Career Criminal Act of 1984 (ACCA), 18 U.S.C. § 924(e)(2)(B)(ii),  were likewise present in Section 16(b) as incorporated into the INA.  *Dimaya*, 138 S. Ct. at 1213 (*quoting Johnson v. United States*, 135 S. Ct. 2551, 2557 (2015)).

The Supreme Court explained that Section 16(b), like the ACCA's residual clause, "calls for a court to identify a crime's 'ordinary case' in order to measure the crime's risk" and creates "uncertainty about the level of risk that makes a crime 'violent.'" *Id*. at 1215.  The Supreme Court emphasized, however, that the "substantial risk" feature gives rise to constitutional concerns only when combined with the "categorical approach" feature.  Id. at 1214-15.  The Supreme Court disavowed the view that the substantial-risk feature "is alone problematic," and it "'d[id] not doubt' the constitutionality of applying" a "'substantial risk [standard] to real-world conduct.'"  *Id*. at 1215 (quoting *Johnson*, 135 S. Ct. at 2561).

The Supreme Court also did not hold in *Dimaya* that language like Section 16(b)'s invariably mandates a categorical approach, under which a court must disregard real-world conduct in favor of attempting to identify the "ordinary case" of a particular crime.  A plurality of the Suprem Court viewed Section 16(b) - - which often, as in the INA context presented in *Dimaya* itself, is applied to classify a prior conviction entered by another court in otherwise unrelated proceedings - - as "[b]est read" to require such an approach.  138 S. Ct. at 1217 (opinion of Kagan, J.); *see id*. at 1216-18.

The plurality observed, however, that the government had not asked the Supreme Court to abandon the categorical approach in the Section 16(b) context.  *Id*. at 1217.  Justice Gorsuch, concurring in part and concurring in the judgment, similarly stressed that the government had conceded the categorical-approach issue in *Dimaya* and expressed his willingness to consider "in another case" whether "precedent and the proper reading of language" like Section 16(b)'s in fact requires a categorical approach.  *Id*. at 1233 (opinion of Gorsuch, J.).  And Justice Thomas, joined by Justices Kennedy and Alito, filed a dissenting opinion, advocating that the Supreme Court "should abandon [the categorical] approach" entirely under Section 16(b).  *Id*. at 1242 (opinion of Thomas, J.).

*Dimaya* did not include any holding by a majority of the Supreme Court that Section 16(b) requires a categorical approach, and it leaves open the same question for Section 924(c)(3)(B).  Although the majority of courts of appeals, like the government, have previously viewed Section 924(c)(3)(B) to require a categorical approach,  that view should be reconsidered in light of the constitutional concerns that such an interpretation would create following *Dimaya*.  *See, e.g., INS v. St. Cyr*, 533 U.S. 289, 300 (2001) (noting that a court is "obligated to construe

[a] statute to avoid [constitutional] problems" if it is "'fairly possible'" to do so)  (citations

omitted).[3]

As discussed below, courts should construe Section 924(c)(3)(B) to require a case-

specific approach that considers the defendant's own conduct, rather than the "ordinary case" of

his crime.  Such a case-specific approach makes particular sense in the context of Section 924(c),

which - - unlike Section 16(b) or the ACCA - - employs the term "crime of violence" exclusively

to describe the circumstances of the conduct for which the defendant is presently charged.

III.   Section 924(c)(3)(B) Should Be Interpreted with a Case-Specific Approach

Conviction under Section 924(c) requires a jury to find that the defendant "committed all

the acts necessary to be subject to punishment for" a qualifying federal crime and that his

---

[3]  The Fourth Circuit has pending before it multiple cases that potentially raise the constitutionality of § 924(c)(3)(B), and has requested supplemental briefing in at least two of them following *Dimaya*.  *See United States v. Ali*, No. 15-4433; *United States v. Simms*, No. 15-4640; *United States v. Mathis*, No. 16-4633.  Oral argument has occurred in *Simms* and *Mathis*, but not *Ali*.  The panels in *Ali* and *Mathis* also requested supplemental briefing after *Dimaya*.  In the interim, the Fourth Circuit has placed well over a dozen other matters, including numerous habeas appeals, in abeyance.  *See, e.g., United States v. Cuong Gia Le*, No. 16-7302, ECF No. 29;  *United States v. Blankeney*, No. 17-6425, ECF No. 18.

