**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| *Plaintiff*, | ) |
| v. | ) Case No. 1:04-cr-385 (LMB) |
| ALI AL-TIMIMI, | ) |
| *Defendant*. | ) |

**REPLY BRIEF IN SUPPORT OF AL-TIMIMI'S RENEWED MOTION FOR ACQUITTAL ON COUNT 1 IN LIGHT OF INTERVENING AUTHORITY**

The government's attempt to sustain Count 1 relies on a mistaken assessment of both the law and the record. Count 1 charged Al-Timimi with aiding and abetting a § 924(o) conspiracy formed by several of the paintball defendants who were tried separately in the case of *United States v. Royer, et al.*, 1:03-cr-296-LMB (E.D. Va.). As this Court has recently observed, when a defendant is accused of aiding and abetting a residual clause offense, the Court must first examine the conduct of the principals to determine whether their conduct presented a substantial risk that force would be used against the person or property of another. *Id*. at Dkt. No. 926 ("Royer Op.") at 34-35, n.18.

This Court has already performed that inquiry, having recently examined the conduct of Khan, Aatique, Kown, Hasan, and Chapman—all named as principals to the same § 924(o) conspiracy Al-Timimi is charged with aiding and abetting—and concluded that there was no evidence to suggest that their actions ever involved a substantial risk of physical force being used against the person or property of another. Royer Op. at 34; *see also United States v. Chapman*, No. 1:03-cr-296-LMB (E.D. Va., July 19, 2018), Dkt. No. 914 ("Chapman Op.") at 24-29;

*United States v. Khan*, No. 1:03-cr-296-LMB (E.D. Va., August 1, 2018), Dkt. No. 922 ("Khan Op.") at 31-32. Accordingly, Al-Timimi is entitled to acquittal of his § 924(o) accomplice liability conviction for the same reasons that the principals were entitled to vacatur of their convictions.

I. **Count 1 charged Al-Timimi with aiding and abetting a § 924(o) conspiracy; accordingly, the conduct-based approach to its residual clause requires an evaluation of the conduct of the conspiracy members.**

The government begins its opposition brief by claiming that Count 1 charged Al-Timimi with inducing others "to use" firearms in relation to crimes of violence. Govt. Opp. at 1-2. This is incorrect.

Count 1 was based on an unusual legal theory that chained together two different forms of inchoate liability—accomplice liability and conspiracy—to charge Al-Timimi with aiding and abetting a conspiracy pursuant to 18 U.S.C. §§ 2 and 924(o).[1] Dkt. No. 47 at 4. The principals—whose members included related defendants Royer, Khan, and Chapman whose convictions were recently vacated by this Court in light of *Dimaya*—were a group of men the government charged in a separate trial with forming a conspiracy in or about January 2000 to train with firearms in preparation for violent jihad. *See United States v. Royer, et al.*, 1:03-cr-296-LMB (E.D. Va.), Dkt. No. 1, at 5 (Count 1) and 34 (Count 16). Various members of the conspiracy testified at Al-Timimi's trial that they did this by, among other things, playing paintball games, purchasing firearms, conducting target practice at gun ranges, and watching jihad movies. These men also formed connections to a group in Pakistan called Lashkar-e-Taiba (LET), a group that the United

---

[1] Apparently owing to a typographical error, Count 1 of the operative indictment cites 18 U.S.C. § 924(n) as its underlying offense instead of § 924(o). *See* Dkt. No. 47. Section 924(n) covers the unrelated offense of traveling across state lines to illegally obtain firearms. This citation error carried over into trial; accordingly, the jury instructions and final judgment form contain the same citation mistake.

2

States would later designate a terrorist organization. Royer had a pre-existing relationship with LET, having attended LET training camps in April and May of 2000. *See* Statement of Facts by Randall Todd Royer at 4-6, *United States v. Royer, et al.*, No. 03-cr-296-LMB (E.D. Va.). Kwon, under the tutelage of Royer, later began attempting to recruit for LET by soliciting members of the paintball group. Trial Transcript[2] at 1179-82.

