IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 1:04-cr-385 |
| ALI AL-TIMIMI, | ) | |
| | ) | |
| Defendant. | ) | |

**Government's Response in Opposition to**
**<u>Defendant's Emergency Motion for Bail Pending Appeal</u>**

The defendant has filed an emergency motion for bail pending appeal under 18 U.S.C.

§ 3145(c).  (ECF No. 465.)  That provision permits the Court to grant a motion for bail,

notwithstanding the defendant's conviction under 18 U.S.C. § 924(c) for an offense with a

maximum possible sentence of life imprisonment (*see* 18 U.S.C. §§ 3143(b)(2), 3142(f)(1)(B)),

under three conditions.  First, the Court must find "by clear and convincing evidence that the

person is not likely to flee or pose a danger to the safety of any other person or the community if

released."  § 3145(b)(1)(A).  Second, the Court must conclude "that the appeal is not for the

purpose of delay and raises a substantial question of law or fact likely to result" in reversal, a

new trial, or a sentence less than time served "plus the expected duration of the appeal process."

§ 3145(b)(1)(B).  Third, it must be "clearly shown that there are exceptional reasons why such

person's detention would not be appropriate."  § 3145(c).

The motion fails to satisfy these criteria.  More specifically, the defendant has not

demonstrated that, in its current posture, this case involves "a substantial question of law," nor

has he made a persuasive showing that the existence of the novel coronavirus is an "exceptional

reason" justifying his immediate release.  The Court should therefore deny the motion.

**Relevant Procedural History**

After the defendant's arrest in September 2004, the government consented to pretrial release with conditions.  The defendant was then released on bond.  (Dkt. Entry for Sept. 24, 2004; ECF No. 4.)  A grand jury returned a superseding indictment in February 2005.  (ECF No. 47.)  It charged the defendant with ten counts, including:

- Inducing others to conspire to use, carry, possess, and discharge firearms during and in relation to crimes of violence, in violation of 18 U.S.C. §§ 2 and 924(n) (Count 1);[1]

- Soliciting others to commit treason against the United States, in violation of 18 U.S.C. §§ 373 and 2381 (Count 2);

- Inducing others to conspire to levy war against the United States, in violation of 18 U.S.C. §§ 2 and 2384 (Count 3);

- Attempting to contribute services to the Taliban, in violation of 50 U.S.C. § 1705 and associated regulations and executive orders (Count 4);

- Inducing others to aid the Taliban, in violation of 18 U.S.C. § 2 and 50 U.S.C. § 1705, as well as associated regulations and executive orders (Count 5);

- Inducing others to conspire to violate the Neutrality Act, in violation of 18 U.S.C. §§ 2, 371, and 960 (Count 6);

- Inducing others to discharge firearms during and in relation to crimes of violence, in violation of 18 U.S.C. §§ 2 and 924(c) (Counts 7 and 8); and

- Inducing others to carry explosives during the commission of federal felonies, in violation of 18 U.S.C. §§ 2 and 844(h)(2) (Counts 9 and 10).

In the "Overt Acts" section relating to Count 1, the superseding indictment summarized the events giving rise to this prosecution.  More specifically, the indictment explained that Al-Timimi "was the primary lecturer at the Dar al Arqam Islamic Center, also known as the Center for Islamic Information and Education, an organization in Falls Church, Virginia, that focused on

---

[1] The citation to § 924(n) in the superseding indictment is a typographical error.  The correct code section is 18 U.S.C. § 924(o).  (*See* ECF No. 455 at 2 n.1.)

teaching in the English language about Islamic faith, practice, and civilization."  (ECF No. 47 at 4 ¶ 10.)  Shortly after the attacks of September 11, 2001, the defendant met with several others at the home of Yong Kwon in Fairfax, Virginia.  During that meeting, which occurred on September 16, 2001, the defendant:

- "[T]old [others] that the time had come for them to go abroad to join the mujahideen engaged in violent jihad in Afghanistan";

- "[T]old his listeners that American troops likely to arrive in Afghanistan would be legitimate targets of the violent jihad in which his listeners had a duty to engage";

- "[D]iscussed obtaining military-style training from Lashkar-e-Taiba [LET] in order to join the mujahideen expected to engage in violent jihad against American troops in Afghanistan";[2]

- "[T]old the gathered individuals considering whether to obtain military-style training from [LET] in Pakistan that the organization was on the correct path" and

- "[T]old told the conspirators that what he said at the meeting must be kept secret."

(ECF No. 47 at 5–6 ¶¶ 2–6.)  Several of those at the meeting on September 16 eventually reached the LET training camps in Pakistan.  Counts 7 and 9 related to offenses committed by Yong Kwon at an LET camp in mid-October 2001.  Counts 8 and 10 related to offenses committed by Khwaja Hasan at an LET camp in early November 2001.

A jury trial began on April 4, 2005.  After nine days of evidence and argument, the jury deliberated for several days before returning across-the-board guilty verdicts.  (ECF No. 107.) After the jury announced its verdicts, the government orally moved to detain the defendant under

---

[2] The superseding indictment explained that LET "is the military wing of an organization in Pakistan known as Markaz Dawa Wa'al Irshad, which was founded to organize Pakistani mujahideen participating in the violent jihad against the Russians in Afghanistan.  Since the Russians left Afghanistan, the primary—but not exclusive—focus of [LET] has been on conducting violent jihad against the Government of India.  [LET] operates training camps for individuals from around the world seeking to be mujahideen, and claims to have trained thousands to fight in Afghanistan, Kashmir, Chechnya, Bosnia, Kosovo, and elsewhere."  (ECF No. 47 at 2 ¶ 4.)

18 U.S.C. § 3143.  Because the defendant was found guilty of violating § 924(c), which carries a possible maximum sentence of life imprisonment, detention post-verdict was mandatory under §§ 3143(a)(2) and 3142(f)(1)(B) unless:

(A)

    (i)    the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or

    (ii)    an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and

(B)    the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

18 U.S.C. § 3142(a)(2).  Applying these standards, the Court denied the government's motion and the defendant remained on bond.  (Dkt. Entry for Apr. 26, 2005.)

