IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff*,<br><br>v.<br><br>ALI AL-TIMIMI,<br><br>    *Defendant*. | Case No. 1:04-cr-385 (LMB) |

**REPLY BRIEF IN SUPPORT OF EMERGENCY MOTION FOR RELEASE**

Al-Timimi's emergency motion for conditional release under the Bail Reform Act should be granted. Al-Timimi's prison sentences for Counts 1-6 are fully discharged and the remaining Counts 7-10 are the subject of pending motions with this Court that have at least a substantial likelihood of success in light of intervening legal developments. As such, conditional release pending the resolution of his appeal is warranted to guard against the considerable prospect of unjust confinement in the midst of an unprecedented pandemic that poses grave risks to the medically vulnerable.

**UNDISPUTED ISSUES AND FACTS**

In the interest of narrowing the argument, the defense notes the parties' agreement on several underlying issues and facts:

    1.    Both parties acknowledge that this Court allowed Al-Timimi to remain free throughout his trial, and also pending his sentencing hearing. Govt. Opp. at 2 & 4. In ordering the latter relief in 2005, this Court found that the legal issues in his case were sufficiently

substantial to warrant his continued release. *See* Govt. Opp. at 4.

2. The government does not dispute this Court's previous finding that Al-Timimi is not a flight risk. *See* Def. Br. at 8. Nor does it take issue with the U.S. Probation Office's report that Al-Timimi fully complied with the terms of his 2005 release. *See* Def. Br. at 17 & Ex. D.

3. Al-Timimi's direct appeal has not yet occurred. Govt. Opp. at 6. As such, the parties agree that his case remains within the purview of the Bail Reform Act.

4. The government acknowledges that Al-Timimi has fully discharged his prison sentences on Counts 1-6; as such, only Counts 7-10 continue to subject him to imprisonment. Govt. Opp. at 5.

5. Of the remaining Counts 7-10, the government stipulates that Al-Timimi's pending challenges to Counts 7-8 (and also Count 1) raise substantial legal issues based on intervening Supreme Court authority. Govt. Opp. at 9.

6. Although the government disputes that Al-Timimi's pending motion for leave to seek a new trial on Counts 9 and 10 raises substantial legal issues, it acknowledges several of the key facts that underlie the motion. For example, the government recognizes that the Supreme Court's intervening decision in *Rosemond v. United States*, 572 U.S. 65, 67 (2014) changed the foreknowledge requirements for establishing accomplice liability in crimes that require the use of a weapon. *See* Govt. Opp. at 10-15. It also acknowledges a split of authority over the validity of the "aiding and abetting a conspiracy" theory that it used to charge the conspiracies needed to establish *Pinkerton* liability for Counts 9-10—and further acknowledges that this disagreement has not been resolved by the Supreme Court or Fourth Circuit. Govt. Opp. at 18-19. The government does not contest that its internal practice manual advises prosecutors to avoid this very theory.

7. Although the government denies that Al-Timimi faces a heightened risk for severe complications from COVID-19, it acknowledges that his hypertension was uncontrolled as recently as two months ago and presently requires treatment with four different medications. The government also acknowledges that Al-Timimi's asthma requires daily inhaled corticosteroid (ICS) therapy. *See* Declaration of Susan Conroy (under seal).

## ARGUMENT

Broadly speaking, the government's opposition makes two arguments. First, it claims that the legal questions underlying Al-Timimi's challenge to Counts 9 and 10 are not sufficiently substantial to meet the requirements of the Bail Reform Act. Second, it claims that the circumstances of his case are not sufficiently "exceptional" to warrant his conditional release pending appeal. Neither argument is persuasive.

**I.   A multitude of intervening legal developments have created a substantial likelihood of reversal of Al-Timimi's convictions under Counts 9 and 10**.

Counts 9 and 10 charged Al-Timimi as an accomplice to certain weapons activities that principals Kwon and Hasan engaged in at LET camps in Pakistan. Both principals admitted to carrying an RPG weapon during training exercises, for which each later admitted guilt to the crime of carrying explosives during the commission of a felony in violation of 18 U.S.C. § 844(h)(2). *See* Dkt. No. 47 at 16 (superseding indictment). The government charged Al-Timimi as an accomplice to those crimes, based on its broader allegation that his comments at Kwon's September 16th dinner motivated them to attend LET. In evaluating whether Kwon and Hasan's carrying of an RPG occurred during the commission of a "felony," the jury was directed to refer to the list of predicate crimes in Jury Instruction No. 44—the same list it used to evaluate Counts 1, 7, and 8. *See* Trial Tr., April 18, 2005 [Dkt. No. 156] at 2319-20.

