1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA      .      Criminal No. 1:04cr385
                              .
     vs.                      .      Alexandria, Virginia
                              .      June 11, 2020
ALI AL-TIMIMI,                .      2:09 p.m.
                              .
               Defendant.     .
                              .
.  .  .  .  .  .  .  .  .  .  .
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:  (by telephone)

FOR THE GOVERNMENT:          JOHN T. GIBBS, AUSA
                             GORDON D. KROMBERG, AUSA
                             DANIEL T. YOUNG, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314


FOR THE DEFENDANT:           THOMAS M. HUFF, ESQ.
                             P.O. Box 2248
                             Leesburg, VA 210177
                               and
                             JONATHAN TURLEY, ESQ.
                             The George Washington University
                             Law School
                             2000 H Street, N.W.
                             Washington, D.C. 20052


OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
                             U.S. District Court, Fifth Floor
                             401 Courthouse Square
                             Alexandria, VA 22314
                             (703)299-8595


(Pages 1 - 21)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

P R O C E E D I N G S

1  
2       THE CLERK:  Okay.  Criminal -- Civil Action 04 -- oh,

3  I'm sorry, Criminal Case 04-385, United States of America v.

4  Ali Al-Timimi.  Would counsel please note their appearances for

5  the record.

6       MR. HUFF:  Yes.  This is Thomas Huff for the

7  defendant.

8       MR. TURLEY:  Yes.  This is Jonathan Turley for the

9  defendant.

10      THE COURT:  All right.  For the government?

11      MR. YOUNG:  Daniel Young for the government.

12      MR. KROMBERG:  Gordon Kromberg for the government.

13      THE COURT:  All right.  Who will be the main

14  spokesperson for the defendant?

15      MR. HUFF:  With respect to the emergency motion, it

16  will be me, Thomas Huff.

17      THE COURT:  All right.  And for the government, who's

18  going to be addressing that motion?

19      MR. YOUNG:  It will be Daniel Young, me, Your Honor.

20  Thank you.

21      THE COURT:  All right.  So I don't want to hear from

22  other counsel then.  And, Mr. Huff and Mr. Young, whenever you

23  speak, you need to state your name first because this is an

24  on-the-record telephone conference, and we can't tell who you

25  are since we're not looking at you.  All right?

3

1          MR. HUFF:  Yes.

2          MR. YOUNG:  Yes, Your Honor.

3          THE COURT:  And we're having trouble hearing you.

4   Hold on one second.

5          All right.  Mr. Huff, speak a little softer.  Let me

6   hear you again.

7          MR. HUFF:  Okay.  Check one, two, three.

8          THE COURT:  That's much better.

9          All right.  And, Mr. Young, let me hear from you.  A

10  little softer.

11         MR. YOUNG:  The rain in Spain falls mainly in the

12  plain.

13         THE COURT:  You're hard to understand.  Are you on a

14  speaker phone, cell phone?  What are you on?

15         MR. YOUNG:  I'm on a voice over IP connection.  I can

16  try calling the line back from a different phone, Your Honor,

17  if I'm not intelligible.

18         THE COURT:  Well, you're intelligible, but it's

19  difficult.  So I think the phone is a better way to do this,

20  but we'll try.

21         MR. YOUNG:  Okay.  I will dial in momentarily, Your

22  Honor.

23         THE COURT:  All right.  We'll wait for you.

24         While we're waiting, Mr. Kromberg, are you there

25  still?

4

1            THE CLERK:  He didn't hear you.  I had it on mute.

2    It's off mute now.

3            THE COURT:  All right.  Mr. Young, are you there?

4            MR. YOUNG:  This is Dan Young for the government.

5            THE COURT:  All right.  That's much better, all

6    right?

7            So now we have Mr. Huff and Mr. Young on the phone.

8    And again, please state your name first.  Just say "Huff" or

9    "Young," and then say whatever you're going to say.

