IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) 1:04-cr-385 (LMB) |
| ALI AL-TIMIMI, | ) REDACTED |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION[1]

On April 27, 2020, defendant Ali Al-Timimi ("defendant" or "Al-Timimi") filed a Motion for Release from Custody Pending Appeal ("Motion") under 18 U.S.C. § 3145(c) in which he seeks to be released from United States Penitentiary Florence ("USP Florence") pending the appeal of his 2005 convictions and sentence. The government opposes the Motion. For the following reasons, the Motion will be granted and Al-Timimi will be released under the conditions set out in the Order accompanying this Memorandum Opinion after a 14-day quarantine controlled by the Bureau of Prisons ("BOP").

I. BACKGROUND

This is a complex criminal case the history of which now spans more than 15 years. In the interests of brevity, only the essential events are recounted here. In 2001, Al-Timimi was a principal lecturer at the Dar al-Arqam Islamic Center, a mosque located in Falls Church, Virginia. Among the worshippers there was a group of devout young men with whom Al-Timimi grew close. On September 16, 2001, five days after terrorists attacked the World Trade Center and the Pentagon, Al-Timimi attended a dinner with these men at which they spoke about the

---

[1] This Memorandum Opinion contains limited redactions of personal medical information. An unredacted version has been filed under seal.

events that had occurred. Al-Timimi advised the men that it would become necessary to defend Islam by engaging in violent jihad against its enemies, including United States military forces expected to be deployed to Afghanistan. Some of these men heeded Al-Timimi's words and shortly thereafter flew to Pakistan, where they obtained military training at a camp run by Lashkar-e-Taiba ("LET"), a group which the United States Department of State would later designate as a Foreign Terrorist Organization. Many of those who attended the dinner, including Al-Timimi, were subsequently charged with and convicted of multiple criminal offenses. See generally United States v. Khan, 309 F. Supp. 2d 789 (E.D. Va. 2004) (explaining these events in detail).

On February 5, 2005, a federal grand jury returned a superseding indictment against Al-Timimi which charged him with the following 10 counts.

> Count 1: Inducing others to conspire to use, carry, possess, and discharge firearms during, in relation to, and in furtherance of crimes of violence, in violation of 18 U.S.C. §§ 924(o) and 2.
>
> Count 2: Soliciting others to levy war against the United States, in violation of 18 U.S.C. §§ 2381 and 373.
>
> Count 3: Inducing others to conspire to levy war against the United States, in violation of 18 U.S.C. §§ 2384 and 2.
>
> Count 4: Attempting to contribute services to the Taliban, in violation of 50 U.S.C. § 1705 and associated regulations and executive orders.
>
> Count 5: Inducing others to attempt to aid the Taliban, in violation of 50 U.S.C. § 1705 and associated regulations and executive orders.
>
> Count 6: Inducing others to conspire to violate the Neutrality Act, in violation of 18 U.S.C. §§ 960, 371, and 2.
>
> Counts 7 and 8: Inducing others to use firearms during and in relation to crimes of violence, in violation of 18 U.S.C. §§ 924(c) and 2.
>
> Counts 9 and 10: Inducing others to carry explosives during the commission of federal felonies, in violation of 18 U.S.C. §§ 844(h)(2) and 2.

[See Dkt. 47]. On April 26, 2005, following a jury trial, Al-Timimi was convicted of all 10 counts. [See Dkt. 107]. He subsequently filed a motion for judgment of acquittal as to all 10 counts. [See Dkt. 118]. At his July 13, 2005 sentencing hearing, his motion for judgment of acquittal was denied and he was sentenced to the following terms of imprisonment.

> Counts 1–3: 121 months' imprisonment, to run concurrently.
>
> Counts 4 and 5: 120 months' imprisonment, to run concurrently with the sentences on Counts 1–3.
>
> Count 6: 60 months' imprisonment, to run concurrently with the sentences on Counts 1–5.
>
> Count 7: 360 months' imprisonment, to run consecutively to the sentences on Counts 1–6.
>
> Count 8: life imprisonment, to run consecutively to the sentences on Counts 1–7.
>
> Count 9: 120 months' imprisonment, to run consecutively to the sentences on Counts 1–8.
>
> Count 10: 240 months' imprisonment, to run consecutively to the sentences on Counts 1–9.

