# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| *Plaintiff*, | ) |
| v. | ) Case No. 1:04-cr-385 (LMB) |
| ALI AL-TIMIMI, | ) |
| *Defendant*. | ) |

## DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION FOR A STAY

The government's motion to stay this Court's conditional release order [Dkt. No. 520] ("Order") is premised almost entirely on arguments that have already been extensively briefed, carefully considered, and ultimately denied. Because the government fails to identify any compelling justification for delaying relief any longer, its motion for stay should be denied as well.

The government's appeal—which it did not notice until seven days after this Court's Order (and halfway through the defendant's 14-day quarantine)—is unlikely to succeed. Indeed, the record reflects that Al-Timimi has demonstrated an impeccable release history with the U.S. Probation Office, having previously been permitted to remain free throughout his trial, and again after conviction pending his sentencing hearing in 2005. That latter relief, ordered over the government's objection, was based on this Court's express findings that Al-Timimi posed no flight risk or danger, and that his case raised several substantial legal issues. In the years since, those legal issues have become only more substantial, with the Supreme Court issuing several intervening decisions that cast further doubt on the charges that continue to subject Al-Timimi to

imprisonment. *See* Memorandum Opinion [Dkt. No. 519] ("Mem. Op.") at 4, 10-11, 12 n.4. Given this Court's 15+ year history of overseeing the cases of both Al-Timimi and the related defendants in *United States v. Royer*, et al., Case No. 1:03-cr-296-LMB (E.D. Va.), the government offers little justification for second-guessing this Court's findings—particularly in light of its substantial experience in presiding over a wide variety of high-profile national security cases.

### I. The government is unable to satisfy the criteria for stay under the *Hilton* factors.

The government bases its motion for the stay on the familiar factors described by the Supreme Court in *Hilton v. Braunskill*, 481 U.S. 770 (1987). When the government moves to stay enforcement of a court's release order, it is required to address four elements: (1) whether the government has made a strong showing that it is likely to succeed on the merits of an appeal; (2) whether the government has demonstrated it will suffer an irreparable injury absent a stay; (3) whether the party opposing the stay will be injured by the issuance of a stay; and (4) whether the public interest favors a stay. *Id*. at 776. Although the government characterizes the *Hilton* factors as presenting a mere balancing test, the government in fact "bear[s] the burden of proving *each* of these factors." *United States v. Wise*, No. 5:14-CV-844-FL, 2016 U.S. Dist. LEXIS 23020, at *5 (E.D.N.C. Feb. 25, 2016) (emphasis added) (*citing Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970)). Here, the government fails to meet its burden on *any* of the *Hilton* factors, much less all of them.

### A. The government has not demonstrated a likelihood of success on the merits of its appeal.

The government has not demonstrated a likelihood of success on the merits of its appeal because the Fourth Circuit is unlikely to disturb this Court's repeated findings—once in 2005

2

after trial and again pursuant to his emergency release motion—that Al-Timimi is not a flight risk, does not pose a danger to society, and that his case raises substantial legal issues. It is also unlikely to conclude that this Court abused its discretion in concluding that Al-Timimi's case involved exceptional reasons sufficient to warrant his release—particularly when numerous other courts have granted conditional release on substantially similar grounds.

    **1.    The government's claim that Al-Timimi's appeal fails to state a substantial legal issue is without merit.**

The parties agree that Al-Timimi's prison sentences on Counts 1-6 are now fully discharged; as such, Counts 7-10 are the only counts still subjecting him to imprisonment. *See* Mem. Op. at 3. Of these remaining four counts, the government has already stipulated that Al-Timimi's pending challenges to Counts 7-8 (and also Count 1) raise substantial legal issues based on intervening Supreme Court authority, Mem. Op. at 9, and indeed, this Court has expressly observed that "Al-Timimi's § 924(c) convictions under Counts 7 and 8 will likely be invalidated before his appeal returns to the Fourth Circuit." *Id*. at 16; *see also id*. at 10.

And although the government disputes that Al-Timimi's pending motion for leave to seek a new trial on Counts 9 and 10 raises substantial legal issues, it has already conceded several of the key facts that underlie the motion. For example, the government acknowledges that the Supreme Court's intervening decision in *Rosemond v. United States*, 572 U.S. 65, 67 (2014) changed the foreknowledge requirements for establishing accomplice liability in crimes that require the use of a weapon. *See* Govt. Opp. at 10-15; *see also* Mem. Op. at 11-12. It also acknowledges a split of authority over the validity of the "aiding and abetting a conspiracy" theory that it used to charge the conspiracies needed to establish *Pinkerton* liability for Counts 9-10—and further acknowledges that this disagreement has not been resolved by the Supreme Court or Fourth Circuit. Govt. Opp. at 18-19; *see also* Mem. Op. at 11.

