IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) 1:04-cr-385 (LMB) |
| ALI AL-TIMIMI, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION

The United States Court of Appeals for the Fourth Circuit has remanded the direct appeal

of defendant Ali Al-Timimi ("defendant" or "Al-Timimi") to this Court for consideration of two

issues—whether the government improperly withheld material, exculpatory evidence at trial

regarding prior investigations of Al-Timimi and whether Al-Timimi's 18 U.S.C. § 924

convictions must be vacated in light of the Supreme Court's decision in Johnson v. United

States, 576 U.S. 591 (2015).  Before the Court are four motions filed by Al-Timimi subsequent

to the Fourth Circuit's remand, all of which have been fully briefed and are ripe for review:

Motion to Compel Disclosure of Unredacted Documents to Cleared Defense Counsel and

Production of Index of Undisclosed Evidence [Dkt. No. 417] ("Motion to Compel"); Renewed

Motion for Acquittal on Counts 7 and 8 in Light of Intervening Authority [Dkt. No. 432]

("Motion for Acquittal on Counts 7 and 8"); Renewed Motion for Acquittal on Count 1 in Light

of Intervening Authority [Dkt. No. 445] ("Motion for Acquittal on Count 1"); and Unopposed

Motion for Leave to File and Brief a Motion for New Trial on Counts 9 and 10 [Dkt. No. 460]

("Motion for Leave").  For the following reasons, the Motion to Compel and Motion for Leave

will be denied, and the Motions for Acquittal will be granted.

I

A. **Factual Background**

This is a complex criminal case that focuses on the role Al-Timimi played in encouraging

and inspiring over a dozen young Muslim men to leave the United States after the terrorist

attacks on September 11, 2001, to obtain military training at a camp run by Lashkar-e-Taiba

("LET")—a group that the United States Department of State would later designate as a Foreign

Terrorist Organization—and to then go to Afghanistan to protect the Taliban from anticipated

attacks by the United States military.  See United States v. Royer, Case No. 1:03-cr-296 (E.D.

Va. Sept. 25, 2003), [Dkt. No. 167].  All of those men were subsequently charged with, and

convicted of, committing multiple federal crimes.  See generally United States v. Khan, 309 F.

Supp. 2d 789 (E.D. Va. 2004) (explaining these events in detail).  Many of those crimes involved

the use of firearms during the commission of crimes of violence; however, due to significant

changes in the law concerning what qualifies as a crime of violence, several of those convictions

have been vacated.  See United States v. Royer, Case No. 1:03-cr-296.  Al-Timimi was not

charged in that case.

Al-Timimi was a well-known lecturer on Islam who had authored several books and

produced several tapes, many of which focused on violent jihad between Muslims and non-

Muslims.  He regularly lectured at the Dar al-Arqam Islamic Center, a mosque in Falls Church,

Virginia, where he was esteemed by many as an authoritative figure.  Given the attacks on

Muslims in Chechnya, Bosnia, Kosovo, and Afghanistan, as well as the United States' strong

support for Israel, several young male members of the mosque were influenced by Al-Timimi to

begin preparing for jihad.  Three of these men, Khwaja Mahmood Hasan ("Hasan"), Yong Ki

Kwon ("Kwon"), and Muhammed Aatique ("Aatique"), testified at Al-Timimi's trial and

explained how Al-Timimi inspired and encouraged them to prepare for jihad.  For example,

Kwon testified, "I remember him telling us, one time, you know, the teachings of the Prophet, you know, like, shooting, you know, shooting is power, and he said it's something the Muslims should know." Trial Tr. at 1148:21–23 (Kwon testimony—Volume V).[1] Kwon and several others bought firearms, joined rifle ranges, and engaged in paintball games, which they described as ways to prepare for combat, as well as being a form of recreation. Trial Tr. at 23:1–5; 26:7 (Kwon Testimony). He also explained how before the attacks on September 11, 2001, Al-Timimi had praised Ibn al-Khattab, a commander in the Chechnya conflict with the Russians. Several of the paintball players watched a video, "Russian Hell 2000" that showed al-Khattab executing a captured Russian soldier.

Aatique testified about a course entitled "The Signs of the End of Times" that Al-Timimi taught at the mosque for about a year before the September 11, 2001 attacks and a taped lecture entitled "The New World Order." Trial Tr. 179:3–12 (Aatique Testimony—Volume I). Aatique understood those materials as describing a battle between Muslims and non-believers who Al-Timimi referred to as "kuffar." Id. at 19.

At some point before September 11, 2001, the FBI had become aware of the paintball exercises and had interviewed one of the participants, Seifullah Chapman. Kwon told Al-Timimi about the FBI interview and asked him for advice. In response, Al-Timimi told Kwon that the men should continue playing because it would look suspicious if they stopped; however, Al-Timimi instructed Kwon that they should be more discreet. Trial Tr. 40:20–25 (Kwon Testimony).

On the evening of September 11, 2001, in response to the attacks on the World Trade

---

[1] Because the trial took place in 2005, the Court has only paper copies of the transcripts. As a result, citations to the trial transcripts may differ slightly from transcripts in the appeal record.

Center and the Pentagon, there was an emotional gathering at the mosque. Kwon testified that

Al-Timimi told him and his friends "to be careful." Trial Tr. 33:22–25 (Kwon Testimony). At

some point, one of the attendees characterized the September 11, 2001 attacks as evil, to which

Al-Timimi responded that, although Islam does not condone killing innocent people, it allows for

combatants to be killed. Trial Tr. 34:10–18 (Kwon Testimony). He further explained that a

combatant "is not just a person who goes and fights but also a person who supports, you know,

who supports monetarily in those fights can be categorized as combatant." Id.

Kwon drove Al-Timimi home after that meeting. During the drive, Al-Timimi said "this

event . . . was a punishment from God, but, you know, he hadn't expected something like this.