Cases raising the viability of this non-categorical approach to § 924(c)(3)(B) are currently pending before numerous courts of appeals.  *See, e.g., Ovalles v. United States*, 861 F.3d 1257, 1267 (11th Cir. 2017), *reh'g en banc granted, opinion vacated*, No. 17-10172, 2018 WL 2209427 (11th Cir. May 15, 2018).

The Seventh Circuit previously invalidated § 924(c)(3)(B) in *United States v. Cardena*, 842 F.3d 959, 996 (7th Cir. 2016).  After *Dimaya*, the Supreme Court granted, vacated, and remanded two certiorari petitions in Seventh Circuit cases after the government asked for an opportunity to argue for a non-categorical reading of § 924(c)(3)(B).  *See United States v. Jenkins* & *United States v. Jackson*, Nos. 17-97 & 17-651.

commission of that crime had a sufficient nexus to his use, carrying, or possession of a firearm.

*United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 (1999).  The jury's role, thus, inherently

requires consideration of, and determinations about, the unlawful course of conduct charged as a

"crime of violence" under Section 924(c)(3)(B).

On May 27, 2016, this Court made that very point.  At a hearing on a *Johnson* motion

filed by Seifullah Chapman, this Court noted why the categorical approach that might make

sense for the ACCA was not appropriate for Section 924(c)(3)(B):

> Again, I'm not -- I don't want to preview what might be my final decision,
> because I really have not resolved this issue in my own mind, and I think
> looking at more case law will be very helpful, but from a totally practical
> standpoint, the 924(c) issue is very different from the ACCA issue.
>
> When you're using the ACCA, you're -- as a judge, you're applying or
> deciding a sentencing issue, not a guilt issue, and you have to look at a
> prior conviction that you were not involved with in most cases.  You don't
> know any of the true details about it.
>
> With the 924(c), the predicate offense is very clear, and as the government
> says, you know, you don't have to use your imagination. You know
> exactly what the elements of that specific offense are, and in Mr.
> Chapman's case, they're very specific, you know, the violation of the
> Neutrality Act, and we've talked about this before in some of our other
> decisions in this case.
>
> So there's nothing speculative about what the elements are for the crime of
> violence in this particular case.

Transcript of Hearing, *United States v. Chapman*, 1:03cr296-6, May 27, 2016, at pp. 13-14 (the

relevant excerpts of which are attached as Exhibit A).  This Court was exactly right.

Unlike in the context of a recidivist sentencing enhancement (like the ACCA) or the

classification of a prior offense for purposes of determining an alien's removability (like Section

16

16(b) in *Dimaya*), Section 924(c)(3)(B)'s definition of a "crime of violence" is never applied to a prior conviction, the specific facts of which may not be before the court.  Instead - - as this Court noted in May 2016 - - a prosecution under Section 924(c) will by necessity involve a "developed factual record" about the underlying crime.  *United States v. St. Hubert*, 883 F.3d 1319, 1335 (11th Cir. 2018).  That feature of Section 924(c) cases enables the jury (or, in a bench trial, a judge) to apply the "crime of violence" definition in Section 924(c)(3)(B) in a case-specific manner that considers a defendant's own conduct.  Construing the statute to incorporate such an approach "makes good sense," *id*. at 1334, and is consistent with its text, context, and interpretation by the Supreme Court.

        A.      The Text Of Section 924(c)(3)(B) is
                     <u>Consistent With a Case-Specific Approach</u>

In order for an "offense" to be a crime of violence under Section 924(c)(3)(B), it must, "by its nature, involve[]" a substantial risk that physical force "may be used in the course of committing the offense."  18 U.S.C. § 924(c)(3)(B).  That language comports with a case-specific approach that relies on the conduct at issue in a particular prosecution.