It is uncontroverted that Al-Timimi was not a member of this conspiracy—that is, he never joined the conspiracy agreement. Indeed, the operative indictment made no such allegation and jury instructions did not require any finding to that effect. Dkt. No. 47 at 4-9 (operative indictment); Dkt. No. 156 at 2304 (jury instructions regarding Count 1). It is also uncontroverted that Al-Timimi did not play paintball with the group, did not discuss firearms with the group, and did not watch jihad videos with the group. Instead, the government charged Al-Timimi with aiding and abetting this conspiracy based on its broader claim that he made comments at a dinner at Kwon's house on September 16, 2001—days after the terrorist attacks of 9/11—that allegedly induced or inspired some of the conspirators to move forward and travel to LET. Dkt. No. 47 at 4-9 (operative indictment).

The witnesses at trial presented differing accounts of Al-Timimi's comments at the Kwon dinner. A Rule 29 motion requires the evidence to be viewed in the light most favorable to the government. The witness most favorable to the government was Kwon, although the defense emphatically disputes his credibility based on his impeachment in this and other trials.[3] Kwon

---

[2] The trial transcripts in this case are found in Dkt. Nos. 148 through 161, and are labeled Volumes 1 through 14 respectively. They are paginated continuously throughout.

[3] The defense notes that Kwon's testimony concerning these events was also called into question by this Court in a related bench trial. *See United States v. Khan*, 309 F. Supp. 2d 789, 809 (E.D. Va. 2004) ("The government presented testimony about [the 9/16] meeting from Gharbieh, Aatique, Hasan, and Kwon. We find the accounts of the first three witnesses fully credible, because the demeanor of the witnesses was candid and their separate accounts generally

testified that Al-Timimi advised the men to do three things: First, they should repent. Second, they should leave the United States, if possible. Third, Kwon claimed that he told them they should join a coming mujahidin that was predicted to be soon occurring throughout the world in accordance with theories of Islamic eschatology.[4] Trial Transcript at 1002-1004. Contrary to the government's claims, Govt. Opp. at 2, Kwon did not testify that Al-Timimi told them to target U.S. troops. When asked at trial, Kwon said that he only remembered Al-Timimi saying to "[j]oin the mujahideen," but that it didn't matter who specifically they fought. Trial Transcript at 1003.

Al-Timimi's comments at this dinner were said to have lasted between 45 minutes and an hour. *Id*. at 207. At some point after, several of the men—including Royer, Kwon, Hasan, and

---

consistent. Although we are troubled by some inconsistencies in Kwon's testimony, we credit his testimony to the extent it is corroborated by the testimony of the other three witnesses."). In Al-Timimi's trial, the government candidly acknowledged that its witnesses had substantial credibility issues, telling the Court in a bench conference: "If I could just say, this is not a surprise to anyone, that our witnesses, our cooperating witnesses are subject to significant impeachment, and we don't have a tape recording of what happened on September 16." Trial Transcript at 1654. The defense further notes that Kwon admitted to repeatedly lying to the FBI, *id*. at 1200, that his testimony came after an ominously worded letter to his attorney from the government, Def. Trial Exhibit 57, ("[U]ntil the case was indicted, Mr. Kwon was well positioned for a dramatically reduced sentence as a result of cooperation. Accordingly, it would be [a] shame for him ultimately to serve more time than necessary because of cold feet at this hour."), and that he originally faced a lifetime prison sentence before entering into a plea deal in exchange for his cooperating testimony. *See* Trial Transcript at 1135.