Sentencing occurred on July 13, 2005.  The Court imposed the following terms of imprisonment:

<u>The Defendant's Sentence</u>

| Count | Offense | Term | To be Served |
|-------|---------|------|--------------|
| Count 1 | Inducing a firearms conspiracy | 121 months | Concurrently |
| Count 2 | Soliciting treason | 121 months | |
| Count 3 | Inducing seditious conspiracy | 121 months | |
| Count 4 | Attempting to support the Taliban | 120 months | Concurrently with Counts 1–3 |
| Count 5 | Inducing others to support the Taliban | 120 months | |
| Count 6 | Inducing a Neutrality Act violation | 60 months | Concurrently with Counts 1–5 |
| Count 7 | Inducing a violation of § 924(c) | 360 months | Consecutive to Counts 1–6 |
| Count 8 | Inducing a violation of § 924(c) | Life imprisonment | N/A |
| Count 9 | Inducing a violation of § 844(h) | 120 months | Consecutive to Counts 1–8 |
| Count 10 | Inducing a violation of § 844(h) | 240 months | Consecutive to Counts 1–9 |

The term of 360 months on Count 7 was mandatory under 18 U.S.C. § 924(c)(1)(B)(ii), which sets a statutory mandatory minimum of 30 years for § 924(c) offenses involving machineguns. Likewise, the term of imprisonment on Count 8 resulted from § 924(c)(1)(C)(ii) (1998), which stated that, "[i]n the case of a second or subsequent conviction under this subsection, the person shall … if the firearm involved is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, be sentenced to imprisonment for life."  Then 10- and 20-year terms on Counts 9 and 10 were also statutory mandatory minimums under § 844(h).  The defendant has now discharged all of his sentences except those on Counts 7–10.

At his sentencing hearing, the defendant moved for bail pending appeal under 18 U.S.C. § 3143(b).  Under § 3143(b)(2), the default rule is "that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 [here, a § 924(c) offense punishable by life imprisonment, under § 3142(f)(1)(B)] and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, [shall] be detained."  There is then an exception for cases in which the district court finds:

(A)     by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

(B)     that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—

(i)     reversal,

(ii)     an order for a new trial,

(iii)     a sentence that does not include a term of imprisonment, or

(iv)     a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1).  The Court denied the motion, and the defendant began serving his term

of incarceration.  (Dkt. Entry for July 13, 2005.)

The defendant's direct appeal remains pending.  In August 2015, the Fourth Circuit remanded the case back to this Court for limited purposes.  (No. 14-4451, ECF No. 56-1.)  In July 2016, the Fourth Circuit enlarged the scope of its remand order to permit the defendant to raise arguments under *Johnson v. United States*, 135 S. Ct. 2551 (2015), to attack his § 924(c) convictions.  (No. 14-4451, ECF No. 73-1.)  After the Supreme Court decided *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), and *United States v. Davis*, 139 S. Ct. 2319 (2019), and after the Fourth Circuit decided *United States v. Simms*, 914 F.3d 229 (4th Cir. 2019) (en banc), the defendant filed motions seeking to invalidate his convictions on Count 1, 7, and 8.  (ECF Nos. 432–33, 445–46, 452, 459, 464.)  The government opposed those motions.  (ECF Nos. 442, 455–56, 461.)

In particular, the government has argued that three of the predicate offenses supporting Counts 1, 7, and 8 remain crimes of violence under § 924(c)'s still-valid force clause.  (*See* ECF No. 455-2 at 1–3 (Trial Tr. 2317–19) (identifying the predicates charged to the jury).)  These include violations of 18 U.S.C. § 960 (the Neutrality Act), § 2381 (the treason statute), and § 2390 (criminalizing enlisting with the intent to engage in armed hostilities against the United States).  (*See* ECF No. 455 at 13–20; ECF No. 461 at 5–10.)  In support of its argument that the defendant's convictions remain valid and that no new trial is necessary, the government has also compiled record citations regarding the strength of the trial evidence as to violations of § 2390 (ECF No. 455-3 at 1–12), § 2381 (*id.* at 13–15), and § 960 (ECF No. 456-1).

The defendant has also sought leave to file an additional motion attacking his convictions on Counts 9 and 10 for violating § 844(h) (ECF No. 460), arguing that the validity of those convictions depends on the ongoing viability of his conviction on Count 1, notwithstanding the

6

fact that his § 844(h) convictions depend on predicate offenses that are federal felonies and not

"crimes of violence."  *See* 18 U.S.C. § 844(h)(2) (making it unlawful to "carr[y] an explosive

during the commission of any felony which may be prosecuted in a court of the United States").

While the government has not fully responded to that argument, it has previewed its position that

the claim is without merit.  (*See* ECF No. 455 at 23 n.11; ECF No. 461 at 10–11.)

This emergency bail motion followed.

## Argument

## I.    Applicable Legal Standards under the Bail Reform Act

The defendant filed his emergency motion under 18 U.S.C. § 3145(c), which states:

> An appeal from a release or detention order, or from a decision denying revocation
> or amendment of such an order, is governed by the provisions of section 1291 of
> title 28 and section 3731 of this title.  The appeal shall be determined promptly.  A
> person subject to detention pursuant to section 3143(a)(2) or (b)(2), and who meets
> the conditions of release set forth in section 3143(a)(1) or (b)(1), may be ordered
> released, under appropriate conditions, by the judicial officer, if it is clearly shown
> that there are exceptional reasons why such person's detention would not be
> appropriate.

Here, the defendant's § 924(c) convictions subject him to the terms of § 3143(b)(2), which

states:

> The judicial officer shall order that a person who has been found guilty of an offense
> in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section
> 3142 [here, a § 924(c) offense punishable by life imprisonment, under
> § 3142(f)(1)(B)] and sentenced to a term of imprisonment, and who has filed an
> appeal or a petition for a writ of certiorari, be detained.

Section 3143(b) applies here, rather than § 3143(a), because the defendant seeks bail pending

appeal rather than bail pending sentencing.