The government's argument that Al-Timimi's appeal fails so much as to raise a substantial legal question is manifestly at odds with the governing standard. *See* Govt. Opp. at 9-19. For purposes of the Bail Reform Act, the parties agree that a "substantial question" is one that is "a 'close' question or one that very well could be decided the other way," *United States v. Steinhorn*, 927 F.2d 195, 196 (4th Cir. 1991) (citation omitted); *see also* Opening Br. at 7-8; Govt. Opp. at 8. "Whether a question is 'substantial' must be determined on a case-by-case basis." *Id*. Here, Al-Timimi has identified a multitude of substantial questions that, if resolved in his favor, would result in the reversal of Counts 9 and 10.

**First**, Al-Timimi's pending challenge to the Count 1 conspiracy under *Davis* has at least a substantial likelihood of rendering Counts 9 and 10 unsustainable by negating the *Pinkerton* theory on which they rely. As further outlined below, Counts 9 and 10 depend exclusively on *Pinkerton*; the government's alternative effort to sustain them under standard accomplice liability rests on a now-invalid theory of constructive knowledge that has been foreclosed by the Supreme Court's intervening decision in *Rosemond*, 572 U.S. at 67, and other controlling precedent. **Second**, irrespective of Al-Timimi's *Davis* challenge to Count 1, *all* of the conspiracies charged in this case remain vulnerable to reversal based on the controversial "aiding and abetting a conspiracy" legal theory that the government used to charge them. Indeed, the government's own practice manual cautions against this theory on the grounds that several courts have rejected it. Moreover, even if the Fourth Circuit were to ultimately sanction its use, any surviving conspiracy convictions would still lack the critical element of conspiracy *membership* that *Pinkerton* depends on for scienter. **Third**, Al-Timimi's appeal continues to present a substantial First Amendment question over the line between protected forms of general advocacy and unprotected forms of highly specific advocacy. Indeed, law schools have based First

4

Amendment fact patterns on this very case.[1] **Fourth**, the release of new evidence has caused the Fourth Circuit to remand this case over the government's objection. Briefs and documents have been filed with a Classified Information Security Officer according to protocol, but suffice to say here that the Fourth Circuit's granting of an opposed motion for remand suggests the presence of at least a substantial issue of law.

Al-Timimi outlines all four of these issues in his opening brief; the government's opposition responds to the first two. Al-Timimi replies below.

### A. The government's *Pinkerton* theory faces multiple critical defects.

The *Pinkerton* theory that the government used to support Counts 9 and 10 faces multiple critical defects. The government's efforts to cure them are unavailing.

First, the invalidation of Count 1 under *Davis* would leave the government without a weapons conspiracy on which *Pinkerton* liability could be premised. *See, e.g., United States v. Rosas-Fuentes*, 970 F.2d 1379, 1383 (5th Cir. 1992) ("We also agree that [defendant's] conviction for possession could rest only upon his participation in the conspiracy under the *Pinkerton* rule. A reversal of the conspiracy conviction causes the possession conviction to fall."). There is at least a substantial likelihood that the jury based *Pinkerton* liability on Count 1: Not only was it the only weapons conspiracy charged in this case, it was also the only conspiracy that shared a common reliance on Jury Instruction 44's list of predicate crimes. Moreover, the superseding indictment specifically names Count 1 as a predicate felony for Counts 9-10. *See* Dkt. No. 47 at 16, ¶ 2.