10           All right.  So this matter is before the Court, and

11   the only matter I'm hearing today is the defendant's emergency

12   motion for release from custody pending appeal.  I want

13   Mr. Huff first -- I'm sorry, Mr. Young first.  Can you tell me

14   what is your knowledge of the status of any COVID infections at

15   Super Max?

16           MR. YOUNG:  Yes.  This is Young.  The government

17   reached out to our contact at FCC Florence, and that includes

18   all the Florence facilities, among them ADX Florence, where the

19   defendant is housed, and as of this morning, there are no

20   reported cases of COVID-19 among either staff or inmates in the

21   FCC Florence series of facilities.

22           THE COURT:  All right.  Well, Mr. Huff, that is

23   certainly a factor which the Court has to take into

24   consideration in evaluating your motion, because right now,

25   ironically, your client is actually in a safer environment

1   vis-a-vis the virus than he would be if he was living in the

2   District of Columbia.

3           MR. HUFF:  So I acknowledge that, Your Honor, but at

4   the same time, I think the, the *Harris* court dealt with this

5   same situation in D.D.C., also evaluating a section 3145(c)

6   motion in the context of the pandemic, and the *Harris* court

7   observed that while, you know, uncertainty is endemic in the

8   present circumstances, that uncertainty can't preclude courts

9   from acting until the damage is done.

10          I think especially for a person like our client, who

11  has certain underlying health conditions, should he contact --

12  or should he contract COVID-19, it may well be too late,

13  especially because, you know, in this particular prison

14  situation, any sort of medical transfer requires -- at least

15  it's our understanding requires special FBI approval that's not

16  readily granted.

17          THE COURT:  All right.  And again, I don't quite know

18  why we're getting so much strange background noise on your

19  connection, but we're going to have to put up with it for now.

20          Well, as you know, this is an unusual case because

21  unlike most of the motions for compassionate release, in

22  Mr. Al-Timimi's situation, he has not yet -- his case is on

23  appeal.  I haven't had any other cases where the individual was

24  on -- was in custody and there was an appeal pending.

25          And so under 18 U.S.C., Section 3145(c), I've got to

1    find by clear and convincing evidence, number one, that

2    Mr. Timimi does not pose a risk or a danger -- a risk of flight

3    or a danger to the community, and I don't think the government

4    is arguing that that actually would be the case.  He was on

5    bond throughout the court proceedings.  But for his conviction

6    for the one offense that carries life imprisonment, he would

7    probably have been allowed to self-surrender; and while he was

8    on bond for quite a long time while the proceedings were going

9    on, there were absolutely, to my knowledge, no problems with

10   his fully satisfying all the conditions.

11          So I think the first factor clearly goes in his

12   favor, and I think the government basically doesn't dispute

13   that.  It's the second and third factors, that is, whether his

14   appeal raises a substantial question likely to result in

15   reversal, a new trial, or a sentence of time served; and the

16   third factor, that there are exceptional reasons why his

17   detention is no longer appropriate.

18          I think the COVID-19 virus threat plus the underlying

19   health conditions of Mr. Timimi are certainly relevant factors

20   that go into that third consideration.  The second factor,

21   though, the second consideration about the appeal is a really

22   fascinating one because even at the time of the trial, I was

23   concerned and voiced some concern about some of the unique

24   legal issues; and, of course, now that has become more

25   complicated in the post-*Johnson-Davis* era, where at least two

7

1    of the counts of conviction are most likely vulnerable to being

2    set aside.

3              So I really, I guess, want to hear from the

4    government as to why you think this defendant should not be

5    allowed to be released on bond especially given the fact that

6    he's already served well over ten years of incarceration.  And

7    were the defense to be successful in, in getting these counts

8    that are still at issue reversed, then it would be a manifest

9    injustice that he would have been serving time for offenses

10   which are no longer valid.

11             So I want to hear the government's response to that.

12             MR. YOUNG:  Yes, Your Honor.  This is Mr. Young.  I

13   would say a few things.  At the outset, I think the overarching

14   argument is sort of the one with which we concluded our filing

15   in this case, which is while, of course, Your Honor is correct

16   that this defendant has served a substantial period of

17   incarceration, the government's position throughout this

18   litigation has been that these are extraordinarily serious

19   offenses; and to the extent that there are consecutive

20   sentences with mandatory minimums, I think the government's

21   position would be that that reflects Congress's judgment that

22   somebody who before the first step-back violated 924(c) or was

23   liable for violating 924(c) in this fashion or somebody who is

24   liable for that carrying of explosives, carrying federal

25   felonies in this fashion, aren't to serve that period of

1   incarceration.  So that's -- at the highest level of

2   generality, I think that's the government's assertion.