[See Dkt. 131–32]. To date, by having served approximately 180 months in prison, Al-Timimi has satisfied the sentences imposed on Counts 1–6, is currently serving the sentence imposed on Count 7, and has yet to serve the sentences imposed on Counts 8–10.

Despite having served a significant portion of his sentence, due to a number of procedural hurdles, Al-Timimi has not completed his direct appeal. Although Al-Timimi filed a notice of appeal two days after his sentencing, the Fourth Circuit has twice remanded his appeal with instructions to consider his arguments that the government failed to disclose certain material, exculpatory evidence. [See Dkt. 133, 164, 406]. Most recently, in 2016, the Fourth Circuit expanded its second remand order with additional instructions to reconsider Al-Timimi's 18

U.S.C. § 924(c) convictions in light of the Supreme Court's decision in Johnson v. United States, 135 S. Ct. 2441 (2015). [See Dkt. 431]. Al-Timimi subsequently filed renewed motions for judgment of acquittal as to Counts 1, 7, and 8, which have gone through multiple rounds of briefing addressing additional Supreme Court decisions, including United States v. Davis, 139 S. Ct. 2319 (2019). [See Dkt. 432, 455]. These decisions have changed much of the legal landscape underlying those counts. Al-Timimi has also filed a motion for leave to file a motion for new trial as to Counts 9 and 10, which largely hinges on the disposition of his renewed motions for judgment of acquittal. [See Dkt. 460]. These motions will be resolved in due course.

On April 27, 2020, Al-Timimi filed the pending Motion. [See 465]. The government has filed a brief in opposition to which Al-Timimi has replied. [See Dkt. 473, 477]. On June 11, 2020, a telephonic oral argument was held. [See Dkt. 480]. Following oral argument, with leave of court, the parties filed supplemental briefing. [See Dkt. 482, 488, 495, 503]. The parties have also filed several notices regarding intervening factual developments and supplemental legal authority. [See, e.g., Dkt. 506–07, 511, 514–15, 517]. The Motion is ripe for review.

## II. DISCUSSION

Al-Timimi is presently subject to mandatory detention pending appeal due to the sentence to which he was exposed as a result of his convictions; however, 18 U.S.C. § 3145(c) establishes a "safety valve" from certain mandatory detention rules. United States v. Harris, 2020 WL 1503444, at *5 (D.D.C. Mar. 27, 2020); see also United States v. Marshall, 2020 WL 2614817, at *3 (D. Md. May 22, 2020). As relevant here, under § 3145(c), a defendant subject to mandatory detention pending appeal pursuant to 18 U.S.C. § 3143(b)(2) may be released during the pendency of his appeal if he satisfies the two conditions set out in 18 U.S.C. § 3143(b)(1) and demonstrates that there are "exceptional reasons" why his detention is not appropriate. United

States v. Wilder, 2020 WL 2319136, at *5 (D. Md. May 11, 2020); see also United States v. Brizuela, 2019 WL 5684508, at *1 (W.D. Va. Nov. 1, 2019). The two conditions in § 3143(b)(1) require the defendant to demonstrate that he is not likely to flee or pose a danger to others, and that his appeal raises a substantial question of law or fact likely to result in reversal, a new trial, or a sentence less than time served plus the expected duration of the appeal process. Wilder, 2020 WL 2319136, at *5; see also Brizuela, 2019 WL 5684508, at *1.

Here, Al-Timimi is subject to mandatory detention pursuant to § 3143(b)(2) because his 18 U.S.C. § 924(c) convictions under Counts 7 and 8 exposed him to a maximum sentence of "life imprisonment." 18 U.S.C. § 3142(f)(1)(B); see also Marshall, 2020 WL 2614817, at *3. Accordingly, to justify release during the pendency of his appeal, Al-Timimi must demonstrate: (1) by clear and convincing evidence that he is not likely to flee or pose a danger to others; (2) that his appeal raises a substantial question of law or fact likely to result in reversal, a new trial, or a sentence less than time served plus the expected duration of the appeal process; and (3) that there are exceptional reasons why his detention is not appropriate. See also Harris, 2020 WL 1503444, at *5 (explaining that all three requirements for release under § 3145(c) must be "'clearly' satisfied"). As explained in this Memorandum Opinion, Al-Timimi has clearly satisfied each of these requirements.