In any event, the government's ultimate argument is unavailing. As noted in the merits briefing, a "substantial question" is merely one that is "a 'close' question or one that very well could be decided the other way," *United States v. Steinhorn*, 927 F.2d 195, 196 (4th Cir. 1991) (citation omitted); *see also* Mem Op. at 7. In Al-Timimi's merits briefing, he identifies a multitude of substantial questions that, if resolved in his favor, would result in the reversal of Counts 9 and 10.

**First**, Al-Timimi's pending challenge to the Count 1 conspiracy under *Davis* has at least a substantial likelihood of rendering Counts 9 and 10 unsustainable by negating the *Pinkerton* theory on which they rely. As previously outlined, Counts 9 and 10 depend exclusively on *Pinkerton*; the government's alternative effort to sustain them under standard accomplice liability rests on a now-invalid theory of constructive knowledge that has been foreclosed by the Supreme Court's intervening decision in *Rosemond*, 572 U.S. at 67, and other controlling precedent. See Dkt. No. 477 at 9. Indeed, even prior to *Rosemond*, leading cases such as *United States v. Spinney*, and its progeny required that "the government must establish that the [accomplice] knew to a practical certainty that the principal would be using a [weapon]. . . . a rubric that calls for proof verging on actual knowledge." 65 F.3d 231, 238-40 (1st Cir. 1995) (internal citations and quotations omitted). The government's response—a cursory claim that Al-Timimi actually "masterminded" Counts 9 and 10, Dkt. No. 8—is wholly unsupported by citation and defies the record.[1] Although the witnesses split over whether Al-Timimi encouraged

---

[1] In any event, even this conclusory (and inaccurate) statement is insufficient to make its case. The *Spinney* Court notably concluded that "Under the circumstances, we conclude that the government's best evidence (that Spinney *helped to mastermind the robbery*), taken in the light most favorable to the verdict, even when coupled with the jury's ability to make intuitive judgments, is insufficient to support the requisite inference of practical certainty." 65 F.3d 231, 239 (1st Cir. 1995) (emphasis added).

their plan to attend LET[2] (a plan that all witnesses agree was initiated by Royer), it is uncontroverted that Al-Timimi was not involved in any discussion contemplating their use of weapons—and certainly did not counsel or solicit their use of the particular RPG weapons charged in Counts 9 and 10. To the contrary, every witness who was asked about such a claim flatly repudiated it. *See* Dkt. No. 449 at 6-8 (record citations and summary of witness testimony). Indeed, it is unclear on the record whether Kwon and Hasan themselves had any particularized expectation of handling an RPG at LET. Perhaps for this very reason, the government's post-trial Rule 29 opposition brief defended Counts 7-10 exclusively on *Pinkerton*; it did not attempt to support them under standard accomplice liability at all. *See* Dkt. No. 125 at 37-40. Its new attempt to do so now is unavailing.

**Second**, irrespective of Al-Timimi's *Davis* challenge to Count 1, *all* of the conspiracies charged in this case remain vulnerable to reversal based on the controversial "aiding and abetting a conspiracy" legal theory that the government used to charge them. Indeed, the government's own practice manual cautions against this theory on the grounds that several courts have rejected it. Moreover, even if the Fourth Circuit were to ultimately sanction its use, any surviving conspiracy convictions would still lack the critical element of conspiracy *membership* that *Pinkerton* depends on for scienter. See generally Dkt. No. 477 at 6-8. And as this Court observed, district courts in this circuit have consistently held that appeals involving unsettled issues of law qualify as substantial for purposes of conditional release. Mem. Op. at 11 (citing cases).