He expected something like an earthquake." Trial Tr. 35:7–10 (Kwon Testimony). Kwon also

testified that Al-Timimi told him "to gather some brothers and come up with a, with a

contingency plan in case . . . there will be . . . mass hostility towards Muslims in America." Id.

at 13–16. In response, Kwon emailed several of the paintball players and other Muslims he had

met at firing ranges to meet at his home on Sunday, September 16, 2001. Although Al-Timimi

was not invited, he asked to join them when Kwon told him about the meeting. Trial Tr. 42:1–3

(Kwon Testimony).

Kwon, Hasan, and Aatique described how, before Al-Timimi began speaking at that

meeting, he instructed Kwon to unplug his answering machine, and he told everyone to turn off

their phones, draw the curtains, and "not repeat anything that was said in the meeting outside of

the people who are present." Trial. Tr. 47:2–11 (Kwon Testimony).[2] Kwon described Al-

Timimi as saying that "the amir of Afghanistan has called for help—called for assistance and

---

[2] Hasan also described Al-Timimi as telling them to close the blinds as well as turn off their phones, and that the meeting was "amama" which means "trust." Trial Tr. 9:5–16 (Hasan Testimony).

that it is obligatory on all Muslims to go and defend Afghanistan," and "it doesn't matter if we fight the Indians or the Russians or the Americans, that is all legitimate jihad." Trial Tr. 5:8–10; 6:15–18 (Kwon Testimony). Al-Timimi also told the attendees that they "should join the LET and get some training from the LET camps." He described LET as being on the "sunnah," or the correct path. Some of the paintballers, including Randall Royer ("Royer"), had previously visited the LET camps, and, after Al-Timimi left the meeting, Royer provided the attendees with contact information for the LET. Trial Tr. 10:11–25; 11:6–7 (Kwon Testimony).

The next day, Kwon and Hasan went to the Pakistani Embassy to obtain visas. Trial Tr. 18:14–15 (Kwon Testimony). On September 19, 2001, Hasan and Kwon met Al-Timimi and told him they were going to Pakistan to train with the LET. Al-Timimi did nothing to discourage them but warned them not to look suspicious. Trial Tr. 21:22–25 (Kwon Testimony).

As a result of the September 16, 2001 meeting, nearly all of the attendees went to Pakistan where they received training from LET on various weapons, including RPGs and machine guns; however, because the United States' invasion of Afghanistan occurred so quickly, none of the attendees entered Afghanistan, none fired any weapons at United States personnel or property, and all returned to the United States and were convicted of various offenses by trial or guilty pleas.

### B. **Procedural History**

On September 23, 2004, a federal grand jury returned a six-count Indictment against Al-Timimi. On February 3, 2005, a Superseding Indictment was returned, which charged Al-Timimi with the following 10 counts:

> Count 1: Counseling and inducing a conspiracy to use firearms during, in relation to, and in furtherance of crimes of violence, in violation of 18

U.S.C. §§ 924(o)[3] and 2.

<u>Count 2</u>: Solicitation to levy war against the United States, in violation of 18 U.S.C. §§ 2381 and 373.

<u>Count 3</u>: Counseling and inducing a conspiracy to levy war against the United States, in violation of 18 U.S.C. §§ 2384 and 2.

<u>Count 4</u>: Attempting to contribute services to the Taliban, in violation of 50 U.S.C. § 1705.

<u>Count 5</u>: Counseling and inducing an attempt to aid the Taliban, in violation of 50 U.S.C. §§ 1705 and 2.

<u>Count 6</u>: Counseling and inducing a conspiracy to violate the Neutrality Act, in violation of 18 U.S.C. §§ 371 and 2.

<u>Counts 7 and 8</u>: Inducing others to use firearms during, in relation to, and in furtherance of crimes of violence, in violation of 18 U.S.C. §§ 924(c) and 2.

<u>Counts 9 and 10</u>: Inducing others to carry explosives during the commission of federal felonies, in violation of 18 U.S.C. §§ 844(h)(2) and 2.

<u>See</u> [Dkt. No. 47].

As relevant here, Count 1 specifically charged Al-Timimi with "unlawfully and knowingly aid[ing], abet[ting], counsel[ing], and induc[ing] Masoud Khan, Randall Royer, Yong Kwon, Muhammad Aatique, Khwaja Hasan, Donald Surratt, and others . . . to combine, conspire, confederate, and agree together and with others . . . to use, carry, possess, and discharge firearms during, in relation to, and in furtherance of crimes of violence." <u>Id.</u> at 4. Counts 7 and 8 charged Al-Timimi with "unlawfully and knowingly aid[ing], abet[ting], counsel[ing], induc[ing], and

---

[3] Due to a typographical error, Count 1 of the Superseding Indictment cites 18 U.S.C. § 924(n), which covers the unrelated offense of traveling across state lines to illegally obtain firearms, as its underlying offense instead of § 924(o). This citation error carried over into trial, and as a result, the Court's Judgment contains the same citation mistake, <u>see</u> [Dkt. No. 449] at 2 n.1; however, the Superseding Indictment and all trial documents use the correct language of § 924(o) when referring to Count 1.

procur[ing] . . . the discharge of firearms . . . by Khwaja Hasan and Yong Kwon in Pakistan during, in relation to, and in furtherance of crimes of violence . . . including the conspiracy alleged in Count 1." Id. at 15.