As the Supreme Court recognized in *Nijhawan v. Holder*, 557 U.S. 29 (2009), "in ordinary speech words such as 'crime,' 'felony,' 'offense,' and the like  * * *  sometimes refer to the specific acts in which an offender engaged on a specific occasion."  *Id*. at 33-34.  The Supreme Court in that case accordingly interpreted a provision that used the term "offense" to "call[] for a 'circumstance-specific,' not a 'categorical,' interpretation."  *Id*. at 36; see 8 U.S.C. § 1101(a)(43)(M)(i).  The Supreme Court, in *United States v. Hayes*, 555 U.S. 415 (2009),

likewise construed a statutory reference to "an offense * * * committed by a current or former spouse," 18 U.S.C. § 921(a)(33)(A), as contemplating a factual, rather than a categorical, inquiry.  *Hayes*, 555 U.S. at 426.

As the Supreme Court explained in a later decision, the language at issue in *Hayes* was exactly the type of language that Congress would employ as an instruction "to look into the facts" of a crime.  *Mathis v. United States*, 136 S. Ct. 2243, 2252 (2016).  Section 924(c)(3)(B)'s similar reference to "committing the offense" can thus reasonably be understood to refer to the specific criminal conduct at issue in the Section 924(c) prosecution.  *See Johnson*, 135 S. Ct. at 2562 (recognizing that reference to the commission of an offense can indicate a case-specific approach).

Section 924(c)(3)(B) also uses the term "involves," a term that Congress repeatedly used in other provisions of the Comprehensive Crime Control Act of 1984 (the enactment that contained the original "crime of violence" definition for Section 924(c)), in a manner that requires courts to consider a defendant's underlying conduct.  See, e.g., Pub. L. No. 98-473, § 4243, 98 Stat. 1837, 2059 (Oct. 12, 1984) (elevating the burden of proof for the release of "a person found not guilty only by reason of insanity of an offense involving bodily injury to, or serious damage to the property of, another person, or involving a substantial risk of such injury or damage"); *id*. at § 502, 98 Stat. 2068 (establishing the sentence for drug offenses "involving" specific quantities and types of drugs); *id*. at § 1952B, 98 Stat. 2137 (defining violent crimes in aid of racketeering to include "attempting or conspiring to commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury").

18

Although the rule is not invariable, it is a "basic canon of statutory construction that identical terms within an Act bear the same meaning." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992) (citations omitted). Application of that canon makes particular sense in this context, because the Supreme Court has previously relied on the absence of the word "involves" as indicating that a categorical approach is required. *See Taylor v. United States*, 495 U.S. 575, 600 (1990).

A jury can readily determine whether a defendant's underlying "offense  * * *  by its nature, involves" the use of physical force in the course of its commission, without needing to consider what the "ordinary case" of that offense might be. The term "nature" refers to "the basic or inherent features, character, or qualities of something." Oxford Dictionary of English 1183 (3d ed. 2010). That "something" can be the defendant's own crime, rather than a stylized "ordinary case."

Congress has, for example, instructed sentencing courts to consider "the nature and circumstances of the offense"—naturally understood as the defendant's own conduct—in determining the appropriate sentence in a federal criminal case.  18 U.S.C. § 3553(a)(1); *see, e.g., Schware v. Board of Bar Examiners*, 353 U.S. 232, 242-43 (1957) (describing "the nature of the offense" of a bar applicant as "recruiting persons to go overseas to aid the Loyalists in the Spanish Civil War"); *see also Dimaya*, 138 S. Ct. at 1254 n.7 (Thomas, J., dissenting) (citing other examples).

Similarly, in the context of Section 924(c)(3)(B), the phrase "by its nature" can reasonably be read to "mean only that an offender who engages in risky conduct cannot benefit

19

from the fortuitous fact that physical force was not actually used during his offense." *Id.* at 1254
(Thomas, J., dissenting).  A jury (or, in a bench trial, a judge) finding the facts of a particular
offense is well positioned to also determine its "nature"—e.g., whether a particular conspiracy
that was as a factual matter largely or entirely inchoate nevertheless involved a substantial risk
that force would be used in its commission.

      B.      <u>The Context Of § 924(c)(3)(B) Supports a Case-Specific Approach</u>

      The statutory and jurisprudential context of Section 924(c)(3)(B) provides additional
support for the case-specific approach that this Court described in May 2016.