[4] Muhammad Aatique—a paintball group member originally charged with membership in the conspiracy but who later pleaded guilty to other charges pursuant to a plea deal—testified that Al-Timimi regarded the September 11 attacks as an omen that signaled the coming of end-time events described in Islamic eschatology, and made an opening comment to the effect of "[n]ow you're going to see the signs and the promises come true." *Id*. at 178-79. Aatique testified that he understood this comment to relate to a book that they had studied the previous year—*The Signs of The Last Day* by Ibn. Kathir—at the Dar al-Arqam Islamic learning center where Al-Timimi lectured, and another taped series of lectures by Al-Timimi titled "The New World Order." *Id*. at 179 and 262. According to Aatique's understanding of those lectures, these end-time events would include the arrival of a "Mahdi," or leader, who would unite the Muslims, *id*. at 263, and a final battle with the anti-Christ, *id*. at 264, that precedes a final day of judgment. *Id*. at 264.

Aatique—began to form a plan to attend LET to get training. Although the government claims that "proof established" that Al-Timimi actively encouraged this plan, Govt. Op. at 2, the jury made no special finding to that effect. Once again, the government's only supporting testimony came from Kwon, who testified that Al-Timimi told Hasan at the dinner that he should get training from LET. Trial Transcript at 1008. But this testimony was contradicted by Hasan himself (another government witness), who testified that the LET conversation was initiated by Royer after Al-Timimi had already left. *Id*. at 2069-70. Aatique testified that he believed Al-Timimi was present for part of the discussion concerning LET, but presented no testimony that Al-Timimi encouraged or solicited it. *Id*. at 202-203.

All agree that Royer, using his existing contacts with LET, put the men in contact with the group. After the meeting, Royer drove Kwon and Hasan to a 7-11 payphone to call LET's offices in Lahore on their behalf. *Id*. at 1263-64. Royer also gave a referral letter and LET phone number to Aatique, who made separate plans to travel to Pakistan with Khan. *See Id*. at 171; 212.

Kwon, Hasan, Aatique, and Khan all ultimately traveled to LET camps where their conduct was limited to various training exercises. As explained in a recent opinion of this Court, there was no evidence that any of these four men entered a combat zone, traveled to the front lines, or engaged in active fire. Royer Op. at 34. Accordingly, their conspiracy violation did not constitute a crime of violence for purposes of § 924(c)(3)(B), which meant that Royer could not be held liable for aiding and abetting their commission of a § 924(c) violation. *Id*. For the same reasons, Al-Timimi may not be held liable for aiding and abetting their commission of a § 924(o) violation.

> II. **The uncontroverted trial evidence confirms that Al-Timimi had no communications with the conspiracy members about firearms.**

As outlined above, the relevant conduct-based approach to the § 924(o) residual clause in

5

an accomplice liability case looks to the conduct of the principals that the accomplice is accused of assisting; in this case, none of the principals' actual conduct gave rise to a substantial risk of force being used against the person or property of another. This suffices to end the inquiry and resolve the motion in Al-Timimi's favor.

The government's opposition brief attempts to shift gears, suggesting that Count 1 be sustained not on the theory that Al-Timimi aided, abetted, or induced a § 924(o) firearms conspiracy (as charged in the operative indictment), but instead that he solicited and counseled it. See Govt. Op. at 3. The government's argument fails: first, because this is not the crime that was charged in the operative indictment, and second, because the government put on no evidence of Al-Timimi soliciting the men to conspire to use firearms per the elements of § 924(o). To the contrary, an examination of the trial evidence confirms that Al-Timimi had no communications with any of the conspiracy members regarding their use of firearms; every witness who was asked about such a claim flatly repudiated it.

*Kwon* testified that he did not recall ever telling Al-Timimi that he owned firearms or had been training with them, Trial Transcript at 1113-14, and that he had no information that Al-Timimi knew that any of the other people at the dinner owned firearms. *Id*. at 1212. He explained that the men had little personal contact with Al-Timimi, who "wasn't [their] peer," but "more like a teacher." *Id*. at 1211-12. Kwon also explicitly stated that Al-Timimi never told him to commit any crime with a gun, *id*. at 1116, and never told him to fire a machine gun in the course of a crime. *Id*. at 1117. Kwon further explained that he had actually been recruiting for LET prior to the 9/16 dinner under the tutelage of Royer, *id*. at 1179-80, having previously asked "most" of the dinner's attendees if they were interested in going to the training camps. *Id*. at 1182. All of this prior recruiting activity was done without Al-Timimi's knowledge. *Id*. at 1183.