The net result of this statutory scheme is that, to succeed in his motion, three things must

be true.  First, the Court must find "by clear and convincing evidence that the [defendant] is not

likely to flee or pose a danger to the safety of any other person or the community if released."

§ 3143(b)(1)(A).  Second, the Court must find "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in … (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process."  § 3143(b)(1)(B).  And third, the defendant must have "clearly shown that there are exceptional reasons why [his] detention would not be appropriate."  § 3145(c).  To make this third showing, the defendant claims that he is at risk of exposure to the novel coronavirus while incarcerated and that the risk of contracting COVID-19 constitutes an "exceptional reason."

For the reasons appearing below, the defendant's motion is unavailing.

**Argument**

I.    **The defendant's appeal will not raise "a substantial question of law" likely to result in *vacatur* of his two convictions under 18 U.S.C. § 844(h).**

To begin, the defendant has not raised "a substantial question of law" likely to result in reversal, a new trial, or a non-imprisonment sentence.  § 3143(b)(1)(B).  The inquiry is necessarily narrow by virtue of this case's unusual procedural posture.  Because the defendant has discharged his sentences on all counts other than his two § 924(c) convictions and his two § 844(h) convictions, the question becomes whether all four of those convictions are in danger of invalidation at the Fourth Circuit.  The answer is "no."

Under Circuit precedent, a "substantial question of law" is a "close" question or "one that very well could be decided the other way."  *United States v. Steinhorn*, 927 F.2d 195, 196 (4th Cir. 1991) (per curiam) (quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985) (per curiam)).  The defendant bears the burden of showing that his appeal involves a "substantial question."  *See, e.g.*, *United States v. Zimny*, 857 F.3d 97, 100 (1st Cir. 2017);

8

*accord United States v. Dietz*, No. 94–5733, 1995 WL 133353, at *4 (4th Cir. Mar. 28, 1995) (per curiam). In view of the extensive briefing on the post-*Davis* validity of the defendant's § 924(c) convictions, the government accepts for argument's sake that *those* convictions raise substantial questions. But the defendant's two § 844(h) convictions, by themselves, carry an additional consecutive sentence of 360 months. The defendant can therefore only succeed if he shows that those convictions, too, raise a "substantial question" of law. Because they do not, the defendant's motion fails.

The defendant has previewed his line of attack on his § 844(h) convictions. (ECF No. 460.) In a nutshell, the defendant's argument is that those convictions rely on a vicarious theory of liability, and neither an aiding-and-abetting theory nor a theory of co-conspirator liability is viable on these facts. Without prejudice to more fully briefing the issue should the Court grant the defendant's motion to raise his arguments in a standalone filing, the government submits that the defendant's assertions on this score are unpersuasive and fail to rise to the level of a "substantial question of law" under § 3143(b)(1).

At the outset, the government notes that it is not at all clear that the Fourth Circuit's remand order, which permits the Court to "to reconsider [the defendant's] section 924(c) convictions in light of *Johnson*" (No. 14-4451, ECF No. 73-1), permits the defendant to raise his § 844(h) claims. Insofar as the Court were to credit the defendant's argument that those counts are only viable on a theory of co-conspirator liability, *and* that the only count that could serve as the source for that liability is Count 1, there is at least a reasonable argument that the *Johnson* claims and the § 844(h) claims are sufficiently connected to fall within the scope of the remand order. But if the Court were to conclude *either* that the § 844(h) counts are potentially valid on a theory of aiding-and-abetting liability, *or* that they are potentially viable based on co-conspirator

liability flowing from other counts of conviction, the § 844(h) claims would exceed the remand order's scope.  In those circumstances, the defendant must raise them before the Fourth Circuit, which will consider them under the rubric of plain-error review.

Finally, it is important to emphasize that the § 844(h) convictions need only rest on one theory of vicarious liability to remain valid.  Thus, aiding-and-abetting liability (under *Rosemond v. United States*, 572 U.S. 65 (2014)) and co-conspirator liability (under Pink*erton v. United States*, 328 U.S. 640 (1946)) provide alternative pathways to sustain the convictions, such that the defendant must clear both substantial-question hurdles.  *See, e.g.*, *United States v. Hare*, 820 F.3d 93, 105 (4th Cir. 2016) (concluding that a forfeited claim of *Rosemond* instructional error did not affect the defendant's substantial rights where the conviction could also rest on a *Pinkerton* theory); *United States v. Hill*, 743 F. App'x 241, 244 (10th Cir. 2018) ("[I]f the evidence was sufficient to convict Hill of violating § 924(c) on a theory of *Pinkerton* co-conspirator liability, he can't show his attorney's failure to challenge his conviction under *Rosemond*—which concerns only aiding and abetting—prejudiced him."); *Spataro v. Warden Fort Dix FCI*, 684 F. App'x 117, 121 (3d Cir. 2017) ("*Rosemond* and *Pinkerton* address two distinct and separate theories of vicarious liability, and … a conviction under a theory of vicarious liability pursuant to *Pinkerton* serves as an alternate basis for conviction.").

### A.   There is no substantial question as to whether Counts 9 and 10 remain valid on a theory of aiding-and-abetting liability.

In *Rosemond v. United States*, the Supreme Court addressed the standard for proving aiding-and-abetting liability under 18 U.S.C. § 2, under which "a person is liable … if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission."  572 U.S. at 71.  In the context of 18 U.S.C. § 924(c), *Rosemond* held that this standard requires the intent to further "the specific and entire crime charged"—namely,

10

the "predicate crime plus gun use"—and may be satisfied by proof that a defendant "knows that one of his confederates will carry a gun." *Id.* at 76–77.

*Rosemond*, of course, post-dated the jury charge in this case, and because the defendant did not object to the aiding-and-abetting instruction at trial on any ground presaging *Rosemond*, the Fourth Circuit would review any claim under *Rosemond* raised now for plain error. *Hare*, 820 F.3d at 104–05. To satisfy that standard, the defendant would need to show "that 'an error occurred, that the error was plain, and that the error affected [his] substantial rights,' meaning that it 'actually affected the outcome of the proceedings.'" *Id.* (quoting *United States v. Hastings*, 134 F.3d 235, 239–40 (4th Cir. 1998)). Even then, the Fourth Circuit would not "exercise [its discretion to correct the error] unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 105 (quoting *Hastings*, 134 F.3d at 239 (brackets in original)).