The government counters that the jury might instead have based *Pinkerton* liability on one of the alternative conspiracies charged in Counts 3 or 6. *See* Govt. Br. at 16-17. But there is

---

[1] *See, e.g.*, https://scholar.harvard.edu/files/msen/files/sen_gov1510_speech1hypos.pdf

little reason to believe the jury reached its verdict in this matter and no special verdict to support such a hypothesis. At best, the government's argument simply produces a new defect in the form of verdict indeterminacy—one that generally requires that the verdict be set aside. *See Zant v. Stephens*, 462 U.S. 862, 881 (1983) ("a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground."); *see also United States v. Kaiser*, 660 F.2d 724, 732 (9th Cir. 1981) ("Our reversal of the conspiracy convictions of Remsing and Schafer precludes the imposition of vicarious liability upon them for the acts of their alleged co-conspirators. Because we cannot now be certain that the jury did not rely upon the vicarious liability theory, we must reverse the convictions of Remsing and Schafer on those counts."). Thus, if Al-Timimi's pending challenge to Count 1 under *Davis* is successful, there is a substantial likelihood that his challenge to Counts 9 -10 will be successful as well.

Moreover, even independent of Al-Timimi's *Davis* challenge, all three of the conspiracy convictions in this case remain vulnerable to reversal based on the controversial "aiding and abetting a conspiracy" legal theory that the government used to charge them. This theory purported to chain together two different forms of inchoate liability in a single count, charging Al-Timimi with "Inducing others to Conspire to Use Firearms" (Count 1), "Inducing others to Conspire to Levy War" (Count 3), and "Inducing others to Conspire to Violate the Neutrality Act" (Count 6). *See* Superseding Indictment [Dkt. No. 47] at 1. And although this Court ultimately allowed the theory to proceed, it noted in oral argument over jury instructions that the issue was a difficult one:

> I mean, I think the issue is -- this is a tough case because it's almost a third level of culpability; that is, you've got the underlying offense, an inchoate offense such as

6

>conspiracy to do it, then you've got him one step further removed, aiding and abetting or soliciting or procuring the conspiracy. It certainly is a unique set of legal structure.

Trial Tr., April 18, 2005 [Dkt. No. 156] at 2180.

While the government expresses confidence that the theory will be upheld, it simultaneously acknowledges a split of authority over its validity that neither the Supreme Court nor the Fourth Circuit has yet resolved. *See* Govt. Opp. at 18-19; *see also* U.S. DEPT. OF JUSTICE, USAM CRIMINAL RESOURCE MANUAL § 2483, available at http://www.justice.gov/usam/criminal-resource-manual-2483-conspiracy-aid-and-abet ("The concept of aiding and abetting a conspiracy has not been widely adopted. A number of district courts have rejected the concept. Even in the Seventh Circuit, the concept has been criticized.") (citations omitted) (last visited May 26, 2020). As such, the government's claim that this question fails to qualify as a substantial one—that is, one "that very well could be decided the other way," *Steinhorn*, 927 F.2d at 196—is unpersuasive.[2]

Finally, even if the Fourth Circuit were to uphold the concept of aiding and abetting a conspiracy, *Pinkerton* would remain unavailable because the government has failed to charge actual *membership* in the conspiracy. Although *Pinkerton* and accomplice liability share certain features in common, the *Pinkerton* doctrine is distinctly premised on conspiracy *membership*: it relies on a conspirator's act of joining the illegal agreement to establish mens rea and create culpability for the actions of his or her co-conspirators. *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946). Indeed, the *Pinkerton* Court makes this explicit:

---

[2] The government's mention of the unrelated charge of "conspiracy to aid and abet" is inapposite. *See* Govt. Opp. at 19. The concept of "aiding and abetting a conspiracy" would allow the government to charge conspiracy without proving its definitional element—the act of joining a conspiracy agreement. By contrast, this issue is not present in a "conspiracy to aid and abet," which necessarily involves a defendant whose actual membership in the conspiracy has been charged by the grand jury and proven to the trial jury.

7

> The criminal intent to do the act is established by the formation of the conspiracy. Each conspirator instigated the commission of the crime. The unlawful agreement contemplated precisely what was done. It was formed for the purpose. The act done was in execution of the enterprise.

*Id.* at 647.

This central element of *Pinkerton*—the formation of a conspiracy agreement—is entirely absent from Al-Timimi's case, as the superseding indictment carefully avoided accusing him of joining or forming any of the alleged conspiracies at issue, but opted instead to charge him with aiding and abetting the members. As such, the government's attempt to attach *Pinkerton* liability to any of these conspiracies would necessarily involve an impermissible broadening of the indictment (without the involvement of the grand jury) to encompass an element that is absent from its case.