3           With respect to the criteria governing the motion, I

4   suppose I would say that if I'm not focusing my comments in

5   ways that are helpful to the Court, Your Honor, please let me

6   know; but the government has disputed the notion that there are

7   substantial questions at least with respect to the 844

8   explosives counts; and I can just say a few words about those

9   issues.

10          Those counts are sustainable on either an aiding and

11  abetting or a *Pinkerton* theory; and, of course, the government

12  is aware that the Court had some questions at the time of trial

13  about the applicability of those theories; but we don't think

14  that any further developments in the law have undermined the

15  validity of those convictions.

16          I'd start with the *Pinkerton* theory --

17          THE COURT:  Well, wait, wait.

18          MR. YOUNG:  Of course, the --

19          THE COURT:  Wait, sorry.  I don't want to hear

20  those -- those motions are not explicitly before the Court, and

21  I don't really want to get into them.  I mean, you've discussed

22  them somewhat in your papers on the bond issue, but let me ask

23  you this:  I believe now that every other defendant in this

24  multi-defendant case has finished their term of incarceration;

25  and, you know, unlike Kwon and Khan and the others, Mr. Timimi

9

1     did not go to Pakistan.  He never touched a gun or an

2     explosive.  And the people who did touch the guns and

3     explosives didn't get sentences anywhere near as draconian as

4     his.

5              And so if you look at the entire case and all the

6     players in the case, it is somewhat disconcerting to think that

7     somebody as removed as he -- even if he were the instigator,

8     the end of the instigation, the final acts of the instigation

9     by other players in the conspiracy did not result in anywhere

10    near as long a sentence as he is now serving.

11             And so I think that certainly is an equity factor

12    that the Court has to have in mind.  It goes into the

13    exceptional circumstances factor that we have to look at, and

14    this case has a ton of what I think are complex and difficult

15    legal issues.

16             I know you, you say that there -- the government may

17    win them; and you very well may; but the fact that the

18    government might win the appeal does not necessarily mean that

19    there are not meritorious issues, real, interesting, legal

20    issues that are permeating this case such that in deciding

21    whether or not the defendant ought to be at this point free

22    from incarceration, which has the extra potential burden for

23    him of a significant health problem should he become infected.

24             So I think this is a very unique case, and it's a,

25    it's a troubling one, and so I'm not convinced that there's

 1    anything I've seen in your papers, in the government's papers

 2    that really undercuts the defendant's argument that at this

 3    juncture, this particular motion ought to be granted in his

 4    favor.

 5              MR. YOUNG:  This is Mr. Young.  May I say a few words

 6    in response, Your Honor, that would be helpful to the Court?

 7              THE COURT:  Go ahead.

 8              MR. YOUNG:  The first is the government takes Your

 9    Honor's point about codefendants, and, of course, Your Honor

10    recognized the point about instigation, but in the government's

11    view, I do want to underscore during this conference that, you

12    know, this defendant was in a leadership position in a critical

13    moment after the worst terrorist attack on American soil in

14    living memory and used that power and influence to direct

15    others on a course of committing treason against the United

16    States, and while it is true that the defendants who

17    successfully made it to the LeT camps were not able to get to

18    Afghanistan and pick up arms against Americans fighting the

19    Taliban, that could not have been known at the time on

20    September 16, when these events occurred.  So I feel it's

21    important to say that, Your Honor, because that is the

22    government's view of the equitable balance of the case, and we

23    think it puts this defendant in a separate category.

24              With respect to danger, I would be remiss, Your

25    Honor, if I did not say the follow-on, which is the Court is

1    entirely correct that the government did not raise the danger

2    issue in its filing.  We focused on other issues where we

3    thought our arguments were stronger.

4         I would want to make the Court at least aware, this

5    defendant was not always subject to the special administrative

6    measures about which we informed the Court as an attachment to

7    our filing to speak to whether or not he's at risk of

8    contracting COVID-19 while incarcerated.