### A. Likelihood of Flight or Danger to Others

Whether a defendant is likely to flee or pose a danger to others is typically evaluated by reference to the factors listed in 18 U.S.C. § 3142(g). See, e.g., Marshall, 2020 WL 2614817, at *3; Wilder, 2020 WL 2319136, at *5. These factors broadly include, among other considerations, "the nature and circumstances of the offense charged," "the weight of the evidence" against the defendant, and "the history and characteristics" of the defendant. 18 U.S.C. § 3142(g). Here,

although the parties do not specifically cite to the § 3142(g) factors, their arguments bear on them. Al-Timimi correctly argues that the Court "allowed him to remain free" on bond throughout his trial and until his sentencing based on findings that he was not likely to flee or pose a danger to others, and that he "scrupulously followed" all of the conditions of his release. [Dkt. 466 at 8, 17]. The government's only argument in response, that Al-Timimi "has not met his burden to show he is not a danger to the community given the gravity of his offenses of conviction," is thoroughly unpersuasive.[2] [Dkt. 505 at 3].

Although the offenses for which Al-Timimi was convicted are undoubtedly serious, the record clearly shows that he has consistently adhered to court orders throughout this case. For example, Al-Timimi remained free on bond with certain conditions from his initial appearance through his sentencing and the United States Probation Office reported that he fully complied with all of the conditions during that 10-month period. [See Dkt. 2, 466-4]. Indeed, the minute entry for Al-Timimi's initial appearance indicates that the government consented to his release at that time, when any likelihood of his flight or danger to others was one of the primary considerations before the Court. Additionally, in the approximately 180 months that Al-Timimi has been in custody since his sentencing, he has received only one disciplinary sanction. [See Dkt. 482-1]. That sanction, which was imposed in 2019 for "disruptive conduct," was based on Al-Timimi having told a USP Florence staff member that he would "beat [another inmate's] ass"

---

[2] In an under seal supplemental brief, the government initially attempted to argue that Al-Timimi had not met his burden given certain allegations which formed the basis on which the BOP has imposed Special Administrative Measures ("SAMs") on Al-Timimi since 2010. SAMs are "restrictions placed on a prisoner in the interests of national security." United States v. Moussaoui, 591 F.3d 263, 267 (4th Cir. 2010). For the many reasons set out in Al-Timimi's under seal supplemental brief, there were significant concerns regarding the veracity of those allegations. [See Dkt. 488, 503]. Indeed, the government subsequently "withdr[ew] reliance" on those allegations "in support of [its] argument that [Al-Timimi] is a danger to the community." [Dkt. 505 at 3].

6

if they were housed together. Id. ¶ 10. Significantly, it appears that the inmate to whom Al-Timimi was referring had previously threatened to harm both Al-Timimi and other inmates at USP Florence, and the sanction imposed on Al-Timimi was merely a $20 fine and the loss of 27 days of good conduct time. [See Dkt. 482-1, 495]. All indications are that Al-Timimi has otherwise been a model inmate. For instance, during the ongoing coronavirus ("COVID-19") pandemic, Al-Timimi, who was previously an assistant professor at the George Mason University Center for Biomedical Genomics, utilized his educational background to advocate on behalf of other inmates, including by urging the warden at USP Florence to take detailed, "proactive steps" to prevent an outbreak there. [Dkt. 477-2 at 7]. In light of his compelling track record since this case began, Al-Timimi has clearly satisfied the first requirement for release, that he does not pose a risk of flight or danger to others.[3]

## B. Substantial Question of Law or Fact

Whether a defendant's appeal raises a substantial question of law or fact "must be determined on a case-by-case basis." United States v. Steinhorn, 927 F.2d 195, 196 (4th Cir. 1991) (quotation omitted). A "substantial question" is "a 'close' question or one that could very well be decided the other way." Id. (quotation omitted). In evaluating this requirement, "[o]ne natural and human difficulty that the trial judge has . . . is to treat the matter as wholly objectively as is possible and not to be influenced in his [or her] determination by any subjective considerations." United States v. Warring, 16 F.R.D. 524, 527 (D. Md. 1954). "[I]t should be