**Third**, Al-Timimi's appeal continues to present a substantial First Amendment question

---

[2] Notably, only Kwon testified that he did. By contrast, Hasan testified that the men did not begin to discuss LET until after Al-Timimi had left Kwon's apartment. Trial Tr., April 14, 2005 [Dkt. No. 155] at 2069-70.

over the line between protected forms of general advocacy and unprotected forms of highly specific advocacy. Of course, the defense does **not** argue (as the government again seems to suggest), that anyone has a First Amendment right to "solici[] followers to commit treason by training in terrorist camps and fighting against American troops." Govt. Br. at 8-9. But as previously noted, no witness directly claimed that Al-Timimi did so; the government instead claimed that this was Al-Timimi's intent, relying for example on evidence that included an email that Al-Timimi later wrote about Mullah Omar and the Taliban. The witnesses split over what Al-Timimi said at the 9/16 dinner gathering, and the government candidly acknowledged that its witnesses were "subject to significant impeachment." *See*, *e.g.*, Trial Tr., April 12, 2005 [Dkt. No. 153] at 1654 (government at bench conference on day 6 of trial: "If I could just say, this is not a surprise to anyone, that our witnesses, our cooperating witnesses are subject to significant impeachment, and we don't have a tape recording of what happened on September 16. We have a couple of documents that tend to corroborate what Ali Al-Timimi's position was with respect to his supporting the Taliban.").

Thus, one of the defense's appellate positions is that there is a substantial First Amendment question over whether his alleged advocacy—in which he is accused of advising others to make "hijra" (leave the country) and be with the mujahideen anywhere in the world— would meet the high specificity threshold required for criminal solicitation. *See United States v. Williams*, 553 U.S. 285, 297 (2008); *see also* Brief for Professor Eugene Volokh as Amicus Curiae, *United States v. Sineneng-Smith*, Case No. 19-67, pp. 3-7, available at: https://www.supremecourt.gov/DocketPDF/19/19-67/124856/20191209115753057_19-67acVolokh.pdf (summarizing solicitation doctrine and noting that *Williams* "distinguished specific advocacy—for instance, of a crime involving a specific item of contraband, a specific

6

victim, or a specific tangible reward—and abstract advocacy.").

**Fourth**, the release of new evidence has caused the Fourth Circuit to remand this case over the government's objection. Briefs and documents have been filed with a Classified Information Security Officer according to protocol, but suffice to say here that the Fourth Circuit's granting of an opposed motion for remand suggests the presence of at least a substantial issue of law.

Accordingly, the government's argument that Al-Timimi has failed so much as to state a substantial issue—i.e., one that could be decided either way—on Counts 9 and 10 is unlikely to prevail.

### 2. The government's claim that Al-Timimi has failed to demonstrate an exceptional reason to justify his release is without merit.

The government fails to offer any compelling reason to conclude that this Court abused its discretion in finding that exceptional reasons justify Al-Timimi's release. As previously noted, Section 3145(c) establishes a "flexible" test that allows courts "to respond to real-world circumstances in a pragmatic and common-sense manner." United States v. Harris, 2020 WL 1503444, at *5 (D.D.C. Mar. 27, 2020). Here, a multitude of district courts throughout the country have already ordered precisely the same relief under Section 3145(c) that this Court granted to Al-Timimi in light of the COVID-19 pandemic, with many of those cases involving inmates with health conditions less acute than those of Al-Timimi.³ *See* Mem. Op. at 13-14; *see*

---

³   This is to say nothing of the fact that ADX appears to have significantly understated some of Al-Timimi's medical issues in declarations to this Court, including blood pressure measurements so high that they qualified as "hypertensive crisis"—a potential medical emergency. ADX originally characterized Al-Timimi's blood pressure as stable and only corrected the record after an independent investigation from counsel. *See generally* Dkt. No. 495, Ex. A (under seal). While the government attempts to minimize his conditions "fairly common," it ignores that his are precisely the conditions that put individuals at high risk according to the Centers for Disease Control and Prevention. *See* Centers for Disease Control and Prevention,

7

*also* Dkt. No. 10-11. Indeed, the government now expressly concedes that Al-Timimi "is *potentially* at a higher risk of developing COVID-19" under current CDC guidelines. Govt. Br. at 9 (emphasis added). Notably, the government again understates those guidelines—which expressly state persons with a BMI of 30 or higher "**are at increased risk** of severe illness from COVID-19." *See* Centers for Disease Control and Prevention, People at Increased Risk for Severe Illness, available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (emphasis in original).

And of course, the only factor requiring Al-Timimi to resort make an "exceptional reasons" showing under Section 3145(c) at all is the mandatory lifetime prison sentence associated with Counts 7 and 8. Mem. Op. at 15-16 (noting that Al-Timimi's convictions under Counts 7 and 8 "will likely be invalidated," thus rendering "the requirements for release pending appeal . . . far less onerous.").