The Superseding Indictment did not allege the particular crimes of violence on which Counts 1, 7, and 8 were predicated; however, in its response to Al-Timimi's Motion for a Bill of Particulars as to the original Indictment, the government had "give[n] notice" of "the . . . crimes of violence for which Al-Timimi and those he induced to act may be prosecuted." [Dkt. No. 23] at 6. Specifically, the government identified the following offenses in response to defendant's Motion for a Bill of Particulars:

a. Enlisting and entering oneself or another to go beyond the jurisdiction of the United States with intent to be enlisted and entered in the service of any foreign prince, state, colony, district, and people as a soldier—and conspiring to do so— in violation of [18 U.S.C. §§ 371, 959];

b. Beginning, providing for, preparing a means for, and taking part in military expeditions and enterprises to be carried on from the United States against the territory and dominion of foreign states, districts and people with whom the United States was at peace, in violation of [18 U.S.C. § 960];

c. Conspiring to commit at any place outside the United States acts that would constitute the offense of murder or maiming if committed in the special maritime and territorial jurisdiction of the United States, in violation of [18 U.S.C. § 956(a)];

d. Conspiring to damage or destroy specific property situated within a foreign country and belonging to a foreign government or to any political subdivision thereof with which the United States is at peace, and any railroad, canal, bridge, airport, airfield and other public utility, public conveyance, and public structure and any religious educational and cultural property so situated, in violation of [18 U.S.C. § 956(b)];

  e.  Attempting and conspiring to provide material support and resources, knowing or intending that they are to be used in preparation for, or in carrying out a violation of [18 U.S.C. § 956], in violation of [18 U.S.C. § 2339A];

  f.  Attempting and conspiring to supply services to the Taliban, to the territory of Afghanistan controlled by the Taliban, and to persons whose property and interests in property were blocked pursuant to [31 C.F.R. § 545.201], in violation of [50 U.S.C. § 1705];

  g.  Attempting and conspiring to provide material support and resources to foreign terrorist organizations, in violation of [18 U.S.C. § 2339B];

  h.  Levying war against the United States in violation of [18 U.S.C. § 2381]; and

  i.  Enlisting and engaging with intent to serve in armed hostility against the United States – and conspiring to do so – in violation of [18 U.S.C. §§ 371, 2390].

Id. at 7–8. After the Superseding Indictment was returned, defense counsel did not file a renewed motion for a Bill of Particulars, and the government did not amend the list of predicate offenses, which were referenced throughout the proceeding against Al-Timimi.

After the charging conference in which defense counsel objected to many of the predicate offenses included for the jury's consideration, the Court gave the following instruction to the jury:

Instruction 44 is going to define for you various offenses that constitute crimes of violence . . . and these are technical terms that are used in the statute, so you do need to know them.

The following offenses constitute crimes of violence for purposes of Count 1 of the indictment as well as for Counts 7 and 8 of the indictment . . .

A. Levying war against the United States and conspiring to do so, in violation of [18 U.S.C. §§ 2381, 2384];

B. Attempting and conspiring to supply services to the Taliban, in violation of [50 U.S.C. § 1705];

8

C. Beginning, providing for, preparing a means for, and taking part in military expeditions and enterprises to be carried on from the United States against the territory and dominion of foreign states, districts, and peoples with whom the United States was at peace—and conspiring to do so—in violation of [18 U.S.C. §§ 371, 960];

D. Enlisting and entering oneself or another to go beyond the jurisdiction of the United States with intent to be enlisted and entered in the service of any foreign prince, state, colony, district, and people as a solider—and conspiring to do so—in violation of [18 U.S.C. §§ 371, 959];

E. Conspiring to commit at any place outside the United States acts that would constitute the offense of murder or maiming if committed in the special maritime and territorial jurisdiction of the United States, in violation of [18 U.S.C. § 956(a)];

F. Conspiring to damage or destroy specific property situated within a foreign country and belonging to a foreign government or to any political subdivision thereof with which the United States is at peace, and any railroad, canal, bridge, airport, airfield, and other public utility, public conveyance, and public structure and any religious, educational, and cultural property so situated, in violation of [18 U.S.C. § 956(b)];

G. Attempting and conspiring to provide material support and resources, knowing or intending that they are to be used in preparation for or in carrying out a violation of Section 956 of Title 18, United States Code, in violation of [18 U.S.C. § 2339(a)];

H. Attempting and conspiring to provide material support and resources to Al-Qaeda, in violation of [18 U.S.C. § 2339(b)]; and

I. Enlisting and engaging with intent to serve in armed hostility against the United States—and conspiring to do so—in violation of [18 U.S.C. §§ 371, 2390].

Now, Counts 1, 7, and 8 include an element referring to crimes of violence . . . . To find this element, the jury must be unanimous as to which of the nine crimes was involved. And the nine enumerated crimes are the ones that you have listed there in Instruction 44. The jury may unanimously find more than one crime of violence . . . ; however, to satisfy that element, the jury must unanimously find at least one such crime for each count.

9

[Dkt. 455-1] at 2317–20. The jury was not given any further definition of the offenses listed in Instruction No. 44 in connection with Counts 1, 7, and 8.

On April 26, 2005, the jury returned guilty verdicts on all 10 counts. [Dkt. No. 107]. After the verdicts, a bench conference was held, during which both the government and defense counsel agreed that the Court did not need to ask the jury to identify the particular crime or crimes of violence on which it had based its verdicts.[4]  [Dkt. No. 433-3] at 2412.

Following the guilty verdicts, Al-Timimi moved for judgment of acquittal on all counts [Dkt. No. 118]. At his July 13, 2005 sentencing hearing, Al-Timimi's motion for judgment of acquittal was denied, and he was sentenced to life imprisonment, consisting of the following:

> Counts 1–3: 121 months' imprisonment, to run concurrently to each other.
>
> Counts 4 and 5: 120 months' imprisonment, to run concurrently with the sentences on Counts 1–3.
>
> Count 6: 60 months' imprisonment, to run concurrently with the sentences on Counts 1–5.
>
> Count 7: 360 months' imprisonment, to run consecutively to the sentences on Counts 1–6.
>
> Count 8: life imprisonment.
>
> Count 9: 120 months' imprisonment, to run consecutively to the

---

[4] Although this case presents a stark issue of verdict indeterminacy given that a special verdict form was not used to ascertain which crime(s) of violence the jury found, the parties agree that such indeterminacy does not automatically necessitate a judgment of acquittal. Typically, "when a general verdict on a single criminal charge rests on two alternative theories of prosecution, one valid and the other invalid, the verdict should be set aside if it is 'impossible to tell which [theory] the jury selected;'" however, "an alternative-theory error is nevertheless subject to harmless error review." Bereano v. United States, 706 F.3d 568, 577 (4th Cir. 2013) (citation omitted). "Accordingly, a reviewing court is not entitled to reverse a conviction that could rest on either a valid or invalid legal theory" if it "can conclude 'beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" United States v. Jefferson, 674 F.3d 332, 361 (4th Cir. 2012) (citation omitted).

sentences on Counts 1–8.