      The position and function of Section 924(c)(3)(B) suggest a statutory inquiry that goes
beyond the legal definition of an offense.  As noted above, Section 924(c)(3)(B) operates in
tandem with Section 924(c)(3)(A), which defines a "crime of violence" to include any federal
offense that "has as an element the use, attempted use, or threatened use of physical force."  By
focusing solely on the "elements" of the crime, Section 924(c)(3)(A) requires an "elements-
based categorical approach" by a court, rather than consideration of "the specific means by
which the defendant committed the crime" by a jury.  *United States v. Evans*, 848 F.3d 242, 245-
46 (4th Cir. 2017); *see, e.g., St. Hubert*, 883 F.3d at 1331; *cf. Mathis*, 136 S. Ct. at 2248
(explaining that the inquiry under a similarly worded ACCA provision "focus[es] solely on
whether the elements of the crime of conviction sufficiently match" the statutory definition).

      Section 924(c)(3)(B), however, is necessarily understood to cover offenses other than
those covered by Section 924(c)(3)(A).  *See Corley v. United States*, 556 U.S. 303, 314 (2009)
(explaining the "basic interpretive canon[]" that different provisions of a statute should be

interpreted to mean different things).  And because Section 924(c)(3)(A) already covers all offenses that have the legal element of physical force, Section 924(c)(3)(B)'s substantial-risk-of-force standard naturally invites an inquiry that goes outside the four corners of an offense's legal definition.

The customary way to apply a "qualitative standard such as 'substantial risk'" is to do so by reference "to real-world conduct," not platonic legal constructs.  *Johnson*, 135 S. Ct. at 2561. "[D]ozens of federal and state criminal laws" use such terms, and "almost all" of them "require gauging the riskiness of conduct in which an individual defendant engages on a particular occasion."  *Ibid*.

An "ordinary case" categorical approach is an anomaly, not the norm, and Section 924(c)(3)(B)'s "substantial risk" inquiry can thus readily be understood as a mixed question of law and fact that a jury (or, in a bench trial, a judge) would determine.  *Gaudin*, 515 U.S. at 509-10; *see id*. at 513, 522-23 (noting that, with the exception of "pure questions of law," "[t]he Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged") (emphasis omitted). Juries have resolved mixed questions of law and fact in light of the record of the case before them since the Founding, *see id*. at 511-15, and are fully capable of doing so in the context of Section 924(c)(3)(B).

C.      The Reasons For Applying The Categorical Approach to
Other Statutes Do Not Apply To Section 924(c)(3)(B)

The Supreme Court has required an "ordinary case" categorical approach only in the

context of statutes that are applied to classify prior convictions.  As this Court noted in May 2016

(see Exhibit A), the reasons for applying the categorical approach in that context do not extend to

Section 924(c)(3)(B), which instead applies only to the conduct giving rise to the current

prosecution.

The Supreme Court first endorsed a "categorical approach" interpretation of a federal

statute in *Taylor v. United States, supra.  See St. Hubert*, 883 F.3d at 1335.  The Supreme Court

in that case considered whether the ACCA's reference to a prior conviction for "burglary" meant

burglary as defined by state law or instead referred to "some uniform definition."  *Taylor*, 495

U.S. at 580.  The Supreme Court determined that Congress had intended to refer to burglary in a

uniform "generic" sense, *id*. at 598, and then addressed how the government would prove that a

defendant's prior conviction was for "generic burglary."  *Id*. at 599-602.

The Supreme Court resolved that issue by interpreting the ACCA to "mandate[] a formal

categorical approach, looking only to the statutory definitions of the prior offenses, and not to the

particular facts underlying those convictions."  495 U.S. at 600.  Under that approach, "an

offense constitutes 'burglary' for purposes of [an ACCA] sentence enhancement if either its

statutory definition substantially corresponds to 'generic' burglary, or the charging paper and

jury instructions actually required the jury to find all the elements of generic burglary in order to

convict the defendant."  *Id*. at 602.

22

The Supreme Court later interpreted the ACCA's now-defunct residual clause, which asked whether a prior conviction "involves conduct that presents a serious potential risk of physical injury to another," 18 U.S.C. § 924(e)(2)(B)(ii), in light of "*Taylor*'s categorical approach." *James v. United States*, 550 U.S. 192, 208 (2007).  The Supreme Court explained that the categorical approach for the residual clause required an inquiry into "whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another."  *Ibid*.