6

*Hasan* admitted to training with and firing an AK-47 rifle at LET, *see id*. at 2084-85, but presented no testimony that he ever communicated with Al-Timimi about this training in any way. He also testified that he "was not a personal friend" of Al-Timimi, *id*. at 2091, that Al-Timimi "did not know" about his earlier Virginia paintball and combat training, *id*. at 2098, and that he never told Al-Timimi about any of the earlier firearms training he had done in Virginia. *Id*. at 2097.

*Aatique*—another cooperating witness present at the 9/16 meeting—also presented no testimony to having ever communicated with Al-Timimi about firearms or other weapons in any way. *See generally id*. at 140-348; 2143-45 (complete testimony of Aatique). As noted above, Aatique had actually made his arrangements to attend LET *before* both 9/11 and the 9/16 dinner, having purchased his plane tickets during the first week of September with encouragement and assistance from Hamdi, Kwon, and Royer. *Id* at 170-72. Although, he testified that the 9/16 dinner "firmed up" his decision to attend (he had become uncertain after the events of 9/11), *id*. at 329, he presented no testimony indicating that Al-Timimi affirmatively instructed or encouraged him to attend LET, much communicated about any use of firearms there.

*Donald Surratt* was a cooperating witness who, while not present at the 9/16 dinner, was an admitted member of the paintball group's pre-existing firearms conspiracy, for which he was convicted of two felonies. *See Id*. at 360; 440-441. Surratt testified that to his knowledge Al-Timimi had nothing to do with this firearms conspiracy, *id*. at 441, that he had never heard Al-Timimi speak of Muslims owning guns, *id*. at 431, and that he had never told Al-Timimi that he himself owned a gun. *Id*.

*Nabil Gharbieh* (the original "amir"—or leader—of the paintball group before Kwon and Chapman later took over, *id*. at 112) was one of the founders of the Dar al-Arqam Islamic

7

learning center where Al-Timimi lectured, *id.* at 30, and thus knew Al-Timimi better than most of the other men. *See Id.* at 90. As explained above, Gharbieh was present for only part of the 9/16 dinner, and was never charged with a crime. *Id.* at 110. Regardless, he too testified that he did not recall ever telling Al-Timimi that he owned a gun, *id.* at 116, that Al-Timimi never gave him any advice on how to run their paintball training, *id.* at 93, and that Al-Timimi had never suggested any sort of jihad training to him. *Id.* at 91-92. Gharbieh testified that while Al-Timimi had discussed combative jihad in the context of theology, *id.* at 94, he had never advocated any implementation of it. See *Id.* ("The only times we talked about violent states of combat is either in his lecture or the book *40 Hadeeths on Jihad*, like that. But if you're asking me has he talked about implementing a physical combat against somebody or a country or a government, I don't recall him ever saying something like that.")

### III. The government cannot invoke *Pinkerton* to sustain the conviction.

Finally, the government also attempts to sustain Count 1 by invoking the Supreme Court's *Pinkerton* doctrine, which permits a convicted conspiracy member to be held culpable for the substantive offenses of his or her co-conspirators, provided that they were both reasonably foreseeable and in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946); *see also United States v. Ashley*, 606 F.3d 135, 142-43 (4th Cir. 2010). This doctrine is unavailable to the government for multiple reasons.

First and foremost, this Court has already examined the conduct of co-conspirators Khan, Aatique, Kown, Hasan, and Chapman, and concluded that none had committed crimes of violence under the conduct-based approach to the residual clause. Royer Op. at 34; Chapman Op. at 24-29; Khan Op. at 31-32. Accordingly, the government fails to identify any particular conspirator whose substantive offense might be imputed to Al-Timimi to sustain a conviction

8

that depends on the residual clause.