As an initial proposition, the government disputes that the Court's jury charge on Counts 9 and 10 was inconsistent with *Rosemond*. Here is the Court's aiding-and-abetting instruction, including an extended hypothetical used by the Court to illustrate the key concepts:

> In order to aid or abet another to commit a crime, it is necessary that the defendant knowingly associate himself in some way with the crime and that he participate in the crime by doing some act to help make the crime succeed.
>
> To establish that a defendant knowingly associated himself with the crime, the government must establish that the defendant knew of the illegal activity and intended to help the activity succeed. The necessary knowledge and intent depend upon the essential elements of the crime which the defendant is alleged to have aided and abetted.
>
> \*       \*       \*
>
> In addition, to establish that the defendant aided or abetted the commission of the specific crime charged in Counts 1, 3, and 5 through 10, the government must prove beyond a reasonable doubt that defendant engaged in some affirmative conduct or

11

overt act for the specific purpose of bringing about that crime and that the particular crime was, in fact, committed.

The mere presence of a defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed, or merely associating with others who were committing a crime is not sufficient to establish aiding and abetting.  Moreover, one who has no knowledge that a crime is being committed or is about to be committed but inadvertently does something that aids in the commission of that crime is not an aider and abettor.  An aider and abettor must know that the crime is being committed and act in a way which is intended to bring about the success of the criminal venture.

To determine whether the defendant aided or abetted the commission of the crimes charged in Counts 1, 3, and 5 through 10, ask yourself these questions in relation to each count:

Did he -- did the defendant participate in the specific crime charged in the respective count as something he wished to bring about?

Did he knowingly associate himself with the criminal venture?

Did he seek by his actions to make the criminal venture succeed?

If he did, then the defendant is an aider and abettor and therefore guilty of the offense.  If on the other hand your answer to any of these questions is no, then the defendant is not an aider and abettor.

Let me give you a simple example that may help you in thinking about these distinctions.  Let's say that John is a bank teller, and one of his best friends, who we'll call Bob, wants to rob that bank.  I'll give you two scenarios.

In the first scenario, John and Bob go out for a drink and Bob starts asking John -- John is the teller -- Bob starts asking the teller innocently enough, you know, "Hey, you know, how many doors does your bank have?,"  and, you know, "Do you have any  special guards there?," in other words, asking information about  the bank, and the teller quite innocently is just, you know, telling his friend about his job, etc., and the next day, his friend comes in and robs the bank.

Now, the teller may have actually helped that bank robber be successful because he gave information to the robber that the robber was able to use, but in the eyes of the law under the scenario I just gave you, the teller, John, would not be criminally liable because there's no evidence that he knew why this information was being requested, and there's no evidence that he intended to help Bob rob the bank.

12

But change the facts slightly.  Let's say that Bob goes to his friend John, the bank teller, and said, "Hey, you know, I'm really interesting in doing something in that bank of yours. I know you're off tomorrow, but can you just tell me, how is that bank set up?  I mean, if I tried to rob it, would there be a guard in my way?," blah, blah, blah.

And John, the teller, understanding why Bob wants this information and interested in helping him rob the bank, gives him the information.

Now, John is off from the bank that day.  He's sitting at home watching television when the bank is robbed.  Under that second scenario, he could be charged as an aider and abettor.  He could be charged with the crime of bank robbery just like a [principal], just as if he walked in there and committed the robbery.

And that's the kind of distinction that we're trying to make in the law.  That's why you have to look so carefully at the knowledge and the intent of the defendant.

(ECF No. 455-1 at 31–35 (Trial Tr. 2308–13).)

In order for a *Rosemond* error to have occurred here, the jury would need to have listened to these instructions and found the defendant guilty on Counts 9 and 10 without concluding that he knew, in advance, that Kwon and Hasan would carry explosives while training at the LET camps.  But the Court's instructions foreclose that possibility.  The entire thrust of the Court's bank-robbery example was that "John" would only be liable on an aiding-and-abetting theory if *he knew in advance that a robbery would occur*.  So too here:  under these instructions, the jury could only have found Al-Timimi liable if it concluded that he knew in advance that others would carry explosives in relation to one or more federal felonies.  The jury so found, and *Rosemond* does not undermine those verdicts.

The Fourth Circuit has held that the kind of aiding-and-abetting instruction the Court used in this case—*i.e.*, an instruction that aiding and abetting requires a defendant to "knowingly associate himself in some way with the crime and that he participate in the crime by doing some act to help make the crime succeed"—complies with *Rosemond.  See United States v. Garcia*, 752 F.3d 382, 389 n.6 (4th Cir. 2014) (stating that aiding-and-abetting liability arises when a

13

defendant "knowingly associated himself with and participated in the criminal venture," citing, among other cases, *Rosemond*); *accord United States v. Oloyede*, 933 F.3d 302, 317 (4th Cir. 2019), *cert. denied sub nom. Popoola v. United States*, 140 S. Ct. 1212 (2020) (sustaining a similar jury instruction post-*Rosemond*).

As the Fourth Circuit explained in *Oloyede*, a *Rosemond* error occurs when a district court's instructions permit the jury to impose aiding-and-abetting liability in the absence of a finding that the defendant knew, in advance, that the *substantive offense* would occur, as opposed to that the *predicate offense* would occur.  In a § 924(c) case, for example, *Rosemond* requires advance knowledge of firearm usage and not just advanced knowledge of the underlying crime of violence.  *See* 933 F.3d at 317.  But here, the Court was explicit that the aiding-and-abetting criteria applied to "the specific crime[s] charged in Counts 1, 3, and 5 through 10."  (ECF No. 455-1 at 32 (Trial Tr. 2310).)  Consistent with *Oloyede*, that instruction was *Rosemond*-compliant.  *See also United States v. Margarita Garcia*, 906 F.3d 1255, 1280 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 2027 (2019) (holding that the defendant could not show plain error where the district court's instructions were "altogether consonant with the law on aiding and abetting").