The government's citation of *Portocarrero v. United States*, No. 1:16-cv-00763 (LMB), 2019 U.S. Dist. LEXIS 5786, at *20 (E.D. Va. Jan. 11, 2019) is inapposite. *Portocarrero* observes that an accomplice is "punishable as a principal" under federal law—an uncontroversial proposition that neither party disputes. It does not address the concept of aiding and abetting a conspiracy at all, much less the doctrinal question of whether *Pinkerton* liability could properly attach to such a defendant without some jury finding that he joined the conspiracy agreement.

Finally, *Pinkerton* liability also makes little sense in this context because it would leave a court or jury with no way of evaluating its duration. *Pinkerton* reasoned that "so long as the partnership in crime continues, the partners act for each other in carrying it forward." *Pinkerton*, 328 U.S. at 646. This rule has no logical applicability to an accomplice, who is not a member of the partnership at all and thus has no way of exiting it.

### B. The government's alternative attempt to rest Counts 9 and 10 on ordinary principals of accomplice liability is foreclosed by caselaw.

The government argues that it might alternatively rest Counts 9 and 10 on ordinary principals of accomplice liability. Govt. Br. at 10-15. As a starting point, the defense is compelled to point out that government's post-trial Rule 29 opposition brief defended Counts 7-10 exclusively on *Pinkerton*; it did not attempt to support them under standard accomplice liability at all. *See* Dkt. No. 125 at 37-40. In any event, the government's attempt to do so now is unavailing because it rests on an untenable theory of constructive foreknowledge that has been foreclosed by controlling precedent.

The Supreme Court's intervening decision in *Rosemond v. United States*, 572 U.S. 65 (2014) confirms that accomplice liability under § 2 requires an accomplice's complete foreknowledge of every element of the underlying offense. *Id*. at 76-77. In the context of a weapons crime, this requires proof that he or she had "advance knowledge that a confederate would use or carry a gun during the crime's commission." *See id*. at 67. In this case, by contrast, neither Kwon nor Hasan testified to speaking with Al-Timimi about the use of any weapons at any time—much less their specific activities at LET camp. *See* Dkt. No. 449 at 6-8 (record citations). Although the witnesses split over whether Al-Timimi encouraged their plan to attend LET[3] (a plan that all witnesses agree was initiated by Royer), it is uncontroverted that Al-Timimi was not involved in any discussion contemplating their use of weapons—and certainly did not counsel or solicit their use of the particular RPG weapons charged in Counts 9 and 10. To the contrary, every witness who was asked about such a claim flatly repudiated it. *See* Dkt. No. 449

---

[3] Notably, only Kwon testified that he did. By contrast, Hasan testified that the men did not begin to discuss LET until after Al-Timimi had left Kwon's apartment. Trial Tr., April 14, 2005 [Dkt. No. 155] at 2069-70.

9

at 6-8 (record citations and summary of witness testimony). Indeed, it is unclear on the record whether Kwon and Hasan themselves had any particularized expectation of handling an RPG at LET.

The government attempts to answer *Rosemond* with a loose theory of constructive knowledge, arguing for example that Al-Timimi knew of instances of other LET affiliates using weapons. *See* Govt. Opp. at 14-15. Notably, *none* of the examples the government cites involve the crime that it accuses Al-Timimi of being an accomplice to—namely, Kwon and Hasan's particular activity of carrying an RPG weapon at LET camp in "Mid-October" or "Early November" of 2001. *See* Superseding Indictment [Dkt. No. 47] at 16.

In any event, the government's argument is unavailing. Even pre-*Rosemond*, such arguments failed to pass muster in the courts of appeals, which held that aiding and abetting a crime with a weapons element required proof that the defendant knew to a "practical certainty" or actual certainty that the weapon would be involved. *See United States v. Spinney*, 65 F.3d 231, 238-40 (1st Cir. 1995) ("the government must establish that the [accomplice] knew to a practical certainty that the principal would be using a gun. . . . a rubric that calls for proof verging on actual knowledge.") (internal citations and quotations omitted); *United States v. Donel*, 211 F. App'x 180, 181 (4th Cir. 2006); *see also United States v. Greene*, No. 14-C-431, 2015 U.S. Dist. LEXIS 7871, at *4-5 (E.D. Wis. Jan. 23, 2015) (concluding that *Rosemond* elevates the *Spinney* standard from "practical certainty" to "actual knowledge," thus eliminating any lingering permissible theories of "constructive knowledge").