9         There was an event that occurred in about 2010 that

10   led to the imposition of those measures; and since the Court

11   does have to make a finding by clear and convincing evidence

12   that he's not a danger, if the Court is leaning towards

13   granting the motion, the government would respectfully request

14   the opportunity to make a production to defense counsel and a

15   filing just so the Court is aware of the circumstances

16   surrounding imposition of those measures because they could be

17   relevant to the Court's fact-finding; and I wanted to inform

18   the Court of that.  While it is not something that the

19   government has focused on, if it comes down to that, it might

20   be helpful for the Court to at least have that information.

21        And the last thing that I would say, Your Honor, you

22   know, Your Honor described Mr. Al-Timimi as having serious

23   health conditions.

24        THE COURT:  Wait, wait.  Stop, stop.  Counsel, you've

25   got to stop for a second.  Are you rustling papers?  What kind

1    of phone are you using right now?  We're getting incredible

2    static on it.

3             MR. YOUNG:  I am standing stock-still on a cell

4    phone, Your Honor.  I'm not rustling papers.  I apologize.

5             THE COURT:  Well, you've got to get some landlines at

6    the U.S. Attorney's Office if you're going to be doing many of

7    these conferences by phone because it's very difficult.  I'm

8    not sure we're going to have a verbatim transcript because

9    you've been very hard to understand.

10            Mr. Huff, have you been able to -- I'm sorry,

11   Mr. Young, have you been able to -- I'm sorry, what are we

12   looking at here?

13            Mr. Huff, have you been able to hear clearly what

14   Mr. Young is saying?

15            MR. HUFF:  Yes, I have, Your Honor.

16            THE COURT:  All right.  Well --

17            MR. HUFF:  So I guess one thing I would say, in

18   response to the SAM, it's interesting that the government

19   mentions that because we've been objecting to the imposition of

20   the SAM for at least three years in a row now.  I've written an

21   objection letter to the Board of Prisons basically saying I

22   don't understand why the SAM has been imposed, and I've never

23   gotten any response.  So it's almost a little bit too little

24   too late here.

25            This is a, you know, a person that has not shown any

1  propensity for violence, no classified information involved

2  that he is privy to.  So I, I don't see the justification

3  there.

4          THE COURT:  Well, obviously, we don't have it.  I

5  mean, the government must believe that they have something; and

6  that would be, I think, appropriate; and it probably should

7  have been in the, in the response in the first place, because a

8  question that I always want answered, and it was on my list to

9  ask the government, was whether or not there had been any

10 disciplinary infractions by Mr. Timimi within the last couple

11 of years that would go to the issue of whether or not he posed

12 any danger to the community; and so obviously, I don't have a

13 complete record on that issue.

14         Well, it's quite difficult to hear you-all; and I

15 think you've, you've briefed the issues well.  I've sort of

16 expressed to you my concerns about this case.  I want to see

17 what the government's argument is, what the evidence you have

18 as to this issue of possible misbehavior by the defendant.

19         When was he moved?  Where was he before, at Marion,

20 before he went to Colorado?  Where was he?

21         MR. YOUNG:  This is Mr. Young.  For a period, he was

22 in the Eastern Neck, and between that time and Colorado, I do

23 not know, and so I would invite, I suppose, either of my

24 colleagues if they do know to respond.

25         MR. HUFF:  The one thing that I know -- this is

14

1   Thomas Huff. The one thing that I'm aware of, I've been on the

2   case since 2014, and it was early 2015 that he was moved to

3   ADX. However, my information is that the SAM order was imposed

4   before that, around 20- (inaudible).

5          THE COURT: All right.

6          MR. KROMBERG: Your Honor, this is Gordon Kromberg.

7   So the SAM, the special administrative measures, were imposed

8   in 2010, when Timimi was still at Northern Neck. There had

9   been a significant amount of time when he was at the Alexandria

10   Detention Center; and then he had been moved to Northern Neck;

11   and an incident arose while he was at Northern Neck which

12   caused the imposition -- triggered the imposition of the SAM.

13          THE COURT: And then did he go from 2010, was he then

14   put in Super Max? How long has he been there?

15          MR. KROMBERG: I can check right now. I think I have

16   that information. Hang on.

17          MR. HUFF: Your Honor, this is Thomas Huff. I'm

18   aware of this because I was working on the case at the time.