---

[3] In a notice of supplemental legal authority, the government attempted to characterize the offenses of which Al-Timimi was convicted as terrorism offenses; however, as Al-Timimi explained in his response, which the government did not dispute, he was neither charged with nor convicted of any terrorism offenses. [See Dkt. 515–16]. Indeed, although the government argued in favor of a terrorism enhancement at Al-Timimi's sentencing, no such enhancement was applied. [See Dkt. 147].

borne in mind that the determination of whether to [release a defendant] pending appeal is quite a different question legally from that posed by the original decision, and the determination that there is a substantial question does not properly imply that the judge who grants [release] personally remains in doubt as to the question involved." Id.

Here, the parties agree that to satisfy this requirement, Al-Timimi must demonstrate that his appeal raises a substantial question as to the validity of his convictions under Counts 7–10, his two 18 U.S.C. § 924(c) convictions and his two 18 U.S.C. § 844(h)(2) convictions. Al-Timimi argues that his appeal raises a substantial question regarding the validity of these convictions because they "are the subject of active motions" before the Court which "have at least a substantial likelihood of success," and because "several other intervening developments further bolster his likelihood of success" on appeal. [Dkt. 466 at 13, 15]. In response, the government "accepts for argument's sake" that Al-Timimi's appeal raises a substantial question regarding the validity of his § 924(c) convictions, but argues that it does not raise a substantial question regarding the validity of his § 844(h)(2) convictions because there are two "alternative pathways to sustain th[ose] convictions." [Dkt. 473 at 9–10]. Al-Timimi has the better argument.

At the outset, the Court previously found that Al-Timimi's convictions sufficiently raised questions of law which could result in reversal or a new trial when permitting him, over the government's objection, to remain free on bond between his convictions and his sentencing. Indeed, that finding was made pursuant to § 3143(b)(1), the same provision at issue here through its incorporation by reference into § 3145(c). In overruling the government's objection to Al-Timimi remaining free on bond pending his sentencing, the Court stated: "I think the legal issues in this case are sufficiently dense that I'm going to give the defendant the benefit of the doubt, and I'm going to let him remain out on bond." [Dkt. 161 at 2416–19]. That statement is as true

8

today as it was then. In fact, if anything, intervening Supreme Court authority has added complexities to this case. As but one example, the Supreme Court's decisions in Johnson and Davis have resulted in the parties' substantial litigation regarding the validity of Al-Timimi's § 924(c) convictions, and it is "[i]n view of th[at] extensive briefing" that the government concedes that Al-Timimi's appeal raises a substantial question as to the validity of his convictions for the § 924(c) charges in Counts 7 and 8. [Dkt. 473 at 9].

Although the government has conceded the point, because Al-Timimi's § 924(c) convictions are also relevant to the third requirement for release, a brief discussion of the litigation regarding the validity of those convictions is necessary. After the Supreme Court's decision in Davis, § 924(c) convictions for using a firearm during and in relation to crime of violence remain valid only if they are predicated on an offense that constitutes a crime of violence under 18 U.S.C. § 924(c)(3)(A), which is often referred to as the "force clause." See, e.g., United States v. Mathis, 932 F.3d 242, 263–64 (4th Cir. 2019). In determining whether an offense constitutes a crime of violence under the force clause, courts are bound to apply the "categorical approach," which "consider[s] only the crime as defined, not the particular facts in the case," and asks "whether the statutory elements of the offense necessarily require the use, attempted use, or threatened use of physical force." United States v. Simms, 914 F.3d 229, 233 (4th Cir. 2019). Under the categorical approach, "[w]hen a statute defines an offense in a way that allows for both violent and nonviolent means of commission, that offense is not . . . a crime of violence under the force clause" and cannot support a § 924(c) conviction. Id.