With respect to the highly unusual and complex posture of this case, Mem. Op. at 15, the government makes the extraordinary argument that "this case is only in such a posture by virtue of the defendant's own choices" and that further offers that "[i]f he had *already* perfected his direct appeal, and if the Fourth Circuit had agreed with his arguments attacking Counts 7–10, then under the current judgment he would have been a free man five years ago." Govt. Br. at 11. This ignores that the Fourth Circuit granted the current remand over the government's objection, and that Al-Timimi has had a pending motion on the evidentiary remand issue since 2015.[4] The defense cannot reasonably be expected to abandon its appellate arguments that were expressly countenanced by the Court of Appeals.

---

People at Increased Risk for Severe Illness, available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

[4] As previously noted, Dkt. No. 466 at 15, the defense intends to update that motion in light of new developments once the present motion is resolved.

### 3. The government's claim that Al-Timimi poses a danger to society is without merit and indeed undermined by its own litigation history.

This Court has twice found by clear and convincing evidence that Al-Timimi does not pose a flight risk or danger to society—first in 2005 in permitting him to remain free pending sentencing and again in granting the instant motion. Given that this Court has spent over 15 years overseeing the cases of both Al-Timimi and the related paintball defendants in *United States v. Royer*, et. al, the government offers no compelling reason for disturbing those findings— particularly when the government actually consented to Al-Timimi's release throughout his trial (during which time he was not subject any electronic monitoring at all). The record shows that Al-Timimi scrupulously followed his terms of conditional release in 2005, see Mem. Op. at 6, and, aside from a single disciplinary incident, has been a model inmate during his incarceration—even using his educational background in biology to advocate on behalf of other inmates. See Mem. Op. at 6-7.

The government repeats its attempt to link the crimes that Al-Timimi was convicted of with "terrorism," even though Al-Timimi was not charged with or convicted of any terrorism crimes and the government's additional effort to establish a terrorism enhancement at sentencing was declined by both the U.S. Probation Office (in its sentencing report) and this Court. *See* Mem. Op. at 6, n.2; see also Dkt. No. 516 at 1. And although the underlying charges in this case are of course serious, they also involve highly complex—and at times unprecedented—legal theories. Indeed, in previously allowing Al-Timimi to remain free pending sentencing, this Court specifically noted the "second- to third- degree-removed nature of the defendant's activities here" in denying the government's request that he be taken into custody pending sentencing. Trial Tr., April 26, 2005 [Dkt. No. 161] at 2146.

This Court correctly concluded that the government's argument that Al-Timimi has failed

to meet his burden that he is not a danger to the community due to the nature of the offenses he was convicted of was "thoroughly unpersuasive." Mem. Op. at 6. The government presents no new reasons for disturbing that conclusion now.

      **B.**      **The government has not demonstrated that it will suffer irreparable injury absent a stay**.

The government does not appear to identify any specific irreparable injury it will suffer if this Court declines to grant its stay, but instead makes only a vague allusion to the serious nature of the offenses he was charged with. In so doing, the government again ignores the "second- to third-degree removed nature of the defendant's activities," Trial Tr., April 26, 2005 [Dkt. No. 161] at 2146, and the highly unusual theories of inchoate liability that the government used to charge them—highly relevant factors that this Court took careful note of both in 2005 and in its Memorandum Opinion.

And again, it is difficult for the government to claim that it would suffer an irreparable from his conditional release to home confinement now (subject to electronic monitoring and active supervision from the Probation Office) when it actually *consented* to his release during trial (at which point he was not subject to any form of electronic monitoring at all).

Indeed, the government has not displayed any great urgency in having its appeal heard. It waited seven days (at which point Al-Timimi's 14-day quarantine at BOP was already half completed) before noticing the appeal and another day before moving for a stay—and did not give the defense any prior notice that it was considering taking an appeal. To the contrary, as recently as last week, the government communicated to defense counsel that FBI Agent John Wyman (who previously interviewed Al-Timimi during the case's investigation) was interested in meeting with Al-Timimi upon his release, relaying that Agent Wyman is now retired from case work and that "based on their conversations from years ago, [Al-Timimi] might even be

interested in talking to him about how the world has changed in the last 15 years." *See* Email Correspondence of August 20, 2020 (attached as **Exhibit A**).