Count 10: 240 months' imprisonment, to run consecutively to the sentences on Counts 1–9.

[Dkt. No. 132].  Two days later, Al-Timimi filed a notice of appeal as to the Judgment.  [Dkt. No. 133].

Due to several procedural hurdles, Al-Timimi's direct appeal has not been resolved. While his appeal was pending, public reports revealed the existence of previously undisclosed government surveillance programs.  In light of these reports, Al-Timimi asked the Fourth Circuit to remand his case for further proceedings, arguing that the government failed to disclose material communications obtained through such programs.  On April 25, 2006, the Fourth Circuit granted Al-Timimi's motion and remanded the case with instructions to "consider upon remand [the] issues raised by [defendant] and order whatever relief or changes in the case, if any, that [the Court] considers appropriate."  [Dkt. No. 164].

Over the next eight years, which included further revelations about the government surveillance programs at issue, Al-Timimi filed a series of motions seeking the disclosure of any of his communications that the government had obtained through the previously undisclosed surveillance programs, as well as other related documents.  The Court resolved these motions in April and May of 2014.  [Dkt. Nos. 349, 357].  The delay in their resolution was largely due to the government's refusal to clear any of the Court's staff for access to certain classified materials.

On June 4, 2014, Al-Timimi filed a notice of appeal as to the May 2014 Order, and the case returned to the Fourth Circuit.  [Dkt. No. 358].  While that appeal was pending, defendant's counsel obtained what he believed to be a previously undisclosed FBI document regarding the government's prior investigation of Al-Timimi.  In light of this revelation, Al-Timimi asked the

11

Fourth Circuit to again remand his case for further proceedings, arguing that the government failed to disclose this document before trial. On August 4, 2015, the Fourth Circuit granted Al-Timimi's motion and remanded the case "for further proceedings" but kept his appeal on its active docket and ordered that the parties file monthly status reports. [Dkt. No. 406]. Al-Timimi subsequently filed the Motion to Compel that is a subject of this Memorandum Opinion. [Dkt. No. 417].

On July 8, 2016, Al-Timimi asked the Fourth Circuit to expand its remand order in light of the Supreme Court's decision in Johnson v. United States, 576 U.S. 591 (2015), in which the Supreme Court held that the "residual clause" of 18 U.S.C. § 924(e)(2)(B) was unconstitutionally vague. Al-Timimi argued that the holding in Johnson should invalidate his convictions for Counts 7 and 8, which charged violations of 18 U.S.C. § 924(c). On July 24, 2016, the Fourth Circuit granted Al-Timimi's motion and instructed the Court to "reconsider [his] § 924(c) convictions in light of Johnson." [Dkt. No. 431]. Al-Timimi subsequently filed his pending Motions for Acquittal and Motion for Leave. [Dkt. Nos. 432, 445, 460].

On August 18, 2020, Al-Timimi was granted release from custody pending his appeal pursuant to 18 U.S.C. § 3145(c).[5] [Dkt. No. 520]. At the time of his release, Al-Timimi had served 180 months in prison, thereby satisfying the sentences imposed on Counts 1–6, and was

---

[5] The Court granted Al-Timimi's Motion for Release from Custody Pending Appeal because he successfully demonstrated that he was not likely to flee or pose a danger to others; his appeal raised a substantial question of law or fact likely to result in reversal, a new trial, or a sentence less than time served plus the expected duration of the appeal process; and there were exceptional reasons why his continued detention was not appropriate, namely, the risk of contracting severe illness from COVID-19. [Dkt. No. 519]. Multiple restrictions were imposed to ensure that Al-Timimi did not abscond or pose a risk to the health or safety of others, including home confinement with GPS monitoring and several limitations on his ability to communicate with others.

serving the sentence imposed on Count 7.  He had not started serving the sentences imposed on

Counts 8–10.  [Dkt. No. 519].

II

### A. <u>Motion to Compel</u>

In his Motion to Compel, Al-Timimi claims that the government violated its discovery

obligations under Fed. R. Crim. P. 16 and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), by failing to

provide defense counsel with two unredacted documents from the National Archives and Record

Administration ("NARA"): a document describing FBI Squad IT-3's involvement in terrorism

investigations and a 9/11 Commission memorandum detailing an interview with FBI Special

Agent Ammerman ("SA Ammerman") who was one of the case agents involved in the

investigation of defendant.  [Dkt. No. 418] at 1–2.  Al-Timimi argues that both unredacted

documents constitute <u>Brady</u> material, in that they corroborate his defense by undercutting

evidence of his intent to encourage acts of aggression against the United States.  Al-Timimi also

argues that these documents are inconsistent with SA Ammerman's trial testimony in which he

stated that he first began investigating Al-Timimi in 2003.