The Supreme Court has also "generally"—but not invariably—"employ[ed] a 'categorical approach'" when "the Government alleges that a state conviction qualifies as an 'aggravated felony' under the INA."  *Moncrieffe v. Holder*, 569 U.S. 184, 190 (2013); *see Nijhawan*, 557 U.S. at 33-38 (applying a case-specific approach to a particular portion of the "aggravated felony" definition).    The Supreme Court's use of the categorical approach in that context has extended to 18 U.S.C. § 16, which is incorporated by reference into the aggravated-felony definition, as well as "a variety of [other] statutory provisions, both criminal and noncriminal."  *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004); *see id*. at 7 (stating that the "language" of Section 16 "requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to [an alien's] crime"); *see also Dimaya*, 138 S. Ct. at 1258 (Thomas, J., dissenting) (viewing *Leocal* as non-binding because *Dimaya* "largely overrules" it).

*Taylor* adopted the categorical approach for reasons that were largely specific to the ACCA's focus on prior convictions and have no direct analogue in the context of Section

23

924(c)(3)(B).  *See* 495 U.S. at 600-02; *see, e.g., id.* at 600 (reasoning that the ACCA required a

categorical approach because that statute "refers to 'a person who . . . has three prior *convictions*'

for—not a person who has committed—three previous violent felonies or drug offenses")

(emphasis added).  At the "heart of the decision" was a limitation on the amount of evidence

about the circumstances underlying prior convictions that the parties would be permitted to

introduce for the first time at sentencing.  *Shepard v. United States*, 544 U.S. 13, 23 (2005); *see*

*Taylor*, 495 U.S. at 601 (explaining why "the practical difficulties and potential unfairness of a

factual approach are daunting" in that context).

Prior convictions "that are counted for an ACCA enhancement are often adjudicated by

different courts in proceedings that occurred long before the defendant's sentencing."  *United*

*States v. Robinson*, 844 F.3d 137, 142 (3d Cir. 2016).  In *Taylor*, for example, the two prior

burglary convictions at issue had been adjudicated in Missouri state courts at least 17 years

before they were introduced to support an enhanced federal sentence under the ACCA for an

unrelated federal gun crime.  495 U.S. at 578 & n.1.

In such cases, the categorical approach serves the "'practical' purpose[]" of "promot[ing]

judicial and administrative efficiency by precluding the relitigation of past convictions in

minitrials conducted long after the fact."  *Moncrieffe*, 569 U.S. at 200-01 (citation omitted).  The

same is true for many statutes that incorporate Section 16(b), including the immigration statute at

issue in *Dimaya*.  *See Dimaya*, 138 S. Ct. at 1218 (plurality opinion) (observing that the "utter

impracticability" and "associated inequities" of a fact-based approach are "as great" in the

context of classifying prior convictions under Section 16(b) as they were under the ACCA's residual clause) (citation omitted).

As explained in later cases, judicial factfinding involving prior convictions during sentencing also presents concerns about potential violations of the Sixth Amendment. A judge's resolution of the disputed facts underlying a defendant's prior conviction at sentencing would be "too much like" the kind of factfinding that the Sixth Amendment requires the jury to conduct. *Shepard*, 544 U.S. at 25 (plurality opinion); *see Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (holding that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt").

Thus, in the context of the ACCA's residual clause, which increases the statutory sentencing range for certain federal firearm crimes if the defendant has a sufficient number of qualifying prior convictions, the categorical approach was required in order to comply with the "rule of reading statutes to avoid serious risks of unconstitutionality." *Shepard*, 544 U.S. at 25 (plurality opinion). The same is true of many criminal statutes that incorporate Section 16(b). *See, e.g.*, 8 U.S.C. § 1326(b)(2) (providing an increased statutory-maximum term of imprisonment for an alien who illegally reenters the United States and has a prior conviction for an "aggravated felony," which includes a "crime of violence" under Section 16).