Second, *Pinkerton* is unavailable in this case because Al-Timimi was not accused of being a conspiracy member, but only as an accomplice to a conspiracy. The *Pinkerton* doctrine is explicitly premised on conspiracy *membership*; it relies on a conspirator's act of joining the illegal agreement for the necessary mens rea to establish culpability for the acts of his or her co-conspirators. *Pinkerton*, 328 U.S. 647-48. Indeed, the *Pinkerton* Court explains this in detail:

> *The criminal intent to do the act is established by the formation of the conspiracy*. Each conspirator instigated the commission of the crime. *The unlawful agreement contemplated precisely what was done. It was formed for the purpose. The act done was in execution of the enterprise*. The rule which holds responsible one who counsels, procures, or commands another to commit a crime is founded on the same principle. That principle is recognized in the law of conspiracy when the overt act of one partner in crime is attributable to all. An overt act is an essential ingredient of the crime of conspiracy under § 37 of the Criminal Code. If that can be supplied by the act of one conspirator, we fail to see why the same or other acts in furtherance of the conspiracy are likewise not attributable to the others for the purpose of holding them responsible for the substantive offense.

*Id*. at 647 (citations omitted) (emphasis added).

As noted above, this central element of *Pinkerton* liability—the formation of an unlawful agreement—is absent from Al-Timimi's case, as the operative indictment carefully avoided accusing him of actual membership in any of the alleged conspiracies at issue, but instead as an accomplice to those conspiracies.[5] 18 U.S.C. § 2 permits an accomplice to be punished as a principal, but nothing in the statute purports to impute elements of the crime he did not commit

---

[5] Notably, an entry in the Justice Department's own internal practice manual advises its prosecutors to avoid this legal theory. *See* U.S. DEPT. OF JUSTICE, USAM CRIMINAL RESOURCE MANUAL § 2483, *available at* http://www.justice.gov/usam/criminal-resource-manual-2483-conspiracy-aid-and-abet ("The concept of aiding and abetting a conspiracy has not been widely adopted. A number of district courts have rejected the concept. Even in the Seventh Circuit, the concept has been criticized. It would be wiser for prosecutors to avoid charges alleging conspiracy to aid and abet and instead allege the underlying substantive offense as the object of the conspiracy.") (citations omitted) (last visited September 4, 2018).

for purposes of outside doctrines. To allow otherwise would be to allow the government to invoke *Pinkerton* without proof of its definition element—membership in the conspiracy agreement.

## Conclusion

Defendant Ali Al-Timimi respectfully requests that the Court grant this motion and issue a judgment of acquittal with respect to his conviction under Count 1.

Dated: September 4, 2018    Respectfully submitted,

                                          /s/
Thomas Michael Huff, Virginia Bar No. 73587
Thomas M. Huff, Attorney-at-Law
P.O. Box 2248
Leesburg, VA 20177
Telephone: 703.665.3756
Facsimile: 571.354.8985
thuff@law.gwu.edu

Jonathan Turley (*pro hac vice*)
The George Washington University Law School
2000 H Street, NW
Washington, D.C. 20052
(202) 994-7001 (telephone)
(202) 508-6200 (facsimile)
jturley@law.gwu.edu

Attorneys for Defendant Dr. Ali Al-Timimi

## CERTIFICATE OF SERVICE

I certify that on September 4, 2018, I will file the foregoing document on the CM/ECF system, which will then serve it by sending an electronic notification to:

AUSA Gordon D. Kromberg
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700 (telephone)
(703) 837.8242 (facsimile)
gordon.kromberg@usdoj.gov

                                                           /s/
                              Thomas Michael Huff, Virginia Bar No. 73587
                              Thomas M. Huff, Attorney-at-Law
                              P.O. Box 2248
                              Leesburg, VA 20177
                              Telephone: 703.665.3756
                              Facsimile: 571.354.8985
                              thuff@law.gwu.edu