Moreover, even if the Court were to disagree with the analysis above, to vacate Counts 9–10 on plain-error review, the Fourth Circuit would have to conclude that the *Rosemond* error affected the defendant's substantial rights and was otherwise not harmless.  *See, e.g.*, *United States v. Prado*, 815 F.3d 93, 105 (2d Cir. 2016) (a *Rosemond* error did not affect a defendant's substantial rights where the court could not "say that there [was] a reasonable probability of a different outcome at trial had the jury been properly instructed"); *United States v. Lawson*, 810 F.3d 1032, 1041–42 (7th Cir. 2016) (concluding that "[t]he theoretical possibility of a conviction" on erroneous *Rosemond* grounds did not merit *vacatur* where "it appear[ed]

14

beyond a reasonable doubt that the error complained of did not have any effect on the verdict"). Here, the government has already compiled record citations demonstrating that Al-Timimi knew, in advance, that Kwon and Hasan would use firearms and explosives at the LET training camps. (ECF No. 461-1.)  For example:

- Kwon testified that co-conspirator Royer, in Al-Timimi's presence, described firing explosive mortar shells on Indian positions while at the LET camps (4/7/05 Trial Tr. 28–30);

- Hasan testified that that co-conspirators Hamdi and Royer each described using firearms at the LET camps, and Hamdi described firing on Indian positions (4/15/05 Trial Tr. 51);

- Wyman testified that Al-Timimi stated that he "was well aware of [LET] tactics," including "cross-border shelling, raids on police stations and military camps," use of "guerilla tactics and also the use of what he called fidayeen attacks, which are also referred to as suicide missions" (4/12/05 Trial Tr. 1596);

- Wyman testified that Al-Timimi stated that members of the LET camps used "military tactics" and "conduct[ed] training on weapons and other forms of military tactics that will enable someone to go fight in a battle" (4/12/05 Trial Tr. 1596–97); and

- Wyman testified that Al-Timimi reviewed LET bulletins describing the "use of explosives to blow up bridges and buildings" (4/12/05 Trial Tr. 1612).

In light of this testimony, any potential *Rosemond* error did not affect the defendant's substantial rights and was harmless.  The evidence established, beyond a reasonable doubt, that the defendant understood *in advance* that persons he encouraged to visit the LET camps would handle explosives.  For that reason, the defendant's *Rosemond* claim does not rise to the level of a "substantial question" under § 3143(b)(1)(B).

### B. There is no substantial question as to whether Counts 9 and 10 remain valid on a theory of co-conspirator liability.

Counts 9 and 10 also remain viable on a theory of *Pinkerton* liability.  "The *Pinkerton* doctrine provides that a defendant is 'liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the

conspiracy.'"  *United States v. Blackman*, 746 F.3d 137, 141 (4th Cir. 2014) (quoting *United States v. Dinkins*, 691 F.3d 358, 384 (4th Cir. 2012)).

The defendant has raised three arguments attacking the viability of a *Pinkerton* theory here.  First, he claims that the only offense that could give rise to *Pinkerton* liability is Count 1, which charged him with inducing others to conspire to violate § 924(c).  Second, he claims that *Davis* calls the validity of Count 1 into question.  And third, he asserts in a more generalized fashion that someone who induces a conspiracy under 18 U.S.C. § 2 is not necessarily *Pinkerton* liable to the same extent as an actual co-conspirator.  Even assuming that *Davis* threatens the validity of Count 1—a contention the government has opposed in its prior briefing—the defendant's two other assertions are not correct.

First, Count 1 is not the only charge that could give rise to *Pinkerton* liability.  The jury also found the defendant guilty of inducing others to conspire to levy war against the United States, in violation of 18 U.S.C. §§ 2 and 2384 (Count 3), and inducing others to conspire to violate the Neutrality Act, in violation of 18 U.S.C. §§ 2, 371, and 960 (Count 6).  It was *also* reasonably foreseeable and in furtherance of *those* conspiracies that Kwon and Hasan would carry explosives at the LET training claims.  With respect to Count 3, the express purpose of the conspiracy was to wage war against the United States alongside the Taliban.  (*See* ECF No. 455-3 at 1–7, 13–15.)  To that end, Kwon testified that Al-Timimi directed others to "[j]oin the mujahideen," explaining that it did not matter if they were to "fight the Indians or the Russians or the Americans, that this is all legitimate jihad."  (4/7/05 Trial Tr. 6.)  In light of the additional evidence at trial that Al-Timimi was familiar with LET's tactics and training methods—including the use of explosives—it was reasonably foreseeable that a conspiracy to send others to LET training camps *for the purpose of waging war against the United States*

16

would result in the handling of such explosives.  (*See* ECF No. 461-1 (summarizing evidence that Al-Timimi encouraged others to obtain training at the LET camps).)

The same logic applies with equal force to Count 6 and the defendant's conviction for inducing others to violate the Neutrality Act.  Al-Timimi's actions arose against a factual backdrop where he and others were aware that part of the *modus operandi* at the LET camps was firing explosive mortars at Indian positions.  (*See* 4/7/05 Trial Tr. 28.)  It was therefore entirely foreseeable and in furtherance of the Neutrality Act conspiracy that others would carry explosives in relation to the goal of attacking India, even if only during training sessions at the LET camps.