In *Spinney*, for example, an accomplice's extensive involvement in the planning of a bank robbery was insufficient to establish accomplice liability for a § 924(c) conviction where firearms were not specifically discussed at the planning stages. 65 F.3d at 238. The court

10

explained:

> Put bluntly, even though Spinney may have spent much time with Kirvan devising the plan, *and was on notice of the likelihood that a gun would be used* in the course of the robbery, there is simply no evidence to support a reasoned conclusion that Spinney was *practically certain* that Kirvan would be armed. . . . In sum, 'likelihood' and 'practical certainty' are not equivalent terms.

*Id*. at 239 (emphasis added). As these cases make clear, the fact that Al-Timimi had heard of instances of LET affiliates using weapons that included explosives falls far short of the foreknowledge standard needed to create accomplice liability for Kwon and Hasan's particular weapons crimes at LET. Undoubtedly, Mr. Spinney and Ms. Greene had heard of instances of persons carrying firearms in bank robberies. But the relevant doctrinal question is whether the defendant had actual advance knowledge of the entirety of the specific crime he or she is accused of aiding and abetting—and not a mere general awareness of its possibility.

The government devotes much of its opposition brief to defending its jury instruction on aiding and abetting. *See generally* Govt. Opp. at 10-14. Although the defense reserves the right to challenge that instruction, it expects Rule 29 to render the question moot. The government's post-trial Rule 29 opposition brief did not defend Counts 9-10 on standard accomplice liability at all, and its efforts to do so now are unavailing.

\* \* \*

As a final point, the government also argues that this Court's post-trial finding that Al-Timimi's case involved substantial legal issues is no longer applicable because, in the government's view, the case "has a much different complexion now than it did 15 years ago," and that the legal issues have become "far narrower." Govt. Opp. at 19. But to the extent the issues have narrowed in the interim years, they've narrowed in favor of the defense. As outlined above, a multitude of intervening Supreme Court decisions have cast doubt on the counts that

11

continue to subject Al-Timimi to imprisonment. The government does not identify any legal issues that have narrowed in its favor.

## II. At least two sets of "exceptional reasons" support Al-Timimi's conditional release under the Bail Reform Act.

Al-Timimi's opening brief identified two different exceptional reasons warranting his conditional release pending his appeal under 18 U.S.C. 3145(c)—first, the ongoing COVID-19 pandemic and his underlying health issues that place him at a high risk of developing server illness, and second, the substantial likelihood of unjust confinement given Al-Timimi's pending legal challenges to Counts 7-10. The government responds primarily to the first; the defense replies below.

### A. The exceptional circumstances of the COVID-19 pandemic warrant Al-Timimi's conditional release pending appeal, particularly in light of his significantly elevated risk of grave illness.

The government stipulates "that the risk of contracting COVID-19 could constitute an exceptional reason in an appropriate case," Govt. Opp. at 21, but denies that Al-Timimi has presented such a case. Although Al-Timimi's opening brief cites a multitude of district court decisions that have analyzed similar Section 3145(c) motions for conditional release arising from the pandemic, Def. Br. at 10-11, the government does not address those decisions but instead asks this Court to follow an alternative standard used to evaluate motions for compassionate release under Section 3582. *See* Govt. Opp. at 21 (*citing United States v. White*, No. 2:07cr150, 2020 U.S. Dist. LEXIS 68222, at *3 n.2 (E.D. Va. Apr. 17, 2020)).

The government's invitation should be declined, as the two statutes address very different circumstances. Compassionate release motions under Section 3582 involve inmates whose convictions are final and appeals exhausted, whereas Bail Reform Act motions under Section

3145(c) concern defendants whose appeals (or trial proceedings) are still pending and thus face the prospect of unjust confinement. Under § 3145(c), courts have explained that "each case must be evaluated on its own terms," *United States v. Harris*, 2020 U.S. Dist. LEXIS 53632, *17-18 (D.D.C. March 27, 2020), emphasizing that the "exceptional-reasons analysis is flexible and permits courts to respond to real-world circumstances in a pragmatic and common-sense manner." *Id*. at *18. A "wide range of factors may bear upon the [§ 3145(c)] analysis," and the reviewing court has "broad discretion . . . to consider all the particular circumstances of the case before it and [to] draw upon its broad experience with the mainsprings of human conduct." *Id*. at *17 (internal citations and quotations omitted).