19   It was early 2015 that he was moved to ADX.

20          THE COURT: But -- all right. Between 2010, when the

21   SAM was imposed, and the time he gets moved into Super Max,

22   where is he in that five-year interval? I couldn't decipher

23   the one attachment that I thought might have had his different

24   locations. Was he ever at Atlanta?

25          MR. KROMBERG: I do not think so, Judge.

1           THE COURT:  Who just spoke?

2           MR. KROMBERG:  I believe that is -- I'm looking at

3    something from 2012, when he was still at Northern Neck.  I

4    will look at my documents from 2013 and 2014 momentarily.

5           As of 2013, he was still at Northern Neck; and in

6    2014, as of April 1, 2014, he was still at Northern Neck.

7           THE COURT:  All right.  So it sounds as though he may

8    have gotten -- gone directly from Northern Neck then to ADX.

9           MR. KROMBERG:  As of 2015, as of April 2015, he was

10   at U.S. Penitentiary in Hazelton, West Virginia.

11          THE COURT:  All right.  Okay.

12          MR. KROMBERG:  And as I trace this through, I should

13   be able to determine when he got to -- when he got where.

14          THE COURT:  Mr. Kromberg, though --

15          MR. KROMBERG:  He was still at Hazelton, West

16   Virginia, as of -- my records show he was still at Hazelton,

17   West Virginia, as of March 2016; and as of March 2017, he was

18   at the U.S. Penitentiary in Florence, Colorado.

19          THE COURT:  All right.  My understanding is that

20   people normally are not moved into Florence, because that is

21   the ultimate holding facility, unless they've had significant

22   problems in other institutions and/or they've been convicted of

23   an offense that, you know, automatically sort of puts them

24   there, like Mr. Moussaoui and the shoe bomber.

25          Is there anything in this record to suggest as to why

1    he didn't go directly to Florence, why there was this delay, if

2    he's such a serious inmate?

3              MR. KROMBERG:  Your Honor, this is Mr. Kromberg.  I

4    do not have any information on why he was moved to Florence per

5    se, but the information about why the SAMs were imposed might

6    have an effect on what the Bureau of Prisons decided to do --

7    excuse me, the sequence of events including the events of 2010

8    are likely to have had an impact on where he went.

9              THE COURT:  All right.  Well, I still --

10             MR. TURLEY:  Your Honor, this is Jonathan Turley.  My

11   cocounsel was not counsel back then, so I just wanted to give

12   the Court the benefit of my recollection.  I was counsel

13   through this period.

14             I, I am not sure what Mr. Kromberg is referencing

15   with regard to Northern Neck.  My understanding is that

16   Dr. Al-Timimi had an excellent record at Northern Neck.

17             He was then transferred to the interim facility.  We

18   were never told why he was transferred, but I was never told by

19   anyone at any time that he was transferred to Colorado because

20   he had had any disciplinary problems or that he was a danger in

21   any regard.

22             THE COURT:  All right.  Well, I think that would help

23   to inform my decision, so I would like to get that,

24   Mr. Kromberg, as soon as you can, all right?

25             MR. KROMBERG:  Yes, ma'am.

1          THE COURT:  All right.  The other issue while I have

2    you-all on the phone is the defense have raised the issue that

3    some of the classified information that was such a thorn in

4    everybody's side, because as you will recall, Mr. Kromberg, and

5    I think, Mr. Turley, you were on the case at that time as well,

6    that the information was considered so classified that the

7    government would not allow my law clerks to help me with it, so

8    I said, well, until I get a law clerk who can work on it, I'm

9    not touching it, and that's why it went into hold for so long,

10   but you've represented in your papers, Mr. Turley and Mr. Huff,

11   that some of that information has been declassified or the

12   classification is lowered, and so there may be more

13   accessibility to it.

14          MR. KROMBERG:  Your Honor, this is Gordon Kromberg.

15   Can I, can I interject for just a moment, I think, to clarify

16   the record?

17          THE COURT:  Yeah.

18          MR. KROMBERG:  So that the document, the information

19   that was so highly classified has not been disclosed to the

20   defense, but that was the subject of Your Honor's ruling in

21   2014.