In his renewed motions for judgment of acquittal, Al-Timimi has argued that his § 924(c) convictions are invalid because there is no crime of violence upon which they could have been predicated. [See Dkt. 432]. The government has responded that Al-Timimi's § 924(c)

9

convictions remain valid because they could have been predicated on either of two offenses which it argues constitute crimes of violence under the force clause: expedition against a friendly nation in violation of 18 U.S.C. § 960, and enlistment to serve against the United States in violation of 18 U.S.C. § 2390. [See Dkt. 455]. Al-Timimi's renewed motions for judgment of acquittal are pending and will be resolved in due course; however, as to Counts 7 and 8, a judgment of acquittal will likely be granted because both § 960 and § 2390 define the respective offenses "in a way that allows for both violent and nonviolent means of commission." Simms, 914 F.3d at 233. As a result, Al-Timimi's § 924(c) convictions under Counts 7 and 8 will likely be invalidated before his appeal returns to the Fourth Circuit.

As to Al-Timimi's § 844(h)(2) convictions, Counts 9 and 10, the parties largely agree on the relevant question but strongly disagree on the answer. Specifically, the relevant question is whether these convictions can "rest on one [of two potential] theor[ies] of vicarious liability"—"aiding-and-abetting liability (under Rosemond v. United States, 572 U.S. 65 (2014)) [or] co-conspirator liability (under Pinkerton v. United States, 328 U.S. 640 (1946))." [Dkt. 473 at 10]. The government asserts that Al-Timimi's convictions can be sustained through either of these "alternative pathways." [Dkt. 473 at 10]. Al-Timimi asserts that "[a] multitude of intervening legal developments" cast doubt on both of these "pathways." [Dkt. 477 at 3]. Although the government's argument may ultimately prevail on appeal, Al-Timimi's argument at least raises "close question[s]" on these issues. Steinhorn, 927 F.2d at 196.

With regard to co-conspirator liability, it is undisputed that Al-Timimi's § 844(h)(2) convictions are based on the unusual theory that he "aid[ed] and abet[ted] a conspiracy." [Dkt. 466 at 16; Dkt. 473 at 18]. Indeed, during Al-Timimi's trial, the Court stated: "I think . . . this is a tough case because it's almost a third level of culpability; that is, you've got the underlying

offense, an inchoate offense such as conspiracy to do it, then you've got him one step further removed, aiding and abetting or soliciting or procuring the conspiracy. It certainly is a unique . . . legal structure." [Dkt. 156 at 2180]. As relevant here, courts are split on whether aiding and abetting a conspiracy is a viable theory of criminal liability. Compare, e.g., United States v. Ulbricht, 2015 WL 413426, at *5–6 (S.D.NY. Feb. 2, 2015) ("Defendant is correct that 'aiding and abetting a conspiracy' is not a valid theory of liability." (citing United States v. Perry, 643 F.2d 38, 46–47 (2d Cir. 1981))) with United States v. Marino, 277 F.3d 11, 30 (1st Cir. 2002) ("Federal law allows for the crime of aiding and abetting a conspiracy."); see also United States Department of Justice Criminal Resource Manual § 2483 ("The concept of aiding and abetting a conspiracy has not been widely adopted[;] [a] number of district courts have rejected the concept." (collecting cases)). Significantly, the Fourth Circuit has yet to weigh in on this split in authority. In similar circumstances of unsettled law, district courts in this circuit have consistently held that a defendant's appeal raises a substantial question of law or fact. See, e.g., United States v. Catone, 2013 WL 6198313, at *2 (W.D.N.C. Nov. 27, 2013); United States v. Maher, 10 F. Supp. 2d 594, 596 (W.D. Va. 1998); United States v. Barton, 1993 WL 669448, at *5 (S.D.W. Va. Sept. 2, 1993).