        **C.**     **Al-Timimi's continued incarceration will cause irreparable harm to him because there is a substantial likelihood of unjust confinement.**

In contrast to the government, Al-Timimi *will* suffer irreparable harm if this Court grants the government's motion to stay his release. As briefly outlined above and further detailed in Al-Timimi's emergency motion, the only charges that continue to subject Al-Timimi to imprisonment at all are the subject of active motions that have a substantial likelihood of reversal in light of multiple intervening legal and evidentiary developments. *Cf. Cobb v. Green*, 574 F. Supp. 256, 262 (W.D. Mich. 1983) ("There is no adequate remedy at law for a deprivation of one's physical liberty. Thus the Court finds the harm asserted by plaintiff is substantial and irreparable."). These concerns are further magnified here given (1) an ongoing global pandemic that poses grave dangers to the incarcerated and medically vulnerable, and (2) the potentially deleterious effects of prolonged solitary confinement that Al-Timimi would continue to experience at ADX. A stay would only prolong that harm.

As of today, FCC Florence reports seven active cases of COVID-19 among inmates at FCI Florence and two active cases among staff members at USP Florence High.[5] Given COVID-19's ability to evade detection by spreading among asymptomatic persons, a movant with underlying health issues such as Al-Timimi cannot reasonably be expected to "wait and see if conditions at the prison change," *United States v. Harris*, Case No. 19-cr-356, 2020 U.S. Dist. LEXIS 53632, *16 (D.D.C. March 27, 2020)—at which point it may well be too late.

The point is particularly salient here: As previously noted, ADX has a documented

---

[5]     See BOP, *COVID-19 resource page*, available at: https://www.bop.gov/coronavirus/ (last visited August 27, 2020).

history of failing to address Al-Timimi's serious medical needs, requiring intervening from counsel to secure care. It also appears to have significantly understated some of Al-Timimi's medical issues, including blood pressure measurements so high that they qualified as "hypertensive crisis"—a potential medical emergency. ADX originally characterized Al-Timimi's blood pressure as stable and only corrected the record after an independent investigation from counsel. *See generally* Dkt. No. 495, Ex. A (under seal). Thus, as a practical matter, Al-Timimi is likely to face serious complications in caring for himself should he become infected.

### D. The conditional release order serves the public interest by guarding against the substantial prospect of unjust confinement.

"[T]he public has an important interest in the liberty of fellow citizens." *United States v. Ecker*, 543 F.2d 178, 207 (D.C. Cir. 1976); *see also Miller v. Stovall*, 759 F. Supp. 2d 694, 670 (E.D. Mich. 2009) ("With regard to [public interest], the court finds that the public interest is served by having a federal [prisoner] transition from incarceration with a period of supervised release as imposed by a legal and binding judgment from the sentencing court").

Given that Al-Timimi has at least a substantial likelihood of prevailing on at least one of the four legal issues he has identified, this Court's conditional release order serves the public interest by guarding against the substantial prospect of unjust confinement in the midst of a global pandemic. This factor is particularly salient to Al-Timimi's case: Because he has now served 15 years in prison, he will have served 5 years too many if his appeal is ultimately successful—and will have done so under the particularly harsh conditions of prolonged solitary confinement.

## CONCLUSION

For all of the foregoing reasons, the government's motion for a stay should be denied.

Dated: August 27, 2020        Respectfully submitted,

                                                  /s/
Thomas Michael Huff, Virginia Bar No. 73587
Thomas M. Huff, Attorney-at-Law
P.O. Box 2248
Leesburg, VA 20177
Telephone: 703.665.3756
Facsimile: 571.354.8985
thuff@law.gwu.edu

Jonathan Turley (*pro hac vice*)
The George Washington University Law School
2000 H Street, NW
Washington, D.C. 20052
(202) 994-7001 (telephone)
(202) 508-6200 (facsimile)
jturley@law.gwu.edu

Attorneys for Defendant Dr. Ali Al-Timimi

## CERTIFICATE OF SERVICE

I certify that on August 27, 2020, I will file the foregoing document on the CM/ECF system, which will then serve it by electronic notification on all parties of record. This Court's designated Classified Information Security Officer has confirmed that the present motion may be filed on the public docket.

                                  /s/                                  
Thomas Michael Huff, Virginia Bar No. 73587
Thomas M. Huff, Attorney-at-Law
P.O. Box 2248
Leesburg, VA 20177
Telephone: 703.665.3756
Facsimile: 571.354.8985
thuff@law.gwu.edu