Under <u>Brady</u>, a prosecutor violates a defendant's right to due process if he or she fails to

provide evidence favorable to the defendant upon his request "where the evidence is material

either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

373 U.S. at 87.  A <u>Brady</u> violation has three components: (1) the evidence must be favorable to

the defendant; (2) the evidence must have been suppressed by the government; and (3) the

evidence must be material to the guilt or innocence of the defendant.  <u>See</u> <u>id.</u>; <u>see also</u> <u>United</u>

<u>States v. McLean</u>, 715 F.3d 129, 142 (4th Cir. 2013).  Evidence is considered "favorable" if it is

exculpatory, <u>Brady</u>, 373 U.S. at 87, or if it is impeaching, <u>Giglio v. United States</u>, 405 U.S. 150,

154–55 (1972).  Evidence is considered "material" if there is "a reasonable probability that [its]

13

disclosure . . . would have produced a different outcome" at trial. McLean, 715 F.3d at 142

(citing Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

Defendant's Motion to Compel also invokes Fed. R. Crim. P. 16, which requires the

government to make available for inspection "item[s] . . . material to preparing the defense" if

such items are "within the government's possession, custody, or control." Similar to the

requirements under Brady, the items sought by the defendant must be "material." In this context,

the defendant must establish a "strong indication" that the evidence would have "play[ed] an

important role in uncovering admissible evidence . . . corroborating testimony, or assisting

impeachment or rebuttal." United States v. Caro, 597 F.3d 608, 621 (4th Cir. 2010).

Although the Supreme Court in Rovario v. United States, 353 U.S. 53 (1957), recognized

a general governmental privilege to withhold discovery that could reveal legal methods and

sources, such as surveillance techniques, that privilege "give[s] way" where disclosure would be

"relevant and helpful to the defense of an accused," or would be "essential to a fair determination

of a cause." Id. at 60–61.

Given the extensive amount of classified and unclassified discovery that was provided in

this case, both the Court and the prosecution failed to realize that the government had provided

the unredacted Squad IT-3 document to the Court in February 2007 as attachment 10 to the

government's ex parte and under seal classified filing regarding documents from the NARA

Database [Dkt. No. 212], and the unredacted SA Ammerman memorandum was attachment 32 to

that same pleading. As the government correctly responds, the Court reviewed those two

documents in camera and determined that they did not have to be disclosed to defense counsel as

they did not contain information that constituted Brady material and were not otherwise relevant

to defendant's theory of defense. [Dkt. No. 231]. Indeed, allowing defense counsel access to the

14

unredacted versions of these documents would not only have provided Al-Timimi discovery to which he was not entitled but would also have defeated the protections to national security created by the document classification system that seeks to preserve the integrity of ongoing counterterrorism operations.  Accordingly, because the government did not violate its obligations under either Brady or Rule 16, defendant's Motion to Compel [Dkt. No. 417] will be denied.

### B. Motions for Acquittal

Al-Timimi argues that his § 924 convictions under Counts 1, 7, and 8 must be vacated in light of the Supreme Court's decision in United States v. Davis, 588 U.S. 445 (2019),[6] which held that the residual clause in § 924(c) was unconstitutionally vague.  [Dkt. No. 455] at 1.[7]  In response, the government argues that Al-Timimi's § 924 convictions under Counts 1, 7, and 8 remain valid because they could have been based on multiple predicate offenses, which today would qualify as crimes of violence.  [Dkt. No. 461] at 5–10.  Specifically, the government argues that Counts 1, 7, and 8 could have been predicated on either the crime of conducting an expedition against a friendly nation in violation of 18 U.S.C. § 960 or enlistment to serve against the United States in violation of 18 U.S.C. § 2390, and that Count 1 could also have been predicated on the crime of treason in violation of 18 U.S.C. § 2381.

---

[6] Following the Fourth Circuit's 2016 instruction to the Court to "reconsider [Al-Timimi's] § 924(c) convictions in light of Johnson," [Dkt. No. 431], defendant filed a supplemental memorandum in 2019 explaining that because Davis directly addressed § 924(c) on which Counts 1, 7, and 8 depend, Davis "resolves the pending motions in Al-Timimi's favor." [Dkt. No. 452] at 2.

[7] In addition to challenging his convictions for the § 924(c) violations charged in Counts 7 and 8, Al-Timimi also challenges his § 924(o) conviction charged in Count 1.  Count 1 is within the scope of the Fourth Circuit's remand because § 924(o) incorporates § 924(c).  Specifically, § 924(o) states, "A person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years, fined under this title, or both; and if the firearm is a machine gun or destructive device, or is equipped with a firearm silencer or muffler, shall be imprisoned for any term of years or life."  Therefore, any analysis of § 924(c) necessarily applies equally to § 924(o).

Under Fed. R. Crim. P. 29, a district court may "enter a judgment of acquittal for 'any offense on which the evidence is insufficient to sustain a conviction,'" United States v. Diana Shipping Servs., S.A., 985 F. Supp. 2d 719, 723 (E.D. Va. 2013) (citing Fed. R. Crim. P. 29(a)). This includes situations in which there is no longer any legal basis for the conviction, such as where there has been an intervening change in law. See United States v. Abu Khatallah, 316 F. Supp. 3d 207 (D.D.C. 2018) (considering Rule 29 motion given an intervening change in law). "The question raised by a motion for judgment of acquittal is whether 'as a matter of law the government's evidence is insufficient to establish factual guilt on the charges in the indictment.'" United States v. Montejo, 353 F. Supp. 2d 643, 646 (E.D. Va. 2005) (citation omitted). "It goes without saying that, as a matter of law, the government bears the burden of proving the essential elements of the offense[s] charged beyond a reasonable doubt." Id. "Thus, in reviewing a motion for judgment of acquittal, the court must, 'considering the evidence and all reasonable inferences that can be drawn from it in the light most favorable to the government, determine whether any rational factfinder could have found the essential elements of the crimes charged beyond a reasonable doubt.'" Id. (citation omitted). If a rational factfinder could have so found, the conviction must stand; if not, the verdict must be set aside and a judgment of acquittal entered. See, e.g., United States v. Eychaner, 326 F. Supp. 3d 76, 85 (E.D. Va. 2018).