For those practical and constitutional reasons, "[t]he categorical approach serves a purpose when evaluating prior state convictions committed long ago in fifty state jurisdictions with divergent laws." *St. Hubert*, 883 F.3d at 1336. But - - as this Court noted in May 2016 (see

25

Exhibit A) - - it does not serve that purpose in the context of Section 924(c)(3)(B), where a jury has the factual record of the underlying offense before it, and must determine whether the defendant committed that offense before determining whether the defendant's use, carrying, or possession of a gun violated Section 924(c).

Unlike in the context of the classification of prior crimes, no practical or constitutional reason exists that would require courts to "analyz[e] a § 924(c) predicate offense in a vacuum." *Robinson*, 844 F.3d at 143.  In the trial context, "[t]he jury's determination of the facts of the charged offenses unmistakably shed[s] light on whether the predicate offense" qualifies as a crime of violence.  *Id*. at 141.  In that circumstance, "[t]he remedial effect of the 'categorical' approach is not necessary."  *Ibid*.

Nor does an underlying-conduct approach give rise to any of the Sixth Amendment concerns that animated the Supreme Court's adoption of the categorical approach.  "[A]ny fact that increases the penalty for a crime" under Section 924(c) is "submitted to a jury, and proved beyond a reasonable doubt."  *Apprendi*, 530 U.S. at 490.  Accordingly, the defendant "suffers no prejudice because the court is not finding any new facts which are not of record in the case before it."  *Robinson*, 844 F.3d at 143.  This Court's analysis was correct in May 2016 (*see* Exhibit A).

D.   Principles Of Constitutional Avoidance Support Construing
Section 924(c)(3)(B) To Require A Case-Specific Approach

Indeed, in the context of Section 924(c)(3)(B), constitutional concerns point in precisely

the opposite direction, and counsel in favor of a case-specific, rather than a categorical,

approach.

A court is "obligated to construe [a] statute to avoid [constitutional] problems" if it is

"'fairly possible'" to do so.  *St. Cyr*, 533 U.S. at 300 (citations omitted); *see Jennings v.

Rodriguez*, 138 S. Ct. 830, 836 (2018) ("Under the constitutional-avoidance canon, when

statutory language is susceptible of multiple interpretations, a court may shun an interpretation

that raises serious constitutional doubts and instead may adopt an alternative that avoids those

problems.").

That is particularly true where, absent a reasonable limiting construction, a statute could

be deemed void for vagueness.  *See United States ex rel. Attorney General v. Delaware &

Hudson Co.*, 213 U.S. 366, 407 (1909) (noting that courts have a "plain duty" to adopt any

"reasonabl[e]" interpretation of a statute that avoids constitutional concerns, rather than

invalidating the statute as unconstitutionally vague); *cf. Clark v. Martinez*, 543 U.S. 371, 381

(2005) (noting that the constitutional-avoidance canon "is a tool for choosing between competing

plausible interpretations of a statutory text, resting on the reasonable presumption that Congress

did not intend the alternative which raises serious constitutional doubts").

A court should not, therefore, lightly conclude that Congress intended Section

924(c)(3)(B) to be applied in a manner that would render the statute unconstitutionally vague.

27

Instead, the better interpretation of Section 924(c)(3)(B), in light of *Dimaya*, is that the statute permits a jury to consider the defendant's real-world conduct in determining whether his offense qualifies as a crime of violence.

In this particular case, the better interpretation of Section 924(c)(3)(B) would be to permit this Court to consider the actual real-world actions that Timimi solicited, induced, and committed, in determining whether those offenses qualified as crimes of violence.  Based on the facts that were adduced at trial 13 years ago, they surely did.  Since those crimes surely qualified as crimes of violence under the proper post-*Dimaya* interpretation of Section 924(c)(3)(B), any instructional error at Timimi's trial in 2005 was harmless.

Conclusion

For the above reasons, Timimi's motion should be denied.

Respectfully submitted,

Tracy Doherty-McCormick
Acting United States Attorney


_____/s_____
Gordon D. Kromberg
Assistant United States Attorney
Virginia Bar No. 33676
Assistant United States Attorney
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 837.8242 (fax)
gordon.kromberg@usdoj.gov

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of May 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all attorneys of record.

_____/s_____
Gordon D. Kromberg
Assistant United States Attorney
Virginia Bar No. 33676
Assistant United States Attorney
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 837.8242 (fax)
gordon.kromberg@usdoj.gov

29