Moreover, once one accepts that *Pinkerton* liability attaches to the actions of those conspirators who agreed to wage war against the United States and to violate the Neutrality Act, there is nothing doctrinally quixotic about attaching *Pinkerton* liability to Al-Timimi himself, who induced those conspiracies into existence.  The relevant doctrinal question—whether *Pinkerton* liability attaches to someone who induces a conspiracy to the same extent as those who join a conspiracy—is straightforwardly answered by this Court's prior opinion in *Gordillo Portocarrero v. United States*, No. 110-cr-661 (LMB), 2019 WL 181119 (E.D. Va. Jan. 11, 2019).  There, the Court held that one who aids and abets a crime of violence under § 924(c) is liable as though he himself had committed a crime of violence.  *See id.* at *8.  The Court's conclusion arose from a direct application of § 2's statutory text, which states that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."  18 U.S.C. § 2(a).  It follows here, as it followed in *Gordillo Portocarrero*, that Al-Timimi is liable on Counts 3 and 6 as though he were a principal—which is to say, as though he were a member of the underlying conspiracy.  And

once that is true, Al-Timimi faces precisely the same exposure to *Pinkerton* liability as any other

conspiracy defendant.

Thus, while charging someone with aiding and abetting or inducing a conspiracy is

perhaps rare, the underlying legal principles are straightforward.  And indeed, *Pinkerton* itself

linked the concepts of aiding-and-abetting liability and co-conspirator liability:

> The rule which holds responsible one who counsels, procures, or commands
> another to commit a crime is founded on the same principle.  That principle is
> recognized in the law of conspiracy when the overt act of one partner in crime is
> attributable to all.

*Pinkerton*, 328 U.S. at 647.  There is therefore nothing unusual about concluding that Al-Timimi

is liable for Kwon's and Hassan's handling of explosives, as charged in Counts 9–10, on a theory

of *Pinkerton* liability arising from inducing the conspiracies charged in Counts 1, 3, and 6.

The government acknowledges that at least one circuit has cast doubt on whether aiding

and abetting a conspiracy is a viable theory of liability at all.  *See United States v. Ulbricht*,

No. 14-cr-68 (KBF), 2015 WL 413426, at *5 (S.D.N.Y. Feb. 2, 2015) (citing *United States v.

Perry*, 643 F.2d 38, 46–47 (2d Cir. 1981)).  But several other circuits have upheld such charges.

*See, e.g.*, *United States v. Rodriguez-Lopez*, 756 F.3d 422, 432–33 (5th Cir. 2014) (upholding

conviction for aiding and abetting a conspiracy); *United States v. Galiffa*, 734 F.2d 306, 309 &

n.6 (7th Cir. 1984) ("In his treatise on criminal law, Professor LaFave enunciates his belief that

the Supreme Court, although it has not explicitly ruled on this issue, would decide that a person

can be guilty of aiding and abetting a conspiracy when the person commits an act designed to

further the conspiracy." (citing W. LaFave & A. Scott, Criminal Law § 61, at 462–63 (1972)));

*United States v. Lane*, 514 F.2d 22, 27 (9th Cir. 1975) (affirming a conviction for aiding and

abetting a conspiracy where the defendant "used the information he obtained by monitoring the

police frequency to warn drug dealers that they were being investigated or duped by the LAPD

narcotics squad").  And, insofar as the defendant argues that innovative combinations of inchoate

liability are disfavored, the Fourth Circuit recently affirmed a conviction for a conspiracy to aid

and abet computer-intrusion and wire-fraud offenses without suggesting that the novelty of the

charging theory was problematic.  *See United States v. Bondars*, 801 F. App'x 872, 878–79

(4th Cir. 2020).

In short, while the linkage of § 2 and conspiracy liability may be unusual, it was entirely

appropriate here, where the government's entire theory of the case was that the defendant's

"word served to direct those [present at the September 16 meeting] on a course of criminal

conduct," and that "[he] intended by his words to procure their active … involvement in that

criminal conduct, and he successfully convinced several of them to actually take part in that

criminal conduct."  (4/18/05 Trial Tr. 2206 (Gov't Closing Argument).)  Accordingly, the

defendant's *Pinkerton* claim also does not rise to the level of a "substantial question" under

§ 3143(b)(1)(B).

*     *     *

The government wishes to make two additional points.

First, in his reply, the defendant likely will cite this Court's prior conclusion that this case

presented "sufficiently dense" legal issues to justify bond pending sentencing.  (ECF No. 466

at 8 (quoting 4/26/05 Trial Tr. 2416–19).)  To the extent the defendant argues that this prior

statement is binding now, the government notes that the law of the case doctrine does not apply

where the procedural posture, relevant facts, or underlying legal questions are meaningfully

different.  *See Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 1118

(2020).  The case has a much different complexion now than it did 15 years ago, and the legal

issues are far narrower.

Second, the defendant will likely argue, if not now then in a future motion (should the

Court grant leave to file one), that his claims of *Rosemond* and *Pinkerton* error justify a new trial

under Federal Rule of Criminal Procedure 33's "interest of justice" standard, such that only the

§ 924(c) issues, and not the § 844(h) issues, would ever come to the Fourth Circuit.  All of the

reasons cited above for why the § 844(h) counts do not raise a substantial question apply with

equal force to a future Rule 33 argument.  Indeed, such motions should be granted "sparingly,"

*United States v. Chong Lam*, 677 F.3d 190, 203 (4th Cir. 2012), and the strength of the evidence

here counsels against granting such a motion.

Because the defendant has lengthy sentences yet to serve on his outstanding § 844(h)

convictions, and because the validity of those convictions does not raise a substantial question of

law, the defendant cannot satisfy the gatekeeping requirements of §§ 3145(c) and 3143(b)(1).

His emergency motion for bail pending appeal therefore fails.

## II.     The defendant has not shown an "exceptional reason" for bail pending appeal in light of the novel coronavirus.