As outlined in Al-Timimi's opening brief, Def. Br. at 10-11, a multitude of district courts have granted conditional release to defendants who, like Al-Timimi, suffer from underlying health issues and whose cases involve substantial legal issues. By contrast, conditional release is generally denied to defendants who lack these criteria or who otherwise pose a flight risk or danger to society owing to the violent nature of their crimes. *Id*. at 12.

### 1.  Al-Timimi has multiple underlying health conditions that put him at "significantly elevated risk for COVID-19 complications."

The government has submitted a declaration from Dr. Susan Conroy—a physician at FCC Florence—that summarizes Al-Timimi's health status and confirms much of the medical information that he identifies in his opening brief. *See* Declaration of Susan Conroy ("Conroy Decl.") (under seal). Among other things, Dr. Conroy reports that Al-Timimi has hypertension that was uncontrolled as recently as March, *id*. ¶ 11, and is presently treated with four different medications. *Id*. ¶ 9. Dr. Conroy also confirms that Al-Timimi has asthma, which is treated with daily inhaled corticosteroid (ICS) therapy in combination with an albuterol rescue inhaler. ¶ 9-10. She further notes that Al-Timimi experienced an acute exacerbation in February 2019 that

required treatment with a nebulizer. *Id*. at ¶ 10.

Nonetheless, Dr. Conroy indicates that she does not find Al-Timimi to be at higher risk for serious illness from COVID-19, *id*. ¶ 12, based on her characterization of Al-Timimi's asthma as "intermittent and well controlled," *id*. ¶¶ 14 & 16, and her assessment that Al-Timimi's hypertension is "closely monitored and has shown improvement over the past two months." *Id*. ¶ 16. Notably, Dr. Conroy does not affirmatively *deny* that Al-Timimi is a high-risk patient for COVID-19; rather, she indicates that she does not characterize him as such using criteria from the CDC website. *See generally id*. at 12-15. By contrast, Dr. Chris Beyrer[4]—a professor of epidemiology and medicine with particular expertise in emerging infections—has submitted a declaration that analyzes the pathophysiology and epidemiology of COVID-19 in greater detail than the general guidelines found on the CDC website. *See* Beyrer Decl. [Dkt. No. 466, Ex. A]. Dr. Beyrer explicitly identifies hypertension as a risk factor for serious illness, citing significantly elevated mortality rates observed by the World Health Organization. *See* Beyrer Decl. [Dkt. No. 466, Ex. A] ¶ 14. Dr. Conroy's declaration does not dispute these findings.

At the request of undersigned counsel, Dr. Beyrer has reviewed Dr. Conroy's declaration and made an assessment of Al-Timimi in a new declaration. *See* Second Declaration of Chris Beyrer, MD, MPH ("Second Beyrer Decl.") (attached as Exhibit A). Based on current epidemiological evidence, Dr. Beyrer finds that Al-Timimi has "a significantly elevated risk for COVID-19 complications." *See* Second Beyrer Decl. ¶ 4-6. He observes:

> Based on current epidemiological evidence, Mr. Al-Timimi's recent uncontrolled

---

[4] As outlined in his declaration, Dr. Beyrer is a member of the National Academy of Medicine and a professor of Epidemiology, International Health, and Medicine at the Johns Hopkins Bloomberg School of Public Health. Beyrer Decl. ¶ 1. Dr. Beyrer has been active in been active in infectious diseases epidemiology since 1992. *Id*.

14

hypertension alone puts him at great risk for a severe outcome. One of the more striking observations about COVID-19 has been the increasing awareness of both stroke and cardiovascular complications with the disease. Hypertension has emerged as one of the more important underlying conditions that predispose people for worse outcomes upon infection with this virus. In addition, Mr. Al-Timimi's age (over 50), male gender, and underlying pulmonary condition (asthma) add to this risk.