22          THE COURT:  Right.

23          MR. KROMBERG:  The document that is now at issue was,

24   was classified but it wasn't, it wasn't the type of sensitivity

25   that was the -- that your clerk would not be cleared for.  The

1   document that's now at issue was provided to your chambers in

2   2007 as a part of one of the government's ex parte filings; and

3   the government has provided a somewhat redacted version of it

4   to the defense, I guess it was earlier this year.

5            So just, just for the purposes of the record, the

6   things that, that held the case up that your clerk could not be

7   cleared for, that is over.  This is one particular document the

8   Court has in its file, because I filed it --

9            THE COURT:  Right.

10           MR. KROMBERG:  -- more than 13 years ago, and the

11  defense has not seen it in unredacted form, but they have seen

12  most of it at this point, Your Honor.

13           THE COURT:  Okay.  All right.

14           MR. TURLEY:  Well, Your Honor -- and this is Jonathan

15  Turley.  If I could establish our position on this, the, the

16  document, the Squad IT-3 document is indeed unclassified.  Our

17  understanding is that the material that has not been disclosed

18  is being withheld under some type of law enforcement privilege.

19  Mr. Kromberg may be able to clarify that.  But I do not believe

20  that that document is classified.

21           We've also asked for discovery on a number of

22  serialized investigations that are mentioned in the IT-3

23  document.  These are investigations that are, include 217423

24  and 222852 as well as others.  We don't know the status of

25  those -- that information because we've never been given

1    discovery as to those investigations.

2            And also, just to clarify something that Mr. Kromberg

3    said, we have also raised the Ammerman report, which was also

4    raised with the Fourth Circuit.  We don't know the status of

5    all the information underlying that, but in both of these

6    incidents, we have raised what we believe are glaring

7    contradictions with what the government has said to the Court

8    in the past as to its own orders, in fact, in contradiction of

9    what the Court has said in the case as to its understanding of

10   any investigations before 2003; but we also have noted that

11   these documents, included Squad IT-3, make direct reference not

12   only to Dr. Al-Timimi but to matters that were involved at

13   trial.  They were material matter.  So that's the reason we've

14   made these discovery requests.

15           But in this mix, there is clearly unclassified

16   material with regard to Squad IT-3, and then there's the

17   serialized investigation which we are really still in the dark

18   on.

19           THE COURT:  All right.  Well -- all right.  That's

20   not before us right now.  We'll take a look at that.  I want to

21   try to get this case -- or the things that are on our calendar

22   wrapped up in the not-too-distant future, but the issue that's

23   pending right now is the one about whether the defendant should

24   be released on bond pending appeal, and I want to see what the

25   government has as to any disciplinary infractions that

1  Mr. Timimi may have accumulated in the time he's been in

2  custody and the reasons why a SAM has been imposed and actually

3  what the SAM restrictions are.

4          So, Mr. Kromberg, you need to get that information to

5  the Court and, of course, to defense counsel, all right?

6          MR. KROMBERG:  Yes, ma'am.

7          THE COURT:  All right.  While we are on the phone,

8  because I know it's been hard for my reporter to hear

9  everthing, Anneliese, is there anything that you want any of

10  the counsel to spell out for you?  Did you get everything in

11  terms of particularly the numbers and the letters that

12  Mr. Turley was referencing?  Did you get all of that?

13          THE COURT REPORTER:  Is it Squad IT-3?

14          THE COURT:  Squad IT-3?  Do we have that correct,

15  Mr. Turley, Squad, S-q-u-a-d?

16          MR. TURLEY:  Squad IT-3, yes.

17          THE COURT:  IT-3, okay.  It's IT, right, as in

18  international --

19          MR. TURLEY:  Yes, IT.

20          THE COURT:  All right, thank you.

21          Anything further?  If not, then we're signing off.

22  Thank you for participating by phone.  I think next time, I'm

23  going to make you come to court because this was a little bit

24  difficult.

25          MR. TURLEY:  Thank you, Your Honor.

21

```
1              THE COURT:  All right?

2              MR. YOUNG:  Thank you, Your Honor.

3                          (Which were all the proceedings

4                           had at this time.)

5

6                     CERTIFICATE OF THE REPORTER

7       I certify that the foregoing is a correct transcript of

8    the record of proceedings in the above-entitled matter.

9

10

11                              _____
                                         /s/
12                                Anneliese J. Thomson

13

14

15

16

17

18

19

20

21

22

23

24

25
```