With regard to aiding-and-abetting liability, it is undisputed that Rosemond, which was decided nine years after Al-Timimi was convicted, "clarified . . . the mens rea requirement for aiding and abetting a firearms offense," explaining that aiding and abetting such an offense requires "advance knowledge" of the firearm. Hopkins v. United States, 2018 WL 8619643, at *8 (S.D.W. Va. Mar. 22, 2018); see also Kerr v United States, 2016 WL 958202, at *3 (E.D.N.C. Mar. 8, 2016). Indeed, since Rosemond, the Fourth Circuit has frequently been tasked with evaluating whether the government's evidence or a district court's jury instructions complied

11

with that decision. See, e.g., United States v. Benson 957 F.3d 218, 237 (4th Cir. 2020); United States v. Hare, 820 F.3d 93, 104 (4th Cir. 2016). Because these inquiries are fact-specific, it is "difficult to extrapolate a consistent pattern" from case law, Karn v. PTS of Am., LLC, 2017 WL 4162251, at *8 n.7 (D. Md. Sept. 19, 2017); see also Clark v. United States, 2018 WL 1033455, at *6 (E.D. Wisc. Feb. 21, 2018), particularly where, as here, the defendant's convictions are based on an extensive factual record. For example, both the government and Al-Timimi highlight competing evidence introduced at trial regarding Al-Timimi's knowledge of the use of explosives at the LET camp in Pakistan, which formed the basis for his § 844(h)(2) convictions. [See Dkt. 473, 477]. Such "uncertainty" as to the proper outcome is the hallmark of a substantial question of law or fact. Catone, 2013 WL 6198313, at *2; see also United States v. Reed, 2017 WL 947274, at *4 (E.D. La. Mar. 9, 2017) (explaining that release pending appeal is appropriate in "cases in which the defendant faces certain prison time while appealing an uncertain conviction"); United States v. Ajrawat, 2016 WL 2853863, at *1 (D. Md. May 16, 2016) (explaining that, when evaluating whether release pending appeal is appropriate, "federal courts are not to be put in the position of 'bookmakers' who trade on the probability of [the] ultimate outcome" (quotation omitted)). Accordingly, Al-Timimi has satisfied the second requirement for release, that his appeal presents a substantial question of law or fact.[4]

---

[4] Even if Al-Timimi's appeal did not raise a substantial question regarding aiding-and-abetting liability under Rosemond, the government has left entirely uncontested his assertions that there are additional substantial questions of law or fact involved in his appeal. For example, Al-Timimi has asserted that his appeal "presents a substantial First Amendment question over whether his alleged advocacy . . . would meet the high specificity threshold required for criminal solicitation" under the Supreme Court's intervening decision in United States v. Williams, 553 U.S. 285, 297 (2008). [Dkt. 466 at 15–16]. He has also asserted that there is a substantial question regarding the "newly released evidence" which led the Fourth Circuit to remand his appeal in 2015 over the government's objection. Id. at 15.

## C. Exceptional Reasons

"Although the Fourth Circuit has not yet considered what constitutes 'exceptional reasons' under § 3145(c), other courts have generally defined 'exceptional reasons' as circumstances which are 'clearly out of the ordinary, uncommon, or rare.'" Brizuela, 2019 WL 5684508, at *2; see also Marshall, 2020 WL 2614817, at *3. "The exceptional-reasons analysis is flexible and permits courts to respond to real-world circumstances in a pragmatic and common-sense manner." Harris, 2020 WL 1503444, at *6. "A 'wide range of factors may bear upon [this] analysis,' and a district court has 'broad discretion to consider all the particular circumstances of the case before it.'" Id. at *5 (quotation omitted). Here, Al-Timimi argues that both the "ongoing COVID-19 pandemic" and the "unusually complex posture of this case" constitute exceptional reasons why his continued detention is not appropriate. [Dkt. 466 at 2]. In response, the government "accepts for argument's sake that the risk of contracting COVID-19 could constitute an 'exceptional reason' in an appropriate case," but argues that Al-Timimi has not made a sufficiently "particularized" showing of such risk in this case. [Dkt. 473 at 21]. Again, Al-Timimi has the better argument.

First, "[c]ourts have held that the risk the COVID-19 pandemic presents to persons who are incarcerated may constitute an exceptional reason justifying release" under § 3145(c). Marshall, 2020 WL 2614817, at *3 (collecting cases); see also Wilder, 2020 WL 2319136, at *3 (explaining that the COVID-19 pandemic has had an "unprecedented . . . effect on virtually every sector of public life" and poses a particularly "serious[]" threat to "individuals who are incarcerated" (quotation omitted)). Of course, "generalized concern" about the COVID-19 pandemic "falls far short" of the exceptional reasons necessary under § 3145(c). United States v. Childs, 2020 WL 1910097, at *4 n.3 (D.S.C. Apr. 20, 2020). Instead, there must be a

13

"particularized" showing of risk, such as evidence that the defendant has underlying health conditions which would place him at increased risk of severe illness were he to contract COVID-19. Id. at *3.