    1. Crime of Violence—Defined

Federal law criminalizes using or carrying a firearm during and in relation to any "crime of violence." 18 U.S.C. § 924(c)(1)(A). When Al-Timimi was sentenced, a "crime of violence" was defined as a felony offense that:

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (B) that by its nature, involves a substantial risk that physical force
> against the person or property of another may be used in the course
> of committing the offense.

Id. § 924(c)(3); see also United States v. Khan, 309 F. Supp. 2d 789, 823 (E.D. Va. 2004) (citing

§ 924(c)(3)). Courts commonly refer to the first prong of this definition as the "force clause" and

to the second prong of this definition as the "residual clause." See, e.g., United States v. Khweis,

971 F.3d 453, 464 (4th Cir. 2020). In United States v. Davis, 588 U.S. 445 (2019), the Supreme

Court held that the residual clause is unconstitutional. As a result, § 924(c) convictions for using

or carrying a firearm during and in relation to a crime of violence remain valid only if they are

predicated on an offense that qualifies as a crime of violence under the force clause. See, e.g.,

Khweis, 971 F.3d at 456. Because new rules from the Supreme Court "are always fully

retroactive on direct appeal," this major change to § 924's jurisprudence applies to Al Timimi's

convictions for Counts 1, 7, and 8. United States v. Mathur, 685 F.3d 396, 402 (4th Cir. 2012).

      To determine whether an offense qualifies as a crime of violence under the force clause,

courts must apply the categorical approach, which asks "whether the statutory elements of the

[predicate] offense necessarily require the use, attempted use, or threatened use of physical

force." United States v. Simms, 914 F.3d 229, 233 (4th Cir. 2019). Under the categorical

approach, courts "focus on 'the elements of the [] offense rather than the conduct underlying the

conviction,'" and must determine "whether those elements 'necessarily require the use,

attempted use, or threatened use of physical force.'" United States v. Bryant, 949 F.3d 168, 172

(4th Cir. 2020) (citation omitted). "If the 'minimum conduct necessary' to sustain a conviction

under the predicate statute does not require the use, attempted use, of threatened use of force, . . .

then the offense 'is not categorically a crime of violence under the force clause.'" Id. at 172–73

(citation omitted). "In undertaking this inquiry," courts "must ensure that there is a 'realistic

probability,' rather than a 'theoretical possibility,' that the minimum conduct would actually be punished under the statute." Id. at 173 (citation omitted).

2. Instruction Incongruity

This case presents multiple issues of instruction incongruity because nearly all of the predicate crimes of violence in Instruction No. 44 listed both the substantive offense and conspiracy to commit the substantive offense. Al-Timimi argues that because "conspiracy does not require the use, threatened use, or attempted use of force, none [of the listed crimes of violence] are valid force-clause predicates." See [Dkt. No. 459] at 9 (citing Simms, 914 F.3d at 233–34).

Although the parties agree that none of the conspiracy offenses in Instruction No. 44 would, under current law, qualify as a crime of violence under the force clause, the government argues that three of the substantive offenses in Instruction No. 44—expedition against a friendly nation, enlistment to serve against the United States, and treason—qualify as crimes of violence under the force clause.[8] Because substantive offenses and conspiracy offenses are analyzed separately under the categorical approach, Simms, 914 F.3d at 233–34, each of those substantive offenses will be addressed in turn. See United States v. Chandia, 514 F.3d 365, 372 (4th Cir. 2008) (recognizing the "'settled principle' that 'the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses'").

---

[8] In Simms, the Fourth Circuit held that conspiracy to commit Hobbs Act robbery was not a force-clause crime because, similarly to the offenses for conspiracy in this case, "the Government must prove only that the defendant agreed with another to commit actions," which does not require the use, attempted use, or threatened use of physical force. 914 F.3d at 233–34.

### i. Expedition Against a Friendly Nation

Under 18 U.S.C. § 960,

> Whoever, within the United States, knowingly begins or sets on foot or provides or prepares a means for or furnishes the money for, or takes part in, any military or naval expedition or enterprise to be carried on from thence against the territory or dominion of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace, shall be fined under this title or imprisoned not more than three years, or both.

Al-Timimi argues that this offense does not qualify as a crime of violence under the force clause because a person can be convicted of the offense merely by furnishing money or preparing a means for a military or naval expedition against a friendly nation without actually using, attempting to use, or threatening to use physical force. [Dkt. No. 459] at 17. In response, the government argues that a person who furnishes money to, or prepares a means for, a military or naval expedition against a friendly nation "is, by definition, aiding and abetting" a military expedition, and therefore "is himself guilty of participating in" that expedition "under federal principles of accomplice liability." [Dkt. 455] at 14.

Contrary to the government's argument, the Court finds that the offense of expedition against a friendly nation does not qualify as a crime of violence under the force clause because, as the text of § 960 makes clear, a person can commit the offense by furnishing money or preparing a means for a military or naval expedition against a friendly nation, neither of which requires the use, attempted use, or threatened use of physical force. Bryant, 949 F.3d at 172–73 ("If the 'minimum conduct necessary' to sustain a conviction under the predicate statute does not require the use, attempted use, or threatened use of physical force, . . . then the offense 'is not categorically a crime of violence under the force clause.'"). Indeed, although this question has not been addressed by the Fourth Circuit, other federal courts have convicted or upheld

19

convictions for expedition against a friendly nation offenses based on non-violent conduct, such as providing funds for efforts to overthrow allied governments.  See, e.g., United States v. Chhun, 744 F.3d 1110 (9th Cir. 2014) (defendant convicted of expedition against a friendly nation for raising funds and supplies and planning an overthrow); United States v. Ramirez, 765 F.2d 438 (5th Cir. 1985) (defendant convicted of expedition against friendly nation for their thwarted scheme to overthrow the government of Haiti); United States v. Black, 685 F.2d 132 (5th Cir. 1982) (defendants convicted of expedition against a friendly nation for recruitment efforts); United States v. Jack, 2010 WL 4718613 (E.D. Cal. Nov. 12, 2010) (defendants convicted of expedition against a friendly nation for fund-raising activities and procurement of arms); United States v. Chakraberty, 244 F. 287 (S.D.N.Y. 1917) (defendants convicted of expedition against a friendly nation for providing funds); United States v. Tauscher, 233 F. 597 (S.D.N.Y. 1916) (defendants convicted of expedition against a friendly nation for recruitment and furnishment of arms and funds).

The government's claim that "[b]ecause aiders and abettors are 'responsible for the acts of the principles as a matter of law,' and because a military expedition necessarily involves the use or threatened use of force, aiding and abetting such an expedition necessarily makes a defendant liable for using or threatening that same force" is unpersuasive. [Dkt. No. 461] at 6. The logic of this argument is flawed because, as recognized by other federal courts, expedition against a friendly nation can be based on solely non-violent conduct.  The only case the government cites in support of its position, United States v. Dinkins, 928 F.3d 349 (4th Cir. 2019), determined that a defendant's conviction for accessory before the fact to armed robbery under North Carolina common law qualified under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), as a "violent felony." Id. at 358.  The Fourth Circuit based its holding on the

20

fact that "a completed act of armed robbery is an element of the offense of being an accessory

before the fact [to] armed robbery under North Carolina law," and that the court "previously

ha[d] held that the offense of North Carolina armed robbery is a violent felony under the

ACCA's force clause." Id. at 359. The Fourth Circuit's decision in Dinkins is inapplicable in

this case. As previously discussed, supra at 20, the offense of expedition against a friendly

nation does not qualify as a crime of violence because, unlike armed robbery under North

Carolina law, this offense can be carried out without the use, attempted use, or threatened use of

physical force. Accordingly, the expedition against a friendly nation offense cannot support Al-

Timimi's § 924 convictions.

### ii. Enlistment to Serve Against the United States

Under 18 U.S.C. § 2390, "Whoever enlists or is engaged within the United States or in

any place subject to the jurisdiction thereof, with intent to serve in armed hostility against the

United States, shall be fined under this title or imprisoned not more than three years, or both."

Al-Timimi argues that this offense does not qualify as a crime of violence under the force clause

because a person can enlist to serve against the United States without using, attempting to use, or

threatening to use physical force. [Dkt. No. 459] at 23. Defendant supports this argument by

citing to United States v. Taylor, 596 U.S. 845 (2022), in which the Supreme Court held that

attempted Hobbs Act robbery is not a "crime of violence" for purposes of § 924(c) because it

fails to satisfy the plain text of the force clause, and argues that enlistment to serve against the

United States similarly does not involve "the use, attempted use, or threatened use of force"

required to satisfy the force clause. [Dkt. No. 542] at 1. In its opposition, the government argues

that enlistment to serve against the United States "necessarily involves an attempted use of

physical force—i.e., the specific intent to engage in 'armed hostilities,' plus a substantial step in furtherance of that goal (enlisting or engaging for that purpose)." [Dkt. No. 455] at 19.

The offense of enlistment to serve against the United States plainly does not qualify as a crime of violence under the force clause because, as the text of § 2390 makes clear, a person can commit the offense simply by enlisting, which conduct does not require the use, attempted use, or threatened use of physical force. As this Court has previously explained, "The plain language of the statut[ory] [phrase] 'enlists or is engaged' is not limited to formal enrollment in an enemy military force, [and] can reach preparations within the United States for joining an enemy force overseas." Khan, 309 F. Supp. 2d at 819. Indeed, a defendant may be convicted of enlistment to serve against the United States by making basic preparations to serve in armed hostility without taking any steps toward participation in combat. See id. at 819. Because "the only relevant question [under the force clause] is whether the federal felony at issue always requires . . . the use, attempted use, or threated use of force," Taylor, 596 U.S. at 850, enlistment to serve against the United States does not qualify as a "crime of violence" under the force clause.

Moreover, the government's argument is undermined by its acknowledgement that "the line between mere preparation and a substantial [step] [taken] toward the commission of a crime is inherently-fact intensive, and it is not always a clear one." United States v. Pratt, 351 F.3d 131, 136 (4th Cir. 2003); [Dkt. No. 461] at 9. "To determine whether conduct is preparation or an attempt, a court must assess how probable it would have been that the crime would have been committed—at least as perceived by the defendant—had intervening circumstances not occurred." Pratt, 351 F.3d at 136. Given this requisite, fact-intensive assessment, § 2390 cannot be read to categorically require the attempted use of physical force.

### iii. Treason

Under 18 U.S.C. § 2381, "Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason and shall suffer death, or shall be imprisoned not less than five years and fined under this title but not less than $10,000; and shall be incapable of holding any office under the United States." Al-Timimi argues that that this offense does not qualify as a crime of violence under the force clause because a person can adhere to the country's enemies, giving them aid and comfort, without using, attempting to use, or threatening to use physical force. [Dkt. No. 459] at 26. In opposition, the government argues that § 2381 is divisible into two separate offenses—"adher[ing] to the country's enemies, giving them aid and comfort," and "lev[ying] war"—and that Instruction No. 44 confirms that the jury was only permitted to convict Al-Timimi based on the offense of levying war, which does involve the use of physical force.[9] [Dkt. No. 455] at 14.

If § 2381 is considered as a whole, treason does not qualify as a crime of violence under the force clause because, as the text makes clear, a person can violate § 2381 merely by adhering to the enemies of the United States through aiding and comforting the enemies, which does not necessarily require the use, attempted use, or threatened use of physical force. Indeed, numerous

---

[9] The government also argues that Al-Timimi has forfeited his argument that treason does not qualify as a crime of violence under the force clause because he did not argue at trial that Count 2, which charged treason as the predicate offense under a similar force clause in 18 U.S.C. § 373(a), should be dismissed on that basis. The government's position is unpersuasive because forfeiture "is a non-jurisdictional doctrine that calls for flexible application," and its application is not justified here given that Al-Timimi's argument that treason does not qualify as a crime of violence under the force clause does not involve either Count 2 or § 373(a). W.V. Dep't of Health and Human Resources v. Sebelius, 649 F.3d 217, 222 (4th Cir. 2011) (citation omitted). Moreover, neither party could have anticipated the unusual procedural history of this case or how much the legal landscape underlying Al-Timimi's convictions would change.

convictions for treason, either under § 2381 or under the treason clause of the Constitution of the United States on which § 2381 is based, have involved non-forceful conduct, including distributing enemy propaganda and intelligence, interpreting enemy orders, and harboring enemy operatives.  See, e.g., United States v. Provoo, 215 F.2d 531 (2d Cir. 1954) (defendant convicted of treason for radio broadcasting, reporting, and offering services); D'Aquino v. United States, 192 F.2d 338 (9th Cir. 1951) (defendant convicted of treason for working as a radio speaker, announcer, script writer and broadcaster for the Imperial Japanese Government and the Broadcasting Corporation of Japan during World War II); Best v. United States, 184 F. 2d 131 (1st Cir. 1950) (defendant convicted of treason for engaging in radio broadcasting activities in Germany and Austria during World War II); United States v. Haupt, 152 F.2d 771 (7th Cir. 1945) (defendant convicted of treason for harboring and assisting enemy operatives).

The government responds that § 2381, which criminalizes both "lev[ying] war" against the United States and "adher[ing] to the country's enemies, giving them aid and comfort," is divisible, and that the "lev[ying] war" prong qualifies as a crime of violence because it requires the use of force.  Although no court has directly addressed whether the two prongs of § 2381 constitute separate offenses and are thus divisible, this Court finds that both the structure of the statute—namely, the use of "or" between the two statutory phrases—and the significant behavioral differences required by each statutory phrase support divisibility.  See United States v. Allred, 942 F.3d 641, 649–651 (4th Cir. 2019) (explaining that a statute is likely divisible "[w]here the behavior underlying one statutory phrase 'differs so significantly from the behavior underlying' another").

Having found that § 2381 is divisible, the Court also finds that legal precedent supports the conclusion that "levying war" necessarily requires the use of force.  In Ex parte Bollman, 8

U.S. (4 Cranch) 75 (1807), the Supreme Court defined "levying war" as a "body of men []
actually assembled for the purpose of effecting by force a treasonable purpose," id. at 126. In
that decision, the Supreme Court carefully distinguished between conspiracy to levy war and the
act of levying war, the former of which does not require that "war [be] actually levied." Id. at
127. Al-Timimi cites to Ex parte Bollman to support his argument that force is not necessary to
violate the treason statute by quoting a portion of the decision that states, "[T]hose who perform
any part, however, minute, or however remote from the scene of action, and who are actually
leagued in the general conspiracy, are to be considered as traitors." Id. at 126. That quote does
not help Al-Timimi because all it addresses is the "aid and comfort" prong and not the "levying
war" prong of § 2381. Indeed, in Kawakita v. United States, 343 U.S. 717, 739 (1952), the
Supreme Court cited to that precise language in Ex parte Bollman and intimated support for
§ 2381's divisibility by stating that the cited language supports convictions for overt acts that
"plainly g[i]ve aid and comfort to the enemy in the constitutional sense," id. Given the
divisibility of § 2381, the act of "levying war" against the United States, as opposed to
conspiring to levy war or adhering to the country's enemies, requires some use, attempted use, or
threatened use of physical force.

Even though the "lev[ying] war" prong of § 2381 qualifies as a crime of violence, given
that, during the trial, the government provided no evidence that either Al-Timimi or any of the
men he encouraged to fight against American troops in Afghanistan ever traveled to Afghanistan
or engaged in armed conflict of any kind against a United States soldier, no reasonable juror
could have found Al-Timimi guilty of this offense. "The question raised by a motion for
judgment of acquittal is whether 'as a matter of law the government's evidence is insufficient to
establish factual guilt on the charges in the indictment.'" Montejo, 353 F. Supp. at 646. Here, it

is irrefutable that no reasonable jury could have found that either Al-Timimi or any of the men

he advised actually levied war against the United States.

Accordingly, because the offenses of expedition against a friendly nation and enlistment

to serve against the United States do not qualify as predicate offenses to support Al-Timimi's

§ 924 convictions and because there was insufficient evidence to support treason as a predicate

offense, Al-Timimi's Motion for Acquittal on Counts 1, 7 and 8 will be granted, and his § 924

convictions under these Counts will be vacated.

### C. Motion for Leave

In his Motion for Leave, Al-Timimi seeks "leave to file and brief a motion for new trial

on Counts 9 and 10," which he argues "rel[y] on the conspiracy charged in Count 1 that has been

rendered unsustainable in light of Davis." [Dkt. No. 460] at 1.  Although this motion is

unopposed, and the Court has found that Count 1 must be vacated, the leave Al-Timimi seeks is

well outside the scope of the Fourth Circuit's expanded remand order, which only instructed the

Court to "reconsider [his] § 924(c) convictions." [Dkt. No. 431].  Because all of Al-Timimi's

§ 924(c) convictions have been reconsidered and vacated in light of Johnson and its progeny, this

Court's review is complete.  As a result, this case is ready to return to the Fourth Circuit.

### III

For these reasons, by an Order to be issued with this Memorandum Opinion, defendant's

Motion to Compel and Motion for Leave will be denied, his Motions for Acquittal will be

granted, and, as a result of these decisions, defendant's convictions under Counts 1, 7, and 8 will

be vacated.

Entered this 18 day of July, 2024.

/s/ _____
Leonie M. Brinkema
United States District Judge

Alexandria, Virginia