The defendant has also failed to show that the existence of the novel coronavirus and the

risk of contracting COVID-19 are "exceptional reasons" to grant bail pending appeal under

18 U.S.C. § 3145(c).

The Fourth Circuit has not addressed what constitutes an "exceptional reason" under the

Bail Reform Act.  *See, e.g.*, *United States v. Goforth*, 546 F.3d 712, 715 (4th Cir. 2008) (holding

only that a district court judge is a "judicial officer" under § 3145(c)).  *Goforth* also cited an

article summarizing various formulations of what constitutes an "exceptional reason."  *See id.*

(citing Jonathan S. Rosen, *An Examination of the "Exceptional Reasons" Jurisprudence of the*

*Mandatory Detention Act:  Title 18 U.S.C. §§ 3143, 3145(c)*, 19 Vt. L. Rev. 19 (1994)).  There

appear to be two leadings standards.  Several courts have adopted the view that an "exceptional

reason" must be something "clearly out of the ordinary, uncommon, or rare." *United States v. Brown*, 368 F.3d 992, 993 (8th Cir. 2004) (quoting *United States v. Koon*, 6 F.3d 561, 563 (9th Cir. 1993) (Rymer, J., concurring in denial of rehearing en banc)).  Thus, factors such as a defendant's "compliance with the terms of his pretrial release, his lack of a criminal record, his payment of child support, and his ongoing employment" do not suffice.  *United States v. Larue*, 478 F.3d 924, 925 (8th Cir. 2007).  Other courts have stated that "[e]xceptional circumstances exist where there is 'a unique combination of circumstances giving rise to situations that are out of the ordinary.'"  *United States v. Lea*, 360 F.3d 401, 403 (2d Cir. 2004) (quoting *United States v. DiSomma*, 951 F.2d 494, 497 (2d Cir. 1991)).

The government accepts, for argument's sake, that the risk of contracting COVID-19 could constitute an "exceptional reason" in an appropriate case.  But a finding of such an "exceptional reason" depends on particularized facts.  Accordingly, the proper way for this Court to consider such a claim is in the same way that courts have considered motions for compassionate release arising from the pandemic.  Courts in this district "have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to [COVID-19] and a particularized risk of contracting the disease at his prison facility."  *United States v. White*, — F. Supp. 3d —, No. 2:07-cr-150 (RBS), 2020 WL 1906845, at *1 n.1 (E.D. Va. Apr. 17, 2020) (quoting *United States v. Feiling*, No. 3:19-cr-112 (DJN), 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020)).  Because the defendant has not made either showing here, the Court should deny his motion.

### A.   The Bureau of Prisons is taking appropriate measures in response to the current pandemic.

The Bureau of Prisons ("BOP") is actively working on the critical problem of containing the spread of the coronavirus within prisons.  Several of these measures are summarized in the

attached declaration of Shari Himlie, who is the Complex Health Services Administrator at the Federal Correctional Complex in Florence, Colorado (FCC Florence).  (*See* **Exhibit 1**.)  "FCC Florence includes four separate institutions:  the Federal Prison Camp (FPC) (minimum security), the Federal Correctional Institution (FCI) (medium security), the United States Penitentiary Florence – High Security (USP), and the United States Penitentiary Florence – Administrative Maximum (ADX)."  (*Id.* ¶ 1.)  Al-Timimi is housed in the maximum-security ADX facility.  (*Id.* ¶ 6.)

As a threshold matter, BOP facilities around the country have taken a number of steps to address COVID-19, to include implementing a six-part action plan for dealing with this threat. (*Id.* ¶¶ 7–20).  These steps include minimizing inmate contact with other individuals (*id.* ¶ 10), new screening requirements at BOP facilities (*id.* ¶ 11), maximizing social distancing in BOP facilities (*id.* ¶ 13), and requiring all new arrivals at BOP facilities to be quarantined for a period of 14 days or until they are medically cleared to be removed from quarantine (*id.* ¶ 16).

In addition, the BOP required that, as of March 31, 2020, all inmates in BOP institutions be secured in their assigned cells/quarters for a period of at least 14 days to stop any spread of the disease.  (*Id.* ¶ 17a.)  Only limited group gatherings are permitted, with social distancing required to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access.  Further, BOP has severely limited the movement of inmates and detainees among its facilities.  Though there will be exceptions for medical treatment and similar exigencies (*id.* ¶ 26c), this step also limits transmission.

All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved.  Every newly admitted inmate is screened for COVID-19 risk

factors and symptoms.  "Following this initial screening, inmates are escorted to an intake/quarantine unit where they are automatically quarantined for 14 days to ensure that they do not develop any symptoms consistent with COVID-19."  (*Id.* ¶ 30b.)

Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.*, medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems.  (*Id.* ¶¶ 10f, 12.)  All volunteer visits are suspended absent authorization by the Deputy Director of BOP.  (*Id.* ¶ 10g.)  Any contractor or volunteer who requires access will be screened for symptoms and risk factors.  Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page:  www.bop.gov/coronavirus/index.jsp.

### B.     The defendant has not shown a particularized risk of contracting COVID-19 at FCC Florence.

Beyond the actions undertaken by the BOP generally to stem prisoners' risk of contracting COVID-19, the defendant has failed to show that his BOP facility—*i.e.*, the maximum-security facility at FCC Florence—is at any particularized risk of an outbreak.

First, and most importantly, "[a]s of the date of this submission, no FCC Florence inmate has tested positive for COVID-19."  (Ex. 1 ¶ 5.)  Second, FCC Florence and ADX Florence have rigorously implemented the BOP's coronavirus protocols to minimize the risk of infection. These steps include:

- Directing that "all inmates at the ADX will remain confined to their cells for the majority of the day" (*id.* ¶ 20);

- Activating two command centers at FCC Florence to monitor, plan and implement national directives related to the COVID-19 threat (*id.* ¶ 23);

- Providing inmates and staff with regular updates and education on measures to take to stay healthy (*id.* ¶ 26);

23

- Screening all arriving inmates, to include quarantining new arrivals for 14 days (*id.* ¶ 30);

- Implementing enhanced screening of all inmates in "essential" work details such as food service, cleaning orderlies, and general maintenance (*id.* ¶ 36);

- Providing protective face masks to inmates and staff (*id.* ¶ 55);

- Screening all staff and visitors and denying entry to anyone with a temperature in excess of 100.4 degrees (*id.* ¶¶ 38–40); and

- Testing individuals suspected of having a COVID-19 infection (*id.* ¶¶ 43–46). To date, three COVID-19 tests have been conducted at FCC Florence, all of which were negative for COVID-19 (*id.* ¶ 46).

Against this factual backdrop, the defendant has not made any particularized showing that either FCC Florence or ADX Florence are subject to any heightened risk of inmates contracting COVID-19. The absence of such a showing counsels against relief. *See, e.g.*, *United States v. Jones*, — F. Supp. 3d —, No. 18-cr-100 (NBF), 2020 WL 1674145, at *4 (W.D. Pa. Apr. 6, 2020) (stating "that speculation concerning present or future conditions involving COVID-19 at [a particular prison facility] does not suffice to establish exceptional reasons warranting release under 18 U.S.C. § 3145(c)," since "the potential for … exposure to the COVID-19 virus … currently exists anywhere in the community"); *United States v. Morris*, No. 17-cr-107-1 (DWF), 2020 WL 1471683, at *4 (D. Minn. Mar. 26, 2020) (declining request under § 3145(c) where "there [were] zero reported cases of COVID-19 in the jail"); *cf. United States v. Wright*, No. 16-cr-214-4 (EEF), 2020 WL 1976828, at *5 (W.D. La. Apr. 24, 2020) ("The Court stresses that the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances.") (denying relief in the compassionate-relief context).

Indeed, as one magistrate judge has concluded, when there are no cases of COVID-19 at a particular facility, "it would be speculative to say whether [a defendant's] release plan … truly

mitigates [his] health risks rather than potentially exacerbating them." *United States v. Duncan*, — F. Supp. 3d —No. 18-cr-40030-1 (HLT), 2020 WL 1700355, at *1 (D. Kan. Apr. 8, 2020). That same logic applies here.  Indeed, the defendant proposes to be released into the custody of his mother in Washington, DC.  (ECF No. 466-2.)  But Washington, DC has identified 6,736 instances of coronavirus infection, leading to 358 deaths.  *See* Coronavirus Data, Government of the District of Columbia, https://coronavirus.dc.gov/page/coronavirus-data (last updated May 13, 2020).  Those numbers stand in stark contrast to the zero cases of COVID-19 at FCC Florence.

### C.   The defendant has not shown that he, personally, faces an elevated risk of contracting COVID-19.

In addition, the defendant has failed to make an individualized showing that he, in particular, is at an elevated risk of contracting COVID-19.

#### 1.   The defendant's Special Administrative Measures dramatically reduce his likelihood of infection.

First, the defendant is currently subject to Special Administrative Measures, or SAMs, within ADX Florence.  A redacted version of the most recent memorandum authorizing these measures is attached as **Exhibit 2**.  One of those measures is that "[t]he inmate shall be permitted to visit only with his immediate family members."  (Ex. 2 at 10.)  Those visits must occur without physical contact and involve only one adult visitor at a time.  (*Id.*).  These measures further diminish the defendant's likelihood of contracting COVID-19 while incarcerated.

#### 2.   The defendant is not in a high-risk category.

Second, the government does not agree that the defendant is at an especially elevated risk for contracting COVID-19.  The declaration of Susan Conroy, D.O., submitted under seal to protect the defendant's medical information, summarizes the key facts.

In his motion, the defendant cites three factors which he argues place him in a high-risk

category:  his age (56 years old), his asthma (for which he takes two prescription inhalers), and "hypertension for which he takes several prescription medications."  (ECF No. 466 at 11.)  As Dr. Conroy's declaration explains in greater detail, however, these medical conditions do not place the defendant in an especially high-risk category should FCC Florence ever experience an outbreak of the coronavirus.  Reviewing relevant medical records, Dr. Conroy disputes the defendant's assertions about the severity of his asthma and hypertension.  (¶¶ 14–15.)  His medical conditions are, if anything, well managed (¶ 16), he is in a single-occupancy cell where all staff who interact with him observe social distancing (¶ 17), and—most critically—these precautions are taking place in a facility where no known COVID-19 cases have occurred (*id.*).

Accordingly, the defendant has not made an individualized showing that he is at an increased risk of contracting COVID-19.

\*       \*       \*

While the government of course acknowledges that the current pandemic creates unprecedented challenges across all institutions, including the federal prison system, it is worth pausing to appreciate the extraordinary breadth of the defendant's request.  There have been no cases of COVID-19 at FCC Florence at all.  The defendant's only justifications for finding an "exceptional reason" in this case are his age, his controlled asthma, and his hypertension.  But the defendant here committed extraordinarily serious offenses, including soliciting treason by encouraging others to wage war against the United States.  If the three factors he cites create an "exceptional reason," even in circumstances where there is no evidence of COVID-19 at the defendant's BOP facility, then every federal prisoner over the age of 50 with asthma or high blood pressure merits release under the Bail Reform Act, irrespective of the severity of his crimes.  Even in these unusual times, that cannot be correct.

26

**Conclusion**

The defendant's emergency motion for bail pending appeal is unavailing.  Because the defendant's two § 844(h) convictions will subject him to an additional 360 months of incarceration irrespective of the ongoing post-*Davis* litigation in this case, and because those convictions rest on multiple theories of vicarious liability that do not raise substantial questions of law, the defendant cannot satisfy the requirements of 18 U.S.C. §§ 3145(c) and 3143(b)(1).

Moreover, the defendant's assertion that the generalized risk of contracting COVID-19 creates an "exceptional reason" justifying his immediate release is not persuasive.  There have been zero cases of COVID-19 at FCC Florence.  The defendant has thus not made an individualized showing that he is at an elevated risk of contracting the disease.

The Court should therefore deny the emergency motion for bail pending appeal.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney


By:     _____/s/_____
        Daniel T. Young
        John T. Gibbs
        Gordon D. Kromberg
        Assistant United States Attorneys
        United States Attorney's Office
        2100 Jamieson Avenue
        Alexandria, Virginia 22314
        Office:   (703) 299-3700
        Fax:      (703) 299-3980
        Email:    daniel.young@usdoj.gov
                  john.gibbs@usdoj.gov
                  gordon.kromberg@usdoj.gov

**Certificate of Service**

I certify that on May 15, 2020, I electronically filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF)

to all counsel of record.


By: _____/s/_____

Daniel T. Young
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Office:   (703) 299-3700
Fax:      (703) 299-3980
Email:    daniel.young@usdoj.gov