*Id*. ¶ 5. Given Dr. Beyrer's significant expertise in emerging infections, and the fact that Dr. Conroy does not specifically contest any conclusions in his first declaration, the government's argument that Al-Timimi "is not in a high-risk category," see Govt. Opp. at 25-26, is unpersuasive.[5]

### 2. Section 3145(c) does not require Al-Timimi to "wait and see" if COVID-19 invades FCC Florence.

The government also opposes Al-Timimi's motion on the grounds that FCC Florence does not yet have any confirmed cases of COVID-19, Govt. Opp. at 23, and that the "Bureau of Prisons is taking appropriate measures in response to the current pandemic." *Id*. at 21. But as the *Harris* court observes, "uncertainty is endemic in the present circumstances, and that uncertainty

---

[5] The defense also notes that Dr. Conroy's conclusion that Al-Timimi's asthma is not severe enough to qualify as a COVID-19 risk factor may be in some tension with the classification charts that underlie her assessment. In opining that she does not characterize Al-Timimi's asthma as "moderate to severe," Dr. Conroy cites the "National Heart, Lung, and Blood Institute's Classification and Stepwise Treatment of Asthma chart, available at http://www.nhlbi.nih.gov/guidelines/asthma/index.htm." Conroy Decl. ¶¶ 14-15. But those NHLBI charts appear to indicate that asthma severity classifications are to be made at **baseline**—that is, "in patients who are not currently taking long-term control medications." *See* NHLBI, *Guidelines for the Diagnosis and Management of Asthma* (attached as Exhibit D) at 5; *see also id*. at 2. Because Al-Timimi is in fact "taking long-term control medication" in the form of daily inhaled corticosteroid (ICS) therapy, it appears that Dr. Conroy may have based her assessment on post-treatment observations rather than baseline observations.

In light of the ongoing pandemic, the defense has been unable to obtain an independent assessment by a pulmonologist in time for this filing. However, other courts do not appear to have required particularized severity assessments of an inmate's asthma condition. *See*, *e.g.*, *United States v. French*, No. 1:12-cr-00160-JAW, 2020 U.S. Dist. LEXIS 56155, at *29 (D. Me. Mar. 31, 2020*); United States v. McKenzie*, 2020 U.S. Dist. LEXIS 55503, at *9 (S.D.N.Y. Mar. 30, 2020).

cannot preclude courts from acting until the damage has been done." 2020 U.S. Dist. LEXIS 53632 at *16. In the time since Al-Timimi filed his opening brief, the number of COVID-19 deaths in the United States has nearly doubled from 55,000 to approximately 100,000.[6] And while it remains unclear how many inmates within the federal prison system have been tested for the virus, BOP now reports over 4,700 active and recovered cases of infection among inmates and 64 deaths.[7] Given COVID-19's ability to evade detection by spreading among asymptomatic persons, a movant with underlying health issues cannot reasonably be expected to "wait and see if conditions at the prison change," *see Harris*, 2020 U.S. Dist. LEXIS 53632 at *16—at which point it might well be too late.

Moreover, the defense has identified additional reasons to believe that the H-Unit of ADX Florence would be an unsuitable environment for a patient suffering from severe COVID-19 complications. For example:

- ADX has a documented history of failing to address Al-Timimi's serious medical needs. As recently as last summer, Al-Timimi suffered from a dental abscess that presented with high fever, swelling, and severe pain that went untreated for weeks and required intervention from his attorneys to secure appropriate care—a fact that the government does not contest. *See* Def. Opening Br. at 4-5 & Ex. E.

- The government does not dispute that an inmate's medical transfer out of ADX requires special FBI approval that is not readily granted.

- Although the government states that "BOP has severely limited the movement of inmates and detainees among its facilities," Govt. Opp. at 22, ADX continues to mandate regular cell rotations among H-Unit inmates, notwithstanding numerous requests that such rotations be temporarily suspended to reduce the risk of COVID-19 transmission. Declaration of Dr. Ali Al-Timimi ("Al-Timimi Decl.") (attached as Exhibit B), ¶ 5 & n.1; *see also* April 10, 2020 Letter from Sturm College of Law to Warden True (attached as Exhibit C).

---

[6] *See* CSSE at John Hopkins University, *COVID-19 Dashboard*, *available at*: https://tinyurl.com/uwns6z5 (last visited May 26, 2020).

[7] *See* BOP, *COVID-19 Cases*, *available at*: https://www.bop.gov/coronavirus/ (last visited May 26, 2020).

16

- Prior to his incarceration, Al-Timimi was an assistant professor at the Center for Biomedical Genomics at the George Mason University in Fairfax, Virginia. Because of his background and training in biology, several other inmates at ADX voiced their concerns to him about COVID-19. In response, he wrote a letter to the H-Unit counselor that outlines his thoughts and concerns about COVID-19 at ADX. *See* Al-Timimi Decl. ¶¶ 2-3. He further reports that as of April 30, ADX is still taking no apparent steps to screen inmates for COVID-10. *Id*. ¶ 4. For example, it is not monitoring their temperatures for fever. *Id*.

- Al-Timimi also notes that "certain staff members who work in the H-Unit have told us (collectively) that their absence was due to self-quarantine for 14 days." Al-Timimi Decl. ¶ 4. In response to an inquiry from undersigned counsel, the government reports that it has investigated and confirmed that two correctional officers at ADX were in fact tested for COVID-19, but that their test results returned negative.

* * *

Finally, the government's concern that granting relief to defendants such as Al-Timimi would necessitate granting relief to every federal inmate with underlying health issues is misplaced. See Govt. Opp. at 26. The Bail Reform Act addresses these concerns by preventing the release of inmates who fail to identify substantial legal issues, as well as those who pose a flight risk or danger to society owing to the violent nature of their crimes. *See* Def. Br. at 12.

### B. The prospect of unjust confinement alone is sufficient to warrant Al-Timimi's conditional release under §3145(c).

The government stipulates in its opposition brief that Al-Timimi's pending challenge to Counts 7 and 8—the counts that produced his mandatory lifetime prison sentence—raises substantial legal issues in light of the Supreme Court's recent invalidation of § 924(c)'s residual clause in *United States v. Davis*, 139 S. Ct. 2319, 2336 (2019). *See* Govt. Opp. at 9. This Court last summer ordered the government to show cause why Al-Timimi's corresponding motions for acquittal should not be granted. Dkt. No. 453.

Notably, the lifetime prison sentence associated with these particular counts is the only factor requiring Al-Timimi to make a heightened showing of "exceptional reasons" under §

3145(c) at all. *See* Def. Br. at 13-14; *see also* 18 U.S.C. §§ 3143(b)(2) and 3142(f)(1)(B). Otherwise, he would be eligible to seek release under the less stringent standard of 18 U.S.C. § 3143(b)(1), requiring him only to show the existence of a substantial appellate issue. As more fully described in Al-Timimi's opening brief, Def. Br. at 13-14, such circumstances alone are sufficient to warrant § 3145(c) relief to guard against the substantial prospect of unjust confinement. *See United States v. DiSomma*, 951 F.2d 494, 497-98 (2d Cir. 1991) (affirming conditional release where "[t]he element of the crime called into question on appeal is the element of the bail statute that bars release"). Those concerns are only magnified in light of Al-Timimi's underlying health conditions that leave him particularly vulnerable to grave illness from COVID-19

## CONCLUSION

WHEREFORE Defendant Ali Al-Timimi respectfully requests that the Court grant this motion and order his conditional release pending his appeal.

Dated: May 26, 2020          Respectfully submitted,

/s/
Thomas Michael Huff, Virginia Bar No. 73587
Thomas M. Huff, Attorney-at-Law
P.O. Box 2248
Leesburg, VA 20177
Telephone: 703.665.3756
Facsimile: 571.354.8985
thuff@law.gwu.edu

Jonathan Turley (*pro hac vice*)
The George Washington University Law School
2000 H Street, NW
Washington, D.C. 20052
(202) 994-7001 (telephone)
(202) 508-6200 (facsimile)
jturley@law.gwu.edu

Attorneys for Defendant Dr. Ali Al-Timimi

## CERTIFICATE OF SERVICE

I certify that on May 26, 2020, I will file the foregoing document on the CM/ECF system, which will then serve it by electronic notification on all parties of record. This Court's designated Classified Information Security Officer has confirmed that the present motion may be filed on the public docket.

/s/
Thomas Michael Huff, Virginia Bar No. 73587
Thomas M. Huff, Attorney-at-Law
P.O. Box 2248
Leesburg, VA 20177
Telephone: 703.665.3756
Facsimile: 571.354.8985
thuff@law.gwu.edu