Here,

**PERSONAL MEDICAL INFORMATION REDACTED**

. The Court finds that these conditions sufficiently increase Al-Timimi's risk of severe illness from COVID-19 such that there are exceptional reasons why his continued detention is not appropriate.[5] See Centers for Disease Control and Prevention, People at Increased Risk for Severe Illness, available at:

---

[5] The government portrays Al-Timimi's risk of severe illness from COVID-19 as low, primarily because Al-Timimi's particular facility within USP Florence has not yet reported any COVID-19 cases; however, there is no way to know with any certainty what the future holds when it comes to this virus. Such uncertainty "is endemic in the present circumstances" and "cannot preclude courts from acting until the damage has been done"; rather, it is simply "one of the many factors courts must consider" in deciding whether there are exceptional reasons why detention would not be appropriate. Harris, 2020 WL 1503444, at *5. Here, the government's portrayal of Al-Timimi's risk of severe illness from COVID-19 is unpersuasive because although no facility within USP Florence had reported any COVID-19 cases when the Motion was filed, two facilities have since reported a total of at least seven cases. [See Dkt. 517]. These developments illustrate precisely why courts "need not wait until COVID-19 is present" in a defendant's particular facility to grant relief. United States v. Jackson, 2020 WL 2735724, at *4 n.7 (W.D. Va. May 26, 2020). Ultimately, there is "[a] very real risk" that COVID-19 will spread to Al-Timimi's particular facility within USP Florence, "as evidenced by the spread of COVID-19 throughout . . . the BOP," and that risk "is sufficient." Id.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited August 17, 2020). Indeed, many courts in this circuit have recently granted various forms of release to defendants who suffer from a combination of these conditions. See, e.g., United States v. Hardy, 2020 WL 4436376 (D. Md. Aug. 3, 2020); United States v. Oaks, 2020 WL 3433326 (D. Md. June 23, 2020); Wise v. United States, 2020 WL 2614816 (D. Md. May 22, 2020); United States v. Creek, 2020 WL 2097692 (D. Md. May 1, 2020); United States v. Harper, 2020 WL 2046381 (W.D. Va. Apr. 28, 2020); United States v. Handy, 2020 WL 2041666 (D. Md. Apr. 28, 2020).

Second, even if Al-Timimi's significant risk of severe illness from COVID-19 were insufficient to constitute exceptional reasons why his detention should not be continued, it certainly is sufficient in combination with the previously discussed procedural and legal posture of this case. It bears emphasizing just how unusual that posture is. Despite having served almost 15 years in prison, Al-Timimi has yet to complete the direct appeal as of right of his convictions and sentence. Should Al-Timimi succeed in having his convictions under Counts 7, 8, 9, and 10 reversed, he would have already served more time in prison than warranted. In a similar vein, Al-Timimi correctly points out that most, if not all, of the principal offenders who were prosecuted as a result of conduct originating at the Dar al-Arqam Islamic Center, including those who actually handled explosives at the LET camp in Pakistan, have already served their sentences and been released.

Lastly, it is also worth emphasizing that Al-Timimi is only required to demonstrate exceptional reasons why his detention is not appropriate because he was exposed to a maximum sentence of life based on his § 924(c) convictions under Counts 7 and 8. If not for those convictions, the requirements for release pending appeal would be far less onerous. Significantly,

as previously discussed, Al-Timimi's § 924(c) convictions under Counts 7 and 8 will likely be invalidated before his appeal returns to the Fourth Circuit. Accordingly, Al-Timimi has satisfied the third requirement for release, the existence of exceptional reasons why his continued detention is not appropriate.

### III. CONCLUSION

For the reasons stated above, Al-Timimi's Motion for Release from Custody Pending Appeal will be granted by an Order accompanying this Memorandum Opinion.

Entered this 18 day of August, 2020.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge